ACCEPTED
15-25-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
10/16/2025 11:54 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-000120-CV

# In the Court of Appeals
## for the Fifteenth District of Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
10/16/2025 11:54:14 AM
CHRISTOPHER A. PRINE
Clerk

## Primexx Energy Opportunity Fund, LP and Primexx Energy Opportunity Fund II, LP,

*Appellants,*

**v.**

## Primexx Energy Corporation, *et al.*,

*Appellees.*

---

### Appeal from the Texas Business Court, First Division
Dallas County, Texas
Honorable Bill Whitehill

---

## APPELLANTS' BRIEF

## ORAL ARGUMENT REQUESTED

---

## SUSMAN GODFREY L.L.P.

Stephen Shackelford, Jr.
State Bar No. 24062998 (TX)
sshackelford@susmangodfrey.com
1000 Louisiana Street, Ste 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Bryan Caforio
bcaforio@susmangodfrey.com
Lindsey Godfrey Eccles
leccles@susmangodfrey.com
Sarah Hannigan
shannigan@susmangodfrey.com

*Attorneys for Appellants*

# Table of Contents

**STATEMENT OF THE CASE**......................................................................1

**STATEMENT REGARDING ORAL ARGUMENT** ...........................2

**ISSUES PRESENTED**...............................................................................2

**STATEMENT OF FACTS** .......................................................................4

    I.    APPELLANTS ALLEGE THAT BLACKSTONE SOLD PRIMEXX IN BAD FAITH IN VIOLATION OF THE PARTNERSHIP AGREEMENT. .................4

    II.    PLAINTIFFS BEGAN SEEKING RECOURSE IN TEXAS COURTS IN 2022.    7

    III.    THE BUSINESS COURT GRANTED SUMMARY JUDGMENT AND REJECTED APPELLANTS' REQUEST TO CONDUCT DISCOVERY AFTER PEC AND BPP EXPRESSLY WAIVED RELIANCE ON ANY FACTS. ........................9

    IV.    THE BUSINESS COURT DISMISSED THE MAJORITY OF DEFENDANTS ON *SUA SPONTE* MOTIONS TO DISMISS.............................16

    V.    THE BUSINESS COURT GRANTED BLACKSTONE'S AND ANGELO ACCONCIA'S SPECIAL APPEARANCES. ....................................................17

    VI.    PLAINTIFFS APPEALED THE FINAL JUDGMENT......................19

**SUMMARY OF THE ARGUMENT** ......................................................20

**ARGUMENT** .........................................................................................26

    I.    EXTENSIVE FACTUAL ISSUES PRECLUDE PRE-DISCOVERY SUMMARY JUDGMENT. ..............................................................................26

        *A.    Appellees must introduce sufficient facts to establish as a matter of law that they acted according to the "Agreed Duties" of "good faith and fair dealing" when liquidating Primexx to satisfy Blackstone's ESG priorities.*........................................................27

*B. The Business Court erred in denying Appellants' request to conduct discovery and granting summary judgment when Appellees waived all reliance on any facts.* ...................................... 32

*C. The Business Court erred in relying on Texas Beef to find that Appellees necessarily act in good faith when acting pursuant to any other purported contractual right.* ........................................... 35

*D. The drag-along provision does not modify the § 152.002 "obligation of good faith," and the contractual "Agreed Duties" of "good faith and fair dealing" create an independent separate duty.* 38

1. The procedural requirements in the drag-along provision are not standards by which to measure good faith. ...... 39
2. Any modification to the minimum *statutory* obligation of good faith does not impact the separate and independent *contractual* "Agreed Duties." ....................................................... 43

*E. Section 152.002 prevents the Partnership Agreement from entirely eliminating the duties of loyalty and care.* ......................... 43

II. AT A MINIMUM, THE PARTNERSHIP AGREEMENT IS AMBIGUOUS—WHICH ITSELF PRECLUDES SUMMARY JUDGMENT AND MANDATES REVERSAL. ....................................................................... 46

III. APPELLANTS PROPERLY STATE CLAIMS AGAINST BLACKSTONE, THE BLACKSTONE ENTITIES, AND DOYLE. ........................ 48

*A. Blackstone and the Blackstone Entities owe fiduciary duties to Appellants based on their control of PEC and BPP.* .......... 50

*B. Blackstone and the Blackstone Entities are alter egos of BPP and therefore liable for both breach of fiduciary duty and breach of contract on that basis.* ..................................................... 56

*C. Appellants state derivative claims against Blackstone and the Blackstone Entities.* ............................................................ 62

D.    Section 13.9 of the Partnership Agreement does not compel dismissal of any claims. ....................................................... 64

IV.    ACCONCIA AND BLACKSTONE ARE SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN TEXAS. ..................................................... 67

A.    Acconcia, President of BPP and Director on the PEC Board, personally traveled to Texas and continuously directed and solicited Texas residents regarding the Primexx investment and Callon Sale in Texas. .................................................................... 68

B.    Blackstone controlled and managed, and directed the sale of, the Texas oil assets of a Texas partnership to profit. ............ 73

**PRAYER FOR RELIEF** ................................................................... 77

# Index of Authorities

**Page(s)**

**Cases**

*Allen v. Devon Energy Holdings, L.L.C.,*
367 S.W.3d 355 (Tex. App.—Houston [1st Dist.] 2012, no
pet.) ................................................................................................ 55, 56

*American Star Energy and Minerals Corp. v. Stowers,*
457 S.W.3d 427 (Tex. 2015) .................................................................. 37

*Ballantyne v. Champion Builders, Inc.,*
144 S.W.3d 417 (Tex. 2004) .................................................................. 36

*Belliveau v. Barco, Inc.,*
987 F.3d 122 (5th Cir. 2021).................................................................. 62

*BMC Software Belgium, N.V. v. Marchand,*
83 S.W.3d 789 (Tex. 2002) .................................................................... 68

*Bohatch v. Butler & Binion,*
977 S.W.2d 543 (Tex. 1998) .................................................................. 45

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985)......................................................................... 71, 75

*Carlile Bancshares, Inc. v. Armstrong,*
No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort
Worth Aug. 7, 2014, no pet.)................................................................. 71

*Castleberry v. Branscum,*
721 S.W.2d 270 (Tex. 1986) .................................................................. 57

*CBIF Ltd. P'ship v. TGI Friday's Inc.,*
No. 05-15-00157-CV, 2017 WL 1455407 (Tex. App.—
Dallas Apr. 21, 2017, pet. denied) .................................................. 52, 54

*Chien v. Chen,*
759 S.W.2d 484 (Tex. App.—Austin 1988, no writ) .......................... 45

*Coleman v. Klockner & Co. AG,*
   180 S.W.3d 577 (Tex. App.—Houston [14th Dist.] 2005, no
   pet.) .......................................................................................... 74

*ConocoPhillips Co. v. Koopmann,*
   547 S.W.3d 858 (Tex. 2018) ........................................................ 47

*Cook v. Brundidge, Fountain, Elliott & Churchill,*
   533 S.W.2d 751 (Tex. 1976) ........................................................ 34

*Dalton v. Innov8tive Nutrition, Inc.,*
   No. 3:24-CV-00687-N, 2025 WL 391737 (N.D. Tex. Feb. 4,
   2025) ..................................................................................... 57, 58

*Darnell v. Rogers,*
   588 S.W.3d 295 (Tex. App.—El Paso 2019, no pet.) ........................ 50

*El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.,*
   8 S.W.3d 309 (Tex. 1999) ............................................................ 37

*English v. Fischer,*
   660 S.W.2d 521 (Tex. 1983) ........................................................ 38

*Exxon Corp. v. Atl. Richfield Co.,*
   678 S.W.2d 944 (Tex. 1984) ........................................................ 38

*First United Pentecostal Church of Beaumont v. Parker,*
   514 S.W.3d 214 (Tex. 2017) ........................................................ 64

*Fjell Tech. Grp. v. Unitech Int'l Inc.,*
   No. 14-14-00255-CV, 2015 WL 457805 (Tex. App.—
   Houston [14th Dist. Feb. 3, 2015, pet. denied) ............................... 75

*Flores v. Bank of Am., N.A.,*
   697 S.W.3d 243 (Tex. App.—El Paso 2023, no pet.) ........................ 50

*Henkel v. Emjo Investments, Ltd.,*
   480 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2015, no
   pet.) .......................................................................................... 71

*Hoggett v. Brown,*
  971 S.W.2d 472 (Tex. App.—Houston [14th Dist.] 1997,
  pet. denied)....................................................................................55

*Hong v. Havey,*
  551 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2018, no
  pet.) ..................................................................................................63

*Houle v. Casillas,*
  594 S.W.3d 524 (Tex. App.—El Paso 2019, no pet.).....................31, 45

*Huynh v. Nguyen,*
  180 S.W.3d 608 (Tex. App.—Houston [14th Dist.] 2005, no
  pet.) ..................................................................................................74

*Immobiliere Jeuness Establissement v. Amegy Bank Nat'l*
  *Ass'n,* 525 S.W.3d 875 (Tex. App.—Houston [14th Dist.]
  2017, no pet.)....................................................................................64

*In re Facebook, Inc.,*
  625 S.W.3d 80 (Tex. 2021) ................................................................50

*In re Harwood,*
  637 F.3d 615 (5th Cir. 2011)............................................................51

*In re Whittington,*
  530 B.R. 360 (Bankr. W.D. Tex. 2014) ............................................52

*Janvey v. GMAG, L.L.C.,*
  592 S.W.3d 125 (Tex. 2019) ..............................................31, 41, 42

*JNM Express, LLC v. Lozano,*
  688 S.W.3d 327 (Tex. 2024) ..............................................57, 60, 61

*John Masek Corp. v. Davis,*
  848 S.W.2d 170 (Tex. App.—Houston [1st Dist.] 1992, writ
  denied)..............................................................................................38

*Katy Venture, Ltd. v. Cremona Bistro Corp.,*
  469 S.W.3d 160 (Tex. 2015) ..............................................................27

*Keyes v. Weller,*
    692 S.W.3d 274 (Tex. 2024) ...................................................................... 63

*Kinzbach Tool Co. v. Corbett-Wallace Corp.,*
    138 Tex. 565 (Tex. 1942) ......................................................................... 64

*Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,*
    925 S.W.2d 565 (Tex. 1996) .................................................................... 30

*Lucas v. Tex. Indus., Inc.,*
    696 S.W.2d 372 (Tex. 1984) .................................................................... 61

*M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.,*
    *Inc.,* 512 S.W.3d 878 (Tex. 2017) ........................................... 68, 72, 77

*Matter of Bennett,*
    989 F.2d 779 (5th Cir. 1993) ................................................................... 51

*McBeth v. Carpenter,*
    565 F.3d 171 (5th Cir. 2009) ............................................................. 51, 54

*MCI Telecommunications Corp. v. Tex. Utilities Elec. Co.,*
    995 S.W.2d 647 (Tex. 1999) .............................................................. 66, 67

*McLeod v. McLeod,*
    644 S.W.3d 792 (Tex. App.—Eastland 2022, no pet.) ........................ 60

*Moncrief Oil Intern. Inc. v. OAO Gazprom,*
    414 S.W.3d 142, 154 (Tex. 2013) ........................................... 73, 75, 77

*Morgan Buildings & Spas, Inc. v. Turn-Key Leasing, Ltd.,*
    97 S.W.3d 871 (Tex. App.—Dallas 2003, pet. denied) ................. 43, 46

*Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC,*
    639 S.W.3d 682 (Tex. 2022) .................................................................... 47

*Old Republic Nat'l Title Ins. Co. v. Bell,*
    549 S.W.3d 550 (Tex. 2018) .................................................................... 68

*Point Energy Partners Permian, LLC v. MRC Permian Co.,*
    669 S.W.3d 796 (Tex. 2023) .................................................................... 49

*Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*,
29 S.W.3d 74 (Tex. 2000) .................................................... 37

*R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*,
482 S.W.3d 559 (Tex. 2016) ........................................ 31, 42

*Retamco Operating, Inc. v. Republic Drilling Co.*,
278 S.W.3d 333 (Tex. 2009) ................................. 69, 71, 72

*Rhone-Poulenc, Inc. v. Steel*,
997 S.W.2d 217 (Tex. 1999) ............................................ 27

*Rosetta Res. Operating, LP v. Martin*,
645 S.W.3d 212 (Tex. 2022) ............................................ 49

*RPC, Inc. v. CTMI, LLC*,
606 S.W.3d 469 (Tex. App.—Fort Worth 2020, pet. denied) .............. 47

*Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*,
601 S.W.3d 904 (Tex. App.—Houston [14th Dist.] 2019, no
pet.) ....................................................................... 46

*Spethmann v. Anderson*
171 S.W.3d 680 (Tex. App.—Dallas 2005, no pet.) ............... 15, 30, 37

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
275 S.W.3d 444 (Tex. 2008) ............................................ 61

*Texas Beef Cattle Co. v. Green*,
921 S.W.2d 203 (Tex. 1996) ...................................... *passim*

*Tilton v. Marshall*,
925 S.W.2d 672 (Tex. 1996) ............................................ 64

*Tryco Enters., Inc. v. Robinson*,
390 S.W.3d 497 (Tex. App. — Houston [1st Dist.] 2012,
*pet. dism'd*) ................................................ 58, 59, 60, 62

*Vejara v. Levior Intern., LLC*,
No. 04-11-00595-CV, 2012 WL 5354681 (Tex. App.—San
Antonio Oct. 31, 2012, pet. denied) .................................. 55

*Walker Ins. Services v. Bottle Rock Power Corp.*,
   108 S.W.3d 538 (Tex. App.—Houston [14th Dist.] 2003, no
   pet.) ....................................................................................... 68

*Wilson v. Davis*,
   305 S.W.3d 57 (Tex. App.—Houston [1st Dist.] 2009, no
   pet.) ....................................................................................... 61

*Wren v. Midwestern State Univ.*,
   No. 05-22-00207-CV, 2023 WL 6139452 (Tex. App.—
   Dallas Sept. 20, 2023, no pet.) .......................................... 60

*Yujie Ren v. ANU Res., LLC*,
   502 S.W.3d 840 (Tex. App.—Houston [14th Dist.] 2016, no
   pet.) ....................................................................................... 71

## Statutes

Tex. Bus. Org. Code § 152.002 ...................................................... *passim*

Tex. Bus. Org. Code § 152.204 ............................................................. 41

Tex. Bus. Org. Code § 152.205 ............................................................. 45

Tex. Bus. Org. Code § 152.206 ............................................................. 46

Tex. Bus. Org. Code § 21.223 ................................................... 61, 62, 63

## Rules

Tex. R. Civ. P. 91a.1 ...................................................................... *passim*

Tex. R. Civ. P. 166a ........................................................................ *passim*

# Index of Parties and Counsel

| | |
|---|---|
| Appellants Primexx Energy Opportunity Fund, LP and Primexx Energy Fund II, LP | Stephen Shackelford Jr. SUSMAN GODFREY LLP<br><br>State Bar No. 24062998<br>sshackelford@susmangodfrey.com<br>1000 Louisiana Street, Suite 5100<br>Houston, Texas 77002<br>Telephone: (713) 651-9366 |
| Appellee Christopher M. Doyle | Roger B. Cowie TROUTMAN PEPPER LOCKE LLP<br><br>State Bar No. 00783886<br>roger.cowie@troutman.com<br>2200 Ross Avenue, Suite 2800<br>Dallas, Texas 75201<br>Telephone: (214) 740-8000 |
| Appellee Primexx Energy Corporation | Jeremy A. Fielding, P.C. KIRKLAND & ELLIS LLP<br><br>State Bar No. 24040895<br>jeremy.fielding@kirkland.com<br>4550 Travis Street<br>Dallas, Texas 75205<br>Telephone: (214) 972-1770 |
| Appellees Blackstone Inc., Angelo Acconcia, Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Energy Partners II LP, Blackstone Management Associates VII LLC, Blackstone Capital Partners VII LP, BCP VII/BEP II Holdings Manager LLC, and BX Primexx Topco LLC | Christopher W. Patton LYNN PINKER HURST & SCHWEGMANN, LLP<br><br>State Bar No. 24083634<br>cschwegmann@lynnllp.com<br>2100 Ross Avenue, Suite 2700<br>Dallas, Texas 75201<br>Telephone: (214) 981-3000 |

# Index of Appendices

| | |
|---|---|
| Appendix 1 | Trial Court's Final Judgment |
| Appendix 2 | Trial Court's Opinion and Order Partially Granting Summary Judgment |
| Appendix 3 | Excerpts from Partnership Agreement |
| Appendix 4 | Trial Court's Opinion and Order Denying Motion for Reconsideration |
| Appendix 5 | Trial Court's Opinion and Order Granting Special Appearances |
| Appendix 6 | Trial Court's Opinion and Order Dismissing Blackstone Defendants |
| Appendix 7 | Trial Court's Opinion and Order Dismissing Doyle and Blackstone Defendants |
| Appendix 8 | Third Amended and Restated Limited Partnership Agreement of Primexx Energy Partners, Ltd. |
| Appendix 9 | Supplemental Record of Oppositions to Acconcia and Blackstone Inc. Special Appearances |
| Appendix 10 | Statutes and Key Cases |

## STATEMENT OF THE CASE

Plaintiffs-Appellants are two minority investors in Primexx, a Texas oil partnership that Defendants-Appellees allegedly sold by violating their contractual and statutory duties of good faith and fair dealing and statutory duties of loyalty and care. CR5752–53. Appellants sue for damages. CR5824.

The Business Court entered Final Judgment on June 16, 2025. CR6126. First, the court granted pre-discovery summary judgment to M. Christopher Doyle, Primexx Energy Corporation ("PEC"), and BPP HoldCo LLC ("BPP"). CR6128. Second, the court *sua sponte* dismissed, under a motion to dismiss standard, all causes of action against M. Christopher Doyle and the Blackstone Entities.[1] *Id.* Third, the court granted the special appearances of Blackstone Inc. ("Blackstone") and Angelo Acconcia. *Id.* Appellants appeal the Final Judgment in its entirety.

---

[1] The "Blackstone Entities" are Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Energy Partners II LP, Blackstone Management Associates VII LLC, Blackstone Capital Partners VII LP, BCP VII/BEP II Holdings Manager LLC, and BX Primexx Topco LLC.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. Resolving this appeal will involve applying partnership law and the Texas Business Organizations Code to issues including contractual interpretation, contractual waivers of statutory rights, and contractual ambiguity. The Court's resolution will also involve an analysis of the standards articulated in Tex. R. Civ. P. 166a, Tex. R. Civ. P. 91a.1, and Texas law on specific personal jurisdiction. As the Business Court observed in a status conference on January 17, 2025, "there are a number of issues in this case that I think are questions of first impression." RR Vol. 3 at 26. Appellants believe that oral argument will assist the Court in resolving the complex questions presented.

## ISSUES PRESENTED

1. Can a partner establish in a pre-discovery motion under Tex. R. Civ. P. 166a that there is no genuine issue as to any material fact of whether it satisfied a contractual obligation that all partners abide by the "Agreed Duties" of "good faith and fair dealing" if that partner presents *no evidence* in its motion?

2. Is the Business Court's grant of summary judgment, when PEC, BPP, and Doyle waived all reliance on *any facts*, irreconcilable with Tex. R. Civ. P. 166a and the court's finding that the summary judgment movants owed the duties of good faith and fair dealing?

2

3. Does Tex. Bus. Org. Code § 152.002, which prohibits partners from eliminating the obligation of good faith, the duty of loyalty, and the duty of care, preclude the Business Court's finding that the drag-along provision permitted Appellees' conduct?

4. Does the drag-along provision in the Partnership Agreement include, pursuant to Tex. Bus. Org. Code § 152.002(b)(4), "standards by which the performance of the obligation [of good faith] is to be measured," and if it does, are those standards "manifestly unreasonable"?

5. Does the drag-along provision in the Partnership Agreement include, pursuant to Tex. Bus. Org. Code § 152.002(b)(2)–(3), categories or standards that create an exception to the prohibition on the elimination of the duties of loyalty and care, and if so, are those standards or categories "manifestly unreasonable"?

6. Is the Partnership Agreement at least ambiguous, thus precluding summary judgment, since the provision Appellees claim permits partners to act in their own self-interest also requires partners to always act according to the "Agreed Duties" of "good faith and fair dealing"?

7. Do Appellants state claims against M. Christopher Doyle and the Blackstone Entities that have a basis in law or fact and as a result are sufficient to survive a *sua sponte* Rule 91a.1 motion to dismiss?

8. Do the Texas courts have specific personal jurisdiction over Senior Managing Director Angelo Acconcia of Blackstone in this dispute when he orchestrated the sale of Primexx's Texas oil assets to another Texas oil company in his capacity as President of BPP and Director of PEC (a Texas company), including traveling to Texas and soliciting business from persons in Texas to effectuate that Texas transaction?

9. Do the Texas courts have specific personal jurisdiction over Blackstone in this dispute when the contacts of Blackstone employees are attributed to it, and when Blackstone, as the

majority owner of a Texas oil partnership, appointed and controlled the majority of the board of PEC (a Texas company) and directed and controlled the sale of Primexx's Texas oil assets to another Texas oil company?

## STATEMENT OF FACTS

### I. Appellants Allege that Blackstone Sold Primexx in Bad Faith in Violation of the Partnership Agreement.

Primexx Resource Development LLC was an oil company that successfully operated two rigs in the Delaware Basin. CR5752, CR5783. Appellants allege that private equity company Blackstone and its subsidiaries organized a special purpose investment entity called BPP HoldCo LLC ("BPP") that Blackstone and the Blackstone Entities used to become the majority owner of Primexx. CR5753. The investment was structured as a partnership—BPP, on behalf of Blackstone and the Blackstone Entities, entered into the Third Amended and Restated Limited Partnership Agreement (the "Partnership Agreement") of Primexx Energy Partners, Ltd. ("Primexx Energy Partners," and collectively with the subsidiaries and assets it controlled, "Primexx"). CR5753. The Blackstone Entities constitute one vertical branch of Blackstone's subsidiaries and form the chain connecting the upper holding companies to BPP. CR5765 (chart describing subsidiary

4

relationships). The chain of Blackstone Entities includes Blackstone Capital Partners VII LP and Blackstone Energy Partners II LP, Blackstone funds that it used to fund the investment in Primexx. CR5774.

Primexx Energy Corporation ("PEC"), the managing general partner of Primexx Energy Partners, operated as a Blackstone portfolio company. CR5753. Blackstone had the power to nominate a majority of the PEC Directors. CR5753. Appellants, minority investors in Primexx Energy Partners, are two limited partnerships consisting of individual and private institutional investors. CR5753.

In June 2021, Primexx Energy Partners was independently valued at $1.43 billion. CR5754. At that valuation, Appellants' investments in Primexx Energy Partners were collectively worth more than $200 million. CR5754. Throughout early 2021, Callon Petroleum Company ("Callon") made a series of lowball offers to purchase Primexx that the PEC Board found uncompetitive. CR5754, CR5788. Appellants allege that on July 28, 2021, M. Christopher Doyle, then the CEO of PEC, told a PEC Director that Callon's latest offer was still far too low and would need to be increased considerably to be taken seriously. CR5788.

Appellants allege that around the same time, a Blackstone executive admitted to a PEC Director that senior Blackstone management gave the direction to exit the Primexx investment, even though the executive knew Callon's offer was a bad deal. CR5788.

On Friday July 30, 2021, Blackstone, BPP, and the Blackstone Entities informed the PEC Directors of an impending sale of Primexx to Callon pursuant to the same terms the CEO of PEC said were too low to consider. CR5789. Blackstone, BPP, and the Blackstone Entities forced the PEC Directors to formally approve the sale on Monday. CR5792. The final sale documents were executed on August 3, 2021, only four days after the PEC Directors first learned of the final terms. CR5792.

Appellants allege that Blackstone, BPP, and the Blackstone Entities, working with PEC, forced the sale—despite knowing it would harm the other partners in Primexx—due to Blackstone's new corporate focus on environmental, social, and governance ("ESG") factors, and specifically on divesting from fossil fuels. CR5794. Blackstone knew that the Callon sale, at the discount price, would still provide hundreds of millions of dollars in returns to Blackstone, BPP, and the Blackstone Entities while almost entirely wiping out the minority investors. CR5795.

6

Appellants have suffered a near-total loss on their investment. CR5797. Appellants allege, based on Securities and Exchange Commission ("SEC") filings, that Blackstone and the Blackstone Entities used their corporate matrix to siphon funds away from BPP in Texas to further Blackstone's focus on ESG in New York and Delaware. CR5799.

## II. Plaintiffs Began Seeking Recourse in Texas Courts in 2022.

Appellants originally filed this suit in 2022 in the civil court for Dallas County. CR5757. While § 14.1 of the Partnership Agreement contains a forum selection clause in favor of "any United States District Court located in Dallas, Texas," there was no jurisdiction to proceed in federal court. CR5758. Nonetheless, Blackstone, BPP, the Blackstone Entities, PEC, and Doyle filed a Motion to Dismiss for Improper Venue. CR5758. On March 29, 2023, the Dallas court dismissed Appellants' complaint without prejudice, concluding that in the first instance "the federal court is best situated to determine its own jurisdiction." CR5758. Appellants re-filed in the U.S. District Court for the Northern District of Texas on May 4, 2023. CR5758. That court dismissed the case for lack of subject matter jurisdiction, emphasizing that "a federal court's subject matter jurisdiction cannot be expanded upon agreement of the parties,"

7

so the Partnership Agreement could not "create subject matter jurisdiction where none exists." CR5759.

Appellants again filed the case in Dallas County in July 2023, and BPP, PEC, and Doyle moved for summary judgment. CR1181. The summary judgment movants refused to answer any of Appellants' requests for production or interrogatories while the motion was pending, claiming that no discovery was necessary because the motion depended on purely legal grounds. CR1182; CR1637 (BPP objecting to each of sixty-two requests for production and six interrogatories because BPP "has filed a motion for summary judgment (the 'Motion') that outlines the legal issues that will resolve this case"). Appellants moved to compel on May 8, 2024, which the court orally granted. CR1182.

Once the Business Court began accepting cases, Appellants removed to the First Business Court Division with Appellees' consent. CR5760. The parties then mutually agreed to dismiss and re-file the case as an original action in the Business Court. CR5761. Appellants filed the instant lawsuit in the First Business Court Division on October 24, 2024. CR5761.

**III. The Business Court Granted Summary Judgment and Rejected Appellants' Request to Conduct Discovery After PEC and BPP Expressly Waived Reliance on Any Facts.**

After Appellants filed the instant lawsuit in the Business Court in October 2024, the Blackstone Entities and Angelo Acconcia filed Special Appearances, and BPP, PEC, and Doyle again moved for pre-discovery summary judgment.[2] CR236, CR256, CR299. Appellants amended the Petition to add Blackstone as a defendant, and Blackstone also filed a Special Appearance. CR4619. Since the Blackstone Entities voluntarily appeared and answered in the first, near-identical proceeding in Dallas without entering special appearances, the Court denied their special appearances.[3] CR4272. The parties conducted limited jurisdictional discovery related to the special appearances of Blackstone and Acconcia, but no merits discovery occurred.

In opposing the motion for summary judgment, Appellants expressly requested a continuance to conduct the discovery that

---

[2] The parties had previously briefed the Special Appearances and the Motion for Summary Judgment in the second Dallas action, which were still pending at the time of removal. Pursuant to a Rule 11 Agreement, the parties re-filed substantively similar briefing in the Business Court.

[3] The Blackstone Entities appealed the denial of their Special Appearances. That appeal is fully briefed before this Court. *See* No. 15-25-00014-CV.

Appellants required to oppose the summary judgment motion. CR1208; *see also* Tex. R. Civ. P. 166a(g). In response to the Business Court's written questions in advance of the hearing, BPP, PEC, and Doyle represented to the court in writing: "[T]o narrow the issues before the court to *purely legal questions*—and avoid the need to fight about the necessity of discovery regarding these other issues—Moving Defendants hereby withdraw those grounds" based on estoppel and ratification. CR4263 (emphasis added). As a result, "Moving Defendants will seek summary judgment *solely on the pure legal question* of whether the LPA's limitation of fiduciary duties and express grant of BPP HoldCo's Drag-Along Right dispose of Plaintiffs' claims as a matter of law." CR4263 (emphasis added).

At the summary judgment hearing, BPP, PEC, and Doyle again disclaimed any reliance on any facts: "This is a simple case that involves a pure question of the law. You saw the e-mail we sent yesterday about the ratification of the estoppel claims. We've done that because we just want to isolate this to this sole issue that doesn't require any discovery." RR Vol. 2 at 7:11–17. After Appellees disclaimed any factual bases for their motion for summary judgment, the Business Court resolved the

motion without permitting Appellees to conduct any merits discovery. CR5442.

Since there was no factual record in the case, Appellees represented that the pre-discovery motion for summary judgment turned only on the plain text of the Partnership Agreement. CR299. The first key provision at issue was § 5.9 of the Partnership Agreement, titled "Fiduciary Duties." CR5866. Section 5.9(a) provides:

> Each Partner and the Managing General Partner shall, **to the fullest extent required by Texas law, owe to the Partnership and its Partners the duties of good faith and fair dealing**, and in the case of the Managing General Partner, the duty not to exceed in such capacity the bounds of the authority granted to any general partner by this Agreement and Texas law **(all such duties collectively, the "<u>Agreed Duties</u>")**.

CR5866–67 (bold emphasis added). When the Partnership Agreement purports to limit or restrict other duties "to the fullest extent permitted pursuant to applicable law," it exempts the "Agreed Duties" from any restriction. CR5867 (§ 5.9(b)(B)).

The second provision at issue, § 6.7, is titled "Drag-Along Rights." CR5879. The drag-along provision states:

> Subject to the limitations and conditions set forth in this Section 6.7, if at any time after the second (2nd) anniversary of the Effective Date, Blackstone elects to consummate, or to

11

cause the Partnership to consummate, a sale to a Third Party on an arms-length basis that constitutes an Exit Event (a "Drag-Along Transaction"), the other Unitholders will consent to such Drag-Along Transaction, and will take or cause to be taken all other actions, including instructing any Existing Limited Partner Directors to approve such Drag-Along Transaction, reasonably necessary or desirable to cause the consummation of such Drag-Along Transaction on the terms proposed by Blackstone, including entering into a customary registration rights agreement in connection with a public offering of the Partnership . . .

CR5879.

BPP, PEC, and Doyle argued that the "Agreed Duties" of "good faith and fair dealing" do not apply to any drag-along transaction. CR299. Appellants argued in opposition that the "Agreed Duties" apply to the entirety of the Partnership Agreement, including with respect to executing the drag-along provision. CR1170. Appellants further argued that Tex. Bus. Org. Code § 152.002 prevents any interpretation of the Partnership Agreement that entirely eliminates those duties. CR1170.

On March 10, 2025, the Business Court granted summary judgment in large part. CR5442. The court held that Appellants could not state any claims for breach of fiduciary duty or breach of contract based on Appellants' allegations that BPP and the Blackstone Entities (1) pushed through the Callon sale while knowing it was a bad deal that

12

would largely wipe out their partners; (2) prioritized Blackstone's corporate interest in oil divestment over their obligations to their partners in a Texas partnership; (3) failed to consider the relative benefit of continuing to operate as a stand-alone entity or explore other alternatives (including other potential buyers) in advance of the Callon sale; (4) failed to conduct the requisite due diligence on the Callon sale; (5) failed to adequately inform Appellants about the imminent Callon sale; and (6) forced through the rushed Callon sale in one business day. CR5492–93.

The court summarized: "In short, the analysis *converges on whether HoldCo acted in good faith* when it exercised its drag-along rights and forced the sale of PRD's assets to Callon on terms HoldCo selected." CR5491 (emphasis added). The court again reiterated that "[i]t is undisputed that HoldCo and PEC were [Primexx Energy Partners] partners and owed [Appellants] statutory loyalty and care duties and an obligation to discharge them in good faith regarding the Callon sale— subject to their agreed modifications to those responsibilities." CR5496.

Despite acknowledging the contractual and statutory duties owed to Appellants, the Business Court concluded that there was no genuine

13

issue as to any material fact with respect to whether any conduct of BPP, PEC, or Doyle before or during the Callon sale breached their contractual or statutory duties. The Court did not mention that Appellees waived any reliance on any facts in connection with the motion. CR4263. With respect to the duties of loyalty and care, the court concluded that the drag-along provision met the exceptions described in § 152.002(b)(2)–(3), but did not consider whether those changes would be "manifestly unreasonable."[4] CR5496.

In rejecting Appellants' claims based on the duty of good faith, the court relied on *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). The court broadly concluded that "one does not act in bad faith by exercising its lawful rights," and therefore "one does not lack good faith by exercising lawful contract rights." CR5483. It follows, the court asserted, that "as a matter of law HoldCo and PEC did not act in bad faith by exercising their contract rights to discharge HoldCo's drag-along rights as they did." CR5508. The court denied summary judgment with

---

[4] The court further added that Appellants "do not claim that any [Partnership Agreement] modifications to those responsibilities is manifestly unreasonable." CR5496. That is incorrect—in Appellants' Opposition, Appellants argued that BPP's and PEC's interpretation of the drag-along provision is, "to use the language from Section 152.002," "manifestly unreasonable." CR3456.

14

respect to two of Appellants' claims stemming from the distribution of proceeds between partners *after* the Callon sale occurred. CR5500–01.

The Business Court then rejected Appellants' Motion for Reconsideration, reiterating that Appellants "failed as a matter of law to raise a genuine issue of material fact supporting liability based on their claims of bad faith." CR5555; CR5736, CR5738. Notably, however, in rejecting Plaintiffs' argument that the summary judgment opinion permitted BPP to "act in bad faith" as long as it could point to a "contractual provision purportedly permitting its conduct," the court stated the following:

> To begin, the MSJ Opinion concludes only that lawfully exercising contract rights is not acting in bad faith . . . That is, *Texas Beef Cattle* and the court's opinion require that the exercised contract right be (i) a lawful right and (ii) exercised 'in a legal way.' *Id*. So, **the court did not conclude that *Texas Beef Cattle* permitted HoldCo to exercise its drag-along rights in bad faith or in an otherwise illegal manner**.
>
> Accordingly, the MSJ Opinion agrees with *Spethmann* that how a fiduciary performs their contract rights is important. *See* 171 S.W.3d at 696. To that point, **the court emphasized that HoldCo had to satisfy its TBOC responsibilities and exercise its drag-along rights in good faith**.

CR5741–5742 (emphasis added). The court repeated its conclusion that "***in reviewing the evidence***, the court did not find that there was a

15

genuine issue of material fact as to whether PEOFs were misled." CR5742 n.22 (emphasis added).

## IV. The Business Court Dismissed The Majority of Defendants On *Sua Sponte* Motions to Dismiss.

Appellees did not move to dismiss any claims at any stage of this litigation. However, the Business Court *sua sponte* raised perceived issues with Appellants' pleadings with respect to Blackstone, the Blackstone Entities, and Doyle—issues that Appellees had not previously raised. The court asked the parties for briefing so it could "consider the viability of those claims under the analytical standards applicable to a Rule 91a.1 motion to dismiss." CR6071. In a series of orders, the Business Court subsequently dismissed all claims against Blackstone, the Blackstone Entities, and Doyle.

On May 9, 2025, the Business Court dismissed the breach of contract and breach of fiduciary duty claims against Blackstone and the Blackstone Entities. CR6071. The court concluded that, because Blackstone and the Blackstone Entities "were not parties" to the Partnership Agreement, they did not owe Appellants any "statutory responsibilities or contract obligations." CR6072. The court held that § 13.9 of the Partnership Agreement, titled "No Recourse," precluded

16

Appellants' claims against Blackstone and the Blackstone Entities. CR6072. Finally, the court concluded, without analysis, that Appellants' "allegations do not support ignoring the defendants' separate corporate forms as would be required for plaintiffs to prevail." CR6074.

On May 19, 2025, the Business Court applied its May 9 Opinion to Doyle and held that § 13.9 similarly precluded the claims against him. CR6101, CR6110. The court also determined that § 13.9 barred any conspiracy, aiding and abetting, and knowing participation claims against the Blackstone Entities arising from Appellants' claims against BPP or PEC.[5] CR6111. The court rejected Appellants' argument that § 13.2 of the Partnership Agreement prevented the non-signatories from claiming a third-party benefit. CR6113–14. The court further concluded that § 13.9 did not eliminate unwaivable duties in violation of Tex. Bus. Org. Code § 152.002. CR6115.

## V. The Business Court Granted Blackstone's and Angelo Acconcia's Special Appearances.

The Business Court also granted the Special Appearances of Blackstone and Acconcia. The court granted the Special Appearances in

---

[5] The Opinion and Order does not appear to apply to Blackstone or Acconcia, who as the Business Court noted, were previously dismissed for lack of jurisdiction. CR6113 at n.1.

an Order dated April 28, 2025, followed by an Opinion and Order dated May 22, 2025. CR6139. While the court only conducted a "specific jurisdictional analysis" for the limited claims that survived summary judgment, the court noted that its "conclusions are the same considering all the claims asserted" in the Second Amended Petition. CR6161.

With respect to Acconcia, the Business Court held that "the evidence fails to establish that [Appellant]s' claims against Acconcia arise from his purposeful contacts with Texas," and concluded that "Acconcia's forum contacts are attributable to a different entity, not Blackstone." CR6140. First, the court concluded that Appellants "do not allege, argue, or adduce evidence that Acconcia committed a tortious act *in whole or in part in Texas* that would support personal—meaning direct—liability against him . . ." CR6161 (emphasis added). Second, the court determined that "[a]s a threshold matter, it is not appropriate to assert jurisdiction over a non-resident corporate officer where the only claims asserted against them are derivative in nature," and noted that Appellants "do not even assert direct tort liability against him." CR6165–6171. With respect to Blackstone, the Court held that because Appellants' jurisdictional arguments "are rooted in Acconcia's actions as their agent,

18

the court lacks jurisdiction over Blackstone too," and rejected any basis for jurisdiction resulting from Blackstone's direct conduct. CR6140, CR6172, CR6174.

## VI. Plaintiffs Appealed the Final Judgment.

On June 3, 2025, the parties filed a Rule 11 Agreement with the Business Court requesting the entry of final judgment. After the court's summary judgment, *sua sponte* motion to dismiss rulings, and Special Appearances orders, the only claims remaining were against BPP and PEC with respect to the distribution of proceeds after the Callon sale. CR6120. The parties consented to the entry of a "final, appealable judgment on the claims and defendants dismissed by the Orders," as applied to Appellants' Second Amended Petition.[6] CR6120. The parties agreed that the remaining claims would be dismissed without prejudice and subject to the parties' tolling agreement. CR6121.

The Business Court entered Final Judgment on June 16, 2025. CR6126. The court dismissed without prejudice the Remaining Claims

---

[6] Appellants filed a Second Amended Petition on May 2, 2025 to incorporate additional alter-ego allegations relevant to the court's consideration of the *sua sponte* motion to dismiss. CR5752. The Rule 11 Agreement provided that, "subject to the Court's approval," the court's orders "shall be deemed to apply to the claims and parties in the Second Amended Petition." CR6120.

against the Remaining Defendants, noting that "the parties filed a Rule 11 Agreement in which the parties agreed Plaintiffs shall dismiss without prejudice the Remaining Claims against the Remaining Defendants so that the causes of action and claims dismissed by the Orders can proceed to appealable judgment." CR6127–28. The Business Court ordered that it lacks personal jurisdiction over Blackstone and Angelo Acconcia; all causes of action against M. Christopher Doyle and the Blackstone Entities are dismissed with prejudice according to the May 22, 2025 Opinion and Order; and summary judgment is granted to M. Christopher Doyle, PEC, and BPP except with respect to two allegations regarding post-sale distribution of proceeds. CR6130. The court "order[ed] that Plaintiffs take nothing" and stated that the Final Judgment "finally disposes of all claims, causes of action, and parties before the court." CR6128–6129.

Appellants filed a Notice of Appeal on July 7, 2025, from the Final Judgment and all other rulings ancillary to the Final Judgment. CR6132.

## SUMMARY OF THE ARGUMENT

While precluding Appellants from conducting *any merits discovery whatsoever*, the Business Court wrongly granted summary judgment to

20

Appellees based on Appellants' purported failure to introduce facts establishing Appellees' misconduct. That decision was procedurally improper and legally wrong.

In 2021, senior Blackstone executives decided that Blackstone should completely divest from its fossil fuel investments so it could have better access to investors concerned with ESG issues. Those executives in New York directed Acconcia to liquidate Blackstone's Texas-based Primexx investment for any price he could get so Blackstone could focus on ESG elsewhere. Accordingly, Acconcia negotiated with a Texas company to purchase Blackstone's Texas-based real oil assets so Blackstone could receive hundreds of millions of dollars from Texas with total disregard to its partners and the contractual and fiduciary responsibilities Appellees owed pursuant to the Partnership Agreement.

Specifically, Section 5.9(a) of the Partnership Agreement requires all partners, "to the fullest extent required by Texas law," to comply with the "Agreed Duties" of "good faith and fair dealing." CR5866. The duty of good faith and fair dealing is both written into the Partnership Agreement *and* required by the Texas Business Organizations Code, which also mandates the duties of loyalty and care. *See* Tex. Bus. Org.

Code § 152.002. The obligations are explicit and clear. As the Business Court explained in denying Appellants' Motion for Reconsideration, the court "agrees . . . that how a fiduciary performs their contract rights is important" and "emphasized that HoldCo **had to satisfy its TBOC responsibilities and exercise its drag-along rights in good faith**." CR5742 (emphasis added); CR5491 (Summary Judgment Opinion) ("In short, **the analysis converges on whether HoldCo acted in good faith when it exercised its drag-along rights** . . .").

Yet the Business Court concluded—before *any discovery at all* occurred, when the summary judgment movants disclaimed any factual basis for their motion, and after rejecting Appellants' request for a continuance to conduct discovery—that there is no genuine issue as to any material fact in this case. *See* Tex. R. Civ. P. 166a(c). Whether a party acted in good faith or according to the duties of loyalty and care is a quintessential question of fact. Appellants allege that Appellees violated the duties of good faith, loyalty, and care, but in their pre-discovery motion for summary judgment, BPP, PEC, and Doyle did not present any evidence whatsoever regarding their compliance with those duties in connection with the allegations in the Petition. The Business Court thus

misapplied Tex. R. Civ. P. 166a when it denied Appellants' request for a continuance to conduct discovery and granted pre-discovery summary judgment despite the extensive factual disputes at the heart of Appellants' claims.

The drag-along provision does not even purport to modify either the contractual "Agreed Duties" of "good faith and fair dealing" or the obligation of good faith required by § 152.002 of the Tex. Bus. Org. Code. That section prohibits a partnership agreement or partners from "eliminat[ing] the obligation of good faith under Section 152.204(b), except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable." Section 152.002 also prohibits a partnership agreement or partners from eliminating the duties of care and loyalty.

Under established Texas law, the issue of good faith involves the *subjective motivation* of the partners. As a result, the two *procedural* requirements in the drag-along provision that Appellees identify are not "standards by which the performance of the obligation [of good faith] is to be measured." The procedural requirements also do not meet the

23

exceptions for "specific types of activities or categories of activities that do not violate the duty of loyalty" or and do not describe "standard[s] by which the performance of the obligation [of care] is to be measured."

At the very minimum, the Partnership Agreement is ambiguous, which compels reversing the Business Court's grant of pre-discovery summary judgment. Appellants assert that the partners' "Agreed Duties" of "good faith and fair dealing" established in § 5.9(a) apply throughout the Partnership Agreement, including when executing the drag-along provision. That interpretation is reasonable, and a contract is ambiguous when it is reasonably susceptible to more than one interpretation. The Texas Supreme Court has repeatedly emphasized that an ambiguous contract creates a fact issue with respect to the meaning of the contract, which precludes summary judgment.

Appellants also state claims against Doyle and the Blackstone Entities that have a basis in law or fact and thus survive a *sua sponte* motion to dismiss under Tex. R. Civ. P. 91a.1. At the motion to dismiss stage, which requires only that a plaintiff state a cause of action with "basis in law or fact," Appellants have pled sufficient facts to state claims directly against Doyle and the Blackstone Entities, and against the

Blackstone Entities under an alter-ego theory.

Finally, Acconcia and Blackstone are both subject to specific personal jurisdiction in Texas for this dispute. Acconcia, then a Senior Managing Director at Blackstone, was the President of BPP, the special purpose entity Blackstone used to invest in the Primexx Texas oil partnership, and was a Director on the board of PEC, the Texas company that ran Primexx. Acconcia personally traveled to Texas to manage and direct PEC's Texas employees while Acconcia's team evaluated a potential Callon deal. Acconcia participated in hybrid PEC board meetings regarding Callon when he knew that other PEC Directors on the call were physically in Texas. He contacted individuals that he knew were located in Texas on behalf of Primexx. And, ultimately, Acconcia was responsible for orchestrating and directing the sale of Primexx's Texas oil assets to another Texas oil company.

Acconcia's Texas contacts, which were conducted in his capacity as a Blackstone Senior Managing Director, are attributed to Blackstone. Blackstone was the majority owner of the Texas oil partnership; appointed and controlled the majority of the PEC Board; directed and controlled Primexx's operations in Texas; and forced the PEC Board to

approve the sale of Primexx's Texas oil assets to another Texas oil company. Both Acconcia and Blackstone repeatedly and intentionally availed themselves of Texas resources and ultimately made hundreds of millions of dollars for Blackstone, the Blackstone Entities, and BPP by forcing the sale of the Texas oil assets of one Texas company to another Texas company.

## ARGUMENT

### I. Extensive Factual Issues Preclude Pre-Discovery Summary Judgment.

Section 5.9(a) of the Partnership Agreement provides that partners, "to the fullest extent required by Texas law," must abide by the "Agreed Duties" of "good faith and fair dealing." CR5866. Whether a person or entity acts in good faith, which involves consideration of subjective motive, is an issue of fact. Similarly, Tex. Bus. Org. Code § 152.002 requires partners to act according to the "duty of loyalty," "duty of care," and "obligation of good faith." Whether partners complied with those duties is also a fact issue. The Business Court misapplied Rule 166a when it concluded, while rejecting Appellants' request to conduct discovery, that there was no genuine issue as to any material fact.

Appellate courts engage in *de novo* review of whether there is a genuine issue as to any material fact. *See Katy Venture, Ltd. v. Cremona Bistro Corp.,* 469 S.W.3d 160, 163 (Tex. 2015). Texas courts must "examine the record in the light most favorable to the non-movant, indulge every reasonable inference against the motion and likewise resolve any doubts against it." *Id.* at 163. "The movant must establish its right to summary judgment on the issues expressly presented to the trial court by *conclusively proving* all elements of the movant's cause of action or defense as a matter of law." *Rhone-Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 223 (Tex. 1999) (emphasis added). Appellees failed to do so here.

> **A. Appellees must introduce sufficient facts to establish as a matter of law that they acted according to the "Agreed Duties" of "good faith and fair dealing" when liquidating Primexx to satisfy Blackstone's ESG priorities.**

The Partnership Agreement requires that the parties abide by the "Agreed Duties" of "good faith and fair dealing," which applies to the partners' conduct with respect to the drag-along provision and necessarily creates a fact issue that precludes summary judgment.

Section 5.9(a) of the Partnership Agreement provides that "Each Partner and the Managing General Partner shall, to the fullest extent

27

required by Texas law, owe to the Partnership and its Partners the duties of good faith and fair dealing . . ." CR5866. Although the Partnership Agreement purports to limit or restrict other duties, it *explicitly exempts* the "Agreed Duties" from any restriction. CR5867, § 5.9(b)(A) (eliminates fiduciary duties "except for the Agreed Duties" and "except as required by any provisions of applicable law that cannot be waived"); § 5.9(b)(B) (eliminates duties "other than the Agreed Duties"); § 5.9(c) ("Subject to the foregoing clauses (a) and (b)," which includes the "Agreed Duties"); § 5.9(c)(i) ("other than an Agreed Duty"). Notably, even § 5.9(c)(ii), the provision permitting partners to act in their own interest, *still* requires that partners do so "subject to the Agreed Duties." CR5867 (". . . [E]ach Partner, in its capacity as such, may decide or determine any matter in its sole and absolute discretion taking into account solely its interests and those of its Affiliates (excluding the Partnership and its Subsidiaries) *subject to the Agreed Duties*.") (emphasis added).

The drag-along provision at § 6.7 does not in any way implicate or limit the "Agreed Duties" of "good faith and fair dealing." CR5879. The Business Court recognized this when it repeatedly acknowledged that Defendants owed the duty of good faith to Plaintiffs, *even with respect to*

28

*executing the drag-along provision.* CR5504 at ¶ 161 ("But HoldCo (and PEC) had to conduct the sale in good faith."); CR5504 at ¶ 164 ("But, HoldCo still had to discharge that obligation [the arms-length transaction] in good faith."); CR5516 at ¶ 194 ("HoldCo's 'fiduciary' duties required it to perform in good faith."); CR5491 at ¶ 134 (The "analysis converges on whether HoldCo acted in good faith when it exercised its drag-along rights and forced the sale of PRD's assets to Callon on terms HoldCo selected.").

Texas courts regularly require a party to satisfy its good faith obligations when executing other rights found elsewhere in a contract. For example, in *Spethmann v. Anderson*, the Court of Appeals for the Fifth District concluded that a party was required to act with good faith when executing a contractual right to its own benefit. 171 S.W.3d 680, 695–96 (Tex. App.—Dallas 2005, no pet.). The court concluded: "The issue is not whether the parties followed the Buy–Sell Agreement but whether the transaction was fair to SGSI and was performed with the utmost good faith and scrupulous honesty and without taking advantage of their position with SGSI at the expense of SGSI." *Id.*; *see also Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 571 (Tex. 1996)

("The [contract] does permit the Sellers to increase delivery capacity by drilling new wells and by unitizing the committed reserves. But nothing in the [contract] permits the Sellers to undertake these activities in bad faith."). The Business Court agrees—in denying Appellants' Motion for Reconsideration, the court noted that "the MSJ Opinion agrees with *Spethmann* that how a fiduciary performs their contract rights is important." CR5741–5742 (emphasis added).

BPP and PEC were thus required to execute the drag-along provision in compliance with the "Agreed Duties" of "good faith and fair dealing," which necessarily involves a factual investigation that precludes summary judgment. *See, e.g., R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.,* 482 S.W.3d 559, 568 (Tex. 2016) (concluding that definitions of good faith "focus overwhelmingly on subjective state of mind" and "[b]ecause a fact issue exists on the Commission's good faith, we may not render judgment in its favor"); *see also Janvey v. GMAG, L.L.C.,* 592 S.W.3d 125, 129 (Tex. 2019) (describing subjective nature of good faith). As a result, Texas courts routinely hold that summary judgment is inappropriate when any factual dispute surrounds a party's good faith. *Houle v. Casillas,* 594 S.W.3d 524, 552 (Tex. App.—El Paso

2019, no pet.) (factual dispute prevents summary judgment regarding breach of duty of good faith and fair dealing when partner "engaged in a course of conduct with regard to clearly significant matters affecting the partnership" without considering other partner's interest).

Appellants allege throughout the Petition that BPP and PEC acted in bad faith when they forced the Callon sale despite knowing it was an unfair deal, at an unjustifiably low price, that would unduly harm their partners. *See, e.g.*, CR5752 at ¶ 1 ("Yet Defendants forced a quick sale of Primexx, over a weekend, at a price well below its fair value that rendered Plaintiffs' combined investment almost totally worthless, and distributed those proceeds unfairly in a manner that prioritized Blackstone over other investors and generated hundreds of millions of dollars for Blackstone."); ¶ 98 ("Upon information and belief, Blackstone prioritized its own corporate interest in fossil fuel divestment over acting in the best interest of Primexx, as it was required to do under Texas law); ¶ 111 ("Defendants acted with intentional misconduct to recover hundreds of millions of dollars for themselves while having a deliberate disregard for the company and its other partners."). BPP, PEC, and Doyle filed a pre-discovery motion for summary judgment and presented no

facts or evidence whatsoever to establish that they acted in good faith. Here, fact disputes not only remain—there *are no facts* in the record that could even plausibly establish Appellees' good faith.

## B. The Business Court erred in denying Appellants' request to conduct discovery and granting summary judgment when Appellees waived all reliance on *any facts.*

The Business Court's decision that no genuine issue as to any material fact remains cannot be reconciled with the court's acknowledgement that PEC and BPP owed Appellants the duties of good faith and fair dealing. The summary judgment movants *expressly disclaimed all reliance on any facts*, so movants necessarily did not introduce into the summary judgment record the facts necessary to establish as a matter of law that they actually complied with the duties of good faith and fair dealing.

Appellants issued comprehensive discovery requests and successfully moved to compel in the Dallas proceeding, but Appellees continued to refuse to engage in discovery while the motion for summary judgment remained pending. CR1182. As a result, Appellants requested a continuance to conduct the discovery required to oppose the motion. CR1208; *see also* Tex. R. Civ. P. 166a(g) (the court may "order a

continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just").

The Texas Supreme Court has long and repeatedly held that the summary judgment *movant* carries the sole burden of introducing facts to negate a Plaintiff's claims:

> It was the burden of the law firm as the defendant-movant for summary judgment to establish as a matter of law that no fact issue stands in the way of judgment in its favor. The summary judgment burden was that of establishing the negative of the statutory issues, namely, that Lyon was not apparently carrying on in the usual way the business of the law firm, i.e., was not acting in the ordinary course of its business and hence was not acting within the scope of apparent authority by force of statute. ***The defendant is required to meet the plaintiff's case as pleaded and to demonstrate that the plaintiff cannot prevail***. **There can be no further burden upon the plaintiff if the requisite facts for summary judgment are not established by the summary judgment record.**

*Cook v. Brundidge, Fountain, Elliott & Churchill*, 533 S.W.2d 751, 759 (Tex. 1976) (internal citations omitted) (emphasis added).

Evidently recognizing that their motion depended on fact issues that would necessarily preclude summary judgment, BPP, PEC, and Doyle expressly disclaimed and waived reliance on *any facts*. CR4263 (in order to "avoid the need to fight about the necessity of discovery regarding these other issues," movants "seek summary judgment *solely*

33

*on the pure legal question* of whether the LPA's limitation of fiduciary duties and express grant of BPP HoldCo's Drag-Along Right dispose of Plaintiffs' claims as a matter of law") (emphasis added). At the summary judgment hearing, BPP, PEC and Doyle again waived any factual basis for summary judgment "because we just want to isolate this to this sole issue that doesn't require any discovery." RR Vol. 2 at 7:11–17.

Nonetheless, the Business Court improperly resolved as a matter of the law the inherently factual question of whether Appellees complied with the duties of good faith and fair dealing. The Business Court then doubled down on the error when denying Appellants' Motion for Reconsideration. The court clarified that its summary judgment opinion "did not conclude that" BPP could "exercise its drag-along rights in bad faith or in an otherwise illegal manner," and "emphasized that HoldCo had to satisfy its TBOC responsibilities and exercise its drag-along rights in good faith." CR5741–5742. The Court also acknowledged that the duty of good faith and fair dealing required "at a minimum" that BPP "could not have lied or misled its partners in executing its rights." CR5742 n.22. But the Court then asserted that "***in reviewing the evidence***, the court did not find that there was a genuine issue of material fact as to whether

34

PEOFs were misled." CR5742 n.22 (emphasis added). But, of course, *there was no evidence*—no discovery had occurred; movants disclaimed reliance on any facts; and the Court rejected Appellants' request for a continuance to conduct discovery. While Appellees carried the affirmative burden "to meet the plaintiff's case as pleaded and to demonstrate that the plaintiff cannot prevail," the Court flipped the burden upside down and ruled against Appellants because they apparently failed to negate facts that Appellees disclaimed and never introduced into the record. That error requires reversal.

###    C.    The Business Court erred in relying on *Texas Beef* to find that Appellees necessarily act in good faith when acting pursuant to any other purported contractual right.

The Business Court mistakenly relied on *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203 (Tex. 1996) to support its findings. CR5508. But the *Texas Beef* line of cases in no way stands for the proposition that BPP and PEC can establish, as a matter of law, that they acted in good faith—as required by both a separate contractual provision and statute—by pointing to a different contractual provision.

First, *Texas Beef* does not apply to cases involving fiduciaries. *Texas Beef* addresses good faith only in the context of tortious interference with

35

a third-party contract, which does not apply to a partnership relationship with both statutory duties and an explicit contractual obligation to act in good faith. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 427 (Tex. 2004) (noting that *Texas Beef* involved whether "a justification defense to a tortious interference claim may be based on a 'good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken'"). Moreover, even in that limited context, a party does not have absolute license to engage in any conduct by merely pointing to a contractual provision purportedly authorizing that conduct. *See Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 81 (Tex. 2000) (concluding that a party could not "say or do anything under the guise of exercising a privilege," because a party "may not exercise an otherwise legitimate privilege by resort to illegal or tortious means").

For example, in *Spethmann*, which post-dates *Texas Beef*, the Court rejected appellants' argument "that they cannot be held liable for breach of fiduciary duty because their actions in the sale of their stock were in accordance with the Buy–Sell Agreement," holding that appellants were still required to comply with their fiduciary duties. 171 S.W.3d at 695–96 ("The issue is not whether the parties followed the Buy–Sell

36

Agreement but whether the transaction was fair to SGSI and was performed with the utmost good faith and scrupulous honesty and without taking advantage of their position with SGSI at the expense of SGSI."); *see also El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 313 (Tex. 1999) ("El Paso has a statutory obligation to act in good faith in the performance, enforcement and modification of these agreements.").

Second, *Texas Beef* predates the relevant statutory provisions. *See American Star Energy and Minerals Corp. v. Stowers*, 457 S.W.3d 427, 434 (Tex. 2015) (a later-enacted conflicting statute "eliminates any instructive or persuasive value those decisions may have once had"). Section 152.002 took effect in 2006, which is after both *Texas Beef* (1996) and the other cases the Business Court cites when discussing *Texas Beef*. CR5483. Accordingly, none of those cases evaluate how § 152.002's prohibition on the elimination of the obligation of good faith and duties of loyalty and care applies.

Finally, when discussing the *Texas Beef* line of cases, the Business Court relied on cases involving *implied* duties. The Partnership Agreement contains, and repeatedly reiterates, an express requirement

that partners act according to the "Agreed Duties" of "good faith and fair dealing," which further distinguishes the Partnership Agreement from those where a court must read an implied duty *into* the contract that does not otherwise exist in the contract itself. CR5483 (citing *Exxon Corp. v. Atl. Richfield Co.,* 678 S.W.2d 944 (Tex. 1984); *John Masek Corp. v. Davis,* 848 S.W.2d 170 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *English v. Fischer*, 660 S.W.2d 521 (Tex. 1983)).

> **D. The drag-along provision does not modify the § 152.002 "obligation of good faith," and the contractual "Agreed Duties" of "good faith and fair dealing" create an independent separate duty.**

The drag-along provision does not contain any purported or actual standards that could be used to measure the obligation of good faith pursuant to § 152.002. Texas Supreme Court precedent demonstrates that good faith relates to the *subjective motivation* of the partners. The two *procedural, process* requirements in the drag-along provision are not "standards by which the performance of the obligation is to be measured," § 152.002(b)(4), and if the procedural requirements did in fact purport to state a standard for the obligation of good faith, that standard would be "manifestly unreasonable." *Id.*

More fundamentally, even assuming arguendo that the drag-along provision did constitute a permissible modification of the *statutory* "obligation of good faith," that modification would have no bearing on BPP's and PEC's *contractual* duty of "good faith and fair dealing." The "Agreed Duties" operate independently from the statute to require partners to act in accordance with "good faith and fair dealing." Even if the drag-along provision modified the "obligation of good faith" required by § 152.002, BPP and PEC must still introduce evidence to establish as a matter of law that they complied with their express contractual duties.

> 1. The procedural requirements in the drag-along provision are not standards by which to measure good faith.

Appellees wrongly rely on two procedural requirements in the drag-along provision to support their motion. Section 152.002 prohibits partners from "eliminat[ing] the obligation of good faith under Section 152.204(b)," but permits partners to "determine the standards by which the performance of the obligation [of good faith] is to be measured." § 152.002(b)(2)–(4). Section 152.002(b)(4) incorporates the Tex. Bus. Org. Code's definition of good faith found in a separate section of the code:

> (b) A partnership agreement or the partners may not: . . . (4) eliminate the obligation of good faith *under Section*

39

*152.204(b)*, except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable[.]

(emphasis added). Section 152.204(b) in turn provides that:

(b) A partner shall discharge the partner's duties to the partnership and the other partners under this code or under the partnership agreement and exercise any rights and powers in the conduct or winding up of the partnership business: (1) *in good faith*; and (2) in a manner the partner reasonably believes to be in the best interest of the partnership.

(emphasis added).

The code's description of good faith in § 152.204 establishes that, consistent with Texas Supreme Court precedent, the obligation relates to the subjective motivation of the partners. Section 152.204 governs how a partner "discharge[s] the partner's duties" and "exercise[s] any rights and powers in the conduct" of the partnership, and states that partners must do so "in good faith." § 152.204(b)(1). *How or the manner in which* a partner executes their rights and duties is a subjective concept that necessarily implicates intent, state of mind, and motivation. This is consistent with the second clause of that section, which requires a partner to act "in a manner the partner *reasonably believes* to be in the best interest of the partnership." § 152.204(b)(2) (emphasis added).

40

*In Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125 (Tex. 2019), the Supreme Court considered the definition of "good faith" as used in the Texas Uniform Fraudulent Transfer Act. The Court noted that Black's Law Dictionary defines good faith as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing ..., or (4) absence of intent to defraud or to seek unconscionable advantage." *Id.* at 129. The court stated that, in general, good faith "requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand." *Id.* (quoting *R.R. Comm'n.*, 482 S.W.3d at 569). The court ultimately concluded that good faith under the particular statute at issue requires a transferee to demonstrate that "its conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud." *Id.*

Those descriptions stand in stark contrast to the procedural, process requirements in the drag-along provision, which have nothing to do with Blackstone's subjective intent or motivation. Section 6.7(a) of the drag-along provision provides that "if at any time after the second (2nd) anniversary of the Effective Date, Blackstone elects to consummate, or to

41

cause the Partnership to consummate, a sale to a Third Party on an arms-length basis that constitutes an Exit Event (a "Drag-Along Transaction"), the other Unitholders will consent to such Drag-Along Transaction . . ." CR5182. These procedural and process requirements do not determine the standards by which the performance of the subjective obligation of good faith may be measured as they would permit a partner to sell in a dishonest manner and with negative subjective intentions, as Appellants alleged happened here. In contrast, a standard to measure the performance of good faith—a subjective intent requirement—would *also* relate to subjective intent, such as a requirement to use "personal best efforts" or "proceed with honesty and candor in negotiations."

If the Business Court were correct that those two procedural requirements were standards by which good faith could be measured, then those standards would be "manifestly unreasonable" and prohibited by § 152.002. A standard is not reasonable if it involves completely waiving duties that, by statute, are unwaivable. *Morgan Buildings & Spas, Inc. v. Turn-Key Leasing, Ltd*., 97 S.W.3d 871, 881 (Tex. App.—Dallas 2003, pet. denied) (while standards can be modified under the UCC statute as long as they are not "manifestly unreasonable," "there is

a limit," and purported modifications were "manifestly unreasonable in light of the prohibition of waiver of those provisions"). If, as Appellees contend, the Partnership Agreement permitted them to force a company sale in bad faith for a fraction of a company's valuation with the conscious intent to wipe out minority partners, then § 152.002 would have no meaning.

> 2. Any modification to the minimum *statutory* obligation of good faith does not impact the separate and independent *contractual* "Agreed Duties."

*Even if* the drag-along provision modified Appellees' statutory "obligation of good faith," it does not modify BPP's and PEC's *contractual* "Agreed Duties" of "good faith and fair dealing." The "Agreed Duties" stand on their own and require partners to act in accordance with the duties of "good faith and fair dealing," separate and apart from any statutory obligations operating in the background. This is further underscored by the fact that the "Agreed Duties" contain an additional requirement of "fair dealing" that the statutory language does not.

**E.   Section 152.002 prevents the Partnership Agreement from entirely eliminating the duties of loyalty and care.**

Section 152.002 prohibits the Partnership Agreement from

eliminating the duties of loyalty or care, and the drag-along provision does not contain any "categories" or standards" that can be used to measure compliance with those duties. Even if the procedural requirements in the drag-along provision were "categories" or "standards," those standards would be "manifestly unreasonable" and prohibited by § 152.002.

While the Partnership Agreement purports to eliminate fiduciary duties other than the "Agreed Duties," it only does so "to the fullest extent permitted pursuant to applicable law"—and § 152.002 prohibits eliminating the duties of loyalty and care.[7] CR5867 (§ 5.9(b)(B)). Section 152.002 permits partners to "identify specific types of activities or categories of activities that do not violate the duty of loyalty" or "determine the standards by which the performance of the obligation [of care] is to be measured," as long as those provisions are not "manifestly unreasonable." § 152.002(b)(2)–(3). But the drag-along provision does not

---

[7] Section 152.002 prohibits partnership agreements or partners from eliminating the obligation of good faith or the duties of loyalty and care. Partners can, however, eliminate other fiduciary duties that may have existed under Texas common law, which recognized a wide-ranging set of duties that partners owed each other. *See, e.g.*, *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998); *Chien v. Chen*, 759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ); *Houle v. Casillas*, 594 S.W.3d at 552.

even purport to modify the duties of loyalty or care.

The drag-along provision's procedural requirements of (1) a two-year waiting period and (2) an arms-length transaction do not modify the duties of loyalty and care. Sections 152.002(b)(2)–(3) incorporate the code's definitions of the duties of loyalty and care. The code describes the duty of loyalty in part as preventing partners from "competing or dealing with the partnership in a manner adverse to the partnership." § 152.205. The duty of care requires partners to act "with the care an ordinarily prudent person would exercise in similar circumstances." § 152.206. Procedural requirements do not bear on whether an action is adverse to the partnership or the care an ordinarily prudent partner would exercise when considering a transaction that would have severe consequences for the other partners. *See, e.g.*, *Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[A]lthough the Partnership Agreement authorizes contracts between the Partnership and a partner or a partner's affiliate, a partner entering into such a contract ***still must comply with the duty of care*** by acting in good faith and in a manner the partner reasonably believes to be in the partnership's best interest. The Partnership Agreement could not

change this and did not purport to do so.") (emphasis added).

Again, as discussed above with respect to the duty of good faith, if the drag-along provision's procedural requirements somehow did serve to modify the duties of loyalty and care, then any such modifications would be "manifestly unreasonable" and prohibited by § 152.002. *See Morgan Buildings*, 97 S.W.3d at 881. The statutory prohibition on eliminating the duties of loyalty and care would have no meaning if a partnership agreement could permit a partner to actively seek to harm other partners and the partnership when executing the drag-along provision.

## II. At a Minimum, the Partnership Agreement is Ambiguous—Which Itself Precludes Summary Judgment and Mandates Reversal.

At a minimum, the Partnership Agreement is ambiguous on the question of whether the "Agreed Duties" of "good faith and fair dealing," and the other non-waivable statutory duties, apply when executing a drag-along transaction. That ambiguity requires fact discovery.

"Whether a contract is ambiguous is a question of law," and appellate courts "review de novo the trial court's determination of whether a contract is ambiguous." *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 483 (Tex. App.—Fort Worth 2020, pet. denied). "A contract subject

46

to more than one reasonable interpretation is ambiguous, giving rise to a fact issue regarding the parties' intent." *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022); *see also ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018) ("A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation."). Appellants assert that the partners' non-waivable statutory duties and "Agreed Duties" of "good faith and fair dealing" established in § 5.9(a) apply throughout the Partnership Agreement, including to any drag-along transaction. That interpretation is at least reasonable, and prevents conflicting with Tex. Bus. Org. Code § 152.002 and deleting the "Agreed Duties" from the contract.

The reasonableness of Appellant's interpretation—and the potential ambiguity in the Partnership Agreement—is reinforced by § 5.9(c)(ii), which permits partners to act in their own interest "*subject to the Agreed Duties*." CR5867. That provision is in the same sub-section as the Agreed Duties provision and states that "each Partner, in its capacity as such, may decide or determine any matter *in its sole and absolute discretion taking into account solely its interests* and those of its Affiliates

(excluding the Partnership and its Subsidiaries) ***subject to the Agreed Duties***." (emphasis added). Appellants submit this demonstrates that the "Agreed Duties" apply *throughout* the Partnership Agreement, including to provisions that might otherwise permit partners to act in their own self-interest. But at the very least, § 5.9(c)(ii) leaves some ambiguity given that the same provision provides that a party may act "in its sole and absolute discretion," "taking into account solely its interests," but must do so with "good faith and fair dealing."

Either way, reversal is required because when a contract is ambiguous, the court must permit discovery on extrinsic evidence related to the contract. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue."); *see also Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 804 (Tex. 2023) (concluding that if an agreement "is subject to more than one reasonable interpretation, summary judgment is improper").

### III. Appellants Properly State Claims Against Blackstone, the Blackstone Entities, and Doyle.

Appellees did not move to dismiss any claims at any stage of this

litigation. However, the Business Court incorrectly raised perceived issues with Appellants' pleadings with respect to Blackstone, the Blackstone Entities, and Doyle *sua sponte* and dismissed them. At the pleading stage, Tex. R. Civ. P. 91a.1 requires only that, when all allegations are construed in favor of the plaintiff, the cause of action have a basis in law and fact, which Appellants' claims readily satisfy.

The court stated in its February 14, 2025, Order that it would "assess the viability" of Claims I and III against the Blackstone Defendants "under the standards applicable to a Rule 91a.1 motion to dismiss." CR6071. The Texas Supreme Court instructs that a plaintiff's allegations are to be "construe[d] liberally" when considering a Rule 91a.1 motion to dismiss. *See In re Facebook, Inc.*, 625 S.W.3d 80, 97 (Tex. 2021). "If a petition provides sufficient facts to give fair notice of the claim, then a motion seeking dismissal based on lack of a basis in fact should be denied." *Darnell v. Rogers*, 588 S.W.3d 295, 301 (Tex. App.—El Paso 2019, no pet.) (quotation omitted). "Because Rule 91a provides a harsh remedy, its requirements must be strictly construed." *Flores v. Bank of Am., N.A.*, 697 S.W.3d 243, 249 (Tex. App.—El Paso 2023, no pet.).

## A. Blackstone and the Blackstone Entities owe fiduciary duties to Appellants based on their control of PEC and BPP.

Appellants' Petition sufficiently alleges breach of fiduciary claims against Blackstone and the Blackstone Entities (together, the "Blackstone Defendants"). The Blackstone Defendants owe fiduciary duties to Plaintiffs under the Partnership Agreement based on their joint control of both PEC and BPP.

Non-partner entities owe fiduciary duties to limited partners when the non-partner controls an entity that in turn controls the limited partnership. Texas law also recognizes that a majority or controlling shareholder may owe fiduciary duties to a minority shareholder. Here, the Blackstone Defendants were the majority shareholders and controlled both PEC, the managing general partner, and BPP, a limited partner that exercised control over the partnership. The Blackstone Defendants therefore exerted complete control over Primexx through their control of both PEC and BPP.

Texas law recognizes multiple tiers of fiduciary duties in a partnership—when a defendant is *not* a partner, it can still owe fiduciary duties to a limited partner based on the defendant's control of a partner

50

that *does* control partnership affairs. "Under Texas law, the usual general partner fiduciary duties apply in this two-tiered structure where [defendant] was acting as the general partner of a general partner." *McBeth v. Carpenter*, 565 F.3d 171, 178 (5th Cir. 2009); *see also In re Harwood*, 637 F.3d 615, 621 (5th Cir. 2011); *Matter of Bennett*, 989 F.2d 779, 790 (5th Cir. 1993) (while the defendant was not a partner *per se*, the defendant owed the limited partners "the highest fiduciary duty recognized in the law" due his role "as the managing partner of the managing partner"). The fact that the controlling entity or individual is not a direct partner does not "insulate" the defendant from its fiduciary duties, because "[i]n light of the thorough control" exercised over the partnership, the defendant "took on a fiduciary duty to the limited partners." *In re Whittington*, 530 B.R. 360, 379 (Bankr. W.D. Tex. 2014) (collecting cases).

Similarly, when a limited partner takes on a greater role by "engag[ing] in control over the operation of the business," the entity that controls the limited partner—including an LLC entity—owes a fiduciary duty to the other partners and the partnership. *See CBIF Ltd. P'ship v.*

51

*TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, at *20 (Tex.

App.—Dallas Apr. 21, 2017, pet. denied).

Here, Appellants make specific allegations regarding the

Blackstone Defendants' extensive control over PEC and BPP:

- Blackstone, through BPP, was the majority shareholder in PEC. CR5754.

- Blackstone had the power to appoint the majority of the PEC Board of Directors. CR5775.

- Through its exercise of the drag-along provision, Blackstone was able to control the votes of the majority of the PEC Board of Directors. CR5758; CR5794.

- Blackstone's actual enforcement of the drag-along provision in practice demonstrates that PEC understood itself to be controlled by Blackstone. CR5804–05.

- The Blackstone deal team for Primexx supervised and managed the actions of the PEC leadership team, including managing the Callon sale. CR5793–94.

- Blackstone's control of Primexx and BPP was effectuated by Blackstone employees who worked on behalf of all Blackstone Defendants as part of a "matrix" organization. CR5781. For example, Blackstone employees signed SEC filings related to Primexx on behalf of the Blackstone Defendants. CR5779–80.

- Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Management Associates VII LLC, BCP VII/BEP II Holdings Manager LLC, and BX Primexx Topco LLC all completely control the Blackstone affiliate one level down as either the sole member, managing member, or general partner of

that entity. CR5781–82. Each of those entities stated in SEC filings related to the Callon sale that their "principal business" is controlling the entity one level down. CR5781–82.

- Blackstone Energy Partners II LP and Blackstone Capital Partners VII LP, which the Term Sheet refers to as "Blackstone," were part of that "matrix" of management. Those two Blackstone funds contributed the money that made Blackstone (through BPP) the majority shareholder in PEC. CR5775–77.

Those allegations defeat a Rule 91a.1 motion. In *McBeth v. Carpenter*, the Fifth Circuit held that a defendant controlled the general partner of the partnership—and thus the partnership itself—when trial testimony established that the defendant was "the man in control" and "heading the efforts" of the partnership. 565 F.3d at 178. Similarly, Appellants allege that the Blackstone Defendants controlled PEC by controlling the majority of its Board. And in *CBIF*, the Dallas Court of Appeals concluded that because the LLC controlled a limited partner that in turn "exerted dominant operating control" over the limited partnership, the LLC owed fiduciary duties:

> The jury found, and appellants do not challenge on appeal, that [limited partner] exerted dominant operating control over the affairs of [limited partnership]. Thus, [limited partner] owed [limited partnership] a fiduciary duty. Columbia, managed by Flory and Canseco, was the general partner of [limited partner] and a manager of [limited partnership]. Thus, Columbia owed [limited partnership] a fiduciary duty.

53

2017 WL 1455407 at *20. The same is true here. The Blackstone Defendants controlled the limited partner BPP, which "exerted dominant operating control" over the partnership.

Blackstone was ultimately the majority shareholder of PEC, which also creates fiduciary duties. While the "majority shareholder's fiduciary duty ordinarily runs to the corporation," "in certain limited circumstances, a majority shareholder who dominates control over the business may owe such a duty to the minority shareholder." *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). A majority shareholder owes fiduciary duties when the relationship between "the majority owner and sole manager" and the "non-participating minority owner" is "substantially similar to the relationship between the general partner and a limited partner in a limited partnership." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 393 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Similarly, a shareholder—even if not a majority shareholder—can owe fiduciary duties to another shareholder based on its level of control and knowledge of the company's operations. *See Vejara v. Levior Intern., LLC*, No. 04-11-00595-CV, 2012 WL 5354681, at *5 (Tex. App.—San Antonio Oct. 31,

54

2012, pet. denied) ("In this case, while not a majority shareholder, [defendant] exhibited the same type of control and had intimate knowledge of [company]'s affairs . . . Thus, we hold [defendant]'s control and intimate knowledge of the company's affairs and plans gave rise to the existence of an informal fiduciary duty to [the other shareholder].").

Appellants allege in this case that Blackstone was ultimately the majority shareholder of PEC. Appellants were minority shareholders in PEC through the Partnership Agreement. Blackstone's control of PEC made its relationship with Plaintiffs "substantially similar to the relationship between the general partner and a limited partner in a limited partnership." *Devon Energy Holdings, L.L.C.*, 367 S.W.3d at 393. Blackstone controlled the PEC Board and the general operations of Primexx, while Appellants did not have any operational control. The Blackstone deal team for Primexx supervised and managed the actions of the PEC leadership team and even *excluded* the PEC leadership team from management decisions. Blackstone had the power to force the Callon sale over strenuous objection from minority shareholders. Appellants sufficiently stated claims against the Blackstone Defendants.

## B. Blackstone and the Blackstone Entities are alter egos of BPP and therefore liable for both breach of fiduciary duty and breach of contract on that basis.

Appellants sufficiently allege alter-ego breach of contract and breach of fiduciary duty claims against the Blackstone Defendants. The Blackstone Defendants use BPP as an alter-ego shell company—operated, run, and capitalized by Blackstone employees and the Blackstone Defendants' funds—to benefit the Blackstone Defendants.

"Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased *and* holding only the corporation liable would result in injustice." *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 335 (Tex. 2024) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). "In Texas, a finding of alter ego liability is based on factors including 'the degree to which . . . corporate and individual property have been kept separately, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.'" *Dalton v. Innov8tive Nutrition, Inc.*, No. 3:24-CV-00687-N, 2025 WL 391737, at *6 (N.D. Tex. Feb. 4, 2025)

(quoting *Castleberry*, 721 S.W.2d at 273). "And when an entity is the defendant, courts also consider":

> "[1] whether the entities shared a common business name, common offices, common employees, or centralized accounting;
>
> [2] whether one entity paid the wages of the other entity's employees;
>
> [3] whether one entity's employees rendered services on behalf of the other entity;
>
> [4] whether one entity made undocumented transfers of funds to the other entity; and
>
> [5] whether the allocation of profits and losses between the entities is unclear."

*Id.* (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 509 (Tex. App.—Houston [1st Dist.] 2012, *pet. dism'd*)).

Appellants make comprehensive allegations regarding the alter-ego nature of the Blackstone Defendants' corporate structure:

- Blackstone operates as one entity without distinctions between subsidiaries. Blackstone is a "matrix" organization in which there are no formal distinctions between entities. CR5781.

- Blackstone senior executives view themselves as working on behalf of "Blackstone" as a unitary organization. CR5781.

- All business on behalf of any Blackstone entity (including BPP) is conducted by Blackstone employees using an @blackstone.com email address. CR5781; CR5787.

57

- Blackstone entities, other than Blackstone, do not have any employees. CR5781.

- Blackstone entities, including BPP, use the Blackstone systems and do not have any of their own email or records systems. CR5781.

- Blackstone entities, including BPP, report on SEC filings that their address is "c/o Blackstone," with the same 345 Park Avenue address as Blackstone. CR5780.

- Blackstone employees serve as presidents/directors of all Blackstone entities and sign SEC filings on their behalf. CR5778–79.

- Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Management Associates VII LLC, BCP VII/BEP II Holdings Manager LLC, and BX Primexx Topco LLC all completely control the Blackstone affiliate one level down as either the sole member, managing member, or general partner of that entity. CR5766–71.

- There is in effect no separate/individual corporate property, as evidenced by the joint beneficial ownership of the Callon shares. CR5800–01.

- BPP was entirely run and operated by Blackstone employees. CR5781; CR5787.

- The Blackstone Defendants siphoned the proceeds from the Callon sale away from BPP. CR5801.

Plaintiffs' allegations state a basis for alter ego liability. In *Tryco Enterprises, Inc. v. Robinson*, the court concluded that the entities were alter egos when "the evidence showed that [controlling individuals]

58

exercised absolute ownership and control over both corporations, maintained a very significant personal financial interest in both corporations, and used them for personal purposes." 390 S.W.3d at 509. The controlling individuals "transferred Tryco's assets to Crown Staffing, which they had previously incorporated. Crown Staffing had the same officers as Tryco, including James Dixon, its president; it took over the offices of Tryco at the same location; it used the same telephone numbers as Tryco; it shared common employees with Tryco; it performed the same temporary staffing services for essentially the same companies; and it was managed by the same managers." *Id*. As described above, the Blackstone Defendants used a similar unitary organizational structure, with no independent employees or resources. Plaintiffs sufficiently allege facts to demonstrate that "the allegations, taken as true, together with inferences reasonably drawn from them," could establish that the Blackstone Defendants and BPP are alter egos. Tex. R. Civ. P. 91a.1.

The Blackstone Defendants may be found liable due to their alter-ego status and the injustice that would result from finding otherwise. Once a plaintiff establishes that entities are alter egos, liability attaches

on tort claims[8] when "holding only the corporation liable would result in injustice." *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 335 (Tex. 2024). Injustice refers to "the kinds of abuse . . . that the corporate structure should not shield," including "fraud" and "evasion of existing obligations." *Id*. (quoting *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)). The plaintiff "must prove that he has fallen victim to a basically unfair device by which a corporate entity has been used to achieve an inequitable result." *Id*. (quoting *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984)).

Appellants allege the Blackstone Defendants siphoned the proceeds of the Callon sale away from BPP, so an "inequitable result" would arise in the absence of alter-ego liability. *See Wilson v. Davis*, 305 S.W.3d 57, 71 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (entity could be liable when the individual defendant was undercapitalized and had used the entity's assets for personal gain). Similarly, Appellants' allegations demonstrate that "evasion of existing obligations," *JNM Express,* 688 S.W.3d at 335, would arise if the Blackstone Defendants were permitted

---

[8] Breach of fiduciary duty is a tort claim. *See McLeod v. McLeod*, 644 S.W.3d 792, 806 (Tex. App.—Eastland 2022, no pet.); *Wren v. Midwestern State Univ.*, No. 05-22-00207-CV, 2023 WL 6139452, at *2 (Tex. App.—Dallas Sept. 20, 2023, no pet.).

to use BPP as their conduit and tool, siphon off BPP's assets to Blackstone in New York, and then avoid BPP's obligations.

The Blackstone Defendants may be found liable on the contractual claims due to the "actual fraud" on Appellants for the individual benefit of the Blackstone Defendants. Although Tex. Bus. Org. Code § 21.223(a)(2) generally limits liability for contractual obligations based on alter-ego, Section 21.223(b) creates an explicit exception to that rule, providing that Section (a)(2) "does not prevent or limit the liability" of an affiliate or beneficial owner if it "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the affiliate or beneficial owner. Tex. Bus. Org. Code § 21.223(b). The "actual fraud" requirement, in contrast to a fraud claim, requires only that the affiliate engaged in "dishonesty of purpose or intent to deceive." *Tryco*, 390 S.W.3d at 508.

Here, Appellants alleged that the Blackstone Defendants engaged in a "dishonesty of purpose or intent to deceive" for the "direct personal benefit" of the Blackstone Defendants. First, Appellants allege that the Blackstone Defendants engaged in a "dishonesty of purpose" when they forced the Callon sale on minority shareholders, resulting in losses of

61

hundreds of millions of dollars compared to Primexx's independently-appraised value, and then quickly siphoned off those proceeds from BPP in Texas for the benefit of the other Blackstone Defendants in New York and Delaware to remove those assets from Appellants' reach. *See, e.g., Belliveau v. Barco, Inc.*, 987 F.3d 122, 130 (5th Cir. 2021) ("Extremely insufficient consideration may provide, at least in the fraudulent transfer context, evidence of actual fraud."). Second, Appellants allege that the Blackstone Defendants engaged in the Callon sale and siphoning of proceeds for their "direct personal benefit." *See Keyes v. Weller*, 692 S.W.3d 274, 283 (Tex. 2024); *Hong v. Havey*, 551 S.W.3d 875, 885 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("In cases in which the direct personal benefit showing has been met, evidence showed that funds derived from the corporation's allegedly fraudulent conduct were pocketed by or diverted to the individual defendant."). The § 21.223(b) exception thus applies to Appellants' contract claims against the Blackstone Defendants.

### C. Appellants state derivative claims against Blackstone and the Blackstone Entities.

Even if this Court determined that the Blackstone Defendants could not be held *directly* liable for breach of fiduciary duty, Appellants

also state *derivative* claims against the Blackstone Defendants based on their participation in PEC's and BPP's breaches. Appellants state claims against the Blackstone Defendants for conspiracy to breach fiduciary duty, knowing participation in breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

First, the Blackstone Defendants may be liable for aiding and abetting, and knowingly participating in, PEC's and BPP's breaches of fiduciary duty, which do not require that the Blackstone Defendants owe fiduciary duties directly. *See, e.g.*, *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574 (Tex. 1942) ("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."); *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting that aiding and abetting involves "assist[ing] the primary actor").

Second, with respect to civil conspiracy, "[t]he actions of one member in a conspiracy might support a finding of liability as to all of the members." *First United Pentecostal Church of Beaumont v. Parker*,

514 S.W.3d 214, 224 (Tex. 2017). A claim for conspiracy does not require that each individual conspirator actually commit the underlying tortious act. *See Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold *at least one* of the named defendants liable.") (emphasis added). It is undisputed that PEC and BPP owe fiduciary duties to Appellants. As a result, even if the Blackstone Defendants did not owe a direct fiduciary duty to Appellants, the Blackstone Defendants may still be liable for the role they played in PEC's and BPP's breaches.

**D.  Section 13.9 of the Partnership Agreement does not compel dismissal of any claims.**

Section 13.9 of the Partnership Agreement does not preclude Appellants' claims. Section 13.2 prevents the Blackstone Defendants and Doyle from establishing they are third-party beneficiaries entitled to invoke § 13.9. And § 13.9 itself is voided by Tex. Bus. Org. Code § 152.002, which prohibits *partnership agreements* from eliminating non-waivable duties.

Section 13.2, titled "Entire Agreement; Applicable Law; Effect," provides that the Partnership Agreement "shall be binding upon the

64

parties hereto, their successors, heirs, devisees, permitted assigns, legal representatives, executors and administrators, but *shall not be deemed for the benefit of creditors or any other Persons*."[9] (emphasis added). CR5898. Section 13.9, which is included in the same "Miscellaneous" article of the Partnership Agreement, is titled "No Recourse." CR5899. That provision states that the partners "acknowledge[] that no Persons other than the Partners shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder" against a wide variety of persons, including current and former officers, directors, and "Affiliates" of partners. CR5899. "Affiliate" is defined in Exhibit B as "any Person directly or indirectly controlling, controlled by, or under common control with, such specified Person," with "control" further defined as "the power to direct or cause the direction of the actions, management or policies of such Person, directly or indirectly . . ." CR5917.

First, § 13.2 establishes that the Blackstone Defendants and Doyle are not third-party beneficiaries to the Partnership Agreement and may

---

[9] "Person" is defined in Exhibit B and encompasses the Blackstone Defendants and Doyle. CR5927 ("Person" defined as "an individual, partnership, tenancy-in-common, joint tenancy-in-common, joint tenancy, joint venture, firm, corporation, trust, charitable institution or other business or legal entity.").

not enforce § 13.9 to their benefit. In *MCI Telecommunications Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647 (Tex. 1999), the Texas Supreme Court held that a third-party was not a beneficiary under the contract and thus could not enforce its provisions "[i]n light of the clear language in the contract that the agreement not be construed as being for the benefit of any nonsignatory." *Id.* at 651. The contract in *MCI* provided that it shall not "be construed as being for the benefit of any party not in signatory hereto." *Id.* at 650. Section 13.2 similarly states that the Partnership Agreement "shall not be deemed for the benefit" of "any other Persons." Accordingly, while § 13.9 may at first appear to provide a benefit to the Blackstone Defendants and Doyle, the Supreme Court rejected that argument in *MCI*: while the contract there "acknowledge[d] certain protections that TU is entitled to as an earlier licensee to the right-of-way," the Court nonetheless found that the "incidental benefit" did not establish that the parties "entered into the contract directly for TU's benefit." *Id.* at 651–52.

Second, § 13.9 is voided by § 152.002(b) of the Tex. Bus. Org. Code, which prohibits a "partnership agreement" from eliminating the obligation of good faith and duties of loyalty and care. That is exactly

66

what § 13.9 purports to do when it eliminates *all* liability for any breaches of those non-waivable duties. Section 13.9 not only eliminates *recourse*—it also purports to eliminate the underlying substantive rights by providing that each partner agrees "no Persons other than the Partners shall *have any obligation hereunder* and that it has no rights of recovery hereunder . . ." CR5899. That provision is invalid.

## IV. Acconcia and Blackstone Are Subject to Specific Personal Jurisdiction in Texas.

Acconcia and Blackstone repeatedly and purposely availed themselves of doing business in the State of Texas to facilitate the sale of the Texas oil assets of a Texas partnership to another Texas oil company for hundreds of millions of dollars. Acconcia and Blackstone are therefore subject to specific personal jurisdiction for this dispute.

"Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). The trial court's factual findings may be challenged "on legal and factual sufficiency grounds." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *see also Walker Ins. Services v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 555 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

67

"Texas's long-arm statute extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit." *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017). Because the "broad doing-business language" in Texas' long-arm statute reaches the limits of the constitutional requirements, courts need "only analyze whether [the defendant]'s acts would bring [the defendant] within Texas' jurisdiction consistent with constitutional due process requirements." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

### A. Acconcia, President of BPP and Director on the PEC Board, personally traveled to Texas and continuously directed and solicited Texas residents regarding the Primexx investment and Callon Sale in Texas.

Acconcia is subject to specific personal jurisdiction because he intentionally and repeatedly availed himself of Texas in connection with this dispute. In the month before executing the drag-along provision, Acconcia traveled to Texas to direct PEC employees and met remotely with Texas bankers *regarding the Callon sale*. His contacts with Texas exceed those courts routinely find sufficient for specific jurisdiction.

Acconcia served as the president of BPP and Director of PEC. CR5776, CR6143–44. He served on the investment team and committee that decided to invest in Primexx, and he signed the Partnership Agreement on behalf of BPP. CR6144–55. As a director, Acconcia participated in bi-weekly telephonic board meetings in Texas. CR6145. Acconcia also had an indirect personal financial interest in Primexx that could impact his Blackstone compensation based on Primexx's performance in Texas. SR38 (Supplemental Record); CR6146.

In June 2021, Acconcia organized and initiated a call titled "Primexx" with the "senior" Citibank investment bankers based in Houston and representing Callon *in the sale of Primexx to Callon*. SR82–87; SR122–23. And after the Primexx sale to Callon was publicly announced, Acconcia met with the CEO of Callon *to discuss the Primexx sale*. SR91-93; Blackstone Inc. Sealed Exhibits.

But his work on the Primexx transaction began earlier than that. In April 2021, Acconcia organized and initiated a call with the PEC executive team and RBC bankers based in Houston titled "Primexx/ RBC/ BX re: general status and next steps discussion." SR195. Acconcia arranged a call and discussed a potential Primexx collaboration with an

69

oil and gas company based in Midland, Texas with an investor from Warburg Pincus while that investor was in Texas. SR114; CR6146. He remotely participated in a board meeting on June 9, 2021, that was held "in person in Dallas, Texas and via teleconference." SR24; Acconcia Sealed Exhibit. He flew to Dallas in early June 2021 to meet *in-person in Texas* with the PEC leadership team, including Doyle, the then-CEO. SR181; CR6145. Later that month, Acconcia flew to Houston for meetings and called Doyle, who was in Texas, while in Houston. SR183; CR6145.

Acconcia's established contacts far exceed what Texas courts regularly deem sufficient to establish specific jurisdiction.[10] *See, e.g., Yujie Ren v. ANU Res., LLC*, 502 S.W.3d 840, 848 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("[A] single contact may be sufficient to establish specific jurisdiction."); *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (directors were involved in conducting due diligence for the potential merger, and the court concluded that "[t]he merger discussions

---

[10] For example, there could still be specific jurisdiction over Acconcia even if he never entered the state of Texas in connection with Primexx. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009) ("[J]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state.") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

and exchange of information were not unilateral and showed that [the directors] were availing themselves of the privilege of conducting business-a possible corporate merger-with a Texas corporation"); *Henkel v. Emjo Investments, Ltd.*, 480 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (the "most notabl[e]" evidence of a defendant's minimum contacts with Texas was the fact that the defendant's "membership on [a Texas-based corporation]'s board of directors created 'continuing obligations' between himself and a Texas-based company, the formation of which is alleged to be at the center of the alleged fraudulent investment scheme").

Appellants' claims "arise[] from or [are] related to" Acconcia's Texas "contacts or activities." *See Retamco*, 278 S.W.3d at 337. Acconcia's availment of Texas pertained specifically to the dispute in this case. Appellants allege that Acconcia played a "central" and "instrumental" role in pushing through the Callon sale. CR6144. Appellants further allege that Acconcia actively participated in, and facilitated, Blackstone's failure to evaluate Primexx's viable options; conduct a proper due diligence, sale, or marketing process; consider how a rushed sale would harm Appellants; and conduct a proper allocation of the proceeds from

71

the Callon sale. CR6144. Acconcia's intentional contacts with Texas relate to Acconcia's ongoing management of Primexx throughout 2021 in the lead-up to the Callon sale *and* his involvement in the Callon sale itself. For example, Acconcia organized and initiated a call with the Citibank investment bankers based in Houston who *represented Callon* in the sale, regarding the Callon sale, shortly before executing the drag-along transaction in Texas. SR82–87; SR122–23.

The exercise of specific jurisdiction over Acconcia does "not offend traditional notions of fair play and substantial justice." *See M&F Worldwide Corp.*, 512 S.W.3d at 88. Acconcia is not unduly burdened by appearing in Texas, especially considering his travel to Texas in connection with his role as a Director of PEC, a Texas corporation, in which Acconcia represented the majority shareholder. *See Moncrief Oil*, 414 S.W.3d at 155. Texas has a compelling interest in adjudicating the claims against Acconcia, which involve Acconcia's active leadership of a Texas corporation's sale of oil assets physically located in Texas to another oil company based in Texas.

**B.** **Blackstone controlled and managed, and directed the sale of, the Texas oil assets of a Texas partnership to profit.**

Blackstone, the majority shareholder of a Texas oil partnership that managed Texas oil assets, forced the sale of those Texas-based assets to another Texas-based oil company and received hundreds of millions of dollars from Texas as a result.

Blackstone is the publicly-traded parent company of BPP and each of the Blackstone Entities. CV5765. Each of the Blackstone Entities, over which the Business Court already asserted jurisdiction, sit below Blackstone in a direct chain that starts with Blackstone and ends with BPP. CV5765, CV5773–78. Blackstone is operated as a "matrix" organization in which Blackstone employees conduct work on behalf of BPP and the Blackstone Entities, which do not have their own employees. CR5779. BPP is operated by employees of Blackstone using an @blackstone.com email domain. CR5779, CR5785. In its SEC filings, BPP lists its address as "c/o Blackstone," and the signatories on BPP's SEC filings are Blackstone employees. CR5777.

Appellants allege that employees of Blackstone, working on behalf of Blackstone, were responsible for "coordinating, managing, and

73

approving" the Callon Sale, even though they knew that the sale price was unjustifiably low. CR5792. Appellants further allege that at the time of the Callon sale, "a Blackstone executive admitted to a Primexx board member that senior Blackstone executives gave the direction to exit the investment even though he knew it was a bad deal." CR5788. The contacts of Blackstone employees are imputed to Blackstone for purposes of specific jurisdiction. *Huynh v. Nguyen,* 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The Texas contacts of agents or employees are attributable to their nonresident principals."); *Coleman v. Klockner & Co. AG,* 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("An agent's contacts can be imputed to the principal for purposes of the jurisdictional inquiry.").

Blackstone repeatedly and intentionally availed itself of Texas to profit from its business there, including by orchestrating the Callon sale and receiving hundreds of millions of dollars from Texas as a result. *See, e.g., Fjell Tech. Grp. v. Unitech Int'l Inc.,* No. 14–14–00255–CV, 2015 WL 457805, at *1 (Tex. App.—Houston [14th Dist.] Feb. 3, 2015, pet. denied) (the actions of a Norwegian company constituted purposeful availment of Texas when the company "sought to profit when they sent mails into

74

Texas for the express purpose of becoming a supplier to Texas-based companies"). As the Texas Supreme Court described in *Moncrief Oil,* "the United States Supreme Court concluded that forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer specific jurisdiction." *Id.* (citing *Burger King,* 471 U.S. at 468, 478). That is what happened here: Blackstone joined an enterprise in Texas, sent money to Texas for that enterprise, directed its executive employees to manage that investment in Texas for many years, orchestrated the sale of the Texas-based real property of that Texas company to another Texas-based company, and accepted the proceeds of that transaction from Texas.

The Business Court minimized Blackstone's availment of Texas by claiming that Appellants' allegations turned primarily on the role of Acconcia, and the Business Court concluded that "Acconcia's Texas-based contacts were performed on behalf of either PEC or BPP, not Blackstone" CR6173. As evidenced above, Appellants' allegations do not solely rely upon Acconcia. But in any event, the Business Court's conclusion that Acconcia acted on behalf BPP, not Blackstone, was wrong.

At his deposition, Acconcia *did not even recall* that he served as President of BPP, even though he signed the Partnership Agreement on behalf of BPP as its President. SR26. Acconcia did not recognize the name BPP on an organizational chart listing the entities at issue in this case. SR22–24. And he did not recall conducting any work at all for BPP. SR22–27. Acconcia did remember, however, that he worked for Blackstone from 2004 to 2021 and served as its "Senior Managing Director" from approximately 2015 through 2021. SR14–16. Acconcia's email signature while managing Primexx read "Senior Managing Director, Private Equity, The Blackstone Group," with the same 345 Park Avenue address Blackstone lists in its SEC filings.[11] SR205. Undisputed evidence demonstrates that Acconcia conducted his Primexx-related work in his capacity as a Blackstone executive.

The exercise of specific jurisdiction over Blackstone "does not offend traditional notions of fair play and substantial justice." *See M&F Worldwide Corp.*, 512 S.W.3d at 88. Blackstone forced the sale of the Texas oil assets of a Texas partnership to another Texas-based company

---

[11] The Blackstone Group informed the SEC that it changed its name to Blackstone effective August 6, 2021. CR5270.

and received hundreds of millions of dollars as a result. Texas has a strong interest in adjudicating alleged breaches of fiduciary duty that occurred with respect to an investment in a Texas partnership and the sale of valuable Texas oil assets to another Texas-based company. While Blackstone is incorporated in Delaware, being subjected to suit in Texas "imposes a burden on . . . all nonresidents," and "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief Oil*, 414 S.W.3d at 155. The exercise of jurisdiction over Blackstone comports with the notions of fair play and substantial justice.

## PRAYER FOR RELIEF

The Business Court correctly recognized that BPP, PEC, and Doyle owed contractual and statutory fiduciary duties to Appellants, but then wrongly denied Appellants' request to conduct discovery and granted summary judgment for Appellees based on factual arguments Appellees expressly waived. The Partnership Agreement and Texas Business Organizations Code required Appellees to act in good faith in liquidating Primexx for pennies on the dollar, which Appellees utterly failed to establish as a matter of law. Accordingly, Appellants respectfully request

77

that this Court reverse the judgment of the Business Court and remand

for further proceedings consistent with its opinion.

Dated: October 15, 2025

Respectfully submitted,
SUSMAN GODFREY L.L.P.

By: */s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.
State Bar No. 24062998 (TX)
sshackelford@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Bryan Caforio
State Bar No. 261265 (CA)
bcaforio@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Lindsey Godfrey Eccles
State Bar No. 33566 (WA)
leccles@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Sarah Hannigan

State Bar No. 5961248 (NY)
shannigan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

***Attorneys for Appellees***

## Certificate of Service

This is to certify that on October 15, 2025, a true and correct copy of the above and foregoing instrument was properly forwarded to counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure.

*/s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.

## Certificate of Compliance

This is to certify that, pursuant to Rule 9.4 of the Texas Rules of Appellate Procedure, this document contains 14,985 words.

*/s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stephen Shackelford on behalf of Stephen Shackelford
Bar No. 24062998
sshackelford@susmangodfrey.com
Envelope ID: 106925956
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellants Brief Requesting Oral Argument
Status as of 10/16/2025 12:17 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Roger Cowie | 783886 | roger.cowie@troutman.com | 10/16/2025 11:54:14 AM | SENT |
| Christopher Patton | 24083634 | cpatton@lynnllp.com | 10/16/2025 11:54:14 AM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Zack Ewing | | zack.ewing@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Nicholas Perrone | | nicholas.perrone@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Gary Vogt | | gvogt@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Griffin Vail | | griffin.vail@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 10/16/2025 11:54:14 AM | SENT |
| Austin Lesch | | austin.lesch@kirkland.com | 10/16/2025 11:54:14 AM | SENT |
| Michael Patton | | michael.patton@kirkland.com | 10/16/2025 11:54:14 AM | SENT |

Associated Case Party: Primexx Energy Opportunity Fund, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Sarah Hannigan | | shannigan@susmangodfrey.com | 10/16/2025 11:54:14 AM | SENT |
| Bryan Caforio | | bcaforio@susmangodfrey.com | 10/16/2025 11:54:14 AM | SENT |
| Michelle Williams | | mwilliams@susmangodfrey.com | 10/16/2025 11:54:14 AM | SENT |
| Josephine Wang | | jwang@susmangodfrey.com | 10/16/2025 11:54:14 AM | SENT |

No. 15-25-000120-CV

**In the Court of Appeals
for the Fifteenth District of Texas**

---

**Primexx Energy Opportunity Fund, LP and Primexx Energy
Opportunity Fund II, LP,**

*Appellants,*

**v.**

**Primexx Energy Corporation, *et al*.,**

*Appellees.*

---

**Appeal from the Texas Business Court, First Division**
Dallas County, Texas
Honorable Bill Whitehill

---

**APPENDIX TO APPELLANTS' BRIEF**

**ORAL ARGUMENT REQUESTED**

---

**SUSMAN GODFREY L.L.P.**

Stephen Shackelford, Jr.
State Bar No. 24062998 (TX)
sshackelford@susmangodfrey.com
1000 Louisiana Street, Ste 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Bryan Caforio
bcaforio@susmangodfrey.com
Lindsey Godfrey Eccles
leccles@susmangodfrey.com
Sarah Hannigan
shannigan@susmangodfrey.com

*Attorneys for Appellants*

# APPENDIX 1



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP, *Plaintiffs*, <br><br> v. <br><br> PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLS, BX PRIMEXX TOPCO LLC, and BPP HOLDCO LLC, *Defendants* | § § § § § § § § § § § § § § § § § § § § § § § § § | Cause No. 24-BC01B-0010 |

---

**FINAL JUDGMENT**

---

The court issued a January 17, 2025, Blackstone Special Appearances Order, followed by a February 10, 2025, Opinion and Order; March 10, 2025, Summary Judgment Opinion and Order; April 10, 2025, Reconsideration Order, followed by an April 15, 2025, Opinion and Order; April 28, 2025, Acconcia and Blackstone Inc. Special Appearances Order; May 9, 2025, Counts I and III Order; and May 22, 2025, Doyle and Blackstone Defendants Opinion and Order (the "Orders").

In light of the Orders, the remaining claims in the above-captioned matter are "claims that (i) the Callon sale proceeds were not properly distributed according to the TAPA waterfall and (ii) the consideration was not fairly allocated between PEP and BPP" ("Remaining Claims"). *See* March 10, 2025, Summary Judgment Opinion and Order, ¶ 200. The remaining Defendants in the above-captioned matter are BPP HoldCo LLC and Primexx Energy Corporation (collectively, the "Remaining Defendants").

On June 3, 2025, the parties filed a Rule 11 Agreement in which the parties agreed Plaintiffs shall dismiss without prejudice the Remaining Claims against the Remaining Defendants so that the causes of action and claims dismissed by the Orders can proceed to appealable judgment.

Accordingly, the court dismisses without prejudice the Remaining Claims against the Remaining Defendants.

It is ORDERED, Adjudged, and Decreed that this court lacks personal jurisdiction over Blackstone Inc. and Angelo Acconcia.

It is ORDERED, Adjudged, and Decreed that all causes of action against M. Christopher Doyle, Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Energy Partners II LP, Blackstone Management Associates VII LLC, Blackstone Capital Partners VII LP, BCP VII/BEP II Holdings Manager LLC, and BX Primexx Topco LLC are dismissed with prejudice for the reasons stated in the court's May 22, 2025, Memorandum Opinion and Order.

It is ORDERED, Adjudged, and Decreed that summary judgment is granted to M. Christopher Doyle, Primexx Energy Corporation, and BPP HoldCo LLC on all claims except "claims that (i) the Callon sale proceeds were not properly distributed according to the TAPA waterfall and (ii) the consideration was not fairly allocated between PEP and BPP."

Accordingly, the court orders that Plaintiffs take nothing. This Final Judgment finally disposes of all claims, causes of action, and parties before

the court.  To the extent not addressed herein or in a prior order of the court, all relief requested by Plaintiffs is denied.  This judgment is appealable.

It is SO ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED:  June 16, 2025

4

# APPENDIX 2

2025 Tex. Bus. 9



The Business Court of Texas,
1st Division

PRIMEXX ENERGY
OPPORTUNITY FUND, LP and
PRIMEXX ENERGY
OPPORTUNITY FUND II, LP,
*Plaintiffs*,

v.

PRIMEXX ENERGY
CORPORATION, M.
CHRISTOPHER DOYLE,
ANGELO ACCONCIA,
BLACKSTONE INC.,
BLACKSTONE HOLDINGS III
LP, BLACKSTONE EMA II LLC,
BMA VII LLC, BLACKSTONE
ENERGY MANAGEMENT
ASSOCIATES II LLC,
BLACKSTONE ENERGY
PARTNERS II LP, BLACKSTONE
MANAGEMENT ASSOCIATES
VII LLC, BLACKSTONE
CAPITAL PARTNERS VII LP,
BCP VII/BEP II HOLDINGS
MANAGER LLS, BX PRIMEXX

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Cause No. 24-BC01B-0010

TOPCO LLC, and BPP HOLDCO          §
LLC, *Defendants*                           §

═══════════════════════════════════════

## OPINION AND ORDER

═══════════════════════════════════════

### *Syllabus*[*]

*This opinion addresses the nature, scope, adaptability, and enforcement of a partner's statutory duties of loyalty and care and obligation to perform them in (i) good faith and (ii) a manner it reasonably believes to be in the partnership's best interest when that partner exercised its drag-along rights and sold the partnership's business.*

*Texas's freedom of contract principles give partners wide latitude to expand or limit their conduct standards. But the loyalty and care duties and related performance obligations cannot be eliminated. This partnership agreement expressly limits those duties and obligations to the greatest extent permitted by law. This case centers on the enforceability of those limits.*

### I. OPINION

[¶ 1] This is a drag-along sale case arising from a private equity investment in a limited partnership. The controlling partner exercised its partnership agreement drag-along sale rights to force an exit event sale, and two minority owners complain that the sale was unlawful.

[¶ 2] Drag-along rights are a normal vehicle for majority owners to force minority owners—potentially against their will—to sell their interests to a

---

[*] This syllabus is provided for the reader's convenience; it is not part of the Court's opinion; and it is not legal authority.

third party on terms and conditions the majority owner decides. So, there may be conflicts between the owners when the majority decides to sell at a price or on terms the minority dislikes. The issues can be more acute where the parties hold different equity positions. Thus, parties creating such agreements often negotiate terms protecting themselves in a future drag-along sale.

[¶ 3] Two limited partners sued the controlling partner and managing general partner alleging that they breached "fiduciary" and contract duties and obligations by, among other things, (i) accepting too low a price; (ii) failing to perform adequate due diligence, consider continuing the business as a viable stand-alone business or other alternatives, consider whether the sale was fair to the partnership and other partners; and (iii) not giving timely notice of the sale. They also sued the managing partner's chief executive for conspiracy and other "derivative theory" causes of action.[1]

[¶ 4] Those defendants moved for traditional summary judgment.[2] The material facts are undisputed, and the result turns on the extent to which (i)

---

[1] Plaintiffs sued numerous other parties, but they are not included in this summary judgment motion.

[2] Movants' attacked plaintiffs' original petition, which was their then live pleading. Plaintiffs since filed their first amended petition (FAP), which adds an additional defendant but no new causes of action. The parties agreed that the FAP would not moot the summary judgment motion. So, this opinion and order is directed to the FAP.

the Texas Business Organizations Code (TBOC) displaces common law partnership fiduciary duty law and (ii) partners may limit a partner's "fiduciary like" responsibilities to the partnership and other partners.

[¶ 5] The court denies the motion regarding plaintiffs' claims that the sales proceeds (i) were misapplied under the partnership agreement and (ii) were unfairly allocated between the partnership and a "sidecar" business sold in the same transaction.

[¶ 6] However, based on the partnership agreement's plain text, the court otherwise concludes that the controlling partner's drag-along rights meet minimum statutory requirements. Further, except as described in ¶ 5, the evidence conclusively proves that the controlling partner and the managing general partner met their modified statutory and contract duties and obligations.

[¶ 7] Additionally, for the reasons discussed in ¶ 6, the court grants the motion regarding "derivative liability" theories regarding the managing partner and its chief executive to the same extent the court grants the controlling partner's motion.

[¶ 8] Moreover, the court directs the parties to provide additional briefing regarding plaintiffs' remaining derivative liability theories.

[¶ 9] The summary judgment motion concerns only the duty and breach elements of plaintiffs' causes of action. Thus, the court expresses no opinion regarding plaintiffs' injury causation and resulting damages elements.

## II. JURISDICTION AND VENUE

[¶ 10] This court has subject matter jurisdiction since this is a partnership governance dispute and the amount in controversy exceeds $5 million. TEX. GOV'T CODE § 25A.004(b)(2) and (4)–(6).

## III. THE SUMMARY JUDGMENT RECORD

[¶ 11] The court considered the parties' summary judgment filings and proper summary judgment evidence. It did not consider evidence movants filed with their prior supplemental briefing because they did not seek leave to supplement the record and plaintiffs in substance objected to that evidence. Neither party objected to any other summary judgment evidence.

## IV. FACTS AND PEOFS' CLAIMS

[¶ 12] The court derives these facts from the parties' summary judgment evidence and PEOFs' FAP admissions.

## A. The Parties and Related Entities

[¶ 13] Primexx Energy Partners, Ltd. (PEP) was a limited partnership.[3] Its Third Amended and Restated Partnership Agreement (TAPA) is the applicable agreement.[4] PEP owned Primexx Resource Development, LLC (PRD).[5] PEP and PRD are not parties.

[¶ 14] Primexx Energy Opportunity Fund LP (PEOF I) and Primexx Energy Opportunity Fund II (PEOF II) were PEP limited partners.[6] PEOF I signed the TAPA through its representative Whittier Management GP LLC, by Steven A. Anderson as the Vice President of Whittier Holdings, Inc.[7]

[¶ 15] BPP HoldCo LLC (HoldCo or Blackstone) was a PEP limited partner.[8] HoldCo is a Blackstone Inc. affiliate.[9]

---

[3] FAP ¶ 1.

[4] FAP ¶ 1; Movants' Ex. 2 (TAPA).

[5] FAP ¶ 1.

[6] FAP ¶s 42, 55.

[7] TAPA at 73.

[8] Movants' Ex. 1 (PIPA); FAP ¶ 1.

[9] FAP ¶ 20.

[¶ 16]  Primexx Energy Corporation (PEC) was PEP's managing general partner.[10]  PEC was formed in September 2000, and in 2021 was governed by its July 2016, Second Amended and Restated Bylaws (Bylaws).[11]

[¶ 17]  A nine-member board of directors controlled PEC.[12]  HoldCo appointed five such directors, PEOF I appointed two, and Tom Fagadau appointed two.[13]  Thus, at all relevant times HoldCo controlled PEC's Board.[14]

[¶ 18]  Angelo Acconcia and four others were HoldCo's initial-appointed directors.[15]  Jim Jeffs and Robert Holland were PEOF I's appointed directors, and Tom and Chip Fagadau were Fagadau's appointed directors.[16]

[¶ 19]  Under the Bylaws, Tom Fagadau was PEC's President and Chief Executive Officer.[17]  However, as of August 2, 2021, Christopher Doyle held those positions.[18]

---

[10] FAP ¶s 1, 42.

[11] Movants' Ex. 10 (Bylaws).

[12] FAP ¶ 82.

[13] Bylaws at Art. III, § 2; Schedule I.  The Bylaws do not define "Blackstone," however, context shows that it means HoldCo.  Both the TAPA and the PIPA, entered contemporaneously with the Bylaws, define "Blackstone" to mean HoldCo. (TAPA at 1; PIPA at 1).  Furthermore, the Bylaws were signed by HoldCo.  (Bylaws at 21).

[14] FAP ¶ 53.

[15] Movants' Ex. 10 (Bylaws) at Schedule I.

[16] Movants' Ex. 10 (Bylaws) at Schedule I.

[17] Movants' Ex. 10 (Bylaws) at Schedule II.

[18] FAP ¶ 33; Movants' Ex. 3 (Aug. 2, 2021, Board Minutes).

[¶ 20] PEOFs sued Doyle, PEC, HoldCo, Blackstone Inc., various Blackstone Inc. affiliates[19], and Angelo Acconcia. Acconcia, Blackstone Inc., and the Blackstone Inc. affiliates did not join this motion.

## B. PEP's Background

[¶ 21] PEP's operating company, PRD, developed horizontal drilling properties in the Permian Basin.[20]

[¶ 22] In 2016, PEP engaged firms to identify opportunities for reducing its debt and raising capital.[21] After considering several proposals and multiple financing options, PEP chose "The Blackstone Group's" offer as the most attractive based on its valuation, capital commitment, and reputation.[22]

[¶ 23] Before signing the TAPA, "Blackstone," certain members of PEP's management team, and PEP's existing equity holders created a term sheet outlining expected terms for "Blackstone's" potential investment.[23] Per the term sheet, they expected a transaction whereby (i) "Blackstone" would

---

[19] FAP ¶ 20 ("All of the other Blackstone Defendants are direct subsidiaries of Blackstone Inc.").

[20] FAP ¶s 1, 37.

[21] FAP ¶ 40.

[22] FAP ¶ 41. In 2021, The Blackstone Group changed its name to Blackstone Inc. *Id.*

[23] FAP ¶ 48; TAPA at Annex B. The court uses "Blackstone" throughout this opinion where PEOFs are unclear regarding which Blackstone entity or related person they refer to.

invest up to $500 million; (ii) "Blackstone" would control a management company with five of nine board members; (iii) with three exceptions not relevant here, all "Board matters" would be decided by a majority vote; (iv) "Blackstone" could at any time force an in-kind distribution of all Company assets in a "Liquidity Event" in accordance with an agreed distributions waterfall; and (v) "Blackstone" would have "customary drag-along rights" regarding a potential sale of the partnership Units.[24]

[¶ 24] HoldCo and PEP signed a fifty-four-page Partnership Interest Purchase Agreement (PIPA) stating terms whereby HoldCo would invest in PEP.[25]

[¶ 25] HoldCo signed the TAPA as a limited partner (Unitholder).[26] PEC remained PEP's Managing General Partner[27] and, at some point, contributed $1,000 as a Managing General Partner Capital Contribution.[28]

---

[24] FAP ¶ 48; TAPA at Annex B.  The term sheet and other documents do not say which "Blackstone" entities would provide the new equity or how "Blackstone" would internally structure its investment.

[25] PIPA; *see also* TAPA at 1.

[26] FAP ¶ 42; TAPA at 1, 83.

[27] FAP ¶ 42.

[28] TAPA § 3.2.

## C. Partners' Duties to the Partnership and other Partners

[¶ 26] Per the TAPA, HoldCo and PEC owe PEP and its partners the duty of good faith and fair dealing to the fullest extent Texas law requires:

> Each Partner and the Managing General Partner shall, to the fullest extent required by Texas Law, owe to the Partnership and its Partners the duties of good faith and fair dealing, and in the case of the Managing General Partner, the duty to not exceed in such capacity the bounds of authority granted to any general partner by this Agreement and Texas law (all such duties collectively, the "Agreed Duties").[29]

[¶ 27] But the TAPA then limits—to the extent the law permits—HoldCo's and PEC's duties to the partnership and other partners, including giving HoldCo and PEC the right to make partnership decisions in their sole and absolute discretion and in their own sole interests.[30] For example,

> (ii) To the extent that, at law or in equity, a Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to the applicable law, any such duty, other than the Agreed Duties, is hereby eliminated to the fullest extent permitted pursuant to applicable law, it being the intent of the Partners that to the extent permitted by law and except to the extent set forth in this Section 5.9 or expressly specified elsewhere in this Agreement, no Partner or the Managing General Partner, in their capacities as such, shall owe any duties of any nature whatsoever to the Partnership, the other Partners or any Assignee, other than the Agreed Duties, and each Partner, in its capacity as such, may decide or

---

[29] TAPA § 5.9(a) (emphasis original).
[30] TAPA §§ 5.9(b)–(c).

determine any matter in its sole and absolute discretion taking into account solely its interests and those of its Affiliates *(excluding the Partnership and its Subsidiaries)* subject to the Agreed Duties. Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this agreement were not acceptable to it.[31]

## D. HoldCo's Drag-Along Sale Rights

[¶ 28] Next, TAPA Article VI describes the Unitholders' rights, duties, and obligations.[32] In particular, § 6.7 gives HoldCo "drag-along" rights authorizing it to negotiate and ultimately force the other Unitholders to consummate a sale of PEP's business to a third party—provided the sale results from an arm's-length transaction after July 12, 2018.[33] That section also provides for distributing the resulting proceeds pursuant to a TAPA waterfall.[34]

## E. PEOF II and BPP Sidecar

[¶ 29] PEOF II soon became a PEP Unitholder.[35]

---

[31] TAPA § 5.9(c)(ii) (emphasis added). The emphasized parenthetical shows that even if the partnership itself could be considered an affiliate of a partner, the partner is still free to disregard the interests of the partnership. So, the TAPA establishes that partners may put their interests above the partnership, to the extent allowed by applicable law.

[32] TAPA at Art. VI.

[33] TAPA § 6.7(a); *see What Is an Arm's Length Transaction*, Investopedia, https://www.investopedia.com/terms/a/armslength.asp (last visited March 5, 2025).

[34] TAPA § 6.7(b).

[35] FAP ¶ 55.

[¶ 30] "Blackstone" later created a "sidecar vehicle," BPP Acquisition LLC (BPP), to buy additional acreage in PEP's acreage footprint.[36]

## F. The Callon Sale

[¶ 31] PEP's valuations improved in 2020 and 2021.[37] By June 2021, PEOFs' stakes were worth more than $200 million.[38]

[¶ 32] In early Spring 2021, Jim Jeffs learned that PEC's management, led by Doyle, was exploring a potential sale.[39] At that time, Jeffs was a PEC board member and received updates from PEC "management" and the "Blackstone" board members about the sale process.[40]

[¶ 33] In early May, Callon Petroleum made an initial offer of interest to purchase PEP and BPP for $375 million and 8.5 million Callon shares.[41] Three weeks later, it increased the cash portion to $425 million.[42]

---

[36] FAP ¶ 58. *See* Sidecar, Investopedia, https://www.investopedia.com/terms/s/sidecar-investment.asp (last visited March 5, 2025).

[37] *See* FAP ¶s 62–64.

[38] FAP ¶ 64.

[39] PEOFs' Ex. 3 (Jeffs Dec.) ¶ 3.

[40] Jeffs Dec. ¶ 3.

[41] FAP ¶ 69.

[42] FAP ¶ 69.

[¶ 34] On June third, Doyle emailed PEC's Board (including Jeffs) that Callon's enhanced offer was not nearly as compelling as continuing to operate as a stand-alone entity.[43]

[¶ 35] It was reported during a PEC Board meeting a week later that (i) PRD's and BPP's balance sheets had strengthened over the past six months and remained healthy, (ii) they met forecast expectations through the first-quarter 2021, and (iii) the efficient execution and capital acceleration with a second rig expected to grow the companies meaningfully.[44]

[¶ 36] Throughout June and July 2021, Doyle told PEC's Board that he continued speaking with Callon, but it was unable to close the gap and had not presented an attractive offer.[45] During that same period, Callon increased its offer to $440 million cash and 9.2 million shares; however, its share price also decreased so the actual offer remained unimproved.[46]

[¶ 37] On July twenty-eighth, Jeffs and Doyle discussed the potential Callon deal.[47] By then, Callon's stock price had decreased, making its offer

---

[43] FAP ¶ 69; Jeffs Dec. ¶ 5.
[44] FAP ¶ 70.
[45] FAP ¶ 74.
[46] FAP ¶ 75.
[47] Jeffs Dec. ¶ 6.

worth $50 million less than the prior month.[48]  Doyle told Jeffs that Callon's offer was "too low" to be taken seriously and that Callon needed to dramatically increase its offer before he would even consider it a realistic offer.[49]

[¶ 38] Then, "without any warning or explanation," on July thirtieth "Blackstone" told the Board that it had accepted Callon's offer at the same price Doyle two days earlier told Jeffs was too low to even consider.[50]

[¶ 39] Based on information Doyle and the "Blackstone" directors provided directly to Jeffs, he did not understand that a sale was close until Doyle formally announced the sale at the end of July.[51]

[¶ 40] Once Jeffs heard from "Blackstone" about the final sale terms, he spoke with Eric Derrington and Steve Anderson, PEOFs' representatives with Whittier Trust Company.[52]  They in no way suggested that PEOFs supported the deal and expressed their belief that it was hastily put together without sufficient opportunity to evaluate the sale.[53]

---

[48] Jeffs Dec. ¶ 6.
[49] Jeffs Dec. ¶ 6.
[50] Jeffs Dec. ¶ 7.
[51] Jeffs Dec. ¶ 4.
[52] Jeffs Dec. ¶ 9.
[53] Jeffs Dec. ¶ 9; PEOFs' Ex. 4 (Derrington Dec.) ¶s 7–9.

[¶ 41] PEC's board and BPP's board of managers met on August 2, 2021, and after discussion unanimously approved the Callon deal.[54]  However, Tom Fagadau said he did not personally support the sale but was voting for it "only pursuant to drag-along obligations."[55]  Steve Pully similarly voted for the sale, expressing the same sentiment."[56]  No other PEC director, including Jeffs and Langdon, expressed that reservation.[57]

[¶ 42]  The sale closed on October 1, 2021.[58]

[¶ 43] In a phone call around "the time of sale," a "Blackstone" executive told a "Primexx board member" that senior "Blackstone" executives directed the exit although "he" knew it was a bad deal.[59]

## G.    Summary of Claims

[¶ 44]  According to PEOFs:

> 85. By forcing the Board to vote on (and approve) the proposed transaction over a weekend, Blackstone necessarily precluded the Managing General Partner or the Board from engaging in a reasoned and fully informed decision-making process or satisfying their contractual and fiduciary duties.  Yet all

---

[54] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes).

[55] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 2.

[56] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 3.  Chip Fagadau approved the deal for BPP with the same reservation.  *Id.*

[57] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes) at 2–3.

[58] FAP ¶ 94.

[59] FAP ¶ 76.

Blackstone-controlled Board Members voted to approve the sale without conducting any analysis or due diligence to fairly evaluate the transaction and whether it would be fair to all Primexx investors.

86. The final sale documents were executed on August 3, 2021.

*\*\**

87. In the weeks and months leading up to the Callon transaction, Defendants did not hold regularly scheduled Board meetings to discuss and consider whether a sale transaction made sense from the point of view of the company and all of its unitholders, engage in any non-cursory review or analysis of the company's intrinsic fair value or future prospects, or retain experts to conduct thorough due diligence or review of the fairness of the forced sale.[60]

[¶ 45] PEOFs further allege that (i) "Blackstone" structured the sale terms, which included both PRD's assets and "Blackstone's" sidecar (BPP), so "Blackstone" was the only entity to receive any significant sale proceeds[61] and (ii) although PEOFs owned preferred shares, after the Callon sale closed, "Blackstone" paid compensation to common Unitholders, who were behind PEOFs in the payment waterfall.[62]

---

[60] FAP ¶s 85–87.
[61] FAP ¶s 96, 107.
[62] FAP ¶ 98.

## H. Procedural History

[¶ 46] PEOFs sued defendants, except Acconcia, in a state district court.[63]  That court dismissed the case based on a forum-selection clause requiring the suit to be brought in federal court.[64]

[¶ 47]  PEOFs added Acconcia and refiled in federal court.[65]  That court *sua sponte* dismissed the case before any defendant appeared.[66]

[¶ 48]  PEOFs again sued in state court.[67]  Later, in May 2024, movants filed a traditional summary judgment motion challenging the breach element of PEOFs' causes of action and moved to stay discovery.

[¶ 49] In September 2024, PEOFs removed the case to this court.[68]  Based on the parties' agreement, the court dismissed the case without prejudice.[69]  The parties filed a district court Rule 11 agreement providing that

---

[63] FAP ¶ 6.
[64] FAP ¶ 7.
[65] FAP ¶ 8.
[66] FAP ¶s 9–10; FAP Exs. 4, 5.
[67] FAP ¶ 11.
[68] FAP ¶ 12.
[69] FAP ¶ 12.

earlier discovery could be used here and outlining the parties' agreement regarding dispositive motions.[70] PEOFs then filed this action.[71]

[¶ 50] The court held arguments regarding movants' motion and requested supplemental briefing on certain issues. The parties responded with additional briefing and evidence. The court considered the briefing but did not consider the supplemental evidence because it was not properly submitted.

### V. APPLICABLE LAW

#### A.   Summary Judgment Standards

[¶ 51] At any time, a defendant may move with or without supporting evidence for a summary judgment as to all or any part of any causes of action asserted against it. TEX. R. CIV. P. 166a(b). The motion must state its specific grounds. *Id.* at 166a(c).

[¶ 52] Thereafter, the court *shall* render judgment if the pleadings, summary judgment filings, and properly filed evidence show that, except as to the amount of damages, there is no *genuine* issue as to any *material* fact and the movant is entitled to judgment as a matter of law on the issues stated in

---

[70] FAP ¶ 13.
[71] FAP ¶ 13.

the motion or in an answer or any other response. *Id.*; *JLB Builders, L.L. C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021).

[¶ 53] A court can grant a defendant traditional summary judgment only if the defendant's evidence as a matter of law either proves all elements of its defense or disproves at least one element of the nonmovant's claim. *See, e.g., Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (causation disproved as a matter of law).

[¶ 54] So, a summary judgment motion

> . . . is essentially a motion for a pretrial directed verdict. * * * Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. * * * [Courts] review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. * * *

*Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006) (citations omitted).

[¶ 55] A genuine fact issue exists if more than a scintilla of evidence supports the alleged fact. *See Amazon.com Servs. LLC v. Grant*, No. 05-23-01306, 2024 WL 5053063, *2 (Tex. App.—Dallas Dec. 10, 2024, no pet.).

Evidence is more than a scintilla when it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). However, less than a scintilla exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

[¶ 56] When a partnership agreement's terms are unambiguous and the material facts are undisputed, compliance with those terms is a question of law for the court. *Hrdy v. Second St. Props.*, 649 S.W.3d 522, 554 (Tex. App.—Houston [1st Dist.] 2022, pet. denied).

[¶ 57] Accordingly, to decide this motion the court must apply contract and statutory construction principles to the TAPA, movants' motion, PEOFs' response, and the summary judgment evidence.[72]

---

[72] At common law, transactions between a partner and the partnership or other partners are presumed unfair, and the partner seeking to justify the transaction must prove its fairness. *Hrdy*, 649 S.W.3d at 539; *Texas Bank & Tr. Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). However, the court need not address whether that burden allocation applies to statutory causes of action at trial because movants must conclusively establish the Callon sale's fairness to negate the breach element of PEOFs' "fiduciary" breach claims as a matter of law. *Hrdy*, 649 S.W.3d at 539, 554.

## B.    Contract Construction Rules

[¶ 58] Courts construe partnership agreements like contracts.  *Id*.  A court's primary objective when construing contracts "is to ascertain and give effect to the parties' intent as expressed in the instrument."  *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (quoting *URI, Inc. v. Kleberg Cty*, 543 S.W.3d 755, 763 (Tex. 2018)).

[¶ 59] Usually, courts deem the contract alone to express the parties' intent because it is objective, not subjective, intent that controls.  *Id.*

[¶ 60] With unambiguous contracts, courts "can determine the parties' rights and obligations under the agreement as a matter of law."  *Inwood Nat'l Bank v. Fagin*, No. 24-0055, 2025 WL 349890, *4 (Tex. January 31, 2025) (per curiam) (quoting *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

[¶ 61] Additionally, context is a permissible indicator of meaning, and courts are to harmonize and give effect to all contract terms by analyzing them regarding the whole contract.  *Polyco*, 681 S.W.3d at 390.

[¶ 62] Appropriate context includes the circumstances that existed when the parties made their contract:

> Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered. This is so because words are the skin of a living thought, and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

*Board of Regents of the Univ. of Texas Sys. v. IDEXX Labs., Inc.*, 691 S.W.3d 438, 444 (Tex. 2024) (per curiam) (quoting *URI, Inc.*, 543 S.W.3d at 764). Stated differently, context includes the business context and realities the words were meant to address. *Id.* at 445.

## C.    Statutory Construction Rules

[¶ 63] Statutory construction's purpose is to implement the Legislature's intent by giving effect to every word, clause, and sentence. *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 689–90 (Tex. 2020). Indeed, statutory text is the "first and foremost" indication of legislative intent. *Greater Hous. P'Ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). Thus, courts apply the words' common, ordinary meaning unless (i) the text supplies a different meaning or (ii) the common meaning produces absurd results. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

[¶ 64] Further, courts derive statutory meaning from the entire statute. TEX. GOV'T CODE § 311.021(2); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560,

572 (Tex. 2016). So, courts "presume the Legislature chose statutory language deliberately and purposefully," *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014), and that it likewise excluded language deliberately and purposefully, *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

[¶ 65] Absent contrary text, courts assume the Legislature uses statutory terms having a supreme-court-developed common law meaning to convey a consistent statutory meaning. *SandRidge Energy, Inc. v. Barfield*, 642 S.W.3d 560, 566 (Tex. 2022). But a statutory provision inconsistent with prior common law decisions "eliminates any instructive or persuasive value those decisions may have once had." *American Star Energy and Minerals Corp. v. Stowers*, 457 S.W.3d 427, 434 (Tex. 2015).

[¶ 66] Finally, but critically, Texas upholds parties' contractual freedom to narrow general fiduciary duties consistent with statutory minimum requirements:

> Unless otherwise provided by statute or law, duties owed by an agent to his or her principal may be altered by agreement. Accordingly, factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal.

*National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (principal's contract with third-party administrator limited agent's fiduciary duties to its principal according to agreed terms); *Strebel v. Wimberly*, 371 S.W.3d 267, 284 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (partnership agreement may limit partners' fiduciary duties).

[¶ 67] That is, "the substance of an agreement to act on behalf of a principal must be considered in determining the exact nature of the relationship." *National Plan*, 235 S.W.3d at 702–03. Even more specifically, parties may agree to limit an agent's general duty to act solely for the principal's benefit in all matters connected with their relationship. *Id.* at 703.

[¶ 68] Thus, courts will not impose a general fiduciary duty when the parties agreed that a partner can take actions that would otherwise violate it. *Id.* at 703. This is especially so where the contract results from a transaction between sophisticated parties represented by experienced representatives and counsel. *Id.* at 702.

## D. Interpretive Canons

[¶ 69] Further, the *expressio unius est exclusio alterius* canon, which presumes that purposeful inclusion of specific terms implies the purposeful exclusion of terms that do not appear, is a proper construction maxim absent a

valid alternative construction. *City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011); Antonin Scalia and Bryan A. Garner, Reading Law 107 (2012).

[¶ 70] Conversely, the *noscitur a sociis* canon—"it is known by its associates"—provides that a word or phrase's meaning, especially one in a list, should be known by the words immediately surrounding it. *Paxton*, 468 S.W.3d at 61. Courts rely on this canon to avoid giving a word a meaning so broad that it is incompatible with the statutory context. *Id.*

## E.    Intermediate Appellate Court Precedents

[¶ 71] This court began operating September 1, 2024, and the simultaneously created Fifteenth Court of Appeals has exclusive intermediate appellate jurisdiction over business court decisions. *See* Act of May 25, 2023, 88th Leg., R.S., ch. 380, §§ 8, 2023 Tex. Sess. Law Serv. 919, 929 (H.B. 19) (business court creation); Tex. Gov't Code § 254.007 (appellate jurisdiction). And neither the Fifteenth Court nor this court has decided cases addressing this case's partnership issues. Thus, Texas Supreme Court decisions are currently the only judicial precedents addressing these issues. However, this court considers other intermediate appellate decisions for whatever persuasive value they have.

**F. Applicable Business Organizations Code Provisions**

**1. Introduction**

[¶ 72] A limited partnership is a partnership formed by two or more persons, with one or more general partners and one or more limited partners. TBOC § 1.002(50); Byron F. Egan, EGAN ON ENTITIES 467 (4th Ed. 2023).

[¶ 73] TBOC Chapter 153 governs limited partnerships. However, Ch. 152's general partnership laws and other rules of law and equity compatible with Ch. 153 also apply to limited partnerships. TBOC § 153.003(a)–(b).

[¶ 74] Specifically, limited partnership managing partners are subject to Ch. 152's general partner duties and obligations. *Id.* §§ 152.204(a), 153.152(a)(1)–(2), 153.153(1)–(2); EGAN ON ENTITIES 475. Thus, PEC was subject to a partner's Ch. 152 statutory responsibilities. Further, the parties assume HoldCo exercised sufficient control over PEP such that rules applicable to general partners also apply to HoldCo's conduct.[73]

**2. Chapter 152 Responsibilities**

[¶ 75] PEOFs allege that HoldCo and PEC breached TBOC's loyalty and care duties and the related obligation to discharge them in good faith and in a

---

[73] Movants' Motion at 16, n.34; *see also Strebel*, 371 S.W.3d at 279 (fiduciary duties that otherwise do not exist may arise when a limited partner exercises control over the partnership).

manner the defendant reasonably believes to be in the partnership's best interests.[74] The applicable statutes include:

*General Conduct Standards*

(a)  A partner owes to the partnership [and]  the other partners . . .:

    (1)  a duty of loyalty; and

    (2)  a duty of care.

(b)   A partner shall discharge the partner's duties to the partnership and the other partners under this code or under the partnership agreement and exercise any rights and powers in the conduct . . . of the partnership business:

    (1)  in good faith; and

    (2)  in a manner the partner reasonably believes to be in the best interest of the partnership.

(c)  A partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

(d)  A partner, in the partner's capacity as partner, is not a trustee and is not held to the standards of a trustee.

TBOC § 152.204.

*Duty of Loyalty*

A partner's duty of loyalty includes:

---

[74] FAP ¶s 105–09, 112–114.

(1) accounting to and holding for the partnership property, profit, or benefit derived by the partner: (A) in the conduct . . . of the partnership business; or . . . ;

(2) refraining from dealing with the partnership on behalf of a person who has an interest adverse to the partnership; and

(3) refraining from competing or dealing with the partnership in a manner adverse to the partnership.

*Id.* § 152.205.

### *Duty of Care*

(a) A partner's duty of care to the partnership and the other partners is to act in the conduct . . . of the partnership business with the care an ordinarily prudent person would exercise in similar circumstances.

(b) An error in judgment does not by itself constitute a breach of the duty of care.

(c) A partner is presumed to satisfy the duty of care if the partner acts on an informed basis and in compliance with Section 152.204(b).

*Id.* § 152.206.

### *Effect of Partnership Agreement and Nonwaivable Provisions*

(a) Except as provided by Subsection (b), a partnership agreement governs the relations of the partners and between the partners and the partnership. To the extent that the partnership agreement does not otherwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.

(b) A partnership agreement or the partners may not:

(1) unreasonably restrict a partner's or former partner's right of access to books and records under Section 152.212;

(2) eliminate the duty of loyalty under Section 152.205, except that the partners by agreement may identify specific types of activities or categories of activities that do not violate the duty of loyalty if the types or categories are not manifestly unreasonable;

(3) eliminate the duty of care under Section 152.206, except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

(4) eliminate *the obligation of good faith under Section 152.204(b),* except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

* * *

*Id.* § 152.002 (emphasis added).

*Information Regarding Partnership*

(a) On request and to the extent just and reasonable, each partner and the partnership shall furnish complete and accurate information concerning the partnership to:

(1) a partner; . . .

*Id.* § 152.213.

[¶ 76] In short, the partners' agreement is the baseline for determining their responsibilities to the partnership and each other—subject to TBOC's minimum requirements. TBOC § 152.002(a).

[¶ 77] Like 1994's Texas Revised Partnership Act (TRPA) before it, these statutes provide a more specific and explicit statement of a partner's duties to the partnership and other partners than existed under the common law and the prior Texas Uniform Partnership Act (TUPA). *See* Miller, *Partner Duties Under the Common Law and the Texas Business Organizations Code*, 68 The Advocate Ch. 18, § 1 (Miller, *Partner Duties*).

[¶ 78] However, because courts and commentators have been unclear regarding the extent to which the TBOC and its predecessors modified common law fiduciary principles, reviewing that statutory history aids their proper construction and application.

## G.    Legislative Background

[¶ 79] Before 1961, the common law governed Texas partnership law, *Ingram v. Deere*, 288 S.W.3d 886, 894–95 (Tex. 2009), and recognized fiduciary duties between partners, *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992) (citing *Johnson v. Peckham*, 120 S.W.2d 786, 787 (Tex. 1938)).

[¶ 80] In 1961, Texas adopted the TUPA. *Ingram*, 288 S.W.3d at 894. Without expressly defining partners as fiduciaries, the TUPA stated a partner's duty to account for partnership profits and hold them as "a trustee" and the

section governing partners' duties was titled "Partner Accountable as a Fiduciary." TUPA § 21(1). Thus, TUPA comported with treating partners as trustee-fiduciaries but did not unambiguously call them that.

[¶ 81] At common law and under TUPA, partners owed each other fiduciary duties to: (i) fully disclose all matters affecting the partnership, (ii) account for all partnership profits and property, (iii) refrain from self-dealing, and (iv) refrain from competing with the partnership. *Bohatch v. Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App.—Houston [14th Dist.] 1995, *aff'd*, 977 S.W.2d 543 (Tex. 1998)).

[¶ 82] For example, the common law imposed a strict duty on partners to disclose material facts affecting the partnership or other partners—even if the partners have strained relationships and adverse interests. *See Johnson*, 120 S.W.2d at 787 (duty to disclose negotiations with third parties to resell partnership's property); Erin Larkin, Comment, *Partners' Duties Without the Word Fiduciary*, 59 Baylor L. Rev. 895, 899 (2010).

[¶ 83] Nonetheless, TUPA's text appeared to alter *Johnson's* voluntary disclosure requirement by imposing the disclosure duty on demand:

> Partners shall render on demand true and full information of all things affecting the partnership to any partner . . .

TUPA § 20.

[¶ 84] But § 20's commentary said that § 20 should not be construed to limit the disclosure duty to instances without demand when fiduciary principles would require full disclosure. *See* Larkin at 900–12; Alan R. Bromberg, *The Proposed Texas Uniform Partnership Act*, 14 Sw L. J. 437, 448 (1960) (comment to § 20, citing Byron D. Sher and Alan R. Bromberg, *Texas Partnership Law in the 20th Century – Why Texas Should Adopt the Uniform Partnership Act*, 12 Sw L.J. 263, 298–300 (1958)). And case law continued to express the full disclosure duty. *See Bohatch*, 905 S.W.2d at 602.

[¶ 85] However, effective January 1, 1994, Texas adopted the TRPA. *Ingram*, 288 S.W.2d at 894. TRPA § 4.03(c) provided that

> . . . [e]ach partner and the partnership shall furnish, on request and to the extent just and reasonable, to a partner complete and accurate information regarding the partnership.

[¶ 86] Despite nearly identical language as TUPA § 20, the Bar Committee Notes to TRPA § 4.03 (TRPA's successor to TUPA § 20 and predecessor to TBOC § 152.213) reached a different conclusion regarding the disclosure duty:

> Subsection (c) is based on TUPA § 20 and provides that partners must be furnished, on demand, complete and accurate information concerning the partnership to the extent just and

reasonable. *This information right arises only on request; the information need not be volunteered.* \* \* \*

Comment of Bar Committee—1993, Art. 6132b-4.03 (emphasis added).

[¶ 87] Commentators and courts debated the extent to which the TRPA changed the common law, including whether it eliminated *Johnson's* voluntary full-disclosure duty. *See* Elizabeth S. Miller, *Overview of Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, 49-SUM Tex. J. Bus. L. 1, 36–47 (2020) (Miller, *Overview*); Larkin at 900–12.

[¶ 88] Although the Legislature derived TRPA from the Uniform Law Commission's Revised Uniform Partnership Act (RUPA), there are informative differences. For example, RUPA § 404 describes its "General Standards of Partner's Conduct" as fiduciary duties, but TRPA does not. And TRPA § 4.04(f)'s added provision that a partner is not a trustee and is not held to the standards of a trustee arguably further evidenced that TRPA replaced partners' common law fiduciary principles with specific statutory standards, while leaving the common law as a gap-filler. Larkin at 900–12. That is, unlike RUPA § 404, TRPA § 4.04 created ambiguity by providing that a partner's loyalty duty was not limited to only those duties stated in the text.

*Compare* RUPA § 404(b) ("A partner's duty of loyalty to the partnership and the other partners is *limited to the following . . .*" (emphasis added)) *with* TRPA § 4.04(b) ("A partner's duty of loyalty *includes . . .*" (emphasis added)).

[¶ 89] Soon after TRPA's enactment, the supreme court described a partner's statutory duties to the partnership and other partners as "in the nature of a fiduciary duty in the conduct" of partnership business. *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995). However, that statement's effect on the TRPA is unclear because the prior TUPA and common law governed that case. *Id.* at 618, n.1. And the court held that the applicable principle—former partners have no duty to offer a business opportunity to each other—is the same under the old and new laws. *Id.*

[¶ 90] So, the Fifth Circuit Court of Appeals commented on the lack of clarity regarding TRPA's effect on prior TUPA and common law principles. *In re Gupta*, 394 F.3d 347, 351–52 (5th Cir. 2004).

[¶ 91] Moreover, it is hard to tell whether the fiduciary duty discussions in *Cruz v. Ghani*, No. 05-17-0056-CV, 2018 WL 6566642, *6 (Tex. App.—Dallas 2018, no pet); *Shannon Medical Center v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 909–15 (Tex. App.—Houston [14th Dist.] 2019, no pet.); and *Red Sea Gaming, Inc. v. Block Invs. (Nevada) Co.*, 338 S.W.3d 562, 568

(Tex. App.—El Paso 2010, pet. denied) (and similar cases) state the applicable law because they involve unobjected to jury charges.[75]

[¶ 92] In sum, the extent to which the TRPA and the TBOC replaced common law principles—and especially the disclosure duty—is unclear. It is with that background that the court discusses the TBOC's application here.

## H. The Nature and Scope of HoldCo's and PEC's Duties and Obligations

### 1. Introduction

[¶ 93] PEOFs posit ten causes of action. All but one allege direct or indirect (conspiracy, aiding and abetting, and knowing participation in) fiduciary breach claims without delineating between common law or TBOC duties.[76] PEOFs' summary judgment response is equally non-differentiating.[77] Therefore, the court begins by discussing the current status of TBOC partnership "fiduciary duties."

### 2. Applicable Loyalty and Care Duties and Discharge Obligations

[¶ 94] It is axiomatic that the court must identify the nature and scope of HoldCo's duties and obligations to PEP and its partners before it can

---

[75] Where an appellant did not object to the jury charge, evidentiary sufficiency issues are measured against the charge as written and not necessarily the correctly stated law. *Cruz*, 2018 WL 6566642, at *6. *Red Sea Gaming*, 338 S.W.3d at 566.

[76] FAP ¶s 104–68.

[77] *See* PEOFs' MSJ Resp. at 11–30 (combining common law and statutory principles).

address whether HoldCo conclusively established that it did not breach those responsibilities as PEOFs claim.[78] (The court collectively refers to a partner's "fiduciary" duties and obligations as "responsibilities.") The existence of a legal duty is a threshold legal question for the court to decide. *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 171, 181, n.20 (Tex. 2004).

[¶ 95] Where, as here, determining the nature and scope of a partner's duties and obligations is a matter of statutory and contract construction, that process begins with the TAPA:

> [A] partnership agreement governs the relations of the partners and between the partners and the partnership. To the extent that the partnership agreement does not otherwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.

TBOC § 152.002(a)

[¶ 96] Because here, the partners agreed that they would have the "duties of good faith and fair dealing" to the fullest extent required by Texas law (TAPA § 5.9(a)) but otherwise disclaimed any "fiduciary duties" to the

---

[78] For clarity, "causes of action" are legal theories supporting a right to relief such as negligence or contract breach. "Claims," when used as a noun, are assertions a party makes to describe the factual basis supporting a cause of action or affirmative defense. For example, "Defendant breached the contract by . . ." "Grounds" are legal bases underlying a party's request for court action. For example, "the court should grant summary judgment because . . ." Parties should be careful to properly use these terms.

fullest extent permitted by law (TAPA §§ 5.9(b)–(c)), we turn to applicable

TBOC sections to determine what duties and obligations remained. That

analysis produces these results:

### a. Affirmative Responsibilities

[¶ 97] At common law, a trustee is held to strict fiduciary standards:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *** Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (citation

omitted) (trustee standards applied to joint venturer).

[¶ 98] However, TBOC § 152.204(d) provides that partners are not held

to a trustee's standards. And TBOC, like its predecessor TRPA, omits the

word "fiduciary" when prescribing partners' duties to the partnership and

other partners. So, based on plain text, traditional trustee-fiduciary duties, as

such, do not apply to partners except (i) as TBOC imposes analogous statutory

duties and obligations; (ii) the TBOC incorporates compatible common law principles; or (iii) partners agree to impose them on themselves.

[¶ 99] Loyalty and care duties and the obligations to perform them (i) in good faith and (ii) in a manner the partner reasonably believes to be in the partnership's best interest are among the responsibilities TBOC imposes. *Id.* § 152.204(a)–(b).

[¶ 100] TBOC's list of loyalty duties is not exclusive because "includes" precedes that list. *Id.* § 152.205. So, common law loyalty principles apply if compatible with Ch. 152 and the partnership agreement. *Id.* § 152.003. And, under the *noscitur a sociis* canon, any supplemental common law loyalty duties must be of the type listed in § 152.205 and consistent with other partnership statutes and permitted TAPA terms. *See Paxton*, 468 S.W.3d at 61.

[¶ 101] However, TBOC's duty of care definition is exclusive because it omits expansive language.[79] *See* TBOC § 152.206; *City of Houston*, 353 S.W.3d at 145. That is,

---

[79] § 152.206(c)'s statement that a partner is presumed to satisfy its duty of care if it acts on an informed basis and in compliance with its § 152.206 obligations is an evidentiary presumption, not a separate statutory responsibility. *Id.*

> Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*).

READING LAW 93.

[¶ 102] And, unless modified, the TBOC retains the common law obligations to act in good faith and in a manner the partner reasonably believes to be in the partnership's best interest. TBOC § 152.204(b).

[¶ 103] The TBOC also imposes a duty upon request and to the extent just and reasonable to provide partners with accurate information concerning the partnership. *Id.* § 152.213.

### b. Modifications to Responsibilities

[¶ 104] One of the principal trustee duties the TBOC removes from partners' duties is a trustee's duty to place its beneficiary's interest above the trustee's interest. *See* TBOC §152.204(d) (elimination of trustee status and duties); BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 543 (Trustee's duty of loyalty to the beneficiaries).

[¶ 105] Further, partners do not violate their responsibilities merely because the partner acts in its own interest. *Id.* § 152.204(c).

[¶ 106] Although partners may not completely eliminate their responsibilities, they may define specific conduct that does not violate them

provided those terms are not manifestly unreasonable. *Id*. § 152.002(b). The TBOC does not state any "magic words" that are required to implement these contractual carveouts to the statutory responsibilities.

[¶ 107] However, partners may eliminate the obligation to perform their duties and exercise any rights and powers under the partnership agreement in a manner the partner reasonably believes to be in the partnership's best interest if such terms are not manifestly unreasonable. *See id*. § 152.002(b)(4). That is because § 152.002(b)'s list of unwaivable responsibilities mentions a partner's obligation to perform its duties in good faith under § 152.204(b)(1) without also listing a partner's obligation to discharge its duties in a manner it reasonably believes to be in the partnership's best interest under § 152.204(b)(2). *Id*. § 152.002(b)(4).

[¶ 108] That partners may waive the obligation to act in a manner the partner reasonably believes to be in the partnership's best interest comports with §§ 152.204(c), (d).

[¶ 109] Moreover, the *expressio unius est exclusion alterius* canon further supports that result because § 152.002(b)(4) mentions the good faith obligation while not mentioning the separate obligation to perform those

obligations in a manner the partner reasonably believes is in the partnership's best interest. *City of Houston*, 353 S.W.3d at 145.

### 3. Good Faith and Fair Dealing

[¶ 110]  Although TBOC § 152.204(b)(1) requires partners to discharge their contract rights and duties and TBOC loyalty and care duties in good faith, that obligation does not rise to the level of a separate "fiduciary" duty as such:

> Though courts may be tempted to elevate this language to an independent duty, this obligation is not stated as a separate duty, but merely as a standard for discharging a partner's statutory or contractual duties.

Elizabeth S. Miller, *Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, State Bar of Texas Advanced Business Law Course 30 (2023) (Miller, *Fiduciary Duties*); *see* Comment of Bar Committee—1993, Art. 6132b-4.04 (good faith obligation "is not a separate duty" it is "merely a statement of how any duty . . . must be discharged").

[¶ 111]  Unlike loyalty and care duties, the TBOC does not define the "good faith" discharge obligation. *See* TBOC § 152.204(b)(1).  Thus, courts refer to the common law for that meaning. *Id.* § 152.003; *SandRidge*, 642 S.W.3d at 566.

[¶ 112] *Fitz-Gerald v. Hull*, holds that partners owe each other the "utmost good faith and the most scrupulous honesty."  237 S.W.2d 256, 265 (Tex. 1951).  *Bohatch v. Butler & Binion*, subsequently reiterated that principle but concluded that terminating a partner for reporting alleged overbilling did not violate the principle.  977 S.W.2d 543, 545–47 (Tex. 1998).

[¶ 113] Later, the supreme court clarified that, although a partner's common law fiduciary duty includes a duty of good faith and fair dealing, that duty requires only that the parties "deal fairly" with each other and does not include the more onerous fiduciary duty to place the other party's interests before its own:

> Although a fiduciary duty encompasses at the very minimum a duty of good faith and fair dealing, the converse is not true.  The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.

*Crim*, 823 S.W.2d at 594.  However, the court did not further define "deal fairly."  Nor has it since done so.

[¶ 114] Case law indicates that the statutory good faith obligation includes, at a minimum, not lying to or misleading other partners.  *See, e.g.*, *Shannon Medical*, 603 S.W.3d at 912–915 (partner misled partners regarding

permitted affiliate business); *Cruz*, 2018 WL 6566642, *10–16 (partner misrepresented reasons for closing one business and misled partner regarding permitted competing business); *Red Sea Gaming*, 338 S.W.3d at 568–69 (failure to disclose resale opportunity while negotiating buyout).

[¶ 115] However, one does not act in bad faith by exercising its lawful rights:

> Improper motives cannot transform lawful actions into actionable torts. "Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right."

*Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996) (quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 972 (Tex. Civ. App.—Amarillo 1932, writ ref'd) (quoting 1 R.C.L. § 6 at 319)).

[¶ 116] Thus, one does not lack good faith by exercising lawful contract rights. *See Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944, 947 (Tex. 1984) ("There can be no implied covenant as to a matter specifically covered by the written terms of the contract."); *English v. Fischer*, 660 S.W.2d 521, 523 (Tex. 1983) (No implied covenant of good faith and fair dealing required mortgagee to disburse insurance proceeds contrary to contract terms.); *John*

*Masek Corp. v. Davis*, 848 S.W.2d 170, 174 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (approved jury instruction that a "fiduciary duty [] does not extend so far as to create duties in derogation of the express terms of the partnership agreement").

[¶ 117] Further, good faith is often best described as not in bad faith.

> Good faith, as judges generally use the term in matters contractual, is best understood as an "excluder" – a phrase with no general meaning or meanings of its own. Instead, it functions to rule out many different forms of bad faith. It is hard to get this point across to persons used to thinking that every word must have one or more general meanings of its own – must be either univocal or ambiguous.

*See* Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va. L. Rev. 195, 262 (1968).

### 4. Duties of Candor and Mandatory Disclosures

#### a. Introduction

[¶ 118] Some courts have recently held that partners owe a fiduciary duty (i) to make full disclosure of all matters affecting the partnership, including a duty to account for all partnership profits and property and (ii) a strict duty of good faith and candor. *See Zinda v. McCann Street, Ltd.*, 178 S.W.3d 883, 890–91 (Tex. App.—Texarkana 2005, pet. denied); *Houle v. Casillas*, 594 S.W.3d 524, 552 (Tex. App.—El Paso 2019, no pet.).

[¶ 119] Such rulings concern two issues: (i) does the good faith obligation encompass the honesty requirement; and (ii) does the *Johnson v. Peckham* mandatory duty to disclose all facts that could materially affect the partnership, or other partners, continue after TRPA § 4.03 and TBOC § 152.213. "Yes" is the answer to the former, and "it depends on the circumstances" is the answer to the second.

### b. Good Faith and Candor

[¶ 120] To begin, *Zinda* for example equates good faith and candor. 178 S.W.3d at 890–91. Because "candor" means "[t]he quality of being open, honest, and sincere; frankness; outspokenness," *Candor*, BLACK'S LAW DICTIONARY (12th ed. 2024), the TBOC effectively incorporates the candor duty to be honest in § 152.204(b)(1)'s good faith obligation.

### c. Voluntary Disclosure

[¶ 121] Although *Zinda* cited TRPA § 4.04 as authority for a broad duty to disclose all information affecting the partnership, that court did not address whether § 4.03 retained the prior *Johnson v. Peckham* duty to voluntarily disclose, even without request, all material information. 178 S.W.3d at 890–91.

[¶ 122] Like TRPA § 4.03, the TBOC requires partners to provide information on reasonable request. TBOC § 152.213. So, the debate regarding the *Johnson* rule after TRPA § 4.03 applies to TBOC § 152.213 too. However, although the TBOC does not expressly so state, the common law good faith obligation also applies to § 152.213. *See id.* § 152.003 (common law supplement to TBOC). However, those concepts are limited to (i) the common law definition of "good faith" to mean "deal fairly," *Crim*, 823 S.W.2d at 593–94, and (ii) statutory constraints that §§ 152.204(c), (d), and 152.213 and any applicable partnership agreement terms impose.

[¶ 123] Since Texas adopted TRPA § 4.03, the Texas Supreme Court has provided little guidance regarding a partner's duty to voluntarily provide information affecting the partnership. For example, in *American Star Energy and Minerals Corp. v. Stowers*, the Supreme Court suggested in *dicta* that there are circumstances when the duty of care may require a partner to disclose material information affecting the partnership's operation. 457 S.W.3d at 434–35.

[¶ 124] That statement is *dicta* because the issue there was when do limitations begin to run in a suit to enforce a partnership's contract liability against a partner. The Supreme Court held that, based on the partnership as

an entity theory, partners were not individually liable until the partnership's liability was finally established at which time limitations began running against the individual partner. *Id.* at 428–30, 435.

[¶ 125] Responding to the partners' argument that due process required that they be joined in the suit against the partnership, the court explained that (i) as a matter of law the partners had notice of their potential liability when they became partners; (ii) citing *Zinda*, the court stated that the duty of care "may" require partner to inform other partners of a suit against the partnership; and (iii) partners can agree in their partnership agreement for a partner served with a lawsuit against the partnership to provide that information to the other partners. *Stowers*, 457 S.W.3d at 434–35.

[¶ 126] Regarding the second point, the court did not discuss TRPA § 4.03 or TBOC 152.213. *Id.* Nor did it explain what circumstances "may" require disclosures. *Id.* Finally, the court did not explain why such a duty falls under the care duty instead of the good faith obligation. *Id.* So, *Stowers* does not guide as to when partners must voluntarily disclose information to other partners. And that statement may be construed as a "suggestion" that such an obligation survives after TRPA § 4.03 and TBOC § 152.213. Miller, *Fiduciary Duties* 30.

[¶ 127] Additionally, "[a]s a general rule, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent."[80] *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). And, in an arm's-length transaction, a duty to disclose facts does not exist absent a misleading statement about facts and the complaining party lacked an equal opportunity to discover the facts. *See id.* 756.

[¶ 128] Without firm rules concerning when a partner must volunteer information regarding circumstances not expressly mentioned in § 152.213, the court applies these standards in this case:

• A partnership agreement may address the issue either directly or indirectly by omission. *See* TBOC §§ 152.002(a) (partnership agreement governs the relations among partners and the partnership), 152.002(b)(2)–(4) (ability to modify loyalty and care duties and good faith obligation); *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95–96 (Tex. 2011) (contract freedom);

---

[80] For example, fraud by omission may occur where a person discovers new information that makes an earlier material representation false or misleading, *Dewayne Rogers Logging, Inc. v. Propac, Ltd.*, 299 S.W.3d 374, 391 (Tex. App.—Tyler 2009, pet. denied); or a person makes a partial disclosure that leaves a false impression, *Mercedes-Benz USA, LLC v. Cardusco, Inc.*, 583 S.W.3d 553, 561–62 (Tex. 2019).

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, L.P., 426 S.W.3d 59, 68 (Tex. 2014) (omissions may be read as intentional).

- Absent a partnership agreement standard, partners must disclose material information affecting the partnership or other partners that ordinarily would not be expected to be covered by a partnership agreement. For example, a partner must tell at least partnership management when the partner is served with a suit against the partnership. *See Stowers*, 457 S.W.3d at 434–35.

- A partner may not mislead the partnership or other partners where fraud by omission principles would apply absent the partnership relationship. *See* ¶s 114, 127.

- That a partner is acting in its self-interest does not by itself create a duty to voluntarily disclose information regarding its conduct if the partnership agreement lawfully permits that conduct. *See* TBOC § 152.204(c), (d).

- A partner need not disclose facts that would be immaterial under the circumstances, including circumstances contemplated by the partnership agreement.

### 5. Separate Analysis Required

[¶ 129] TBOC's text divides partners' loyalty and care *duties* on one hand from their *obligation* to *discharge* them in good faith (and when applicable

in a manner the partner reasonably believes to be in the partnership's best interest) on the other hand. *See* TBOC § 152.204.

[¶ 130] For example, one can perform its loyalty duty according to the partnership agreement's terms but discharge that duty in bad faith by lying to or misleading its partners while doing so. *See, e.g.*, *Shannon Medical*, 603 S.W.3d at 912–915; *Cruz*, 2018 WL 6566642, *10–16; *Red Sea Gaming*, 338 S.W.3d at 568–69. On the other hand, the good faith obligation is irrelevant for liability purposes if the partner breached the duty by engaging in prohibited conduct.

[¶ 131] So, courts should analyze whether a duty is breached before considering whether the defendant acted in good faith and, when applicable, in a manner it reasonably believed was in the partnership's best interest.

## VI. APPLICATION

### A. Introduction

[¶ 132] Movants basically argue that PEOFs' claims fail in their entirety because (i) the TAPA authorized HoldCo to exercise its drag-along rights and force the other partners to participate in selling PRD's assets in an Exit Event; (ii) HoldCo complied with its TAPA conditions to wait two years and conduct the sale in an arm's-length transaction; and (iii) its contract rights and conduct

satisfied Texas law's minimum requirements since TAPA defines conduct that meets the minimum requirements of loyalty and care and it acted in good faith.

[¶ 133] Conversely, PEOFs primarily argue that "Blackstone" breached its contract good faith duty and statutory responsibilities in several ways—including by failing to act in the partnership's best interest regarding the consideration received and the processes HoldCo used to analyze the deal.

[¶ 134] In short, the analysis converges on whether HoldCo acted in good faith when it exercised its drag-along rights and forced the sale of PRD's assets to Callon on terms HoldCo selected. Because movants seek complete dismissal of all claims against them, the court addresses all claims PEOFs assert against movants regardless of whether movants expressly addressed every such claim.

## B.    PEOFs' Claims by Category

[¶ 135] PEOFs' petition and the parties' submissions do not divide their arguments between distinct breach of loyalty, care, or good faith

responsibilities. And several of PEOFs' claims are variations of the same idea. Nonetheless, PEOFs' claims include these categories:[81]

- **Loyalty**: (i) failing to act in the partnership's best interest; (ii) structuring the deal to benefit "Blackstone;" (iii) prioritizing "Blackstone's" interest in fossil fuel divestment over acting in Primexx's best interests; (iv) acting in "Blackstone's" sole interest; (v) structuring a deal that would provide no return for PEOFs but would generate a substantial recovery for Blackstone; (vi) accepting an unfair sales proceeds' allocation; (vii) directing the sale to proceed despite knowing it was a bad deal; (viii) failing to maximize the value and return for PEP or other Unitholders aside from furthering "Blackstone's" interests; and (ix) failing to ensure "Blackstone" had no conflicts of interest.

- **Care**: (i) failing to keep PEOFs informed about the potential sale leading up to the sale; (ii) failing to conduct regular board meetings to discuss whether the sale made sense from the company's perspective; (iii) forcing a rushed sale; (iv) forcing the sale with only one business days' notice of the final terms; (v)

---

[81] Any claims not mentioned here are variations of what is discussed and are treated in the same manner. If the court calls a loyalty claim a care claim or vice-versa, it is regarded as such.

failing to take steps to maximize the value for PEP or the Unitholders; (vi) inadequate due diligence and marketing; (vii) preventing the board or other Unitholders from analyzing the terms; (viii) failing to professionally market the business or its assets; (ix) failing to analyze whether it was more profitable to run the business as a stand-alone operation than to sell it; (x) failing to consider alternatives; (xi) failing to consider whether a rushed sale would be fair to PEP or its partners, including PEOFs; and (xii) failing to properly distribute proceeds according to the waterfall.

- **Good faith**: All the above.

## C. Overall Considerations

[¶ 136] The court must analyze PEOFs' claims under the TAPA subject to TBOC minimum standards. That is, Texas recognizes these sophisticated parties' freedom to contract within TBOC's minimum standards. *See, e.g.*, TBOC § 152.002(a); *Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 504 (Tex. 2015). Indeed, Texas regards parties' freedom to contract as they wish (within public policy) a sacred right:

> As a fundamental matter, Texas law recognizes and protects a broad freedom of contract. We have repeatedly said that "if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their

contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice."

*Nafta Traders*, 339 S.W.3d at 95–96 (quoting *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2008)).

[¶ 137] Moreover, freedom of contract principles require courts to "recognize that 'sophisticated parties have broad latitude in defining the terms of their business relationship,' and courts are obliged to enforce the parties' bargain according to its terms." *Sundown Energy LP v. HJSA No. 3 P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (quoting *FPL Energy*, 426 S.W.3d at 67). Therefore, courts may not rewrite a contract under the guise of interpretation. *Id.*

[¶ 138] Here, the parties agreed to minimize HoldCo's and PEC's loyalty and care duties to the extent Texas law permits and agreed that HoldCo would discharge the remaining duties in good faith to the fullest extent Texas law requires.

[¶ 139] The court's analysis is also informed by these undisputed facts:

- These are sophisticated parties represented by counsel.

- Drag-along rights are established vehicles used to facilitate equity investments.

- PEOFs empowered HoldCo and PEC to exercise HoldCo's drag-along rights in their sole interest and discretion and in a manner that served HoldCo's (and by extension its affiliates') and PEC's interests—if it waited two years, completed an arm's-length transaction, and dealt fairly in doing so.

- PEOFs agreed that PEP's Unitholders must follow HoldCo's instructions when it exercised its drag-along rights.

- That is, PEOFs agreed to a structure that gave Blackstone, Inc.—acting through HoldCo—a majority of PEC's board seats; required all Unitholders to fulfill HoldCo's directions regarding the sale, thereby requiring all partner appointed directors and, thus, PEC to approve the sale at HoldCo's direction; and removed any discretionary PEC power to disobey HoldCo's directions regarding the Callon sale.[82]

[¶ 140] In short, that is the deal PEOFs made and the deal the court is to enforce to the full extent Texas law permits.

---

[82] *See* TAPA § 6.7 (Unitholders must instruct their directors to approve the sale).

### D. Breach of Statutory Responsibilities

#### 1. Introduction

[¶ 141] Although PEOFs' "fiduciary" breach causes of action are properly TBOC breach causes of action, the court uses the elements of a common law fiduciary breach claim to frame a TBOC cause of action's elements as: (i) a statutorily recognized relationship between the plaintiff and defendant, (ii) the defendant's breach of a statutory responsibility to the plaintiff, and (iii) the defendant's breach caused an injury to the plaintiff or a benefit to the defendant.[83] *See McLeod v. McLeod*, 644 S.W.3d 792, 804 (Tex. App.—Eastland 2022, no pet.) (fiduciary breach elements).

[¶ 142] It is undisputed that HoldCo and PEC were PEP partners and owed PEOFs statutory loyalty and care duties and an obligation to discharge them in good faith regarding the Callon sale—subject to their agreed modifications to those responsibilities.[84] And PEOFs do not claim that any TAPA modifications to those responsibilities is manifestly unreasonable. *See* TBOC §§ 152.002(b)(2)–(4); *Cruz*, 2018 WL 6566642, *14.

---

[83] There are not two separate breach of fiduciary duty causes of action: one under the statute and one under the common law. Rather, there is only a cause of action based on the code that may incorporate certain common law aspects that are compatible with the code.

[84] *See* ¶ 74.

[¶ 143] Accordingly, the court must (i) define the nature and scope of the applicable responsibilities and (ii) decide whether PEOFs raised a genuine issue of material fact regarding their alleged breach regarding the Callon sale.

## 2. First Cause of Action: "Fiduciary" Breach (HoldCo)

### a. Preface

[¶ 144] The Callon sale resulted from agreements the parties created five years earlier. Their term sheet shows that "Blackstone" expected, among other things, (i) control over PEC's board with five of nine directors and (ii) "customary drag-along rights" regarding a proposed sale of 100% of the partners' interests.[85] The TAPA embodies those points.

[¶ 145] The parties implemented this arrangement through the PIPA;[86] the TAPA;[87] and PEC Bylaws.[88] PEOFs do not claim those contracts were signed under duress or they did not understand their risks.

[¶ 146] Whittier Trust Co., by Steven Anderson, signed the TAPA as PEOF I's general partner.[89] PEC's Bylaws identified Jim Jeffs and Robert

---

[85] TAPA at Annex B (Summary of Proposed Terms, Term Sheet-Royalties Vehicle).
[86] PIPA.
[87] TAPA.
[88] Movants' Ex. 10 (Bylaws).
[89] TAPA.

Holland as PEOF I's "Fund Directors" and Holland as PEC's General Counsel and Secretary.[90] Jeffs' declaration confirms that he was appointed to serve as a PEC director.[91] Whittier's professional financial managers represented PEOFs.[92]

[¶ 147] PEOF I, PEC, and HoldCo made that deal, which PEOF II accepted.

### b. Loyalty and HoldCo's Drag-Along Rights

#### i. Introduction

[¶ 148] At a high level, the loyalty duty concerns a transaction's substance and whether a partner acted with conflicts of interest. *See* TBOC § 152.205 (loyalty includes refraining from (i) acting on behalf of a conflicted person, (ii) competing with the partnership, or (iii) dealing with the partnership in a manner adverse to the partnership).

[¶ 149] Thus, the court begins with those requirements and considers the extent to which the TAPA lawfully limits those duties. In sum, the TAPA and TBOC combine to produce these Callon sale results: (i) HoldCo must give

---

[90] Movants' Ex. 10 (Bylaws).
[91] Jeffs Dec. ¶ 2.
[92] *See* Derrington Dec. ¶s 3, 6.

PEOFs reasonable access to books and records, including a duty to account for and distribute Callon sale profits according to the waterfall; (ii) HoldCo need not conduct the sale in a manner it reasonably believed was in PEP's or PEOFs' interests; (iii) HoldCo could negotiate the sale terms in its sole discretion and in its own sole interest (including PEC's and "Blackstone's" interests) without subordinating its interests to PEP's or the other partners' interests—if it waited two years and conducted an arm's-length transaction; and (iv) HoldCo had to comply with the TAPA's terms and "deal fairly" with PEP and its partners while exercising its drag-along rights.

### ii. Accounting for Proceeds

[¶ 150] PEOFs allege that HoldCo did not properly distribute Callon sale proceeds according to the TAPA waterfall.[93] Movants' *motion* asserts that "[t]he sale proceeds were [] distributed to the partners pursuant to the agreed waterfall in the Limited Partnership Agreement" and includes some evidence

---

[93] FAP ¶ 98.

to that effect.[94]  PEOFs did not respond to movants' argument or provide any corresponding evidence.[95]

[¶ 151]  However, a summary judgment motion itself is not evidence. *Americana Motel, Inc. v. Johnson*, 610 S.W.2d 143 (Tex. 1980).  And movants' evidence does not conclusively negate PEOFs' improper payment claim. *Frost Nat. Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).  So, PEOFs "ha[d] no burden to respond to [the]  summary judgment motion" on this issue. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000).

[¶ 152]  Movants' evidence tends to show that PEOF II (but not PEOF I) received money and Callon shares and the value of those shares.[96]  However, that does not disprove PEOFs' claim that common Unitholders may have been paid ahead of preferred Unitholders contrary to the waterfall.   So, the court denies movants' motion to the extent it seeks dismissal of PEOFs' claim that

---

[94] Movants' MSJ at 3; Movant's Exs. 7, 8, 11.

[95] *See* PEOFs' Resp. at 8.  PEOFs' only reference to the waterfall payment structure in their response was that "Blackstone was the only investor to receive any significant proceeds from the sale," citing to a different portion of their petition than where this allegation appears. *Id.*  Accordingly, the court understands this statement was offered in support of PEOFs' allegation that the Callon sale was fundamentally unfair to the non-HoldCo investors, not that the waterfall was distributed improperly.

[96] Movant's Exs. 7 (PEOF II Distribution Letter), 8 (AST Callon Petroleum Share Registration Statement), 11 (NASDAQ Historical Data for CPE).

HoldCo failed to properly account for and distribute the Callon sale profits according to the waterfall.

### iii. Allocation of Proceeds between PEP and BPP

[¶ 153] PEOFs allege that HoldCo unfairly structured the allocation of sales proceeds between PEP and BPP (the sidecar business) to advantage BPP's owners and disadvantage PEP's owners.[97] Movants' motion did not address that claim. Thus, the court denies summary judgment regarding it.

### iv. Remaining Loyalty Claims

[¶ 154] TAPA § 6.7 addresses the nature and scope of HoldCo's Callon loyalty duty by defining permitted conduct. And, reading § 6.7 together with § 5.9 and the circumstances surrounding HoldCo's private equity investment in PEP further inform the parties' objective understanding regarding the nature and scope of HoldCo's Callon sale responsibilities. *Polyco*, 681 S.W.3d at 391 (construe contracts as a whole giving effect to all contract terms).

[¶ 155] That is, the parties broadly met TBOC § 152.002(b)(2) contract-created loyalty standards by framing specific activities that do not violate the loyalty duty. For example, TAPA §§ 5.4 through 5.9 and 5.11 span more than

---

[97] FAP ¶s 96, 107, and 108.

three pages discussing "arm's-length" or fair market value requirements and fairness standards for potential conflicted transactions that might otherwise breach loyalty duties.[98] So, the partners identified those circumstances, considered their risks, and negotiated protections. Thus, they knew how to identify and negotiate regarding risks.

[¶ 156] More specifically, TAPA § 5.9 defines conduct that would not violate loyalty duties, including granting all partners—including PEC—the ability to

> . . . decide or determine any matter in its sole and absolute discretion taking into account solely its interest and those of its Affiliates (excluding the Partnership and its Subsidiaries) subject to the Agreed Duties. Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this arrangement were not acceptable to it.

[¶ 157] They further defined Agreed Duties to mean "to the fullest extent required by Texas law, . . . the duties of good faith and fair dealing . . .," which means the duty to "deal fairly." *Crim*, 823 S.W.2d at 593–94.

---

[98] TAPA § 5.4 Gas Purchasing Lines; § 5.05 Farmouts; § 5.6 Sales of Properties to Partnership; § 5.7 Purchases Properties from Partnership; § 5.8 Fair Market Value; and § 5.11 Competitive Activities and AMI.

[¶ 158] Those agreements extend to HoldCo's § 6.7 drag-along rights involving an "Exit Event," which includes "(i) the consummation of a sale of the Partnership substantially as a whole in one transaction or a series of closely related transactions or a sale of all or substantially all of the assets of the Partnership." In short, TAPA §§ 5.9(c) and 6.7 authorized HoldCo to negotiate and complete the Callon sale in its sole discretion and interest if it waited at least two years and conducted an arm's-length transaction.

[¶ 159] However, TAPA § 6.7 provides more deferential standards for HoldCo's drag-along rights. The differences between HoldCo's sole discretion and sole interest standards that do not require a fair market value, and the TAPA Article V standards for those potentially conflicted transactions that do require a fair market value shows that the parties knowingly negotiated for and accepted the risks that § 6.7 created. Thus, they met TBOC § 152.205's minimum standards, and it is undisputed that HoldCo waited roughly five years and the Callon sale was an arm's-length sale.[99]

---

[99] FAP ¶s 2 (referring to "third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

[¶ 160] So, except as to the sale proceeds' allocation and distribution, HoldCo conclusively met its loyalty duty regarding the Callon sale.

[¶ 161] But HoldCo (and PEC) had to conduct the sale in good faith.

### c. Care and HoldCo's Drag-Along Rights

[¶ 162] In contrast to the loyalty duty, the care duty concerns the conduct or process a partner used while operating the business or deciding whether to do a third-party deal. *See* TBOC § 152.206 (care requires acting without negligence in conducting the partnership's business). That is, the TBOC adopts a form of business judgment rule as its care duty standard. *See id.*; Miller, *Fiduciary Duties* 27.

[¶ 163] Here, the parties' arm's-length sale standard as a matter of law satisfied TBOC § 152.206(a)'s care duty regarding the Callon sale by adopting an alternative minimum sale process procedure. *See Cruz*, 2018 WL 6566642, *14. It is undisputed that the Callon sale was an arm's-length transaction.[100] Thus, HoldCo satisfied its care duty with the Callon sale.

[¶ 164] But, HoldCo still had to discharge that obligation in good faith.

---

[100] FAP ¶s 2 ("third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

### d. Good Faith

#### i. Introduction

[¶ 165] Texas courts have not drawn clear distinctions between the loyalty, care, good faith, and candor responsibilities. *See, e.g.*, *Zinda, Ltd.*, 178 S.W.3d at 890–91 (analyzed duties of full disclosure, candor, and good faith as a single fiduciary duty); *Cruz*, 2018 WL 6566642, *10–11 (combined loyalty and good faith analysis). Nor has the court found Texas cases applying those principles to drag-along sales.

[¶ 166] However, the risks inherent with drag-along rights are well known. *See, e.g.*, Evan Tarver, *What are Drag-Along Rights? Meaning, Benefits, and Example*, Investopedia June 11, 2024, https://www.investopedia.com/terms/d/dragalongrights.asp. Thus, they are typically negotiated at the beginning of a relationship and are recognized as one of the best ways for a majority owner to maintain control over future transactions that may involve minority owners. Soren Lindstrom and Lindsey Reighard, *II. How to Deal with Minority Shareholder Investments*, 2016 TXCLE Advanced Bus. L. 14.II (2016).

[¶ 167] Indeed:

> Drag-Along rights, or drag rights, which give the majority owner the right to force minority owners to participate in a sale

of the company, can be a fiercely negotiated provision in a company's governing documents.

<p style="text-align:center">* * *</p>

In negotiating these provisions, the minority owner seeks to ensure that such a sale will not disadvantage the minority. In light of what is at stake and the inherent uncertainty drag rights engender, parties are understandably cautious when approaching the negotiating table.

Robert B. Little & Joseph A. Orien, *Issues and Best Practices in Drafting Drag-Along Provisions*, Harvard Law School Forum on Corporate Governance (2016) (Little and Orien).

[¶ 168] With PEOFs having accepted those risks and HoldCo having met the TAPA's minimized standards, PEOFs rely on good faith-based arguments to support their claims.[101] The court addresses PEOFs' arguments as follows:

### ii.    Fair Price and Process

[¶ 169] Many of PEOFs' claims share the core premise that the consideration HoldCo negotiated and the process used to value and negotiate the sale was unfair because the consideration was too low and produced too little return for PEOFs.[102] Central to that premise is the notion that HoldCo

---

[101] *See, e.g.*, FAP ¶s 52, 53, 105; PEOF Resp. at 3–6, 11–20.
[102] *See, e.g.*, FAP ¶s 2, 80–81, 84, 100–103, 107; PEOF Resp. at 8–9, 27–30, 35.

had to conduct different processes and negotiate a fair price for the partnership as a whole, including PEOFs, instead of a price that suited HoldCo as decided in its sole discretion.[103] Yet HoldCo's freedom to do exactly that is what TAPA §§ 5.9 and 6.7 provide for and what PEOFs agreed to five years earlier when they wanted "Blackstone's" money.

[¶ 170] Nonetheless, PEOFs ask the court to alter the risk allocation equation and imply non-existent § 6.7 fair price and required process terms.[104] But no such terms exist in the TAPA, and imposing them would violate Texas's sacred contract freedom rights. *See Nafta Traders*, 339 S.W.3d at 95–96. Instead, PEOFs negotiated away those potential protections for "Blackstone's" promised at least two-year capital infusion.[105]

[¶ 171] Furthermore, PEOFs presuppose that HoldCo had to act "in a manner the partner reasonably believes to be in the best interest of the

---

[103] *See, e.g.*, FAP ¶s 85, 92, 99; PEOF Resp. at 28.
[104] *See* PEOF Resp. at 26–30.
[105] TAPA § 6.7.

partnership." *See* TBOC § 152.204(b)(2).[106]  Not so.  As discussed in ¶s 107–09 and 149, the parties disclaimed that obligation.[107]

[¶ 172]  Moreover, as a matter of law HoldCo and PEC did not act in bad faith by exercising their contract rights to discharge HoldCo's drag-along rights as they did.  *E.g.*, *Texas Beef Cattle*, 921 S.W.2d at 211 (Tex. 1996); *John Masek*, 848 S.W.2d at 174.

[¶ 173]  PEOFs' argue that applying the TAPA as written could lead to absurd results such as HoldCo selling the business for a dollar.[108]  The court rejects that argument because, although courts will not enforce unambiguous terms that lead to absurd results, that safety valve is reserved for only truly exceptional cases where it is unthinkable, unfathomable, or quite impossible that a rational person could have intended it.  *Fairfield Indus., Inc. v. EP Energy E&P co., L.P.*, 531 S.W.3d 234, 248–49 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).  Here, the consideration was far greater than a dollar.

---

[106] *See, e.g.*, FAP ¶ 92 ("Blackstone prioritized its own corporate interest … over acting in the best interest of Primexx.").

[107] *See* TAPA §§ 5.9(b)–(c).  PEOFs' reliance on *Houle v. Casillas* for the premise that HoldCo had to consider their interests is misplaced because there was no written agreement in that case excluding that responsibility.  PEOFs' Resp. at 14; *see* 594 S.W.3d at 547.

[108] PEOFs' Resp. at 25.

[¶ 174] Furthermore, it is not the court's role "to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it."[109] *Id.* at 242.

[¶ 175] Accordingly, based on the undisputed facts, the parties' business purposes when they signed the TAPA, its unambiguous terms, and TBOC's unambiguous provisions applicable to this case, as a matter of law HoldCo's drag-along rights were not so unthinkable, unfathomable, or impossible that a reasonable person in the parties' positions could not have rationally agreed to their application when they created the TAPA. Indeed, TAPA § 5.9(c)(ii) unambiguously records the parties' agreement that they would not have entered into the TAPA if its terms were not acceptable to them.

[¶ 176] Had these results not been the product of risks PEOFs accepted at the outset, they would have negotiated different standards as they repeatedly did in §§ 5.4–5.8. Or they would have rejected what they deemed to be their best option at the time. But they did none of those things. Accordingly, the court (i) declines to retroactively add diligence standards or

---

[109] *Fairfield* cites *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013), for support. Although *Combs* is a statutory construction case, the same principles apply here.

a fair price requirement and (ii) and dismisses all PEOFs' claims regarding HoldCo's pre-sale process or negotiated consideration.

### iii. Information Disclosures

#### [¶ a] Drag-sale Notice Provisions

[¶ 177] The nature of HoldCo's disclosure and good faith responsibilities requires blending common law and statutory principles with contract terms.[110]

[¶ 178] And the amount of notice a majority owner must give the minority owners before invoking drag rights is a common issue parties may address. Little and Orien. For example, in *Halpin v. Riverstone Nat'l, Inc.*, the court refused to enforce drag-along rights where the majority owners did not comply with a pre-merger notice requirement. C.A. No. 9796, 2015 WL 854724, *5–7 (Del. Ch. February 26, 2015).

[¶ 179] Furthermore, the TAPA refers to "notice" over one hundred times.[111] That is, PEOFs could have negotiated for an advance notice protection as they did elsewhere in the TAPA but did not do so in § 6.7.

---

[110] *See* ¶s 110–28.
[111] *See, e.g.*, TAPA §§ 3.6(b)(v) (in certain circumstances the partnership must give ten days' notice to Series A Preferred Unitholders prior to a liquidation event).

**[¶ b] Voluntary Advance Notice**

[¶ 180]  The PEP partnership agreement is silent on whether HoldCo or PEC had to give PEP, PEOFs, or any other partners advance notice regarding the Callon Sale.  For these reasons, the court declines to rewrite the TAPA to include that requirement:

- To begin, as discussed in ¶ 178, advance notice requirements are common with drag-along rights.  Yet, the parties did not include an advance notice requirement.

- Further, given HoldCo's unambiguous authority to conduct the sale in its sole discretion in its sole interests (including its affiliates and PEC's sole discretion and interests), advance notice to PEOFs was not material to that deal.  That is, the Unitholders, and thus a majority of the directors had to follow HoldCo's directions.

[¶ 181]  Accordingly, the court declines to inject notice provisions into § 6.7's drag-along rights that the parties omitted.  *See FPL Energy*, 426 S.W.3d at 68 (Tex. 2014) (omissions intentional where parties negotiated for similar terms elsewhere in the contract).

### iv. Sales Proceeds Allocation and Distribution

[¶ 182] For the reasons the court denies HoldCo's motion regarding whether it breached its loyalty duty regarding the allocation and distribution Callon sale proceeds, HoldCo did not conclusively negate the good faith obligation regarding those claims.

### v. Requested or Misleading Information

[¶ 183] PEOFs do not allege that HoldCo, PEC, or Doyle failed to provide any information PEOFs requested regarding the Callon sale. Thus, TBOC § 152.213's duty to provide requested information is not implicated.

[¶ 184] Similarly, PEOFs do not allege that HoldCo, PEC, or Doyle gave them, or the board false or misleading information regarding the deal. Indeed, those persons could not have provided misleading information to PEOFs if (i) none of those persons communicated with PEOFs and (ii) Jeffs and Langdon were not, as PEOFs posit, their agents on the board. So, the court need not consider whether any such bad faith breach occurred.

### vi. Regular Board Meetings

[¶ 185] PEOFs say that in the weeks and months before the Callon sale, HoldCo failed to hold regularly scheduled board meetings to discuss whether

a sale made sense from the company's or partners' viewpoints.[112]  Central to that claim is that there were missed regularly scheduled board meetings.  However, PEC's Bylaws do not say when such meetings were to occur.[113]  And PEOFs did not respond with evidence on that issue.  Since HoldCo submitted evidence that there were no regularly scheduled meetings to be missed, and PEOFs not having submitted contrary evidence, the court grants HoldCo's motion regarding the claim that it failed to hold regularly scheduled PEC board meetings to discuss the Callon sale.

### e. Conclusion

[¶ 186] Excluding PEOFs' claims directed to the allocation and distribution Callon sale proceeds, as a matter of law HoldCo did not breach its duties of loyalty or care or its obligation of good faith in the execution of Callon sale pursuant to its drag right.

## 3. Second Cause of Action: "Fiduciary Breach" (PEC)

[¶ 187] With limited exception, PEOFs' arguments regarding PEC are the same as for HoldCo.  Thus, the court's conclusions regarding HoldCo are at least the same as for PEC.

---

[112] FAP ¶ 87.

[113] *See* Movants' Ex. 10 (Bylaws at Art. III).

[¶ 188]  Additionally, TAPA § 5.9 provides PEC additional support.  For example, § 5.9(b) provides that PEC, as the Managing General Partner,

> . . . shall not owe any fiduciary or similar duty or obligation whatsoever to the Partnership, any Partner or Assignee, except as required by any provision of applicable law that cannot be waived, and

> (B) to the extent that, at law or in equity, the Managing General Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or assignee pursuant to applicable law, any such duty other than the Agreed Duties is hereby eliminated to the fullest extent permitted pursuant to the applicable law.

[¶ 189]  PEOFs argue that PEC breached its responsibilities by participating in the sale because no provisions in the TAPA required PEC to comply with "Blackstone's" drag-along instructions.  Although the TAPA does not expressly require PEC to follow HoldCo's direct instructions, PEOFs' argument ignores reality.  The reality is that HoldCo controlled PEC's board.  And TAPA § 6.7 required all Unitholders to consent to the sale and take all steps needed to complete the sale—including instructing any Existing Limited Partner Directors to approve the drag-along sale.  Indeed, PEC had no choice but to do what its directors voted to do, and they all voted to approve the sale and the Transaction Resolutions authorizing PEC's officers to take actions

necessary to complete the sale.[114]  Notably, PEOF appointed directors Jeffs

and Langdon voted for the sale without reservation.[115]

[¶ 190]  Additionally, FAP ¶ 85 concedes that forcing the Callon sale by

using its drag-along rights was under HoldCo's sole control:

> By forcing the Board to vote on (and approve) the proposed
> transaction over a weekend, Blackstone necessarily precluded
> the Managing General Partner or the Board from engaging in a
> reasoned and fully informed decision-making process or
> satisfying their contractual and fiduciary duties.  Yet all
> Blackstone-controlled Board members voted to approve the sale
> without conducting any analysis or due diligence to fairly
> evaluate the transaction and whether it would be fair to all of
> Primexx's investors.

[¶ 191] So, the court resolves PEOFs' Second Cause of Action as it does

their First.

### E.    Third Cause of Action: Breach of Contract (HoldCo)

[¶ 192]  The elements of a contract breach claim are: (i) a valid contract

exists; (ii) the plaintiff performed; (iii) the defendant breached the contract;

and (iv) the plaintiff was damaged as a result.  *E.g.*, *Williams v. First Tenn. Nat.*

---

[114] Movants' Ex. 3 (Aug. 2, 2021, Board Minutes at Ex. A).

[115] Movants' Ex. 3 (August 2, 2021, Board Minutes).  PEOFs deny that they controlled Jeffs and Langdon as of August 2, 2021.  However, PEOFs was entitled to control two seats on the board.  Whether PEOFs chose to abandon that right is not material to this motion because board approval was a non-discretionary function since all Unitholders had to cooperate in closing the deal, including the § 6.7 requirement that they direct their appointed directors to approve the deal.  And HoldCo controlled five of nine seats.

*Corp.*, 97 S.W.3d 798, 802 (Tex. App.—Dallas, 2003, no pet). Here, the third element is the only one before the court.

[¶ 193] It is undisputed that HoldCo waited the required two years and it conducted the Callon deal in an arm's-length sale.[116] Nonetheless, PEOFs' Third Cause of Action posits that HoldCo breached the TAPA based on the same alleged good faith breaches they say support their First Cause of Action.

[¶ 194] Because HoldCo's "fiduciary" duties required it to perform in good faith, its contract duty to perform in good faith is no greater than its TBOC-based responsibilities. Accordingly, the court resolves PEOFs' Third Cause of Action same as it disposes of their First.

### F. Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action: Derivative Liability Causes of Action (Holdco, PEC, and Doyle)

#### 1. Introduction

[¶ 195] PEOFs' Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action assert civil conspiracy, aiding and abetting fiduciary breach, and knowing participation in fiduciary breach causes of action against Holdco, PEC, and Doyle.[117] These are derivative liability torts because they involve a

---

[116] FAP ¶s 2 (referring to "third party" Callon), 42 (TAPA signed July 12, 2016), 94 (Callon sale closed October 1, 2021); Nov. 21, 2024, Hrg. Tr. at 8:2–22, 22:11–25:12, 26:16–27:18.

[117] FAP ¶s 136–154.

defendant's participation in another person's torts where the defendant otherwise would not be liable for the tort. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140–42 (Tex. 2019) (civil conspiracy a vicarious—not direct—liability tort); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 930 (Tex. 2010) (aiding abetting claim failed for same reason civil conspiracy failed, but noted that the Texas Supreme Court has not recognized an independent aiding and abetting claim); *Kinzbach Tool Co v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (joint and several liability for knowingly participating in agent's fiduciary breach to principal).

### 2. Aiding and Abetting (HoldCo and Doyle)

[¶ 196] Neither the supreme court nor the Fifteenth Court of Appeals have recognized aiding and abetting as a separate liability theory apart from civil conspiracy. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017); *Palliative Plus LLC v. A Assure Hospice, Inc.*, No. 03-23-00770-CV, 2025 WL 284920, *10 (Tex. App.—Beaumont January 24, 2025, no pet. h.). So, subject to those courts later recognizing this theory, the court dismisses PEOFs' aiding and abetting cause of action against Holdco and Doyle. *See* TEX. R. CIV. P. 166(g), (p).

### 3. Civil Conspiracy and Knowing Participation (Holdco, PEC, and Doyle)

[¶ 197] PEOFs' civil conspiracy and *Kinzbach* claims depend on the viability of their fiduciary breach claims. Thus, at a minimum, the court's rulings regarding PEOFs' fiduciary breach claims apply equally to these causes of action; and the court incorporates those prior rulings here.

[¶ 198] The following discussion concerns issues that movants' motions implicate but that the parties did not previously discuss. So, the court does not rule on them now. However, pursuant to Rules 166(g), (p) the court directs the parties to brief these issues:

- To what extent were PEC or Doyle legally capable of the civil conspiracies alleged against them (consider the various combinations alleged against them)?

- Is knowing participation in a fiduciary breach a viable cause of action where HoldCo controlled the Board, the Unitholders, and Doyle regarding the Callon sale?

[¶ 199] For causes of action concerning them, PEC and Doyle are to submit their briefs within ten days of this opinion's signature date. PEOFs are to submit their responses, if any, within ten days of the later submission by

PEC or Doyle.  The briefs are to be no more than ten pages excluding the style, caption, and preliminary tables.

## VII. CONCLUSION

[¶ 200] Accordingly, the court denies movants' motion regarding causes of action asserted against them based on claims that (i) the Callon sale proceeds were not properly distributed according to the TAPA waterfall and (ii) the consideration was not fairly allocated between PEP and BPP. Otherwise, the court grants movants' motion and dismisses the causes of action against them as described above.

It is, SO ORDERED.

_____
BILL WHITEHILL
Judge, Texas Business Court-
First Division

SIGNED:  March 10, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98269421
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Summary Judgment
Status as of 3/10/2025 3:51 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher W.Patton | | cpatton@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Scott Smoot | | ssmoot@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Stephen Shackelford | | sshackelford@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| NATALIE STALLBOHM | | nstallbohm@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| M. TaylorLevesque | | taylor.levesque@troutman.com | 3/10/2025 2:35:27 PM | SENT |
| Sarah Hannigan | | shannigan@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Gary Vogt | | gvogt@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Bryan Caforio | | bcaforio@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Michelle Williams | | mwilliams@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Kerri Jones | | kjones@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Gina Flores | | gflores@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Roger BCowie | | Roger.Cowie@troutman.com | 3/10/2025 2:35:27 PM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Zack Ewing | | zack.ewing@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Nicholas Perrone | | nicholas.perrone@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Josephine Wang | | jwang@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Lindsey Godfrey Eccles | | leccles@susmangodfrey.com | 3/10/2025 2:35:27 PM | SENT |
| Michael Patton | | michael.patton@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Laura QuinnBrigham | | laura.brigham@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Christopher Schwegmann | | cschwegmann@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Kyle Gardner | | kgardner@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98269421
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Summary Judgment
Status as of 3/10/2025 3:51 PM CST

Case Contacts

| Kyle Gardner | | kgardner@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
|---|---|---|---|---|
| Louisa Karam | | louisa.karam@lockelord.com | 3/10/2025 2:35:27 PM | SENT |
| Theressa Washington | | Theressa.Washington@lockelord.com | 3/10/2025 2:35:27 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 3/10/2025 2:35:27 PM | SENT |
| Griffin Vail | | griffin.vail@kirkland.com | 3/10/2025 2:35:27 PM | SENT |
| Jessica Cox | | jcox@lynnllp.com | 3/10/2025 2:35:27 PM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 3/10/2025 2:35:27 PM | ERROR |

# APPENDIX 3

other Person to construct or purchase, gathering lines from Partnership Wells to gas transportation systems, and whenever the Managing General Partner does so, the Partnership shall pay the Managing General Partner or such Affiliate an amount that is within the range of prices that an unrelated party could have reasonably charged in an arm's-length transaction for similar services in the area, as a transportation fee for the transportation of all gas through the gathering system so constructed or acquired, and no other transportation fee shall be paid to the Managing General Partner or to any of its Affiliates. Contractual arrangements to transport gas that are in existence on the date of this Agreement shall be deemed to comply with the provisions of the preceding sentence.

5.5 **Farmouts**. The Managing General Partner may, in its sole discretion, acquire leases for the purpose of subsequent sale or Farmout. Neither the Managing General Partner nor any of its Affiliates will enter into a Farmout or other similar agreement with the Partnership unless (i) the Managing General Partner, exercising the standard of a prudent Operator, determines that the Farmout is in the best interests of the Partnership, and (ii) the terms of the Farmout are consistent with and in any case no less favorable than those utilized for similar arrangements in the geographic area in which the subject property is located. The decision with respect to making a Farmout, and the terms of the Farmout to another Person, will be in the sole discretion of the Managing General Partner. A Farmout of an undeveloped property from the Partnership to the Managing General Partner or its Affiliates must be made in accordance with Section 5.8 below.

5.6 **Sales of Properties to Partnership**. The Managing General Partner and its Affiliates may sell properties to the Partnership; provided that the Managing General Partner and its Affiliate shall not sell any properties to the Partnership except pursuant to transactions that are fair and reasonable to the Unitholders, and at a price that is not more than its fair market value as provided in Section 5.8.

5.7 **Purchases of Properties From Partnership**. Neither the Managing General Partner nor any Affiliate, may purchase or acquire any property from the Partnership, except pursuant to transactions that are fair and reasonable to the Unitholders and in any event in compliance with the provisions of Section 5.11(b), and at a price that is not less than its fair market value as provided in Section 5.8.

5.8 **Fair Market Value**. For purposes of Farmouts or purchases and sales of properties in accordance with the requirements of Sections 5.5, 5.6 and 5.7 above, the fair market value of a property shall be the price set forth in an Appraisal, which shall obtained by the Managing General Partner within a reasonable period of time prior to the closing of such sale or purchase. The Appraisal shall be maintained in the records of the Partnership for at least four years. The cost of the Appraisal shall borne equally by the Partnership and the Managing General Partner.

5.9 **Fiduciary Duties.**

(a) Each Partner and the Managing General Partner shall, to the fullest extent required by Texas law, owe to the Partnership and its Partners the duties of good faith and fair dealing, and in the case of the Managing General Partner, the duty not to exceed in such capacity

31

the bounds of the authority granted to any general partner by this Agreement and Texas law (all such duties collectively, the "Agreed Duties").

(b)      To the fullest extent permitted by Law,

(A)      except for the Agreed Duties and as expressly provided in this Agreement, the Managing General Partner shall not owe any fiduciary or similar duty or obligation whatsoever to the Partnership, any Partner or Assignee, except as required by any provisions of applicable law that cannot be waived, and

(B)      to the extent that, at law or in equity, the Managing General Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to applicable law, any such duty other than the Agreed Duties is hereby eliminated to the fullest extent permitted pursuant to applicable law.

(c)      Subject to the foregoing clauses (a) and (b), the Partnership and the Partners acknowledge and agree that the Managing General Partner may decide or determine any matter subject to the Board's approval hereunder in the sole and absolute discretion of the Managing General Partner, it being the intent of all Partners the Managing General Partner have the right to make such decision or determination solely on the basis of the interests the Managing General Partner desires to consider, including the Managing General Partner's own interests, the interests of the Partner that designated such any directors of the Managing General Partner and the interests of such Partner's Affiliates.

(i)      The Partnership and the Partners agree that any claims against, actions, rights to sue, other remedies or recourse to or against the Managing General Partner (except for such claims, actions, rights to sue, remedies or recourse that may be initiated or brought solely by the Partner that appointed directors on the Board) grounded in or alleging any breach of any fiduciary or similar duty, other than an Agreed Duty, are expressly released and waived by the Partnership and each Partner (and each Assignee), to the fullest extent permitted by law, as a condition to and as part of the consideration for the execution of this Agreement and the undertaking to incur the obligations provided for in this Agreement.

(ii)      To the extent that, at law or in equity, a Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to applicable law, any such duty, other than the Agreed Duties, is hereby eliminated to the fullest extent permitted pursuant to applicable law, it being the intent of the Partners that to the extent permitted by law and except to the extent set forth in this Section 5.9 or expressly specified elsewhere in this Agreement, no Partner or the Managing General Partner, in their capacities as such, shall owe any duties of any nature whatsoever to the Partnership, the other Partners or any Assignee, other than the Agreed Duties, and each Partner, in its capacity as such, may decide or determine any matter in its sole and absolute discretion taking into

32

account solely its interests and those of its Affiliates (excluding the Partnership and its Subsidiaries) subject to the Agreed Duties. Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this arrangement were not acceptable to it.

(iii)    Nothing herein is intended to create a partnership, joint venture, agency or other relationship creating fiduciary or quasi-fiduciary duties or similar duties or obligations, otherwise subject the Partners to joint and several liability or vicarious liability or to impose any duty, obligation or liability that would arise therefrom with respect to any or all of the Partners or the Partnership.

**5.10**    **No Duty of Third Parties to Investigate Authority**. No Person, dealing with the Partnership shall be required to inquire into the authority of the Managing General Partner to take any action or make any decision.

**5.11**    **Competitive Activities and AMI**.

(a)    Subject only to the provisions of this Section 5.11, during the continuation of the Partnership (i) any of the Partners may acquire, promote, develop, operate and manage any oil and gas property on his or their own behalf or on behalf of any Affiliate; and (ii) the Managing General Partner and any Affiliate of the Managing General Partner may, notwithstanding the existence of this Agreement, engage in any activities it chooses, whether the same are competitive with the Partnership or otherwise without having or incurring any obligation to offer any interest in such activities to the Partnership or any party hereto and, as a material part of consideration for the Managing General Partner's execution hereof, each Unitholder hereby waives, relinquishes and renounces any such right of claim of participation.

(b)    Except as provided in the next two sentences of this Section 5.11(b), the Managing General Partner and each Limited Partner hereby agrees that neither it nor any of its Affiliates shall purchase or make an investment in any oil and gas property of the type that is (i) within the scope of the Partnership's business as set forth in Section 2.4 and (ii) within AMI Area except, in each case, if the Partnership is offered a reasonable opportunity to purchase or make such investment during a period of 10 days and declines or is unable to effect such purchase or investment; provided, that in the event the Partnership does not pursue such opportunity within such period, such applicable Limited Partner or the Managing General Partner and/or its Affiliates, as applicable, shall be permitted to pursue such opportunity without restriction. The provisions of this Section 5.11(b) shall not be applicable to (x) existing activities relating to (i) Bluegrove NRG, Ltd., NRG Pipeline Company of Texas and Possum Kingdom Processing Corporation, (ii) any of the limited partnerships in which Affiliates of the Managing General Partner are presently general partners (including the F&B limited partnerships), (iii) any oil and gas interest held by the Managing General Partner or its Affiliates as of the Effective Date, (iv) investments by the Managing General Partner or its Affiliates in not more than five percent (5%) of the issued and outstanding shares of capital stock of any publicly traded corporation or entity and (v) activities approved by the Unanimous Consent of the Managing General Partner. The provisions of this Section 5.11(b) shall terminate with respect to the Managing General Partner and its Affiliates upon the earlier to occur of (i) five (5) years from the Effective Date, (ii) at such time as the Managing General Partner or any of its Affiliates shall

33

# APPENDIX 4

2025 Tex. Bus. 13



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP et al. *Plaintiffs*, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 24-BC01B-0010 |
| v. | | |
| PRIMEXX ENERGY CORPORATION, et al., *Defendants* | | |

═══════════════════════════════════════

**MEMORANDUM OPINION AND ORDER**

═══════════════════════════════════════

[¶ 1] By order signed April 10, 2025, the court denied Plaintiffs' (PEOFs) Motion for Reconsideration (Mot.) of the court's Opinion and Order granting in part BPP HoldCo LLC, Primexx Energy Corporation, and M. Christopher Doyle's Motion for Summary Judgment (MSJ).[1]

---

[1] *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, — S.W.3d — (Tex. Bus. Ct. 2025) (MSJ Opinion).

## I.

[¶ 2] "After a court grants a summary judgment motion, the court generally has no obligation to consider further motions on the issues adjudicated by the summary judgment." *Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quoting *Kelly v. Gaines*, 181 S.W.3d 394, 416 (Tex. App.—Waco 2005), rev'd on other grounds, 235 S.W.3d 179 (Tex. 2007)). Nonetheless, the court addresses PEOFs' arguments.[2]

## II.

[¶ 3] The court's MSJ Opinion did not conclude, as PEOFs contend, that HoldCo was "allow[ed] to act in bad faith" so long as it "rel[ies] on a contractual provision purportedly permitting its conduct."[3]

[¶ 4] Instead, as the court stated, movants' summary judgment motion distilled to whether there was a genuine issue of material fact regarding whether they failed to act in good faith (that is, acted in bad faith) regarding the Callon sale. 2025 Tex. Bus. 9, ¶ 134.

---

[2] This memorandum opinion does not expressly address every argument PEOFs' reconsideration motion asserts. Nonetheless, the court considered all of PEOFs' arguments and rejects them.

[3] Mot at 1, 17.

[¶ 5] PEOFs' motion concedes as much:

> As is required by the text of the Partnership Agreement, the Court found in its Opinion that PEC and BPP HoldCo owed the duty of good faith to Plaintiffs, *including* with respect to the execution of the drag-along provision. *See* Op. at ¶ 161 ("But HoldCo (and PEC) had to conduct the sale in good faith."); ¶ [1]64 ("But, HoldCo still had to discharge that obligation in good faith."); ¶ 194 ("HoldCo's 'fiduciary' duties required it to perform in good faith"). In fact, the Opinion recognizes that the "analysis **converges** on whether HoldCo acted in good faith when it exercised its drag-along rights and forced the sale . . ." *Id.* at ¶ 134.[4]

[¶ 6] The court's analysis considered PEOFs' causes of action, claims (which allege several ways in which they posit movants failed to act in good faith regarding the Callon sale), arguments, and all proper summary judgment evidence. That evidence includes movants' summary judgment evidence, PEOFs' responsive evidence, and PEOFs' FAP admissions.

[¶ 7] After considering the parties' arguments and all the proper summary judgment evidence, the court concluded that, except for instances described in the court's opinion (*see id.* ¶ 200), PEOFs failed as a matter of law to raise a genuine issue of material fact supporting liability based on their claims of bad faith. *See id.* ¶ 172.

---

[4] Mot. at 18–19 (emphasis original).

**A.   Arguments PEOFs Previously Made**

[¶ 8] PEOFs' reconsideration motion repeats these rejected arguments:

- *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex. 1996) does not apply in cases involving fiduciary duties.[5] PEOFs raised this argument during the November 21, 2024, hearing[6] and specifically referred to *Spethmann v. Anderson*.[7] PEOFs argued the same in their supplemental reply brief.[8]

- Cases discussed at ¶s 116 and 172 of the MSJ Opinion address only implied fiduciary duties, not an explicit duty written into the contract.[9] PEOFs made this argument in their opposition[10] and at the November 21, 2024, hearing.[11]

- Defendants adduced no evidence establishing that they acted in good faith.[12] PEOFs' opposition made this argument.[13]

- Section § 152.002 explicitly prohibits a partnership agreement from entirely eliminating the duties of loyalty, care, or good faith.[14] PEOFs made this argument throughout their briefing and at the November 21, 2024, hearing.[15]

---

[5] Mot. at 11 (citing *Spethmann v. Anderson*, 171 S.W.3d 680, 695–96 (Tex. App.—Dallas 2005, no pet.); *see also id.* at 2, 11–15.

[6] Nov. 21, 2024, Hrg. Tr. at 77:17–82:11.

[7] Nov. 21, 2024, Hrg. Tr. at 81:16–82:11.

[8] PEOFs' Jan. 3, 2025, Suppl. Reply. at 25–26.

[9] Mot. at 16; *see also* at 3, 12, 16–17.

[10] PEOFs' Nov. 1, 2024, Opp. at 15–16.

[11] Nov. 21, 2024, Hrg. Tr. at 67:25–68:22.

[12] Mot. at 19; *see also* at 1–2, 18–21.

[13] PEOFs' Nov. 1, 2024, Opp. at 4, 6, 17, 23.

[14] Mot. 22; *see also* at 3–4, 22–26.

[15] PEOFs' Nov. 1, 2024, Opp. at 18, 21–23; PEOFs' Dec. 13, 2024, Suppl. Br. at 7, 25; PEOFs' Jan. 3, 2025, Suppl. Reply at 8, 27; Nov. 21, 2024, Hrg. Tr. at 89:24–92:21.

- Defendants' proposed interpretation would render "Agreed Duties" meaningless and therefore makes the contract ambiguous.[16] The court asked PEOFs at the November 21, 2024, hearing if the contract was ambiguous.[17] PEOFs said "no" under their interpretation of the contract, which they argued was the only way to read the contract.[18]

- Plaintiffs allege breaches by Defendants well before invoking the drag-along provision.[19] PEOFs' briefing made this argument.[20]

[¶ 9] The court rejects those arguments for the reasons expressly stated in or impliedly covered by its prior MSJ Opinion.

## B.    PEOFs' Additional Arguments

[¶ 10] PEOFs motion makes these additional arguments or expands prior arguments that the court also rejects:

### 1.    *Texas Beef Cattle*

[¶ 11] PEOFs argue that *Texas Beef Cattle* is inapplicable because (i) it does not apply to cases involving fiduciaries; (ii) it predated the Business and

---

[16] Mot. at 26; *see also* 4–5, 30–34.

[17] Nov. 21, 2024, Hrg. Tr. At 64:20–21.

[18] Nov. 21, 2024, Hrg. Tr. At 64:22–25 ("No.  We think it's perfectly consistent, and we think it can be enforced as written.  And in fact, our reading is the only one that does work.").

[19] Mot. at 21; *see also* at 8, 20–22.

[20] PEOFs' Nov. 1, 2024, Opp. at 5; PEOFs' Dec. 13, 2024, Suppl. Br. at 16, 19; PEOFs' Jan. 3, 2025, Suppl. Reply at 33.

Organizations Code; and (iii) it and its progeny apply to only implied duties.[21]

PEOFs read too much into the court's reference to that case.

[¶ 12] To begin, the MSJ Opinion concludes only that *lawfully* exercising contract rights is not acting in bad faith. 2025 Tex. Bus. 9, ¶s 115–16, 172. Specifically, the court's *Texas Beef Cattle* reference quotes *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 972 (Tex. App.—Amarillo 1932, writ ref'd) (which has the same precedential value as a supreme court opinion) for the point that one does not act in bad faith by exercising its lawful rights provided one does so "in a legal way." 2025 Tex. Bus. 9, ¶ 115. That is, *Texas Beef Cattle* and the court's opinion require that the exercised contract right be (i) a lawful right and (ii) exercised "in a legal way." *Id.* So, the court did not conclude that *Texas Beef Cattle* permitted HoldCo to exercise its drag-along rights in bad faith or in an otherwise illegal manner.[22]

---

[21] Mot. at 11–18.

[22] For instance, the court concluded that "at a minimum" HoldCo could not have lied or misled its partners in executing its rights. *See* 2025 Tex. Bus. 9, ¶ 114:

> Case law indicates that the statutory good faith obligation includes, at a minimum, not lying to or misleading other partners. *See, e.g.*, *Shannon Medical*, 601 S.W.3d at 912–915 (partner misled partners regarding permitted affiliate business); *Cruz*, 2018 WL 6566642, *10–16 (partner misrepresented reasons for closing one business and misled partner regarding permitted

[¶ 13] Accordingly, the MSJ Opinion agrees with *Spethmann* that how a fiduciary performs their contract rights is important. *See* 171 S.W.3d at 696. To that point, the court emphasized that HoldCo had to satisfy its TBOC responsibilities and exercise its drag-along rights in good faith. *See* 2025 Tex. Bus. 9, ¶s 138, 142, 161, 164, 194.

[¶ 14] Furthermore, nothing in the Business Organizations Code nor its predecessors preclude applying *Texas Beef Cattle*'s general principle to a partner's applicable legal responsibilities.

## 2. PEOFs' "Manifestly Unreasonable" Argument

[¶ 15] PEOFs argue that the court did not consider whether any purported modifications to movants' statutory responsibilities are "manifestly unreasonable."[23] They are wrong.

---

competing business); *Red Sea Gaming*, 338 S.W.3d at 568–69 (failure to disclose resale opportunity while negotiating buyout).

But in reviewing the evidence, the court did not find that there was a genuine issue of material fact as to whether PEOFs were misled. *See, e.g.*, *id.* ¶ 184:

Similarly, PEOFs do not allege that HoldCo, PEC, or Doyle gave them[] or the board false or misleading information regarding the deal. Indeed, those persons could not have provided misleading information to PEOFs if (i) none of those persons communicated with PEOFs and (ii) Jeffs and Langdon were not, as PEOFs posit, their agents on the board. So, the court need not consider whether any such bad faith breach occurred.

[23] Mot. at 32.

[¶ 16]  The TBOC does not define "manifestly unreasonable."  However, PEOFs argued that HoldCo's interpretation of the TAPA produced "absurd results," and they used the absurd results doctrine as a proxy.[24]  Regardless of the label used for PEOFs' argument, the court considered and rejected it:

> [¶ 173] PEOFs[] argue that applying the TAPA as written could lead to absurd results such as HoldCo selling the business for a dollar. The court rejects that argument because, although courts will not enforce unambiguous terms that lead to absurd results, that safety valve is reserved for only truly exceptional cases where it is unthinkable, unfathomable, or quite impossible that a rational person could have intended it. *Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, 531 S.W.3d 234, 248–49 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Here, the consideration was far greater than a dollar.
>
> [¶ 174] Furthermore, it is not the court's role "to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it." *Id.* at 242.
>
> [¶ 175] Accordingly, based on the undisputed facts, the parties' business purposes when they signed the TAPA, its unambiguous terms, and TBOC's unambiguous provisions applicable to this case, as a matter of law HoldCo's drag-along rights were not so unthinkable, unfathomable, or impossible that a reasonable person in the parties' positions could not have rationally agreed to their application when they created the TAPA. Indeed, TAPA § 5.9(c)(ii) unambiguously records the

---

[24] *See* PEOFs' Nov. 1, 2024, Opp. at 25 ("Defendants' argument that they could invoke the drag-along provision at any time without owing any duty of loyalty or care whatsoever would lead to absurd results. . . . That interpretation is absurd, contrary to Texas law and the Partnership Agreement, and (to use the language from Section 152.002) 'manifestly unreasonable.'").

parties' agreement that they would not have entered into the TAPA if its terms were not acceptable to them.[25]

2025 Tex. Bus. 9, ¶s 173–75 (footnotes omitted). Indeed, MSJ Opinion ¶ 173, footnote 108 cited to PEOFs' specific argument.

## IV.

[¶ 17] In sum, as a matter of law the record negated every instance of a lack of good faith (that is, bad faith) PEOFs alleged, and PEOFs failed to adduce evidence of other facts constituting a lack of good faith. So, on March 10, 2025, the court granted in part the MSJ and on April 10, 2025, the court denied PEOFs' Motion for Reconsideration for the reasons described in this opinion.

## V.

[¶ 18] Accordingly, the court vacates in part its March 14, 2025, Order to Stay and Amend Scheduling Order except as to its briefing deadlines, which remain in place. It is, SO ORDERED.

---

[25] Having previously concluded that TAPA's relevant terms are unambiguous, the court also rejects PEOFs' reconsideration argument that "the inherent tension between the Agreed Duties provision and other provisions of the Partnership Agreement renders the contract ambiguous, which precludes summary judgment and requires the parties to engage in discovery." Mot. at 27.

_____

BILL WHITEHILL
Judge, Texas Business Court-
First Division

SIGNED: April 15, 2025

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99681171
Filing Code Description: No Fee Documents
Filing Description: Memorandum Opinion on Motion for Reconsideration
Status as of 4/15/2025 11:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher W.Patton | | cpatton@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Scott Smoot | | ssmoot@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Stephen Shackelford | | sshackelford@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| NATALIE STALLBOHM | | nstallbohm@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| M. TaylorLevesque | | taylor.levesque@troutman.com | 4/15/2025 11:18:41 AM | SENT |
| Sarah Hannigan | | shannigan@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| Gary Vogt | | gvogt@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Bryan Caforio | | bcaforio@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| Michelle Williams | | mwilliams@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| Kerri Jones | | kjones@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Gina Flores | | gflores@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Roger BCowie | | Roger.Cowie@troutman.com | 4/15/2025 11:18:41 AM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Zack Ewing | | zack.ewing@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Nicholas Perrone | | nicholas.perrone@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Josephine Wang | | jwang@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| Lindsey Godfrey Eccles | | leccles@susmangodfrey.com | 4/15/2025 11:18:41 AM | SENT |
| Michael Patton | | michael.patton@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Laura QuinnBrigham | | laura.brigham@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Christopher Schwegmann | | cschwegmann@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Kyle Gardner | | kgardner@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99681171
Filing Code Description: No Fee Documents
Filing Description: Memorandum Opinion on Motion for Reconsideration
Status as of 4/15/2025 11:38 AM CST

Case Contacts

| Kyle Gardner | | kgardner@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
|---|---|---|---|---|
| Louisa Karam | | louisa.karam@lockelord.com | 4/15/2025 11:18:41 AM | SENT |
| Theressa Washington | | Theressa.Washington@lockelord.com | 4/15/2025 11:18:41 AM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 4/15/2025 11:18:41 AM | SENT |
| Griffin Vail | | griffin.vail@kirkland.com | 4/15/2025 11:18:41 AM | SENT |
| Jessica Cox | | jcox@lynnllp.com | 4/15/2025 11:18:41 AM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 4/15/2025 11:18:41 AM | ERROR |

# APPENDIX 5



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP, *Plaintiffs*, <br><br> v. <br><br> PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLS, BX PRIMEXX | § § § § § § § § § § § § § § § § § § § § § § § § | Cause No. 24-BC01B-0010 |

TOPCO LLC, and BPP HOLDCO
LLC, *Defendants*

---

**MEMORANDUM OPINION**

---

[¶ 1] Angelo Acconcia and Blackstone Inc. filed special appearances. Having considered those special appearances, the responses, the pleadings, the materials on file, and counsels' arguments, the court concluded that it lacked personal jurisdiction over those defendants, granted their special appearances, and dismissed the claims against them.

[¶ 2] The court concluded that the evidence fails to establish that PEOFs' claims against Acconcia arise from his purposeful contacts with Texas, and so the court lacks specific personal jurisdiction over him. Because PEOFs' Blackstone Inc. arguments are rooted in Acconcia's actions as their agent, the court lacks jurisdiction over Blackstone Inc. too. Moreover, Acconcia's forum contacts are attributable to a different entity, not Blackstone Inc.

## I. BACKGROUND

[¶ 3] Because the court previously released several opinions in this action, it discusses only the facts relevant to the present issues. *See* 2025 Tex.

Bus. 5; 2025 Tex. Bus. 9; 2025 Tex. Bus. 13; 2025 Tex. Bus. 21.  The court uses abbreviations consistent with those opinions.[1]

## A. Procedural History

[¶ 4]  PEOFs filed their Original Petition (Pet.) on October 25, 2024.

[¶ 5]  Acconcia filed his special appearance, and the parties briefed the issue.[2]

[¶ 6] In January 2025, PEOFs filed a First Amended Petition (FAP) adding Blackstone Inc. as a defendant.

[¶ 7] Later, Blackstone Inc. filed its special appearance.[3]  PEOFs opposed Blackstone Inc.'s special appearance and supplemented their opposition to Acconcia's special appearance on March 7, 2025.[4]  The March seventh filings included in support confidential evidence obtained through discovery.

---

[1] *E.g.*, Third Amended Partnership Agreement (TAPA); Plaintiffs Primexx Energy Opportunity Fund LP and Primexx Energy Opportunity Fund II (PEOFs); Defendant BPP HoldCo LLC (BPP HoldCo); Primexx Energy Corporation (PEC); Primexx Energy Partners (PEP).

[2] Acconcia's 10/30/2024 Special Appearance (Acconcia's Br.); PEOFs' 11/1/2024 Opposition (PEOFs' Opp. to Acconcia); Acconcia's 11/4/2025 Reply (Acconcia's Reply).

[3] Blackstone Inc.'s 2/14/2025 Special Appearance (Blackstone Br.).

[4] PEOFs' 3/7/2025 Opposition (PEOFs' Opp. to Blackstone); PEOFs' 3/7/2025 Supplemental Opposition (PEOFs' Suppl. Opp. to Acconcia).

[¶ 8]  On March 10, 2025, the court entered 2025 Tex. Bus. 9, granting in part other defendants' summary judgment motion (MSJ Opinion).

[¶ 9]  Later, in response to questions from the court whether PEOFs intended to (i) file an amended pleading and (ii) take more jurisdictional discovery regarding the special appearances, PEOFs asked the court to decide the special appearances on the current record.

[¶ 10]  Two days later, the court granted Acconcia and Blackstone Inc.'s special appearances and dismissed the claims against them.

[¶ 11]  Thereafter, PEOFs filed their Second Amended Petition (SAP).

[¶ 12]  On May ninth and twenty-second, the court entered additional orders dismissing further claims against certain defendants.

[¶ 13]  A month later, the parties filed a Rule 11 agreement wherein PEOFs agreed to dismiss without prejudice their remaining claims against the remaining defendants for a tolling agreement while the parties appeal the court's previous rulings.  Their agreement stipulates, subject to the court's approval (which was granted), that the court's previous rulings (including its April 28, 2025, order on Acconcia and Blackstone Inc.'s special appearances) "shall be deemed to apply to the claims and parties in the [SAP]."

[¶ 14]  On June 16, 2025, the court entered a final judgment.  This court retains its plenary power for thirty days following the final judgment, which expires July 16, 2025.  *See* TEX. R. CIV. P. 329b.

## B.  Jurisdictional Facts

[¶ 15]  The court considers allegations contained in the SAP and related evidence submitted in response to Acconcia and Blackstone Inc.'s special appearances.  *See Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010).  The court does not consider allegations made outside the SAP and only considers additional evidence to the extent it supports or undermines the SAP's allegations.  *Id.*

[¶ 16]  Below are the allegations and evidence that are material to this opinion.  The court considered every allegation contained within PEOFs' pleadings as well as all the evidence submitted by the parties on these issues framed by the pleadings.

### 1.  Acconcia

#### a.  SAP Allegations

- Acconcia is a Massachusetts citizen.  ¶ 34.
- Acconcia served as a Senior Managing Director of Blackstone Inc., the President of BPP HoldCo, a director on the PEC Board, and a

member of Blackstone Management Partners LLC. ¶s 4, 34, 45, 51, 72, 90.

- Acconcia signed the TAPA for BPP HoldCo. ¶s 45, 50, 51.

- Acconcia was one of Blackstone Inc.'s most senior oil and gas dealmakers. ¶ 51.

- Acconcia was responsible (among others) for managing "Blackstone's"[5] Primexx investment. ¶ 72.

- Acconcia (among others) played a "central" and "instrumental" role in pushing through the Callon sale. ¶s 90–91, 96.

- Acconcia actively participated in, and facilitated, "Blackstone" and PEC's failures to (i) evaluate Primexx's viable options; (ii) conduct a proper due diligence, sale, or marketing process; (iii) consider whether a rushed sale without proper marketing would be fair to PEP or PEOFs; and (iv) properly allocate waterfall proceeds. ¶s 78–80, 104.

### b.    Opposition Evidence

- Acconcia (as a director) attended remote/hybrid PEC board meetings on June ninth and July thirteenth, 2021.[6]

---

[5] PEOFs at times do not distinguish between "Blackstone" generally and Blackstone Inc. or individual Blackstone Inc. affiliated parties. However, the court attempts to distinguish between PEOFs' general allegations regarding "Blackstone" versus Blackstone Inc. because "each defendant's actions and contacts with the forum [must be considered] separately" (*i.e.*, so called "group pleading" is not sufficient to maintain personal jurisdiction over a particular defendant). *Morris v. Kohls-York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd); *see Calder v. Jones*, 465 U.S. 783, 790 (1984).

[6] PEOFs' Opp. to Acconcia Exhibits 2 & 3 (it was not established whether Mr. Acconcia attended these meetings in person or remotely).

- Callon is based in Houston and maintains a Dallas registered agent.[7]

- Acconcia and others received a June 3, 2021, email from Chris Doyle regarding the Callon sale.[8]

- Acconcia admitted he was on the investment team and investment committee that decided to invest in Primexx.[9]

- Acconcia admitted that as a director, and part of his continuing obligations following "Blackstone's" investment, he participated in bi-weekly telephonic meetings of the PEC board.[10]

- The June 9, 2021, PEC board meeting (see above) was held in Dallas and via teleconference.[11] Acconcia is noted as discussing matters unrelated to the Callon sale.

- Emails show Acconcia traveled to Dallas in early June 2021 to meet with the PEC leadership team.[12]

- Emails show Acconcia flew to Houston in late-June 2021.[13]

---

[7] PEOFs' Opp. to Acconcia Exhibit 4.

[8] PEOFs' Opp. to Acconcia Exhibit 5.

[9] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) (Feb. 21, 2025, Deposition of Angelo Acconcia) at 31:16–23, 33:9–34:2.

[10] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 41:21–43:18, 67:10–69:3; Exhibit 6 (*in camera*).

[11] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 71:17–76:22; Exhibit 5 (*in camera*).

[12] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 53:4-55:4; Exhibit 2 (*in camera*).

[13] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 48:2–49:16, 57:13–59:14; Exhibits 3 & 4 (*in camera*).

- Acconcia admitted he discussed Primexx business with third parties who appear to be located or have an address in Texas.[14]

- Acconcia admitted he had an indirect personal financial interest in the Primexx investment.[15]

## 2. Blackstone Inc.

### a. SAP Allegations

- Blackstone Inc. is a Delaware corporation with its principal place of business in New York. ¶ 21.

- Blackstone Inc. and its subsidiaries, employees, and agents "control" and operate BPP HoldCo as well as the other Blackstone Inc. affiliated defendants and were responsible for managing and approving the Callon sale. ¶s 1, 22–23, 46, 52, 56, 72–73, 90–91. The "principal business" of each entity in the "Blackstone" structure is controlling the entity one-level down as either the general partner of a limited partnership or the sole or managing member of an LLC—with Blackstone Inc. at the top and BPP HoldCo at the bottom. ¶s 56–58.

- Acconcia was a Senior Managing Director of Blackstone Inc. (and therefore its agent). ¶s 4, 34, 45, 51, 72, 90. Other agents include Erik Belz, Omar Rehman, Tabea Hsi, Mark Henle, Jonathan Hamilton, Jeff Kelly, and Anika Gautam. ¶s 52, 72–73, 91.

- Blackstone Inc.'s agents were responsible for managing "Blackstone's" investment in Primexx. ¶ 72. Its agents conducted business related to Primexx and the Callon sale on its behalf using "@blackstone.com" email addresses and sent

---

[14] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 62:11–64:15, 79:14–80:5, 80:22–83:10, 83:11–87:2; Exhibits 7, 8, 9, & 10 (*in camera*).

[15] PEOFs' Suppl. Opp. to Acconcia Exhibit 1 (*in camera*) at 38:23–39:8.

thousands of emails to PEC while managing its investment in Primexx. ¶ 74. BPP HoldCo lacks its own email system. ¶ 75.

- Blackstone Inc. orchestrated the Callon sale despite knowing the price was too low and prioritizing its own interest and those of its subsidiaries. ¶s 91, 98. "Blackstone" structured the deal terms to (i) favor "Blackstone's" sidecar and (ii) misallocate profits according to the waterfall provision. ¶s 102–03, 105–06.

- Blackstone Inc. (along with the other Blackstone affiliated defendants) made joint SEC filings in connection with the Callon sale. ¶ 57. SEC forms for BPP HoldCo list its address as "c/o Blackstone Inc." ¶ 52.

- Blackstone Inc. executives gave the direction to exit the Primexx investment. ¶ 83.

- The "Blackstone Defendants" operate out of the same address. ¶ 53. They are all operated solely by employees of Blackstone Inc. and use "@blackstone.com" email domains. ¶ 54. Blackstone Inc. employees conduct business on behalf of each of the Blackstone affiliated defendants. *Id.* "Blackstone" is operated as a "matrix" organization in which Blackstone Inc. employees conduct work for the Blackstone affiliated defendants. ¶ 55. Blackstone Inc. executives describe themselves as working on behalf of "Blackstone" as a collective organization. *Id.* "Blackstone" used its corporate structure to siphon proceeds from the Callon sale away from BPP HoldCo. ¶s 107–09.

- BPP HoldCo transferred proceeds of the Callon sale (including Callon shares) to the "Blackstone Defendants." ¶s 108–09.

### b. Opposition Evidence

- The evidence submitted in PEOFs' supplemental opposition to Acconcia's special appearance.

- Two additional Acconcia communications showing his management of "Blackstone's" investment in Primexx.[16]

- Testimony from Mr. Acconcia that PEOFs argue shows he was acting on behalf of Blackstone Inc.—and not BPP HoldCo—in managing "Blackstone's" investment in Primexx and the Callon sale, including: he did not recall serving as the President of BPP HoldCo; he reported directly to senior Blackstone Inc. management; he used an "@blackstone.com" email address and his signature block included Blackstone Inc.'s principal address; he did not recall receiving compensation directly from BPP HoldCo; he served on the Blackstone Inc. investment committee that decided to invest in Primexx; etc.[17]

- A talking points memo Mr. Acconcia received from Blackstone Inc. employee Mark Henle following the Callon sale.[18]

- A press release stating that the sale of Primexx to Callon included leasehold interests.[19]

## C. Parties' Arguments

### 1. Acconcia

[¶ 17] Acconcia argued that he was not subject to general jurisdiction, but regardless would be protected in that context by the fiduciary shield doctrine because he was acting in his role as a PEC director and BPP HoldCo

---

[16] PEOFs' Opp. to Blackstone Exhibits 6 & 10 (*in camera*).

[17] PEOFs' Opp. to Blackstone Exhibit 4 at 26:11–27:21, 18:21–19:3, 17:18–25, 35:7–19, 33:14–34:2; Exhibit 6 (*in camera*).

[18] PEOFs' Opp. to Blackstone Exhibit 17 (*in camera*).

[19] PEOFs' Opp. to Blackstone Exhibit 18.

officer.[20] He further challenged the sufficiency of specific jurisdiction because PEOFs had not alleged that he performed acts in Texas on his own behalf that give rise to this dispute, other than conclusory allegations that he "played a key role" in the Callon sale.[21] Furthermore, that he served as BPP HoldCo's President and signed the TAPA on its behalf did not support asserting jurisdiction.[22] He replied that none of PEOFs' evidence supports a different outcome and the director cases PEOFs cited are distinguishable.[23]

[¶ 18] In opposition, PEOFs did not assert general jurisdiction. As to specific jurisdiction, they argued that "Mr. Acconcia's personal and direct involvement in the [TAPA] and investment in Primexx; the governance of Primexx during the Callon sale process; and orchestration of the Callon sale itself grants this Court specific personal jurisdiction."[24] PEOFs focused on the fact that Acconcia "served as a director of a Texas corporation" and "routinely participated in PEC board meetings" and "discussions over email"

---

[20] Acconcia's Br. at 3–4.

[21] Acconcia's Br. at 5–7.

[22] Acconcia's Br. at 2.

[23] Acconcia's Reply at 10–12. Acconcia did not file a supplemental response to PEOFs' March 7, 2025, supplemental opposition. Accordingly, he only responded to the evidence proffered with PEOFs' November 1, 2024, original opposition.

[24] PEOFs' Opp. to Acconcia at 3–4, 12.

concerning the Callon sale.[25]   PEOFs cited cases they argued supported asserting jurisdiction over a non-resident director.[26]

[¶ 19] Later, PEOFs filed a supplemental opposition attaching the products of jurisdictional discovery (listed in the previous section).   They argued that this evidence "confirms Mr. Acconica's robust purposeful contacts in Texas" and that he "conducted business related to Primexx while he was physically located in Texas."[27]   They further argued that the fiduciary shield doctrine does not apply because they were asserting specific jurisdiction.[28]

## 2.   Blackstone Inc.

[¶ 20] Blackstone Inc. argued that this was not an "exceptional case" where general jurisdiction would be appropriate.[29]   It added that specific jurisdiction did not apply because PEOFs did not allege that Blackstone Inc.

---

[25] PEOFs' Opp. to Acconcia at 4, 6 (citing Exhibits 2, 3, 5), 12–16.

[26] *See In Glencoe Cap. Partners IL L.P. v. Gernsbacher*, 269 S.W.3d 157, 164 (Tex. App.—Fort Worth 2008, no pet.); *Fjell Tech. Grp. v. Unitech Int'l Inc.*, No. 14-14-00255-CV, 2015 WL 457805, at *6 (Tex. App.—Houston [14th Dist.] Feb. 3, 2015, pet, denied); *Henkel v. Emjo Investments Ltd.*, 480 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.).

[27] PEOFs' Suppl. Opp. to Acconcia at 2 (emphasis omitted).

[28] PEOFs' Suppl. Opp. to Acconcia at 6 n.3.

[29] Blackstone Br. at 8.

or any of its employees performed any acts in Texas giving rise to this dispute.[30] It further argued that PEOFs did not distinguish between acts performed by individuals—such as Mr. Acconcia—in their capacity as Blackstone Inc. employees as opposed to their capacity as directors and officers of BPP HoldCo or PEC. Additionally, the receipt of Callon shares as proceeds of the Callon sale was insufficient to confer jurisdiction.[31] Finally, it argued that PEOFs had not carried their burden to establish that BPP HoldCo was Blackstone Inc.'s alter ego, and that the TAPA contractually prohibited them from attempting to do so.[32]

[¶ 21] PEOFs' response largely attached the same jurisdictional discovery gathered against Acconcia. They argued that Blackstone Inc. directly controlled its investment in Primexx through its agents—such as Mr. Acconcia—and disavowed any reliance on alter ego allegations.[33] They argued specific jurisdiction was proper over Blackstone Inc. because it (i) raised capital to invest in a Texas partnership governing the assets of a Texas oil

---

[30] Blackstone Br. at 9–11.

[31] Blackstone Br. at 14–16.

[32] Blackstone Br. 12–14.

[33] PEOFs' Opp. to Blackstone at 6, 22.

company, (ii) exercised control over the subsidiary operating the Texas oil company, (iii) was responsible for directing the fire sale of the Texas oil assets to another Texas-based company, and (iv) received hundreds of millions of dollars from the sale of the Texas oil assets.[34]

## II.    APPLICABLE LAW

### A. Special Appearances

[¶ 22]  Rule of Civil Procedure 120a governs special appearances.  TEX. R. CIV. P. 120a(1).  A party availing itself of Rule 120a must strictly comply with its terms because failure to do so results in waiver.  *PetroSaudi Oil Servs. Ltd. v. Hartley*, 617 S.W.3d 116, 136 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

[¶ 23] A party waives its special appearance when it (i) invokes the court's judgment on any question other than the court's jurisdiction; (ii) recognizes by its acts that an action is properly pending; or (iii) seeks affirmative action from the court.  *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004) (per curiam) (citing *Dawson-Austin v. Austin*, 968 S.W.2d 319, 322 (Tex. 1998)).  But a party does not waive its jurisdictional challenge

---

[34] PEOFs' Opp. to Blackstone at 17.

by seeking affirmative relief consistent with the special appearance. *Nationwide Distrib. Servs., Inc. v. Jones*, 496 S.W.3d 221, 225 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

## B. *In Personam* Jurisdiction

[¶ 24] A nonresident defendant is subject to personal jurisdiction in Texas if (i) the Texas long-arm statute authorizes the exercise of jurisdiction and (ii) the exercise of jurisdiction does not violate federal or state constitutional due process guarantees. *Kelly*, 301 S.W.3d at 657.

[¶ 25] The long-arm statute permits courts to exercise jurisdiction over a defendant who "does business in this state," which the Legislature defines to include a nonresident defendant who "commits a tort in whole or in part in this state." *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023) (quoting TEX. CIV. PRAC. & REM. CODE § 17.042(2)).

[¶ 26] The statute's broad "doing business" language (that is, committing a tort in whole or in part in Texas) allows the trial court's jurisdiction to "reach as far as the federal constitutional requirements of due process will allow." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

[¶ 27] Therefore, courts need "only analyze whether [the defendant]'s acts would bring [the defendant] within Texas' jurisdiction consistent with constitutional due process requirements." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

[¶ 28] A state's exercise of jurisdiction comports with federal due process if (i) the nonresident defendant has "minimum contacts" with the state and (ii) the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

### 1.    Minimum Contacts

[¶ 29]  A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco*, 278 S.W.3d at 338.

[¶ 30]  Courts consider three issues in determining whether a defendant purposefully availed itself of the privilege of conducting activities in Texas:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than

random, fortuitous, or attenuated. ... Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction.

*Id.* at 339 (quoting *Moki Mac*, 221 S.W.3d at 575); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005).

[¶ 31] The minimum-contacts analysis focuses on the "quality and nature of the defendant's contacts," not quantity. *Retamco*, 278 S.W.3d at 339.

[¶ 32] "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Id.* at 338 (quoting *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).

### a. General Personal Jurisdiction

[¶ 33] A court has general jurisdiction over a nonresident defendant whose "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016) (alteration in original) (quoting Daimler v. Bauman, 571 U.S. 117, 127 (2014)). This test requires "substantial activities within the forum" and presents "a more demanding minimum contacts analysis than for

specific jurisdiction." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 797 (Tex. 2002). When a court has general jurisdiction over a nonresident, it may exercise jurisdiction "even if the cause of action did not arise from activities performed in the forum state." *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

### b. Specific Personal Jurisdiction

[¶ 34] Specific jurisdiction requires that "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco*, 278 S.W.3d at 338 (buying Texas real estate) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "The 'arise from or relate to' requirement lies at the heart of specific jurisdiction by defining the required nexus between the nonresident defendant, the litigation, and the forum." *Moki Mac*, 221 S.W.3d at 579; *Guardian Royal*, 815 S.W.2d at 228 (specific jurisdiction focuses on "the relationship among the defendant, the forum and the litigation").

[¶ 35] For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*,

221 S.W.3d at 585. The "operative facts" of a litigation are those that "will be the focus of the trial" and "will consume most if not all of the litigation's attention." *Id.* at 585.

[¶ 36] Specific jurisdiction requires courts to analyze jurisdictional contacts on a claim-by-claim basis. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013); *see also Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006) ("If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts."). But a court need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contact. *Moncrief*, 414 S.W.3d at 150–51.

## 2. Fair Play and Substantial Justice

[¶ 37] If the minimum contacts requirements are met, it is "rare" for exercising personal jurisdiction to not comply with fair play and substantial justice. *Retamco*, 278 S.W.3d at 341. Nonetheless, courts still consider factors to ensure that exercising jurisdiction does not offend traditional notions of fair play and substantial justice:

(1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* (citing *Burger King*, 471 U.S. at 477–78).

### 3. The Parties' Burdens

[¶ 38] The plaintiff "bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute." *Kelly*, 301 S.W.3d at 658. If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Id.* at 658–59. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id.* at 658.

[¶ 39] "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id.* Defendant can negate jurisdiction on either a factual or legal basis. *Id.* at 659.

[¶ 40] Factually, a defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. *Id.* The plaintiff must then respond with its own evidence that affirms its allegations or else risk dismissal. *Id.* However, the court considers "additional evidence," including, "stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony," to the extent it supports or undermines the pleadings' allegations. *Id.* at 658 n.4 (citing TEX. R. CIV. P. 120a(3)). If the plaintiff's evidence is not within the scope of the pleadings' factual allegations, the plaintiff should amend the pleadings for consistency. *Id.* at 659 n.6; *see also Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 129 (Tex. App.—Dallas 2021, no pet.).

[¶ 41] The defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction either (i) because the defendant's contacts with Texas fall short of purposeful availment (including that the claims do not arise from the contacts) or (ii) that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.* at 659.

### III. DISCUSSION

## A. The Remaining Claims

[¶ 42] The court had issued its MSJ Opinion when it issued its April 28, 2025, order granting Acconcia and Blackstone Inc.'s special appearances. That opinion dismissed PEOFs' claims that (i) the accepted Callon sale price was too low, (ii) defendants performed inadequate due diligence, and (iii) defendants gave inadequate notice to PEOFs. *Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶ 3, 709 S.W.3d 619, 628 (1st Div.), reconsideration denied 2025 Tex. Bus. 13, 713 S.W.3d 416. Only PEOFs' claims that (iv) the Callon sale proceeds were not properly distributed according to the TAPA waterfall and (v) the consideration was not fairly allocated between PEP and BPP survived the motion (Surviving Claims). *Id.* ¶ 200.

[¶ 43] The parties never discussed whether the court's jurisdictional analysis should address only the Surviving Claims or all asserted claims. *See Moncrief*, 414 S.W.3d at 150 (specific jurisdiction requires claim-by-claim analysis).

[¶ 44] The Texas Supreme Court has warned that courts should not delve into "the underlying merits" when resolving jurisdictional issues. *See*

*Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 70 (Tex. 2016) (quoting *Michiana*, 168 S.W.3d at 790).  However, that court's reasoning does not apply where a court has already adjudicated particular issues.  *See Michiana*, 168 S.W.3d at 790.  Accordingly, this court concludes that the specific jurisdictional analysis should concern only the claims that survived summary judgment.  However, the court's conclusions are the same considering all the claims asserted in the SAP (as discussed further below).

**B. Acconcia**

[¶ 45]  PEOFs did not argue general jurisdiction over Acconcia.  For the following reasons, the court concludes that it lacks personal jurisdiction over Acconcia.

[¶ 46]  In short, PEOFs do not allege, argue, or adduce evidence that Acconcia committed a tortious act in whole or in part in Texas that would support personal—meaning direct—liability against him such as making a fraudulent statement, breaching a personal duty, stealing a trade secret, committing a trespass, or converting an asset.  Instead, they seek to impute other persons' conduct to him (be it BPP HoldCo or PEC), which imputation is improper.  *See Nikolai v. Strate*, 922 S.W.2d 229, 240 (Tex. App.—Fort Worth 1996, writ denied) ("Texas law is clear that a business's contacts may

not be imputed to its personnel to establish personal jurisdiction over them.").

Thus, their jurisdictional arguments do not meet even the statutory test for personal jurisdiction as broadly as that statute may be interpreted. *See* TEX. CIV. PRAC. & REM. CODE § 17.042(2) (jurisdiction is proper over a defendant that "commits a tort … in this state"); *Morgan*, 670 S.W.3d at 346.

### 1. PEOFs' Original Opposition Arguments

[¶ 47] PEOFs' original opposition to Acconcia's special appearance argued that "Mr. Acconcia's personal and direct involvement in the [TAPA] and investment in Primexx; the governance of Primexx during the Callon sale process; and orchestration of the Callon sale itself grants this Court specific personal jurisdiction."[35]

***Signing the TAPA***

[¶ 48] The TAPA's negotiation and signing are not substantially connected to this lawsuit's operative facts. PEOFs' claims (both its original claims and the Surviving Claims) concern breaches of contract and fiduciary duties arising out of the Callon sale. The "focus of the trial" and therefore the operative facts will be centered on defendants' conduct surrounding the sale,

---

[35] PEOFs' Opp. to Acconcia at 3–4, 12.

not the initial investment into Primexx or the signing of the TAPA. *See Moki Mac*, 221 S.W.3d at 585. While the TAPA's terms may be relevant to the ultimate trial, the facts surrounding its signing will not be. *See Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (contract construction is a matter of law).

### *Governance of Primexx and Orchestration of the Callon Sale*

[¶ 49] PEOFs argue that Acconcia "purposefully availed himself of the Texas forum through choosing to sit on the board of a Texas-based company."[36] Were that enough to find jurisdiction is proper over a defendant, it would vitiate the fiduciary shield doctrine.

[¶ 50] As a general rule, jurisdiction over an individual cannot be based upon jurisdiction over a corporation. *Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 750 (Tex. App.—Dallas 2009, no pet.). "The fiduciary shield doctrine protects a nonresident corporate officer or employee from a trial court's exercise of general jurisdiction over the individual when all of his contacts with Texas were made on behalf of the employer." *Id.*; *see also Nikolai*, 922 S.W.2d at 240.

---

[36] PEOFs' Opp. to Acconcia at 12.

[¶ 51] In its supplemental opposition, PEOFs argue that the fiduciary shield doctrine does not apply because (i) they allege specific jurisdiction over Acconcia, and the doctrine only protects against general jurisdiction and (ii) corporate agents can always be found liable for their own fraudulent or tortious acts even when acting on behalf of an entity.[37]

[¶ 52] The facts that Acconcia was a director of PEC and President of BPP HoldCo do not by themselves give rise to this litigation. *Moki Mac*, 221 S.W.3d at 585. Therefore, those facts, standing alone, are possibly relevant to only general jurisdiction. *Cf. id.* 576 ("[G]eneral jurisdiction is established whether or not the defendant's alleged liability arises from those contacts."). Thus, the court rejects that Acconcia "purposefully availed himself of the Texas forum through choosing to sit on the board of a Texas-based company."[38]

[¶ 53] However, PEOFs are correct that "a corporate officer is not protected from the exercise of specific jurisdiction, even if all of his contacts were performed in a corporate capacity, if the officer engaged in tortious or

---

[37] PEOFs' Suppl. Opp. to Acconcia at 6 n.3 (citing *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024) and *Tabacinic v. Frazier*, 372 S.W.3d 658, 669 (Tex. App.—Dallas 2012, no pet.)).

[38] PEOFs' Opp. to Acconcia at 12.

fraudulent conduct directed at the forum state for which he may be held *personally liable*." *Tabacinic*, 372 S.W.3d at 668–69 (emphasis added).

[¶ 54] As a threshold matter, it is not appropriate to assert jurisdiction over a non-resident corporate officer where the only claims asserted against them are derivative in nature. None of the SAP's causes of actions against Acconcia are based on *direct personal* liability.[39] Instead, each is based on a "derivative," vicarious, or secondary liability theory where he is only liable as a joint tortfeasor.[40]

[¶ 55] That PEOFs never asserted a claim for which Acconcia may be independently liable supports the court's conclusion. *See Tabacinic*, 372 S.W.3d at 668–69; *see also National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) (jurisdiction may not be "based solely upon the effects or consequences of an alleged conspiracy").

---

[39] *See* SAP Eighth (conspiracy), Eleventh (aiding and abetting), and Twelfth (knowing participation) Causes of Action.

[40] *See Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) (civil conspiracy is a theory of vicarious liability and not an independent tort); *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 738 (Tex. 2020) (aiding and abetting and conspiracy are theories of derivative or vicarious liability); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (1942) (same as to knowing participation).

[¶ 56] Accordingly, we must examine the actual allegations and evidence of Acconcia's contacts with Texas and their connection to the Callon sale.

[¶ 57] At the time PEOFs filed their opposition, only the Original Petition was on file. The Original Petition alleged that Acconcia played a "key," "central," or "instrumental" role in pushing through the Callon sale without further specifics.[41] The court concludes that these conclusory allegations "are insufficient to meet [PEOFs'] burden of establishing jurisdiction." *PermiaCare v. L.R.H.*, 600 S.W.3d 431, 444 (Tex. App.—El Paso 2020, no pet.) (citing *State v. Lueck*, 290 S.W.3d 876, 884–85 (Tex. 2009)).

[¶ 58] As the concurrence remarked in *Steward Health Care*, "[c]orporations do not have a corporeal existence and can only act through their agents" and thus every corporate tort might inevitably subject at least one individual to a personal capacity suit if PEOFs' conclusory allegations were sufficient. 633 S.W.3d at 150–51 (J. Schenck concurring). However, this would "eviscerate the fiduciary shield doctrine and render it meaningless." *Id.*

---

[41] Pet. ¶s 4, 71, 77.

at 151.  Instead, a plaintiff must still plead and, when challenged, provide facts that would justify personal jurisdiction in a tort action by showing that the defendant committed a direct liability tort in whole or in part while in Texas, even as broadly as the long-arm statute may be construed.  *See* TEX. CIV. PRAC. & REM. CODE § 17.042(2); *Kelly*, 301 S.W.3d at 658–59.

[¶ 59] PEOFs' opposition included proof that (i) Acconcia attended remote/hybrid PEC board meetings on June 9, 2021 and July 13, 2021, that were at least partially held in Texas and (ii) he received an email from Chris Doyle (who was located in Texas) regarding the Callon sale.[42]  However, that evidence fails to show that (i) Acconcia committed a tort in whole or in part in Texas that would support direct liability against him and (ii) PEOFs' causes of action arise from those contacts.  *Retamco*, 278 S.W.3d at 338.

[¶ 60]  First, neither of the board meetings to which PEOFs point are the July 30, 2021, or August 2, 2021, meetings where the Callon sale was announced or voted on.[43]  Second, the June ninth and July thirteenth meeting minutes do not show that Acconcia took any action.[44]  As discussed above,

---

[42] *See* ¶ 16.

[43] SAP ¶s 3, 4.

[44] PEOFs' Opp. to Acconcia Exhibits 2 & 3.

Acconcia's mere attendance of PEC board meetings, without any indication that he took any role or action regarding the Callon sale, are insufficient.

[¶ 61] Regarding the email, receipt of emails from a Texas resident do not support jurisdiction because it constitutes the unilateral act of another party. *Retamco*, 278 S.W.3d at 339; *see also Moncrief*, 414 S.W.3d at 152–53 (*Michiana* overruled a myriad of cases where jurisdiction was predicated solely on receipt of out-of-state communications).

[¶ 62] In comparison, the cases cited by PEOFs demonstrate scenarios where the out-of-state director/manager defendant's contacts with Texas were more significant and plaintiff's causes of action directly arose from those contacts. *See Glencoe*, 269 S.W.3d at 167 (defendant directors' own misrepresentations during board meetings were the "operative facts of the [fraud] litigation"); *Carlile*, 2014 WL 3891658, at *12 (defendant directors conducted the due diligence that allegedly failed to disclose information in Texas during merger negotiations); *Fjell Tech.*, 2015 WL 457805, at *8 (defendant manager's emails sent to Texas residents were the basis of plaintiff's trade secret causes of action); *Henkel*, 480 S.W.3d at *7 (formation of Texas-based company itself, and defendant director's role on the board, was at the center of the alleged fraudulent investment scheme).

[¶ 63] Those cases are all distinguishable and demonstrate why personal jurisdiction is improper here.

## 2. PEOFs' Supplemental Opposition Arguments

[¶ 64] The SAP and PEOFs' supplemental opposition added additional allegations and evidence that PEOFs allege support specific jurisdiction over Acconcia.[45]

[¶ 65] The SAP's allegations substantially overlap with the ones included in the Original Petition, except that PEOFs now additionally allege that Acconcia "actively participated in," and facilitated "Blackstone's" and PEC's failures to (i) evaluate Primexx's viable options; (ii) conduct a proper due diligence, sale, or marketing process; (iii) consider whether a rushed sale without proper marketing would be fair to PEP or PEOFs; and (iv) properly allocate waterfall proceeds.[46]

[¶ 66] Despite being marginally more specific than PEOFs' original allegations, they are no less conclusory. *PermiaCare*, 600 S.W.3d at 444. Indeed, they are essentially a recitation of the court's characterization of

---

[45] *See* ¶ 16.

[46] SAP ¶s 78–80, 104.

PEOFs' claims from its MSJ Opinion. *See Primexx*, 2025 Tex. Bus. 9, ¶s 3, 200.

[¶ 67] PEOFs' new evidence obtained through discovery includes admissions from Acconcia and documents showing that he travelled to Texas on at least two occasions during his work on the board of PEC and that he communicated with several individuals that appeared to be in Texas concerning Primexx.[47] Assuming this evidence suggests purposeful Texas contacts, "[f]or specific-jurisdiction purposes, purposeful availment has *no jurisdictional relevance unless* the defendant's liability arises from or relates to the forum contacts." *Moki Mac*, 221 S.W.3d at 579 (emphasis added).

[¶ 68] PEOFs' evidence of Acconcia's contacts with Texas are not substantially connected with the operative facts of either the Surviving Claims or all asserted claims. While his contacts may have been related to his work on the PEC board, none of the evidence shows any connection to the Callon sale.[48] Indeed, for example, PEOFs note that Acconcia "actively participated" in a June 9, 2021, hybrid board meeting that was held in Dallas and

---

[47] *See* ¶ 16.

[48] *See* ¶ 16.

telephonically, but they fail to address that *none* of Acconcia's recorded comments have anything to do with the Callon sale.[49]

[¶ 69] And while Acconcia may have been in Texas on two occasions, the evidence shows only that he was in the state and potentially on Primexx business, but not that he took any actions related to the Callon sale, let alone that he did anything in Texas that would be independently tortious as to PEOFs.[50] They do not even assert direct tort liability against him.

* * * * *

[¶ 70] Therefore, the court concludes that it lacks personal jurisdiction over Acconcia.

## C. Blackstone Inc.

### 1. Minimum contacts

[¶ 71] PEOFs did not argue general jurisdiction regarding to Blackstone Inc. Instead, they argued four theories for specific jurisdiction over Blackstone Inc.: (i) it raised capital to invest in a Texas partnership governing the assets of a Texas oil company, (ii) it exercised control over the subsidiary

---

[49] PEOFs' Suppl. Opp. to Acconcia at 3, Exhibits 1 & 5 (*in camera*).
[50] PEOFs' Suppl. Opp. to Acconcia Exhibits 1, 2, 3, 4 (*in camera*).

operating the Texas oil company, (iii) it was responsible for directing the fire sale of the Texas oil assets to another Texas-based company, and (iv) it received hundreds of millions of dollars from the sale of the Texas oil assets.[51] None of these arguments support jurisdiction over Blackstone Inc.

### *Raised Capital*

[¶ 72] PEOFs' first theory fails because raising capital to invest in Primexx is not sufficiently connected to the operative facts of this lawsuit and their argument is contradicted by their own pleadings (nor is it independently tortious conduct). PEOFs' claims (both its original claims and the Surviving Claims) concern breaches of contract and fiduciary duties arising out of the Callon sale. The "focus of the trial" and therefore the operative facts will be centered on defendants' conduct surrounding the sale, not the initial investment into Primexx. *Moki Mac*, 221 S.W.3d at 585. Furthermore, PEOFs' argument is contradicted by their own pleadings, which consistently allege that defendants Blackstone Energy Partners II LP and Blackstone

---

[51] PEOFs' Opp. to Blackstone at 17.

Capital Partners VII LP raised and committed capital for the investment, not Blackstone Inc.[52]

### *Control over BPP HoldCo and Responsibility for the Callon Sale*

[¶ 73] PEOFs' second and third theories essentially rely on the same allegations and facts asserted against Acconcia contending that he was Blackstone Inc.'s agent. *See Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet. For the reasons discussed earlier regarding Acconcia's special appearance, *see* ¶s 49–69, those arguments fail to establish this court's jurisdiction over Blackstone Inc.

[¶ 74] Furthermore, while "[t]he Texas contacts of agents or employees are attributable to their nonresident principals," 180 S.W.3d at 620, PEOFs still had to adequately identify Acconcia's principal in question. *See IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) ("Texas law does not presume agency, and the party who alleges it has the burden of proving it.").

[¶ 75] The court concludes that Acconcia's Texas-based contacts were performed on behalf of either PEC or BPP HoldCo, not Blackstone Inc. Acconcia was President of BPP HoldCo and a director of PEC.[53] He attended

---

[52] SAP ¶s 45, 48.

[53] SAP ¶ 34.

joint board meetings in his capacity as a PEC director and BPP HoldCo manager.[54] It is his performance of duties as director of the general partner and manager of one of the limited partners that is relevant to PEOFs' causes of action. The reason he was a PEC director was because BPP HoldCo appointed him to the role.[55] It was therefore BPP HoldCo that had the power to remove Acconcia as a director if it was unhappy with his performance, not Blackstone Inc.[56] So, Acconcia's activities are not attributable to Blackstone Inc.

### *Callon Sale Proceeds*

[¶ 76] PEOFs' fourth theory fails because the proceeds "Blackstone" received from the Callon sale were fungible assets, which do not support jurisdiction, rather than Texas real estate, which may.

[¶ 77] Blackstone Inc. argues that receipt of Callon shares does not support jurisdiction because they are "a fungible asset" and create "no

---

[54] PEOFs' Opp. to Acconcia Exhibits 2 & 3; PEOFs' Suppl. Opp. to Acconcia Exhibit 5 (*in camera*).

[55] *See* 2025 Tex. Bus. 9, ¶s 17–18.

[56] PEOFs' Opp. to Acconcia at 13 ("Mr. Acconcia served as the President of BPP HoldCo, the company that managed Blackstone's investment in the Primexx Texas oil assets.").

continuing presence in Texas," like the cash transfer in O*ld Republic Nat. Title Ins. Co. v. Bell*, 549 S.W.3d 550, 563–64 (Tex. 2018).[57]

[¶ 78]  PEOFs argue that *Old Republic* does not apply because that case involved cash transfers between two friends and noted that the analysis may have been different had the defendant been "a corporate lender distributing funds … with the expectation of collecting interest."  *Id.* at 562; *cf. Retamco*, 278. S.W.3d at 341 (oil and gas interests are real property interests that create a continuing relationship with the forum).[58]

[¶ 79] PEOFs' attempt to distinguish *Old Republic* misses the mark because they cite to the portion of the opinion concerning the defendants' transfer of money *to Texas*, not the transfer of money *away from Texas*, which is the relevant section here.  *Compare* 549 S.W.3d. at 562 (no personal jurisdiction based on sending money to a friend in the state) *with id.* at 563–64 (no jurisdiction based on receiving money from the sale of real estate in Texas).  Furthermore, as discussed previously, "Blackstone's" transfer of

---

[57] Blackstone Br. at 15–16.

[58] PEOFs' Opp. to Blackstone at 30.

money to Texas is not an operative fact because the initial investment into Primexx will not be the focus at trial. *Moki Mac*, 221 S.W.3d at 585.

[¶ 80] Furthermore, as *Old Republic* explains, *selling* Texas-based assets does not create the same continuing connection with the forum as *receiving* Texas-based assets. *See* 549 S.W.3d at 563–64 (distinguishing *Retamco*). The defendant in *Old Republic* received cash proceeds from the sale of Texas real estate. The supreme court said that transfer of "a fungible asset—money—with no continuing presence in Texas … is of negligible significance for purpose of determining whether a foreign defendant had sufficient contacts in Texas." *Id.* at 564 (quotations omitted). Here, the parties sold Texas oil and gas interests and received cash and Callon shares. Callon is a public company.[59] Shares in a public company are fungible assets.[60] Thus, the present case is more like *Old Republic* than *Retamco*.

\* \* \* \* \*

[¶ 81] Accordingly, Blackstone Inc. does not have sufficient minimum contacts with Texas to support specific jurisdiction.

---

[59] *See* SAP ¶ 82.

[60] *See Fungibility: What It Means and Why It Matters*, Investopedia.com (last accessed 7/11/2025) https://www.investopedia.com/terms/f/fungibility.asp.

## 2. Alter Ego Jurisdiction

[¶ 82]  Blackstone Inc. further argued that PEOFs failed to overcome the presumption against imputing the jurisdictional contacts of one entity against a related entity.[61]  In response, PEOFs explicitly disclaimed that they were relying on any "alter ego" basis for establishing personal jurisdiction.[62]  However, later, PEOFs included alter ego allegations in the SAP.[63]  The court therefore addresses this issue.

[¶ 83] PEOFs make allegations regarding whether Blackstone Inc. exerted the level of "control" that is "greater than normally associated with common ownership and directorship."  *BMC*, 83 S.W.3d at 798–99.[64]  However, the court does not address whether Blackstone Inc. broke that barrier.

[¶ 84] Rather, to establish alter ego jurisdiction, the evidence must show "that the two entities cease[d] to be separate so that the corporate fiction should be disregarded *to prevent fraud or injustice*."  *Id.*  Here, there could not

---

[61] Blackstone Br. at 12–14.

[62] PEOFs Opp. to Blackstone at 32.

[63] SAP ¶s 53–58, 107.

[64] *See* SAP ¶s 53–58, 107 (the Blackstone Inc. affiliated entities share the same address, email domain name, employees, etc.).

have been any fraud or injustice regarding the corporate structure because PEOFs admit they were fully aware of the structure that "Blackstone" created for its Primexx investments—with Blackstone Inc. at the top, seven-layers removed from BPP HoldCo, who became a partner in Primexx.[65]  PEOFs, as sophisticated parties, saw that "HoldCo" was constructed precisely to insulate its ultimate parent from liability.[66]

[¶ 85]  It is important that parties may "structure their primary conduct with some minimum assurance" where they are liable to suit so that corporations may make "business and investment decisions."  *See BRP-Rotax GmbH & Co. KG v. Shaik*, ---- S.W.3d ----, 2025 WL 1727903, at *12 (Tex. June 20, 2025) (J. Busby concurring) (internal quotations and citations omitted); *see also Michiana*, 168 S.W.3d at 785.  So, the court concludes that Blackstone Inc. could not have "reasonably anticipate[d] being called into a Texas court" based on the structure of its investment into Primexx and its management of the same.  *Retamco*, 278 S.W.3d at 338.

---

[65] SAP ¶ 23, 44.

[66] *See* PEOFs' Opp. to Acconcia at 5 ("Blackstone used a subsidiary called BPP HoldCo LLC to serve as the investment vehicle for its majority stake in Primexx.").

### 3. Waiver

[¶ 86] Finally, the court concludes that Blackstone Inc. did not waive its special appearance by raising TAPA § 13.9 in its brief.[67] Blackstone Inc. did not invoke the court's judgment on any question other than the court's jurisdiction, recognize by its acts that this action is properly pending, or seek affirmative action from the court through its brief reference to TAPA § 13.9. *Exito Elecs.*, 142 S.W.3d at 304. And the court does not rest its opinion on TAPA § 13.9.

## IV. CONCLUSION

[¶ 87] For these reasons, the court previously granted Acconcia and Blackstone's special appearances on April 28, 2025.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: July 16, 2025

---

[67] Blackstone Br. 14; PEOFs' Opp. to Blackstone at 32–33.

# APPENDIX 6



The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP, *Plaintiffs*, <br><br> v. <br><br> PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLS, BX PRIMEXX TOPCO LLC, and BPP HOLDCO LLC, *Defendants* | § § § § § § § § § § § § § § § § § § § § § § § § § | Cause No. 24-BC01B-0010 |

---

**ORDER**

---

On February 13, 2025, the court ordered the parties pursuant to TEX. R. CIV. P. 166(g), (p) to provide briefing regarding the legal viability of plaintiffs' First Amended Petition's (FAP) First and Third Causes of Action against the "Blackstone Defendants,"[1] excluding BPP HoldCo LLC (HoldCo). The court later informed the parties that it would consider the viability of those claims under the analytical standards applicable to a Rule 91a.1 motion to dismiss.

Under the FAP and SAP, plaintiffs' first count asserts breach of fiduciary duties against the Blackstone Defendants arising out of the July 12, 2016, Third Amended and Restated Limited Partnership Agreement (TAPA). Plaintiffs' count three asserts that Blackstone Defendants breached the TAPA.

Having considered the pleadings, the parties' briefing, and additional arguments heard during a May 9, 2025, status conference, the court concludes that plaintiffs' count one and count three allegations, taken as true, together with inferences reasonably drawn from them do not in this case support valid causes of action against the Blackstone Defendants, excluding HoldCo. The court reaches that conclusion for at least these reasons:

---

[1] The court referred to "Blackstone Defendants" as used by plaintiffs in the First and Third Causes of Action. *See* FAP at 47 n.14; *see also* Plaintiffs' Second Amended Petition (SAP) at 50 n.16.

First, those defendants were not parties to the TAPA and thus, did not owe plaintiffs any TBOC statutory responsibilities or contract obligations arising from or related to the TAPA.

Second, TAPA § 13.9 precludes plaintiffs' breach of fiduciary duty and breach of contract causes of action against those defendants.

Third, plaintiffs' the allegations do not support ignoring the defendants' separate corporate forms as would be required for plaintiffs to prevail. *See JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 335 (Tex. 2024); *First Reserve Mgmt., L.P.*, 671 S.W.3d 653, 660–61 (Tex. 2023). The court concludes that two additional cases plaintiffs cited during the May 9, 2025, status conference are inapplicable. *See MRT of Kemp TX-SNF, LLC v. Lloyd Douglas Enters., LC*, 698 S.W.3d 607, 614–18 (Tex. App.—Dallas 2024, no pet.); *USX Corp. v. West*, 759 S.W.2d 764, 767 (Tex. App.—Houston [1st Dist.] 1988, no writ).

Accordingly, the court dismisses these causes of action without prejudice.[2]

So ORDERED.

---

[2] The court's order applies equally to the FAP and SAP.

3

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: May 9, 2025

4

# APPENDIX 7



The Business Court of Texas,
1st Division

PRIMEXX ENERGY
OPPORTUNITY FUND, LP et al.,
*Plaintiffs*,

v.

PRIMEXX ENERGY
CORPORATION, et al., *Defendants*

§
§
§
§
§
§
§
§
§

Cause No. 24-BC01B-0010

---

**MEMORANDUM OPINION AND ORDER**
**NUNC PRO TUNC**

---

**I.**

[¶ 1]  Before the court is the parties' request for the court to rule on Third Amended Partnership Agreement (TAPA) § 13.9's potential effect on Primexx Energy Opportunity Fund, LP and Primexx Energy Opportunity Fund II, LP's (PEOFs) claims against Christopher Doyle and all remaining Blackstone

entity defendants (Blackstone Defendants)[1] besides BPP HoldCo LLC.[2]

[¶ 2] This order relates to the court's summary judgment rulings discussed in (i) 2025 Tex. Bus. 9 and 2025 Tex. Bus. 13 and (ii) the court's May 9, 2025, order dismissing PEOFs' fiduciary breach and contract breach causes of action against the Blackstone Defendants.

[¶ 3] The issue is whether TAPA § 13.9 exempts Doyle and the remaining Blackstone Defendants from potential conspiracy, aiding and abetting, and knowing participation liability for any claims PEOFs may have against HoldCo or PEC regarding the Callon sale.[3] The court concludes that § 13.9 does so because (i) Doyle and the Blackstone Defendants are within the class of persons § 13.9 exempts from potential liability regarding that sale and (ii) § 13.9 applies notwithstanding any other TAPA terms, including TAPA § 13.2's terms disclaiming third-party beneficiaries.

## II.

[¶ 4] Because the parties know the facts and procedural background, the court does not address those items except as needed for this decision. For

---

[1] The court dismissed Blackstone Inc. and Angelo Acconcia for lack of personal jurisdiction.

[2] *See* Defendants Christopher Doyle and Primexx Energy Corporation's (PEC) Supplemental Briefing on TAPA § 13.9 (Doyle Br.) and Plaintiffs' Supplemental Briefing Regarding Section 13.9 (PEOFs Br.). On May 21, 2025, the parties asked the court to include the Blackstone Defendants in this analysis and ruling.

[3] Section 13.9 does not cover PEC because it is a Primexx partner.

convenience, references to Doyle's and PEOFs' arguments also apply to the Blackstone Defendants.

[¶ 5] Doyle was a PEC director and its CEO while the Callon sale was negotiated and approved pursuant to HoldCo's drag-along sale rights, but he was not a Primexx partner.[4] Citing § 13.9 and *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 830 (Tex. App.—Dallas 2003, no pet), he posits that § 13.9 waives potential claims against him as a "Partner Affiliate," which is defined in § 13.9.[5]

[¶ 6] PEOFs argue two counterpoints: One, TAPA § 13.2's "Entire Agreement" clause providing that the TAPA "shall not be deemed for the benefit of creditors or any other Persons" means Doyle cannot be a third-party beneficiary of § 13.9's provisions; and two, applying § 13.9 to Doyle would violate Business Organizations Code §§ 152.002(b)(2)–(4)'s provisions precluding the elimination of certain partner responsibilities. TEX. BUS. ORG. CODE §§152.002(b)(2)–(4).

---

[4] Counts Six, Seven, and Eight of PEOFs' First Amended Petition (FAP) and Eight, Nine, and Ten of their Second Amended Petition (SAP). The court permitted the SAP for purposes of assessing whether pleading amendments would cure factual deficits in PEOFs' claims against Angelo Acconcia and the Blackstone Defendants (excluding HoldCo).

[5] Doyle Br. at 2–3.

### III.

[¶ 7] As discussed in the court's May 9th order, TAPA § 13.9 waives potential liability claims against various TAPA nonparties. Conceding that § 13.9 "may appear to provide a benefit to Mr. Doyle," PEOFs rely on § 13.2 and *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.* 995 S.W.2d 647, 651 (Tex. 1999) to argue otherwise. In that case, the supreme court held that a nonparty to that contract could not obtain relief as a third-party beneficiary in "light of the clear language in the contract that the agreement not be construed as being for the benefit of any nonsignatory." *Id.* Likewise, PEOFs argue § 13.9 does not apply to Doyle because he is not personally a party to the TAPA and § 13.2 disclaims third-party beneficiaries.[6] However, PEOFs misread §§ 13.2 and 13.9.

[¶ 8] To begin, § 13.2 provides that the TAPA "contains the entire agreement [between] the parties" and "shall not be deemed for the benefit of creditors or any other Persons." However, § 13.9 begins by excepting its terms from § 13.2's broader scope: "Notwithstanding anything that may be expressed or implied in this Agreement . . . ." That is, § 13.9's protection for

---

[6] PEOFs' Br. at 2–3.

non-partners is a narrow exception that applies *notwithstanding* § 13.2. *E.g.,* *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133–34 (Tex. 1994) (specific contract provisions control over broader terms). Thus, § 13.9 applies to Doyle.

[¶ 9] Next, PEOFs' reliance on *MCI* for a contrary premise is misplaced because the contract clauses there are the inverse of the clauses here. Specifically, that case involves a right of use agreement that required MCI to broadly exercise its granted rights to lay fiber optic cable in MoPac's right of way "in such a manner as to not interfere in any way with any existing prior rights." The prior rights at issue were Texas Utilities' prior rights to use that right of way for electricity transmission towers and lines.

[¶ 10] TU argued that MCI's cable trenches caused four TU towers to tilt, which needed to be fixed, and that it was entitled to recover attorneys' fees based on a claim that TU was a third-party beneficiary of MCI's contract obligation with MoPac to not interfere with TU's prior rights. The supreme court reversed TU's attorneys' fees award based on a contract breach cause of action because a different MCI-MoPac contract clause expressly limited contract beneficiary status to only the parties to that contract. 995 S.W.2d at 649–50. So, TU could not recover contract relief as a third-party beneficiary of the MCI-MoPac contract. *Id.*

**IV.**

[¶ 11]  PEOFs next argue that § 13.9 is voided by Business Organization Code §§ 152.002(b)(2)–(4)'s provisions that prohibit parties from eliminating certain unwaivable partner responsibilities.[7]  The court rejects that argument for two reasons.

[¶ 12]  First, those provisions apply to partners and Doyle was not a Primexx partner and did not owe any such duties to PEOFs.  Second, TAPA § 13.9 is a liability waiver and does not waive any partner's duties toward other partners.  *See* Elizabeth S. Miller, *Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, State Bar of Texas Advanced Business Law Course (2023) at 39.  Thus, those TBOC provisions do not apply to PEOFs' § 13.9 agreement to waive any liability claims they might have otherwise had against Doyle regarding the Callon sale.

**V.**

[¶ 13]  The same conclusions apply to the Blackstone Defendants because § 13.9's "Partner Affiliate" definition includes an "Affiliate … of any Partner."  Further "Affiliate" means "any Person directly or indirectly controlling, controlled by, or under common control with, such specified

---

[7] PEOFs' Br. at 3.

Person."[8]  HoldCo is a Partner.  HoldCo and the Blackstone Defendants are under Blackstone Inc.'s control.[9]  So, § 13.9 applies to the Blackstone Defendants too.[10]

## VI.

[¶ 14]  Accordingly, the court dismisses with prejudice PEOFs' causes of action against Doyle and the Blackstone Defendants.

So ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division


SIGNED:  May 22, 2025

---

[8] TAPA, Ex. B (Definitions) at 1.

[9] *See* SAP ¶ 23.

[10] Counts Four, Five, and Six of PEOFs' FAP and Counts Five, Six, and Eight under PEOFs' SAP.

# APPENDIX 8

THIRD AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT

PRIMEXX ENERGY PARTNERS, LTD.

THE OFFER AND SALE OF THE PARTNERSHIP INTERESTS REFERENCED IN THIS THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE PARTNERSHIP INTERESTS WHICH ARE REFERENCED HEREIN MAY NOT BE OFFERED, SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED AND/OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION AND/OR QUALIFICATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. THERE IS NO TRADING MARKET FOR THE PARTNERSHIP INTERESTS, AND IT IS NOT ANTICIPATED THAT ONE WILL DEVELOP. THERE ARE SUBSTANTIAL RESTRICTIONS UPON THE TRANSFERABILITY AND VOTING RIGHTS OF THE PARTNERSHIP INTERESTS SET FORTH HEREIN. NO SALE, TRANSFER OR OTHER DISPOSITION BY A PARTNER OF ITS PARTNERSHIP INTERESTS MAY BE MADE EXCEPT IN ACCORDANCE WITH THE TERMS SET FORTH HEREIN. THEREFORE, PARTNERS MAY NOT BE ABLE TO READILY LIQUIDATE THEIR INVESTMENTS.

# TABLE OF CONTENTS

Page

Article I Definitions..................................................................................................................2

Article II Organizational Matters ...........................................................................................2
  2.1    Formation .....................................................................................................2
  2.2    Partnership Name .........................................................................................2
  2.3    Location of Principal Place of Business and Registered Office .................2
  2.4    Business of the Partnership...........................................................................3
  2.5    Term .............................................................................................................3
  2.6    Qualification to Do Business ........................................................................3

Article III Capital Contributions; Units................................................................................3
  3.1    Capital Contributions of Unitholders...........................................................3
  3.2    Capital Contributions of Managing General Partner ...................................3
  3.3    Capital Contributions of Management Partner .............................................3
  3.4    Return of Capital Contributions...................................................................3
  3.5    No Interest on Capital Contributions...........................................................4
  3.6    Authorization and Issuance of Units ............................................................4
  3.7    Additional Capital Contributions.................................................................11
  3.8    Repurchase Rights. .....................................................................................12

Article IV Computation and Allocation of Financial and Tax Items; Distributions.............14
  4.1    Computation of Profit and Loss...................................................................14
  4.2    Allocation of Profit and Loss.......................................................................15
  4.3    Allocation of Net Gain and Net Loss From an Exit Event ..........................16
  4.4    Allocation to Legacy Unitholders................................................................18
  4.5    Special Allocations ......................................................................................19
  4.6    [Reserved]....................................................................................................20
  4.7    Requirement of Distributions.......................................................................20
  4.8    Withholding .................................................................................................23
  4.9    Other Allocation Rules ................................................................................23
  4.10   Tax Treatment of Partnership Interests Subject to Vesting .........................25

Article V The Managing General Partner: Rights, Duties and Obligations ..........................25
  5.1    Powers of Managing General Partner ..........................................................25
  5.2    Admission of Additional Partners................................................................28
  5.3    Management Interests ..................................................................................29
  5.4    Gas Gathering Lines ....................................................................................30
  5.5    Farmouts ......................................................................................................31
  5.6    Sales of Properties to Partnership ...............................................................31
  5.7    Purchases of Properties From Partnership ...................................................31
  5.8    Fair Market Value ........................................................................................31
  5.9    Fiduciary Duties...........................................................................................31
  5.10   No Duty of Third Parties to Investigate Authority ......................................33

i

| | | |
|---|---|---|
| 5.11 | Competitive Activities and AMI | 33 |
| 5.12 | Events of Withdrawal | 34 |
| 5.13 | Withdrawal of the Managing General Partner | 35 |
| 5.14 | Assignment of Rights and Interest of Managing General Partner | 35 |
| 5.15 | Insolvency or Bankruptcy of Managing General Partner | 36 |
| 5.16 | Additional Conditions to Substitution of Managing General Partner | 36 |
| 5.17 | [Reserved] | 36 |
| 5.18 | [Reserved] | 36 |
| 5.19 | Closing Costs | 37 |
| 5.20 | Reimbursement of Expenses | 37 |
| 5.21 | Compensation for Services | 37 |
| 5.22 | Budgets | 37 |
| 5.23 | VCOC Management Rights | 37 |
| 5.24 | Management Equity Matters | 37 |

**Article VI The Unitholders: Rights, Duties and Obligations** ........ **38**

| | | |
|---|---|---|
| 6.1 | Limited Liability of Limited Partners | 38 |
| 6.2 | Transfers of Units | 38 |
| 6.3 | Effect of Assignment or Transfer of Units on Voting Rights; Unadmitted Assignees | 40 |
| 6.4 | Delivery of Further Instruments | 40 |
| 6.5 | Right of First Refusal | 40 |
| 6.6 | Tag-Along Rights | 42 |
| 6.7 | Drag-Along Rights | 44 |
| 6.8 | Certain Transfers, Death, Bankruptcy or Incompetency | 45 |
| 6.9 | Confidentiality | 46 |
| 6.10 | Management Partner Termination | 46 |
| 6.11 | Initial Public Offering | 46 |
| 6.12 | | 46 |

**Article VII Meetings of Voting Unitholders** ........ **48**

| | | |
|---|---|---|
| 7.1 | Call | 48 |
| 7.2 | Notice | 49 |
| 7.3 | Record Date | 49 |
| 7.4 | Time and Place | 49 |
| 7.5 | Adjournment | 49 |
| 7.6 | Waiver of Notice by Attendance | 50 |
| 7.7 | Quorum | 50 |
| 7.8 | Voting | 50 |
| 7.9 | Conduct of Meeting | 50 |
| 7.10 | Action Without Meeting | 51 |

**Article VIII Indemnification of Managing General Partner** ........ **51**

| | | |
|---|---|---|
| 8.1 | Limitation of Liability of the Managing General Partner and Its Affiliates | 51 |
| 8.2 | Indemnification | 51 |

**Article IX Accounts, Records and Reports** ........ **52**

ii

9.1    Books of Account; Fiscal Year ...................................................................52
9.2    Capital Accounts ........................................................................................52
9.3    Unitholder List ...........................................................................................55
9.4    Records Required by TBOC .......................................................................55
9.5    Bank Accounts and Investment of Funds ..................................................55
9.6    Information Furnished Annually to Unitholders .........................................56
9.7    Other Reports .............................................................................................56

**Article X Preparation of Returns; Elections ...................................................56**
10.1   Tax Reporting Information .........................................................................56
10.2   Elections .....................................................................................................56
10.3   Basis Adjustments .....................................................................................56
10.4   Tax Matters Partner; Partnership Representative. .....................................57
10.5   Other Elections ..........................................................................................60

**Article XI Duration and Termination ..............................................................60**
11.1   Death, Insanity or Bankruptcy of Unitholder ...........................................60
11.2   Events of Dissolution ................................................................................60
11.3   Reconstitution Following Dissolution .......................................................60
11.4   Winding Up and Liquidation .....................................................................60
11.5   No Recourse if Assets Insufficient ...........................................................62

**Article XII Amendment .....................................................................................62**
12.1   Amendment by Managing General Partner ...............................................62
12.2   Amendment Procedures .............................................................................62

**Article XIII Miscellaneous ................................................................................63**
13.1   Communications ........................................................................................63
13.2   Entire Agreement; Applicable Law; Effect ...............................................63
13.3   Modification; Waiver or Termination ........................................................63
13.4   Counterparts ...............................................................................................63
13.5   Severability ................................................................................................64
13.6   Section Headings .......................................................................................64
13.7   Word Meanings ..........................................................................................64
13.8   Further Actions ..........................................................................................64
13.9   No Recourse ...............................................................................................64
13.10  Royalties Vehicle ......................................................................................65

**Article XIV Disputes ..........................................................................................65**
14.1   Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process .....................................................................................65
14.2   Waiver of Jury Trial ...................................................................................65

iii

Exhibit A  Schedule of Partners
Exhibit B  Definitions
Exhibit C  Series A Conversion Notice
Exhibit D  Form of Assignment of Preferred Units
Exhibit E  AMI Area
Exhibit F  Class G Equity Plan
Exhibit G  Legacy Waterfall
Exhibit H  Legacy Waterfall Allocations
Annex A  Form of VCOC Management Rights Letter
Annex B  Royalties Term Sheet

iv

**THIRD AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT**

**PRIMEXX ENERGY PARTNERS, LTD.**

This **THIRD AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT** (the "Agreement"), dated as of July 12, 2016 (the "Effective Date") is made and entered into by and among PRIMEXX ENERGY CORPORATION, a Texas corporation, as Managing General Partner, the Persons listed as Series A Preferred, Series B Preferred, Class A, Class B, Class C, Class D, Class E or Class F Unitholders on the signature pages hereto and such other Persons who are hereafter admitted to the Partnership pursuant to the terms of this Agreement as Limited Partners.

**RECITALS**

**WHEREAS**, the Partnership was formed as a limited partnership pursuant to the TBOC (as defined below) by filing a certificate of limited partnership with the Secretary of State of Texas on September 11, 2000;

**WHEREAS**, the Partnership is currently governed by that certain Second Amended and Restated Limited Partnership Agreement (the "Second A&R Partnership Agreement") effective as of November 1, 2013;

**WHEREAS**, the Partnership and BPP Holdco LLC ("Blackstone") are parties to that certain Partnership Interest Purchase Agreement dated as of the Effective Date (the "Partnership Interest Purchase Agreement");

**WHEREAS**, pursuant to the Partnership Interest Purchase Agreement, Blackstone has agreed to make capital contributions to the Partnership with respect to Series B Preferred Units and Class F Units issued to Blackstone under the Partnership Interest Purchase Agreement;

**WHEREAS**, Blackstone Capital Partners VII L.P. and Blackstone Energy Partners II L.P. (the "Blackstone Investors") have executed and delivered an Equity Commitment Letter, as of July 12, 2016, pursuant to which the Blackstone Investors have committed, subject to the terms and conditions set forth therein, to contribute capital to Blackstone, in order to provide Blackstone with the necessary funds to make capital contributions to the Partnership for purposes of the Second Series B Preferred Units Issuance (as defined herein) pursuant to the terms hereof;

**WHEREAS**, Blackstone and the Partnership have entered into that certain Second Lien Term Loan Agreement dated July 12, 2016, the proceeds of which were utilized to refinance previously existing second lien debt of the Partnership with Ares Capital Corporation;

**WHEREAS**, certain of the Series A Preferred and Class A, B, C, D and E Unitholders identified on Exhibit A, on the terms and subject to the conditions set forth in this Agreement, were previously admitted as Unitholders of the Partnership and will be entitled to receive distributions from the Partnership as set forth herein;

**WHEREAS**, Class G Unitholders identified on Exhibit A, on the terms and subject to the conditions set forth in this Agreement, including Exhibit F hereto, will be admitted as Partners of the Partnership and will receive distributions from the Partnership as set forth herein; and

**WHEREAS**, the Unitholders desire to amend and restate the Second A&R Partnership Agreement to, among other things, provide for the management of the Partnership and set forth their respective rights and obligations.

**NOW**, **THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the parties agree as follows:

## WITNESSETH:

## Article I
### Definitions

Any capitalized term used in this Agreement without definition shall have the meaning set forth in Exhibit B annexed hereto.

## Article II
### Organizational Matters

**2.1    Formation**. The Partnership was formed as a limited partnership under and pursuant to the TBOC by the filing of the original certificate of limited partnership with the Secretary of the State of Texas on September 11, 2000 and the execution of a Limited Partnership Agreement as of July 1, 2000 (the "Original Partnership Agreement"). This Agreement amends and restates in its entirety and supersedes in all respects the Original Partnership Agreement, as amended by that certain Amended and Restated Partnership Agreement, dated effective June 1, 2001 and further amended by that certain Second A&R Partnership Agreement. The rights and liabilities of the Partners of the Partnership shall be as provided in the TBOC and this Agreement.

**2.2    Partnership Name**. The name of the Partnership shall be "PRIMEXX ENERGY PARTNERS, LTD." The business of the Partnership, however, may be conducted under any other name deemed necessary or desirable by the Managing General Partner; provided that the business of the Partnership shall not be conducted under a name that contains the name of a Limited Partner without first obtaining the consent to the use of such name from such Limited Partner.

**2.3    Location of Principal Place of Business and Registered Office**. The principal place of business of the Partnership and of the Managing General Partner shall be 4849 Greenville Avenue, Suite 1600, Dallas, Texas 75206. The registered agent of the Partnership shall be CT Corporation System and the registered office of the Partnership shall be 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201-4234. The Managing General Partner may, from time to time, change the principal place of business and/or the registered office of the Partnership to any other location and may establish such other offices or places of business for

2

the Partnership as it may deem necessary or desirable; provided, however, that the Managing General Partner shall give prompt notice of a change of its principal place of business and/or registered office to all of the other Partners.

**2.4** **Business of the Partnership**. The business of the Partnership shall be to acquire, explore, drill, develop, operate and dispose of oil and gas properties (including, without limitation, Prospects); to produce, collect, store, treat, deliver, market, sell or otherwise dispose of oil, gas and related minerals from Prospects; and to take all such actions which may be incidental thereto as the Managing General Partner may determine. The Partnership may also purchase or acquire equipment, processing and transmission facilities (including gas gathering and pipeline transmission facilities) and other property associated with Prospects. In addition, the Partnership may participate in any other type of transaction relating to Prospects or the drilling and completion of Partnership Wells thereon if the economic effect of such transactions is the same as the ownership of such Prospects by the Partnership.

**2.5** **Term**. The Partnership came into being upon the execution of the Original Partnership Agreement and the filing of the original certificate of limited partnership with the Secretary of the State of Texas, and shall remain in being, unless sooner terminated as hereinafter provided, in perpetuity.

**2.6** **Qualification to Do Business**. Prior to conducting any business in any jurisdiction, the Managing General Partner shall either cause the Partnership to comply with all requirements for the qualification of the Partnership to conduct business as a limited partnership in such jurisdiction or to conduct business in such jurisdiction, through other partnerships, through the Managing General Partner as its agent or by such other means as the Managing General Partner, upon the advice of counsel, deems appropriate in order to preserve the limited liability of the Limited Partners to the fullest possible extent.

## Article III
## Capital Contributions; Units

**3.1** **Capital Contributions of Unitholders**. A Unitholder's Capital Contributions (including the Managing General Partner's contribution as a Unitholder) shall consist of cash and/or the assets (net of liabilities) transferred to the Partnership by such Unitholder. Except as otherwise expressly set forth in this Agreement, no Unitholder shall be required to make any additional Capital Contributions to the Partnership.

**3.2** **Capital Contributions of Managing General Partner**. The Managing General Partner's Capital Contributions, as Managing General Partner, consisted of $1,000. The Managing General Partner shall not be required to make any additional Capital Contributions, except as required by law.

**3.3** **Capital Contributions of Management Partner**. Except as otherwise expressly set forth in this Agreement, no Management Partner shall be required to make any Capital Contributions to the Partnership.

**3.4** **Return of Capital Contributions**. Except as otherwise expressly set forth in this Agreement, none of the Partners shall be entitled to demand a refund or return of any Capital

3

Contributions nor to withdraw any part of his Capital Account nor to receive any Distribution from the Partnership.

**3.5   No Interest on Capital Contributions**. Except as otherwise expressly set forth in this Agreement, no Partner shall be entitled to the payment of interest of any kind on his Capital Contributions.

**3.6   Authorization and Issuance of Units**.

(a)   <u>Classes</u>. There shall be three classifications of interests of the Partnership, with such classifications consisting of: (i) Series A Preferred Units, (ii) Series B Preferred Units, and (iii) Common Units.

(b)   <u>Series A Preferred Units</u>. The Partnership hereby authorizes the issuance of up to 70,000 Series A Preferred Units, of which that number set forth on <u>Exhibit A</u> are outstanding as of the date hereof.

(i)   Except as provided by applicable provisions of the TBOC, and this Agreement, the outstanding Series A Preferred Units shall have no voting rights.

(ii)   The Series A Preferred Units will not be evidenced by certificates.

(iii)   <u>Conversion</u>.

(A)   At any time the Series A Preferred Units owned by any Series A Preferred Unitholder shall be convertible, upon the request of the Series A Preferred Unitholder into a number of Class A-1 Units determined by multiplying the number of Series A Preferred Units held by such Series A Preferred Unitholder by the Series A Conversion Rate. Immediately upon any conversion of Series A Preferred Units, all rights of the Converting Unitholder in respect thereof shall cease, and such Converting Unitholder shall be treated for all purposes as the owner of Class A-1 Units. Conversion of the Series A Preferred Units by a Series A Preferred Unitholder into Class A-1 Units shall be permitted only if all Series A Preferred Units held by such Series A Preferred Unitholder are so converted.

(B)   To convert Series A Preferred Units into Common Units pursuant to <u>Section 3.6(b)(iii)</u>, the Converting Unitholder shall give written notice (a "<u>Series A Conversion Notice</u>") to the Partnership in the form of <u>Exhibit C</u> attached hereto stating that such Series A Preferred Unitholder elects to so convert the Series A Preferred Units and shall state therein the following: (a) the name or names in which such Series A Preferred Unitholder wishes the Class A-1 Units to be issued, and (b) such Series A Preferred Unitholder's computation of the number of Class A-1 Units to be received by such Series A Preferred Unitholder (or designated recipient(s)) upon the Series A Conversion Date. The date any Series A Conversion Notice is received by the Partnership shall be hereinafter

4

referred to as a "Series A Conversion Date." The Converting Unitholder shall also provide an assignment of the Series A Preferred Units in the form of Exhibit D attached hereto. Converted Series A Preferred Units may not be reissued.

(C)     If a Series A Conversion Notice is delivered by a Series A Preferred Unitholder to the Partnership in accordance with Section 3.6(b)(iii)(A), the Partnership shall issue to such Series A Preferred Unitholder (or designated recipient(s)), effective as of the Series A Conversion Date, the number of Class A-1 Units to which such holder shall be entitled. Upon issuance of Class A-1 Units to the Converting Unitholder, effective as of the Series A Conversion Date, all rights under the converted Series A Preferred Units shall cease, and such Converting Unitholder shall be treated for all purposes as the record holder of such Class A-1 Units.

(D)     If, after the Series A Issuance Date, the Partnership (i) makes a distribution on its Legacy Common Units in Legacy Common Units, (ii) subdivides or splits its outstanding Legacy Common Units into a great number of Legacy Common Units, (iii) combines or reclassifies its Legacy Common Units into a smaller number of Legacy Common Units or (iv) issues by reclassification of its Legacy Common Units any Partnership interests (including any reclassification in connection with a merger, consolidation or business combination in which the Partnership is the surviving Person), then the Series A Conversion Rate in effect at the time of the Record Date for such distribution or of the effective date of such subdivisions split, combination, or reclassification shall be proportionately adjusted so that the conversion of the Series A Preferred Units after such time shall entitle the holder to receive the aggregate number of Class A-1 Units (or shares of any Partnership Securities into which such shares of Class A-1 Units would have been combined, consolidated, merged or reclassified pursuant to clauses (iii) and (iv) above) that such holder would have been entitled to receive if the Series A Preferred Units had been converted into Class A-1 Common Units immediately prior to such Record Date or effective date, as the case may be, and in the case of a merger, consolidation or business combination in which the Partnership is the surviving Person, the Partnership shall provide effective provisions to ensure that the provisions in this Section 3.6(b)(iii)(D) relating to the Series A Preferred Units shall not be abridged or amended and that the Series A Preferred Units shall thereafter retain the same powers, preferences and relative participating, optional and other special rights, and the qualifications, limitations and restrictions therein, that the Series A Preferred Units had immediately prior to such transaction or event. An adjustment made pursuant to this Section 3.6(b)(iii)(D) shall become effective immediately after the Distribution Record Date in the case of a distribution and shall become effective immediately after the effective date in the case of a subdivision, combination, reclassification

5

(including any reclassification in connection with a merger, consolidation, or business combination in which the Partnership is the surviving Person) or spilt. Such adjustment shall be made successively whenever any event described above shall occur. If, in the future, the Partnership issues any options, warrants, or other rights to purchase Legacy Common Units, (herein collectively "**Legacy Common Units Purchase Rights**") the Managing General Partner shall either (y) amend the provisions of this Agreement relating to antidilution protection to (i) revise any such provision that is less favorable than the corresponding provision offered in the terms of such Legacy Common Unit Purchase Rights (or any related purchase agreement) so that such provision is the same as such provision offered in the terms of such Legacy Common Unit Purchase Rights (or any related purchase agreement) and (ii) incorporate any provision(s) offered in the terms of such Legacy Common Unit Purchase Rights (or any related purchase agreement" that is not currently provided for in this Agreement and which would make the antidilution protection provisions of this Agreement more favorable to the holders of the Series A Preferred Units, which amendment shall be effective concurrently with the issuance and/or execution of documentation relating to such Legacy Common Unit Purchase Rights, or (z) if consented to by the holders of a majority of the outstanding Series A Preferred Units, retain the antidilution language applicable to the Series A Preferred Units at such time. The Partnership agrees to provide as much prior notice of an issuance of any such Legacy Common Unit Purchase Rights and/or execution or documentation relating to such issuance of Legacy Common Unit Purchase Rights as reasonably practicable (and in any event, such notice shall be provided at least ten (10) Business Days prior to such issuance and/or execution).

(iv) <u>Nonassessable</u>. Any Class A-1 Unit(s) delivered pursuant to this <u>Section 3.6(b)(iv)</u> shall be validly issued, fully paid and nonassessable (except as such nonassessability may be affected by applicable provisions of the TBOC), free and clear of any liens, claims, rights or encumbrances other than those arising under the TBOC or this Agreement or created by the holders thereof.

(v) <u>Liquidation or Exit Event</u>. At the time of an Exit Event or the dissolution of the Partnership, subject to Section 153.210 of the TBOC, the recordholders of the Series A Preferred Units shall become entitled to receive any distributions in respect of the Series A Preferred Units that are accrued and unpaid as of the date of such distribution in priority over any entitlement of any other Legacy Unitholders or their Assignees with respect to any distributions by the Partnership to such other Legacy Unitholders or their Assignees; *provided*, *however*, that the Managing General Partner, as such, will have no liability for any obligations with respect to such distributions to any record holder(s) of Series A Preferred Units. The Partnership shall provide written notice to the Series A Preferred Unitholders not later than ten (10) days prior to the date of consummation (or, if not practicable, as much prior notice as is reasonably practicable) of any liquidation event or Exit Event, describing in reasonable detail the terms of the liquidation event or Exit Event and setting forth the Partnership's calculation of the

6

amount (if any) to which the Series A Preferred Unitholders would be entitled presuming conversion of the Series A Preferred Units prior to such liquidation or Exit Event.

(c)     Series B Preferred Units. The Partnership hereby authorizes the issuance of up to 300,000 Series B Preferred Units (plus any additional Series B Preferred Units contemplated for issuance pursuant to Section 4.2(h) of the Partnership Interest Purchase Agreement and Series B Preferred Units issued as a Payment in Kind pursuant to Section 3.6(c)(ii)(C)) with a stated liquidation value of $1,000.00 per Series B Preferred Unit, of which that number set forth on Exhibit A are outstanding as of the date hereof.

(i)     Except as provided by applicable provisions of the TBOC, and this Agreement, the outstanding Series B Preferred Units shall have no voting rights.

(ii)     The Series B Preferred Units will not be evidenced by certificates. The holders of each outstanding Series B Preferred Unit will be entitled to receive distributions from the Partnership equal to Series B Unit Distribution at the applicable time as herein provided:

(A)     Distributions on the Series B Preferred Units will be prior and in preference to any declaration or payment of any distributions on any other Units including the Series A Preferred Units and any other series of Units created after the date hereof.  Distributions on the Series B Units will be cumulative and will accrue at the Series B Distribution Rate from the date of issuance of such Units, whether or not declared and whether or not there will be funds legally available for the payment thereof.  All Series B Unit Distributions payable by the Partnership pursuant to this Section 3.6(c)(ii) will be payable without regard to income of the Partnership and will be treated for federal income tax purposes as guaranteed payments for the use of capital under Section 707(c) of the Code.

(B)     The distributions to the holders of the Series B Preferred Units will be payable quarterly on each of January 2, April 1, July 1, and October 1 of each year commencing on October 1, 2016 (each such date, the "***Distribution Date***"), except that if any such date is not a Business Day and the applicable distribution is payable in cash, then such distribution will be payable on the first Business Day immediately thereafter.  Distributions payable on the Series B Units will accrue quarterly on each Distribution Date.

(C)     Except as provided in Section 3.6(c)(ii)(D), any distribution payable to the Series B Preferred Unitholders shall be paid in additional Series B Preferred Units at a per-Series B Unit issue price equal to the Series B Issue Price (a "***Payment in Kind***") payable to the holders of the Series B Units as of the Distribution Date.  The Series B Preferred Units issuable as Payment in Kind to a holder of Series B Preferred Units will be equal to that number (rounded to the second decimal point; provided that

7

the Partnership may elect not to issue any fractional Series B Preferred Units, and to pay each applicable holder of Series B Preferred Units an amount of cash equal to the proportional amount of the Series B Issue Price of such fractional Series B Preferred Unit that would otherwise be issued to such holder) of Series B Preferred Units derived by dividing (A) the aggregate distribution otherwise payable to such holder on the subject Distribution Date (using the Series B Distribution Rate) in respect of all such holder's Series B Preferred Units, less any amount of such distribution payable in cash pursuant to Section 3.6(c)(ii)(D) below, by (B) the Series B Issue Price. The Partnership will immediately reflect on its books and records the issuance of such additional Series B Preferred Units and will provide to the Partners a schedule that sets forth, in detail reasonably satisfactory to the holders of Series B Preferred Units, the calculation of the number of additional Series B Preferred Units so issued and the total number of Series B Preferred Units owned by the holders of Series B Preferred Units after giving effect to such issuance.

(D)     The Partnership at the direction of the Managing General Partner may pay up to fifty percent (50%) of the Series B Unit Distribution for each Fiscal Quarter in cash.

(E)     For purposes of maintaining Capital Accounts, if the Partnership issues one or more Payment in Kind with respect to a Series B Unit, (i) the Partnership will be treated as distributing cash with respect to such Series B Preferred Unit in an amount equal to the Series B Issue Price of the Series B Preferred Unit issued as Payment in Kind, which deemed payment will be treated for federal income tax purposes as a guaranteed payment for the use of capital under Section 707(c) of the Code and (ii) the holder of such Series B Preferred Unit will be treated as having contributed to the Partnership in exchange for such newly issued Payment in Kind Series B Preferred Unit an amount of cash equal to the Series B Issue Price of the Series B Unit issued as Payment in Kind.

(iii)     Upon the first (1st) anniversary of the Effective Date, the Partnership will issue an additional 100,000 Series B Preferred Units to Blackstone and such other holders of Series B Preferred Units (each such holder of Series B Preferred Units, the "Series B Preferred Holders") participating in such issuance pursuant to Section 8.8 of the Partnership Interest Purchase Agreement, on a pro rata basis in exchange for an aggregate Capital Contribution of $100,000,000.00 (the "Second Series B Preferred Units Issuance"); provided, however, that the Managing General Partner may effectuate such Second Series B Preferred Units Issuance prior to the first (1st) anniversary of the Effective Date with Unanimous Consent.

(iv)     At any time, and from time to time, the Partnership at the direction of the Managing General Partner may redeem the Series B Preferred Units, in whole or in part, for an amount per Series B Preferred Unit equal to the Liquidation Preference of such Series B Preferred Unit. Any such redemption pursuant to this Section 3.6(c)(iv)

8

shall be made pro rata among all Series B Preferred Holders based on the relative Liquidation Preferences of the Series B Preferred Units. To effectuate such redemption, the Partnership shall fix a date (a "Redemption Date") for such redemption of the Series B Preferred Units (or part thereof) to be redeemed and shall deliver a notice of such redemption not less than thirty (30) nor more than sixty (60) days prior to the Redemption Date, addressed to the Series B Preferred Holders with respect to the Series B Preferred Units (or part thereof) being redeemed as they appear in the records of the Partnership. Each notice must state the following: (A) specification of the Series B Preferred Units being redeemed, (B) the portion of such class of Series B Preferred Units being redeemed, (C) the Redemption Date, and (D) the Liquidation Preference for the Series B Preferred Units (or part thereof) being redeemed, as of the Redemption Date.

(v)     At any time, and from time to time, after the seventh (7th) anniversary of the Effective Date, each Series B Preferred Holder may cause the Partnership to redeem the Series B Preferred Units, in whole or in part, for an amount equal to the Liquidation Preference (a "Redemption Election") for each Series B Preferred Unit. If the Series B Preferred Holders make such a Redemption Election and the Partnership does not have sufficient Available Cash to redeem in full all Series B Preferred Units that the Series B Preferred Holders have elected to redeem, then the Series B Distribution Rate shall increase by 2.0% per annum for all Series B Preferred Units for which Series B Holders have made a valid Redemption Election but are unable to be redeemed as a result of a deficiency of Available Cash until such time that all Series B Preferred Units the Series B Preferred Holders have elected to redeem have been redeemed.

(vi)     At any time, and from time to time, if (A) an Exit Event occurs, (B) the Partnership undertakes any follow-on equity offering or otherwise issues equity to any Person (excluding the Second Series B Preferred Units Issuance and any incentive equity to management and equity issued in connection with an acquisition or business combination), (C) the Partnership makes a sale or other disposition of assets for consideration in excess of $20,000,000 in one or a series of related transactions, or (D) there is an event of default and acceleration under any Financing Facility or any other material debt instrument of the Partnership or any of its Subsidiaries or otherwise an acceleration event occurs thereunder (other than as a result of actions expressly taken or permitted to be taken by Blackstone or a Blackstone Director) (each such event a "Redemption Event"), then the Series B Preferred Holders shall have the right to cause the Partnership to redeem the Series B Preferred Units, in whole or in part, for an amount per Series B Preferred Unit equal to the Liquidation Preference; provided that, for any Redemption Event triggered by clauses (B) or (C) in this Section 3.6(c)(vi), each Series B Preferred Holder's right to cause the Partnership to redeem Series B Preferred Units shall be limited to the number of Series B Preferred Units which may be redeemed using solely the cash proceeds from such Redemption Event, and any other Series B Preferred Units held by Blackstone shall remain outstanding. In the event that multiple Series B Preferred Holders elect to cause the Partnership to redeem Series B Preferred Units pursuant to this Section 3.6(c)(vi), then in any event such redemption shall be made pro rata among all Series B Preferred Holders electing redemption based on the relative

9

Liquidation Preference of the Series B Preferred Units of such Series B Preferred Holders electing redemption.

(vii)    [Reserved].

(viii)   So long as any Series B Preferred Units remain outstanding, the Partnership shall not, and will not permit any of its Subsidiaries to, without the affirmative vote of the Series B Preferred Holders acting by majority vote:

(A)    create, authorize or issue any class or series of interests ranking senior to or pari passu with the Series B Preferred Units (or any security convertible into such interests) or increase the total number of authorized or issued Series B Preferred Units;

(B)    amend, alter or change this Agreement (or any other organizational document), or take any other action, so as to affect adversely in any material respect the specified rights, preferences, privileges or voting rights of the Series B Preferred Units; or

(C)    effect any redemption, acquisition or other purchase of any class or series of equity securities of the Partnership ranking pari passu with or junior to the Series B Preferred Units.

(d)    <u>Common Interests</u>. Common Units may be issued in whole or fractional interests. The Partnership is hereby authorized to issue seven (7) classes of Common Units: the "Class A Units," the "Class A-1 Units," the "Class B Units," the "Class C Units," the "Class D Units," the "Class E Units," the "Class F Units" and the "Class G Units." A total of 10,000 Class A Units are hereby authorized for issuance, a total of 70,000 Class A-1 Units are hereby authorized for issuance, a total of 125,000 Class B Units are hereby authorized for issuance, a total of 10,000 Class C Units are hereby authorized for issuance, a total of 5,000 Class D Units are hereby authorized for issuance, a total of 10,000 Class E Units are hereby authorized for issuance, a total of 200,000 Class F Units are hereby authorized for issuance and a total of 100,000 Class G Units are hereby authorized for issuance. The holders of Class A Units, Class A-1 Units, Class B Units, Class C Units, Class D Units, Class E Units, Class F Units and Class G Units shall have the respective rights, preferences, privileges, restrictions and obligations set forth in this Agreement.

(e)    <u>Admission of Class G Unitholders</u>. On the Effective Date, upon the execution and delivery by the parties of this Agreement, the Partnership shall be deemed to have issued Class G Units to the Class G Unitholders as provided on <u>Exhibit A</u> and each such Person shall be admitted to the Partnership as a Class G Unitholder, effective as of the date hereof.

(f)    <u>Amendments to Exhibits A and H</u>. The Units issued and outstanding are set forth on <u>Exhibit A</u> hereto. <u>Exhibit A</u> and, as applicable, <u>Exhibit H</u>, shall be amended from time to time to reflect changes and adjustments resulting from (i) the admission of any new Unitholder, (ii) any transfer in accordance with this Agreement or (iii) any additional Partnership interests issued, in each case as permitted by this Agreement (<u>provided</u>, that a failure to reflect such change or adjustment on <u>Exhibit A</u> or <u>Exhibit H</u> shall not prevent any otherwise valid

10

change or adjustment from being effective); provided, that the Managing General Partner shall provide each Partner with a copy of any amendment to Exhibit A or Exhibit H within thirty (30) Business Days after adoption thereof.

        (g)     Class G Units.

        (i)     The Class G Units are intended to be "Profits Interests" under IRS Revenue Procedure 93-27, IRS Revenue Procedure 2001-43 and IRS Notice 2005-43, and the provisions of this Agreement shall be interpreted and applied consistently therewith; provided that no party hereto is making any covenant, representation or warranty that any taxing authority or third party shall agree with this interpretation or accept the position that such Class G Units are "Profits Interests" for income tax purposes. In the event that the Partnership issues any Class G Units after the date hereof, the Board may take such actions in order for such Class G Units to be treated as a "Profits Interest" as described in the immediately preceding sentence, including, without limitation, (i) establishing a Participation Threshold of such Class G Units being issued or (ii) authorizing a new series of Class G Units (*e.g.*, Series 1 Class G Units, Series 2 Class G Units, etc.) and establishing a Participation Threshold applicable to all Class G Units issued as part of such series.

        (ii)     This Agreement together with the documents, instruments or agreements pursuant to which the Class G Units are issued are intended to qualify as a compensatory benefit plan within the meaning of Rule 701 of the Securities Act (and any similarly applicable state "blue-sky" securities laws) and the issuance of Class G Units pursuant thereto is intended to qualify for the exemption from registration under the Securities Act provided by Rule 701 (and any similarly applicable state "blue-sky" securities laws); provided that the foregoing shall not restrict or limit the Partnership's ability to issue any Class G Units pursuant to any other exemption from registration under the Securities Act available to the Partnership.

        (h)     Issuances of Legacy Units. After the Effective Date, except with respect to the conversion of Series A Preferred Units into Class A-1 Units pursuant to the terms of this Agreement, (i) issuances of Legacy Units may only be made with the Unanimous Consent of the Board and (ii) issuances of Series A Preferred Units and Class A-1 Units shall also require the prior written approval of holders of a majority of the outstanding Series A Preferred Units.

**3.7**     **Additional Capital Contributions**.

        (a)     Additional Funds. The Board by Unanimous Consent (or majority consent pursuant to Section 5.2(b)) may agree at any time from time to time that additional funds are required by the Partnership in addition to the then-existing Capital Contributions to the Partnership and any financing that the Partnership may have obtained, or that may be available to the Partnership, in accordance with this Agreement ("Additional Capital Requirement"); provided, that, notwithstanding anything herein to the contrary, Unanimous Consent shall be deemed granted (and only ordinary approval of the Board necessary) in respect of additional funds (i) required to the extent that the Partnership would otherwise be in default under, or materially breach, any Financing Facility or other material debt instrument within twenty (20)

11

Business Days from the applicable date of determination or be insolvent or (ii) required to address any additional bona fide emergency liquidity needs of the Partnership as reasonably determined by the Board in good faith. In such instances, the Partners may (but are not obligated to) provide immediate additional funds to the Partnership based on their respective Economic Percentage.  In the event that such Capital Contributions are not made by the Partners at the same time in accordance with their respective Economic Percentage and Partners with an Economic Percentage of greater than 5% in the aggregate fail to fund their pro rata share of such Capital Contributions, the Partner contributing more than its proportionate share of funds shall, notwithstanding anything to the contrary in this Agreement, but subject in all cases to any applicable restrictions under the Financing Facilities, be reimbursed by the Partnership for an amount equal to 2.0 times the portion of such Partner's optional contribution (provided that to the extent Partners are funding in excess of their pro rata portion with respect to a deficiency of less than 5% of the required funding in the aggregate, such excess portion will be reimbursed by the Partnership at an amount equal to 2.0 times solely with respect to such excess funding), including in excess of its pro rata share of the Partnership (based on its Economic Percentage), which amount shall be paid promptly to such Partner by the Partnership from the Partnership's then Available Cash as such funds become available prior to any distributions to the Partners; provided, that, without Unanimous Consent of the Board, a Partner shall only be entitled to reimbursement (without the multiplier) with respect to the provision of funds pursuant to clause (i) or to otherwise pay debt under clause (ii), in each case, to the extent related to debt held by such Partner or its Affiliates.  All amounts due to a Partner in respect of an optional contribution under this Section 3.7 shall be treated as a loan from such Partner to the Partnership (or, if such characterization as a loan is prohibited under any of the Financing Facilities, a preferred equity interest of the Partnership junior to the Series B Preferred Units and senior to all other equity interests of the Partnership) and not as a Capital Contribution; provided, however, that, notwithstanding anything in this Agreement to the contrary, without the consent of the Managing General Partner no such additional funds provided by a Partner shall dilute any Partner's Economic Percentage.

(b)     Mandatory Capital Contributions. Notwithstanding anything herein to the contrary, the Second Series B Preferred Units Issuance shall be deemed a mandatory capital contribution pursuant to which all Series B Preferred Unitholders shall be required to contribute Capital Contributions pro rata to their ownership of Series B Preferred Units. The Partnership shall issue a Mandatory Call Notice to effectuate such requirement, which notice shall state the Call Amount pursuant to this Section 3.7.

## 3.8     Repurchase Rights.

(a)     In the event of any Termination of a Class G Unitholder by the Partnership or any of its Affiliates or Subsidiaries for Cause or because such Class G Unitholder leaves his or her employment with the Partnership or its Affiliates without Good Reason, (i) all unvested Class G Units held by such terminated Class G Unitholder shall be cancelled and forfeited without payment of any kind with respect thereto and (ii) the Partnership (or its designees) shall have the right (but not the obligation) to purchase from such terminated Class G Unitholder and its Permitted Affiliates all or any portion of the Vested Class G Units held by such Class G Unitholder or its Permitted Affiliates (collectively, the "Subject Interests") for consideration equal to the *lesser of* (A) the book value of the Subject Interests as determined by the Board

12

(acting reasonably) and (B) the Fair Market Value of such Subject Interests as determined by the Board (acting reasonably); provided, however, that the Board acting by Unanimous Consent and in its sole discretion, shall have the option (but not the obligation) to elect to have the Partnership (or its designees) purchase such Subject Interests for consideration in excess of the consideration amount determined pursuant to clause (ii) of this Section 3.8(a).

(b)    In the event of any Termination of a Class G Unitholder without Cause (other than a termination by such Class G Unitholder for Good Reason), or because such Class G Unitholder leaves his or her employment with the Partnership or its Affiliates with Good Reason, (i) all unvested Class G Units held by such terminated Class G Unitholder shall be cancelled and forfeited without payment of any kind with respect thereto, and (ii) the Partnership (or its designees) shall have the right (but not the obligation) to purchase from such terminated Class G Unitholder and its Permitted Affiliates all or any portion of the Subject Interests for consideration equal to the Fair Market Value of such Subject Interests as determined by the Board (acting reasonably).

(c)    In the event a Class G Unitholder is in material breach of the terms of any agreement between such Class G Unitholder, on the one hand, and the Partnership and/or any of its Subsidiaries, on the other hand, the Partnership (or its designees) shall have the right (but not the obligation) from time to time to purchase from such Class G Unitholder and its Permitted Affiliates all or any portion of the Subject Interests for consideration equal to the *lesser of* (A) the book value of the Subject Interests as determined by the Board (acting reasonably) and (B) the Fair Market Value of such Subject Interests as determined by the Board (acting reasonably).

(d)    Notwithstanding anything in this Section 3.8 to the contrary, if within five (5) Business Days of receipt of a Fair Market Value determination by the Board pursuant to Sections 3.8(a), (b) or (c), the Class G Unitholder delivers written notice to the Partnership disputing the Board's determination of Fair Market Value (which notice shall include the Class G Unitholder's good faith proposal for Fair Market Value of the Subject Interests), then the Partnership and the Class G Unitholder shall engage in good faith negotiations for fifteen days (15) following the Partnership's receipt of notice to resolve such dispute, which period may be extended upon mutual agreement. If at the end of such fifteen-day (15) period (or such longer mutually agreeable period), the parties have not resolved such dispute, the parties shall engage a mutually agreeable third-party valuation firm that is experienced in valuing Hydrocarbon Interests (the "Subject Interest Valuator"), to determine the Fair Market Value of the Subject Interests. The parties shall use their commercially reasonable efforts to cause the Subject Interest Valuator to render a determination of Fair Market Value of the Subject Interests within thirty (30) days of engagement; provided, that the Subject Interest Valuator's determination shall not be higher than the highest Fair Market Value proposal presented by the parties or lower than the lowest Fair Market Value proposal presented by the parties. The determination of Fair Market Value by the Subject Interest Valuator shall be final and binding on the parties. The fees and expenses of the Subject Interest Valuator shall be paid 100% by the party - either the Partnership or the Class G Unitholder - whose Fair Market Value proposal is furthest from the Fair Market Value determined by the Subject Interest Valuator.

13

(e)     The Partnership (or its designees) may exercise the foregoing purchase options, by written notice to the applicable Class G Unitholder and their Permitted Affiliates, beginning on the date that is six (6) months and one day, and by no later than the date that is 211 days following the applicable Termination. Each of the Partners hereby agrees that the foregoing remedy is a liquidated damage, and not a penalty.  The Partnership shall pay for the Subject Interests to be purchased by it pursuant to this Section 3.8, to the maximum extent permitted by law, by first offsetting amounts outstanding under any bona fide undisputed debts owed by the Class G Unitholder to the Partnership or any of its Subsidiaries (including any amounts advanced to the Class G Unitholder during the course of the Class G Unitholder's employment), and thereafter the remainder of the purchase price by a check or wire transfer of immediately available funds.  The Partnership (or its designees) will receive customary representations and warranties from the applicable Class G Unitholder and/or its Permitted Affiliate(s) regarding the sale of the Subject Interests, including but not limited to the representation that the applicable Class G Unitholder and/or each of its Permitted Affiliate(s) has good and marketable title to the Subject Interests to be Transferred free and clear of all liens, claims and other encumbrances on the date of closing the Transfer. The Class G Unitholders hereby consent to the taking of any steps which the Partnership reasonably deems are necessary or convenient to effect any legal formalities in relation to such Transfer. If the Partnership (or its designees) shall make available the consideration for the Subject Interests to be repurchased in accordance with the provisions of this Agreement, then from and after such time, the Person from whom such Subject Interests are to be repurchased shall no longer have any rights as a holder of such Subject Interests (other than the right to receive payment of such consideration in accordance with this Agreement), and such Subject Interests shall be deemed purchased in accordance with the applicable provisions hereof and the Partnership (or its designees) shall be deemed the owner and holder of such Subject Interests.  Notwithstanding anything to the contrary contained in this Agreement, all repurchases of the Subject Interests by the Partnership shall be subject to applicable restrictions contained in the Securities Act and in the Partnership's and any of its Subsidiaries' debt financing agreements.

(f)     Notwithstanding anything to the contrary, the Partnership (and its designees) shall not have a right to purchase Class G Units of Thomas Fagadau or his Permitted Affiliates under (i) Section 3.8(b) or (ii) otherwise in connection with a Termination without Cause, because he left his employment with Good Reason or resulting from his death or Disability (as defined in his employment agreement).

## Article IV
## Computation and Allocation of Financial and Tax Items; Distributions

**4.1     Computation of Profit and Loss**. For purposes of maintaining the Capital Accounts, the Profit and Loss of the Partnership for any Fiscal Year or other period shall be an amount equal to the Partnership's taxable income or loss for such period (computed in accordance with Section 703(a) of the Code), with the following adjustments:

(a)     any income of the Partnership for the period that is exempt from federal income tax and not otherwise taken into account in computing Profit and Loss under this Section 4.1 shall be added to such taxable income or loss;

14

(b)     any Section 705(a)(2)(B) Expenditure that is not otherwise taken into account in computing Profit and Loss under this Section 4.1 shall be subtracted from such taxable income or loss;

(c)     gain or loss resulting from the disposition during the period of any asset (in a taxable transaction) shall be computed by reference to the book value of such asset;

(d)     in lieu of the depreciation, amortization, or other cost recovery deduction with respect to any item taken into account in computing such taxable income or loss, there shall be taken into account depreciation, amortization or either cost recovery in respect of the item determined by applying the method used by the Partnership for federal income tax purposes with respect to such item to the book value of such item (or, if the tax basis of such item is zero, the method the Partnership would have used for such purpose); and

(e)     any items that are specially allocated under Sections 4.4 or 4.5, shall not be taken into account.

**4.2     Allocation of Profit and Loss**. After giving effect to the special allocations in Sections 4.5, 4.9(a) and (b), and 11.4(a)(iv), Profit and Loss for any Fiscal Year other than Net Gain from an Exit Event and Net Loss From an Exit Event, shall be allocated as follows:

(a)     Profit.

(i)     *First*, 100% to the Managing General Partner until the aggregate Profits allocated to the Managing General Partner pursuant to this Section 4.2(a)(i) for the current and all previous Fiscal Years is equal to the aggregate Losses allocated to the Managing General Partner pursuant to Section 4.2(b)(iii) for all previous Fiscal Years;

(ii)     *Second*, 100% to the Series B Preferred Unitholders, pro rata in proportion to the aggregate number of Series B Preferred Units held by each such Series B Preferred Unitholders, until the aggregate Profits allocated to the Series B Preferred Unitholders pursuant to this Section 4.2(a)(ii) for the current and all previous Fiscal Years is equal to the aggregate Losses allocated to the Series B Unitholders pursuant to Section 4.2(a)(ii) for all previous Fiscal Years;

(iii)     *Third*, 100% to the Unitholders (including the Series A Preferred Unitholders but excluding the Series B Preferred Unitholders) in accordance with their Percentage Interests, until the aggregate Profits allocated to the Unitholders pursuant to this Section 4.2(a)(iii) for the current and all previous Fiscal Years is equal to the aggregate Losses allocated to the Unitholders (including the Series A Preferred Unitholders but excluding the Series B Preferred Unitholders) pursuant to Section 4.2(b)(i) for all previous Fiscal Years;

(iv)     *Fourth*, 100% to the Class A Unitholders in proportion to and to the extent of the excess if any of (x) the Class A Preferred Return in respect of the Class A Units held by such Class A Unitholders, over (y) the aggregate amount of Profits allocated to such Class A Unitholders pursuant to this Section 4.2(a)(iv) for all prior Fiscal Years; and

15

(v)     *Fifth*, the balance, if any to all Common Unitholders (excluding the Class F Unitholders) in accordance with their Percentage Interests. For avoidance of doubt, no portion of such balance allocable pursuant to this Section 4.2(a)(v) shall be allocated to the Series A Preferred Unitholders or the Series B Preferred Unitholders.

(b)     Loss.

(i)     *First*, 100% to the Unitholders (including the Series A Preferred Unitholders but excluding the Series B Unitholders) in accordance with their Percentage Interests, until the Capital Account in respect of each Unit has been reduced to zero, but not below zero;

(ii)     *Second*, 100% to the Series B Preferred Unitholders, pro rata in proportion to the aggregate number of Series B Preferred Units held by each such Series B Preferred Unitholders, until the Capital Account in respect of each Series B Preferred Unit has been reduced to zero, but not below zero; and

(iii)     *Third*, the balance, if any, to the Managing General Partner.

**4.3     Allocation of Net Gain and Net Loss From an Exit Event**. After giving effect to the special allocations in Sections 4.5, 4.9(a) and (b), and 11.4(a)(iv), Net Gain From an Exit Event and Net Loss From an Exit Event for any Fiscal Year shall be allocated as follows:

(a)     Net Gain From an Exit Event.

(i)     *First*, 100% to the Managing General Partner until the Managing General Partner has been allocated an amount equal to the excess if any, of (x) the sum of (1) the aggregate Losses allocated to the Managing General Partner pursuant to Section 4.2(b)(iii) for the current and all prior Fiscal Years, plus (2) the aggregate Net Loss From an Exit Event allocated to the Managing General Partner pursuant to Section 4.3(b)(iv) for the current and all prior Fiscal Years, over (y) the aggregate Net Gain From an Exit Event allocated to the Managing General Partner pursuant to this Section 4.3(a)(i) for all prior Fiscal Years;

(ii)     *Second*, 100% to the Series B Preferred Unitholders, pro rata in proportion to the aggregate number of Series B Preferred Units held by each such Series B Preferred Unitholders, until each Series B Preferred Unitholder has been allocated an amount equal to the excess, if any, of (x) the sum of (1) the aggregate Losses allocated to such Series B Preferred Unitholder pursuant to Section 4.2(b)(ii) for the current and all prior Fiscal Years, plus (2) the aggregate Net Loss From an Exit Event allocated to such Series B Preferred Unitholder pursuant to Section 4.3(b)(iii) for the current and all prior Fiscal Years, over (y) the aggregate Net Gain From an Exit Event allocated to such Series B Preferred Unitholder pursuant to this Section 4.3(a)(ii) for all prior Fiscal Years;

(iii)     *Third*, 100% to the Common Unitholders pro rata in proportion to the aggregate number of Common Units held by each such Common Unitholders, until each Common Unitholder has been allocated an amount equal to the excess, if any, of (x) the sum of (1) the aggregate Losses allocated to such Common Unitholder pursuant to

16

Section 4.2(b)(i) for the current and all prior Fiscal Years, plus (2) the aggregate Net Loss From an Exit Event allocated to such Common Unitholder pursuant to Section 4.3(b)(ii) for the current and all prior Fiscal Years, over (y) the aggregate Net Gain From an Exit Event allocated to such Common Unitholder pursuant to this Section 4.3(a)(iii) for all prior Fiscal Years;

(iv)     *Fourth*, 100% to the Series A Preferred Unitholders, pro rata in proportion to the aggregate number of Series A Preferred Units held by each such Series A Preferred Unitholders, until each Series A Unitholder has been allocated an amount equal to the excess, if any, of (x) the sum of (1) the aggregate Losses allocated to such Series A Preferred Unitholder pursuant to Section 4.2(b)(i) for the current and all prior Fiscal Years, plus (2) the aggregate Net Loss From an Exit Event allocated to such Series A Preferred Unitholder pursuant to Section 4.3(b)(i) for the current and all prior Fiscal Years, over (y) the aggregate Net Gain From an Exit Event allocated to such Series A Preferred Unitholder pursuant to this Section 4.3(a)(iv) for all prior Fiscal Years;

(v)     *Fifth*, 100% to the Legacy Unitholders in accordance with Section 4.4 until the aggregate Net Gain From an Exit Event allocated to such Legacy Unitholders pursuant to this Section 4.3(a)(v) for the current and prior Fiscal Years is equal to $100,000,000;

(vi)     *Sixth*, (v) 45% to the Legacy Unitholders in accordance with Section 4.4, (w) 0.6875% to the Series A Unitholders and the Class A-1 Unitholders in accordance with their Respective Payout Percentages, (x) 0.6875% to the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages, (y) 48.125% to the Class F Unitholders, pro rata in proportion to the aggregate number of Class F Units held by each such Class F Unitholders, and (z) 5.5% to the holders of the Management Interests pro rata, until the Capital Account in respect of the Management Interests has been allocated an amount equal to the First Incentive Distribution;

(vii)     *Seventh*, (v) 45% to the Legacy Unitholders in accordance with Section 4.4, (w) 1.2375% to the Series A Unitholders and the Class A-1 Unitholders in accordance with their Respective Payout Percentages, (x) 1.2375% to the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages, (y) 42.625% to the Class F Unitholders, pro rata in proportion to the aggregate number of Class F Units held by each such Class F Unitholders, and (z) 9.9% to the holders of the Management Interests pro rata, until the Capital Account in respect of the Management Interests has been allocated an amount equal to the excess of the Second Incentive Distribution over the First Incentive Distribution;

(viii)     *Eighth*, (v) 45% to the Legacy Unitholders in accordance with Section 4.4, (w) 1.7875% to the Series A Unitholders and the Class A-1 Unitholders in accordance with their Respective Payout Percentages, (x) 1.7875% to the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages, (y) 37.125% to the Class F Unitholders, pro rata in proportion to the aggregate number of Class F Units held by each such Class F Unitholders, and (z) 14.3%

17

to the holders of the Management Interests pro rata, until the Capital Account in respect of the Management Interests has been allocated an amount equal to the excess of the Third Incentive Distribution over the Second Incentive Distribution;

(b)  Net Loss From an Exit Event.

(i)  *First*, 100% to the Series A Preferred Unitholders, pro rata in proportion to the aggregate number of Series A Preferred Units held by each such Series A Preferred Unitholders, until the Capital Account in respect of each Series A Preferred Unit has been reduced to zero, but not below zero;

(ii)  *Second*, 100% to the Common Unitholders in accordance with their Percentage Interests, until the Capital Account in respect of each Common Unit has been reduced to zero, but not below zero;

(iii)  *Third*, 100% to the Series B Preferred Unitholders, pro rata in proportion to the aggregate number of Series B Preferred Units held by each such Series B Preferred Unitholders, until the Capital Account in respect of each Series B Preferred Unit has been reduced to zero, but not below zero;

(iv)  *Fourth*, the remaining balance, if any, to the Managing General Partner.

4.4  **Allocation to Legacy Unitholders**. Any Net Gain From an Exit Event allocable to the Legacy Unitholders pursuant to Section 4.3(a)(v), (vi), (vii) or (viii) shall be allocated in the following order:

(a)  *First*, 100% to the Series A Preferred Unitholders, pro rata in proportion to the aggregate number of Series A Preferred Units held by each such Series A Preferred Unitholders, until the Capital Account in respect of each Series A Preferred Unit is equal to the Series A Liquidation Value with respect to such Series A Preferred Unit;

(b)  *Second*, 100% to the Class A Unitholders, pro rata in proportion to the aggregate number of Class A Units held by each such Class A Unitholders, until the Capital Account in respect of each Class A Unit is equal to excess of (x) the Class A Preferred Return in respect of such Class A Unit, over (y) the sum of all prior distributions made on such Class A Unit;

(c)  *Third*, 100% to the Class A Unitholders, the Class A-1 Unitholders and Class B Unitholders in accordance with their Percentage Interests until the aggregate Capital Accounts of all such Unitholder is equal to the Threshold Value;

(d)  *Fourth*, 100% to the Class C Unitholders, to the extent necessary such that their respective Capital Account equal the amount distributed to such Class C Unitholders pursuant to Section 4.7(a); and

(e)  *Fifth*, 100% among the Legacy Unitholders in accordance with their Percentage Interests.

**4.5    Special Allocations**. The following special allocations shall be made in the following order:

(a)    <u>Minimum Gain Chargeback</u>. Except as otherwise provided by Section 1.704-2(f) of the Treasury Regulations, if there is a net decrease in the Minimum Gain during any Fiscal Year, there shall be allocated to each Partner (before any other allocation is made under this <u>Section 4.3</u>) items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in proportion to, and to the extent of, an amount equal to such Partner's share of the net decrease in the Minimum Gain during such Fiscal Year (determined in accordance with Section 1.704-2(g) of the Treasury Regulations). The items to be allocated for any Fiscal Year under this <u>Section 4.5(a)</u> shall be determined in accordance with Section 1.704-2(j)(2) of the Treasury Regulations. This <u>Section 4.5(a)</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)    <u>Partner Minimum Gain Chargeback</u>. Except as otherwise provided by Section 1.704-2(i)(4) of the Treasury Regulations, if during any Fiscal Year there is a net decrease in the Partner Minimum Gain attributable to a Partner Nonrecourse Debt, there shall be allocated (before any allocation for such Fiscal Year is made under this <u>Section 4.5</u> other than <u>Section 4.5(a)</u>) to each Partner with a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt (as determined under Section 1.704-2(i)(5) of the Treasury Regulations) items of income and gain for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in proportion to, and to the extent of such Partner's share of the net decrease during such Fiscal Year in the Partner Minimum Gain attributable to such Partner Nonrecourse Debt (determined under Section 1.7042(i)(4) of the Treasury Regulations). The items to be allocated for any Fiscal Year under this <u>Section 4.5(b)</u> shall be determined in accordance with Section 1.704-2(j)(2) of the Treasury Regulations. This <u>Section 4.5(b)</u> is intended to comply with the partner minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>. If during any Fiscal Year any Partner unexpectedly receives any adjustment described in Section 1.704-1 (b)(2)(ii)(d)(4) to the Capital Account maintained for him on the books of the Partnership, any allocation described in Section 1.704-1(b)(2)(ii)(d)(5), or any distribution described in Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations to such Partner; there shall be allocated (before any allocation is made under this <u>Section 4.5</u>, other than <u>Sections 4.5(a)</u> or <u>4.5(b)</u>) to such Partner items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit balance, if any, in the Adjusted Capital Account of such Partner as quickly as possible, <u>provided</u> that an allocation pursuant to this <u>Section 4.5(c)</u> shall be made only if and to the extent that such Partner would have a deficit balance in its Adjusted Capital Account after all other allocations provided in this <u>Section 4.5</u> have been tentatively made as if this <u>Section 4.5(c)</u> were not in the Agreement. Any allocation of income or gain for any Fiscal Year made under this <u>Section 4.5(c)</u> shall consist of a pro rata portion of each item of income of the Partnership (including gross income) and gain for such period (other than income or gain for such period allocated under <u>Section 4.5(a)</u> or <u>Section 4.5(b)</u>).

<div align="center">19</div>

(d)     Gross Income Allocation. If there is a deficit balance in the Capital Account of any Partner at the end of any Fiscal Year which is in excess of the amount of such Partner's Deficit Restoration Obligation at that time, each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible, provided that an allocation to a Partner pursuant to this Section 4.5(d) shall be made only if and to the extent that such Partner would have a deficit balance in its Capital Account in excess of any Deficit Restoration Obligation after all other allocations provided for in this Section 4.5 have been made as if Section 4.5(c) and this Section 4.5(d) were not in the Agreement.

(e)     Section 754 Adjustments. To the extent an adjustment pursuant to Section 734(b) or Section 743(b) of the Code to the tax basis of any asset is required pursuant to Section 1.704-1(b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation: of such Partner's Units or as the result of the sale of a Partner's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in accordance with their interests in the Partnership in the event Section 1.704-1 (b)(2)(iv)(m)(2) of the Treasury Regulations applies, or to the distributee in the event Section 1.70 4-1(b) (2)(iv)(m)(4) of the Treasury Regulations applies.

(f)     Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be allocated as determined by the Managing General Partner in a manner that is consistent with the principles of Sections 1.704-1 and 1.704-2 of the Treasury Regulations.

(g)     Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Fiscal Year shall be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(h)     Allocations in Event of Forfeiture. If any holder of Class C or D Units forfeits all or any portion of such units, such holder shall be allocated items of loss or deduction in the year of forfeiture in an amount equal to the portion of such holder's Capital Account attributable to the forfeited Units.

4.6     [Reserved].

4.7     Requirement of Distributions.

(a)     Subject to the provisions of Section 11.4 pursuant to an actual dissolution of the Partnership but notwithstanding any other provisions of this Agreement to the contrary, distributions of assets and properties of the Partnership shall be made by the Partnership at such times as determined by the Managing General Partner. Distributions of assets and properties other than cash and Cash Equivalents shall require Unanimous Consent and be based upon the Fair Market Value (as determined by the Unanimous Consent of the Board, acting reasonably) of the applicable assets or properties and in accordance with the terms of this Section 4.7 as if such assets and properties were cash or Cash Equivalents equal to their Fair Market Value.

20

Distributions of cash shall be made to the Partners by wire transfer of immediately available funds to the account designated by the relevant Partner. Subject to Section 4.7(b), any distribution shall be made to the Partners as follows:

(i) *First*, to the holders of outstanding Series B Preferred Units (ratably among the holders of Series B Preferred Units based upon the proportion that each such holder's Unreturned Capital bears to the aggregate Unreturned Capital), until (A) the Unreturned Capital with respect to each outstanding Series B Preferred Unit has been reduced to zero dollars ($0), and (B) each holder of the Series B Preferred Units has received cumulative Distributions in an amount sufficient to pay any then accrued but unpaid Series B Unit Distributions with respect to each Series B Preferred Unit;

(ii) *Second*, 100% to the Legacy Unitholders in accordance with the Legacy Waterfall until the aggregate amount distributed pursuant to this Section 4.7(a)(ii) is equal to $100,000,000;

(iii) *Third*, thereafter, (A) 45% to the Legacy Unitholders in accordance with the Legacy Waterfall, (B) 0.6875% to the Series A Preferred Unitholders and Class A-1 Unitholders in accordance with their Respective Payout Percentages, (C) 0.6875% to the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages and (D) 53.625% to the holders of Class F Units (with a portion of such 53.625% amount allocated to the holders of the Management Interests pro rata in an aggregate amount equal to (1) 10.25641026% of the portion of any distribution to which this Section 4.7(a)(iii)(D) applies multiplied by (2) the Aggregate Vested Management Interests Percentage (the "First Incentive Distribution")), until (x) Blackstone has received cumulative Distributions in an amount sufficient to achieve a 20% Internal Rate of Return on its Aggregate Contributions Amount and (y) Blackstone has received cumulative Distributions in an amount equal to 2.05 multiplied by Blackstone's Aggregate Contributions Amount;

(iv) *Fourth*, thereafter, (A) 45% to the Legacy Unitholders in accordance with the Legacy Waterfall, (B) 1.2375% to the Series A Preferred Unitholders and Class A-1 Unitholders in accordance with their Respective Payout Percentages, (C) 1.2375% to the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages and (D) 52.525% to the holders of Class F Units (with a portion of such 52.525% amount allocated to the holders of the Management Interests pro rata in an aggregate amount equal to (1) 18.84816754% of the portion of any distribution to which this Section 4.7(a)(iv)(D) applies multiplied by (2) the Aggregate Vested Management Interests Percentage(the "Second Incentive Distribution")), until (x) Blackstone has received cumulative Distributions in an amount sufficient to achieve a 30% Internal Rate of Return on its Aggregate Contributions Amount and (y) Blackstone has received cumulative Distributions in an amount equal to 3.05 multiplied by Blackstone's Aggregate Contributions Amount; and

(v) *Fifth,* thereafter, (A) 45% to the Legacy Unitholders in accordance with the Legacy Waterfall, (B) 1.7875% to the Series A Preferred Unitholders and Class A-1 Unitholders in accordance with their Respective Payout Percentages, (C) 1.7875% to

21

the Legacy Common Unitholders (Ex. Class A-1) in accordance with their Respective Payout Percentages and (D) 51.425% to the holders of Class F Units (with a portion of such 51.425% amount allocated to the holders of the Management Interests pro rata in an aggregate amount equal to (1) 27.80748663% of the portion of any distribution to which this Section 4.7(a)(v)(D) applies multiplied by (2) the Aggregate Vested Management Interests Percentage (the "Third Incentive Distribution")).

For purposes of the foregoing, if payments are made by or on behalf of the Partnership to a holder of Common Units or an Affiliate thereof other than in respect of such holder's Common Units (*e.g.*, in respect of salary, indebtedness for borrowed money, property rentals or services), then such payments shall not be considered a distribution for purposes of determining the allocation of a distribution pursuant to this Section 4.7.

(b)     Notwithstanding the foregoing:

(i)     Subject to applicable restrictions contained in the Partnership's and any of its Subsidiaries' debt financing agreements, the Managing General Partner shall cause Available Cash to be distributed on or prior to each April 15, June 15, September 15 and January 15 (or next succeeding Business Day if such date falls on a date other than a Business Day) (each an "Estimated Tax Payment Date"), with respect to the Fiscal Year related to each Estimated Tax Payment Date (each, an "Estimated Tax Period"), to each Partner in an amount equal to the excess, if any, of (A) the product of (x) the amount of net taxable income (taking into account income and deductions resulting from any guaranteed payment made by the Partnership) allocable to such Partner in respect of such Estimated Tax Period (net of (I) cumulative taxable losses allocated to such Partner for any prior taxable period and not previously taken into account under this clause (b) and (II) any depletion calculated at the Partner level, utilizing the cost depletion method) times (y) an assumed tax rate equal to the highest maximum combined marginal federal, state and local income tax rates applicable to an individual or corporate taxpayer resident in New York, NY (taking into account the character of such taxable income and the deductibility of state and local income tax for federal income tax purposes) (the "Tax Rate"), over (B) distributions previously made during the Fiscal Year such Estimated Tax Period pursuant to Section 4.7(a) to such Partner.

(ii)     Distributions pursuant to this Section 4.7(b) shall be treated as advances against, and shall reduce any Partner's entitlement to, any subsequent distributions made pursuant to Section 4.7(a) or Section 11.4(a)(iv).

(c)     Notwithstanding anything in Section 4.7(a) to the contrary, (i) if at any time and from time to time after any distribution has been made pursuant to Section 4.7(a) (such distribution, the "Prior Distribution") there occurs an increase in a Management Partner's Applicable Vested Participation Percentage (the incremental portion of the Applicable Vested Participation Percentage, the "Incremental Applicable Vested Participation Percentage"), all amounts that would have been distributable to such Management Partner pursuant to Section 4.7(a)(iii), Section 4.7(a)(iv), or Section 4.7(a)(v), upon the Prior Distribution if the Incremental Applicable Vested Participation Percentage had applied to such Management Partner at the time of the Prior Distribution shall, if and when a subsequent distribution of assets and properties is

22

made pursuant to Section 4.7(a) after such increase, be distributed to such Management Partner (pro rata based on the aggregate amount of Vesting Catch Up Distributions then to be made) as a priority distribution before any amounts are distributed to the Partners pursuant to Section 4.7(a)(iii), Section 4.7(a)(iv), or Section 4.7(a)(v) (such priority Distribution, the "Vesting Catch Up Distribution") until all such Vesting Catch Up Distributions have been made to such Management Partner and each such Management Partner has received the applicable Vesting Catch Up Distribution in respect of his or her Management Interests; provided, that once the applicable Vesting Catch Up Distribution has been made in full to a Management Partner in respect of any Incremental Applicable Vested Participation Percentage pursuant to this Section 4.7(c) with respect to such Partner's Management Interests, as applicable, such Management Partner shall no longer have the right to receive any Vesting Catch Up Distribution with respect to such Incremental Applicable Vested Participation Percentage under this Section 4.7(c) with respect to such Management Interests. The implementation of, and all decisions with respect to, this Section 4.7(c) shall be determined by the Managing General Partner acting in good faith.

(d)     For purposes of Section 4.7(a), any amounts paid by the Partnership to repurchase any Class G Unit pursuant to Section 3.8 shall be considered Distributions made by the Partnership to the holder of the applicable Class G Units.

**4.8     Withholding**. To the extent the Partnership or any other entity in which the Partnership holds an interest is required by law to withhold or to make tax payments on behalf of or with respect to any Partner (including any taxes arising under the Partnership Tax Audit Rules) ("Tax Advances"), the Partnership (or other such entity) may withhold such amounts and make such tax payments as so required. All Tax Advances made on behalf of a Partner shall be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Partner or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Partner. If at the time of liquidation of the Partnership, any such Tax Advances to a Partner exceed the proceeds of liquidation to the Partner, such Partner shall repay such excess to the Partnership. If a distribution to a Partner is actually reduced as a result of a Tax Advance, for all other purposes of this Agreement such Partner shall be treated as having received the amount of the distribution that is reduced by the Tax Advance. Each Partner hereby agrees to indemnify and hold harmless the Partnership and the other Partners from and against any liability from such Partner's failure to repay Tax Advances.  For the avoidance of doubt, any taxes, penalties and interest payable under the Partnership Tax Audit Rules by the Partnership or any fiscally transparent entity in which the Partnership owns an interest shall be treated as specifically attributable to the Partners and the Managing General Partner shall use commercially reasonable efforts to allocate the burden of (or any diminution in distributable proceeds resulting from) any such taxes, penalties or interest to the Partners to whom such amounts are specifically attributable (whether as a result of their status, actions, inactions or otherwise) as determined by the Managing General Partner.

**4.9     Other Allocation Rules**.

(a)     Special Loss Limitation. Loss allocated to the Partners for any Fiscal Year pursuant to Section 4.2 and 4.3 shall not exceed the maximum amount of such Loss that can be so allocated without causing any Partner to have a deficit balance in its Adjusted Capital Account at the end of such Fiscal Year. In the event some but not all of the Partners would have

23

such a deficit balance in its Adjusted Capital Account as a consequence of an allocation of Loss for a Fiscal Year pursuant to Section 4.2 and 4.3, the limitation set forth in the first sentence of this Section 4.9(a) shall be applied so as to allocate the maximum permissible amount of such Loss to each Partner under Section 1.704-1 (b)(2)(ii)(d) of the Treasury Regulations.

(b)     Determination of Profits and Losses. For purposes of determining the Profits, Losses and items in the nature of income, gain, expense, or loss for any period, Profits, Losses and any such items shall be delineated on a daily, monthly, or other basis, as determined by the Managing General Partner using any permissible method under Section 706 of the Code and the Treasury Regulations issued thereunder.

(c)     Excess Nonrecourse Liabilities. The Excess Nonrecourse Liabilities of the Partnership shall be allocated among the Partners in proportion to their respective Percentage Interests.

(d)     Attribution of Distributions to Nonrecourse Liabilities. To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Partnership shall endeavor to treat distributions made under Section 4.7 or 4.8 as having not been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Liability.

(e)     Section 704(c) Considerations. Items of income, gain, loss and deduction with respect to any asset contributed to the capital of the Partnership shall, solely for income tax purposes, be allocated between the Partners so as to take account of any variation between the adjusted basis of such asset to the Partnership for federal income tax purposes and the gross fair market value of such asset at the time of contribution. In the event the book value of any asset contributed to the capital of the Partnership is revalued on the Partnership's books, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset to the Partnership for federal income tax purposes and the book value of such asset immediately following such revaluation in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder. Any elections or other decisions relating to allocations made pursuant to this Section 4.9(e) shall be made by the Managing General Partner in any manner that reasonably reflects the purposes and intentions of this Agreement. Allocations pursuant to this Section 4.9(e) are solely for purposes of federal, state and local income taxes and shall not affect the determination of any Partner's Capital Account or share of Profits or Losses determined under any provisions of this Agreement. Unless otherwise agreed by the Managing General Partner and the Partner contributing property to the Partnership subject to Section 704(c) of the Code, the Partnership will use the remedial method described in Section 1.704-3(d)(i) of the Treasury Regulations with respect to such property contribution.

(f)     Recapture Income. For purposes of determining the character (as ordinary income or capital gain) of any taxable income of the Partnership, such portion of the taxable income of the Partnership which is treated as ordinary income attributable to the recapture of depreciation (or cost recovery) shall, to the extent possible, be allocated between the Partners (or other successors in interest) in the same proportions that the depreciation (or cost recovery) deductions directly or indirectly giving rise to such income were previously allocated. The

24

provisions of this Section 4.9(f) shall not alter the amount of any allocation to a Partner under Article IV, but merely the character of income so allocated.

(g)     Transfers of Partnership Units. If, during any taxable year of the Partnership, there is a change in any Partner's Units in the Partnership, then each Partner's distributive share of each item of Partnership income, gain, loss and deduction shall be delineated for federal income tax purposes as if the taxable year of the Partnership closed on the date of such change. For purposes of this Section 4.9(g), a transfer of a Unit in the Partnership made during the first fifteen (15) days of any calendar month will be deemed to have been effected at the opening of such month, and a transfer made after the fifteenth (15th) day of any calendar month will be deemed to have been effected at the opening of the following month.

(h)     Allocations for Tax Purposes. Except as otherwise provided herein, for federal income tax purposes, each item of income, gain, loss and deduction shall be allocated among the Partners in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated.

**4.10    Tax Treatment of Partnership Interests Subject to Vesting**. The Partnership and each Partner agree to treat the Class C Units, Class D Units and Class E Units as a separate Profits Interest within the meaning of IRS Revenue Procedure 93-27, IRS Revenue Procedure 2001-43 and IRS Notice 2005-43. Absent a change in law, the Partnership shall treat a Partner holding an unvested Profits Interest as the owner of such Profits Interest from the date such Profits Interest is granted, and shall file its IRS form 1065, and issue appropriate Schedule K-ls to such Partner, allocating to such Partner its distributive share of all items of income, gain, loss, deduction and credit associated with such Profits Interest as if it were fully vested. Each such Partner agrees to take into account such distributive share in computing its Federal income tax liability for the entire period during which it holds the Profits Interest. Except as required pursuant to a "determination" as defined in Code Section 1313(a) or a change in law, the Partnership and each Partner agree not to claim a deduction (as wages, compensation or otherwise) for the fair market value of such Profits Interest issued to a Partner, either at the time of grant of the Profits Interest, or at the time the Profits Interest becomes substantially vested. The undertakings contained in this Section 4.10 shall be construed in accordance with Section 4 of Rev. Proc. 2001-43, 2001-2 C.B. 191. The provisions of this Section 4.10 shall apply regardless of whether or not the holder of a Profits Interest files an election pursuant to Section 83(b) of the Code.

## Article V
## The Managing General Partner: Rights, Duties and Obligations

**5.1    Powers of Managing General Partner**.

(a)     The Managing General Partner shall have the full and exclusive power and authority on behalf of the Partnership to manage, control, administer and operate the business and affairs of the Partnership in accordance with the provisions of this Agreement and the TBOC, and to do or cause to be done any and all acts deemed to be necessary or appropriate thereto, and the scope of such power and authority shall encompass all matters in any way

25

connected with or incident to such business, including, but not limited to, the power and authority on behalf of the Partnership:

(i)      to invest any Partnership funds, pending their use for other Partnership purposes, in accordance with Section 9.5 hereof;

(ii)      to expend the Partnership's capital, Revenues, borrowings and profits in furtherance of the business of the Partnership and to execute and deliver all checks, drafts, endorsements and other orders for the payment of Partnership funds;

(iii)      to acquire and manage Prospects within the continental United States, and hold them in the name of the Partnership, or the Managing General Partner, or any other name selected by the Managing General Partner and, in this connection, title to Partnership Property of any kind or character, and contracts or other documents made or executed by the Managing General Partner on behalf of the Partnership, may be taken, made or executed in the name of the Partnership or on a temporary basis solely in the name of the Managing General Partner or any nominee or trustee, or in the name of a nominee entity organized solely for the purpose of holding record title to oil and gas properties, without disclosure to third parties of the existence of the Partnership;

(iv)      to execute such instruments and agreements, do such acts, and employ such Persons and services as are reasonably necessary to acquire Prospects for the Partnership; to engage Operators, including itself and its Affiliates, and to pay for costs of operation, leasehold costs, delay rentals, scientific services, drillings and completions, testing, plugging and abandoning dry holes, dry hole and bottom hole contributions, and any other expenses incurred in connection with the business of the Partnership; to execute contracts for the sale of oil, gas and other minerals for periods consistent with industry practices, and division orders and transfer orders necessary or incident to the sale of production;

(v)      to enter into natural gas or oil hedging arrangements with respect to a portion of production from Partnership Wells by the purchase or sale on the New York Mercantile Exchange or in the over-the-counter market of price floors or price caps, or a combination thereof, or the sale of future natural gas or oil production in a fixed price instrument or exchange of such instruments;

(vi)      to execute offers for United States oil and gas leases in any state or federal waters; to execute and file requests for approval of assignments of United States oil and gas leases, together with any and all contracts for the option, sale or purchase of such leases or the sale or purchase of any products therefrom; to execute any unitization, pooling or communization agreement, plans of development under unit agreements, Farmout contracts, divisions and transfer orders, contracts, conveyances, subleases, mortgages, deeds of trust, affidavits or reports concerning the drilling of wells and production, designations of Operator, lease bonds, Operator's bond and consents of surety; and in general to do all things necessary or desirable regarding any United States oil and gas lease or United States oil and gas lease offer;

26

(vii)    to enter into any partnership agreement, sharing arrangement, or joint venture with any Person acceptable to the Managing General Partner and which is engaged in any business or transaction in which the Partnership is authorized to engage;

(viii)    to enter into, execute, deliver and perform deeds, assignments, leases, subleases, drilling contracts, Farmouts, operating agreements, unitization agreements, pooling agreements, unit or pooling designations, processing agreements, gas sales agreements, transportation agreements, gasoline plant agreements, recycling contracts, dry hole, bottom hole and acreage contribution letters and agreements, participation agreements, agreements and conveyances respecting rights-of-way, agreements respecting installation and operation of surface facilities, agreements respecting surface and subsurface storage and any other agreements customarily employed in the oil and gas industry in connection with the acquisition, exploration, development, operation, or abandonment of any leases or other property interests, and any and all other instruments or documents considered by the Managing General Partner to be necessary or appropriate to conduct the business of the Partnership;

(ix)    to sell, dispose of, trade, exchange, quitclaim, surrender, release, abandon or hypothecate Prospects and other Partnership Property, or any interests therein, to any Person, including the Managing General Partner or its Affiliates, and in connection therewith to receive such consideration, consisting of cash, securities and other property of any form, or any combination thereof, as it deems fair and in the best interests of the Partnership, and to enter into, execute, deliver and perform all such deeds, assignments and other instruments or documents as the Managing General Partner shall deem necessary or appropriate to effect any such transaction;

(x)    to borrow monies, whether nonrecourse borrowings or otherwise, and pursuant thereto and from time to time, to draw, make, execute and issue promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, to repay any such borrowings and to secure the payment of the sums so borrowed and to mortgage, pledge, transfer or assign in trust all or any part of the Partnership Property in support of such borrowings, including, without limitation, production and proceeds of production, or to assign any monies owing or to be owing the Partnership, and to engage in any other means of financing customary in the petroleum industry;

(xi)    to employ agents, employees, accountants, lawyers, geologists, geophysicists, landmen, clerical help, and such other assistance and services as may seem proper, and to pay therefor such remuneration as the Managing General Partner may deem reasonable and appropriate;

(xii)    to purchase, lease, rent, or otherwise acquire or obtain the use of machinery, equipment, tools, materials, and all other kinds and types of real or personal property that may be deemed necessary, convenient, or advisable in connection with carrying on the business of the Partnership, and to incur expenses for travel, telephone, telegraph, insurance, and for such other things, whether similar or dissimilar, as may be deemed necessary or appropriate for carrying on and performing the business of the Partnership;

27

(xiii)  to make and enter into such agreements and contracts with such parties and to give such receipts, releases, and discharges with respect to any and all of the foregoing and any matters incident thereto as the Managing General Partner may deem advisable or appropriate;

(xiv)  to guarantee the payment of money or the performance of any contract or obligation by any Person;

(xv)  to sue and be sued, complain and defend in the name and on behalf of the Partnership;

(xvi)  to make such classifications, determinations, and allocations as it may deem advisable, having due regard for any relevant generally accepted oil and gas industry practices and generally accepted accounting principles;

(xvii)  to purchase insurance, or extend the Managing General Partner's insurance at the Partnership's expense, to protect the Partnership and the business of the Partnership against loss, and to protect the Managing General Partner against liability to third parties arising out of Partnership activities; provided, however, that the Partnership shall not incur the cost of the portion of any insurance which insures any party against any liability as to which such party is prohibited from being indemnified under Article VIII hereof;

(xviii)  to lend money on a recourse basis to the Partnership and charge the Partnership interest on the money so loaned;

(xix)  to enter into agreements with Affiliates of the Managing General Partner or with the Managing General Partner itself or the rendering by such Persons to the Partnership of services or the sale or leasing to the Partnership of equipment or supplies;

(xx)  to be appointed and act upon any dissolution of the Partnership as liquidating agent for the winding up of Partnership affairs and the liquidation and distribution of the assets of the Partnership; and

(xxi)  to take such other action and perform such other acts as it deems appropriate, necessary or convenient to carry out the business of the Partnership.

**5.2    Admission of Additional Partners**.

(a)    Subject to the preemptive rights of the existing Partners as hereinafter provided, the Managing General Partner is specifically authorized to admit additional Partners to the Partnership, and issue Units having such rights, powers and duties to such proposed Partners, as the Managing General Partner shall determine; provided that (i) the Managing General Partner, in good faith, reasonably determines that the admission of such proposed additional Partners and the issuance of such Units would be in the best interests of the Unitholders taken as a whole and (ii) within a reasonable period of time prior to the admission of such proposed additional Partners, the Managing General Partner obtains an Appraisal of all Partnership

28

Properties and any non-cash property to be contributed by such proposed additional Partners for their Units if the issuance of additional Units is at a valuation of the Partnership less than $100,000,000. In connection with any proposed admission of additional Partners, the Managing General Partner shall endeavor, to the extent the Managing General Partner deems it to be in the best interest of the Unitholders taken as a whole, to offer to the existing Limited Partners (pro rata in accordance with their respective Economic Percentage) the first right to subscribe to any such additional units to be issued to such proposed additional Partners on the same terms as proposed to such proposed additional Partners; provided that if the proposed admission consists only of a contribution of cash the Managing General Partner shall offer to the existing Limited Partners the first right to subscribe to any such additional units to be issued to such proposed additional Partners. The terms of exercise of such preferential right (including the period during which such right shall be exercisable) shall be as reasonably established by the Managing General Partner. The Managing General Partner is specifically authorized under this Section 5.2 to amend Exhibit A to reflect any such admission made in compliance with the foregoing provisions of this Section 5.2.

(b)     After the second (2nd) anniversary of the Effective Date, at any time prior to an Exit Event, the Managing General Partner at the direction of the Board acting by majority vote may elect to raise additional capital by offering to sell, and selling, for cash to each Limited Partner (excluding the holders of Management Interests and the Series B Preferred Units (in their capacity as Series B Preferred unitholders)) new Partnership interests of the Partnership ("Additional Partnership Interests"), having such rights (including with respect to Distributions) as the Managing General Partner may determine, in an amount equal to its pro rata portion of such Additional Partnership Interests based on the percentage of Distributions such Limited Partner would receive if the Partnership were sold for its Fair Market Value (as determined by the following sentence) and the proceeds thereof were paid to the Limited Partners pursuant to Section 4.7(a) (assuming for purposes hereof that if clause (i) of Section 4.7(a) would not be satisfied in such a Distribution, then the pro rata percentage for purposes of this Section 5.2(b) shall be determined based on an allocation pursuant to clause (iii) of Section 4.7(a)). The purchase price for any Partnership interests issued pursuant to this Section 5.2(b) shall be determined in good faith by the Managing General Partner based on the Fair Market Value of the Partnership as determined by an Independent Expert selected by the Managing General Partner in good faith. To the extent any eligible Limited Partners do not elect to purchase their pro rata portion of any issuance contemplated by this Section 5.2(b), the Limited Partners participating therein shall have the right to acquire such pro rata portion of a non-participating Limited Partner based upon the relative percentage of such Partnership interests such participating Limited Partners initially elected to purchase pursuant to the initial sentence of this Section 5.2(b).

**5.3     Management Interests**. The Managing General Partner shall have the authority to issue Management Interests to Persons providing services to the Partnership.

(a)     The Managing General Partner shall be entitled to: (i) determine the Persons to whom Management Interests shall be issued, (ii) determine the conditions under which the Management Interests may become vested, forfeited or redeemed, as may be specified in the agreement providing for the award of the Management Interest (the "Award Agreement") pursuant to a particular issuance, and (iii) admit a Management Partner as a Partner of the Partnership, subject to applicable vesting requirements.

29

(b)     [Reserved].

(c)     All Management Interests are intended as Profits Interests in the Partnership. Accordingly, each Management Interest shall have an initial Capital Account of zero ($0.00) and, upon issuance of a Management Interest, the Partnership shall adjust the Capital Accounts of the Partnership's other Partners to the extent necessary pursuant to Section 9.2(b)(ii) to effect the intent that the Management Interest, as of the grant, be classified as a Profits Interest (so that if, immediately after a particular grant of a Management Interest, the Partnership's assets were sold at their fair market value and then the proceeds were distributed in a complete liquidation of the Partnership, the Management Partner's share of such distribution with respect to such Management Interest would be zero ($0.00)).

(d)     No Person, either pursuant to this Agreement or pursuant to their status as an employee, independent contractor or manager to the Partnership shall be entitled to the right to receive any Management Interests, to participate as a Partner or to any other rights or claims under this Agreement except through the grant of Management Interests as evidenced by any document determined at the discretion of the Managing General Partner, and then only to the extent and on the terms and conditions set forth in this Agreement and such other document. There is no obligation for uniformity of treatment of Management Partners. The terms and conditions of a grant of Management Interests need not be the same with respect to each Management Partner.

(e)     The grant of a Management Interest hereunder shall not be construed as giving a Management Partner the right to be retained in the employ of the Partnership or any of its Affiliates, to continue to provide services, or to remain on the governing board of any such Person, as applicable. Further, the Partnership or any of its Affiliates may, at any time, dismiss a Management Partner from employment or service free from any liability or any claim against the Partnership or its Affiliates under this Agreement, unless otherwise expressly provided in this Agreement or other agreement.

(f)     Neither this Agreement nor any grant hereunder shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Partnership or any participating Affiliate and a Management Partner or any other Person. To the extent that any person acquires a right to receive payments from the Partnership pursuant to a grant, such right shall be no greater than the right of any general unsecured creditor of the Partnership.

(g)     Notwithstanding anything herein to the contrary, if Management Interests are to be granted to the Managing General Partner or any of its Affiliates (including for these purposes relatives (by blood or marriage) of the controlling shareholder of the Managing General Partner), the grant shall have been approved by Unanimous Consent of the Board.

5.4     **Gas Gathering Lines**. The Managing General Partner may cause the Partnership to construct or purchase compression or related facilities or gas gathering lines or other gas gathering arrangements if, in the opinion of the Managing General Partner, it would be economically feasible and otherwise consistent with prudent operating practice to do so. The Managing General Partner may, in its discretion, construct or purchase, or cause an Affiliate or

30

other Person to construct or purchase, gathering lines from Partnership Wells to gas transportation systems, and whenever the Managing General Partner does so, the Partnership shall pay the Managing General Partner or such Affiliate an amount that is within the range of prices that an unrelated party could have reasonably charged in an arm's-length transaction for similar services in the area, as a transportation fee for the transportation of all gas through the gathering system so constructed or acquired, and no other transportation fee shall be paid to the Managing General Partner or to any of its Affiliates. Contractual arrangements to transport gas that are in existence on the date of this Agreement shall be deemed to comply with the provisions of the preceding sentence.

5.5 **Farmouts**. The Managing General Partner may, in its sole discretion, acquire leases for the purpose of subsequent sale or Farmout. Neither the Managing General Partner nor any of its Affiliates will enter into a Farmout or other similar agreement with the Partnership unless (i) the Managing General Partner, exercising the standard of a prudent Operator, determines that the Farmout is in the best interests of the Partnership, and (ii) the terms of the Farmout are consistent with and in any case no less favorable than those utilized for similar arrangements in the geographic area in which the subject property is located. The decision with respect to making a Farmout, and the terms of the Farmout to another Person, will be in the sole discretion of the Managing General Partner. A Farmout of an undeveloped property from the Partnership to the Managing General Partner or its Affiliates must be made in accordance with Section 5.8 below.

5.6 **Sales of Properties to Partnership**. The Managing General Partner and its Affiliates may sell properties to the Partnership; provided that the Managing General Partner and its Affiliate shall not sell any properties to the Partnership except pursuant to transactions that are fair and reasonable to the Unitholders, and at a price that is not more than its fair market value as provided in Section 5.8.

5.7 **Purchases of Properties From Partnership**. Neither the Managing General Partner nor any Affiliate, may purchase or acquire any property from the Partnership, except pursuant to transactions that are fair and reasonable to the Unitholders and in any event in compliance with the provisions of Section 5.11(b), and at a price that is not less than its fair market value as provided in Section 5.8.

5.8 **Fair Market Value**. For purposes of Farmouts or purchases and sales of properties in accordance with the requirements of Sections 5.5, 5.6 and 5.7 above, the fair market value of a property shall be the price set forth in an Appraisal, which shall obtained by the Managing General Partner within a reasonable period of time prior to the closing of such sale or purchase. The Appraisal shall be maintained in the records of the Partnership for at least four years. The cost of the Appraisal shall borne equally by the Partnership and the Managing General Partner.

5.9 **Fiduciary Duties.**

(a) Each Partner and the Managing General Partner shall, to the fullest extent required by Texas law, owe to the Partnership and its Partners the duties of good faith and fair dealing, and in the case of the Managing General Partner, the duty not to exceed in such capacity

31

the bounds of the authority granted to any general partner by this Agreement and Texas law (all such duties collectively, the "Agreed Duties").

(b)     To the fullest extent permitted by Law,

(A)     except for the Agreed Duties and as expressly provided in this Agreement, the Managing General Partner shall not owe any fiduciary or similar duty or obligation whatsoever to the Partnership, any Partner or Assignee, except as required by any provisions of applicable law that cannot be waived, and

(B)     to the extent that, at law or in equity, the Managing General Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to applicable law, any such duty other than the Agreed Duties is hereby eliminated to the fullest extent permitted pursuant to applicable law.

(c)     Subject to the foregoing clauses (a) and (b), the Partnership and the Partners acknowledge and agree that the Managing General Partner may decide or determine any matter subject to the Board's approval hereunder in the sole and absolute discretion of the Managing General Partner, it being the intent of all Partners the Managing General Partner have the right to make such decision or determination solely on the basis of the interests the Managing General Partner desires to consider, including the Managing General Partner's own interests, the interests of the Partner that designated such any directors of the Managing General Partner and the interests of such Partner's Affiliates.

(i)     The Partnership and the Partners agree that any claims against, actions, rights to sue, other remedies or recourse to or against the Managing General Partner (except for such claims, actions, rights to sue, remedies or recourse that may be initiated or brought solely by the Partner that appointed directors on the Board) grounded in or alleging any breach of any fiduciary or similar duty, other than an Agreed Duty, are expressly released and waived by the Partnership and each Partner (and each Assignee), to the fullest extent permitted by law, as a condition to and as part of the consideration for the execution of this Agreement and the undertaking to incur the obligations provided for in this Agreement.

(ii)     To the extent that, at law or in equity, a Partner owes any duties (including fiduciary duties) to the Partnership, any other Partner or any Assignee pursuant to applicable law, any such duty, other than the Agreed Duties, is hereby eliminated to the fullest extent permitted pursuant to applicable law, it being the intent of the Partners that to the extent permitted by law and except to the extent set forth in this Section 5.9 or expressly specified elsewhere in this Agreement, no Partner or the Managing General Partner, in their capacities as such, shall owe any duties of any nature whatsoever to the Partnership, the other Partners or any Assignee, other than the Agreed Duties, and each Partner, in its capacity as such, may decide or determine any matter in its sole and absolute discretion taking into

32

account solely its interests and those of its Affiliates (excluding the Partnership and its Subsidiaries) subject to the Agreed Duties. Each Partner further acknowledges and agrees that it would not have become a Partner in the Partnership if this arrangement were not acceptable to it.

(iii)     Nothing herein is intended to create a partnership, joint venture, agency or other relationship creating fiduciary or quasi-fiduciary duties or similar duties or obligations, otherwise subject the Partners to joint and several liability or vicarious liability or to impose any duty, obligation or liability that would arise therefrom with respect to any or all of the Partners or the Partnership.

**5.10     No Duty of Third Parties to Investigate Authority**. No Person, dealing with the Partnership shall be required to inquire into the authority of the Managing General Partner to take any action or make any decision.

**5.11     Competitive Activities and AMI**.

(a)     Subject only to the provisions of this Section 5.11, during the continuation of the Partnership (i) any of the Partners may acquire, promote, develop, operate and manage any oil and gas property on his or their own behalf or on behalf of any Affiliate; and (ii) the Managing General Partner and any Affiliate of the Managing General Partner may, notwithstanding the existence of this Agreement, engage in any activities it chooses, whether the same are competitive with the Partnership or otherwise without having or incurring any obligation to offer any interest in such activities to the Partnership or any party hereto and, as a material part of consideration for the Managing General Partner's execution hereof, each Unitholder hereby waives, relinquishes and renounces any such right of claim of participation.

(b)     Except as provided in the next two sentences of this Section 5.11(b), the Managing General Partner and each Limited Partner hereby agrees that neither it nor any of its Affiliates shall purchase or make an investment in any oil and gas property of the type that is (i) within the scope of the Partnership's business as set forth in Section 2.4 and (ii) within AMI Area except, in each case, if the Partnership is offered a reasonable opportunity to purchase or make such investment during a period of 10 days and declines or is unable to effect such purchase or investment; provided, that in the event the Partnership does not pursue such opportunity within such period, such applicable Limited Partner or the Managing General Partner and/or its Affiliates, as applicable, shall be permitted to pursue such opportunity without restriction. The provisions of this Section 5.11(b) shall not be applicable to (x) existing activities relating to (i) Bluegrove NRG, Ltd., NRG Pipeline Company of Texas and Possum Kingdom Processing Corporation, (ii) any of the limited partnerships in which Affiliates of the Managing General Partner are presently general partners (including the F&B limited partnerships), (iii) any oil and gas interest held by the Managing General Partner or its Affiliates as of the Effective Date, (iv) investments by the Managing General Partner or its Affiliates in not more than five percent (5%) of the issued and outstanding shares of capital stock of any publicly traded corporation or entity and (v) activities approved by the Unanimous Consent of the Managing General Partner. The provisions of this Section 5.11(b) shall terminate with respect to the Managing General Partner and its Affiliates upon the earlier to occur of (i) five (5) years from the Effective Date, (ii) at such time as the Managing General Partner or any of its Affiliates shall

33

no longer be a general partner of the Partnership, (iii) the consummation of an Exit Event or (iv) at such time as the Partnership shall no longer have any funds available to make the purchase or investment in oil and gas properties. Notwithstanding the foregoing, the provisions set forth in this Section 5.11(b) shall not in any way limit (i) the activities of any Affiliate of Blackstone in its business other than the investments made by the "Blackstone Capital Partners VI", "Blackstone Capital Partners VII", "Blackstone Energy Partners I" and/or "Blackstone Energy Partners II" investment funds, successor funds thereto and funds managed by Blackstone Directors, in each case, Affiliated with or managed by Blackstone Management Partners L.L.C. or its successor (such funds, the "BCP/BEP Funds"), (ii) the activities of GSO Capital Partners L.P. or any investment funds or vehicles managed by it, (iii) the acquisition in any transaction of any oil and gas properties in the AMI Area, or of any equity interests in any entity that owns oil and gas properties in the AMI Area, by the BCP/BEP Funds or any of their Affiliates, in each case, to the extent that the Fair Market Value of any oil and gas properties in the AMI Area that would be conveyed in such transaction does not exceed thirty-five percent (35%) of the Fair Market Value of such transaction overall or (iv) the acquisition by any investment funds or vehicles managed by Blackstone Management Partners L.L.C. or any of its Affiliates of any class of securities of an entity that owns any oil and gas property within the AMI Area, if such entity is listed on a national or foreign securities exchange.

      **5.12**    **Events of Withdrawal**. The Managing General Partner will cease to be the Managing General Partner of the Partnership on the occurrence of any of the following events of withdrawal:

      (a)    subject to the provisions of this Section 5.12, the Managing General Partner voluntarily withdraws as the Managing General Partner from the Partnership;

      (b)    the Managing General Partner:

      (i)    makes a general assignment for the benefit of creditors;

      (ii)    files a voluntary bankruptcy petition;

      (iii)    becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding;

      (iv)    files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law;

      (v)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed in a proceeding of the type described in paragraphs (i) through (iv) above; or

      (vi)    seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Managing General Partner or of all or any substantial part of its properties;

34

(c) 120 days expire after the date of the commencement of a proceeding against the Managing General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law if the proceeding has not been previously dismissed, or 90 days expire after the date of the appointment, without the Managing General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the Managing General Partner or of all or any substantial part of the Managing General Partner's properties if the appointment has not previously been vacated or stayed, or 90 days expire after the date of expiration of a stay, if the appointment has not previously been vacated; or

(d) the filing of a certificate of dissolution or its equivalent for the Managing General Partner or the revocation of its charter and the expiration of 90 days after the date of notice to the Managing General Partner of revocation without a reinstatement of its charter.

**5.13 Withdrawal of the Managing General Partner**. The Managing General Partner may not withdraw from the Partnership without the Unanimous Consent of the Board. Upon withdrawal as a Managing General Partner, the interest of the former Managing General Partner shall be forfeited without consideration. For so long as Blackstone holds a majority of the Series B Preferred Units or a majority of the Class F Units, any successor Managing General Partner shall be designated solely by Blackstone, however any such designation shall be subject to the affirmative vote or consent (not to be unreasonably withheld, delayed or conditioned) of the holders of a majority of the Voting Units (other than Blackstone and its Affiliates); provided, that such affirmative vote or consent shall not be required (i) to the extent that (x) the successor General Partner is an Affiliate of Blackstone, Thomas Fagadau or the Managing General Partner being succeeded and (y) if the operating agreement or other governing documents of such successor Managing General Partner contain substantially similar economic and governance rights (including with respect to the composition of the Board) as those contained in the operating agreement or other governing documents of the predecessor Managing General Partner or (ii) in connection with the consummation of an Exit Event. If Blackstone does not hold a majority of the Series B Preferred Units or a majority of the Class F Units, any successor Managing General Partner shall be as elected by the holders of a majority of the Voting Units.

**5.14 Assignment of Rights and Interest of Managing General Partner**. The Managing General Partner may assign or pledge all or any portion of its right to receive Distributions, without the consent of the Unitholders. No such assignment or pledge shall be considered an event of withdrawal under this Agreement. Notwithstanding anything else to the contrary set forth in this Agreement, the Managing General Partner may not assign any portion of its voting, managerial or other rights as Managing General Partner under this Agreement, and any such assignment shall be deemed null and void ab initio. The Managing General Partner may assign its rights and interest in the Partnership to, and substitute as Managing General Partner, another corporation or partnership in connection with (i) a merger or consolidation with, or (ii) a transfer of all or substantially all of the assets of the Managing General Partner to such corporation or partnership, provided that such corporation or partnership (x) assumes all of the obligations of the Managing General Partner with regard to the Partnership, (y) is controlled by Blackstone, Thomas Fagadau, or both, and (z) the operating agreement or other governing documents of such successor Managing General Partner contain substantially similar economic and governance rights (including with respect to the composition of the Board) as those contained in the operating agreement or other governing documents of the predecessor Managing

35

General Partner. No such assignment pursuant to a merger, consolidation or sale of assets shall be deemed an event of withdrawal of the merging, consolidating or selling Managing General Partner.

**5.15    Insolvency or Bankruptcy of Managing General Partner**. If the Managing General Partner suffers an event that with the passage of the specified period of time becomes a potential event of withdrawal under this Article V, the Managing General Partner shall notify the other Partners of the potential event of withdrawal within 30 days after the date of occurrence thereof. The substitution of a new Managing General Partner for the withdrawing Managing General Partner shall be effective only if and when the conditions set forth in Section 5.13 above for substitution of a Managing General Partner in the event of the Managing General Partner's voluntary withdrawal have been satisfied. Effective as of the date at which all of the conditions set forth in this Article V have been satisfied, the withdrawal of the withdrawing Managing General Partner and the substitution of the substitute Managing General Partner shall be deemed to occur simultaneously, so that at no time will the Partnership have been without a Managing General Partner. Until such time as the terms and conditions set forth in this Article V have been satisfied, the Managing General Partner shall not be deemed to have withdrawn and shall continue as Managing General Partner.

**5.16    Additional Conditions to Substitution of Managing General Partner**. No substitution of a new Managing General Partner for a removed or withdrawing Managing General Partner shall be effective until the following conditions have been satisfied, in addition to those set forth above in this Article V;

(a)    The substitute Managing General Partner shall have agreed to accept the responsibilities of the removed or withdrawing Managing General Partner and to continue the business of the Partnership following the removal or withdrawal of the removed or withdrawing Managing General Partner. The substitute Managing General Partner shall have also agreed to assume liability on any Partnership obligations or guarantees arising from and after the date of substitution. The removed or withdrawing Managing General Partner shall remain liable on any Partnership obligations or guarantees that arose before such date, unless the substitute Managing General Partner shall agree to assume such liabilities.

(b)    This Agreement and the Partnership's certificate of limited partnership shall have been amended to name the substitute Managing General Partner as the new Managing General Partner (and, if applicable, as the new registered agent of the Partnership), and to reflect the removal or withdrawal of the removed or withdrawing Managing General Partner.

Additionally, the Partnership shall cause written notice of any removal or withdrawal of the Managing General Partner of the Partnership to be sent to all creditors of the Partnership, and shall place an advertisement announcing the removal or withdrawal in a newspaper of general circulation in each place at which the Partnership's business is regularly conducted.

**5.17    [Reserved]**.

**5.18    [Reserved]**.

36

**5.19    Closing Costs**. The Managing General Partner and Blackstone shall be reimbursed by the Partnership for all costs and expenses incurred (including the fees and expenses of attorneys, consultants, accountants, financial advisors and other advisors, travel costs and miscellaneous expenses) in connection with the transactions contemplated by this Agreement, including with respect to the negotiation, preparation, execution and delivery of this Agreement and any other document or agreement referred to herein or therein.

**5.20    Reimbursement of Expenses**. The Partnership shall bear and be responsible for the costs and expenses of operating and administering the Partnership. Accordingly, the Partnership shall reimburse the Managing General Partner and its Affiliates to the extent that it has paid any expenses in connection with the operation or administration of the Partnership, including, without limitation, all expenses relating to (i) the acquisition, development, maintenance and operation of Partnership Properties, including the expenses of investigating and acquiring Prospects, (ii) legal fees incurred in the administration of the Partnership, (iii) the preparation of the Partnership's financial statements by an independent certified public accountant, (iv) the preparation of annual tax returns, (v) regulatory compliance with any federal or state securities laws (but not including any initial blue sky or state filing fees required to offer and sell the Units in any state), (iv) engineering and reserve evaluation fees, (v) investor communications and (vi) director fees to the directors of the Managing General Partner.

**5.21    Compensation for Services**. The Managing General Partner and its Affiliates may render oil field, equipage and other services to the Partnership and sell or lease equipment or supplies to the Partnership and receive compensation or rental therefor, subject to any express restrictions of this Agreement. The Managing General Partner may charge gas transportation fees to the Partnership, subject to the restrictions of Section 5.4 of this Agreement.

**5.22    Budgets**. The Partnership shall conduct its business and operations, including incurring operating expenditures and capital expenditures, in a manner consistent in all material respects with the then-applicable budget, which shall be adopted by the Managing General Partner (as adopted and as amended or modified from time to time, the "Budgets").

**5.23    VCOC Management Rights**. The Partnership and each Partner agrees that (x) on the date hereof the Partnership shall enter into a letter agreement with Blackstone substantially in the form of Annex A hereto, and (y) the Partnership shall enter into a VCOC letter agreement with any affiliate of Blackstone on request of Blackstone substantially in the form of Annex A hereto.

**5.24    Management Equity Matters**. From time to time with Unanimous Consent, the Partnership may issue up to an aggregate amount of the authorized number of Class G Units to individuals in accordance with the terms of the Class G Incentive Plan set forth on Exhibit F hereto. The Class G Incentive Plan is hereby deemed approved by all of the Partners and the Board by Unanimous Consent.

37

## Article VI
## The Unitholders: Rights, Duties and Obligations

**6.1     Limited Liability of Limited Partners**. No Limited Partner, as such, shall be personally liable for any of the debts of the Partnership or any of the losses thereof except to the extent set forth in Section 153.103 of the TBOC and any amounts as to which he accepts personal liability. No Limited Partner, as such, shall participate in the control of the business of the partnership within the meaning of Section 153.102 of the TBOC.

**6.2     Transfers of Units**. Except for Permitted Transfers, a Unitholder (other than with respect to Management Interests) may not transfer, directly or indirectly his Units until the second (2nd) anniversary of the Effective Date. After the second (2nd) anniversary of the Effective Date, subject to Section 6.5 (Right of First Refusal), Section 6.6 (Tag-Along Rights), and Section 6.7 (Drag-Along Rights), a Unitholder (other than with respect to Management Interests) may transfer his Units subject to the following conditions and restrictions:

(a)     The Unitholder desiring to transfer his Units shall so notify the Managing General Partner, in writing.

(b)     In the event any Unitholder proposes to transfer his Units, the Unitholder shall first offer his Units (or interest or portion) to the other Unitholders pursuant to Section 6.5 hereof.

(c)     For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, no holder of Management Interests shall, directly or indirectly, transfer all or any portion of such holder's Management Interests unless (x)(A) such Management Interests have become Vested Management Interests and (B) the Managing General Partner have provided its prior written consent to such transfer or (y) such transfer is made pursuant to Section 6.6, Section 6.7 or Section 6.8.  Except as provided in Section 6.8, the Managing General Partner shall not effect the transfer until it shall have approved the transfer, the granting or denial of which approval shall be determined by Unanimous Consent of the Managing General Partner. By way of example, a proposed transfer may be denied if the Managing General Partner determines that such transfer would or could (i) endanger the limited liability status or federal partnership tax status of the Partnership or (ii) violate state or federal securities laws applicable to the proposed transfer. In its discretion, the Managing General Partner may condition its approval of a proposed transfer upon the delivery by the transferor and/or transferee, at their own expense, of an opinion of counsel (which counsel shall be acceptable to the Managing General Partner) as to any of the foregoing matters or other legal matters relevant to the proposed transfer. If approval of a transfer is denied, the Managing General Partner shall notify the transferor Unitholder in writing that the desired transfer may not be effected.

(d)     If the proposed transfer will involve an actual change of beneficial ownership of the Units, the Managing General Partner shall deliver to the Unitholder, and the Unitholder and his intended transferee shall execute and return to the Managing General Partner, an instrument of transfer for the Units. The instrument of transfer shall contain (i) a representation by the transferee that he satisfies the Unitholder eligibility requirements set forth

in a subscription agreement in a form satisfactory to the Managing General Partner in its sole discretion, (ii) an agreement by the transferee to be bound by all of the terms and provisions of this Agreement, (iii) a statement of the address to which Distributions and Partnership reports and communications are to be mailed following the transfer, and (iv) such other agreements and representations as the Managing General Partner shall reasonably require. The parties to a proposed transfer involving a change of beneficial ownership of Units shall pay to the Managing General Partner a fee, in an amount specified by the Managing General Partner but not to exceed $1,000, as reimbursement for costs and expenses incurred to effect the transfer.

(e)      If the proposed transfer will not involve an actual change of beneficial ownership of the Units (as determined by the Managing General Partner in its sole discretion) the Managing General Partner shall deliver to the transferor Unitholder, and the Unitholder and his intended transferee shall execute and return to the Managing General Partner, a reaffirmation of this Agreement, evidencing the fact that record but not beneficial ownership of the Units has changed, and that the new Unitholder of record shall be bound by the terms and provisions of this Agreement as if it had been an original Unitholder. The parties to a proposed transfer not involving any change of beneficial ownership of Units shall not be required to pay any fee to the Managing General Partner.

(f)      Except as provided in Section 6.8, in no event shall any transferee of any Unit be deemed to become a "Partner" (as that term is used under this Agreement and under the TBOC) with respect to such Unit or any interest therein without the express written approval of the Managing General Partner, the granting or denial of which approval shall be within the sole, absolute discretion of the Managing General Partner. In its sole discretion, the Managing General Partner may request reasonable additional documentation and information to verify that the representations of the transferor and transferee contained in the instrument of assignment or reaffirmation of this Agreement (as applicable) are true and correct, and that the Persons signing such documents were duly authorized to do so.

(g)      The Managing General Partner and the parties to the proposed transfer shall have executed all certificates, instruments and documents and taken all such other actions as the managing General Partner shall deem appropriate to obtain any required consents of governmental authorities to the proposed transfer.

(h)      The Managing General Partner shall amend the Partnership's books and records at least once each Fiscal Quarter to reflect transfers of record ownership of Units.

(i)      A Unitholder may pledge or encumber all or a portion of its Units to secure such Unitholder's indebtedness or obligations, so long as the pledgee agrees with the Partnership in writing that (x) the pledgee will cooperate with the Unitholder in effecting the release of the Units from such pledge or encumbrance in connection with the consummation of a purchase or sale pursuant to Section 6.5 as contemplated by the following clause (y), and (y) prior to foreclosing or otherwise realizing upon the Units so pledged or encumbered as a result of a default in the payment or other terms of the indebtedness or obligations secured by such pledged or encumbered Units, the pledgee will offer to sell such Units to the other Unitholders (as the price at which such pledgee proposes to foreclose or otherwise realize upon such Unit) as if the pledgee were a Unitholder proposing to make a transfer of the Units subject to this

39

Section 6.2 and Section 6.5 and the pledging Unitholder shall be bound by and shall join in the conveyance of any Units so purchased by the other Unitholders pursuant to Section 6.5.

**6.3** **Effect of Assignment or Transfer of Units on Voting Rights; Unadmitted Assignees**. Any transfer, pledge, assignment or other conveyance of all or any portion of a Unit that does not strictly comply with the provisions of this Article VI shall be null and void and of no force of effect. Except for transfers made pursuant to and in compliance with Sections 6.2 and 6.8, in no event shall a transferee of a Unit acquire any voting or other similar rights with respect to the Units so transferred nor shall such transferee become or be deemed to become a "partner" as that term is used in this Agreement or under the TBOC with respect to any such transferred Unit or portion thereof but shall only have the rights of an "assignee" under Section 153.251 of the TBOC with respect to such Units. A Unitholder that has assigned or otherwise transferred all of any Unit or all of such Unit holder's rights to receive Distributions, shall no longer have any voting or other similar rights with respect to such Unit and shall cease to be a "partner" as that term is used in this Agreement and under the TBOC with respect to such Unit.

**6.4** **Delivery of Further Instruments**. Each Unitholder agrees to execute and deliver to the Managing General Partner within five (5) days after receipt of the Managing General partner's written request therefor, designations, powers of attorney and such other instruments as the Managing General Partner may reasonably deem necessary to evidence a transfer permitted by the provisions of this Article VI.

**6.5** **Right of First Refusal**.

(a) Except as provided for in Section 6.8, any Unit intended to be transferred pursuant to Section 6.2 ("Offered Interest") by any Limited Partner (excluding Blackstone) must in any event be first tendered to (i) Blackstone and, regardless of the class of interests intended to be transferred, then, if Blackstone does not submit an Acceptance Notice within fifteen (15) days after the mailing date of the Sales Notice pursuant to the procedures in this Section 6.5, to (ii) the other non-selling Unitholders of the same class by notice ("Sales Notice") on a pro rata basis (determined on the basis of each Unitholder's percentage of the aggregate Unitholders' Percentage Interests of such class, excluding in the computation of such percentage the Units of the selling Unitholder), for a consideration and upon other terms and conditions no less favorable than those which the selling Unitholder would receive from the prospective transferee, whose identity shall be disclosed in the Sales Notice. The non-selling Unitholders within such class shall have fifteen (15) days after the mailing date of the Sales Notice in which to accept the offer by written notice to the selling Unitholder and to the Managing General Partner ("Acceptance Notice"). To the extent that the selling Unitholder's entire Offered Interest is not accepted by the non-selling Unitholders within such class, the remainder thereof shall be re-offered by notice ("Second Sales Notice") to the Unitholders within such class having given timely Acceptance Notices, on a pro rata basis (determined on the basis of each such accepting Unitholder's percentage of the aggregate Unitholders' Percentage Interest of such class, excluding in the computation of each such percentage the Units of the selling Unitholder and the non-accepting Unitholders within such class), for the same consideration and on the other terms and conditions as were previously offered. Such Unitholders shall have fifteen (15) days after the mailing of the Second Sales Notice in which to deliver an Acceptance Notice for that portion of the Offered Interest being offered by the Second Sales Notice. The procedure set forth in this Section 6.5(a)

40

shall be continued until either Acceptance Notices are received for the entire Offered Interest or no Unitholder of the same class remains who wants to purchase any part of the remaining portion thereof. For avoidance of doubt, for purposes of this Section 6.5, the Percentage Interests of the Series A Preferred Unitholders shall be determined on an as-converted basis.

(b)     In the event that Acceptance Notices for the entire Offered Interests are not timely given by the Unitholders within such class in accordance with Section 6.5(a), the remaining position thereof shall be offered for the same consideration and on the other terms and conditions by notice of all remaining Unitholders within other classes ("Third Sales Notice"). The remaining Unitholders shall have fifteen (15) days after mailing of the Third Sales Notice within which to accept the offer by giving written notice to the selling Unitholder ("Remaining Unitholders' Acceptance Notice") in accordance with their respective Percentage Interest (excluding in the computation of such interest the Units of the Unitholders within the class of the offered Units) or Unitholders otherwise agree. If any such remaining Unitholder does not exercise its pro rata share of such right, the other Unitholders may do so pro rata, by giving a further Remaining Unitholders' Acceptance Notice, all in accordance with the ratio of their respective Percentage Interest to the aggregate Percentage Interests of all accepting remaining Unitholders.

(c)     All Acceptance Notices delivered in accordance with Section 6.5(a) and shall be accompanied by the accepting Unitholder's payment for the portion of the Offered Interest accepted thereby.

(d)     In the event that the entire Offered Interest (as reduced under the provisions of Section 6.5(a)) together with the Units (if any) elected to be included in such sale under the provisions of Section 6.5(a)) are not sold to the other Unitholders pursuant to the terms of Sections 6.5(a) through 6.5(b), none of the acceptances given under Sections 6.5(a) through 6.5(b) shall be consummated and the selling Unitholder shall be free for a period of sixty (60) days after the expiration of the time during which the last of the eligible Unitholders would have had to give their Acceptance Notice, and subject always to the other provisions of this Article VI, to transfer all, but not less than all, of the Offered Interest (as reduced under the provisions of Section 6.5(a)) together with the Units (if any) elected to be included in such sale under the provisions of Section 6.5(a)) to the prospective transferee identified in the Sales Notice for a consideration and on such other terms and conditions no more favorable than those offered to the other Unitholders; provided that the breach by a participating Unitholder to convey its Units to the prospective purchaser shall not be deemed to prohibit the selling Unitholder and all other complying participating Unitholders from consummating such sale. If the identity of such transferee is different, the consideration or other terms or conditions offered to such transferee are more favorable than those offered to the other Unitholders, the selling Unitholder must reoffer such interest in the Partnership to the other Unitholders pursuant to the provisions of this Section 6.5. In the event that a transfer of the selling Unitholder's interest is effected pursuant to this Section 6.5(d), the selling Unitholder shall, within ten (10) days thereafter, certify to the Managing General Partner the identity of the transferee, the actual consideration and other terms and conditions of such transfer. In the event that the transfer of an Offered Interest is not consummated pursuant to the provisions hereof within six (6) months after the first Sales Notice is given with respect thereto pursuant to Section 6.5(a), the provisions of this Section 6.5 shall apply to any subsequent offer or transfer for consideration.

41

**6.6    Tag-Along Rights**.

(a)    If at any time following the second (2nd) anniversary of the Effective Date and prior to the consummation of an Exit Event, a Unitholder proposes to transfer all or any portion of its Units to a Third Party purchaser in an aggregate amount representing (1) an Economic Percentage greater than 10% or (2) a number of Series B Preferred Units representing greater than 10% of the outstanding Series B Preferred Units ( in each case, as applicable, a "Proposed Sale") and otherwise in accordance with this Agreement, other than in a Drag-Along Transaction (in which case Section 6.7 shall govern), then such Unitholder shall furnish to the other Unitholders a written notice of such Proposed Sale (the "Tag-Along Notice") and provide them the opportunity to participate in such Proposed Sale on the terms described in this Section 6.6.  The Tag-Along Notice will include:

(i)    the material terms and conditions of the Proposed Sale, including (A) the number of Units and the Economic Percentage represented thereby or the percentage of Series B Preferred Units represented thereby, as applicable, proposed to be so transferred, (B) the name of the proposed transferee (the "Proposed Transferee"), (C) the proposed amount and form of consideration (including the consideration payable to each Unitholder assuming each Unitholder included the maximum number of Units it would be entitled to sell in such Proposed Sale, such amounts calculated based on a hypothetical application of Section 4.7), (D) the proposed transfer date, if known, which date shall not be less than thirty (30) Business Days after delivery of such Tag-Along Notice and (E) with respect to a Proposed Sale of Common Units, the fraction, expressed as a percentage, determined by dividing (I) the Economic Percentage represented by the number of Units to be transferred by such transferring Unitholder by (II) the Economic Percentage represented by the total number of Common Units held by such transferring Unitholder, or with respect to a Proposed Sale of Series B Preferred Units, (1) the number of Series B Preferred  Units to be transferred by such transferring Unitholder by (2) the total number of Series B Preferred Units held by such transferring Unitholder (in each case, as applicable, the "Tag-Along Sale Percentage"); and

(ii)    an invitation to the other Unitholders to include in the Proposed Sale Units up to a number equal to (A) the Tag-Along Sale Percentage multiplied by (B) with respect to a Proposed Sale of Common Units, the Economic Percentage represented by the total number of Units held by such other Unitholder or, with respect to a Proposed Sale of Series B Preferred Units, the total number of Series B Preferred Units held by such other Unitholder, as applicable.  The transferring Unitholder will deliver or cause to be delivered to the other Unitholders copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(iii)    The other Unitholders must exercise the tag-along rights provided by this Section 6.6 within twenty one (21) calendar days following delivery of the Tag-Along Notice by delivering a notice (the "Tag-Along Offer") to the transferring Unitholder indicating its desire to exercise its rights hereunder and specifying the number of Units it elects to include in the Proposed Sale pursuant to this Section 6.6.  If such other Unitholder does not make a Tag-Along Offer within twenty one (21) calendar days following delivery of the Tag-Along Notice, such other Unitholder shall be deemed to

42

have waived its rights under this Section 6.6 with respect to such Proposed Sale, and the transferring Unitholder shall thereafter be free to transfer its Common Units or Series B Preferred Units, as applicable, to the Proposed Transferee, for the same form of consideration set forth in the Tag-Along Notice, at a per Unit price no greater than the per Unit price set forth in the Tag-Along Notice and on other terms and conditions which are not more favorable to the transferring Unitholder than those set forth in the Tag-Along Notice. If such other Unitholder elects to participate in the Proposed Sale pursuant to this Section 6.6, such other Unitholder shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the transferring Unitholder agrees to make in connection with the Proposed Sale; provided that (w) such other Unitholder shall not be liable for the breach of any covenant by the transferring Unitholder and vice versa, (x) in no event shall any Unitholder be required to make representations and warranties or provide indemnities as to any other Unitholder, (y) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations regarding the business of the Partnership in connection with the Proposed Sale shall be shared by the Unitholders pro rata in proportion to the consideration to be received in the Proposed Sale by each Unitholder and (z) in no event shall any Unitholder other than the transferring Unitholder be responsible for any liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by such Unitholder in the Proposed Sale.

(iv)     The offer of any Unitholder contained in such Unitholder's Tag-Along Offer shall be irrevocable, and, to the extent such offer is accepted, such Unitholder shall be bound and obligated to transfer in the Proposed Sale on the same terms and conditions, with respect to each Unit transferred, as the transferring Unitholder, up to such number of Units and of such series as such Unitholder shall have specified in its Tag-Along Offer; provided, however, that if the material terms of the Proposed Sale change with the result that the per Unit price shall be less than the per Unit price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions shall be less favorable to such Unitholder than those set forth in the Tag-Along Notice, such Unitholder shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the transferring Unitholder and upon such withdrawal shall be released from such holder's obligations.

(v)     In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act, and one or more Unitholders exercise their tag-along rights hereunder in connection with such Proposed Sale, if such Unitholders are entitled to registration rights in respect of such securities, such Unitholders shall ensure that such other Unitholders will receive pro rata piggy-back registration rights on any registration in which such Unitholders are entitled to register such securities (including any demand registrations exercised by such Unitholders).

(vi)     If a Unitholder exercises its rights under this Section 6.6, the closing of the sale of each Unitholder's Units in the Proposed Sale will take place concurrently. If the closing with the Proposed Transferee (whether or not a Unitholder has exercised its rights under this Section 6.6) shall not have occurred by 5:00 p.m.

43

Eastern Time on the date that is sixty (60) days after the date of the Tag-Along Notice, as such period may be extended up to an additional sixty (60) days to obtain any required regulatory approvals, and on terms and conditions not more favorable to the transferring Unitholder than those set forth in the Tag-Along Notice, all the restrictions on Transfer contained herein shall again be in effect with respect to such Units and proposed Transfer.

(vii)    Each Unitholder will bear its own costs in connection with the transactions contemplated by this Section 6.6.

**6.7    Drag-Along Rights**.

(a)    Subject to the limitations and conditions set forth in this Section 6.7, if at any time after the second (2nd) anniversary of the Effective Date, Blackstone elects to consummate, or to cause the Partnership to consummate, a sale to a Third Party on an arms-length basis that constitutes an Exit Event (a "Drag-Along Transaction"), the other Unitholders will consent to such Drag-Along Transaction, and will take or cause to be taken all other actions, including instructing any Existing Limited Partner Directors to approve such Drag-Along Transaction, reasonably necessary or desirable to cause the consummation of such Drag-Along Transaction on the terms proposed by Blackstone, including entering into a customary registration rights agreement in connection with a public offering of the Partnership.  The Unitholders will execute any applicable merger, asset purchase, security purchase, recapitalization or other agreement negotiated by Blackstone in connection with such Drag-Along Transaction; provided, that (v) each Unitholder shall make the same representations and warranties, covenants and indemnities as Blackstone agrees to make in connection with the Drag-Along Transaction; (w) no Unitholder other than Blackstone shall be liable for the breach of any covenants of Blackstone and vice versa; (x) in no event shall any Unitholder be required to make representations and warranties or provide indemnities as to any other Unitholder; (y) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations regarding the business of the Partnership in connection with the Drag-Along Transaction shall be shared by the Unitholders pro rata on a several (but not joint) basis in proportion to the proceeds received by each Unitholder in the Drag-Along Transaction and (z) each Unitholder's aggregate liability relating to the representations and warranties (and related indemnities) or other indemnification obligations will not exceed the purchase price to be received in the Drag-Along Transaction by such Unitholder.

(b)    In connection with a Drag-Along Transaction, (i) all of the Unitholders shall be allocated the same form of consideration, or if any Unitholders are given an option as to the form and amount of consideration to be received, all Unitholders will be given the same option, and (ii) the consideration to be received by the Unitholders in a Drag-Along Transaction will be calculated by taking the aggregate proceeds from such Drag-Along Transaction and allocating such proceeds among the Unitholders in such relative amounts as would have resulted if the Partnership had liquidated and sold its assets for a cash amount equal to such consideration, valuing any non-cash consideration at its Fair Market Value, and immediately distributed such proceeds to the Unitholders in accordance with Section 4.7.

44

(c)     In the event that the consideration received in connection with a Drag-Along Transaction consists of securities that are not registered under the Securities Act, if Blackstone or its Affiliates are entitled to registration rights in respect of such securities, Blackstone shall ensure that such other Unitholders will receive pro rata piggy-back registration rights on any registration in which Blackstone or its Affiliates are entitled to register such securities (including any demand registrations exercised by such parties).

(d)     The Partnership shall bear the reasonable and documented costs incurred by each Unitholder arising pursuant to a Drag-Along Transaction; provided that costs incurred by or on behalf of a Unitholder for its sole benefit will not be considered costs to be borne by the Partnership hereunder.

(e)     Notwithstanding anything contained in this Section 6.7 to the contrary, there shall be no liability or obligation on behalf of Blackstone or its Affiliates or the Partnership determine, for any reason, not to consummate a Drag-Along Transaction, and Blackstone shall be permitted to, and shall have the authority to cause the Partnership to, discontinue at any time any Drag-Along Transaction initiated by Blackstone by providing written notice to the Partnership and the other Unitholders.

(f)     Notwithstanding anything contained in this Section 6.7 to the contrary, any transaction provided in Section 6.7(a) which takes place within the first eighteen (18) months of the Effective Date will require approval by at least one Existing Limited Partner Director.

**6.8     Certain Transfers, Death, Bankruptcy or Incompetency**. Subject to all of the provisions of this Article VI (other than Sections 6.2(b) and 6.5), any Unitholder may transfer, in each such case whether or not for consideration, all or any part of his Units to (i) in connection with his death, his estate or to the heirs under his will, (ii) any of his relatives by blood or marriage, (iii) any trust solely for the benefit of such relatives or such Unitholder, (iv) any charitable institution, (v) any corporation, partnership or limited liability company which he or such relatives control, or (vi) if such Unitholder is a corporation, partnership or limited liability company, to any of the owners thereof who were owners thereof on the date such entity became a party to this Agreement or to any Affiliates thereof ((i) through (vi) each a "Permitted Transfer"). Such assignment shall not be subject to the conditions and restrictions of Sections 6.2(b), 6.2(c) and 6.5 above (including the necessity of obtaining the Managing General Partner's approval of such assignment), except that the assignment shall not be permitted if the Managing General Partner determines that such transfer would or could (i) endanger the federal partnership tax status of the Partnership, or (ii) violate state or federal securities laws applicable to the proposed assignment. Upon compliance with the applicable provisions of Section 6.2(d) or 6.2(e) any transferee of a Unit pursuant to this Section 6.8 shall automatically become a "Partner" (as that term is used in the Agreement and under the TBOC) with respect to the Units so transferred. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, no Class G Unitholder shall, directly or indirectly, Transfer all or any portion of such Class G Unitholder's Class G Units unless (x)(A) such Class G Units have become Vested Class G Units and (B) the Board has provided its prior written consent to such Transfer by Unanimous Consent or (y) such Transfer is (A) to a Permitted Affiliate or (B) otherwise expressly permitted pursuant to this Agreement.

45

**6.9    Confidentiality**. Each Limited Partner covenants that so long as he is a Limited Partner of the Partnership and at all times thereafter he will not intentionally disclose to any third person any information conveyed to him by the Partnership or the Managing General Partner concerning the investments and holdings of the Partnership, or the performance of the Partnership, except (i) to his personal accountants and other income tax advisers (but, in such event, the Limited Partner shall request that such accountants or other advisers keep such information confidential), (ii) to the extent such information is in the public domain other than as a result of such Limited Partner's breach of this Section 6.9, or (iii) where required to be disclosed by court order, subpoena or other governmental process. In the event that a Limited Partner shall be required to make disclosure pursuant to the provisions of clause (iii) of the preceding sentence, such Limited Partner shall promptly, but in no event more than forty-eight (48) hours after learning of such court order, subpoena, or other governmental process, notify the Partnership and, at the Partnership's expense, such Limited Partner shall (a) take all reasonable steps requested by the Partnership to defend against the enforcement of such subpoena, court order or other government process, and (b) permit the Partnership to intervene and participate with counsel of its choice in any proceeding relating to the enforcement thereof. Notwithstanding the foregoing, the Managing General Partner agrees that if a Limited Partner is a partnership or other collective investment vehicle with beneficial owners bound by confidentiality obligations substantially equivalent to those contained in this Agreement, such Limited Partner may disclose the information described in Section 6.9 to its investors and prospective investments; provided, that such (i) Limited Partner shall request that such persons keep such information confidential and (ii) persons do not participate in any activities directly competitive with the Partnership. Notwithstanding anything to the contrary herein, each Limited Partner (and each employee, representative, or other agent of such Limited Partner) may disclose to such Person's advisors, the tax treatment and tax structure of (i) the Partnership, and (ii) its transactions, and materials (including opinions or other tax analyses) that are provided to such Limited Partner relating to such tax treatment and tax structure; provided, that such Limited Partner shall request that such persons keep such information confidential.

**6.10    Management Partner Termination**. Upon a Termination Event, as defined in a Management Partner's Award Agreement, the Managing General Partner shall have the option, if so provided in the applicable Award Agreement, to cause such Management Partner's Management Interest to be automatically forfeited in its entirety, and to cause the partnership to pay to such Management Partner, the Buyout Amount as defined in, and subject to the terms and conditions of, the applicable Management Partner's Award Agreement.

**6.11    Initial Public Offering**.

(a)    An IPO may be approved and effectuated by the Managing General Partner at any time after the second (2nd) anniversary of the Effective Date.

(b)    In connection with any proposed IPO approved in accordance with this Agreement, if required by the Managing General Partner, the outstanding Partnership interests may be converted or exchanged in accordance with this Section 6.11 (the "IPO Exchange") into equity securities of the IPO Issuer and/or its general partner (an "IPO GP") (if applicable) ("IPO Securities"). IPO Securities issued in connection with any IPO Exchange in exchange for Partnership interests may or may not include, in whole or

46

in part, equity securities of the IPO Issuer of the same class or series as the securities of the IPO Issuer proposed to be offered to the public in an IPO (the "Publicly Offered Securities"). In connection with any IPO Exchange, each outstanding Partnership interests will be converted into or exchanged for IPO Securities such that each holder of Partnership interests will receive IPO Securities having a value equal to the amount that such holder would have received if, immediately prior to the consummation of an IPO, all of the Partnership's assets had been sold for their Fair Market Values (which Fair Market Values shall be determined, if applicable, to reflect the expected offering price per Publicly Offered Security in an IPO, net of any underwriting discounts and commissions) and the resulting amount had been distributed by the Partnership pursuant to the rights and preferences set forth in Section 4.7 as in effect immediately prior to such distribution. Notwithstanding the foregoing:

(i) any IPO Securities issued with respect to any unvested Class G Units shall remain subject to any applicable vesting conditions in accordance with, and to the extent provided in, this Agreement and the applicable Award Agreements;

(ii) if the IPO Securities will include multiple classes of securities (including any subordinated interests, general partner interest or incentive distribution rights) in the IPO Issuer or an IPO GP, then the IPO Exchange shall be structured in a manner such that each holder of Partnership interests receives substantially the same proportionate share of the Publicly Offered Securities and of each such other class of securities, or otherwise shares proportionately the economic benefits of such class of securities, as each other holder of Partnership interests (taking into account the amount that would be received by each such holder in the hypothetical distribution described in the immediately preceding sentence); and

(iii) if the hypothetical distribution described in the immediately preceding sentence would result in the holders of Class G Units receiving no amount upon such a hypothetical liquidation event, then such Class G Units shall be automatically canceled for no consideration.

(c) If, in connection with the IPO Exchange, the Managing General Partner reasonably determines that it is advisable to have the holders of the Partnership interests contribute all of the Partnership interests to the IPO Issuer and/or an IPO GP in one or a series of transactions pursuant to an agreement that provides for the exchange of Partnership interests into IPO Securities of such Person or Persons (with the amount of IPO Securities to be received by each such holder being reasonably determined in accordance with this Section 6.11), each holder of Partnership interests agrees to participate in such an exchange. For the sake of clarity, the Managing General Partner may elect, in connection with a proposed IPO where a Subsidiary of the Partnership or another entity that is not the Partnership or its successor is the IPO Issuer, not to cause an IPO Exchange in connection therewith and, to the extent such an IPO Exchange does not occur, this Agreement may continue in effect after an IPO in accordance with its terms.

47

(d)     Subject to Section 6.11(b), but notwithstanding anything to the contrary in this Agreement, at any time after the approval of an IPO in accordance with this Agreement, the Managing General Partner shall be entitled to approve the transaction or transactions to effect the IPO Exchange and to take all such other actions as are required or necessary to facilitate an IPO including: (i) determining the terms of the organizational documents of the IPO Issuer and the IPO GP (if applicable); (ii) forming any entities required or necessary in connection with an IPO (including any IPO GP); (iii) transferring or causing to be transferred any assets between or among the Partnership, the IPO Issuer and any of the Partnership's Subsidiaries; and (iv) subject to Article XII, amending the terms of this Agreement, in each case without the consent or approval of any other Person (including the Board). If the Managing General Partner elects to exercise rights to initiate an IPO under this Section 6.11, the Limited Partners shall (1) take such actions as may be reasonably requested in connection with consummating the IPO Exchange, including (x) such actions as are required to Transfer all of the issued and outstanding Partnership interests or assets of the Partnership to an IPO Issuer or its general partner (including one or more special purpose entities that are classified as corporations for U.S. federal income tax purposes) and (y) such actions as are required in order to merge or consolidate the Partnership into or with an IPO Issuer or IPO GP;

(e)     Each Limited Partner shall sell any fractional IPO Securities owned by such party (after taking into account all IPO Securities held by such party) to the IPO Issuer or IPO GP, as applicable, upon the request of the Partnership in connection with or in anticipation of the consummation of an IPO, for cash consideration equal to the Fair Market Value of such fractional securities.

(f)     Each Limited Partner will cooperate with the Partnership in connection with an IPO as may be reasonably requested by the Managing General Partner including, without limitation, (i) participation in meetings, drafting sessions and due diligence sessions, (ii) assistance to the Partnership and the advisors to the Partnership in the preparation of a prospectus and customary marketing materials, (iii) cooperating with the marketing efforts of the IPO and (iv) entry into customary lock up arrangements (which in no event shall be longer than the lock up period for the IPO Issuer) and entry into such other documentation as may be reasonably requested by the Managing General Partner to effect an IPO in accordance with this Section 6.11.

(g)     At the election of the Managing General Partner, the Limited Partners and the IPO Issuer shall, at or prior to the consummation of an IPO, enter into a registration rights agreement in customary form providing for the registration rights for certain of the Limited Partners, including customary pro rata piggyback rights.

## Article VII
## Meetings of Voting Unitholders

**7.1     Call**. Meetings of Voting Unitholders shall be held in accordance with this Article VII. Meetings of the Voting Unitholders may be called by either the Managing General Partner or by Voting Unitholders holding 51% or, more of the Units then held by Unitholders, for the

48

purpose of addressing any matter upon which the Voting Unitholders may vote under this Agreement. Voting Unitholders may call a meeting by delivering to the Managing General Partner one or more written requests stating that the signing Voting Unitholders wish to call a meeting and indicating the speck purpose for which the meeting is to be held. Action at the meeting shall be limited to these matters specified in the call of the meeting.

**7.2    Notice**. Within fifteen (15) days after receipt of a properly made written call request from the Voting Unitholders, unless extended without notice to Voting Unitholders for a period of up to sixty (60) additional days as the Managing General Partner may deem necessary for the Partnership to comply with any federal or state securities statutes, rules, regulations, or similar requirements governing the holding of a meeting or the solicitation of proxies or preparation of such other documents for use at such a meeting to all Unitholders, the Managing General Partner shall deposit in the United States mails written notice of the meeting, as provided in Section 13.1 an affidavit or certificate of mailing of any notice in accordance with this Section, executed by the Managing General Partner or any transfer agent or registrar that the Managing General Partner may appoint, shall be prima facie evidence of the giving of notice. If any notice addressed to Unitholder at the address of the Unitholder appearing on the records of the Partnership is returned to the Partnership by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver it, that notice and any subsequent notices or reports regarding that meeting shall be deemed to have been duly given without further mailing if they are available for the Unitholder at the principal executive office of the Partnership for a period of one (1) year from the date of the giving of the notice so returned.

**7.3    Record Date**. For purposes of determining the Unitholders entitled to notice of or to vote at a meeting of the Voting Unitholders, the Managing General Partner may set a Record Date which shall not be less than five (5) days nor more than sixty (60) days before the date of the meeting. Only Voting Unitholders who are record holders of Voting Units on the Record Date set pursuant hereto shall be entitled to vote at such meeting; all Unitholders shall be entitled to notice of and attendance at such meeting.

**7.4    Time and Place**. A meeting shall be held at a reasonable time and in a convenient place as determined in the sole discretion of the Managing General Partner on a date not less than ten (10) nor more than sixty (60) days after the mailing of notice of the meeting; provided that the Managing General Partner may schedule a meeting on five (5) days' notice if it reasonably believes that circumstances constituting in its reasonable opinion an emergency warrant a meeting of the Partners on shorter notice than ten (10) days' notice.

**7.5    Adjournment**. When a meeting of the Voting Unitholders is adjourned to another time or place, notice need not be given of the adjourned meeting and a new Record Date need not be fixed if the time and place thereof were announced at the meeting at which the adjournment was taken, unless such adjournment shall be for a period of more than four (4) days. At the adjourned meeting, the Voting Unitholders may transact any business that might have been transacted at the actual meeting. If the adjournment is for a period of more than forty-five (45) days or if a new Record Date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given in accordance with the provisions of Section 7.2.

**7.6     Waiver of Notice by Attendance**. Attendance of a Voting Unitholder at a meeting slid constitute a waiver of notice of the meeting, except when the Voting Unitholder objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the notice of the meeting but not so included, if the objection is expressly made at the meeting.

**7.7     Quorum**. Voting Unitholders holding more than 80% of the Voting Units then held by Voting Unitholders shall constitute a quorum at any meeting of the Voting Unitholders. The Voting Unitholders present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Voting Unitholders so as to result in the presence of less than a quorum, if any action taken other than adjournment is approved by the holders of the percentage of Voting Units then held by Voting Unitholders required to approve such action under this Agreement. In the absence of a quorum, a meeting of Voting Unitholders may be adjourned from time to time by the affirmative vote of the holders of a majority of the Voting Units represented either in person or by proxy at the meeting, but no other business may be transacted.

**7.8     Voting**. Voting Unitholders may vote either in person or by proxy at any meeting. Voting Unitholders shall vote on all matters in respect of which they are entitled to vote as a single class (except that if a specific class of Voting Units is required by this Agreement to vote on any matter, such class shall vote separately on such matter). The vote required to approve any proposed action shall be determined as follows:

(a)     If the proposed action is required by this Agreement to be approved by Voting Unitholders (or a specific class of Voting Unitholders) holding a specified percentage of Voting Units then held by Voting Unitholders, or class of Voting Unitholders, then the action must be approved by Voting Unitholders (or a specific class of Voting Unitholders) holding that percentage of all issued and outstanding Voting Units (or specified class of Voting Units).

(b)     Any proposed action not subject to Section 7.8(a) above must be approved by the Managing General Partner.

**7.9     Conduct of Meeting**. The Managing General Partner shall have full power and authority concerning the manner of conducting any meeting of the Voting Unitholders, including, without limitation, the determination of Persons entitled to vote, the existence of a quorum, the satisfaction of the requirements of this Article VII, the conduct of voting, the validity and effectiveness of any proxies, and the determination of any controversies, votes or challenges arising in connection with or during the meeting or voting. The Managing General Partner shall designate a Person to serve as chairman of any meeting and shall further designate a Person to take minutes of any meeting. The Managing General Partner may designate its own directors, officers, employees or agents to serve in either or both of such positions. All minutes shall be kept with the records of the Partnership maintained by the Managing General Partner. The Managing General Partner may make such other regulations consistent with applicable law and this Agreement as it may deem advisable concerning the conduct of any meeting of the Voting Unitholders, including regulations with regard to the appointment of proxies, the

50

appointment and duties of inspectors of votes, and the submission and examination of proxies and other evidences of the right to vote.

**7.10    Action Without Meeting**.

(a)      Subject to the provisions of Section 7.10(b), any action(s) that may be taken at a meeting of the Voting Unitholders may be taken without a meeting if one or more consents in writing setting forth the action(s) to be taken, shall be signed by Voting Unitholders holding not less than the percentage of Units then held by Voting Unitholders required to approve such action(s) under this Agreement. Such consent(s) shall have the same force and effect as a vote of the signing Voting Unitholders at a meeting duly called and held pursuant to this Article VII. No prior notice from the signing Voting Unitholders to the Managing General Partner or other Voting Unitholders shall be required in connection with the use of a written consent pursuant to this Section 7.10. Written notice of any action taken by means of a written consent of Voting Unitholders shall, however, be sent within a reasonable time after the date of the consent by the Managing General Partner to all Unitholders who did not sign the written consent. A written consent may also be circulated by the Managing General Partner in its sole discretion or will be circulated upon the call of Voting Unitholders holding 51% or more of the Units then held by Voting Unitholders.

(b)      Unless the TBOC expressly requires that any consent of a Voting Unitholder to any specific action for which the consent of the Voting Unitholders is required under this Agreement be in writing, such consent shall be deemed duly and validly given for all purposes of this Agreement by such Voting Unitholder if (i) such Voting Unitholder's consent is solicited in a communication given in accordance with the provisions of Section 13.1, which consent sets forth the action(s) to be taken or requested (the "Request"), and (ii) such Voting Unitholder does not respond in writing to the Request within fifteen (15) days after receipt of the Request.

**Article VIII**
**Indemnification of Managing General Partner**

**8.1    Limitation of Liability of the Managing General Partner and Its Affiliates**. Neither the Managing General Partner nor any of its Affiliates shall be liable to the Partnership or any of the Unitholders for any act or omission performed or omitted by it or him in good faith and reasonably believes to be in the best interests of the Partnership pursuant to the authority granted to it or him by this Agreement, other than an act constituting gross negligence willful misconduct or material breach of this Agreement.

**8.2    Indemnification**. To the full extent of Chapter 8 of the TBOC (but subject to the terms and conditions thereof), the Partnership shall and hereby does indemnify and hold harmless the Managing General Partner and its Affiliates from any loss, damage, claim or liability, including, but not limited to, reasonable attorneys' fees and disbursements, incurred by it by reason of being a general partner of the Partnership (or an Affiliate thereof) or by reason of any act performed by the Managing General Partner or such Affiliate on behalf of the Partnership or in furtherance of the Partnership's interests other than an act constituting gross negligence, willful misconduct or material breach of this Agreement. The Partnership shall

51

advance funds to the Managing General Partner or its Affiliates for legal expenses and other costs incurred as a result of any legal action taken for which indemnification is being sought subject to compliance with Sections 8.104 or 8.105, as applicable, of the TBOC.

## Article IX
## Accounts, Records and Reports

**9.1    Books of Account; Fiscal Year**. The Managing General Partner, at the expense of the Partnership, shall maintain for the Partnership adequate books and records of account that shall be maintained on the accrual method. The Partnership shall adopt the calendar year as its Fiscal Year. When an audit is required by Section 9.6 hereof, the books of the Partnership, at Partnership expense, shall be audited by an accounting film designated by the Managing General Partner. All costs and expenses incurred in connection with such audit shall be borne by the Partnership.

**9.2    Capital Accounts**. Capital Accounts shall be established and maintained for the Partners consistent with generally accepted accounting principles for the accrual method of accounting, provided, however, that for federal income tax reporting purposes it shall maintain its books consistent with Section 1.704-1(b)(2)(iv) of the Treasury Regulations and shall make all final distributions upon liquidation of the Partnership in a manner which reconciles the federal income tax Capital Accounts with the financial Capital Accounts.

(a)    For purposes of determining Capital Account balances and, consequently, the Partners' sharing in Partnership assets, if distributions are made of Partnership assets which have inherent unrecognized gain or loss which is not recognized to the Partnership, the assets shall be deemed to have been sold for their respective fair market values, causing such unrecognized gain or loss to be deemed to have been recognized upon distribution and such gain or loss deemed to have been recognized shall be posted in the proper sharing ratios to the Capital Accounts of the Partners.

(b)    Notwithstanding any provisions to the contrary, allocations of depletion with respect to each oil and gas property and gain and losses therefrom shall be governed by the following:

(i)    For purposes of such computations, the federal income tax basis of each oil and gas property shall be allocated to each Partner in accordance with such Partner's Percentage Interest in Partnership Capital as of the time such oil and gas property is acquired by the Partnership, and shall be reallocated among the Partners in accordance with the Partners' Percentage Interests in Partnership Capital as determined immediately following the occurrence of an event giving rise a revaluation in accordance with Treasury Reg. §1.704-1(b)(2)(iv)(f) of the Partnership's oil and gas properties pursuant to the terms of this Agreement (or at the time of any material additions to the federal income tax basis of such oil and gas property). Such allocations are intended to be applied in accordance with the "partners' interests in partnership capital" under Section 613A(c)(7)(D) of the Code; provided that the Partners understand and agree that the Managing General Partner may authorize special allocations of tax basis, income, gain, deduction or loss, as computed for federal income tax purposes, in order to

52

eliminate differences between Simulated Basis and adjusted federal income tax basis with respect to any oil and gas properties, in such manner as determined consistent with the principles of Section 704(c) of the Code and Section 4.9(e) hereof.

(ii)     For purposes of the separate computation of gain or loss by each Partner on the taxable sale or other disposition of an oil and gas property, the amount realized from such sale or disposition shall be allocated (i) first, to the Partners in an amount equal to the Simulated Basis in such oil and gas property and in the same proportion as their shares thereof were allocated, and (ii) second, any remaining amount realized shall be allocated consistent with the allocation of Simulated Gains; provided, however, that the Partners understand and agree that the Managing General Partner may authorize special allocations of tax basis, income, gain, deduction or loss, as computed for federal income tax purposes, in order to eliminate differences between Simulated Basis and adjusted federal income tax basis with respect to any oil and gas properties, in such manner as determined consistent with the principles of Section 704(c) of the Code and Section 4.9(e) hereof.

(iii)     Each Partner shall separately keep records of its share of the adjusted tax basis in each oil and gas property, adjust such share of the adjusted tax basis for any cost or percentage depletion allowable with respect to such property and use such adjusted tax basis in the computation of its cost depletion or in the computation of its gain or loss on the disposition of such property by the Partnership. Upon the request of the Managing General Partner, each Partner shall advise the Partnership of its adjusted tax basis in each oil and gas property and any depletion computed with respect thereto, both as computed in accordance with the provisions of this subsection. The Partnership may rely on such information and, if it is not provided by the Partner, may make such reasonable assumptions as it shall determine with respect thereto.

(c)     Except as provided in Section 9.2(d) and in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), the Capital Account of each Partner and the book value of each Partnership Property shall be adjusted upward or downward immediately prior to any event specified under Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(*5*) to reflect any Unrealized Gain or Unrealized Loss attributable to such Partnership Property, as if such Unrealized Gain or Unrealized Loss had been recognized on an actual sale of each such property for an amount equal to its fair market value immediately prior the event giving rise to such adjustment and had been allocated to the Partners at such time pursuant to Section 4.3. In determining such Unrealized Gain or Unrealized Loss, the aggregate cash amount and fair market value of all Partnership assets (including cash or Cash Equivalents) immediately prior to the event giving rise to such adjustment shall be determined by the Managing General Partner using such method of valuation as it may adopt; provided, however, that the Managing General Partner, in arriving at such valuation, must take fully into account the fair market value of the Partnership interests of all Partners at such time and the Managing General Partner shall make such adjustments to such valuation as required by Treasury Regulations Section 1.704-1(b)(2)(iv)(h)(*2*). The Managing General Partner shall allocate such aggregate value, as so adjusted, among the assets of the Partnership (in such manner as it determines) to arrive at a fair market value, for individual properties.

(d)     In accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s), immediately after the conversion of the Series A Preferred Units, the Capital Account of each Partner and the book value of each Partnership Property shall be adjusted upward or downward to reflect any Unrealized Gain or Unrealized Loss attributable to such Partnership Property, as if (A) such Unrealized Gain or Unrealized Loss had been recognized on an actual sale of each such property for an amount equal to its fair market value immediately after such exercise, and (B) (1) first, all Unrealized Gain and Unrealized Loss had been allocated pro rata to the Partners holding Class A-1 Units until the Capital Account of each of the Converting Unitholders with respect to each such Class A-1 Unit equals the amount that would be distributed with respect to such Class A-1 Unit pursuant to Section 4.7, and (2) second, any remaining Unrealized Gain or Unrealized Loss had been allocated to the Partners at such time pursuant to Section 4.3. In determining such Unrealized Gain or Unrealized Loss, the aggregate cash amount and fair market value of all Partnership assets (including cash or Cash Equivalents) immediately after the conversion of any Series A Preferred Unit shall be determined by the Managing General Partner using such method of valuation as it may adopt; provided, however, that the Managing General Partner, in arriving at such valuation, must take fully into account the fair market value of the Partnership interests of all Partners at such time and the Managing General Partner shall make such adjustments to such valuation as required by Treasury Regulations Section 1.704-1(b)(2)(iv)(h)(2). The Managing General Partner shall allocate such aggregate value among the assets of the Partnership (in such manner as it determines) to arrive at a fair market value, as so adjusted, for individual properties. If, after making the allocations of Unrealized Gain and Unrealized Loss as set forth above in this Section 9.2(d), the Capital Account of each Partner with respect to each Class A-1 Unit received upon the conversion of any Series A Preferred Unit does not equal the amount that would be distributed with respect to such Class A-1 Unit pursuant to Section 4.7, then, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3), Capital Account balances shall be reallocated between the Partners holding Common Units (other than such Class G Units and Class D Units) and Converting Unitholders holding such Class A-1 Units so as to cause the Capital Account of each Partner holding such Class A-1 Units to equal, on a per unit basis with respect to each such Class A-1 Unit, the amount that would be distributed with respect to such Class A-1 Unit pursuant to Section 4.7. In accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(4), if Capital Account balances are reallocated pursuant to the immediately preceding sentence, the Partnership shall make corrective allocations so as to take into account the reallocation of Capital Account balances as provided in Treasury Regulations Section 1.704-1(b)(4)(x).

(e)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managing General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the Partners), are computed or allocated in order to comply with such Treasury Regulations, the Managing General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 11.4 hereof upon the dissolution of the Partnership. The Managing General Partner also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and

54

the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(f)  The Series A Preferred Units will be treated as a partnership interest in the Partnership which is "convertible equity" within the meaning of the Treasury Regulation §1.721-2(g)(3), and therefore each holder of a Series A Preferred Unit will be treated as a partner in the Partnership other than with respect to the conversion feature of the Series A Preferred Unit. The initial Capital Account balance in respect of each Series A Preferred Unit shall be the Series A Issue Price. The Capital Account balance of each holder of Series A Preferred Units in respect of its Series A Preferred Units shall not be increased or decreased except as otherwise provided in this Agreement.

**9.3   Unitholder List**. A list of Unitholders in the Partnership shall be maintained, and Unitholders shall have access to such list at all times (subject to reasonable confidentiality restrictions as may be imposed by the Managing General Partner).

**9.4   Records Required by TBOC**. During the term of the Partnership and for a period of four years thereafter (but in no event for a period of less than seven years), the Managing General Partner, at the expense of the Partnership, shall maintain in the Partnership's principal place of business specified in Section 2.3 hereof all records required to be kept pursuant to the TBOC. A Unitholder or an assignee of a Unitholder's Units, on written request, may examine and copy, in Person or by the Unitholder's or assignee's representative, at any reasonable time, and at the Unitholder's or assignee's expense, records required to be maintained under the TBOC and such other information regarding the business, affairs and financial condition of the Partnership as is reasonable for the Unitholder or assignee to examine and copy; provided, however, that (i) any information obtained by a Limited Partner from such examination shall be subject to the provisions of Section 6.8, and (ii) well reports, logs and similar records may be kept confidential by the Managing General Partner for limited periods for limited periods of time, not to exceed six months unless the Managing General Partner contemplates the acquisition of additional mineral properties in the vicinity of the operations to which such records pertain in which event such period may be extended for a reasonable period; provided that the Managing General Partner shall permit a Limited Partner to examine all records referred to in this clause (ii) if such Limited Partner executes and delivers to the Partnership an instrument in form and substance reasonably satisfactory to the Managing General Partner in which such Limited Partner agrees not to utilize the information contained in such records or derived from such examination to make an investment in an oil and gas property in which the Partnership has an investment or proposes to make an investment.

**9.5   Bank Accounts and Investment of Funds**.

(a)  All funds of the Partnership shall be deposited in its name in such bank account or accounts as may be designated by the Managing General Partner. The Managing General Partner and any Persons authorized in writing by it to do so shall be authorized to draw checks on the bank accounts of the Partnership. Each bank in which a Partnership account is maintained shall be relieved of any responsibility to inquire into the authority of the Managing

55

General Partner to deal with such funds and shall be absolved of all liability with respect to withdrawals from such Partnership account by any Person duly authorized by the Managing General Partner.

(b)     The Managing General Partner shall endeavor to invest the Capital Contributions of the Class A Unitholders and Series A Preferred Unitholders as well as other available funds of the Partnership in Cash Equivalents unless and until utilized by the Managing General Partner in the Partnership's business.

**9.6     Information Furnished Annually to Unitholders**. Within 120 days after the end of each Fiscal Year, each Unitholder is to be furnished the following information:

(a)     Audited financial statements, including a balance sheet and statements of operations, partners' equity and cash flows prepared in accordance with generally accepted accounting principles; and

(b)     A statement of Unit Value, prepared in the manner set forth in the definition of "Unit Value" contained in this Agreement.

**9.7     Other Reports**. From time to time, at the discretion of the Managing General Partner, the Managing General Partner may prepare such other reports as may be necessary to reflect the financial and economic results of the operations of the Partnership. Such reports may include such information as Capital Contributions received, expenditures, estimated and/or actual income to the Partnership and Distributions to the Partners, together with reports on any other matters deemed significant by the Managing General Partner.

## Article X
## Preparation of Returns; Elections

**10.1     Tax Reporting Information**. The Managing General Partner shall arrange for the preparation and filing of all necessary information returns for the Partnership and, in addition, all necessary income tax reporting information will be furnished annually by the Managing General Partner to the Unitholders and the Managing General Partner shall provide such annual tax reporting information to Unitholders within three and one-half months after the close of the year to which such tax reporting information relates.

**10.2     Elections**. The Managing General Partner shall, on the first federal income tax information return filed on behalf of the Partnership formed hereunder, if applicable, make a proper election to deduct intangible drilling and development costs in accordance with the option granted by Section 263(c) of the Code. No election shall be made by the Partnership, the Managing General Partner or any Unitholder to exclude the Partnership or any of the Partners thereof in respect thereto from the application of the provisions of Subchapter K of the Code, or from any similar provisions of state tax laws.

**10.3     Basis Adjustments**. In the event of the transfer of an interest in the Partnership or in the event of the distribution of Partnership Property to any Partner, the Partnership has elected under Section 754 of the Code to cause the basis of Partnership Property to be adjusted for federal income tax purposes as provided for by Sections 734 and 743 of the Code. To the extent

56

an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-4(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Partner in complete liquidation of the Partnership interest in the Partnership, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in accordance with their interests in the Partnership in the event Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Partners to whom such distribution was made in the event Treasury Regulation Section 1.704- 1(b)(2)(iv)(m)(4) applies.

### 10.4 Tax Matters Partner; Partnership Representative.

(a)     The Managing General Partner is hereby designated the "Tax Matters Partner" (as defined in section 6231(a)(7) of the Code, to the extent applicable for taxable years beginning before January 1, 2018) and as the Partnership Representative of the Partnership for purposes of the Partnership Tax Audit Rules.

(b)     For tax periods prior to the time the Partnership Tax Audit Rules become effective with respect to the Partnership:

(i)     The Tax Matters Partner shall inform each other Partner of all significant matters that may come to its attention in its capacity as Tax Matters Partner and shall forward to each other Partner copies of all significant written communications it may receive in that capacity within seven (7) Business Days of receiving the same.  The Tax Matters Partner shall take such commercially reasonable steps as necessary to ensure that each Partner qualifying as "notice partner" (within the meaning of Section 6231(a)(8) of the Code) is treated as such.

(ii)     Any cost or expense incurred by the Tax Matters Partner in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Partnership.

(iii)     The Tax Matters Partner shall not enter into any extension of the period of limitations for making assessments on behalf of any of the Partners without first obtaining the consent of the affected Partners.  The Tax Matters Partner shall not bind any Partner to a settlement agreement without obtaining the consent of such Partner. Any Partner that enters into a settlement agreement with respect to any "partnership item" (within the meaning of Section 6231(a)(3) of the Code) shall notify the other Partners of such settlement agreement and its terms within ninety (90) days from the date of the settlement.

(iv)     No Partner shall file a request pursuant to Section 6227 of the Code for an administrative adjustment of partnership items for any taxable year without first notifying the other Partners and obtaining the consent of the Tax Matters Partner.  If the Tax Matters Partner consents to the requested adjustment, the Tax Matters Partner shall file the request for the administrative adjustment on behalf of the Partners.  If such

57

consent is not obtained within thirty (30) days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Partner, including the Tax Matters Partner, may file a request for administrative adjustment on its own behalf.  Any Partner intending to file a petition under Sections 6226 or 6228 of the Code with respect to any item involving the Partnership shall notify the other Partners of such intention and the nature of the contemplated proceeding.  In the case where the Tax Matters Partner is the Partner intending to file such petition on behalf of the Partnership, such notice shall be given within a reasonable period of time to allow the other Partners to participate in selecting the forum in which such petition will be filed.

(v)     No Partner shall file a notice of inconsistent treatment under Section 6222(b) of the Code with respect to any partnership items for any taxable year without first notifying the Tax Matters Partner.

(vi)     The provisions of this Section 10.4(b) shall survive the termination of any Partner's interest in the Partnership and shall remain binding on the Partnership and the Partners for so long as necessary to resolve with the Service any and all matters regarding the federal income taxation of the Partners with respect to partnership items.

(c)     No Person, including the Tax Matters Partner or the Partnership Representative, shall make (or cause the Partnership to make) the election contemplated by Section 1101(g)(4) of the Bipartisan Budget Act of 2015.

(d)     For tax periods for which the Partnership Tax Audit Rules become effective with respect to the Partnership, to the maximum extent possible under the Partnership Tax Audit Rules, the Partners intend to preserve and maintain the relative and analogous rights, duties, responsibilities, indemnities, and obligations of the Partners as those provided under Section 10.4(b).  Without limiting the foregoing, the Partners intend that:

(i)     Rules similar to those described above in Section 10.4(b)(i), 10.4(b)(ii), 10.4(b)(iii), 10.4(b)(iv), and 10.1(b)(v) shall continue to apply, substituting "Partnership Representative" for "Tax Matters Partner," where applicable.

(ii)     If the Service, in connection with an audit governed by the Partnership Tax Audit Rules, proposes an adjustment in the amount of any item of income, gain, loss, deduction, or credit of the Partner, or any Partner's distributive share thereof, and such adjustment results in an "imputed underpayment" as described in Section 6225(b) of the Partnership Tax Audit Rules (a "Covered Audit Adjustment"), the Partnership Representative shall elect, to the extent that such election is available under the Partnership Tax Audit Rules (taking into account whether the Partnership Representative has received any needed information on a timely basis from the Partners), to apply the alternative method provided by Section 6226 of the Partnership Tax Audit Rules (the "Alternative Method").  To the extent the Alternative Method is not elected with respect to a Covered Audit Adjustment, the Partnership Representative shall use commercially reasonable efforts to (i) make any modifications available under Section 6225(c)(3), (4), and (5) of the Partnership Tax Audit Rules to the extent that

58

such modifications are available (taking into account whether the Partnership Representative has received any needed information on a timely basis from the Partners) and would reduce any Partnership Level Taxes payable by the Partnership with respect to the Covered Audit Adjustment, and (ii) if requested by a Partner, provide to such Partner information allowing such Partner to file an amended U.S. federal income tax return, as described in Section 6225(c)(2) of the Partnership Tax Audit Rules, to the extent such amended return and payment of any related federal income taxes would reduce any Partnership Level Taxes payable by the Partnership with respect to the Covered Audit Adjustment (after taking into account any modifications described in clause (i) of this Section 10.4(d)(ii). Similar procedures shall be followed in connection with any state or local income tax audit that incorporates rules similar to the Partnership Tax Audit Rules.

(iii) Notwithstanding any provision of this Agreement to the contrary, any taxes, penalties, and interest payable under the Partnership Tax Audit Rules by the Partnership ("Partnership Level Taxes") shall be treated as attributable to the Partners (or former Partners, as applicable), and the Managing General Partner shall allocate the burden of any such Partnership Level Taxes to those Partners (or former Partners, as applicable) to whom such amounts are reasonably attributable (whether as a result of their status, actions, inactions, or otherwise), taking into account the effect of any modifications described in Section 10.4(d)(ii) that reduce the amount of Partnership Level Taxes. All Partnership Level Taxes allocated to a Partner (or former Partner), at the option of the Managing General Partner, shall (i) be promptly paid to the Partnership by such Partner (or former Partner) ("Option A") or (ii) be paid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Partner pursuant to Section 4.7, and, if such distributions are not sufficient for that purpose, by reducing the proceeds of liquidation otherwise payable to such Partner pursuant to Section 11.4 ("Option B"). If the Managing General Partner selects Option A, the Partnership's payment of the Partnership Level Taxes allocated to the applicable Partner (or former Partner, as applicable) shall be characterized in a manner as if the payment by the Partnership were a distribution to such Partner (or former Partner, as applicable) and as if the payment by such Partner (or former Partner, as applicable) to the Partnership were a Capital Contribution for federal income tax purposes; provided, however, that such payments shall not affect the Capital Accounts of, any other contributions to be made by, or the distributions and allocations to be made to the applicable Partners (or former Partners, as applicable) under this Agreement. If the Managing General Partner selects Option B, the applicable Partner shall for all purposes of this Agreement be treated as having received a distribution of the amount of its allocable share of the Partnership Level Taxes at the time such Partnership Level Taxes are paid by the Partnership. To the fullest extent permitted by Law, each Partner (whether or not such Partner becomes a former Partner after the date of this Agreement) hereby agrees to indemnify and hold harmless the Partnership and the other Partners (including other former Partners, as applicable) from and against any liability for Partnership Level Taxes allocated to such Partner (including, without limitation, with respect to any former Partner, any Partnership Level Taxes allocated to such former Partner that are attributable to taxable periods (or portions thereof) during which such former Partner held a Partnership

59

interest). For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the liabilities and obligations of each Partner under this Section 10.4(d)(iii) shall survive any transfer of Partnership interests by such Partner or such Partner ceasing to be a Partner under this Agreement.

**10.5    Other Elections**. All other elections authorized under the Code or regulations may be made by the Managing General Partner, but only to the extent such elections are not inconsistent with Sections 10.2 and 10.3 of this Agreement or the economic sharing arrangement of the Partners as set forth in Article IV and Section 11.4 hereof.

**Article XI**
**Duration and Termination**

**11.1    Death, Insanity or Bankruptcy of Unitholder**. The Partnership shall not terminate by reason of the death of a Unitholder, but the executor or administrator of such Unitholder shall have all the rights of a Unitholder for the purpose of settling his estate and such power as such Unitholder had to constitute his assignee a substituted Unitholder. The estate of a deceased Unitholder shall be liable for his obligations as a Unitholder. Neither the judicially declared insanity or bankruptcy of any Unitholder nor the transfer of a Unitholder's Units shall work a dissolution or termination of the Partnership.

**11.2    Events of Dissolution**. The Partnership shall be dissolved by:

(a)    The affirmative vote of Unitholders holding more than 80% of the Units then held by Unitholders to dissolve and wind up the affairs of the Partnership at a meeting called and held as set forth in Article VI; or

(b)    Except as otherwise provided herein, the occurrence of any other event that, under the TBOC, causes the dissolution of a limited partnership.

**11.3    Reconstitution Following Dissolution**. Upon the dissolution of the Partnership under Section 11.2 above as a result of an event of withdrawal by the Managing General Partner, the Partnership may be reconstituted and its business continued without winding up of the Partnership and liquidation of its assets if following such event of withdrawal there remains a Managing General Partner and such Managing General Partner carries on the business of the Partnership.

**11.4    Winding Up and Liquidation**.

(a)    If the Partnership is dissolved and is not reconstituted under Section 11.3 above, it shall be wound up and the assets shall be sold and proceeds distributed in the order provided herein. The Managing General Partner shall be appointed as the liquidating agent for the winding up of Partnership affairs and the liquidation and distribution of the assets of the Partnership, whether or not it shall have withdrawn or been removed as Managing General Partner in connection with such dissolution, unless (i) it shall have supplied to the Partnership a suitable substitute liquidating agent, (ii) a court of competent jurisdiction has ordered that the Managing General Partner not serve as liquidating agent or has appointed another liquidating agent for the Partnership, or (iii) applicable law prohibits the Managing General Partner from

60

acting as liquidating agent. Until a certificate of cancellation is filed for the Partnership under Texas law, the Managing General Partner or other liquidating agent shall have authority in the name and on behalf of the Partnership to prosecute and defend civil, criminal or administrative suits, to settle and close the Partnership's business, and to sell or dispose of Partnership Property at a price deemed reasonable by the Managing General Partner or other liquidating agent, whether in cash, securities, other property or any other form, or any combination thereof, and the proceeds thereof as well as all other cash and properties of the Partnership shall be distributed as follows:

(i) To the payment and discharge or the establishment of reserves to discharge all of the Partnership's debts and liabilities to Persons other than the Partners;

(ii) To the setting up of any reserves which the Managing General Partner may deem necessary for contingent or unforeseen liabilities or obligations of the Partnership;

(iii) To the satisfaction of all debts, including obligations of the Partnership to the Partners; and if the proceeds are insufficient to pay in full all such obligations, then pro rata to each Partner as the amount of the Partnership's obligation to such Partner bears to the obligations due all Partners;

(iv) As promptly as practicable after dissolution, the Managing General Partner or other liquidating agent shall (i) determine the Fair Market Value (the "Liquidation FMV") of the Partnership's remaining assets (the "Liquidation Assets"), (ii) sell the remaining properties and other assets of the Partnership for cash as promptly as is practical while using reasonable best efforts to obtain the best price therefore; provided, however, the liquidator may retain properties for distribution in kind, and (iii) deliver to each Partner a statement (the "Liquidation Statement") setting forth the Liquidation FMV and each Partner's Capital Account balance (determined in accordance with this Section 11.4(a)(iv)), which Liquidation Statement shall be final and binding on all Partners. Notwithstanding anything to the contrary in this Agreement, in the year in which the Partnership dissolves and winds up pursuant to Article XI and all subsequent years up to and including the year in which the Partnership's existence terminates, all items of income, gain, loss and deduction of the Company, including Simulated Gain, Simulated Loss and Simulated Depletion, shall be allocated among the Partners in a manner reasonably determined by the Managing General Partner as shall cause to the nearest extent possible the Capital Account of each Partner (after taking into account such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, if any) to equal the amount that would be distributed to such Partner pursuant to Section 4.7); and

(v) After satisfying all the Partnership's liabilities and obligations pursuant to Section 11.4(a)(i) through (iii), the Managing General Partner or other liquidating agent shall promptly distribute the Partnership's Liquidation Assets to the Partners in accordance with, and to the extent of, the positive balances in the Partners' Capital Accounts, as determined after taking all Capital Account adjustments (other than those made by reason of distributions pursuant to this Section 11.4(a)(v)) for the taxable

61

period of the Partnership during which the liquidation of the Partnership occurs (with such date of occurrence being determined pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(g)), and such distribution shall be made by the end of such taxable period (or, if later, within 90 days after said date of such occurrence). If property is distributed in kind, the Partner receiving the property shall be deemed for purposes of this <u>Section 11.4(a)</u> to have received cash equal to the Fair Market Value of such property. The Distribution of cash and/or property to a Partner in accordance with the provisions of this <u>Section 11.4</u> constitutes a complete return to the Partner of its Capital Contributions and a complete Distribution to the Partner of its interest in the Partnership and all the Partnership's property and constitutes a compromise to which all Partners have consented within the meaning of the TBOC. To the extent that a Partner returns funds to the Partnership, it has no claim against any other Partner for those funds.

**11.5     No Recourse if Assets Insufficient**. A Unitholder shall look solely to the assets of the Partnership for the return of his Capital Contribution, and if the Partnership Property remaining after the payment or discharge of the debts and liabilities of the Partnership to third-party creditors and to Partners is insufficient to return his Capital Contributions, he shall have no recourse against any Partner. If any Unitholder has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit shall not be considered a debt owed to the Partnership or to any other person for any purpose whatsoever.

## Article XII
## Amendment

**12.1     Amendment by Managing General Partner**. The Managing General Partner may, without prior notice to or consent of any Unitholder, amend this Agreement for: (i) amendments changing the name of the Partnership and/or location of its principal place of business, as may be required by any jurisdiction in which the Partnership owns property or transacts business, (ii) amendments reflecting the admission of additional Partners (and the rights, powers and duties afforded to such Partners) admitted in accordance this Agreement, and (iii) any change that is necessary or advisable in the opinion of the Managing General Partner to qualify the Partnership as a limited partnership or a partnership in which the Unitholders have limited liability under the laws of any state or to insure that the Partnership will not be treated as an association taxable as a corporation or as a publicly traded partnership for federal income tax purposes. Written notice of any amendment to this Agreement effected pursuant to this <u>Section 12.1</u> shall be sent to all Unitholders by the Managing General Partner within a reasonable period of time.

**12.2     Amendment Procedures**. Except as provided in <u>Sections 3.6(f)</u>, <u>5.2</u> and <u>12.1</u>, all amendments to this Agreement must be in writing, signed by the Managing General Partner, and be approved by Unanimous Consent of the Board and the holders of a majority of the Voting Units; <u>provided</u>, that any such amendment of this Agreement that materially and disproportionately adversely affects a Unitholder or group of Unitholders as compared to the

impact of such amendment on the other Unitholders shall not be effective against such Unitholders without their consent.

## Article XIII
## Miscellaneous

**13.1 Communications**. Except as otherwise expressly provided in this Agreement, any election, approval, consent, objection, certification, request, waiver, notice or related document required or permitted to be made or given pursuant to any provisions of this Agreement (collectively, "Communications"), shall be deemed duly made or given, as the case may be, in writing, signed by or on behalf of the Person making or giving the same, and shall be deemed given, received and dated when either personally delivered (with receipt acknowledged by the recipient), three (3) Business Days after being deposited in the U.S. mail, first class, postage prepaid, one (1) day after being sent by facsimile (which shall be confirmed by a writing deposited in the U.S. Mail, first class, postage prepaid, or recognized overnight courier for next day delivery) or by recognized overnight courier for next day delivery, addressed to the Person or Persons to whom such Communications are to be made or given at their respective addresses, in the case of any Unitholder, as reflected in the Partnership's records and, in the case of the Managing General Partner or the Partnership at the office of the Partnership specified in Section 2.3 of this Agreement, or, in any case, at such other address as shall have been set forth in a Communication sent pursuant to the provisions of this Section 13.1, provided, however, that each Communication of change of address shall be effective only upon actual receipt, or refusal of delivery, by or on behalf of the addressee thereof.

**13.2 Entire Agreement; Applicable Law; Effect**. This Agreement contains the entire agreement by and among the parties and supersedes any prior understandings and agreements among them respecting the subject hereof, shall be construed, enforced and governed in conformity with the laws of the State of Texas, without giving effect to principles of conflicts of law, and shall be binding upon the parties hereto, their successors, heirs, devisees, permitted assigns, legal representatives, executors and administrators, but shall not be deemed for the benefit of creditors or any other Persons.

**13.3 Modification; Waiver or Termination**. Except as otherwise expressly provided in this Agreement, no modification, waiver, or termination of this Agreement, or any part hereof, shall be effective unless made in writing signed by the party or parties sought to be bound thereby and no failure to pursue or elect any remedy shall constitute a waiver of any default under or breach of any provision of this Agreement nor shall any waiver of any default under or breach of any provision of this Agreement be deemed to be a waiver of any other subsequent similar or different default under or breach of such or any other provision or of any election of remedies available in connection therewith. Receipt by any party of any money or other consideration due under this Agreement, with or without knowledge of any breach or default, shall not constitute a waiver of such breach or default or of any provision of this Agreement.

**13.4 Counterparts**. This Agreement may be executed in any number of counterparts and each duplicate counterpart shall constitute an original, any one of which may be introduced in evidence or used for any other purposes without the production of its duplicate counterpart. Moreover, notwithstanding that any of the parties did not execute the same counterpart, each of

63

the counterparts shall, for all purposes, be deemed an original, and all such counterparts shall constitute one and the same instrument binding on all of the parties hereto.

**13.5    Severability**. In case any one or more of the provisions contained in this Agreement shall be invalid or unenforceable in any respect the validity and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute for such invalid or unenforceable provision in light of the tenor of this Agreement, and, upon so agreeing, shall incorporate such substitute provision in this Agreement.

**13.6    Section Headings**. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference, and shall not be construed in any way to define, limit, extend or describe the scope of any of the provisions hereof.

**13.7    Word Meanings**. The words such as "herein", "hereinafter", "hereof", and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and the disjunctive shall include the conjunctive and vice versa, unless the context otherwise requires.

**13.8    Further Actions**. Each of the Partners shall hereafter execute and deliver such further instruments and do such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the provisions hereof.

**13.9    No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Partner may be a partnership or limited partnership, each Partner hereto, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Partners shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Partner (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Partner (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Partners (each, but excluding for the avoidance of doubt, the Partners, a "Partner Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against the Partner Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Partner Affiliate, as such, for any obligations of

64

the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

**13.10 Royalties Vehicle**. The Partnership and Blackstone shall use commercially reasonable efforts to negotiate and execute on a "royalties vehicle" on substantially similar terms as those set forth on Annex B and such other mutually agreeable terms within a commercially reasonable period of time after the Effective Date.

**Article XIV**
**Disputes**

**14.1 Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process**. EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN DALLAS, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURT. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURT FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURT. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**14.2 Waiver of Jury Trial**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY

65

DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAYBE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date first written above.

*Series A Preferred Unitholders:*

PRIMEXX ENERGY OPPORTUNITY
FUND, LP

By: _Whittier Management GP LLC_
General Partner

By: _[signature]_
Name: _Steven A. Anderson_
Its: _Vice President of_
_Whittier Holdings, Inc., Manager_
LAS ROSAS CAPITAL LLC

By: _____
Name: _____
Its: _____

*Managing General Partner:*

PRIMEXX ENERGY CORPORATION

By: _____
Name: _____
Its: _____

*Class A Unitholders:*

B.F. Partners, L.P.

By: _____
Name: _____
Its: _____

_____
HOWARD M. COHEN

_____
MARJORY H. COHEN

_____
GARY EDIDIN

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the ___ day of July, 2016.

<div style="margin-left: 50%;">

*Series A Preferred Unitholder:*

PRIMEXX ENERGY OPPORTUNITY FUND, L.P.

By:_____
General Partner

By:_____
Name: _____
Its: _____

*Managing General Partner:*

PRIMEXX ENERGY CORPORATION

By:_____
Name: Thomas Fagadau
Its:    President

*Class A Unitholders:*

B.F. Partners, L.P.

By:_____
Name: _____
Its: _____

_____
HOWARD M. COHEN

_____
MARJORY H. COHEN

_____
GARY EDIDIN

</div>

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date first written above.

*Series A Preferred Unitholders:*

PRIMEXX ENERGY OPPORTUNITY
FUND, LP

By: _____
General Partner

By: _____
Name: _____
Its: _____

LAS ROSAS CAPITAL LLC

By: _____
Name: _____
Its: _____

*Managing General Partner:*

PRIMEXX ENERGY CORPORATION

By: _____
Name: _____
Its: _____

*Class A Unitholders:*

B.F. Partners, L.P.

By: _~David Bayer~_____
Name: _David Bayer, Vice Pres.__
Its: _Bliff Mgmt, Inc., General Partner_

_____
HOWARD M. COHEN

_____
MARJORY H. COHEN

_____
GARY EDIDIN

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date first written above.

*Series A Preferred Unitholders:*

PRIMEXX ENERGY OPPORTUNITY
FUND, LP

By:_____
General Partner

By:_____
Name: _____
Its: _____

LAS ROSAS CAPITAL LLC

By:_____
Name: _____
Its: _____

*Managing General Partner:*

PRIMEXX ENERGY CORPORATION

By:_____
Name: _____
Its: _____

*Class A Unitholders:*

B.F. Partners, L.P.

By:_____
Name: _____
Its: _____

_____
HOWARD M. COHEN

_____
MARJORY H. COHEN

_____
GARY EDDIN

GARY EDIDIN EXEMPT TRUST

By: _Marci Moss_ (signature)
Name: MARCI MOSS
Its: Trustee

GARY EDIDIN FAMILY TRUST

By: _Marci Moss_ (signature)
Name: MARCI MOSS
Its: Trustee

WM. A. FRIEDLANDER REV. TRUST DATED 2/20/98

By: _____
Name: _____
Its: Trustee

_____
DIANE GILBERT

GROH FAMILY TRUST

By: _____
Name: _____
Its: Trustee

_____
GUILLERMO G. MARMOL

SPERSIBS, L.P.

By: _____
Name: _____
Its: _____

_____
HELEN SCHLESINGER

HELEN SCHLESINGER TRUST

By: _____
Name: _____
Its: Trustee

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

GARY EDIDIN EXEMPT TRUST

By: _____
Name: _____
Its: Trustee

GARY EDIDIN FAMILY TRUST

By: _____
Name: _____
Its: Trustee

WM. A. FRIEDLANDER REV. TRUST DATED
2/20/98

By: _Michael S. Cambron, Ttee_
Name: _Michael S. Cambron_
Its: Trustee

_____
DIANE GILBERT

GROH FAMILY TRUST

By: _____
Name: _____
Its: Trustee

_____
GUILLERMO G. MARMOL

SPERSIBS, L.P.

By: _____
Name: _____
Its: _____

_____
HELEN SCHLESINGER

HELEN SCHLESINGER TRUST

By: _____
Name: _____
Its: Trustee

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

GARY EDIDIN EXEMPT TRUST

By:_____
Name: _____
Its: Trustee

GARY EDIDIN FAMILY TRUST

By:_____
Name: _____
Its: Trustee

WM. A. FRIEDLANDER REV. TRUST DATED
2/20/98

By:_____
Name: _____
Its: Trustee

_____
DIANE GILBERT

GROH FAMILY TRUST

By:_____
Name: _____
Its: Trustee

_____
GUILLERMO G. MARMOL

SPERSIBS, L.P.

By:_____
Name: _____
Its: _____

_____
HELEN SCHLESINGER

HELEN SCHLESINGER TRUST

By:_____
Name: _____
Its: Trustee

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

GARY EDIDIN EXEMPT TRUST

By:_____
Name: _____
Its: Trustee

GARY EDIDIN FAMILY TRUST

By:_____
Name: _____
Its: Trustee

WM. A. FRIEDLANDER REV. TRUST DATED
2/20/98

By:_____
Name: _____
Its: Trustee

_____
DIANE GILBERT

GROH FAMILY TRUST

By:_____
Name: _____
Its: Trustee

_____
GUILLERMO G. MARMOL

SPERSIBS, L.P.

By:_____
Name: _____
Its: _____

_____
HELEN SCHLESINGER

HELEN SCHLESINGER TRUST

By:_____
Name: _____
Its: Trustee

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

*Series B Preferred Unitholder:*

BPP HOLDCO LLC

By: _____
Name: Angelo Acconcia
Title: President

*Class B Unitholders:*

_____
KEVIN T. AUL

SANTOM, INC.

By:_____
Name: _____
Its: _____

WYNNE FAMILY TRUST

By:_____
Name: _____
Its:  Trustee

_____
BOBBY J. BAGGETT

GOLD PRIME 2011 TRUST

By:_____
Name: _____
Its:  Trustee

*Class D Unitholders:*

_____
ROBERT B. HOLLAND III

_____
JAMES A. JEFFS

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

*Series B Preferred Unitholder:*

BPP HOLDCO LLC

By: _____
Name: Angelo Acconcia
Title: President

*Class B Unitholders:*

_____
KEVIN T. AUL

SANTOM, INC.

By:_____
Name: _____
Its: _____

WYNNE FAMILY TRUST

By: *Howell Wynne*
Name: Howell Wynne
Its: Trustee

_____
BOBBY J. BAGGETT

GOLD PRIME 2011 TRUST

By:_____
Name: _____
Its: Trustee

*Class D Unitholders:*

_____
ROBERT B. HOLLAND III

_____
JAMES A. JEFFS

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

*Series B Preferred Unitholder:*

**BPP HOLDCO LLC**

By: _____

Name: Angelo Acconcia

Its: President

[Signature Page to Third Amended and Restated Limited Partnership Agreement]

*Class D Unitholder:*

_____

ROBERT B. HOLLAND III

*Class G Unitholder:*

_____
THOMAS H. FAGADAU

[Signature Page to the Third Amended and Restated Limited Partnership Agreement]

## Exhibit A

## Schedule of Partners

| Member | Series A Preferred Units | Series B Preferred Units | Class A Units | Class B Units | Class C Units | Class D Units | Class E Units | Class F Units | Class G Units |
|---|---|---|---|---|---|---|---|---|---|
| **BPP HoldCo LLC**<br><br>c/o The Blackstone Group<br>345 Park Avenue, 31st Floor<br>New York, NY 10154<br>Attention:　Angelo Acconcia<br>Telecopy:　212-201-2874<br>Email:　acconcia@blackstone.com<br><br>and with a copy to:<br><br>Kirkland & Ellis LLP<br>600 Travis Street, Suite 3300<br>Houston, Texas 77002<br>Attention:　Rhett Van Syoc<br>Telecopy:　713-835-3601<br>Email:　rhett.vansyoc@kirkland.com | - | 186,006 | - | - | - | - | - | 186,006 | - |
| **Primexx Energy Opportunity Fund, LP** | 64,214.35 | - | - | - | - | - | - | - | - |
| **BF Partners, L.P.** | - | - | 1,746.92 | - | - | - | - | - | - |
| **Howard M. Cohen** | 4.50 | - | 42.53 | - | - | - | - | - | - |
| **Marjory H. Cohen** | 4.50 | - | 42.53 | - | - | - | - | - | - |
| **Gary Edidin** | - | - | 1,191.77 | - | - | - | - | - | - |
| **Gary Edidin Exempt Trust** | - | - | 339.99 | - | - | - | - | - | - |
| **Gary Edidin Family Trust** | - | - | 850.88 | - | - | - | - | - | - |

| Member | Series A Preferred Units | Series B Preferred Units | Class A Units | Class B Units | Class C Units | Class D Units | Class E Units | Class F Units | Class G Units |
|---|---|---|---|---|---|---|---|---|---|
| **WM. A. Friedlander Rev. Tr. Dtd 2/20/98** | - | - | 1,564.94 | - | - | - | - | - | - |
| **Diane Gilbert** | 12.89 | - | 31.29 | - | - | - | - | - | - |
| **Groh Family Trust** | 11.00 | - | 55.62 | - | - | - | - | - | - |
| **Guillermo G. Marmol** | - | - | 489.87 | - | - | - | - | - | - |
| **Spersibs, LP** | - | - | 219.54 | - | - | - | - | - | - |
| **Helen Schlensinger** | - | - | 45.74 | - | - | - | - | - | - |
| **Helen Schlensinger Trust** | - | - | 45.74 | - | - | - | - | - | - |
| **Las Rosas Capital LLC** | 1,751.46 | - | - | - | - | - | - | - | - |
| **Kevin T. Aul** | - | - | - | 6,169.76 | - | - | - | - | - |
| **Santom Inc.** | - | - | - | 81,799.08 | - | - | - | - | - |
| **Wynne Family Trust** | - | - | - | 18,363.06 | - | - | - | - | - |
| **Bobby J. Baggett** | - | - | - | 1,762.14 | - | - | - | - | - |
| **Gold Prime 2011 Trust** | - | - | - | 834.69 | - | - | - | - | - |
| **Robert Holland** | - | - | - | - | - | 1,285 | - | - | - |
| **Jim Jeffs** | - | - | - | - | - | 1,285 | - | - | - |
| **Thomas H. Fagadau** | - | - | - | - | - | - | - | - | 30,000 |
| **Totals** | **65,998.70** | **186,006** | **6,667.36** | **108,928.73** | **-** | **2,570** | **-** | **186,006** | **30,000** |

Exhibit A to the Third Amended and Restated Limited Liability Company Agreement of Primexx Energy Partners, Ltd.

EXH. 1 - PAGE 87

5689

**Exhibit B**
**Definitions**

"**Acceptance Notice**" has the meaning set forth in Section 6.5(a).

"**Additional Capital Requirement**" has the meaning set forth in Section 3.7.

"**Additional Partnership Interests**" has the meaning set forth in Section 5.2(b).

"**Adjusted Capital Account**" means the Capital Account maintained for a Partner at the close of any Fiscal Year, determined by (i) crediting to such Capital Account the amount of such Partner's Deficit Restoration Obligation at that time; and (ii) charging to such Capital Account (x) any adjustments described in Section 1.704-1(b)(2)(ii)(d)(4) of the Treasury Regulations that, at such time, are reasonably expected to be made to such Capital Account, (y) any allocations described in Section 1.704-1(b)(2)(ii)( d)(5) of the Treasury Regulations that, at such time, are reasonably expected to be made to such Partner, and (z) any distributions described in Section 1.704- 1(b)(2)(ii)(d)(6) of the Treasury Regulations that, at such time, are reasonably expected to be made to such Partner.

"**Affiliate**" means any Person directly or indirectly controlling, controlled by, or under common control with, such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and under "common control with") when used with respect to any specified Person shall mean the power to direct or cause the direction of the actions, management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and whether or not such power is actually exercised. The spouse of a Person shall not be deemed an Affiliate of that Person merely by reason of being his or her spouse. Any Person who is a director of the Managing General Partner shall be an Affiliate of the Managing General Partner.

"**Aggregate Contributions Amount**" means, with respect to a Partner as of a given time of determination, the aggregate amount of Capital Contributions (excluding, with respect to this definition, deemed contributions as described in Section 3.6(c)(ii)(E) in connection with the issuance of Series B Units issued as a Payment in Kind pursuant to Section 3.6(c)(ii)(C)) made to the Partnership by such Partner from the Effective Date through such time of determination.

"**Aggregate Vested Management Interests Percentage**" means the quotient (expressed as a percentage) obtained by dividing (x) the number of Vested Management Interest by (y) the total number of Management Interests authorized at the time of determination.

"**Agreed Duties**" has the meaning set forth in Section 5.9(a).

"**Agreement**" means this Third Amended and Restated Limited Partnership Agreement, as originally executed and as subsequently amended from time to time.

"**Alternative Method**" has the meaning set forth in Section 10.4(d).

"**AMI Area**" means the geographic area outlined on Exhibit E.

"**Appraisal**" means a written appraisal of all Partnership Properties by an Independent Expert in accordance with generally accepted industry practices, which Appraisal shall set forth the then Unit Value of the Partnership. The Appraisal shall set forth all material assumptions underlying the Appraisal.

"**Available Cash**" means as of any date of determination with respect to a quarterly cash distribution to be made to the Unitholders the following (as reasonably determined by the Board), without duplication:

(a)     all revenue and other cash or Cash Equivalent amounts collected or received by the Partnership from any and all sources (other than Partner Capital Contributions) as of the end of the Fiscal Quarter preceding the Fiscal Quarter in which the distribution is to be made, *less*

(b)     as of the end of the Fiscal Quarter preceding the Fiscal Quarter in which the distribution is to be made, the costs and expenses paid by the Partnership and amounts reserved for payment of costs, and expenses paid by the Partnership and amounts reserved for payment of costs, including capital costs and operating costs and expenses (including cost and administrative expenses, product taxes and other applicable taxes and similar amounts, debt service, including, but not limited to reserves required to comply with covenants or limitations imposed by the Partnership's commercial banks, or other reasonable reserves determined in good faith by the Managing General Partner).

"**Award Agreement**" has the meaning set forth in <u>Section 5.3(a)</u>.

"**Bankrupt Partner**" means any Partner:

(a)     that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer in a court of competent jurisdiction seeking for such Partner a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any applicable law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Partner in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of such Partner or of all or any substantial part of such Partner's assets or properties; or

(b)     against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and ninety (90) days have expired without dismissal thereof or with respect to which, without such Partner's consent or acquiescence, a trustee, receiver, or liquidator of such Partner or of all or any substantial part of such Partner's properties has been appointed and sixty (60) days have expired without such appointments having been vacated or stayed, or sixty (60) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"**BCP/BEP Funds**" has the meaning set forth in <u>Section 5.11(b)</u>.

"**Blackstone**" has the meaning set forth in the recitals.

"**Blackstone Commitment**" has the meaning set forth in the recitals.

"**Blackstone Directors**" has the meaning set forth in the Managing General Partner's Bylaws.

"**Blackstone Investors**" has the meaning set forth in the recitals.

"**Board**" means, if the Managing General Partner is managed by a board of managers or directors, such board of managers or directors of the Managing General Partner.

"**Budget**" has the meaning set forth in Section 5.22.

"**Business Day**" means Monday through Friday of each week except that a legal holiday recognized as such by the government of the United States of America or the State of Texas shall not be regarded as a Business Day.

"**Call Amount**" means the amount of requested additional capital pursuant to and in accordance with Section 3.7.

"**Capital Account**" means the Capital Account maintained for each Partner on the books of the Partnership pursuant to Section 9.2 of this Agreement.

"**Capital Contributions**" means, with respect to each Partner, the amount of money and the fair market value of any property actually contributed to the Partnership by such Partner as a capital contribution pursuant to the provisions of this Agreement.

"**Cash Equivalents**" means:

> (i)     marketable obligations maturing one year or less from the date of acquisition thereof and issued, fully guaranteed or insured, by the United States Government or any agency or instrumentality thereof;

> (ii)     negotiable certificates of deposit issued by any domestic bank or trust company or national banking association which is a member of the Federal Reserve System and has a capital and surplus of at least fifty million dollars;

> (iii)     money market accounts of investment companies registered under the Investment Companies Act of 1940 with assets in excess of two billion dollars;

> (iv)     commercial paper maturing one year or less from the date of issuance which, at the time of acquisition by the Partnership, is accorded one of the two highest ratings by Standard & Poor's Corporation, Moody's Investors Services, Inc. or other nationally recognized credit rating agencies of similar standing; and

> (v)     repurchase agreements fully collateralized by obligations specified in (i) above.

"**Cause**" has the meaning set forth in the Class G Incentive Plan.

"**Class A Unit**" means a Unit held by a Class A Limited Partner which has the rights, preferences and privileges set forth in this Agreement. The initial value of a Class A Unit was $500.00.

"**Class A Unitholder**" means a Limited Partner holding Class A Units, in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class A Unit who has not been admitted into the Partnership as a "Partner" pursuant to Section 6.2(f). References to Class A Unitholders shall not include Class A-1 Unitholders.

"**Class A-1 Unit**" means a Unit held by a Class A-1 Limited Partner which has the rights, preferences and privileges set forth in this Agreement. Series A Preferred Units are convertible into Class A-1 Units.

"**Class A-1 Unitholder**" means a Limited Partner holding Class A-1 Units, in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class A-1 Unit who has not been admitted into the Partnership as a "Partner" pursuant to Section 6.2(f). References to Class A-1 Unitholder shall not include Class A Unitholders.

"**Class B Unit**" means a Unit held by a Class B Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class B Unitholder**" means a Limited Partner holding Class B Units, in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class B Unit who has not been admitted into the Partnership as a "Partner" pursuant to Section 6.2(f).

"**Class C Unit**" means a Unit held by a Class C Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class C Unitholder**" means a Limited Partner holding Class C Units in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class C Unit who has not been admitted into this Partnership as a "Partner" pursuant to Section 6.2(f).

"**Class D Unit**" means a non-voting Unit held by a Class D Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class D Unitholder**" means a Limited Partner holding Class D Units in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class D Unit who has not been admitted into this Partnership as a "Partner" pursuant to Section 6.2(f).

"**Class E Unit**" means a Unit held by a Class E Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class E Unitholder**" means a Limited Partner holding Class E Units in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class E Unit who has not been admitted into this Partnership as a "Partner" pursuant to Section 6.2(f).

"**Class F Unit**" means a Unit held by a Class F Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class F Unitholder**" means a Limited Partner holding Class F Units, in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class F Unit who has not been admitted into the Partnership as a "Partner" pursuant to Section 6.2(f).

"**Class G Incentive Plan**" means the plan set forth on Exhibit F and referred to in Section 5.24.

"**Class G Unit**" means a Unit held by a Class G Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Class G Unitholder**" means a Limited Partner holding Class G Units in the number set forth on Exhibit A hereto (as the same may be amended from time to time) and a transferee of a Class G Unit who has not been admitted into this Partnership as a "Partner" pursuant to Section 6.2(f).

"**Code**" means the Internal Revenue Code of 1986, as it may be amended (26 U.S.C.). Section references to the Code are to the section of the Code as of the date of this Agreement. All such references to the Code and sections thereof are deemed to include appropriate portions of any subsequently enacted internal revenue law, code, act or similar legislation dealing with the same subject matter as is contained in the Code.

"**Common Unit**" means, a Partnership interest representing a fractional part of the Partnership interests of all Limited Partners, and having the rights and obligations specified with respect to Common Units in this Agreement including Class A, Class A-1, Class B, Class C, Class D, Class E, Class F and Class G Units. The term "Common Unit" does not refer to, or include, any Series A Preferred Unit prior to the conversion of such Series A Preferred Unit into a Common Unit pursuant to the terms hereon or any Series B Preferred Unit.

"**Common Unitholders**" means, holders of a Class A Units, Class A-1 Units, Class B Units, Class C Units, Class D Units, Class E Units and Class F Units.

"**Communications**" has the meaning set forth in Section 13.1.

"**Control**" means, with respect to any relevant Person on the date such determination is being made, possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of such relevant Person by ownership of voting interest, by contract or otherwise.

"**Converting Unitholder**" means, a Person entitled to receive Common Units upon conversion of any Series A Preferred Units.

"**Covered Audit Adjustment**" has the meaning set forth in Section 10.4(d)(ii).

"**Deficit Restoration Obligation**" means, with respect to any Partner at the end of any Fiscal Year, the amount such Partner is obligated to restore under applicable law or pursuant to any provision of this Agreement on account of a deficit balance in such Partner's Capital Account or is deemed obligated to restore under Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations (determined after taking into account any changes in the Minimum Gain and the Partner Minimum Gain during such Fiscal Year).

"**Distribution Date**" has the meaning set forth in Section 3.6(c)(ii)(B).

"**Distributions**" means distributions from the Partnership to one or more Partners pursuant to Article IV or Article X hereof.

"**Drag-Along Transaction**" has the meaning set forth in Section 6.7(a).

"**Economic Percentage**" means a Partner's percentage economic interest in the Partnership disregarding the Series B Preferred Units and the Management Interests.

"**Effective Date**" has the meaning set forth in the preamble.

"**Estimated Tax Payment Date**" has the meaning set forth in Section 4.7(b)(i).

"**Estimated Tax Period**" has the meaning set forth in Section 4.7(b)(i).

"**Excess Nonrecourse Liabilities**" means those Nonrecourse Liabilities not allocated under Sections 1.752-3(a)(1) or (2) of the Treasury Regulations.

"**Existing Limited Partner Director**" has the meaning set forth in the Managing General Partner's Bylaws.

"**Exit Event**" means any of (i) the consummation of a sale of the Partnership substantially as a whole in one transaction or a series of closely related transactions or a sale of all or substantially all of the assets of the Partnership, (ii) the consummation of an initial public offering of the Partnership (or a successor), subsidiary of the Partnership, or of a subsidiary that is a holding company of the Partnership (or its successor) or (iii) dissolution or liquidation of the Partnership.

"**Fair Market Value**" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, going concern value, control provisions, minority discounts or marketability discounts.

"**Farmout**" means an agreement whereby the owner of an operating interest assigns his interest in certain specific acreage to another operator as a means of financing the costs of developing and operating the property. The owner typically retains some interest such as an overriding royalty interest, net profits interest, oil and gas payment, offset acreage or other type of interest.

"**Financing Facilities**" means the First Lien Credit Agreement and the Second Lien Credit Agreement (in each case as defined in the Partnership Interest Purchase Agreement) and any future agreement of the Partnership or any of its Subsidiaries providing for indebtedness for borrowed money.

"**First Incentive Distribution**" has the meaning set forth in Section 4.7(a)(iii).

"**Fiscal Quarter**" means each quarterly period in each year ending on March 31, June 30, September 30 and December 31.

"**Fiscal Year**" means (i) the period commencing on the Effective Date and ending on the earliest of the following December 31, the date on which the Partnership completely liquidates, or the date on which the Partnership accepts an additional Capital Contribution, and (ii) any subsequent period commencing with the end of the last preceding Fiscal Year and ending on the earliest of the following December 31, the date on which the Partnership completely liquidates, or the date on which the Partnership accepts an additional Capital Contribution.

"**Good Reason**" has the meaning set forth in the Class G Incentive Plan.

"**Hydrocarbon Interests**" means (a) all oil, gas and/or mineral leases, oil, gas or mineral properties, mineral servitudes and/or mineral rights of any kind (including fee mineral interests, lease interests, Farmout interests, overriding royalty and royalty interests, net profits interests, oil payment interests, production payment interests and other types of mineral interests), including any rights to acquire any of the foregoing, and (b) all oil and gas gathering, treating, compression, storage, processing and handling assets of any kind, including all pipelines, wells, wellhead equipment, pumping units, flowlines, tanks, buildings, injection facilities, saltwater disposal facilities, compression facilities, gathering systems, processing plants, and other related equipment of any kind.

"**Incremental Applicable Vested Participation Percentage**" has the meaning set forth in Section 4.7(c).

"**Independent Expert**" means a Person who is independent of the Managing General Partner and its Affiliates who is in the business of rendering opinions regarding the value of oil and gas properties based upon the evaluation of all pertinent economic, financial, geologic and engineering information available to the Managing General Partner or its Affiliates.

"**Internal Rate of Return**" means the interest rate at which the holder's cash flow in respect of a Unit, both positive and negative, (that is, the aggregate Capital Contributions made by the holder and his predecessors in interest in respect of such Unit and the aggregate amount of Distributions made with respect to such Unit) must be discounted on an annual basis (to account for the time value of money concept) so that the aggregate of such discounted amount equals zero.

"**IPO**" means any underwritten initial public offering by the IPO Issuer of equity securities pursuant to an effective registration statement under the Securities Act.

"**IPO Issuer**" means: (a) the Partnership; or (b) an Affiliate of the Partnership or a Subsidiary of the Partnership which will be the issuer in an IPO, in each case as determined by the Managing General Partner.

"**Legacy Common Units**" means Class A Units, Class A-1 Units, Class B Units, Class C Units, Class D Units and Class E Units.

"**Legacy Common Unitholders (Ex. Class A-1)**" means holders of Class A Units, Class B Units, Class C Units, Class D Units and Class E Units.

"**Legacy Common Unit Purchase Rights**" has the meaning set forth in Section 3.6(b)(iii)(D).

"**Legacy Unitholders**" means holders of Legacy Units.

"**Legacy Units**" means Series A Preferred Units, Class A Units, Class A-1 Units, Class B Units, Class C Units, Class D Units and Class E Units.

"**Legacy Waterfall**" has the meaning set forth on Exhibit G.

"**Limited Partner**" means each Person who adopts this Agreement as a Limited Partner and is accepted by the Managing General Partner as such, and any Person who becomes a substituted Limited Partner in accordance with the terms of this Agreement.

"**Liquidation Assets**" has the meaning set forth in Section 11.4(a)(iv).

"**Liquidation FMV**" has the meaning set forth in Section 11.4(a)(iv).

"**Liquidation Preference**" means, as of any time of determination, with respect to each Series B Preferred Unit, the sum of (i) the Series B Issue Price plus (ii) the aggregate amount of all Series B Unit Distributions (expressed in dollars) that have accrued but have not been paid prior to the date of liquidation.

"**Liquidation Statement**" has the meaning set forth in Section 11.4(a)(iv).

"**Loss**" means, for any Fiscal Year, an amount equal to the loss of the Partnership for such period (as computed under Section 4.1).

"**Management Interest**" means any Class G Units issued to Persons providing services to the Partnership.

"**Management Partner**" means the holder of a Management Interest.

"**Managing General Partner**" means PRIMEXX ENERGY CORPORATION, a Texas corporation, or any substituted Managing General Partner admitted in accordance with the terms of this Agreement.

"**Managing General Partner's Bylaws**" shall mean the Second Amended and Restated Bylaws of the Managing General Partner, dated as of the date hereof, as may be amended from time to time.

"**Mandatory Call Notice**" means a written notice of required additional capital pursuant to and in accordance with Section 3.7.

"**Minimum Gain**" means, at the close of any Fiscal Year, the minimum gain of the Partnership (determined in accordance with Section 1.704-2(b)(2) of the Treasury Regulations).

"**Net Gain From an Exit Event**" means, for any taxable period, the sum, if positive, of all items of income, gain loss or deduction recognized by the Partnership from an Exit Event.

"**Net Loss From an Exit Event**" means, for any taxable period, the sum, if negative, of all items of income, gain loss or deduction recognized by the Partnership from an Exit Event.

"**Nonrecourse Deductions**" means, for any period, the nonrecourse deductions of the Partnership for such period (determined under Section 1.704-2(b)(1) of the Treasury Regulations).

"**Nonrecourse Liability**" means, a liability of the Partnership that is a nonrecourse liability (as that term is defined in Section 1.704-2(b)(3) of the Treasury Regulations).

"**Offered Interest**" has the meaning set forth in Section 6.5(a).

"**Operator**" means any Person, engaged in the business of exercising direct supervision over the drilling or completion of or production from a well.

"**Option A**" has the meaning set forth in Section 10.4(d).

"**Option B**" has the meaning set forth in Section 10.4(d).

"**Original Partnership Agreement**" has the meaning set forth in Section 2.1.

"**Participation Threshold**" means, with respect to any Class G Unit, the amount that would, in the reasonable and good faith determination of the Board, be distributed pursuant to Section 11.4 if, immediately prior to the issuance of such Class G Unit, the assets of the Partnership were sold for their Fair Market Values, and the proceeds were used to satisfy all liabilities of the Partnership in accordance with their terms and any excess proceeds were distributed pursuant to Section 11.4; provided that the provisions of Section 11.4, shall be applied and taken into account in determining the Participation Threshold.

"**Partner Affiliate**" has the meaning set forth in Section 13.9.

"**Partner Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Minimum Gain that would result if such debt were treated as a Nonrecourse Liability (determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations).

"**Partner Nonrecourse Debt**" means any liability of the Partnership that is a partner nonrecourse debt (as that term is defined by Section 1.704-2(b)(4) of the Treasury Regulations).

"**Partner Nonrecourse Deductions**" means, for any period, the partner nonrecourse deductions of the Partnership for such period (determined in accordance with Section 1.704-2(i)(2) of the Treasury Regulations).

"**Partner Nonrecourse Liability**" means any liability of the Partnership that is a partner nonrecourse liability (as that term is defined in Section 1.704-2(b)(4) of the Treasury Regulations).

"**Partners**" means the Managing General Partner and the Limited Partners, and any Person having certain economic rights to the extent and as provided in Section 6.3.

"**Partnership**" means PRIMEXX ENERGY PARTNERS, LTD., a Texas limited partnership.

"**Partnership Interest Purchase Agreement**" has the meaning set forth in the recitals.

"**Partnership Level Taxes**" has the meaning set forth in Section 10.4(d).

"**Partnership Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Minimum Gain that would result if such debt were treated as a Nonrecourse Liability (determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations).

"**Partnership Property or Properties**" means all interests, properties, Capital Contributions and rights of any type owned by the Partnership.

"**Partnership Representative**" means the "partnership representative" as defined in section 6223 of the Code.

"**Partnership Tax Audit Rules**" means sections 6221 through 6241 of the Code, as amended by the Bipartisan Budget Act of 2015 and the Protecting Americans from Tax Hikes Act of 2015, together with any guidance issued thereunder or successor provisions and any similar provision of state or local tax laws.

"**Partnership Well**" means any well in which the Partnership has an interest.

"**Payment in Kind**" has the meaning set forth in Section 3.6(c)(ii).

"**Percentage Interest**" means (A) in relation to any single class of Units, the ratio that (a) the number of the Units in that class held of record by the relevant Unitholder bears to (b) the total number of Units outstanding in that class, and (B) in relation to multiple classes of Units (excluding the Series B Preferred Units), the ratio that (a) the Partners' aggregate Capital Accounts attributable to the applicable class of Units (excluding the Series B Preferred Units) bears to (b) the aggregate Capital Accounts of all Partners with respect to all Units (excluding the Series B Preferred Units). For the avoidance of doubt, each Series B Preferred Unit shall have a Percentage Interest equal to zero.

"**Percentage Interest in Partnership Capital**" means, with respect to a Partner, the proportionate share of such Partner's Capital Account in relation to all Partners' Capital Accounts as computed in a manner consistent with Section 9.2 including all applicable allocations and adjustments as set forth in the Agreement in determining Capital Accounts for federal income tax purposes. Notwithstanding the foregoing, each Series B Preferred Unit shall have a Percentage Interest in Partnership capital equal to zero.

"**Permitted Affiliate**" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person.

"**Permitted Transfer**" has the meaning set forth in Section 6.8.

"**Person**" means an individual, partnership, tenancy-in-common, joint tenancy-in-common, joint tenancy, joint venture, firm, corporation, trust, charitable institution or other business or legal entity.

"**Prime Rate**" means the prime rate of interest per annum announced, from time to time by major money center banks and published daily in the Wall Street Journal under "Market Rates" (or elsewhere if not under Market Rates); provided that if the Wall Street Journal should ever cease, for any reason to publish such rate on a daily basis, then the Prime Rate shall be the rate of interest designated, and in effect from time to time, by the Partnership's primary lender of working capital as its "Prime Rate."

"**Prior Distribution**" has the meaning set forth in Section 4.7(c).

"**Profit**" means, for any Fiscal Year, an amount equal to the profit of the Partnership for such period (as computed for pursuant to Section 4.1).

"**Proposed Sale**" has the meaning set forth in Section 6.6(a).

"**Proposed Transferee**" has the meaning set forth in Section 6.6(a)(i).

"**Prospect**" means an area covering lands which, in the opinion of the Managing General Partner, contains structural or stratigraphic conditions making it susceptible to the accumulation of oil or gas in commercially productive quantities, and which area shall have been designated by the Managing General Partner in writing on the basis of the geological and engineering data considered by the Managing General Partner. Prospects may be limited to certain stated depths and may include areas in which leases may or may not have been acquired. The Managing General Partner shall maintain records showing the Prospects (and depths if limited by depth) so designated. In the case of certain Prospects, the designation of Prospects may conform generally to the geographic limits of individual leases. In some cases, where known reservoirs cover large geographic areas and subsequent drilling does not depend directly on results obtained by the Partnership Wells, Prospects may be directly adjacent or in close proximity to other Prospects. Leases on lands which are contiguous or in the vicinity of each other may constitute more than one Prospect, and a zone or horizon under an area may constitute a Prospect separate and apart from another zone or horizon which lies in whole or in part under the same area. With respect to any Prospect that is not limited to a particular zone or horizon and which is within any large continuous known stratigraphic trend which could be defined as a continuous reservoir, the Managing General Partner may reduce the area included in such Prospect to that area which covers the spacing unit or proration unit prescribed by the appropriate regulatory authority on such Prospect or permitted by local practice, whichever is applicable, and such additional area, if any, as the Managing General Partner determines reasonable. A Prospect that is limited to a particular zone or horizon may be limited to that area which covers the spacing unit or proration unit prescribed by the appropriate regulatory authority on such Prospect or permitted by local practice, whichever is applicable, to protect against drainage from adjacent wells if the well to be drilled by the Partnership is to a horizon containing Proved Reserves. The area of a Prospect may be enlarged or contracted from time to time by the Managing General Partner in the reasonable exercise of its judgment.

"**Proved Reserves**" means those quantities of crude oil, natural gas, and natural gas liquids which, upon analysis of geologic and engineering data, appear with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions. Proved Reserves are limited to those quantities of oil and gas which can be reasonably expected to be recoverable commercially at current prices and costs, under existing regulatory practices and with existing conventional equipment and operating methods.

"**Record Date**" means the date established by the Managing General Partner or otherwise in accordance with this Agreement for determining (a) the identity of the record holders entitled to notice of or to vote at, any meeting of Limited Partners or entitled to vote by ballot or give approval of Partnership action in writing without a meeting or entitled to exercise rights in respect of any lawful action of Limited Partners, (b) the identify of record holders entitled to receive any report or distribution or to participate in any offer or (c) the identity of the record holders of Series A Preferred Units entitled to convert such Units.

"**Redemption Date**" has the meaning set forth in Section 3.6(c)(iii).

"**Redemption Election**" has the meaning set forth in Section 3.6(c)(v).

"**Redemption Event**" has the meaning set forth in Section 3.6(c)(vi).

"**Remaining Unitholders' Acceptance Notice**" has the meaning set forth in Section 6.5(b).

"**Respective Payout Percentages**" means (i) with respect to Series A Preferred Unitholders and Class A-1 Unitholders, pro rata in proportion to their respective holdings of Series A Preferred Units and Class A-1 Units (together as a single class) and (ii) with respect to the Legacy Common Unitholders (Ex. Class A-1), pro rata in proportion to their respective Class A Pre-Payout Percentages, Class A Post-Payout Percentages or Class A-1 Post-Payout Percentages (as such terms are defined in Exhibit G), as applicable per the then applicable portion of the Legacy Waterfall.

"**Request**" has the meaning set forth in Section 7.10(b).

"**Revenues**" means gross receipts of the Partnership derived from its interests in oil and gas properties (or related to other permitted operations), including any proceeds from the sale or exchange of capital items including Partnership Properties, plus any interest earned- upon investment of Partnership funds. Proceeds of any Partnership borrowings and Capital Contributions are excluded from Revenues.

"**Sales Notice**" has the meaning set forth in Section 6.5(a).

"**Second A&R Partnership Agreement**" has the meaning set forth in the recitals.

"**Second Incentive Distribution**" has the meaning set forth in Section 4.7(a)(iv).

"**Second Sales Notice**" has the meaning set forth in Section 6.5(a).

"**Second Series B Preferred Units Issuance**" has the meaning set forth in Section 3.6(c).

"**Section 705(a)(2)(B) Expenditure**" means any expenditure by the Partnership of a type that is described in Section 705(a)(2)(B) of the Code (relating to expenditures that are neither deductible nor properly chargeable to capital).

"**Securities Act**" means the Securities Act of 1933.

"**Security Interest**" means any security interest, lien, mortgage, deed of trust, encumbrance, hypothecation, pledge, purchase option or other similar adverse claim or obligation, whether created by operation of law or otherwise, created by any Person in any of its property or rights.

"**Series A Conversion Date**" means, the meaning assigned to such term in Section 3.6(b)(iii)(B).

"**Series A Conversion Notice**" means, the meaning assigned to such term in Section 3.6(b)(iii)(B).

"**Series A Conversion Rate**" means, the number of Common Units issuable upon the conversion of each Series A Preferred Unit, which shall be 1.0 until such rate is adjusted as set forth in Section 3.6(b)(iii).

"**Series A Issuance Date**" has the meaning set forth in Exhibit G.

"**Series A Issue Price**" means $2,340.91 per Series A Preferred Unit.

"**Series A Liquidation Value**" has the meaning set forth in Exhibit G.

"**Series A Preferred Unitholder**" means, a record holder of Series A Preferred Units.

"**Series A Preferred Units**" means a Unit held by a Series A Limited Partner which has the rights, preferences and privileges set forth in this Agreement.

"**Series B Distribution Rate**" means, the amount per Series B Preferred Unit equal to the product of the Series B Issue Price, multiplied by a rate of 13.50% per annum, cumulative compounding quarterly, subject to increase by an additional 200 basis points pursuant to Section 3.6(c)(v).

"**Series B Issue Price**" means $1,000.00 per Series B Preferred Unit.

"**Series B Preferred Units**" means a Unit held by a Series B Preferred Unitholder which has the rights, preferences and privileges set forth in this Agreement.

"**Series B Preferred Unitholder**" means a record holder of Series B Preferred Units.

"**Series B Unit Distribution**" means with respect to each Series B Preferred Unit, the product of the Series B Distribution Rate multiplied by the Series B Issue Price at the applicable time.

"**Service**" means the Internal Revenue Service.

"**Simulated Basis**" means, at any time with respect to any Partnership Property, the book value of such property at such time (determined by decreasing the original book value of such property by the amount of Simulated Depletion computed with respect thereto).

"**Simulated Depletion**" means the simulated depletion allowance computed (pursuant to Section 1.704-1(b)(2)(i)(k) of the Treasury Regulations, using the cost depletion method) by the Partnership with respect to Partnership assets.

"**Simulated Gains and Simulated Losses**" means, respectively, the simulated gains or simulated losses computed under Section 1.704-1(b)(2)(iv)(k) of the Treasury Regulations) by the Partnership with respect to Partnership assets.

"**Subject Interests**" has the meaning set forth in Section 3.8(a).

"**Subject Interest Valuator**" has the meaning set forth in Section 3.8(d).

"**Subsidiary**" means, with respect to any relevant Person as of the date the determination is being made, any other Person that (a) is Controlled (directly or indirectly) by such relevant Person and (b) the equity entitled to vote to elect the board of directors, board of managers or other governing authority of which is more than fifty percent (50%) owned (directly or indirectly) by such relevant Person.

"**Tag Along Notice**" has the meaning set forth in Section 6.6(a).

"**Tag Along Offer**" has the meaning set forth in Section 6.6(a)(iii).

"**Tag Along Sale Percentage**" has the meaning set forth in Section 6.6(a)(i).

"**Tax Advances**" has the meaning set forth in Section 4.8.

"**Tax Rate**" has the meaning set forth in Section 4.7(b)(i).

"**TBOC**" means the Texas Business Organizations Code as adopted and from time to time amended by the State of Texas.

"**Termination**" has the meaning set forth in the Class G Incentive Plan.

"**Third Incentive Distribution**" has the meaning set forth in Section 4.7(a)(v) hereof.

"**Third Party**" means any Person other than a Partner, its Affiliates and the Partnership.

"**Third Sales Notice**" has the meaning set forth in Section 6.5(b) hereof.

"**Transfer**" or "**Transferred**" means, with respect to a Unit, (a) a voluntary or involuntary sale, assignment, transfer, conveyance, exchange, bequest, devise, gift or any other alienation, including any pledge or grant of a security interest, (in each case, with or without consideration and whether by operation of law or otherwise, including, without limitation, by merger or consolidation) of any rights, interests or obligations with respect to all or any portion of such Unit, or (b) a grant or sufferance of a Security Interest on all or any portion of such Unit.

"**Transferee**" means a Person who receives all or part of a Partner's Partnership interest through a Transfer.

"**Treasury Regulations or Regulations**" means the official Treasury Department interpretation of the Code found in Title 26 of the Code of federal Regulations.

"**Unanimous Consent**" has the meaning set forth in the Managing General Partner's Bylaws.

"**Unit**" means that increment of ownership interest in the Partnership owned by a Unitholder in return for its Capital Contributions, as set forth on Exhibit A hereto (as the same may be amended from time to time). The ownership interest of the Managing General Partner, in its capacity as such, may but need not, be represented by Units.

"**Unit Value**" means an amount determined on a per Unit basis equal to the sum of (i) (A) 70% of the estimated future net cash flows from the Proved Reserves of the Partnership (discounted to present value at 10% above the average Prime Rate for the 90-day period preceding the date as of which the reserves are evaluated, provided that the interest rate used shall not be less than 10%, and using unescalated pricing criteria prescribed by the Securities and Exchange Commission), such valuation to be prepared by an Independent Expert, using those prices, operating costs, and other assumptions provided by the Managing General Partner that are reasonable and consistent with generally accepted industry standards, (B) cash on hand, (C) prepaid expenses, (D) accounts receivable (after adjustment for any allowance necessary for doubtful collections) and (E) all other properties owned by the Partnership not otherwise separately valued, at their net book value; provided, however, that if the Managing General Partner has reason to believe that the aggregate fair market value of such assets valued at book value is materially higher, the value attributed to such assets will be the fair market value thereof as determined by the Independent Expert or the accountants for the Partnership), less the sum of (ii) (A) an amount equal to all debts, obligations, and other liabilities of the Partnership, and (B) the amount of any Distributions made to or credited to the account of the Unitholders after the date of such valuation and before the actual purchase of Units at Unit Value as herein defined, except that, if any cash distributed was derived from the sale, subsequent to the appraisal date, of oil or gas production from the Partnership's Prospects, or from the sale of the Partnership's Prospects, for purposes of determining the reduction of the Unit Value, such distribution shall be discounted at the same rate used to value the Proved Reserves of the Partnership, as set forth above.

"**Unitholder**" means any Persons or entities who hold Series A Preferred Units, Series B Preferred Units, Class A Units, Class B Units, Class C Units, Class D Units, Class E Units, Class F Units or Class G Units, or any other Units that may be issued by the Partnership as provided in this Agreement, and any transferee of a Unit who has not been admitted into the Partnership as a "Partner" pursuant to Section 6.2(f).

"**Unrealized Gain**" attributable to any item of Partnership Property means, as of any date of determination, the excess, if any, of (a) the fair market value of such property as of such date (as determined under Section 9.2(c) over (b) the book value of such property as of such date (prior to any adjustment to be made pursuant to Section 9.2(c) as of such date).

"**Unrealized Loss**" attributable to any item of Partnership Property means, as of any date of determination, the excess, if any, of (a) the book value of such property as of such date (prior to any adjustment to be made pursuant to Section 9.2(c) as of such date) over (b) the fair market value of such property as of such date (as determined under Section 9.2(c)).

"**Unreturned Capital**" means, with respect to each Series B Preferred Unit, as applicable, as of the time of determination, the Capital Contributions made in respect of such Series B Preferred Unit (it being agreed that with respect to any Series B Unit issued as Payment in Kind, a Capital Contribution equal to the Series B Issue Price shall be deemed to have been made in respect of such Series B Unit issued as Payment in Kind for purposes of determining Unreturned Capital for such Series B Unit) less the cumulative amount of all prior distributions (excluding, for the avoidance of doubt, any Series B Units issued as Payment in Kind) made in respect of such Series B Preferred Unit pursuant to Section 4.7(a).

"**Vested Class G Units**" means any Class G Units that have vested and remain vested as of the date of determination pursuant to the terms of the Class G Incentive Plan.

"**Vested Management Interests**" means outstanding Management Interests that have vested pursuant to the terms of this Agreement and any applicable Award Agreement.

"**Vesting Catch Up Distribution**" has the meaning set forth in Section 4.7(c).

"**Voting Unitholder**" means a holder of Voting Units.

"**Voting Units**" means Class A, Class A-1, Class B, Class C, Class E and Class F Units.

**EXHIBIT C**

**PRIMEXX ENERGY PARTNERS, LTD.**
**SERIES A CONVERSION NOTICE**

The undersigned hereby irrevocably elects to convert all of the 8% Series A Convertible Preferred Limited Partnership Units (the "Preferred Units") in Primexx Energy Partners, Ltd. ("Primexx"), represented by book entry in the name of the undersigned holder, into Class A-1 Units of Primexx. Notice of this optional conversion is being made in accordance with the terms and conditions of Primexx's Third Amended and Restated Limited Partnership Agreement ("Third Amended Partnership Agreement") and the undersigned hereby elects to convert all Preferred Units represented by book entry held in the name of undersigned.

The undersigned agrees that Primexx is not required to issue the Class A-1 Units to holder until the holder has delivered an assignment to Primexx in the form required by the Third Amended Partnership Agreement.

Name of the registered holder of Preferred Units to be converted: _____

Authorized Signature: _____

Name: _____

Title: _____

Address: _____

E-mail or Fax Number: _____

Number of Preferred Units to be converted (must be all Preferred Units represented by book Entry, held in holder's name): _____

Dated: _____

**EXHIBIT D**

**PRIMEXX ENERGY PARTNERS, LTD.**
**FORM OF ASSIGNMENT OF PREFERRED UNITS**

For Value Received, the undersigned holder hereby sells, assigns, and transfers unto Primexx Energy Partners, Ltd. ("Primexx"), all of the undersigned's right, title and interest in the 8% Series A Convertible Preferred Limited Partnership Units ("Preferred Units") standing in the holder's name on the books of Primexx, and the undersigned does hereby irrevocably constitute and appoint Primexx Energy Corporation, as Managing General Partner of Primexx, as agent and attorney-in-fact to transfer the said Preferred Units on the books of Primexx with full power of substitution in the premises. All of the undersigned's Preferred Units are being transferred by the holder to Primexx for cancellation in exchange for issuance to the holder of Class A-1 Units of Primexx as provided by the terms of the Third Amended and Restated Limited Partnership Agreement.

Name of the registered holder of Preferred Units assigned: _____

Number of Class A-1 Units to be issued: _____

Authorized Signature: _____

Name: _____

Title: _____

Address: _____

E-mail or Fax Number: _____

Dated: _____

# EXHIBIT E

## AMI AREA



Exh. E-1

5708

# EXHIBIT F

# CLASS G EQUITY PLAN

(Attached)

**PRIMEXX ENERGY PARTNERS, LTD.**
**CLASS G INCENTIVE PLAN**

1.    **Purpose**.    The purpose of the Plan is to provide economic incentives to selected employees and other service providers of the Company Group, in order to align their interests with equity holders of the Company and to exert maximum efforts for the success of the Company Group.

2.    **Definitions**.    Capitalized terms used in this Plan but not expressly defined in this Plan shall have the respective meanings ascribed to such terms in the LP Agreement (as defined below).  As used in this Plan, the following terms shall have the meanings set forth below:

(a)    "Award" means a Class G Unit awarded pursuant to the Plan, as evidenced by an Award Agreement.

(b)    "Award Agreement" means a written agreement signed by the Company evidencing an award of Class G Units pursuant to the Plan.

(c)    "Cause" means with respect to any Participant, in the absence of an employment or other service agreement between a Participant and the Employer otherwise defining Cause, (i) the continued failure to substantially perform such Participant's Duties (other than due to physical or mental incapacity); (ii) any damage of a material nature to the business or property of any member of the Company Group caused by such Participant's willful or grossly negligent conduct; (iii) deliberate misconduct which is reasonably likely to be materially damaging to any member of the Company Group; (iv) the indictment for, conviction of or plea of guilty or nolo contendre to any felony or a misdemeanor involving an act of dishonesty, moral turpitude, deceit, or fraud by such Participant; (v) a material breach of any non-competition, non-solicitation, confidentiality, non-disparagement or other restrictive covenant provisions relating to any member of the Company Group by which such Participant may be bound, including, without limitation, any such covenants contained in an Award Agreement; or (vi) such Participant's material breach of the LP Agreement, provided, that none of the foregoing events (with the exception of clauses (ii) – (iv)) shall constitute Cause unless the Participant fails to cure (to the extent curable) such event within thirty (30) days after receipt from the Employer of written notice of the event which constitutes Cause, which written notice shall give reasonable specificity in the nature of the circumstances determined by the Employer in good faith to constitute Cause, provided further that breaches of clauses (v) and (vi) may only be cured to the extent such breach is not willful. In the event that there is an employment or other service agreement between such Participant and the Employer defining Cause, "Cause" shall have the meaning provided in such agreement, and a Termination by the Employer for Cause hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such agreement are complied with.

(d)    "Change of Control" means the occurrence of any of the following: (i) the consummation of any transaction (including any merger or consolidation) the result of which is that one or more Third Parties (other than a Subsidiary of the Partnership) become the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the voting interests of the Company and the Managing General Partner; (ii) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the Company's assets and the assets of its Subsidiaries, taken as a whole, to one or more Third Parties; provided, however, that none of the circumstances in this clause (ii) shall be a Change of Control if the Persons that beneficially own the Company's Common Units immediately prior to the transaction own, directly or indirectly, equity interests with a majority of the total voting power of all of the outstanding equity interests of the surviving or transferee Person immediately after the transaction; and (iii) the Company consolidates with, or merges with or into, any Third Party or any such Third Party consolidates with, or merges with or into, the Partnership, in either case, pursuant to a transaction in which any of the Company's outstanding

KE 42233084

equity interests or the equity interests of such other Third Party is converted into or exchanged for cash, securities or other property, other than pursuant to a transaction in which the Partnership's Partnership Interests outstanding immediately prior to the transaction constitute, or are converted into or exchanged for, a majority of the equity securities of the surviving Person immediately after giving effect to such transaction; provided, that for the avoidance of doubt neither an initial public offering of the Company or any of its Subsidiaries or Affiliates, nor any reorganization of the Company in connection with an initial public offering, shall constitute a Change of Control.

(e)     "Committee" means a committee appointed to administer the Plan in accordance with Section 10(d), if any.

(f)     "Company" means Primexx Energy Partners, Ltd., a Texas limited partnership.

(g)     "Company Group" means, collectively, the Company, together with its Affiliates.

(h)     "Duties" means the duties, responsibilities and obligations of a Participant in connection with such Participant's employment or service with the Employer.

(i)     "Effective Date" means July 12, 2016.

(j)     "Employer" means, with respect to any Participant, the member of the Company Group that such Participant is principally employed by (or, if such Participant is a non-employee service provider, principally providing services to).

(k)     "Exit Event" means a Change of Control other than as a result of a public offering of the Company.

(l)     "Good Reason" means, with respect to any Participant, in the absence of an employment or other service agreement between a Participant and the Employer otherwise defining Good Reason, without such Participant's consent, (i) a material and ongoing reduction by the Employer of such Participant's base salary or bonus opportunity; (ii) a material diminution in such Participant's title, position or Duties; or (iii) the relocation of such Participant's primary office location to a location that is more than fifty (50) miles from the Participant's then-current primary office location; provided, that none of the foregoing events shall constitute Good Reason unless the Employer fails to cure such event within thirty (30) days after receipt from the Participant of written notice of the event which constitutes Good Reason, which written notice shall give reasonable specificity in the nature of the circumstances determined by the Participant in good faith to constitute Good Reason; provided, further, that "Good Reason" shall cease to exist for an event on the sixtieth (60th) day following the occurrence of such event, unless Participant has given the Employer and the Company written notice thereof prior to such date. In the event that there is an employment or other service agreement between such Participant and the Employer defining Good Reason, "Good Reason" shall have the meaning provided in such agreement, and a Termination by the Participant with Good Reason hereunder shall not be deemed to have occurred unless all applicable notice and cure periods in such agreement are complied with.

(m)     "LP Agreement" means the Third Amended and Restated Limited Partnership Agreement of the Company, dated as of July 1, 2016, as the same may be modified, amended, restated or amended and restated from time to time.

(n)     "Participant" means an employee or non-employee service provider of the Employer to whom Class G Units are granted pursuant to the Plan.

(o)     "Permanent Disability" means, with respect to any Participant, in the absence of an employment or other service agreement between a Participant and the Employer otherwise defining

Permanent Disability or Disability, the good faith, reasonable determination by the Company that a Participant is unable to substantially perform the duties of such Participant's employment with the Employer for a period of one-hundred and twenty (120) consecutive days because of (i) a bodily loss or harm or (ii) an illness or disease whether or not incurred prior to or after the date of the LP Agreement.

(p)      "Plan" means this Class G Incentive Plan of the Company, as it may be amended or supplemented from time to time.

(q)      "Termination" means, as to any Participant, the termination of such Participant's employment or service, as applicable, with the Employer.

(r)      "Vesting Commencement Date" means, as to any Participant and with respect to any Class G Unit, the first (1st) anniversary of the date of the award of such Class G Unit.

3.      **Class G Units Available Under the Plan**.  The total number of Class G Units that may be granted pursuant to Awards under this Plan is 100,000.  If, after the Effective Date, any Class G Unit or other class of equity granted hereunder is forfeited, or if any Class G Unit or other class of equity granted hereunder has expired, terminated or been cancelled for any reason whatsoever, and, in either such case, a Participant has received no benefits of ownership with respect to such forfeited, expired, terminated or cancelled Class G Unit or other class of equity, then such Class G Unit or other class of equity shall again be available for Awards and shall again be available to be awarded hereunder.

4.      **Vesting**. Except as otherwise provided in an Award Agreement, Class G Units granted under the Plan shall vest as follows:

(a)      Provided that a Participant has not undergone a Termination prior to the applicable vesting date, with respect to any group of Class G Units awarded to such Participant, (i) 20% percent (20%) of such Class G Units granted shall become Vested Class G Units on the Vesting Commencement Date for such Class G Units, (ii) 20 percent (20%) of such Class G Units granted shall become Vested Class G Units on each of the first four (4) anniversaries of the Vesting Commencement Date for such Class G Units, and (iii) any Class G Units granted under such Participant's Award Agreement that remain unvested as of the occurrence of an Exit Event shall fully vest and become Vested Class G Units upon the occurrence of such Exit Event.

(b)      Subject to the last sentence of Section 4(a), any Class G Units that have not become Vested Class G Units prior to a Participant's Termination for any reason shall be forfeited upon such Termination, and such terminated Participant shall have no further rights with respect thereto.

(c)      Following any Termination, Vested Class G Units not otherwise forfeited pursuant to subsection (b) above shall continue to be subject to the terms of the LP Agreement.

5.      **Treatment of Class G Units; Tax Election**.  It is intended that all Class G Units granted in accordance with this Plan are to be treated as "profits interests" for Interested States federal income tax purposes.  Each Participant must agree, in connection with the grant of any Class G Units, to file a timely election (and provide the Company with a copy of such election) in accordance with the provisions of Code Section 83(b) with respect to such Class G Units.

6.      **Class G Unit Award Provisions**.  Subject to the provisions of this Plan and the LP Agreement, the Board shall have the sole and complete authority to determine the Participants to whom Class G Units shall be granted, the number and class of Class G Units to be covered by each Award and the conditions and restrictions applicable to the Award.  Subject to the foregoing, the terms and conditions of Award Agreements may change from time to time and the terms and conditions of separate Award Agreements need not be identical.

7.    **No Employment Rights**.  Neither this Plan, nor any Award Agreement, nor any Award shall confer upon any Participant any right with respect to continuing the Participant's employment with the Employer, nor shall it interfere in any way with the right to terminate such relationship at any time, with or without Cause, and with or without notice.

8.    **No Rights to Awards**.  No Person shall have any claim to receive any Award under the Plan.  There is no obligation for uniformity of treatment of Participants regarding the number of Class G Units awarded or the manner in which Awards are made.  The terms and conditions of Awards made under the Plan need not be the same with respect to each Participant.

9.    **Withholding Obligations**.  Payments made under the Plan shall be conditional upon the satisfaction by the Participant of any federal, state or local withholding or other taxes required to be paid by the Employer on account of such payments and in this regard, the Company may (i) require that a Participant pay to the Employer an amount sufficient to satisfy such withholding or other taxes, (ii) withhold such amount from any remuneration, distributions or other amounts payable to the Participant or (iii) enter into any arrangements suitable to the Employer, for the receipt of such amount.

10.    **Administration of the Plan**.

(a)    <u>Authority of the Board</u>.  The Board shall administer the Plan unless and until the Board delegates administration to a Committee, as provided in <u>Section 10(d)</u>.

(b)    <u>Powers of the Board</u>.  The Board shall have the power, subject to, and within the limitations of, the express provisions of this Plan and the LP Agreement:

(i)    To determine from time to time which of the employees of the Company Group shall be granted Class G Units; when and how each Class G Unit shall be granted, as applicable; the vesting conditions and other provisions of each Class G Unit granted (which need not be identical), including the time or times when a person shall be permitted to purchase or receive, as applicable, Class G Units pursuant to a Class G Unit Award; and the number of Class G Units with respect to which a Class G Unit Award shall be granted to each such person.

(ii)    To designate those members of the Company Group whose officers, directors, employees or consultants may participate in the Plan.

(iii)    To construe and interpret the Plan and Awards granted under the Plan, and to establish, amend and revoke rules and regulations for its administration.

(iv)    To establish, amend, suspend or waive such rules and regulations and appoint such agents as it shall deem appropriate for the proper administration of the Plan in accordance with its terms or waive any vesting or forfeiture conditions applicable to any Award.

(v)    The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Award Agreement in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

(vi)    Generally, to exercise such powers and to perform any acts as the Board deems necessary or expedient to promote the best interests of the Company Group, which are not in conflict with the provisions of the Plan or the LP Agreement.

(c)    <u>No Liability</u>.  Neither the Board nor any officer, director or employee of any member of the Company Group shall be liable for any action or determination made in good faith with respect to the Plan or any Award made under the Plan.

(d)     Delegation to Committee. The Board may delegate administration of the Plan to a Committee or Committees of one or more individuals or entities designated by the Board, and the term "Committee" shall apply to any person or persons to whom such authority has been delegated by the Board.  If administration is delegated to a Committee, the Committee shall have, in connection with the administration of the Plan, to the extent delegated to the Committee by the Board, all powers theretofore possessed by the Board hereunder, including the power to delegate to a subcommittee any of the administrative powers the Committee is authorized to exercise (and references in this Plan to the Board shall thereafter be to the Committee or subcommittee), subject, however, to such resolutions, not inconsistent with the provisions of the Plan, as may be adopted from time to time by the Board.  The Board may abolish the Committee at any time and re-vest in the Board the administration of the Plan.

(e)     Effect of the Board's Decision.  The Plan and all determinations, interpretations and constructions of the Plan made by the Board in its reasonable good faith determination or discretion shall not, absent manifest error, be subject to review by any Person and shall be final, binding and conclusive on all Persons, including all successors and assigns of the Company and a Participant, including without limitation, the estate of such Participant and the executor, administrator or trustee of such estate, or any receiver or trustee in bankruptcy or representative of the Participant's creditors.

11.     **Amendment or Termination of the Plan**.  Subject to the provisions of this Plan and the LP Agreement, the Board may amend, suspend or terminate the Plan at any time.  No Class G Units may be granted under the Plan after it is terminated.  The amendment, suspension or termination of the Plan shall not materially impair the rights and obligations under any Class G Unit Award granted while the Plan is in effect without the consent of either the affected Participant or the consent of Participants holding a majority of the Class G Units then outstanding under the Plan.

12.     **Conflict Between or Among the Plan, the LP Agreement and/or the Related Award Agreements**.  The Plan is subject to the LP Agreement, the terms and provisions of which are hereby incorporated herein by reference.  In the event of a conflict between any term or provision contained herein and therein, the LP Agreement shall govern and prevail.  In the event of a conflict between any term or provision contained herein and in any Award Agreement, this Plan shall govern and prevail.

13.     **Miscellaneous**.

(a)     Legal Compliance.  Class G Units granted hereunder shall not be issued unless the issuance and delivery of such Class G Units shall comply with applicable laws and shall be further subject to the approval of counsel for the Company with respect to such compliance. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company to be necessary to the lawful issuance and sale of any Class G Units hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Class G Units as to which such requisite authority shall not have been obtained.

(b)     Investment Representations.  As a condition to the receipt of a Class G Unit, the Company may require the Participant (or any Permitted Affiliate) to represent and warrant at the time of any such exercise that the Class G Units are being acquired only for investment and without any present intention to sell or distribute such Class G Units if, on the advice of counsel for the Company, such a representation is required.

(c)     No Limit on Other Compensation Arrangements.  Nothing contained in the Plan shall prevent any member of the Company Group from adopting or continuing in effect other compensation arrangements, which may, but need not, provide for the award of Class G Units, securities and other types of awards, and such arrangements may be either generally applicable or applicable only in specific cases.

5

(d)     Severability.  If any provision of this Plan is deemed invalid, illegal, or unenforceable, such provision shall be deemed amended to the minimum extent necessary to conform to applicable law so as to be valid, legal and enforceable; if such provision cannot be amended as provided above, it shall be stricken and the remainder of this Plan shall remain in full force and effect.

(e)     Notice.  Any notice must be in writing and provided in accordance with the Award Agreement.  Any notice or communication required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) faxed or emailed to the recipient or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), in each case to the applicable address set forth in the Award Agreement.

14.     **Governing Law**.  The validity, construction and effect of the Plan and any rules and regulations relating to the Plan and any Award Agreement shall be construed, enforced and governed in conformity with the laws of the State of Texas, without giving effect to principles of conflicts of law, and shall be binding upon the parties hereto, their successors, heirs, devisees, permitted assigns, legal representatives, executors and administrators, but shall not be deemed for the benefit of creditors or any other Persons.

15.     **Effectiveness of the Plan**.  The Plan shall be effective as of the Effective Date.

16.     **LP Agreement**. As a condition of the grant of any Class G Units to any Participant under the Plan, to the extent that such Participant is not already a party to the LP Agreement, such Participant shall be required to execute a joinder to, and become a party to, the LP Agreement.

*   *   *   *   *

# EXHIBIT G

# LEGACY WATERFALL

(Attached)

**EXHIBIT G**

**LEGACY WATERFALL**

All capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the Agreement. Section references herein are to Sections of this Exhibit G unless otherwise specified. For the sake of clarity, notwithstanding anything herein to the contrary, the making of Distributions is subject to the provisions and requirements of Section 4.7 of the Agreement.

**(A)** **Legacy Waterfall**. For purposes of the Agreement, "**Legacy Waterfall**" shall mean the allocation of Distributions pursuant to Section 4.7(a) of the Agreement among the Legacy Unitholders as set forth below:

**(1)** **Distributions Other Than Capital Proceeds**. All Distributions in accordance with the Legacy Waterfall, except Distributions of Capital Proceeds, shall be distributed as follows:

(a) *First*, to the Series A Preferred Unitholders until any Series A Unpaid Cash Distributions are paid in full;

(b) *Second*, to the Class A Unitholders in proportion to and to the extent of the excess, if any, of (x) the Class A Preferred Return (from the Closing Date to the close of the immediately preceding Fiscal Year) in respect of the Units held by each, over (y) the sum of all prior distributions to such Partner (and such Partner's predecessors in interest) made pursuant Section (A)(2)(b) and to this Section (A)(1)(b) (or previously pursuant to Sections 4.10.1(ii) and 4.10.2(ii) of the Second A&R Partnership Agreement); and

(c) *Third*, the balance to the Legacy Common Unitholders other than Class D Unitholders, in accordance with Section (A)(3).

**(2)** **Distribution of Capital Proceeds**. All Distributions of Capital Proceeds in accordance with the Legacy Waterfall, including Distributions made pursuant to dissolution of the Partnership, shall be made as follows:

(a) *First*, to the Series A Preferred Unitholders until any Series A Unpaid Cash Distributions are paid in full and, if in connection with an Exit Event, the Series A Liquidation Value is paid in full;

(b) *Second*, to the Class A Unitholders in proportion to and to the extent of the excess, if any, of (x) the Class A Preferred Return (from the Closing Date to the close of the immediately preceding Fiscal Year) in respect of the Units held by each, over (y) the sum of all prior distributions to such Partner (and such Partner's predecessors in interest) made pursuant to this Section (A)(2)(b), plus all distributions pursuant to Section (A)(1)(b) (or previously pursuant to Sections 4.10.2(ii) and 4.10.1(ii) of the Second A&R Partnership Agreement);

(c) *Third*, to the Class A Unitholders, Class A-1 Unitholders and Class B Unitholders, pro rata and pari passu, until the cumulative amount distributed to the Class A Unitholders,

Exhibit G, Page 1

Class A-1 Unitholders and Class B Unitholders under Section (A)(1) and Section (A)(2) (or previously pursuant to Sections 4.10.1 and 4.10.2 of the Second A&R Partnership Agreement) after the date of grant of Class C Units equals the Threshold Value;

(d)  *Fourth*, to the Class C Unitholders in proportion to their respective Percentage Interests until the cumulative amount distributed to the Class C Unitholders under this Section (A)(2)(d) equals the product of (a) the Threshold Value, multiplied by (b) the Class C Unitholders' respective Percentage Interests; and

(e)  *Fifth*, the balance to the Legacy Common Unitholders, in accordance with Section (A)(3).

**(3)  Allocation Among Legacy Common Unitholders**.

(a)  Any Distribution allocated to the Legacy Common Unitholders pursuant to Section (A)(1)(c) or Section (A)(2)(e) (or previously pursuant to Sections 4.10.1(iii) and 4.10.2(v) of the Second A&R Partnership Agreement) for any period prior to Class A Payout shall in turn be allocated, to the Legacy Common Unitholders, where applicable, in proportion to respective Class A Pre-Payout Percentages.

(b)  Any Distributions allocated to Legacy Common Unitholders pursuant to Section (A)(1)(c) or Section (A)(2)(e) (or previously pursuant to Sections 4.10.1(iii) and 4.10.2(v) of the Second A&R Partnership Agreement) for any period following Class A Payout, and prior to Class A-1 Payout, shall in turn be allocated to the Legacy Common Unitholders, where applicable, in proportion to their respective Class A Post-Payout Percentages.

(c)  Any Distributions allocated to Legacy Common Unitholders pursuant to Section (A)(1)(c) or Section (A)(2)(e) (or previously pursuant to Sections 4.10.1(iii) and 4.10.2(v) of the Second A&R Partnership Agreement) for any period following Class A-1 Payout shall in turn be allocated to the Legacy Common Unitholders, where applicable, in proportion to their respective Class A-1 Post-Payout Percentages set forth on Exhibit H of the Agreement.

(d)  Class D Unitholders shall only participate in Distributions of Capital Proceeds pursuant to Section (A)(2).

**(4)  Series A Preferred**.

(a)  Series A Distributions.  Commencing with the Fiscal Year ending on December 31, 2013, the holders of the Series A Preferred Units shall be entitled to receive cumulative distributions (each a "**Series A Distribution**"), prior to any other distributions made in respect of any other Partnership interests pursuant to Section (A)(1) or Section (A)(2), in the amount set forth in this Section (A)(4)(a) in respect of each outstanding Series A Preferred Unit.

(i)  For the Fiscal Year ending December 31, 2013, and for each Fiscal Year thereafter through and including the Fiscal Year ending immediately prior to the Fiscal Year in which the Series A Conversion Date occurs, the Series A Distribution on each outstanding

Series A Preferred Unit shall, to the extent not previously paid, accrue (and not be paid in cash outside the Legacy Waterfall notwithstanding anything in the Agreement or this Exhibit G to the contrary, unless determined otherwise by the Board in its sole discretion) at the Series A Distribution Rate (provided that for the Fiscal Year in which the Series A Issuance Date occurs, the amount accrued and otherwise payable pursuant to this clause (i) shall be an amount equal to the product of (I) the full Fiscal Year Series A Distribution amount times (II) a fraction, of which the numerator is the number of days from and including the Series A Issuance Date to, but excluding the date of such Fiscal Year's end, and the denominator is 360).  Furthermore, for the Fiscal Year in which the Series A Conversion Date occurs, the amount accrued and otherwise payable pursuant to this clause (i) shall be an amount equal to the product of (I) the full Fiscal Year Series A Distribution amount times (II) a fraction, of which the numerator is the number of days from and including the first day of such Fiscal Year to, but excluding, the Series A Conversion Date, and the denominator is 360).

(ii)  The record date for a Series A Distribution shall be the last day of the Fiscal Year preceding the date of Distribution ("**Series A Distribution Record Date**").

(iii)  The Parties acknowledge that certain Series A Distributions since the Series A Issuance Date were previously paid in cash and that other amounts have accrued but been unpaid pursuant to the Second A&R Partnership Agreement as referenced in the definition of "Series A Unpaid Cash Distributions".

**(B)**   **Other Definitions**. For purposes of this Exhibit G, any capitalized term used herein shall have the meaning set forth below.

"**Capital Proceeds**" means proceeds distributed on account of a Capital Transaction.

"**Capital Transaction**" means any transaction outside the ordinary course of the Partnership business involving the sale, exchange, other disposition, or refinancing of any Partnership asset, including an Exit Event.

"**Class A Payout**" means, with respect to any Class A Unitholder, the first day of the calendar month next following the date on which the aggregate cumulative Distributions (inclusive of the Class A Preferred Return) made in respect of the Class A Units of such Class A Unitholder, are sufficient so that such Class A Unitholder's Internal Rate of Return with respect to each of his Class A Units will equal eighteen percent (18%).

"**Class A Post-Payout Percentage**" means the respective Class A Post-Payout Percentages of the Legacy Common Unitholders as set forth on Exhibit H of the Agreement.

"**Class A Preferred Return**" means, with respect to any Class A unit, a sum equal to nine percent (9%) per annum (based on a 365 day year) for the actual number of days on the period for which such Class A Preferred Return is being determined (cumulative and compounded annually) of the average daily Unreturned Subscription with respect to such Class A Unit.

"**Class A Pre-Payout Percentage**" means the respective Class A Pre-Payout Percentages of the Legacy Common Unitholders as set forth on Exhibit H of the Agreement.

"**Class A-1 Payout**" means with respect to any holder of Class A-1 Units, the first day of the calendar month next following the date on which the aggregate cumulative Distributions made in respect of the Series A Preferred Units (before conversion into Class A-1 Units) and the Class A-1 Units (after conversion) are sufficient so that the aggregate Internal Rate of Return with respect thereto, will equal twenty percent (20%).

"**Class A-1 Post-Payout Percentage**" means the respective Class A-1 Post-Payout Percentages of the Common Partners as set forth on Exhibit H of the Agreement.

"**Legacy Common Unitholders**" means, holders of Legacy Common Units.

"**Series A Adjusted Issue Price**" means, (i) the Series A Issue Price, divided by (ii) the Series A Conversion Rate.

"**Series A Distribution**" means, the meaning assigned to such term in Section (A)(4)(a).

"**Series A Distribution Rate**" means, the amount per Series A Preferred Unit equal to the product of the Series A Issue Price, multiplied by a rate of 8.00% per annum, cumulative non-compounding.

"**Series A Issuance Date**" means, November 1, 2013.

"**Series A Issue Price**" means, $2,340.91 per Series A Preferred Unit.

"**Series A Liquidation Value**" means, with respect to each Series A Preferred Unit outstanding as of the date of such determination, an amount equal to the sum of (i) the Series A Adjusted Issue Price, plus (ii) all Series A Unpaid Cash Distributions, plus (iii) all accrued but unpaid distributions on such Series A Preferred Unit with respect to the Fiscal Year in which the liquidation occurs.

"**Series A Unpaid Cash Distributions**" means, the amount of any accrued Series A Distributions that have not been paid in cash, which includes, for the sake of clarity, any accrued but unpaid Series A Distributions under the Second A&R Partnership Agreement.

"**Threshold Value**" means the aggregate fair market value of the Capital Accounts of the Managing General Partner and the Class A Unitholders and Class B Unitholders, as adjusted pursuant to Section 9.2 of the Agreement immediately prior to the date of grant of the Class C Units (which, as of June 1, 2013, was agreed to be $250,000,000), less any applicable valuation discount as determined by an independent appraiser.

"**Unreturned Subscriptions**" means, with respect to any Class A Unit as of any date, the excess, if any, of the (x) the Capital Contribution made with respect to such Unit, over (y) the total Distributions made with respect to such Unit under Section (A)(1)(c) or Section (A)(2)(c) (or previously pursuant to Sections 4.10.1(iii) and 4.10.2(iii) of the Second A&R Partnership Agreement) or upon liquidation of the Partnership.

# EXHIBIT H

# LEGACY WATERFALL ALLOCATIONS

(Attached)

## Primexx Energy Partners, Ltd. Legacy Waterfall Allocations

**Allocation to Legacy Unitholders - Page 1**

**ALLOCATION OF OPERATING PROFITS & LOSSES (excluding Capital Transactions)**

| | # of Common Units Prior to Series A Conversion to Class A-1 Units | # of Common Units After Series A Conversion to Class A-1 Units | Prior to Series A Preferred Conversion — PROFITS — Class A Pre-Payout Percentages | Prior to Series A Preferred Conversion — PROFITS — Class A Post-Payout Percentages | Prior to Series A Preferred Conversion — LOSSES — Class A Pre-Payout Percentages | Prior to Series A Preferred Conversion — LOSSES — Class A Post-Payout Percentages | After Series A Preferred Conversion to Class A-1 — PROFITS AND LOSSES — Class A Pre-Payout Percentages | After Series A Preferred Conversion to Class A-1 — PROFITS AND LOSSES — Class A Post-Payout Percentages | After Series A Preferred Conversion to Class A-1 — PROFITS AND LOSSES — Class A-1 Post-Payout Percentages |
|---|---|---|---|---|---|---|---|---|---|
| **Class A Common Limited Partners:** | | | | | | | | | |
| BF Partners, L.P. | 1,746.92 | 1,746.92 | 2.01296% | 1.50972% | 1.06911% | 0.80183% | 1.06911% | 0.80183% | 0.80183% |
| Cohen, Howard M. | 42.53 | 42.53 | 0.04901% | 0.03676% | 0.02603% | 0.01952% | 0.02603% | 0.01952% | 0.01952% |
| Cohen, Marjory H. | 42.53 | 42.53 | 0.04901% | 0.03676% | 0.02603% | 0.01952% | 0.02603% | 0.01952% | 0.01952% |
| Edidin, Gary | 1,191.77 | 1,191.77 | 1.37326% | 1.02995% | 0.72936% | 0.54702% | 0.72936% | 0.54702% | 0.54702% |
| Gary Edidin Exempt Trust | 339.99 | 339.99 | 0.39177% | 0.29383% | 0.20807% | 0.15606% | 0.20807% | 0.15606% | 0.15606% |
| Gary Edidin Family Trust | 850.88 | 850.88 | 0.98046% | 0.73535% | 0.52074% | 0.39055% | 0.52074% | 0.39055% | 0.39055% |
| WM. A. Friedlander Rev. Tr. Dtd 2/20/98 | 1,564.94 | 1,564.94 | 1.80326% | 1.35245% | 0.95773% | 0.71830% | 0.95773% | 0.71830% | 0.71830% |
| Gilbert, Diane | 31.29 | 31.29 | 0.03606% | 0.02704% | 0.01915% | 0.01436% | 0.01915% | 0.01436% | 0.01436% |
| Groh Family Trust | 55.62 | 55.62 | 0.06409% | 0.04807% | 0.03404% | 0.02553% | 0.03404% | 0.02553% | 0.02553% |
| Marmol, Guillermo G. | 489.87 | 489.87 | 0.56447% | 0.42335% | 0.29980% | 0.22485% | 0.29980% | 0.22485% | 0.22485% |
| Spersibs, LP | 219.54 | 219.54 | 0.25298% | 0.18973% | 0.13436% | 0.10077% | 0.13436% | 0.10077% | 0.10077% |
| Schlesinger, Helen | 45.74 | 45.74 | 0.05270% | 0.03953% | 0.02799% | 0.02099% | 0.02799% | 0.02099% | 0.02099% |
| Helen Schlesinger Trust | 45.74 | 45.74 | 0.05270% | 0.03953% | 0.02799% | 0.02099% | 0.02799% | 0.02099% | 0.02099% |
| **Total Class A Common Limited Partners** | **6,667.36** | **6,667.36** | **7.68274%** | **5.76205%** | **4.08040%** | **3.06030%** | **4.08040%** | **3.06030%** | **3.06030%** |
| **Series A Preferred Partners:** | | | | | | | | | |
| Convertible Series A Preferred | | | (8% Coupon + recoup any prior losses) | | 46.88874% | 46.88874% | n/a - converted | n/a - converted | n/a - converted |
| Primexx Opportunity Fund, LP | | 64,214.35 | | | 45.62105% | 45.62105% | 45.62105% | 45.62105% | 31.93474% |
| Las Rosas Capital LLC | | 1,751.46 | | | 1.24432% | 1.24432% | 1.24432% | 1.24432% | 0.87103% |
| Cohen, Howard M. | | 4.50 | | | 0.00320% | 0.00320% | 0.00320% | 0.00320% | 0.00224% |
| Cohen, Marjory H. | | 4.50 | | | 0.00320% | 0.00320% | 0.00320% | 0.00320% | 0.00224% |
| Gilbert, Diane | | 12.89 | | | 0.00916% | 0.00916% | 0.00916% | 0.00916% | 0.00641% |
| Groh Family Trust | | 11.00 | | | 0.00781% | 0.00781% | 0.00781% | 0.00781% | 0.00547% |
| **Post conversion Class A-1 Common Total** | | **65,998.70** | | | **46.88874%** | **46.88874%** | **46.88874%** | **46.88874%** | **32.82212%** |
| **Class B Limited Partners:** | | | | | | | | | |
| Kevin T Aul | 6,169.76 | 6,169.76 | 5.22143% | 5.33189% | 2.77317% | 2.83183% | 2.77317% | 2.831832% | 2.83183% |
| Santom, Inc. | 81,799.08 | 81,799.08 | 69.32604% | 70.79258% | 36.81993% | 37.59883% | 36.81993% | 37.598830% | 37.59883% |
| Wynne Family Trust | 18,363.06 | 18,363.06 | 15.54054% | 15.86929% | 8.25378% | 8.42838% | 8.25378% | 8.428379% | 8.42838% |
| Bobby J. Baggett | 1,762.14 | 1,762.14 | 1.52287% | 1.52287% | 0.80881% | 0.80881% | 0.80881% | 0.80881% | 0.80881% |
| Gold Prime 2011 Trust | 834.69 | 834.69 | 0.70639% | 0.72133% | 0.37517% | 0.38311% | 0.37517% | 0.383108% | 0.38311% |
| **Total Class B Limited Partners** | **108,928.73** | **108,928.73** | **92.31726%** | **94.23795%** | **49.03086%** | **50.05096%** | **49.03086%** | **50.05096%** | **50.05096%** |
| **Class C Limited Partners:** | | | | | | | | | |
| [reserved] | - | - | | | | | | | |
| **Total Class C Limited Partners** | **-** | **-** | | | | | | | |
| **Class D Limited Partners (profits interest):** | | | | | | | | | |
| James Jeffs | 1,285.00 | 1,285.00 | | | | | | | |
| Robert Holland | 1,285.00 | 1,285.00 | | | | | | | |
| **Total Class D Limited Partners** | **2,570.00** | **2,570.00** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** |
| **Class E Limited Partners (profits interest):** | | | | | | | | | |
| [reserved] | - | - | | | | | | | |
| **Total Class E Limited Partners** | **-** | **-** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **14.06662%** |
| **Total Limited Partners** | **118,166.09** | **184,164.79** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** |
| **General Partner:** | | | | | | | | | |
| Primexx Energy Corporation | | | | | | | | | |
| General Partner interest | 117.48 | 117.48 | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% |
| **Total General Partner** | **117.48** | **117.48** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** |
| **Total Legacy Unitholders and General Partner** | **118,283.57** | **184,282.27** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** |

*Note: EV Value has been reduced to $175 million.*

*All grey highlighted rows indicate a separate class of Units*

Exhibit H to the Third Amended and Restated Limited Liability Company Agreement of Primexx Energy Partners, Ltd. (Legacy Waterfall Allocations)

**Primexx Energy Partners, Ltd. Legacy Waterfall Allocations**

|  | # of Common Units Prior to Series A Conversion to Class A-1 Units | # of Common Units After Series A Conversion to Class A-1 Units | Prior to Series A Preferred Conversion — PROFITS — Class A Pre-Payout Percentages | PROFITS — Class A Post-Payout Percentages | LOSSES — Class A Pre-Payout Percentages | LOSSES — Class A Post-Payout Percentages | After Series A Preferred Conversion to Class A-1 — PROFITS AND LOSSES — Class A Pre-Payout Percentages | Class A Post-Payout Percentages | Class A-1 Post-Payout Percentages |
|---|---|---|---|---|---|---|---|---|---|
| **Class A Common Limited Partners:** | | | | | | | | | |
| BF Partners, L.P. | 1,746.92 | 1,746.92 | 2.01296% | 1.50972% | 2.01296% | 1.50972% | 0.98859% | 0.74144% | 0.74144% |
| Cohen, Howard M. | 42.53 | 42.53 | 0.04901% | 0.03676% | 0.04901% | 0.03676% | 0.02407% | 0.01805% | 0.01805% |
| Cohen, Marjory H. | 42.53 | 42.53 | 0.04901% | 0.03676% | 0.04901% | 0.03676% | 0.02407% | 0.01805% | 0.01805% |
| Edidin, Gary | 1,191.77 | 1,191.77 | 1.37326% | 1.02995% | 1.37326% | 1.02995% | 0.67443% | 0.50582% | 0.50582% |
| Gary Edidin Exempt Trust | 339.99 | 339.99 | 0.39177% | 0.29383% | 0.39177% | 0.29383% | 0.19240% | 0.14430% | 0.14430% |
| Gary Edidin Family Trust | 850.88 | 850.88 | 0.98046% | 0.73535% | 0.98046% | 0.73535% | 0.48152% | 0.36114% | 0.36114% |
| WM. A. Friedlander Rev. Tr. Dtd 2/20/98 | 1,564.94 | 1,564.94 | 1.80326% | 1.35245% | 1.80326% | 1.35245% | 0.88560% | 0.66420% | 0.66420% |
| Gilbert, Diane | 31.29 | 31.29 | 0.03606% | 0.02704% | 0.03606% | 0.02704% | 0.01771% | 0.01328% | 0.01328% |
| Groh Family Trust | 55.62 | 55.62 | 0.06409% | 0.04807% | 0.06409% | 0.04807% | 0.03148% | 0.02361% | 0.02361% |
| Marmol, Guillermo G. | 489.87 | 489.87 | 0.56447% | 0.42335% | 0.56447% | 0.42335% | 0.27722% | 0.20791% | 0.20791% |
| Spersibs, LP | 219.54 | 219.54 | 0.25298% | 0.18973% | 0.25298% | 0.18973% | 0.12424% | 0.09318% | 0.09318% |
| Schlesinger, Helen | 45.74 | 45.74 | 0.05270% | 0.03953% | 0.05270% | 0.03953% | 0.02588% | 0.01941% | 0.01941% |
| Helen Schlesinger Trust | 45.74 | 45.74 | 0.05270% | 0.03953% | 0.05270% | 0.03953% | 0.02588% | 0.01941% | 0.01941% |
| **Total Class A Common Limited Partners** | **6,667.36** | **6,667.36** | **7.68274%** | **5.76205%** | **7.68274%** | **5.76205%** | **3.77309%** | **2.82982%** | **2.82982%** |
| **Series A Preferred Partners:** | | | | | | | | | |
| Convertible Series A Preferred | | | 8% Coupon + recoup any prior losses | | (See Legacy Waterfall) | | n/a - converted | n/a - converted | n/a - converted |
| Primexx Opportunity Fund, LP | | 64,214.35 | | | | | 45.62105% | 45.62105% | 31.93473% |
| Las Rosas Capital LLC | | 1,751.46 | | | | | 1.24432% | 1.24432% | 0.87103% |
| Cohen, Howard M. | | 4.50 | | | | | 0.00320% | 0.00320% | 0.00224% |
| Cohen, Marjory H. | | 4.50 | | | | | 0.00320% | 0.00320% | 0.00224% |
| Gilbert, Diane | | 12.89 | | | | | 0.00916% | 0.00916% | 0.00641% |
| Groh Family Trust | | 11.00 | | | | | 0.00781% | 0.00781% | 0.00547% |
| **Post conversion Class A-1 Common Total** | | **65,998.70** | | | | | **46.88874%** | **46.88874%** | **32.82212%** |
| **Class B Limited Partners:** | | | | | | | | | |
| Kevin T Aul | 6,169.76 | 6,169.76 | 5.22143% | 5.33189% | 5.22143% | 5.33189% | 2.56431% | 2.618556% | 2.61856% |
| Santom, Inc. | 81,799.08 | 81,799.08 | 69.32604% | 70.79258% | 69.32604% | 70.79258% | 34.04689% | 34.767128% | 34.76713% |
| Wynne Family Trust | 18,363.06 | 18,363.06 | 15.54054% | 15.86929% | 15.54054% | 15.86929% | 7.63216% | 7.793607% | 7.79361% |
| Bobby J. Baggett | 1,762.14 | 1,762.14 | 1.52287% | 1.52287% | 1.52287% | 1.52287% | 0.74790% | 0.74790% | 0.74790% |
| Gold Prime 2011 Trust | 834.69 | 834.69 | 0.70639% | 0.72133% | 0.70639% | 0.72133% | 0.34692% | 0.354255% | 0.35426% |
| **Total Class B Limited Partners** | **108,928.73** | **108,928.73** | **92.31726%** | **94.23795%** | **92.31726%** | **94.23795%** | **45.33817%** | **46.28145%** | **46.28145%** |
| **Class C Limited Partners:** | | | | | | | | | |
| [reserved] | - | - | | | | | | | |
| **Total Class C Limited Partners** | **-** | **-** | | | | | | | |
| **Class D Limited Partners (profits interest):** | | | | | | | | | |
| James Jeffs | 1,285.00 | 1,285.00 | | | | | 2.00000% | 2.00000% | 2.00000% |
| Robert Holland | 1,285.00 | 1,285.00 | | | | | 2.00000% | 2.00000% | 2.00000% |
| **Total Class D Limited Partners** | **2,570.00** | **2,570.00** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **4.00000%** | **4.00000%** | **4.00000%** |
| **Class E Limited Partners (profits interest):** | | | | | | | | | |
| [reserved] | - | - | | | | | | | |
| **Total Class E Limited Partners** | **-** | **-** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **14.06662%** |
| **Total Limited Partners** | **118,166.09** | **184,164.79** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** |
| **General Partner:** | | | | | | | | | |
| Primexx Energy Corporation | | | | | | | | | |
| General Partner interest | 117.48 | 117.48 | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% | 0.00000% |
| **Total General Partner** | **117.48** | **117.48** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** | **0.00000%** |
| **Total Legacy Unitholders and General Partner** | **118,283.57** | **184,282.27** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** | **100.00000%** |

*Note: EV Value has been reduced to $175 million.*

*All grey highlighted rows indicate a separate class of Units*

EXH. 1 - PAGE 121

Exhibit H to the Third Amended and Restated Limited Liability Company Agreement of Primexx Energy Partners, Ltd. (Legacy Waterfall Allocations)

5723

# ANNEX A

July 12, 2016

BPP HoldCo LLC
c/o The Blackstone Group
345 Park Avenue
New York, NY 10154

Dear Sir/Madam:

Reference is made to the Limited Liability Agreement by and among Primexx Energy Partners, LTD (the "*Partnership*"), BPP HoldCo LLC (the "*VCOC Investor*") and the other parties thereto, dated as of July 12, 2016 (the "*LP Agreement*").

The Partnership hereby agrees that for so long as the VCOC Investor, directly or through one or more subsidiaries, continues to hold any Series B Preferred Units (or other securities of the Partnership into which such Series B Preferred Units may be converted or for which such Series B Preferred Units may be exchanged), without limitation or prejudice of any the rights provided to the VCOC Investor under the LP Agreement, the Partnership shall:

- Provide the VCOC Investor or its designated representative with:

    (i)     the right to visit and inspect any of the offices and properties of the Partnership and its subsidiaries during normal business hours at the VCOC Investor's expense (and subject to, in the case of the Partnership's oil and gas properties, (a) the execution of an access agreement reasonably satisfactory to the Partnership and (b) if the property is not operated by the Partnership or an affiliate, subject to approval of the operator of the property) and inspect and copy the books and records of the Partnership and its subsidiaries, at such times as the VCOC Investor shall reasonably request;

    (ii)    as soon as available and in any event within 60 days after the end of each of the first three quarters of each fiscal year of the Partnership, consolidated balance sheets of the Partnership and its subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Partnership and its subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments;

    (iii)   as soon as available and in any event within 120 days after the end of each fiscal year of the Partnership, a consolidated balance sheet of the Partnership and its subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Partnership and its subsidiaries for the year then ended prepared in conformity with generally accepted accounting principles in the United States

KE 42348597

applied on a consistent basis, except as otherwise noted therein, together with an auditor's report thereon of a firm of established national reputation;

(iv) to the extent the Partnership is required by law or pursuant to the terms of any outstanding indebtedness of the Partnership to prepare such reports, any annual reports, quarterly reports and other periodic reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, actually prepared by the Partnership as soon as available; and

(v) copies of all materials provided to the Board (as defined in the LP Agreement) at the same time as provided to the directors of the Board and if requested, copies of all materials provided to the board of directors of the Partnership's subsidiaries.

- Make appropriate officers and directors of the Partnership, and its subsidiaries, available periodically and at such times as reasonably requested by the VCOC Investor for consultation with the VCOC Investor or its designated representative with respect to matters relating to the business and affairs of the Partnership and its subsidiaries, including, without limitation, significant changes in management personnel and compensation of employees, introduction of new products or new lines of business, important acquisitions or dispositions of plants and equipment, significant research and development programs, the purchasing or selling of important trademarks, licenses or concessions or the proposed commencement or compromise of significant litigation;

- To the extent consistent with applicable law (and with respect to events which require public disclosure, only following the Partnership's public disclosure thereof through applicable securities law filings or otherwise), inform the VCOC Investor or its designated representative in advance with respect to any significant corporate actions, including, without limitation, extraordinary dividends, mergers, acquisitions or dispositions of assets, issuances of significant amounts of debt or equity and material amendments to the certificate of incorporation or formation or other organizational documents of the Partnership or any of its subsidiaries, and to provide the VCOC Investor or its designated representative with the right to consult with the Partnership and its subsidiaries with respect to such actions; and

- Provide the VCOC Investor or its designated representative with such other rights of consultation which the VCOC Investor's counsel may determine to be reasonably necessary under applicable legal authorities promulgated after the date hereof to qualify its investment in the Partnership as a "venture capital investment" for purposes of the United States Department of Labor Regulation published at 29 C.F.R. Section 2510.3-101(d)(3)(i) (the "Plan Asset Regulation").

The Partnership agrees to consider, in good faith, the recommendations of the VCOC Investor or its designated representative in connection with the matters on which it is consulted as described above, recognizing that the ultimate discretion with respect to all such matters shall be retained by the Partnership.

The VCOC Investor agrees, and will require each designated representative of the VCOC Investor to agree, to hold in confidence and not use or disclose to any third party (other than its

2

legal counsel and accountants) any confidential information provided to or learned by such party in connection with the VCOC Investor's rights under this letter agreement except as may otherwise be required by law or legal, judicial or regulatory process, *provided* that the VCOC Investor takes reasonable steps to minimize the extent of any such required disclosure.

In the event the VCOC Investor or any of the other purchasers transfers all or any portion of their investment in the Partnership to an affiliated entity (or to a direct or indirect wholly-owned conduit subsidiary of any such affiliated entity) that is intended to qualify as a venture capital operating company under the Plan Asset Regulation, such affiliated entity shall be afforded the same rights with respect to the Partnership afforded to the VCOC Investor hereunder and shall be treated, for such purposes, as a third party beneficiary hereunder.

This letter agreement and the rights and the duties of the parties hereto shall be governed by, and construed in accordance with, the laws of the State of New York and may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

*[Signature Pages Follow]*

**PRIMEXX ENERGY PARTNERS, LTD.**

By: Primexx Energy Corporation, its general partner

By:_____
Name:  Thomas H. Fagadau
Title:    President

Agreed and acknowledged as of the date first above written:

**BPP HOLDCO LLC**


By:_____
    Name: Angelo Acconcia
    Title:  President

[*], 2016

**Summary of Proposed Terms**

**<u>Term Sheet - Royalties Vehicle</u>**

| | |
|---|---|
| **Structure:** | Delaware limited liability company (the "<u>Company</u>") to be formed by (i) affiliates of Blackstone Energy Partners II L.P. ("<u>Blackstone</u>"), (ii) certain members of the Primexx Energy Partners, Ltd. management team ("<u>Management</u>"), and (iii) the existing equityholders of Primexx Energy Partners, Ltd. (the "<u>Shareholders</u>," and collectively with Blackstone and Management, the "<u>Members</u>"). |
| **Business Purpose:** | Blackstone will invest in the Company for the purpose of forming a partnership between Blackstone, Management and the Shareholders to enable Management and the Shareholders to participate in, and if desired, invest in, certain royalties, overriding royalties, mineral rights and other interests in hydrocarbon interests (other than working interests) in the Delaware basin. |
| **Capitalization & Securities Issued:** | Upon execution of definitive documentation (such date, the "<u>Effective Date</u>"), Blackstone will make an initial nominal capital contribution to the Company in exchange for membership interests of the Company (the "<u>Membership Interests</u>"). |
| | The Company will have two classes of Membership Interests outstanding on the Effective Date, (i) Common Membership Interests (the "<u>Common Units</u>") and (ii) Class A Profit-Sharing Membership Interests (the "<u>Class A Units</u>" and together with the Common Units, the "<u>Units</u>"). |
| | The Common Units will be issued to Blackstone, and as applicable, Management and Shareholders, in accordance with their respective capital commitments as contemplated below. The Class A Units will be issued to certain members of Management and the Shareholders and will be subject to customary straight-line vesting over a period of five (5) years. In addition, the Class A Units will vest on an accelerated basis in connection with certain liquidity events. |
| **Ownership on Effective Date:** | <u>Common Units</u>. 90.909% (Blackstone) / 9.091% (Management / Shareholders) (assumes Shareholder and Management Commitment taken up and funded in full) <u>Class A Units</u>. 65% (Management) / 35% (Shareholders) |
| **Equity Commitments and Funding:** | (A) Blackstone will commit to contribute up to $500 million to the Company and (B) Management, Shareholders and certain of their designees (family and friends) will have the opportunity to commit to contribute up to $50 million (which amount and commitment will be finalized no later than 45 days after the Effective Date) (the "<u>Shareholder and Management Commitment</u>"), in each case for the purpose of funding certain expenditures consistent with the Business Purpose. |
| | The Shareholder and Management Commitment will be funded on a pro rata basis alongside Blackstone's $500 million equity commitment; thereafter, Shareholders and Management will have the right but not the obligation to continue funding their pro-rata share of future capital calls until they elect not to fund any such capital call. |
| | The parties will agree on an initial general and administrative budget to cover expenses in connection with pursuing acquisitions and investments consistent with the Business Purpose for the Company. |
| | The Board will have the right to call capital from the applicable commitments from time to time on a pro rata basis for the purposes of funding certain expenditures |

|                          | consistent with the Business Purpose. |
|--------------------------|---------------------------------------|

**Distributions Waterfall:**

The Company's distributions will be applied in the following order of priority:

- *First*, pro rata to the Common Units until all capital contributions made by the holders of the Common Units are returned and the holders of the Common Units have achieved an IRR of 13.5% on their Common Unit invested capital.

- *Second*, up to 12.5% to the outstanding vested Class A Units and the remainder pro rata to the Common Units until the holders of the Common Units have achieved both (i) an IRR of 20% and (ii) a 2.05x net return on their Common Unit invested capital.

- *Third*, up to 22.5% to the outstanding vested Class A Units and the remainder pro rata to the Common Units until the holders of the Common Units have achieved both (i) an IRR of 30% and (ii) a 3.05x net return, in each case on their Common Unit invested capital.

- *Fourth*, thereafter, 32.5% to the outstanding vested Class A Units and the remainder pro rata to the Common Units.

The Company will make customary tax distributions to the Members that participate ahead of other distributions in the distributions waterfall. All tax distributions to a Member will be viewed as advance payments of a Member's other distributions.

**Board and Voting Rights:**

Blackstone will control the board of managers of the Company (the "Board") and no holder of Units will have voting rights as a holder of such Units. The Board will be comprised of 9 managers, of which Blackstone will have the right to appoint 5 managers, and of which Management and the Shareholders will collectively have the right to appoint 4 managers.

All Board matters will require majority approval, except for the following matters, which will require the Board's unanimous consent:

- Amendment of or modification to any governance documents of the Company in a manner that would result in a disproportionate, material and adverse effect on any rights, preferences or privileges of the Common Units held by Shareholders or Management or the Class A Units.

- Issuance or repurchase of any equity of the Company (other than as provided under the Class A Equity Plan).

- Amend or terminate the Class A Equity Plan.

The day-to-day business activities of the Company will be conducted pursuant to a customary management services arrangement with Primexx.

**Liquidity Event:**

At any time, Blackstone may cause an in-kind distribution of all of the assets of the Company (a "Liquidity Event") in accordance with the distributions waterfall. The parties agree to work together in good faith to structure the in-kind distribution of the Company's assets so as to avoid triggering any consent and/or preferential rights of purchase to which such assets may be subject.

**Transfer Restrictions:**

Subject to certain customary exceptions (including transfers to a Member's beneficiaries or estate upon death, or to a trust or other entity controlled by the transferring Member for estate planning purposes), no Member will be permitted to transfer its Units without Blackstone's consent.

**Tag-Along Rights:**

The other Members will have customary tag-along rights on proposed transfers of

2

|                          |                                                                                                                                                                                                                                                                                                                                      |
|--------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                          | Units to a third party by Blackstone.                                                                                                                                                                                                                                                                                                 |
| **Drag-Along Rights:**   | Blackstone will have customary drag-along rights with respect to the other Members in connection with a proposed sale of 100% of the Units.                                                                                                                                                                                            |
| **Company Call Rights:** | Upon the death, disability or termination of employment of any of the Management Members, the Company will have a customary call option on such Management Member's Units.                                                                                                                                                              |
| **Additional Rights & Restrictions:** | Definitive agreement will include additional rights and restrictions customary for a transaction of this nature.                                                                                                                                                                                                        |
| **Confidentiality:**     | Parties agree to keep the existence and terms of the proposed transactions described in this Summary of Proposed Terms confidential.  In addition, the parties agree not to disclose the fact that any discussions, negotiations or interactions between the parties with respect to any of the foregoing have taken place, or any facts with respect to such discussions, negotiations or interactions, including the name of the other party, in each case without the prior written approval of the other party. |
| **Binding Effect:**      | This Summary of Proposed Terms constitutes a preliminary, non-binding indication of interest by Blackstone and, together with any discussions or course of conduct, is not intended, and shall not be deemed, to create any binding obligation on the part of Blackstone or any of its respective affiliates to make any investment or to continue its consideration of any such investment; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the obligations with respect to confidentiality set forth above shall be binding on the parties. |
| **Governing Law:**       | Delaware.                                                                                                                                                                                                                                                                                                                             |

3

**IN WITNESS WHEREOF**, this proposed Summary of Proposed Terms has been executed by the duly authorized representatives of the parties as of the date(s) set forth below.

**BLACKSTONE MANAGEMENT PARTNERS L.L.C.**

By: _____
  Name:  Angelo G. Acconcia
  Title:   Member

**PRIMEXX ENERGY PARTNERS, LTD.**

By: Primexx Energy Corporation, its general partner

By: _____
  Name:
  Title:

**[MANAGEMENT]**

By: [*]

By: _____
  Name:
  Title:

**[SHAREHOLDERS]**

By: [*]

By: _____
  Name:
  Title:

*[Signature Page to Royalties Term Sheet]*

# APPENDIX 9

# SUPPLEMENTAL CLERK'S RECORD

VOLUME __1__ of __1__

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
10/15/2025 2:47:11 PM
CHRISTOPHER A. PRINE
Clerk

Business Court Cause No. __24-BC01B-0010__

**In the Business Court of Texas**

**Division ___1B___**

**Honorable _Bill Whitehill_ , Judge Presiding**

_____

Primexx Energy Opportunity Fund, LP, Primexx Energy Opportunity Fund II, LP, Plaintiff(s)

vs.

Primexx Energy Corporation, M. Christopher Doyle, Angelo Acconcia, Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII, Blackstone Energy Management Associates II, LLC, BCP VII/BEP II Holdinigs Manager LLC, BX Primexx Topco LLC, BPP Holdco LLC, Blackstone Energy Partners II LP, Blackstone Management Associates VI LLC, Blackstone Capital Partners VII LP, Defendant(s)

_____

**Appealed to the Court of Appeals for the <u>Fifteenth</u> District of Texas, at <u>Austin</u>, Texas.**

_____

**ATTORNEY FOR APPELLANT(S)**

Name __Stephen Shackelford, Jr.__

Address __1000 Louisiana Street, Suite 5100, Houston, Texas 77002__

Telephone no.: __713-651-9366__

Fax no.: __713-654-6666__

E-mail address: _sshackelford@susmangodfrey.com_

SBOT no.: __24062998__

Attorney for: __Primexx Energy Opportunity Fund, LP and Primexx Energy Opportunity Fund II, LP__, Appellant(s)

_____

Delivered by TAMES to the Court of Appeals for the <u>Fifteenth</u> District of Texas at <u>Austin</u>, Texas on the ___15th___ day of _October_, 2025.

BEVERLY CRUMLEY
CLERK OF THE BUSINESS COURT

_Beverly Crumley_

0001

COURT OF APPEAL NO. 15-25-00014-CV
Trial Court Cause No. 24-BC01B-0010
In the Business Court 1B of, Texas
Honorable Bill Whitehill, Judge Presiding


Primexx Energy Opportunity Fund, LP, Primexx Energy Opportunity Fund II, LP vs. PRIMEXX
ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO
ACCONCIA,BLACKSTONE HOLDINGS III LP,BLACKSTONE EMA II LLC,BMA VII
LLC,BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC,BCP VII/BEP II
HOLDINGS MANAGER LLC,BX PRIMEXX TOPCO LLC,BPP HOLDCO
LLC,BLACKSTONE ENERGY PARTNERS II LP,BLACKSTONE MANAGEMENT
ASSOCIATES VII LLC,BLACKSTONE CAPITAL PARTNERS VII LP

**INDEX**

| **DOCUMENT TITLE** | | **FILE DATE** | **PAGES** |
|---|---|---|---|
| Cover Page | | N/A | 1 - 1 |
| Index | | N/A | 2 - 2 |
| Request for Supplemental Clerk's Record with Exhibits 1-3 (filed under seal) | | 10/14/2025 | 3-208 |
| Court's Docket Sheet | | N/A | 209 - 209 |
| Bill of Costs | | 10/15/2025 | 210 - 210 |
| Clerk's Certificate | | 10/15/2025 | 211 - 211 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

E-filed in the Office of the Clerk
for the Business Court of Texas
10/14/2025 7:34 AM
Accepted by: Alexis Jennings
Case Number: 24-BC01B-0010

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

ONE MANHATTAN WEST

NEW YORK, NEW YORK 10001-8602

(212) 336-8330

FAX (212) 336-8340

WWW.SUSMANGODFREY.COM

SUITE 5100
1000 LOUISIANA STREET
HOUSTON, TX 77002-5096
(713) 651-9366

SUITE 1400
1900 AVENUE OF THE AMERICAS
LOS ANGELES, CALIFORNIA 90067-6029
(310) 789-3100

SUITE 3000
401 UNION STREET
SEATTLE, WASHINGTON 98101-2683
(206) 516-3880

STEPHEN SHACKELFORD, JR.
DIRECT DIAL (212) 729-2012

E-MAIL SSHACKELFORD@SUSMANGODFREY.COM

October 14, 2025

Beverly Crumley
Clerk of Court
Texas Business Court Clerk's Office
William P. Clements Building
300 West 15th Street, Suite 606
Austin, Texas 78701
BCClerk@txcourts.gov

Re:     *Primexx Energy Opportunity Fund, LP, et al. Primexx Energy
        Corporation, et al.*, Cause No. 24-BC01B-0010, in the First
        Business Court Division

Dear Clerk of Court:

Pursuant to Tex. R. App. P. 34.5(c)(1), Plaintiffs Primexx Energy Opportunity Fund, LP and Primexx Energy Opportunity Fund II, LP respectfully request that the Clerk file a supplementation to the appellate record in No. 15-25-00120-CV in the Fifteenth Court of Appeals.

On March 7, 2025, Plaintiffs filed an Opposition to the Special Appearance of Blackstone Inc. and a Supplemental Opposition to the Special Appearance of Angelo Acconcia. Plaintiffs filed the briefs and exhibits on the public docket with partial or complete redactions of information that the Blackstone Defendants had designated as Confidential. The Court, through the Court Manager for Division 1B, received the full, unredacted versions of the briefing and the exhibits

0003

| | |
|---|---|
| **Subject:** | RE: Primexx - Sealed Filings |
| **Date:** | Monday, March 10, 2025 at 12:53:54 PM Eastern Daylight Time |
| **From:** | Susan Fox-Bowen <Susan.Fox-Bowen@txcourts.gov> |
| **To:** | Sarah Hannigan <SHannigan@susmangodfrey.com>, Philip Spear <Philip.Spear@txcourts.gov>, Yaman Desai <YDesai@lynnllp.com>, Jeremy Fielding (jeremy.fielding@kirkland.com) <jeremy.fielding@kirkland.com>, Ewing, Zack C. <zack.ewing@kirkland.com>, Brigham, Laura Quinn <laura.brigham@kirkland.com>, Patton, Michael <michael.patton@kirkland.com>, Chris Patton <CPatton@lynnllp.com>, Kyle Gardner <kgardner@lynnllp.com>, Scott Smoot <SSmoot@lynnllp.com>, Natalie Stallbohm <nstallbohm@lynnllp.com> |
| **CC:** | Bryan Caforio <bcaforio@SusmanGodfrey.com>, Stephen Shackelford <SShackelford@susmangodfrey.com>, Lindsey Godfrey Eccles <leccles@susmangodfrey.com>, Marc Seltzer <MSeltzer@SusmanGodfrey.com>, Christopher Maldonado <CMaldonado@susmangodfrey.com>, Michelle Williams <mwilliams@susmangodfrey.com> |
| **Attachments:** | image001.png |

==EXTERNAL Email==

Received. Thank you.



**Susan Fox-Bowen, MBA**
Court Manager
Texas Business Courts—Dallas, Division 1B
8080 Park Lane, Suite 500
Dallas, TX 75231
(945) 495-1718

---

**From:** Sarah Hannigan <SHannigan@susmangodfrey.com>
**Sent:** Friday, March 7, 2025 4:35 PM
**To:** Susan Fox-Bowen <Susan.Fox-Bowen@txcourts.gov>; Philip Spear <Philip.Spear@txcourts.gov>; Yaman Desai <YDesai@lynnllp.com>; Jeremy Fielding (jeremy.fielding@kirkland.com) <jeremy.fielding@kirkland.com>; Ewing, Zack C. <zack.ewing@kirkland.com>; Brigham, Laura Quinn <laura.brigham@kirkland.com>; Patton, Michael <michael.patton@kirkland.com>; Chris Patton <CPatton@lynnllp.com>; Kyle Gardner <kgardner@lynnllp.com>; Scott Smoot <SSmoot@lynnllp.com>; Natalie Stallbohm <nstallbohm@lynnllp.com>
**Cc:** Bryan Caforio <bcaforio@SusmanGodfrey.com>; Stephen Shackelford <SShackelford@susmangodfrey.com>; Lindsey Godfrey Eccles <leccles@susmangodfrey.com>; Marc Seltzer <MSeltzer@SusmanGodfrey.com>; Christopher Maldonado <CMaldonado@susmangodfrey.com>; Michelle Williams <mwilliams@susmangodfrey.com>
**Subject:** Primexx - Sealed Filings

CAUTION: This email originated from outside of the Texas Judicial Branch email system.
DO NOT click links or open attachments unless you expect them from the sender and know the content is safe.

Ms. Fox-Bowen and Counsel,

Please see attached the unredacted briefs for Plaintiffs' Opposition to Blackstone Inc.'s Special Appearance and Plaintiffs' Supplemental Opposition to Acconcia's Special Appearance. The exhibits are in the Dropbox below. Pursuant to the protective order, these were filed with redactions because they contain information designated by Defendants as Confidential or AEO. Thank you.

https://www.dropbox.com/scl/fo/zioboijy3gjw8on7ielru/AJr3iLMHUAagjXR5kBumGGQ?rlkey=bv24zuyidq89zhighwqrlncqd&st=jwhe3g59&dl=0
PW: S%ke7*

Best,
Sarah

**Sarah Hannigan | Susman Godfrey LLP**
212.729.2054 (o), 617.645.7003 (c)
One Manhattan West, 50th Floor
New York, New York 10001
shannigan@susmangodfrey.com

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

| | | |
|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP, | § § § § § | IN THE BUSINESS COURT |
| Plaintiffs, | § § | |
| v. | § § | FIRST BUSINESS COURT DIVISION |
| PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLC, BX PRIMEXX TOPCO LLC, and BPP HOLDCO LLC, | § § § § § § § § § § § § § § § § § § | DALLAS COUNTY, TEXAS  **CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL OR AEO** |
| Defendants. | | |

# PLAINTIFFS' OPPOSITION TO BLACKSTONE INC.'S SPECIAL APPEARANCE

# Table of Contents

I.      **Summary of Argument** ................................................................... 2

II.     **Background** ............................................................................... 3

     1.     *Blackstone Inc.'s fire sale of Primexx's oil assets almost completely wipes out Plaintiffs' investments worth $200 million.* ............................................... 3

     2.     *Blackstone Inc. directly controlled the Primexx investment.* ................................................................. 6

III.    **Legal Standard** ...................................................................... 14

IV.    **Argument** .............................................................................. 17

     1.     *The Court has personal jurisdiction over Blackstone, Inc.* ........................................................................ 17

         A.    Blackstone Inc. has minimum contacts in Texas regarding the subject matter of this dispute. ...................................................... 18

         B.    The exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. ...................................................... 23

     2.     *The Court should disregard Blackstone Inc.'s arguments in support of its Special Appearance.* ................. 24

         A.    Blackstone and its employees performed numerous significant acts in Texas or directed at Texas. ...................................................... 25

         B.    Blackstone Inc.'s argument that its receipt of shares cannot support the exercise of jurisdiction has no support in Texas law ..................... 29

0007

C.     By invoking the Partnership Agreement,
Blackstone Inc. has waived its Special
Appearance. ............................................................... 32

**V.    Conclusion**................................................................................ **34**

0008

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BMC Software Belgium, NV. v. Marchand,*
   83 S.W.3d 789 (Tex. 2002) ................................................................. 16

*Carlile Bancshares, Inc. v. Armstrong,*
   No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort
   Worth Aug. 7, 2014, no pet.) ............................................................. 20

*Coleman v. Klockner & Co. AG,*
   180 S.W.3d 577 (Tex. App.—Houston [14th Dist.] 2005, no
   pet.) ..................................................................................................... 16

*Copeland v. Mayers,*
   657 S.W.3d 599 (Tex. App.—El Paso 2022, pet. denied) ................... 34

*Glencoe Cap. Partners II, L.P. v. Gernsbacher,*
   269 S.W.3d 157 (Tex. App.—Forth Worth 2008, no pet.) .................. 20

*Glob. Paragon Dallas, LLC v. SBM Realty,*
   LLC, 448 S.W.3d 607 (Tex. App.—Houston [14th Dist.]
   2014, no pet.) ...................................................................................... 34

*Google, LLC v. State,*
   No. 13-23-00114-CV, 2025 WL 52611 (Tex. App.—Corpus
   Christi Jan. 9, 2025, no pet. h.) ......................................................... 28

*Henkel v. Emjo Invs., Ltd.,*
   480 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2015, no
   pet.) ................................................................................................ 16, 28

*Huynh v. Nguyen,*
   180 S.W.3d 608 (Tex. App.—Houston [14th Dist.] 2005, no
   pet.) ........................................................................................... 16, 20, 27

0009

*Karaa v. Aramoonie,*
   No. 05-17-00571-CV, 2018 WL 1373958 (Tex. App.—
   Dallas Mar. 19, 2018, no pet.) ................................................................ 31

*Kelly v. Gen. Interior Const., Inc.,*
   301 S.W.3d 653 (Tex. 2010) ................................................................... 35

*Klingenschmitt v. Weinstein,*
   342 S.W.3d 131 (Tex. App.—Dallas 2011, no pet.) .............................. 33

*M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.,*
   *Inc.,*
   512 S.W.3d 878,885 (Tex. 2017) ........................................ 14, 15, 17, 18

*Moncrief Oil Int'l Inc. v. OAO Gazprom,*
   414 S.W.3d 142 (Tex. 2013) ...................................................... 19, 21, 23

*Moring v. Inspectorate Am. Corp.,*
   529 S.W.3d 145 (Tex. App—Houston [14th Dist.] 2017,
   pet. denied) ....................................................................................... 19, 27

*Old Republic Nat. Title Ins. Co. v. Bell,*
   549 S.W.3d 550 (Tex. 2018) ............................................................ 30, 34

*Pulmosan Safety Equip. Corp. v. Lamb*
   273 S.W.3d 829 (Tex. App.—Houston [14th Dist.] 2008,
   pet. denied) ............................................................................................. 29

*Retamco Operating, Inc. v. Republic Drilling Co.,*
   278 S.W.3d 333 (Tex. 2009) ...........................................................*passim*

*Stocksy United v. Morris,*
   592 S.W.3d 538 (Tex. App.—Houston [1st Dist.] 2019, no
   pet.) ......................................................................................................... 16

*Touradji v. Beach Cap. P'ship, L.P.,*
   316 S.W.3d 15 (Tex. App.—Houston [1st Dist.] 2010, no
   pet.) ......................................................................................................... 16

0010

*Willow Tree Consulting Group, LLC v. South Dakota Trust Company, LLC,*
  No. 05-22-00176-CV, 2023 WL 3749803 (Tex. App.—
  Dallas June 1, 2023, no pet.) .............................................................. 31

**Statutes**

Tex. Civ. Prac. & Rem. Code Ann. § 17.042 ............................................ 14

0011

## Table of Abbreviations

| Abbreviation | Definition |
|---|---|
| PEC | Primexx Energy Corporation |
| BPP HoldCo | BPP HoldCo LLC |
| Partnership Agreement | Third Amended and Restated Limited Partnership Agreement |
| Petition | First Amended Petition |

0012

Blackstone Inc. invested hundreds of millions of dollars in a Texas oil corporation governed by a Partnership Agreement with a Texas forum selection clause. Blackstone Inc. tasked its Senior Managing Director, Angelo Acconcia, with a multi-year continuing obligation to oversee that investment. Blackstone Inc. negotiated with a Texas partnership to become the majority shareholder in PEC, a Texas corporation that owned Texas real assets, and then collected the proceeds from Texas after orchestrating the sale of those Texas assets to a different Texas-based company. Blackstone Inc. will have every opportunity to introduce evidence that may ultimately establish it isn't liable for the wrongful conduct at issue in this lawsuit, but there's no legitimate question that this Court has jurisdiction over Blackstone Inc. to resolve this dispute.

Blackstone Inc. is the parent company of Blackstone Holdings III LP, Blackstone EMA II LLC, BMA VII LLC, Blackstone Energy Management Associates II LLC, Blackstone Energy Partners II LP, Blackstone Management Associates VII LLC, Blackstone Capital Partners VII LP, BCP VII/BEP II Holdings Manager LLC, BX Primexx Topco LLC, and BPP HoldCo LLC (the "Blackstone Entities"). With the exception of BPP HoldCo LLC, each of the Blackstone Entities contested

1

this Court's jurisdiction by filing Special Appearances. *See* No. 24-BC01A-0010, October 30, 2024. On January 17, 2025, the Court denied those Special Appearances on the basis that the then-Specially Appearing Entities had waived their challenges to its personal jurisdiction when they made affirmative appearances in a predecessor case before a Dallas County court in 2023. *See* February 10, 2025 Opinion; Ex. 1 (Defendants' Joint Motion to Dismiss for Improper Venue in DC-22-17122); Ex. 2 (Defendants' Special Exceptions and Original Answer in DC-22-17122).

## I.    Summary of Argument

Both the First Amended Petition and the facts in evidence demonstrate that Blackstone Inc. conducted substantial business with Texas persons and corporations, including direct involvement in the investment in Primexx Energy Partners (a Texas partnership), PEC (a Texas oil company), and the sale of the Texas oil assets at issue in this case to another Texas-based oil company. Blackstone Inc. invested millions of dollars into the Texas oil assets, and later received hundreds of millions of dollars and millions of shares resulting from the Callon Sale, in which Blackstone Inc. sought to profit from another Texas-based

2

business. Each of the Blackstone Entities, over which this Court has already asserted jurisdiction, sit below Blackstone Inc. in a direct chain that starts with Blackstone Inc. and ends with BPP HoldCo, the Blackstone entity that directly entered the Partnership Agreement giving rise to this dispute. As explained further below, Blackstone Inc. operates as a "matrix" organization in which employees and groups affiliated with one Blackstone Entity often act on behalf of and for the benefit of another. Angelo Acconcia, a Blackstone Inc. Senior Managing Director, confirmed that he was intimately involved in directing and managing the Primexx investment on behalf of Blackstone Inc. and for Blackstone Inc.'s benefit. Blackstone Inc.'s involvement in the Partnership Agreement, investment in Primexx Energy Partners and PEC, ongoing governance of PEC, and direction of the Callon Sale—all involving Texas partnerships, corporations, and employees—gives rise to specific personal jurisdiction.

## II. Background

### 1. Blackstone Inc.'s fire sale of Primexx's oil assets almost completely wipes out Plaintiffs' investments worth $200 million.

Blackstone Inc., one of New York's largest private equity companies, rushed through a fire sale of the valuable Texas oil assets of

3

Primexx Energy Partners, Ltd. ("Primexx Energy Partners," and collectively with the subsidiaries and assets it controlled, "Primexx") in 2021, almost completely wiping out Plaintiffs' minority stakes, which were independently valued at more than $200 million just before the sale. As Plaintiffs allege, and as discovery has already begun to confirm, Blackstone Inc. was directly involved in the Primexx investment, and senior Blackstone Inc. employees were directly responsible for the fire sale of Primexx's Texas oil assets.

In June 2021, Primexx Resource Development LLC was a successful Delaware Basin energy company that was independently valued at $1.43 billion. Plaintiffs Primexx Energy Opportunity Funds I and II were minority investors in Primexx with stakes worth more than $200 million at that time. Blackstone Inc.'s and Plaintiffs' investments in Primexx were structured through a partnership governed by the Third Amended and Restated Limited Partnership Agreement ("Partnership Agreement"). Ex. 3. Blackstone Inc., as the majority shareholder and investor, controlled the majority of the board of directors of Primexx Energy Corporation ("PEC"), which was the Managing General Partner of Primexx Energy Partners. *Id*. As described below, Blackstone Inc. was

4

closely involved in the Primexx investment, including by contributing capital and having direct responsibility for the fire sale of the Texas oil assets at issue in this case.

Callon Petroleum Company ("Callon") made several lowball offers to purchase Primexx in spring 2021. By late May, Callon's offer stood at $425 million in cash and 8.5 million Callon shares. But in June 2021, an independent third-party valuation firm appraised Primexx Energy Partners at $1.43 billion. First Amended Petition ("Petition") at ¶ 2. At that valuation, Plaintiffs' investments in Primexx Energy Partners were collectively worth more than $200 million. *Id*. On June 3, 2021, Christopher Doyle, the CEO of PEC, told the PEC board that Callon's offer was "not nearly as compelling as" simply continuing to operate as a "stand alone" entity. Petition at ¶ 69. At the same time, Callon's share price declined sharply throughout the summer, and on July 28, 2021, Mr. Doyle told a PEC board member that the latest Callon offer of $440 million and 9.2 million shares was still far "too low." Petition at ¶ 75. But only two days later, Blackstone Inc. told the PEC board that the deal would close on those same terms. Petition at ¶ 77. Blackstone Inc. informed the board of the impending sale on Friday July 30, and invoked

5

its drag-along rights under the Partnership Agreement to force the entire board to approve the sale by Monday August 2. Petition at ¶ 83. Under the waterfall payment structure laid out in the Partnership Agreement, Blackstone Inc. was the only investor to receive any significant proceeds from the sale. Petition at ¶ 96. Plaintiffs, who owned preferred shares worth at least $200 million, suffered a near total loss on their investment. Plaintiffs initially filed this lawsuit in Dallas County in December 2022, stating claims for breach of contract, breach of fiduciary duty, and knowing participation in and aiding and abetting those breaches of fiduciary duty. *See* DC-22-17122.

2. **Blackstone Inc. directly controlled the Primexx investment.**

On February 21, 2025, Plaintiffs took a jurisdictional deposition of Angelo Acconcia, Blackstone Inc.'s former Senior Managing Director. Ex. 4. Mr. Acconcia's testimony demonstrates that this Court has jurisdiction over Blackstone Inc. for this action.

Mr. Acconcia confirmed that he managed the Primexx investment on behalf of Blackstone Inc., not BPP HoldCo, throughout the relevant time period in this case. In fact, Mr. Acconcia did not even recall that he ever served as the President of BPP HoldCo, Ex. 4 at 26:11–27:21—

6

despite signing the Partnership Agreement on behalf of BPP HoldCo as its President. However, Mr. Acconcia did confirm that he worked for Blackstone Inc. from 2004 to 2021 and served as its "Senior Managing Director" from approximately 2015 through 2021. Ex. 4 at 15:21–16:16. While managing Blackstone's massive Primexx investment, Mr. Acconcia reported directly to Joe Baratta, Blackstone Inc.'s Global Head of Private Equity and Blackstone Inc. Board Director[1], and David Foley, the Blackstone Inc. Senior Managing Director "responsible for overseeing Blackstone's private equity investment activities in the energy sector on a global basis." Ex. 4 at 18:21–19:3[2]; 17:18–25; 35:7–19.

While managing Primexx, Mr. Acconcia used a @blackstone.com email address, the domain used by Blackstone Inc., as confirmed in its Securities and Exchange Commission filings such as the 10-K that Blackstone Inc. attached to its Special Appearance. *See* Ex. B to Blackstone Inc.'s Special Appearance at Exhibit 10.7, Article III and Exhibit A. Mr. Acconcia's email signature that he used while managing Primexx read "Senior Managing Director, Private Equity, The

---

[1] https://www.blackstone.com/people/joseph-baratta-2/
[2] https://www.blackstone.com/people/david-foley/

7

Blackstone Group," with the same 345 Park Avenue address that Blackstone Inc. lists in its Securities and Exchange Commission filings. Ex. 6. The Blackstone Group informed the Securities and Exchange Commission that it changed its name to Blackstone Inc. effective August 6, 2021. Ex. 5.

As Mr. Acconcia explained in his deposition, Blackstone Inc. and its subsidiaries operated as a single "matrix." Ex. 4 at 18:21–19:9. In fact, when shown during his deposition the portion of the Blackstone organizational chart that includes the Blackstone Entities (which of course included BPP HoldCo, the entity of which he acted as "President" for the purposes of signing the Partnership Agreement), Mr. Acconcia recognized only the names "Blackstone," "Primexx," and "Blackstone Energy Partners." Ex. 4 at 23:2–18. He recalled no specifics of the legal structures or legal entities with regard to any of the Blackstone Entities. Ex. 4 at 23:2–18. He could not identify BPP HoldCo as an entity that had ever employed him. Ex. 4 at 23:20–24:8. His compensation came from "Blackstone," and he had no recollection of ever receiving any direct compensation from BPP HoldCo. Ex. 4 at 24:10–16; 27:22–25. He did not

8

even recall that he was purportedly acting as President of BPP HoldCo LLC when he signed the Partnership Agreement. Ex. 4 at 26:11–27:21.

Nevertheless, despite being unable to recall any involvement whatsoever with BPP HoldCo, Mr. Acconcia *did* recall negotiating the terms of the Partnership Agreement governing the Primexx investment on behalf of Blackstone. Ex. 4 at 30:10–31:15. His was one of several Blackstone Inc. groups involved in discussions around the investment in Primexx. Ex. 4 at 31:16–20. As a member of Blackstone Inc.'s investment team, Mr. Acconcia played a role in Blackstone Inc.'s decision to make its substantial investment in Primexx and enter into the Partnership Agreement. Ex. 4 at 31:16–23. His Blackstone Inc. investment team made the recommendation to Blackstone Inc.'s investment committee that Blackstone Inc. invest in Primexx, and Mr. Acconcia was serving on that Blackstone Inc. committee when it decided to approve the Blackstone Inc. deal team's recommendation. Ex. 4 at 33:14–34:2.

In addition to his regular compensation from Blackstone, Mr. Acconcia stood to benefit personally from the Primexx transaction. Ex. 4 at 39:5–8. He held a carried interest in the two Blackstone Inc. investment funds that were associated with Primexx: Blackstone Capital

9

Partners VII, L.P. and Blackstone Energy Partners II L.P., which were defined in the Partnership Agreement as the "Blackstone Investors." Ex. 4 at 38:23–40:12.

Mr. Acconcia's responsibilities to Blackstone Inc. regarding the Primexx investment included "general involvement over a period of time." Ex. 4 at 42:10–17. His involvement did not end when he signed the Partnership Agreement. Ex. 4 at 42:18–21. In fact, he recalled participating in meetings regarding Blackstone Inc.'s investment in Primexx from 2016 all the way through 2021. Ex. 4 at 42:22–43:1. During his work on the Primexx investment on behalf of Blackstone Inc. Mr. Acconcia reported to multiple Blackstone Inc. employees throughout the Blackstone Inc. organization. Ex. 4 at 18:21–19:3. For example, Mr. Acconcia worked with a deal team in his energy group made up entirely of Blackstone Inc. employees that worked on the Primexx transaction and reported to David Foley, and Mr. Acconcia also reported to Joe Baratta as part of the "matrix." Ex. 4 at 18:16–19:23; 35:18–19; 36:18–37:11.

Though discovery is in its early stages, the limited evidence produced by Defendants already illustrates that Blackstone Inc. had numerous significant Texas contacts arising directly out of the Primexx

10

investment. In many cases, these contacts involved Mr. Acconcia's physical presence in Texas in his capacity as an employee of Blackstone Inc. managing and controlling the Primexx investment for Blackstone.

For example, on June 29, 2021, Mr. Acconcia emailed Chris Doyle, a member of the executive team at Primexx located in Texas, that Mr. Acconcia was "[o]n a fight [*sic*] this morning to Houston. Will call you when I land." Ex. 7. On May 25, 2021, in an email entitled "Schedule next Tuesday," Mr. Acconcia's assistant Patricia Li advised Mr. Acconcia that he would be "in Dallas," to which Mr. Acconcia proposed meeting with the full PEC team when there. Ex. 8. On June 30, 2021, in response to an email from Primexx employee Chase White to the "BX" team suggesting a call about the "Rosehill proposal/strategy" regarding Primexx, Mr. Acconcia emailed numerous members of the Blackstone Inc. and Primexx teams that he was "back to back in Houston today." Ex. 9.

Moreover, while managing the Blackstone Inc.'s Primexx investment, Mr. Acconcia also initiated multiple email and phone communications with people in Texas:

- Mr. Acconcia sent out a calendar invite for a team meeting titled "Primexx/Blackstone – Strategic Next Steps" that included members of the Blackstone Inc. deal team and at least four Texas-

11

based Primexx employees—Chris Doyle, Sam Blatt, Chase White, and Phil Cook—held on January 6, 2021. Ex. 4 at 61:4–10; Ex. 10.

- Mr. Acconcia generally remembered that RBC was involved with a potential transaction involving Primexx in 2021. Ex. 4 at 61:17–23. And in fact, on April 20, 2021, Jeffrey Spence at RBC Capital Markets in Houston, Texas sent Mr. Acconcia materials entitled "Primexx Process Update" for the purposes of a "Primexx/RBC/BX re: general status and next steps discussion." Ex. 11.

- On June 23, 2021, Mr. Acconcia agreed with Megan Davis, the General Counsel and Secretary of Primexx Energy Partners, based in Dallas, to reschedule "the Bi-weekly board meeting" regarding "a material update on Capitan." Ex. 12. That meeting also involved Blackstone Inc. employees Erik Belz and Mark Henle. *Id.*

- On June 9, 2021, Mr. Acconcia actively participated in a "joint regular meeting" of the Primexx Board of Directors and the BPP Energy Partners LLC Board, which was held "in person in Dallas, Texas" and by phone. Ex. 13.

- In February and March 2021, Mr. Acconcia and Blackstone Inc. employee Erik Belz discussed a meeting with David Habachy of Warburg Pincus LLC, based in Texas, regarding Primexx and a potential opportunity involving an oil and gas company based in Midland, Texas. Ex. 4 at 78:4–80:5; Ex. 14.

- On February 1, 2021, Mr. Acconcia emailed Richard Punches II, Managing Director at EIG Global Energy Partners, located in Houston, Texas, and copying Primexx's Chris Doyle and Blackstone Inc. employee Erik Belz, offering to share a "one-pager on Primexx" and asking whether Mr. Punches might have "the same on Rosehill," another Texas oil company, for the purposes of a call with Mr. Doyle. Ex. 15.

- On June 13, 2021, Mr. Acconcia emailed Stephen Trauber, Vice Chairman and Global Co-Head of Natural Resources & Clean Energy Transition of Citibank, based in Houston, and copied

12

0024

Blackstone Inc. executive David Foley, suggesting a call with Mr. Doyle and the "senior members of the Capitan Citi team." Ex. 16.

- On August 22, 2021, after the Callon sale had been announced, Mr. Acconcia received "talking points" from Blackstone Inc. employee Mark Henle for discussion with Joe Gatto, the CEO of Callon Petroleum based in Houston. Ex. 4 at 91:2–21; Ex. 17.

Mr. Acconcia admitted at his deposition that all the work he did while serving as Senior Managing Director of Blackstone Inc., including managing and controlling the Primexx investment, was on behalf of "Blackstone." Ex. 4 at 15:1–20. He was compensated by Blackstone. Ex. 4 at 24:3–16. While Mr. Acconcia signed the Partnership Agreement on behalf of BPP HoldCo as its President, Mr. Acconcia had no recollection of any role he may have played for BPP HoldCo. Ex. 4 at 26:5–27:21. Instead, one of the few topics on which Mr. Acconcia was clear at his deposition was that at all times he acted on behalf of "Blackstone," whether with respect to Blackstone Inc.'s investment in Primexx or otherwise. *See, e.g.*, Ex. 4 at 15:1–20. In its Securities and Exchange Commission filings, Blackstone Inc. refers to itself as "Blackstone." Ex. 5 ("In this report, references to 'Blackstone,' the 'Company,' 'we,' 'us' or 'our' refer to Blackstone Inc. and its consolidated subsidiaries.").

13

0025

The evidence above comes from a single jurisdictional deposition taken of Mr. Acconcia. Plaintiffs expect that further jurisdictional depositions of the other Blackstone Inc. employees involved in the Primexx investment, including Erik Belz, David Foley, and others, will reveal additional specific examples of Texas contacts on behalf of Blackstone Inc. that are inextricably related to the Primexx investment and the Callon Sale.

## III. Legal Standard

To determine whether a party is subject to personal jurisdiction, the Court begins with the Texas long-arm statute. The broad long-arm statute encompasses any "acts that may constitute doing business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. It is black-letter law that "Texas's long-arm statute 'extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit.'" *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878,885 (Tex. 2017) (quoting *BMC Software*, 83 S.W.3d at 795). Because the "broad doing-business language" reaches the limits of the constitutional requirements, the Texas Supreme Court concluded that courts need "only analyze whether [the defendant]'s acts

14

would bring [the defendant] within Texas' jurisdiction consistent with constitutional due process requirements." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

The personal jurisdiction inquiry thus turns on the federal constitutional requirements. "A state's exercise of jurisdiction comports with federal due process if the nonresident defendant has 'minimum contacts' with the state and the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *M&F Worldwide Corp*, 512 S.W.3d at 88 (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)). For specific personal jurisdiction, which Plaintiffs allege here, minimum contacts requires only that "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco*, 278 S.W.3d at 338. If the minimum contacts requirements are satisfied, it is "rare" for the exercise of personal jurisdiction to fail to comply with the requirement of fair play and substantial justice. *See id*. at 341.

In the face of allegations sufficient "to bring a nonresident defendant within the provisions of the long-arm statute," the specially appearing defendant "carries the burden of negating all bases of personal

15

jurisdiction." *BMC Software Belgium, NV. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). "The plaintiff's original pleadings as well as its response to the defendant's special appearance can be considered in determining whether the plaintiff satisfied its burden." *Touradji v. Beach Cap. P'ship, L.P.*, 316 S.W.3d 15, 23 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Henkel v. Emjo Invs., Ltd.*, 480 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[W]e consider both the plaintiff's original pleadings and its response to the defendant's special appearance in determining whether the plaintiff satisfied its burden to allege jurisdictional facts.").

In the specific personal jurisdiction analysis, an employee or agent's contacts with Texas are deemed contacts of the employer or principal. *See Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The Texas contacts of agents or employees are attributable to their nonresident principals."); *Coleman v. Klockner & Co. AG*, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("An agent's contacts can be imputed to the principal for purposes of the jurisdictional inquiry."); *Stocksy United v. Morris*, 592 S.W.3d 538, 547 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Under Texas law, an

16

0028

agency-based theory of imputed contacts may serve as the basis for the exercise of personal jurisdiction over a foreign defendant.").

## IV. Argument

### 1. The Court has personal jurisdiction over Blackstone, Inc.

Plaintiffs' allegations establish specific personal jurisdiction over Blackstone Inc. "Texas's long-arm statute 'extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit.'" *M&F Worldwide*, 512 S.W.3d at885 (quoting *BMC Software*, 83 S.W.3d at 795). Plaintiffs allege that Blackstone Inc. raised capital to invest in a Texas partnership governing the assets of a Texas oil company, exercised control over the subsidiary operating the Texas oil company, were responsible for directing the fire sale of the Texas oil assets to another Texas-based company, and received hundreds of millions of dollars from the sale of the Texas oil assets. Given this conduct, Blackstone Inc. falls squarely within the reach of the Texas long-arm statute. Once Plaintiffs have alleged conduct that falls under the long-arm statute, the exercise of personal jurisdiction complies with due process "if the nonresident defendant has 'minimum contacts' with the state and the exercise of jurisdiction 'does not offend traditional notions

17

of fair play and substantial justice.'" *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

### A. Blackstone Inc. has minimum contacts in Texas regarding the subject matter of this dispute.

By purposefully investing in, exercising majority control over, and selling a Texas oil company and its Texas oil assets to a different Texas-based company, Blackstone Inc. had the required minimum contacts in Texas to confer this Court with personal jurisdiction. The minimum contacts analysis considers whether "(1) the defendant purposefully avails itself of conducting activities in the forum state, and (2) the cause of action arises from or is related to those contacts or activities." *Retamco*, 278 S.W.3d at 338. Here, Blackstone Inc. purposefully availed itself of the privilege of conducting business within Texas, and Plaintiffs bring claims directed specifically at that Texas business.

### i) <u>Blackstone Inc. purposely availed itself of the privilege of doing business in Texas.</u>

Blackstone Inc. raised capital for a majority stake in a Texas oil company; took on a multi-year continuing obligation for its executive employees to oversee that investment, including by having numerous employees sit on the Board of Directors of a Texas corporation to manage

18

0030

the Texas business; directed the fire sale of the Texas oil assets; and received proceeds from the sale of the Texas oil assets that it directed. "In the context of specific jurisdiction, the following principles guide a purposeful availment inquiry: (1) the relevant contacts are those of the defendant, and the unilateral activity of another person or a third party is not pertinent; (2) the contacts that establish purposeful availment must be purposeful rather than random, fortuitous, isolated, or attenuated; and (3) the defendant must seek some benefit, advantage, or profit by availing himself of the jurisdiction." *Moring v. Inspectorate Am. Corp.*, 529 S.W.3d 145, 153 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Whether an individual purposefully availed themselves of the forum depends on "the quality and nature of the contacts, not the quantity." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). The main purpose of the inquiry is determining "whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there." *Id.* at 152.

Mr. Acconcia's testimony confirms that Blackstone Inc. itself directly managed BPP HoldCo and that numerous Blackstone Inc. employees, directly managed Blackstone Inc.'s investment in Texas for

19

Blackstone Inc.'s benefit, including while physically located in Texas. Blackstone Inc. participated in the transaction by directing the sale of Texas oil assets, held by a Texas corporation, to another Texas-based oil company. Blackstone Inc. also invested in Primexx and received millions of dollars of proceeds from the Callon Sale.

The actions of Blackstone Inc's employees and agents are attributed to Blackstone Inc. *See Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The Texas contacts of agents or employees are attributable to their nonresident principals."). Texas courts routinely find that direct involvement in similar Texas-based corporate disputes is sufficient to confer specific jurisdiction. *See, e.g.*, *Glencoe Cap. Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 167 (Tex. App.—Fort Worth 2008, no pet.) (holding that non-resident directors making misrepresentations on remote board meetings involving Texas residents was sufficient to confer jurisdiction); *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (holding that the court had personal jurisdiction over two directors of a Colorado-based company due to those

20

directors' involvement in a merger transaction between the Colorado company and a Texas company).

Blackstone Inc.'s intentional investment in a Texas partnership and corporation and receipt of proceeds from the sale of Texas oil assets to a different Texas-based company (that it orchestrated) constitute a purposeful availment of the state of Texas. As the Texas Supreme Court found was dispositive in *Moncrief Oil Intern. Inc. v. OAO Gazprom*, the relevant entities "were not unilaterally haled into forming contacts with Texas." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 153 (Tex. 2013). Rather, similarly to the defendants in *Moncrief Oil* and *Retamco*, Blackstone Inc. was a "willing participant[s] in a transaction with an affiliated Texas company." *Id*. (quoting *Retamco*, 278 S.W.3d at 340). As the Texas Supreme Court described in *Moncrief Oil*, "the United States Supreme Court concluded that forming an enterprise in one state to send payments to a corporation in the forum state was sufficient to confer specific jurisdiction." *Id*. (citing *Burger King*, 471 U.S. at 468, 478). That is precisely what happened here: Blackstone Inc. joined an enterprise in Texas, sent money to Texas for that enterprise, directed its executive employees to manage that investment in Texas for many years,

21

orchestrated the sale of the Texas-based real property of that Texas company to another Texas-based company, and accepted the proceeds of that transaction from Texas. The undisputed evidence leaves no doubt that Blackstone Inc. could "reasonably anticipate being haled into court" in Texas.

<p style="text-align: center;">ii) <u>Plaintiffs' claims arise directly from Blackstone Inc.'s Texas activities.</u></p>

The causes of action here "arise from" Blackstone Inc.'s Texas contacts because they center on the Partnership Agreement (which was signed by Mr. Acconcia, a Blackstone Inc. employee acting on behalf of Blackstone Inc.); Primexx's oil assets, real property, and equipment, all located in Texas; and the ultimate decision to sell Primexx rather than continue operating as a profitable company in Texas, which resulted in negotiating and executing the Callon Sale in Texas. The fundamental dispute at issue is over the meaning of the Partnership Agreement, the conduct of parties directed at Texas-based companies and individuals, and the sale of Texas oil assets, which include real property interests in oil. *See* Ex. 18 (noting that the sale of Primexx to Callon includes leasehold interests); *Retamco*, 278 S.W.3d at 341 ("Oil and gas interests

<p style="text-align: center;">22</p>

are real property interests," which "will always be in Texas, which leaves no doubt of the continuing relationship that this ownership creates.").

## B. The exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

The exercise of jurisdiction over Blackstone Inc., which voluntarily chose to invest millions of dollars into a Texas partnership and business with a goal of profiting from that Texas business, and did in fact receive hundreds of millions of dollars from conducting business in Texas, does not offend traditional notions of fair play and substantial justice. Once the minimum contacts requirements are satisfied, it is "rare" for the exercise of personal jurisdiction to fail to comply with the requirement of fair play and substantial justice. *Retamco*, 278 S.W.3d at 341. Texas courts consider "(1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations in furthering fundamental substantive social policies." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 155 (Tex. 2013).

0035

The interests of Texas, the plaintiffs, and judicial efficiency are all served by exercising jurisdiction over Blackstone Inc. Texas has an interest in adjudicating alleged breaches of fiduciary duty that occurred with respect to an investment in a Texas corporation and the sale of valuable Texas oil assets to another Texas-based company. With respect to judicial efficiency, it is undisputed that this Court has jurisdiction over the formerly Specially Appearing Blackstone Entities, BPP HoldCo, PEC, and M. Christopher Doyle. Blackstone Inc. is represented by the same counsel as BPP HoldCo, is part of the same corporate family, and has numerous employees that performed work in or directed at Texas for the Primexx investment. Ex. 4 at 18:8–19:20; 36:18–37:11. While Blackstone Inc. is incorporated in Delaware, being subjected to suit in Texas "imposes a burden on . . . all nonresidents," and "[d]istance alone cannot ordinarily defeat jurisdiction." *Id*. The exercise of jurisdiction over Blackstone Inc. comports with the notions of fair play and substantial justice.

2. **The Court should disregard Blackstone Inc.'s arguments in support of its Special Appearance.**

Blackstone Inc. argues that it is not subject to personal jurisdiction in this Court because (1) Plaintiffs fail to allege that Blackstone Inc. or

24

its employees performed any acts in Texas, and (2) Blackstone Inc.'s receipt of Callon shares after the transaction at issue is not an operative fact in this litigation. As explained below, both arguments fail.

### A. Blackstone and its employees performed numerous significant acts in Texas or directed at Texas.

Blackstone Inc. protests that it is "eight entities removed" from BPP HoldCo, Blackstone Inc. Special Appearance ("Special Appearance") at 4, but each of those entities, including Blackstone Inc. and BPP HoldCo themselves, form a part of the Blackstone Inc. "matrix." Further, Blackstone Inc.'s position that it committed no acts in Texas related to the Primexx investment and Callon Sale was totally rejected by Mr. Acconcia. In his role as a Senior Managing Director at Blackstone, Inc., controlling and managing the Primexx investment *for Blackstone*, Mr. Acconcia repeatedly travelled to Texas, met with Texas-based investment bankers and Primexx executives, and directed communications to Texas residents to manage a Texas business and ultimately sell that Texas business and its Texas assets to a different Texas business. All of these contacts on behalf of Blackstone Inc. were directly related to the management of the Primexx investment and sale of Primexx to Callon.

25

Blackstone Inc. complains further that Plaintiffs fail to distinguish between acts performed by Blackstone, Inc. employees in that capacity as opposed to their capacity as officers and directors of BPP HoldCo. But Blackstone Inc.'s operation as a "matrix" organization renders such distinctions meaningless. Mr. Acconcia confirmed under oath that he did not even recall performing any work on behalf of BPP HoldCo and that his actions with respect to the Primexx investment were instead performed on behalf of "Blackstone." Ex. 4 at 22:11–24:16. In its Securities and Exchange Commission filings, Blackstone Inc. refers to itself as "Blackstone." Ex. 5 ("In this report, references to 'Blackstone,' the 'Company,' 'we,' 'us' or 'our' refer to Blackstone Inc. and its consolidated subsidiaries."). Mr. Acconcia himself—the purported "President" of BPP HoldCo LLC and signatory to the Partnership Agreement on its behalf—was not compensated by BPP HoldCo and has no recollection of serving as its President or performing any work for that shell entity. Ex. 4 at 26:5–27:25.

Blackstone Inc. does not—and cannot—dispute that Mr. Acconcia was employed by Blackstone Inc. at all relevant times, and it is black-letter law that an employee's actions within the scope of his employment

26

are imputed to his employer. *See Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("The Texas contacts of agents or employees are attributable to their nonresident principals."). Mr. Acconcia's direct contacts with Texas, on behalf of and for the benefit of Blackstone Inc., were not "random, fortuitous, isolated, or attenuated." *See Moring v. Inspectorate Am. Corp.*, 529 S.W.3d 145, 153 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). To the contrary, they were clearly aimed at purposeful availment of the benefit of doing business in Texas. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

Blackstone Inc. also argues that even if Plaintiffs were able to allege acts attributable to Blackstone Inc., they fail to allege "operative conduct" performed in Texas. Special Appearance at 11. This is simply wrong. Plaintiffs allege, for example, that "employees and agents of Blackstone Inc., acting on behalf of Blackstone Inc.," including Mr. Acconcia and Mr. Belz, "were responsible for managing Blackstone's investment in Primexx," and that "employees and agents of Blackstone Inc. orchestrated the Callon Sale even though they knew that the sale price was too low and would provide limited or no return to the limited

27

0039

partners while generating a substantial recovery for Blackstone." Petition at ¶¶ 65, 84. And as discussed in this Opposition, Mr. Acconcia traveled to Texas multiple times, made myriad phone calls to Texas residents, and sent countless email communications to Texas residents all in furtherance of his management of Blackstone Inc.'s Primexx investment. *See Henkel v. Emjo Invs., Ltd.*, 480 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[W]e consider both the plaintiff's original pleadings and its response to the defendant's special appearance in determining whether the plaintiff satisfied its burden to allege jurisdictional facts.").

The *Google* case Blackstone finds "instructive," Special Appearance at 11, involved allegedly misleading terms and disclosures made by Google "from afar." *Google, LLC v. State*, No. 13-23-00114-CV, 2025 WL 52611, at *7 (Tex. App.—Corpus Christi Jan. 9, 2025, no pet. h.). Concluding that "events that took place outside of Texas" would "consume most if not all the litigation's attention," the *Google* court found that the exercise of jurisdiction was not appropriate. *Id.* at *7-8. The focus of litigation in this case, by contrast, will be squarely on Texas-based events, Texas-based real property, and Texas-based individuals.

0040

## B. Blackstone Inc.'s argument that its receipt of shares cannot support the exercise of jurisdiction has no support in Texas law.

Blackstone Inc. erroneously contends it is a mere holding company with no material assets and that its receipt of Callon shares stemming from the Primexx transaction does not support the exercise of jurisdiction. Special Appearance at 14–15. It further argues that because the *manner* of distribution of shares to Blackstone Inc. has not been challenged by Plaintiffs and may not be a focus at trial, the *fact* that the Blackstone Inc. "matrix" received hundreds of millions of dollars' worth of Callon shares in exchange for its Primexx investment does not support personal jurisdiction. Special Appearance at 15. Blackstone Inc. provides no legitimate support for that wrong position.

For example, Blackstone Inc. first relies on *Pulmosan Safety Equip. Corp. v. Lamb* for the general proposition that "to identify the operative facts, courts look to 'those facts that would be the focus of the trial.'" Special Appearance at 15. But in *Pulmosan*, the court found that the exercise of personal jurisdiction *was* appropriate despite the fact that it was not at all clear whether the Plaintiff had even used a sandblasting hood manufactured by the defendant in Texas. 273 S.W.3d 829 (Tex.

29

App.—Houston [14th Dist.] 2008, pet. denied). *Pulmosan* does nothing to narrow the realm of "operative facts" so as to exclude the receipt of funds associated with a challenged transaction.

Blackstone Inc. then wrongly argues that *Old Republic Nat. Title Ins. Co. v. Bell*, 549 S.W.3d 550 (Tex. 2018), supports a finding that this Court lacks jurisdiction. Not so. In *Old Republic*, the Texas Supreme Court declined to find specific jurisdiction based on "phone calls with a friend who happens to be in Texas," *id.* at 561—a far cry from the situation here. The court also found that money transfers between those same friends could not support jurisdiction, but noted that if, for example, the defendant had been "a corporate lender distributing funds . . .with the expectation of collecting interest," *id.* at 562, its analysis would change. *Id.* The important question in *Old Republic* was whether—as here—the defendant intended to "use the Texas forum to make money." *Id.* (quoting *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 77 (Tex. 2016)). There is no legitimate dispute that Blackstone Inc. intended to do precisely that with its multi-hundred-million-dollar investment into Primexx that it tasked numerous Blackstone Inc. executives with managing over a period of many years.

30

Blackstone Inc. also cites *Willow Tree Consulting Group, LLC v. South Dakota Trust Company, LLC*, No. 05-22-00176-CV, 2023 WL 3749803 (Tex. App.—Dallas June 1, 2023, no pet.), which involved a non-resident company that agreed to serve as Trustee of trusts with Texas trustors and Texas beneficiaries. *Id.* at *5. In *Willow Tree*, unlike this case, the non-resident party "did not seek out any Texas contacts." *Id.* at *7. The court declined to exercise jurisdiction over the non-resident party "simply because it accepted the position of trustee of a South Dakota trust after being contacted by Texas residents requesting it to do so." *Id.* Finally, Blackstone Inc. cites *Karaa v. Aramoonie*, No. 05-17-00571-CV, 2018 WL 1373958 (Tex. App.—Dallas Mar. 19, 2018, no pet.). The *Karaa* court declined to find specific personal jurisdiction because there was "no evidence that any act . . . occurred . . . in Texas" and there were "no written communications with [Plaintiff] while she was in Texas." *Id.* at *3. Here, however, Blackstone Inc. invested directly into a Texas partnership and corporation, employed a deal team to manage that Texas investment for years, sent its Senior Managing Director *to Texas* multiple times, and tasked that Senior Managing Director and Blackstone Inc. deal team with selling Primexx to another Texas-based oil company in

31

order for Blackstone Inc. to gain hundreds of millions of dollars. Blackstone Inc.'s arguments fall flat in the face of the undisputed evidence here.

### C. By invoking the Partnership Agreement, Blackstone Inc. has waived its Special Appearance.

Because this Court has personal jurisdiction over Blackstone, Inc. based on Blackstone Inc.'s own actions and the actions of its employees, Plaintiffs do not need to rely on "alter ego" as a basis for personal jurisdiction over Blackstone Inc. Nevertheless, Blackstone Inc.'s argument against alter-ego jurisdiction is notable in that it completely forecloses its right to even make a Special Appearance. Blackstone Inc. argues that because Section 13.9 of the Partnership Agreement purports to foreclose *liability* based on an alter ego or veil-piercing theory, Plaintiffs may not rely on an alter ego theory of personal jurisdiction in this case. Special Appearance at 2–3, 14. But Blackstone offers no authority for its position that parties can alter Texas' minimum contacts analysis by contract, potentially depriving Texas courts of jurisdiction over a party that has purposely availed itself of the privilege of doing business in Texas and obtained the benefit thereof.

32

More importantly, Blackstone Inc.'s argument that Section 13.9 of the Partnership Agreement forecloses alter-ego *liability* is a merits-based argument as to why Plaintiffs' ultimate claims against Blackstone Inc. fail—not a jurisdictional argument. By attempting to rely on substantive provisions of the Partnership Agreement for the purposes of its Special Appearance—invoking a merits-based argument to obtain protections from the very instrument it claims not to be bound by—Blackstone Inc. has stepped beyond the strict subject-matter boundaries of a permissible special appearance to argue the substantive merits of the case. *See Klingenschmitt v. Weinstein*, 342 S.W.3d 131, 134 (Tex. App.—Dallas 2011, no pet.) ("A party enters a general appearance and waives a special appearance 'when it (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts that an action is properly pending, or (3) seeks affirmative action from the court.'") (quoting *Exito Elecs. Co., Ltd. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004)). Blackstone Inc. asserts in its Section 13.9 argument that "[t]his Court should reject Plaintiffs' attempt to cherry-pick certain TAPA provisions and ignore others." Special Appearance at 14. As such, its Special Appearance has been waived, and should be denied on that basis. *See*

33

*Glob. Paragon Dallas, LLC v. SBM Realty*, LLC, 448 S.W.3d 607, 613 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that a defendant waived a special appearance when its "supplemental motion for new trial addresses the merits of the default judgment's award . . . This challenge to the trial court's award seeks affirmative relief that the court could grant only if it had jurisdiction.").

Even if Blackstone Inc. has not waived its special appearance by making a merits argument, at a minimum, the Court must disregard the merits-based argument in considering Blackstone Inc.'s special appearance. *See Old Republic Nat'l Title Ins. Co. v. Bell,* 549 S.W.3d 550, 562 (Tex. 2018) ("[W]e may not determine the underlying merits in order to answer the jurisdictional question . . . [W]e limit our inquiry to [defendant]'s contacts with the state of Texas."); *Copeland v. Mayers*, 657 S.W.3d 599, 622 (Tex. App.—El Paso 2022, pet. denied) ("We do not resolve merits-based questions in reviewing a special appearance.") (quoting *Michelin N. Am., Inc. v. De Santiago*, 584 S.W.3d 114, 134 (Tex. App.—El Paso 2018, pet. dism'd)).

## V.  **Conclusion**

Blackstone utterly fails to negate each of Plaintiffs' alleged bases

34

for personal jurisdiction. *Kelly v. Gen. Interior Const., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) ("Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff."). Blackstone Inc. invested directly into a Texas partnership and corporation, employed a deal team to manage that Texas investment for years, sent its Senior Managing Director *to Texas* multiple times, and tasked that Senior Managing Director and Blackstone Inc. deal team with selling Primexx to another Texas-based oil company for a massive profit. Blackstone Inc. has no legitimate basis to avoid personal jurisdiction based on the undisputed facts confirming that it purposely availed itself of the benefits of doing business in Texas. This Court should deny Blackstone Inc.'s baseless Special Appearance and permit Plaintiffs to continue litigating their legitimate claims.

Dated: March 7, 2025　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　SUSMAN GODFREY L.L.P.

35

By: */s/ Stephen Shackelford, Jr.*

Stephen Shackelford, Jr.
State Bar No. 24062998 (TX)
sshackelford@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Marc M. Seltzer
(*pro hac vice forthcoming*)
State Bar No. 54534 (CA)
mseltzer@susmangodfrey.com
Bryan Caforio (*pro hac vice*)
State Bar No. 261265 (CA)
bcaforio@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Lindsey Godfrey Eccles (*pro hac vice*)
State Bar No. 33566 (WA)
leccles@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Sarah Hannigan (*pro hac vice*)
State Bar No. 5961248 (NY)
shannigan@susmangodfrey.com
SUSMAN GODFREY L.L.P.

36

One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Plaintiffs Primexx
Energy Opportunity Fund, LP
and Primexx Energy Opportunity
Fund II, LP*

0049

## Certificate of Service

This is to certify that on March 7, 2025, a true and correct copy of the above and foregoing instrument was properly forwarded to counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure.

*/s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.

0050

# EXHIBIT 4

# FILED UNDER SEAL

**In the Matter Of:**

*PRIMEXX ENERGY OPPORTUNITY FUND vs*

*PRIMEXX ENERGY*

---

*ANGELO ACCONCIA*

*February 21, 2025*



NO. 24-BC01B-0010

| | |
|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP AND PRIMEXX ENERGY OPPORTUNITY FUND II, LP, | : IN THE BUSINESS COURT : : : |
| Plaintiff, | : : FIRST BUSINESS COURT |
| vs. | : DIVISION : |
| PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLC, BX PRIMEXX TOPCO LLC, AND BPP HOLDCO LLC, | : : : : : : : : : DALLAS COUNTY, TEXAS : : : : : : : : : : : : |
| Defendants. | : |

CONFIDENTIAL

VIDEOTAPED STENOGRAPHIC DEPOSITION OF
ANGELO ACCONCIA
NEW YORK, NEW YORK
FRIDAY, FEBRUARY 21, 2025

(Reported Remotely)

REPORTED BY:  TANYA L. VERHOVEN-PAGE,
              CCR-B-1790
FILE NO.  2025-972806

Page 2

February 21, 2025

9:05 a.m.

Videotaped stenographic deposition of ANGELO ACCONCIA, held in New York, New York before Tanya L. Verhoven-Page, Certified Court Reporter (GA), Licensed Court Reporter (TN) and Certified Shorthand Reporter (TX).

Page 3

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

SUSMAN GODFREY, LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, California 90067
(310) 789-3100
BY:  BRYAN CAFORIO, ESQ.
        e-mail: bcaforio@susmangodfrey.com
        (Via Zoom)
SUSMAN GODFREY, LLP
One Manhattan West
New York, New York 10001-8602
(212) 336-8330
BY:  SARAH HANNIGAN, ESQ.
        e-mail: shannigan@susmangodfrey.com
        (Via Zoom)

On behalf of Defendant Blackstone and Angelo Acconcia:

LYNN, PINKER, HURST & SCHWEGMANN
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
(214) 981-3800
BY:  YAMAN DESAI, ESQ.
        e-mail: ydesai@lynnllp.com
BY:  KYLE GARDNER, ESQ.
        e-mail: kgardner@lynnllp.com
        (Via Zoom)

Page 4

APPEARANCES OF COUNSEL

On behalf of Defendant Primexx Energy Corporation:
KIRKLAND & ELLIS, LLP
401 Congress Avenue
Austin, Texas 78701
(512) 678-9100
BY:  ZACK C. EWING, ESQ.
        e-mail: zack.ewing@kirkland.com
        (Via Zoom)

On behalf of Defendant M. Christopher Doyle:
TROUTMAN PEPPER LOCKE, LLP
2200 Ross Avenue
Suite 2800
Dallas, Texas 75201
(214) 740-8000
BY:  TAYLOR LEVESQUE, ESQ.
        e-mail: taylor.levesque@troutman.com
        (Via Zoom)

ALSO PRESENT:
Kenneth Inoa, Videographer

                -   -   -

Page 5

I N D E X

WITNESS: ANGELO ACCONCIA

Examination                                    Page
BY MR. CAFORIO                                  10

## Page 6

EXHIBITS INDEX:

Deposition
(Acconcia)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Plaintiffs' First Amended Petition | 21 |
| Exhibit 2 | Document bearing Bates numbers BPP_0018525 through BPP_0018527 | 46 |
| Exhibit 3 | Document bearing Bates number BPP_0017994 | 53 |
| Exhibit 4 | Document bearing Bates numbers BPP_005953 through BPP_005954 | 55 |
| Exhibit 5 | Document bearing Bates numbers BPP_0016545 through BPP_0016546 | 60 |
| Exhibit 6 | Document bearing Bates numbers BPP_0017552 through BPP_0017553 | 62 |
| Exhibit 7 | Document bearing Bates number BPP_0018469 | 65 |
| Exhibit 8 | Document bearing Bates numbers PRIMEXX029462 through PRIMEXX029468 | 70 |
| Exhibit 9 | Document bearing Bates numbers BPP_0017182 through BPP_0017187 | 77 |
| Exhibit 10 | Document bearing Bates number BPP_0016597 | 80 |
| Exhibit 11 | Document bearing Bates numbers BPP_0018234 through BPP_0018235 | 84 |

## Page 7

EXHIBITS INDEX:

Deposition
(Acconcia)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 12 | Document bearing Bates numbers BPP_0006569 through BPP_0006570 | 88 |
| Exhibit 13 | Document bearing Bates numbers BPP_0019155 through BPP_0019157 | 91 |

## Page 8

NEW YORK, NEW YORK; FRIDAY, FEBRUARY 21, 2025
9:05 A.M.

P R O C E E D I N G S

THE VIDEOGRAPHER: The time is 9:05 a.m. Eastern Time on February 21st, 2025, and we're going on the record for the remote video deposition of Angelo Acconcia in the matter of Primexx Energy Opportunity Fund, et al. versus Blackstone, et al.

My name is Kenneth Inoa, and I'm the legal videographer on behalf of LEXITAS.

Will counsel please introduce themselves and state their firm and who they represent, beginning with the party noticing this proceeding.

MR. CAFORIO: Bryan Caforio from Susman Godfrey on behalf of Plaintiffs.

MR. DESAI: Yaman Desai. I'm here with Kyle Gardner, from Lynn, Pinker, Hurst & Schwegmann, on behalf of Mr. Acconcia, and we also represent the

## Page 9

various Blackstone Defendants.

MR. EWING: Good morning. This is Zack Ewing, from Kirkland & Ellis, on behalf of Primexx Energy Corporation.

MR. LEVESQUE: This is Taylor Levesque, at Troutman Pepper Locke, on behalf of Defendant Christopher Doyle.

MS. HANNIGAN: And Sarah Hannigan, from Susman Godfrey, on behalf of Plaintiffs.

MR. DESAI: And, Sarah and Bryan, before we get started, I haven't gotten the exhibits yet.

Oh, actually, I take that back. They just went through. I'm fine.

THE VIDEOGRAPHER: All right. If that concludes our introductions, will the court reporter please swear or affirm in the witness.

Thereupon --
ANGELO ACCONCIA,
called as a witness, having been first duly sworn, was examined and testified as follows:

Page 10

EXAMINATION

BY MR. CAFORIO:

Q     All right.  Good morning, Mr. Acconcia.
My name is Bryan Caforio, and I represent the
Plaintiffs, Primexx Opportunity Fund and Primexx
Opportunity Fund II, in this litigation.

I'll be asking you questions on behalf of
those entities today.

You understand that, even though we're
doing this remotely, you are under oath for this
deposition?

A     I do.

Q     And you understand that your answers are
being transcribed by a court reporter throughout the
deposition?

A     I do.

Q     And you understand that you are being
video-recorded today, as well?

A     I do.

Q     And you understand that this deposition
is taken in a case pending in the Texas Business
Court in Dallas, right?

A     I assume that that's the case.  I don't
have specific knowledge as to exactly where this case
is pending.

Page 11

Q     Okay.  And we'll show you the petition in
a minute and you can see that, but do you understand
that your deposition testimony may be used in this
proceeding and shown to the judge in this case?

A     I do.

Q     Have you ever been deposed before?

A     I have.

Q     How many times?

A     I don't recall specifically, but a few, a
small -- a small number.

Q     More or less five would you say?

A     Less.

Q     Okay.  When was the last time you were
deposed?

A     I don't recall specifically.  I could
generally estimate more than -- call it -- five years
ago.

Q     Okay.  So that was probably an in-person
deposition then, or was it remote, as well?

A     I don't recall.

Q     Okay.  Well, since it is remote, it's a
slightly unusual format doing it this way, and I'll
try to put the exhibits up so you can see them
clearly, but at any time, as we're going, if you have
any technical difficulties, if you can't hear my

Page 12

question, if you can't see an exhibit, just let us
know, and we can work that out so everything goes
smoothly.

Okay?

A     Thank you.

Q     And you're free to take -- I generally
aim to take a break at least every hour.  You're free
to ask for a break, go to the bathroom, get a drink,
whatever you want more frequently than that.  The
only thing I ask is that you don't take a break while
a question is pending but instead answer the question
and then ask to take a break.

Okay?

A     I appreciate it.

Q     Okay.  Is there anything that you would
like to discuss before we begin the deposition today?

A     No.

Q     Okay.  Are you taking any medication
today that affects your ability to answer questions
truthfully and completely?

A     No.

Q     Are you feeling sick today?

A     No.

Q     Is there any other reason you're not able
to testify truthfully and completely today?

Page 13

A     No.

Q     Where are you located geographically for
this deposition?

A     I'm located in New York.

Q     You're in New York.  Okay.

In the city or elsewhere?

A     I'm located in Manhattan.

Q     How did you prepare for today's
deposition?

A     I had a series of calls with my counsel.

Q     Did you review any documents to prepare
for the deposition?

A     No.

Q     Is there anybody in the room with you
right now where you're testifying from?

A     No.  There are people downstairs.  So
there may be some background noise, but nobody in the
room specifically.

Q     Okay.  Do you have any access to any
messaging platforms where a person could communicate
with you during this deposition?

A     I do not have anything visible.

Q     Okay.  What's your current occupation?

A     I am an investor.

Q     Are you employed by a company, or are you

## Page 14

self-employed?

A    I am not employed by a company.

Q    And what company is that?

A    ArcLight Capital Partners.

Q    How long have you been at ArcLight?

A    I believe I'm going on my fourth year.

Q    So that takes you back to some time in, say, early 2022?  Is that about accurate, or is that timing off?

A    That's about accurate.

Q    Okay.  Where were you employed before you started at ArcLight?

A    I was employed at Blackstone.

Q    How long -- when did you start working at Blackstone?

A    I believe it was in 2004.

Q    Were you at Blackstone all the way from 2004 right up until you started working at ArcLight in 2021 or 2022?

A    There was a short period of time between Blackstone and ArcLight where I was on garden leave, but there were no employers in between.

Q    What's garden leave?

A    A period of time where you are between jobs.

## Page 15

Q    So essentially at Blackstone from 2004 to the end of 2021, give or take; is that fair?

A    That is accurate.

Q    And I've seen documents that reference at different times Blackstone Group and Blackstone, Inc.
     Do you have an understanding if that's the same company or a different company?

A    I do not have specific knowledge.

Q    Do you know who was your actual employer?

A    I do not.

Q    Do you know who actually paid your compensation?

A    I do not know the specific legal entity that paid my compensation.

Q    Okay.  You just referred to having worked for Blackstone is how you talked about it?

A    Correct.

Q    Okay.  Whether that was Blackstone, Inc. or Blackstone Group, just you worked for Blackstone?

A    That is accurate.

Q    Okay.  Can you take me through your job history at Blackstone from 2004 to 2021 if your titles changed at any point?

A    I started in 2004 as an analyst in the private equity group.  I don't recall the specific

## Page 16

periods of times that I was promoted, but through the course of my time at Blackstone, I was promoted a number of times to the ultimate title of Senior Managing Director.

Q    And Senior Managing Director was the final job title you had when you left Blackstone?

A    That is accurate.

Q    Do you recall, in general, when you started with that title?

A    I don't recall specifically.

Q    Do you recall generally?

A    Generally in the mid teens.

Q    So you reached that position in the mid teens, and you basically had that job title for the remainder of your time at Blackstone?

A    That is correct.

Q    What were your general job responsibilities at Blackstone between 2016 and 2021?

A    I was a member of the investment team, and I was a member of the investment committee.

Q    For the whole of Blackstone or a specific sector at Blackstone?

A    My responsibilities were specific to Blackstone Energy Partners.

Q    And what is Blackstone Energy Partners?

## Page 17

A    Blackstone Energy Partners was a group within the private equity group that invested in energy.

Q    And how large was that group?

A    I'm sorry.  Can you be more specific?

Q    Well, we can talk about it in multiple different ways, but how much assets under management did you have in that general time period?

A    I don't recall.

Q    Ballpark, 1 billion, 100 billion?

A    More than 1 billion.

Q    Okay.  How many people did you work with in your role in that group?

A    I worked with a large part of that group.

Q    And about how many people was that?

A    The group overall was -- I don't recall specifics -- generally speaking, 30 people.

Q    And were you the head of that group, or was there somebody senior to you?

A    There was somebody senior to me.

Q    Who was that?

A    A gentleman named David Foley.

Q    Do you know what his job title was?

A    I believe it was Senior Managing Director and CEO of Blackstone Energy Partners.

Page 18

Q    Was he the only person in the group senior to you, or was there anybody else senior to you?

A    Blackstone Energy Partners was part of the private equity group and interacted with the private equity group.  So in that context, there were other people that were more senior to me.

Q    So Blackstone Energy Partners is within the overall private equity group.  Within Blackstone Energy Partners, Mr. Foley was senior to you, but then, going up the chain to the broader private equity group, there were other people also senior to you?

Is that a fair summary?

A    That is a fair summary.

Q    Did you report to any of those people in the private equity group directly, or did everything go through Mr. Foley on the way up?

A    I reported to Mr. Foley but also other people.

Q    Who else did you report to in that 2016 to 2021 time period besides Mr. Foley?

A    Blackstone is a matrix organization.  So there were a number of people that I interacted with and reported to in one fashion, you know, across the

Page 19

firm.

The person that I directly reported to was named Joe Baratta.

Q    Okay.  A couple things:  What does it mean to be -- what do you mean when you say Blackstone is a matrix organization?

A    Well, there are a lot of different groups that are involved in -- in the business of Blackstone.

Q    And so you would work with people -- are you saying you would work with people in other groups that might not be senior to you?  You weren't reporting to them because you were just kind of equals in different branches who worked together on particular investments?

Is that what you mean?

A    I meant more so that there are different functional groups within Blackstone that are involved in the business of Blackstone where there are reporting relationships or communications.

Q    And the person you said you interacted with regularly was Joe Baratta; is that right?

A    Joe Baratta was one of my direct reports.

Q    And where was he -- where was he at Blackstone?  Was he in a particular group or --

Page 20

A    He was in the private equity group.

Q    He was in Blackstone's private equity group, and then Blackstone Energy Partners fell within that?

A    That is fair.

Q    Do you know what his title was in that time period?

A    I believe it was Senior Managing Director and Head of Global Private Equity, but I do not recall specifically.

Q    Okay.  I'm going to put a document into the chat.  I'm going to put it up on the screen, also, and go through the specific parts I'm going to look at, but it's in the chat for you.  If you want to download it, take a look at it.

For any exhibit that I put up, I'm going to go through it.  I'll share my screen, and there will be specific points that I'll direct you to, but take all the time you want to look at any other portion, or if you can't see some of it on the screen, you need it to -- you know, a different page or whatnot, just let me know.

Okay.  Since we're in different rooms, I can't tell exactly what you're doing, and I want to make sure you're able to see it appropriately.

Page 21

Okay?

A    Thank you.

MR. CAFORIO:  So if the court reporter can mark the document I just shared in the chat as Deposition Exhibit 1.

(Deposition (Acconcia) Exhibit No. 1 was marked for the record.)

BY MR. CAFORIO:

Q    Can you see in front of you a -- a document titled Plaintiffs' First Amended Petition?

Do you see that?

A    I do.

Q    Okay. and so this is the -- I can represent to you this is the current operative version of the petition that was filed -- you see up in the top corner -- on January 24th, 2025, and at the top middle of this first page, it says in the Business Court, First Business Court Division, Dallas County.

Do you see that?

A    I see that on the page.

Q    And that's what I was referencing earlier when I mentioned this was court -- a case pending in the Business Court in Dallas, and here's the actual

Page 22

petition that says that.

Have you ever seen the complaint in this case before?

A    I have.

Q    Okay.  Do you recall when you first saw the complaint in this case?

A    I do not recall specifically.

Q    I'm going to go to Page 14 of this document, and are you looking at an org chart now?

A    I see Page 14.

Q    Okay.  And it appears to be an org chart, and it has Blackstone, Inc. at the top, and then it works its way down through a bunch of entities with BPP HoldCo, LLC at the bottom.

Do you see all that?

A    I see the org chart.

Q    Are you familiar with this org chart?

MR. DESAI:  Objection.  Form.

BY MR. CAFORIO:

Q    I just want to know if you've seen it before, if this looks familiar to you or not.  It's just foundational.

A    I do not recall.

Q    Okay.  Are you familiar with any of the entities that are listed in this org chart?

Page 23

A    I'm sorry.  Can you be more specific?

Q    Well, do you -- as you read the names of the different entities on this org chart, are you familiar with those entities?

Do you recognize those names, or are you unfamiliar with these entities, and you don't recognize those names?

A    I do not recall specific legal names or legal entities.

Q    Okay.  Other than Blackstone, Inc. at the top?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I recognize the name Blackstone.  I recognize the name Primexx, and I recognize the name Blackstone Energy Partners, but I do not recall specifics around the legal structure or legal entities.

BY MR. CAFORIO:

Q    Other than Blackstone, Inc., do you believe you've ever been employed by any of the entities on this org chart?

MR. DESAI:  Objection.  Form.

THE WITNESS:  My general understanding was that I was employed by

Page 24

Blackstone.

BY MR. CAFORIO:

Q    Other than Blackstone, Inc., do you believe you've ever performed work for any of the entities on this org chart?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I worked -- I believe I worked on behalf of Blackstone.

BY MR. CAFORIO:

Q    Are you aware of whether you ever received compensation from any of the entities listed on this org chart other than Blackstone?

MR. DESAI:  Objection.

THE WITNESS:  My general understanding was that I received compensation from Blackstone.

BY MR. CAFORIO:

Q    Okay.  We can go to Page 69 of this document, which -- actually, go to 68 just to show you.  This is Exhibit 1 that's just attached at the back of the petition, and do you see on your screen here what's titled the Third Amended and Restated Limited Partnership Agreement of Primexx Energy Partners Limited?

A    I can see that it says Third Amended and

Page 25

Restated Limited Partnership Agreement of Primexx Energy Partners Limited.

Q    Are you familiar with the entity Primexx Energy Partners Limited?

A    I do not recall that entity specifically.

Q    Okay.  Well, let's go ahead and skip ahead a little bit to Page 150 of this document.

Can you see that this document appears to be signed by you on behalf of BPP HoldCo, LLC?

Do you see that?

A    I see the legal entity BPP HoldCo, LLC, and I see my signature.

Q    Okay.  And if we go forward a few pages to Page 153, this is Exhibit A to this document, and it has a schedule of partners, and you see the first partner listed there is BPP HoldCo, LLC?

Do you see that?

A    I see Exhibit A.  I see a list of members, and I see the first member is BPP HoldCo, LLC.

Q    And the -- for BPP HoldCo, LLC, it says in care of the Blackstone Group, right?

A    It does.

Q    And then with attention to you, Angelo Acconcia, right?

Page 26

A    It does.

Q    And that's your e-mail address listed there?

A    That was my e-mail.

Q    And so going back to Page 150, you signed this partnership agreement with the title President of BPP HoldCo, LLC?

Do you see that?

A    I see that it states my name and then reads Its, colon, President.

Q    And you would agree you signed this document as the President of BPP HoldCo; is that correct?

A    I see that is what the document says. I don't recall specifically my role.

Q    Okay. You're not sure if you were President of BPP HoldCo.

A    I do not recall specifically.

Q    If you were President of BPP HoldCo, do you know how long you were President of BPP HoldCo?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q    Do you have any recollection of somebody else being president of BPP HoldCo other than you?

Page 27

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q    Do you have any reason to believe that when you signed this document, Angela Acconcia, President of BPP HoldCo, that you weren't the President of BPP HoldCo when you signed that document?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall specifics.

BY MR. CAFORIO:

Q    Would you have signed a document that says Angelo Acconcia was BPP HoldCo's President if you were not BPP HoldCo's President?

MR. DESAI: Objection. Form.

THE WITNESS: I'm sorry. I don't understand the question.

BY MR. CAFORIO:

Q    That is your signature, right?

A    I believe it is.

Q    Do you recall if you ever received any compensation from BPP HoldCo?

A    I do not believe I received any direct compensation.

Page 28

Q    Let's go back to Page 74 of this document. It's the first page of the -- you can see it's the table of contents and then the first actual page of the Third Amended and Restated Limited Partnership Agreement.

Do you see that?

A    I apologize. Do you mind repeating that.

Q    So I'm just setting the stage. This is the Third Amended Restated Limited Partnership Agreement of Primexx Energy Partners that we looked at earlier, and I'm just going to the first page -- substantive page of that document.

Do you see that?

A    I see the top of the page reads Third Amended and Restated Limited Partnership Agreement. Although, at the top of the PDF, it reads Page 74, and at the bottom, it reads Page 7.

Q    And in the first paragraph of this page, it says that the Third Amended and Restated Limited Partnership Agreement (the "Agreement"), dated as of July 12th, 2016 (the "Effective Date") is made and entered into by and among Primexx Energy Corporation, a Texas Corporation.

Do you see that?

A    I see that on the page.

Page 29

Q    Okay. And then it lists a series of the other counter-parties were various classes of unitholders, correct?

A    I see a number of different groups named here.

Q    And BPP HoldCo was a Series B preferred unitholder, right?

A    I do not recall.

Q    Well, we can go back to your signature on Page 150. Do you see where it says right there, Series B Preferred Unitholder BPP HoldCo, and then you signed it?

A    I now see at the top Series B Preferred Unitholder.

Q    Does that refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    That is what I see on the page.

Q    Does it refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    I don't recall the specifics.

Q    Okay. And if we look at Page 153, this Exhibit A we already looked at, you see it says that BPP HoldCo owned 186,006 Series B Preferred Units.

Do you see that?

A    I see that on the table.

Page 30

Q    Does that refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    That is what it says on the page. I don't recall specifics.

Q    Now -- I'm going to stop sharing this.

You signed, as we saw, that Third Amended Partnership Agreement on behalf of BPP HoldCo, correct?

A    I saw my signature on the page.

Q    Did you play any role in negotiating the terms of the partnership agreement prior to you signing it?

A    I recall general involvement.

Q    And what was your general involvement?

MR. DESAI:  I am going to object to form.  Object to the extent that the questions relate to matters that are outside of jurisdictional discovery and just keep that as a warning objection so I don't need to interrupt every time, but --

MR. CAFORIO:  Understood.

BY MR. CAFORIO:

Q    You can answer.

A    I apologize.  Do you mind repeating the

Page 31

question?

Q    Yeah.  I -- you said, if I heard you correctly, that you recall a general involvement in the negotiation of the partnership agreement, and so I was just asking for clarification.

What do you mean when you say you had a general involvement in negotiating the terms of the partnership agreement?

A    I was one of several groups that were involved in the discussions around that -- the partnership with -- with Primexx.

Q    Did you receive drafts of the partnership agreement prior to signing it?

A    I don't recall specifically, but I believe I would have.

Q    Did you play any role in making the decision for Blackstone to make its substantial investment into Primexx and enter into the partnership agreement?

A    I did.

Q    What role did you play in Blackstone making the decision to invest in Primexx?

A    I was a member of the investment team.

Q    How many people were on that investment team?

Page 32

A    I don't recall specifically.

Q    More or less than five people?

A    Inclusive of the other groups at Blackstone that were involved, more than five people.

Q    Did you have primary responsibility for recommending Blackstone's investment into Primexx, or did somebody else have primary responsibility?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I don't understand what you mean by primary.

BY MR. CAFORIO:

Q    And I'm just trying to understand.  This is foundational for later questions, and so I could be totally -- misunderstand how the investment process works at Blackstone.  So please correct me, but presumably at some point someone made this recommendation that Blackstone should look into this and make an investment into Primexx, and I just want to know, if that person was you, then we can go into questions on that, or if that person was somebody else, in which case, I can ask you for a name, and I don't need to ask those questions because it wasn't you.

So my question is simply:  Who had primary responsibility for recommending that

Page 33

Blackstone make its investment into Primexx?

A    The investment team makes recommendations to the investment committee, and the investment committee makes decisions.  So I'm struggling with the specifics of the word primary.

This gets back to kind of the matrix nature of Blackstone, and groups are involved in decisions.

Q    And to clarify, were you on the investment team and the investment committee or only one of those?

A    I was both on the investment team and on the investment committee.

Q    Okay.  So -- please correct me if I'm wrong.  I'm just trying to understand it.  It's foundational to ask later questions.  If I'm wrong, I want to know.

So you were part of the investment team that made the recommendation to the investment committee to invest in Primexx; is that correct?

A    I believe that's a fair characterization.

Q    And you were also on the investment committee that decided whether to approve the recommendation from the investment team to invest in Primexx; is that correct?

Page 34

A    I was one of the many members of the investment committee.

Q    Okay.  Was there anybody else on the investment committee who was also on the investment team that recommended that Blackstone make its investment in Primexx?

A    Sorry.  Would you mind repeating the question?

Q    Was there anybody else besides you that you recall being on both the investment team that made the recommendation to invest in Primexx and on the investment committee, or were you the only person who was on both the investment team and the investment committee?

A    Generally speaking, the way it worked was the investment team would discuss within Blackstone Energy Partners and Blackstone Energy -- Blackstone Energy Partners would make -- generally speaking, investments that were taken to investment committee, because that investment committee was broader than Blackstone Energy Partners, it had the support of the other partners within Blackstone Energy Partners, which is why I'm trying to think through the specific aspects of your question.

Q    And how many -- you said it had the

Page 35

support of the other partners at Blackstone Energy Partners.

How many partners were there within the Blackstone Energy Partners group?

A    I don't recall specifically at the time but -- I don't recall specifically at the time.

Q    With regards to Blackstone's investment in Primexx, did you report to Mr. Foley with regards to that investment?

You mentioned earlier just in general Mr. Foley was your senior that you would report to at Blackstone Energy Partners, and so I'm just wondering specifically, for the Primexx investment, was it still the case that you reported to Mr. Foley?

A    This gets back to the fact that Blackstone is a matrix organization.  So there were a number of people that I reported to.

Q    Was Mr. Foley one of them?

A    I believe that's a fair characterization.

Q    Were there any Blackstone employees who reported to you with regards to Blackstone's investment in Primexx?

A    This, again, gets back to more of the matrix nature of Blackstone where, to my recollection and knowledge, there weren't specific legal reporting

Page 36

lines.  There was general group involvement.

Q    And were there Blackstone employees junior to you in the group who worked on Blackstone's investment in Primexx that reported to you, or were you the juniormost Blackstone employee working on the Primexx investment?

A    There were other people that -- that worked with me.  I do not recall there being specific legal reporting lines.

Q    And who were the people at Blackstone who worked with you on the Primexx investment?

A    Sorry.  It's taking me a second to try to recall specifically because there were a number of people.  The person who comes to mind -- one of the people that come to mind is Erik Belz.

Q    Anybody else?

A    I don't recall specifically.

Q    Now, was there at Blackstone some sort of deal team that worked on Blackstone's Primexx investment?

A    Generally speaking, there were deal teams.

Q    And I've seen references in documents -- and we might look at some later but that referred to the Primexx deal team as including you, Anika Gautam,

Page 37

Mark Henle, Erik Belz and David Foley.

Does that sound accurate for who was part of the Blackstone/Primexx deal team?

A    Those names are familiar to me.  I do not recall specific roles.

Q    Okay.  Do you recall whether that group of people at Blackstone worked on the Primexx investment?

A    I recall some of their involvement.

Q    Whose involvement do you recall?

A    David Foley and Erik Belz.

Q    But you don't have a recollection right now of work that Anika Gautam performed?

A    I do not recall.

Q    Or Mark Henle?

A    I do not recall.

Q    Are you familiar with Ms. Gautam and Mr. Henley, in general, and you just don't recall that they worked on the Primexx investment, or are you unfamiliar with those names?

A    The names are familiar to me.  I just don't recall their involvement.

Q    In the Primexx investment?

A    Correct.

Q    One way or the other?

Page 38

A    I do not recall their specific involvement in the Primexx investment.

Q    Okay.  And what was Mr. Belz -- is that B-E-L-Z; is that right?

A    I believe that's correct.

Q    Okay.  What was Mr. Belz's involvement in the Primexx investment for Blackstone?

A    Erik Belz was a member of the investment team.

Q    Was he junior or senior to you or same level as you?

A    Erik Belz was junior. to me.

Q    Okay.  So for the people you remember working as part of the Primexx deal team, Mr. Belz was junior to you and you were junior to Mr. Foley; is that accurate?

A    I believe so.

Q    As part of your compensation from Blackstone, did you personally have any carried interest in Blackstone's investment in Primexx?

A    I apologize.  Do you mind repeating the question, Bryan?

Q    Yeah.  As part of your compensation package at Blackstone, did you personally have any carried interest in Blackstone's investment in

Page 39

Primexx?

A    I had a carried interest in our investment fund, which was indirectly associated with Primexx.

Q    So did you expect that your personal earnings could be higher or lower depending on the profitability of Blackstone's investment in Primexx?

A    Generally speaking, yes.

Q    Let's go back to Exhibit 1 that we already looked at.  I'll put something on the screen for you.

Do you see, again, this page we already looked at of the Third Amended and Restated Limited Partnership Agreement of Primexx Energy Partners?

A    I see the page you put up on the screen.

Q    And if you go to the fifth whereas clause under the recitals on that first page, there's a reference to Blackstone Capital Partners VII, L.P. and Blackstone Energy Partners II L.P. (the "Blackstone Investors").

Do you see that?

A    I do.

Q    Do you recognize those two entities?

A    Generally speaking, yes.

Q    And just generally, what -- what are

Page 40

those entities in your understanding?

A    I believe they were investment funds.

Q    Are those the funds that you referenced earlier that you had a carried interest in that would make your personal compensation higher or lower depending upon the profitability of Blackstone's Primexx investment?

A    I believe that's a fair characterization.  Although, I would say it could relative to what -- because there are a number of factors and considerations that went into the calculation of the carried interest for the funds.

THE WITNESS:  And I apologize.  Do you mind if we take -- we're coming up on the hour.  Do you mind if we take a nature break?

MR. CAFORIO:  Yeah, yeah.  Do you need five minutes, ten minutes?  What do you need?

THE WITNESS:  Five minutes would be great.

MR. CAFORIO:  Okay.

THE VIDEOGRAPHER:  The time is 10:07 a.m., and we're going off the record.

Page 41

(Brief pause.)

THE VIDEOGRAPHER:  The time is 10:12 a.m.  We're going back on the record.

BY MR. CAFORIO:

Q    All right.  Welcome back, Mr. Acconcia.  You understand you're still under oath, correct?

A    I do.

Q    Okay.  Can you please describe, in general terms, what were your responsibilities at Blackstone as a member of the Primexx deal team?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I apologize.  Could you be more specific?

BY MR. CAFORIO:

Q    Well, I wanted to start general and get more specific, but just, in general, we discussed the Primexx deal team at Blackstone, right, which included at least you, Mr. Belz and Mr. Foley, right?

A    I recall that discussion.

Q    Okay.  And I'm just asking, in general terms, before we get into specifics, how would you describe your responsibilities being on the Primexx deal team overseeing Blackstone's investment in Primexx?

Page 42

A    I recall general involvement inclusive of being on the Board of Directors.

Q    The Board of Directors of Primexx? Is that what you're referring to?

A    Yes.

Q    I just want to make -- not the Board of Directors of Blackstone? The Board of Directors of Primexx?

A    That is correct.

Q    Okay. Would you describe your responsibilities from Blackstone regarding the Primexx investment to be a one-time event that was completed when you signed that partnership agreement, or did you have a continuing obligation over a series of years regarding that investment?

A    I would say general involvement over a period of time.

Q    Your responsibilities didn't end the moment you signed the partnership agreement?

A    My involvement did not end when I signed the partnership agreement.

Q    In fact, you continued participating in meetings regarding Blackstone's investment in Primexx from 2016 all the way through 2021; is that fair?

A    I recall meetings during that time. The

Page 43

specific dates I don't have specific recollection of.

Q    And in your role on the Blackstone's Primexx deal team, did you play any role on behalf of Blackstone in attempting to sell Primexx in the 2021 time period?

MR. DESAI: Objection. Form.

THE WITNESS: Apologies. Could you rephrase the question?

BY MR. CAFORIO:

Q    Well, I'm just wondering, in your role on the Primexx deal team at Blackstone, did you perform any work or play any role in the process of Blackstone ultimately working to sell Primexx in the 2020-2021 time period?

MR. DESAI: Objection. Form.

THE WITNESS: I was generally involved in the activities related to Primexx.

BY MR. CAFORIO:

Q    And do you recall that ultimately Primexx was sold to Callon Petroleum in the end of 2021?

A    I generally recall that.

Q    And did you personally play any role in the process that resulted in Primexx being sold to Callon Petroleum at the end of 2021?

Page 44

A    I was generally involved in Blackstone's investment in Primexx during that time.

Q    And that includes Blackstone exiting its investment in Primexx at the end of 2021; is that fair?

MR. DESAI: Objection. Form.

THE WITNESS: I was generally involved in the activities related to Primexx during -- during that time.

BY MR. CAFORIO:

Q    Including its ultimate sale to Callon Petroleum; is that correct or not correct?

A    The reason why it's taking me a moment to think about this is your specific use of the word sale or exit. I don't recall the specifics of the transaction, but, generally speaking, I recall it to be more of a merger, and, thus, my comment of my general involvement in the -- in the transaction.

Q    Okay. So you were -- whether a merger or a sale, there was a transaction that -- between Primexx and Callon Petroleum at the end of 2021, correct?

A    I recall the transaction. Specific dates I don't recall.

Q    Okay. And you did play a role in

Page 45

effectuating that transaction with Callon Petroleum in 2021 on behalf of Blackstone, is that fair?

MR. DESAI: Objection. Form.

THE WITNESS: I was one of many people at Blackstone involved in our investment in Primexx.

BY MR. CAFORIO:

Q    And Callon Petroleum is a Texas-based corporation; is that right?

A    I do not recall.

Q    You don't recall that it's headquartered in Houston?

A    I -- I do not.

Q    Did you ever participate in any meetings in Houston where you discussed the potential sale of -- or the potential transaction with Callon?

A    I do not recall.

Q    One way or the other?

A    I do not believe so, but I don't -- I do not recall specifics.

Q    Did you have any direct communications with anyone at Callon Petroleum regarding the potential transaction involving Primexx?

A    I do not recall.

Q    One way or the other?

Page 46

A    I do not recall.

Q    Okay.  In 2021, in your role at Blackstone, did you travel to Texas for work?

A    I do not recall.

Q    Let's put up the next exhibit.  I'm putting it in the chat right now, and I'll share my screen, as well.

(Deposition (Acconcia) Exhibit No. 2 was marked for the record.)

BY MR. CAFORIO:

Q    So Deposition Exhibit 2 is a document, and do you see there's a -- at the bottom right of the document, there's a numeric code.  It says BPP_0018525.

Do you see that?

A    I see that.

Q    And this document is three pages long.  It goes to ending in 27.

Do you see that?

A    I see that.

Q    And this is a document -- this is an e-mail chain that starts on June 24th, 2021 with an e-mail from Phil Cook at Primexx.

Do you see that?

A    I see, on the third page, it lists Phil

Page 47

Cook, an e-mail from Phil Cook.

Q    And it says, in his signature block, that he was the Executive Vice President and Chief Financial Officer of Primexx Energy Partners located in Dallas, Texas.

Do you see that?

A    I do.

Q    Okay.  And if you go up this chain to the first page, at the very top e-mail, do you see that's an e-mail that you sent dated June 29th, 2021 to Chris Doyle at Primexx with a CC to Erik Belz and Mark Henle, both at Blackstone?

Do you see that?

A    Sorry.  I'm just trying to familiarize myself with the document.

Q    Yeah.  Take your time.  Take your time.

A    Okay.  Thank you.  Do you mind repeating the question?

Q    Well, I think I was just clarifying if you saw this.

Do you see that the top e-mail is an e-mail from you dated June 29th, 2021 sent to Chris Doyle at Primexx with a CC to Erik Belz and Mark Henle, both at Blackstone.

Do you see that?

Page 48

A    I see that now.  Thank you.

Q    And you wrote in this e-mail to Mr. Doyle:  On a fight [sic.] this morning to Houston.  Will call you when I land.

Do you see that?

A    I do.

Q    Do you have any reason to believe that when you sent this e-mail to Mr. Doyle and told him that you were on a flight to Houston and that you would call him when you landed that that was not an accurate statement?

A    I do not recall this e-mail.

Q    Okay.  Do you recall whether you did, in fact, call Mr. Doyle when you landed in Houston on June 29th, 2021?

A    I do not recall.

Q    Do you have any reason to believe that you wouldn't have called Mr. Doyle when you landed in Houston as you told him you would?

A    I'm sorry.  I don't recall the specifics of this.

Q    Who is Chris Doyle?

A    Sorry.  Do you mind being a little more specific?

Q    Well, I don't know.  You sent an e-mail

Page 49

dated June 29th, 2021 to Chris Doyle at Primexx.

So I'm just asking you who is Chris Doyle that you sent this e-mail to?

A    I understand your question now.  Chris was a member of the executive team at Primexx.

Q    Was he located in Texas?

A    I believe he was.

Q    I'm going to give you -- I'm sorry.  You said he was on the executive team?  Is that what you described his role at Primexx?

A    I believe that's what I said.

Q    Okay.  Did he report to you in that role?

A    I believe it would be fair to characterize that he reported to the board.

Q    And you were on the board?

A    I was one of the members of the board.

Q    How often did you communicate with Mr. Doyle in the 2021 time period?

A    I do not recall.

Q    Do you recall, in general, that you did communicate with Mr. Doyle at Primexx in 2021?

A    I see the e-mail on screen that you noted.  I do not recall communications with Mr. Doyle.

Q    You don't recall any other

Page 50

communications.

A    No, I do not.

Q    Okay.  If you look at the -- I guess it's the fourth e-mail down, there's a line kind of in the middle of the page, and there's an e-mail from Chris Doyle dated June 28th, 2021.

Do you see that?

A    I see an e-mail in the middle of the page from Chris Doyle.

Q    Okay.  And I just -- looking at all the people who were CC'd here, there are -- do you have an understanding of who these people are?  Do you recognize the names that were part of this e-mail chain or no, just in general, and then we'll get into specifics?

A    I generally recognize some of these names.

Q    Okay.  So I just want to look at some of the names that have an @Primexx.com e-mail address.  So I see a Sam Blatt at Primexx.

Do you see that name?

A    I see that.

Q    Do you know who Sam Blatt at Primexx was?

A    Sam Blatt was a member of the executive team at Primexx.

Page 51

Q    The next name is Chase White at Primexx.  Do you see that?

A    I see that.

Q    Do you know who Chase White was?

A    I recall his general involvement.  I do not recall his specific role or title.

Q    What was his general involvement?

A    He was involved in the finance team at Primexx.

Q    Skipping one name that doesn't have a Primexx e-mail, the next name is Megan Davis at Primexx.

Do you see that?

A    I do.

Q    Do you know who Megan Davis at Primexx was?

A    I do not recall.

Q    And then the last name listed here is Phil Cook at Primexx.

Do you see that?

A    I do.

Q    And we saw his signature block on the third page, but do you -- do you know who Phil Cook at Primexx was?

A    Phil Cook was a member of the executive

Page 52

team at Primexx.

Q    Do you recall whether you ever met in-person in Texas with Mr. Doyle, Mr. White, Ms. Davis, or Mr. Cook regarding Blackstone's investment in Primexx?

A    I do not recall specifics.  I do not recall specifics.

Q    I'll take that document down and put the next document into the chat.

MR. DESAI:  Bryan, while you're doing that, I want to mention -- I know I've said this before, but Mr. Acconcia has a noon eastern hard cut.

MR. CAFORIO:  Yeah.  I'm very hopeful we'll be finished well before noon, but we'll see how quickly we can move through things.

MR. DESAI:  Yeah, I do, too, and I know we still have a ways to go before then, but I just wanted to flag it.

MR. CAFORIO:  Yeah.  Thank you.

THE WITNESS:  Thank you, Bryan.

MR. CAFORIO:  Let me share the screen here, and for the court reporter, it is now marked Deposition Exhibit 3.

Page 53

(Deposition (Acconcia) Exhibit No. 3 was marked for the record.)

BY MR. CAFORIO:

Q    Can you see this is a document with a Bates number down at the bottom BPP_0017994.

Do you see that?

A    I see that.

Q    And this is an e-mail chain between you -- it's various e-mails involving you, Patricia Lee and Mr. Doyle at Primexx.

Do you see that?

A    I see an e-mail from Patricia to myself.

Q    Who is Patricia Lee?

A    Patricia was my executive assistant.

Q    Okay.  And so the first e-mail on this chain at the bottom is from Mr. Doyle to Ms. Lee, dated May 25th, 2021; subject:  Schedule next Tuesday, and it says:  Angelo mentioned having drinks, dinner next week.  I think it makes sense for Angelo and I to have pre dinner drinks and then have a team dinner Wednesday evening.  Does that work?  I would invite Phil, Megan, Chase and Sam.

Do you see that?

A    I see that's what it says.

Q    And then Ms. Lee forwarded that e-mail to

Page 54

you eight minutes later on May 25th, 2021, and wrote: Angelo, please advise on the below, as you will be in Dallas.

Do you see that?

A    I do.

Q    And then you responded to your executive assistant later that same day, May 25th, 2021: Thanks. Let's do drinks with Chris Doyle at 5:30 p.m. and then dinner at 6:30 p.m. with the team.

Do you see that?

A    I do.

Q    And the team, as Mr. Doyle wrote it in that first e-mail, is Phil, Megan, Chase and Sam, the people we looked at on the last e-mail, right?

A    I believe that that is what it's referring to based on the e-mail here.

Q    And Ms. Lee, as your executive assistant, was familiar with your schedule; is that fair?

A    That is fair.

Q    And she wrote on this e-mail on May 25th, that you would be in Dallas, correct?

A    I see that she wrote in her e-mail dated May 25th that I would be in Dallas.

Q    And then you did, in fact, go to Dallas the next week where you met with Mr. Doyle and the

Page 55

rest of the Primexx team while you were there, correct?

MR. DESAI: Objection. Form.

THE WITNESS: I don't recall.

(Deposition (Acconcia) Exhibit No. 4 was marked for the record.)

BY MR. CAFORIO:

Q    I'll put the next e-mail into the chat or document into the chat I should say.

MR. CAFORIO: If the court reporter would mark this as the next exhibit.

BY MR. CAFORIO:

Q    Do you see this is a document with the Bates number BPP_0005953 through 5954?

Do you see that?

A    I see the first page says BPP_0005953. Thank you. I now see the second page. It says 0005954.

Q    Okay. And this is an e-mail chain started by Chase White at Primexx dated June 30, 2021?

Do you see that?

A    Would you mind going to the second page, please?

Q    Yeah.

Page 56

A    Okay. Thank you.

Q    So do you see that that's what this chain started with?

A    Sorry. Would you mind repeating the question?

Q    Yeah. This is an e-mail chain -- this document -- this exhibit -- is an e-mail chain that starts with an e-mail from Chase White at Primexx, dated June 30, 2021, to the Blackstone team and the Primexx team.

Do you see that?

A    I see that.

Q    And we've discussed most of these names, but there is one name I think we haven't discussed. There's a jeffkelly@blackstone.com at the bottom of this e-mail.

Do you see that?

A    I see that.

Q    Who is Mr. Kelly at Blackstone?

A    Mr. Kelly was a member of -- and this e-mail is refreshing my memory -- a member of the portfolio operations team at Blackstone.

Q    Did he play any role on the Primexx deal team?

A    This gets back to the matrix like nature

Page 57

of Blackstone. So there were various groups and people that were involved, some of which were within Blackstone Energy Partners and the private equity group, some of who were in other groups were generally involved, and Jeff was a member of one of those other groups who was generally involved.

Q    And about in the middle of this page, just the third e-mail up from the bottom, is an e-mail you sent dated June 30, 2021.

Do you see that?

A    I see an e-mail from me in the middle of the page.

Q    And you wrote in this e-mail: I am back -- I am back-to-back in Houston today.

Do you see that?

A    I see -- I see that.

Q    And when you wrote that, did you mean you had back-to-back meetings in Houston on June 30th, 2021?

A    I don't recall the specifics of the trip.

Q    But looking at the e-mail you wrote, do you know what you meant when you said I am back-to-back in Houston today with regards to scheduling a call?

A    Generally speaking, I'd state that's a

Page 58

term or phrase that I believe refers to not having available time. I do not -- I do not recall specific activities or meetings or what was taking up my time during that period.

Q But you were in Houston when you sent this e-mail?

A I do not recall.

Q You said you were in Houston when you sent this e-mail, right?

A That is what the first line of the e-mail says. I do not recall any of the specifics.

Q Do you believe you were lying to the rest of the Primexx team when you told them you were in Houston when you sent that e-mail?

MR. DESAI: Objection. Form.

THE WITNESS: I see what the e-mail says. I just do not recall anything further.

BY MR. CAFORIO:

Q And this is an e-mail that you sent to Mr. Doyle, Mr. Blatt, Mr. Cook, Ms. Davis in Texas where you told them that you were in Houston, correct?

A This -- reading this e-mail, this is an e-mail that I sent to mostly members of the

Page 59

Blackstone team in the to line. There were five people noted in the to line. Only one of which was with Primexx.

Q Right, and you sent that e-mail to the Primexx deal team and the five Primexx employees and told them you were in Houston that day, correct?

A I do not recall the specifics. What I'm reading here is I sent an e-mail to four people at Blackstone and one person at Primexx, and what it says is I am back-to-back in Houston today. Why don't you set the time that works best for you all, and if I can't make it, I will follow-up with the team to discuss. I'm on a flight early a.m. but free for most of the afternoon tomorrow.

Q And the subject of this e-mail is a Rosehill Plan B Proposal.

Do you see that?

A I see at the bottom of the page the original e-mail that Chase White sent and the subject line as you noted.

Q And do you have a recollection right now what the Rosehill Plan B Proposal was?

A I do not recall.

Q Okay. I'm putting the next document in the chat.

Page 60

MR. CAFORIO: Would the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 5 was marked for the record.)

BY MR. CAFORIO:

Q Do you see this is a document with a Bates number BPP_0016545, and it's a two-page document ending 546.

Do you see that?

A I do.

Q And this is -- it appears to be a calendar invite from you dated November 3rd, 2020.

Do you see that?

A Sorry. I'm just trying to familiarize myself with the document.

Q Yep.

A This looks like a calendar invite, and while it says from me, typically my assistant was asked to coordinate meetings and would send calendar invites on behalf of myself or -- or the deal team.

So I -- I don't recall whether I sent this or whether my assistant sent it specifically.

Q But you see that it is a calendar invite sent by your e-mail address dated November 3rd, 2020 with the subject call Primexx/Blackstone Strategic

Page 61

Next Steps.

Do you see that?

A I do.

Q And this was a calendar invite that your e-mail address sent to members of the Blackstone deal team, as well as at least four Primexx employees in Texas, Chris Doyle, Sam Blatt, Chase White and Phil Cook?

Do you see that?

A I see them listed here on the to line.

Q And either you or your executive assistant, Ms. Lee, initiated and scheduled this call, correct?

A I do not recall the specifics; although, this document would lead me to believe that that was the case.

Q Okay. Do you recall at some point Primexx and Blackstone engaged with RBC in Texas to explore a potential transaction involving Primexx in 2021?

Do you recall that in general terms?

A I generally recall RBC's involvement. I don't understand what you mean by in Texas.

Q Sure. Let's go to the next document, and I'm putting into the chat.

Page 62

MR. CAFORIO: So if the court reporter will mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 6 was marked for the record.)

BY MR. CAFORIO:

Q    Do you see this is a document with Bates number BPP_0017552 ending at 553?

Do you see that?

A    I do.

Q    And the first e-mail on the chain -- I'll just look at the second page, and you'll see there's no other e-mail.

So the bottom on the first page is the first e-mail on the page. It is a calendar invite from you dated, Thursday, April 15th, 2021.

Do you see that?

A    I see there's a calendar invite noted from me with that date.

Q    And it has a subject: Call Primexx RBC/BX re: General status and next steps discussion.

Do you see that?

A    I see that in the subject line.

Q    And this was a call that you initiated, correct?

Page 63

A    I do not -- I do not recall.

Q    It's a calendar invite sent from your e-mail address, correct?

A    That's what this e-mail -- that's what this document shows. Again, I don't recall the specifics, and typically my assistant would send calendar invites on behalf of people at Blackstone to schedule calls that would come from my e-mail.

Q    And in the top e-mail -- so the last e-mail in the chain -- is an e-mail from a Jeffrey Spence at RBC Capital Markets.

Do you see this?

A    I see that at the top.

Q    And Mr. Spence has a signature line that says he's located at 609 Main Street, Suite 3700, Houston, Texas.

Do you see that?

A    I do.

Q    That's what I meant earlier when I said RBC in Texas. The people at RBC that you communicated regarding a potential Primexx transaction were located in Texas, right?

MR. DESAI: Objection. Form.

THE WITNESS: RBC is a Canadian investment bank that has offices, to my

Page 64

knowledge, across North America. I do not recall specifically where people were located.

BY MR. CAFORIO:

Q    But you received this e-mail from Mr. Spence with the materials for the discussion on the call that you had sent out a calendar invite for, correct?

A    This e-mail shows that I received -- this document shows that I received an e-mail from Jeffrey.

Q    And Mr. Spence's signature line indicates that he's located in Houston, Texas, correct?

A    His signature line states a Houston address.

Q    In 2021 -- and that document we just looked at was April 2021, but in 2021, you personally conducted due diligence regarding potential Primexx transactions involving Texas counter-parties; is that fair?

MR. DESAI: Objection. Form.

THE WITNESS: I'm sorry. I don't understand the question.

BY MR. CAFORIO:

Q    Did you personally conduct any due

Page 65

diligence in the 2021 time period with regards to potential Primexx transactions?

A    My role at Blackstone at the time, I believe, was as a member of the general investment team and on the board of Primexx. The management team at Primexx had day-to-day oversight on the operations, activities and diligence of the company.

Q    I'll put the next document in the chat, and we'll look at that.

MR. CAFORIO: And if the court reporter could mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 7 was marked for the record.)

BY MR. CAFORIO:

Q    It is a one-page document with Bates number BPP_0018469.

Do you see that?

A    I see that at the bottom right-hand of the page.

Q    And this starts with an e-mail from Megan Davis at Primexx to you, Mr. Belz, and Mr. Henley.

Do you see that?

A    I see the e-mail from Megan.

Q    And she says in this e-mail: Angelo,

Page 66

Erik, Mark, I'm looking at potentially rescheduling the bi-weekly board meeting again from tomorrow afternoon to Friday with the idea that we are more likely to have a material update on Capitan by Friday morning.

Do you see that?

A    I see that it says:  I'm looking to potentially rescheduling the bi-weekly board meeting again from tomorrow afternoon to Friday morning with the idea that we are more likely to have a material update on Capitan by Friday morning.  Would you guys like to move the meeting to Friday morning?  If so, please let me know your availability, and I will check general board availability based on the window you provided.

Q    She references a material update on -- and I don't know if that's Captain or Capitan.

Do you see that?

A    I see -- I see it spelled C-A-P-I-T-A-N.

Q    And do you know -- do you understand what that's a reference to?

A    I do not recall.

Q    Okay.  You don't recall that Capitan was the code name that Blackstone and Primexx used to discuss the upcoming Callon transaction?

Page 67

A    I do not recall.

Q    One way or the other?

A    I do not recall.

Q    And you responded to Ms. Davis that -- you wrote:  Yes, thanks, and then provided the window that you were free for the call, correct?

A    I wrote back:  Yes, thanks.  I can free up 11:30 to 3:00 p.m. Eastern on Friday, parentheses, or other times if those don't work.

Q    Do you recall if bi-weekly meetings did start occurring in the June 2021 time period as Primexx and Blackstone started closing in on the Callon transaction?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I do not recall.

BY MR. CAFORIO:

Q    And do you recall if -- do you recall what role you played on these calls with the Primexx team discussing the potential Callon transaction, and I just mean in general?

Were you an active participant, or would you mainly just sit silently on the calls?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe the call that was referenced in the e-mail

Page 68

referenced that it included the full board.

So as a board member and one of many board members, we listen to updates from the management team and their recommendations.

BY MR. CAFORIO:

Q    And when you said you -- you would receive updates from and listen to the management team, you're referring to the Primexx management team?

A    I believe, in this specific instance, the board heard updates from the management team and then also from RBC, who the board had retained on its behalf to evaluate strategical turn of events more broadly.

Q    And I just want to clarify, when you were saying management team, are you referring to the Primexx management team?

A    Yes.

Q    Okay.  That group of people we looked at, Megan Davis, Sam Blatt, Chris Doyle, Chase White located in Texas working for Primexx?

Is that who you're referring to as the management team?

Page 69

A    I believe those were some of -- I believe those were some of the individuals of the executive team that were involved at Primexx.

THE WITNESS:  Bryan, do you mind?  We're on the hour again, and I had a fair amount of coffee this morning.  Do you mind if I take a nature break?

MR. CAFORIO:  Five minutes.

THE WITNESS:  Okay.  Thank you so much.

THE VIDEOGRAPHER:  Stand by.  The time is 11:05 a.m.  We're going off the record.

(Brief pause.)

THE VIDEOGRAPHER:  The time is 11:10 a.m.  We're going back on the record.

BY MR. CAFORIO:

Q    All right.  Welcome back, Mr. Acconcia.  You understand you're still under oath?

A    I do.  Thank you.

Q    Okay.  I -- you mentioned just a few minutes ago before the break that, throughout 2021, you would participate in board meetings for Primexx Energy Corporation and BPP Energy Partners; is that

Page 70

correct?

A     I believe I mentioned a general recollection as to attending board meetings.

Q     We can look at one of those.  I put it into the chat.

MR. CAFORIO:  If the court reporter would mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 8 was marked for the record.)

BY MR. CAFORIO:

Q     You see it's a document with the Bates number at the bottom PRIMEXX029462, and it's a seven-page document going to 468.

Do you see that?

A     I do.

Q     And the title of this document is Minutes of a Joint Regular Meeting of the Board of Directors of Primexx Energy Corporation and the Board of Managers of BPP Energy Partners, LLC, dated June 9th, 2021.

Do you see that?

A     I see the title at the top of the page.

Q     And are you familiar with the board meeting minutes from Primexx Energy Corporation and BPP Energy Partners from your time serving on those

Page 71

boards?

A     I do not recall specifics.

Q     This document it lists, for attendance, it has Primexx directors, BPP managers, management and other attendees.

Do you see that?

A     I see at the top there are different groups that are -- are mentioned.

Q     And you're the first one listed as a Primexx Energy Corporation Director, correct?

A     I see my name within the Primexx director list.

Q     And you're also the first name listed for the BPP manager list, correct?

A     I see myself as listed as one of ten people on that list.

Q     And this joint regular meeting of the Board of Directors of Primexx Energy Corporation and the Board of Managers for BPP Energy Partners was held on June 9th, 2021 in-person in Dallas, Texas and via teleconference, correct?

A     That is what this document says. Although, I do not recall the specifics.

Q     Okay.  And you understood that the management team that we discussed earlier, many of

Page 72

which are listed in the management column, that they were located in Texas where Primexx was located, right?

A     I do not recall where the management team specifically and personally was located.  I know a number of them had different homes or would call in from different locations.  So I can't comment on specifically where that team was located.

Q     Okay.  You do remember and we saw the document earlier where you met with Mr. Cook, Mr. Blatt, Mr. White and Ms. Davis in Dallas that same month, June 2021, right?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I recall earlier in our discussion you referenced an e-mail discussing logistics.

BY MR. CAFORIO:

Q     Of meeting with those four Primexx management members in Dallas, right?

A     Based on what I recall of that e-mail, that was an e-mail discussing logistics for a potential meeting with those members of management.

Q     In Dallas?

A     I believe that that is what the e-mail said.

Page 73

Q     And your executive assistant said you will be in Dallas that day, right?

A     That is what the e-mail said.

Q     Looking at these minutes from this June 9th, 2021 meeting that you attended, would you say you were an active participant at these board meetings or you generally left it to others?

MR. DESAI:  Objection.  Form.

THE WITNESS:  If you don't mind, this is a seven-page document.  I'd like a moment to review it, please.

MR. CAFORIO:  Yeah.

THE WITNESS:  Thank you.  Do you mind repeating the question, please?

BY MR. CAFORIO:

Q     I don't know what the question was.  Now that you're familiar, we can go on.

So at this June 9th, 2021 board meeting that the minutes indicate was held in-person in Dallas and via teleconference, you actively participated, would you agree?

A     I do not recall the specifics.  I'm noted as one of the participants here amongst, you know, ten board of directors, six members of management and three other attendees.

Page 74

Q    Sure.  For example, on the second page, in the third paragraph, the minutes note:  Angelo Acconcia then expressed support for Doyle's indication that the biggest decision to be made by the board was to find a way to facilitate the internal combination of Primexx and BPP.

Do you see that?

A    I see my name listed at the top of the page.

Q    Do you have any reason to believe that what the minutes here indicate that you said is not accurate?

A    I do not recall the specifics of this meeting.

Q    Was it your regular practice to review minutes of board meetings that you attended after they came out?

A    Generally speaking, yes.  I don't recall specifically here.

Q    And was it your general practice to make sure any inaccurate minutes were corrected before they became the official record if you noticed any inaccuracies?

A    Generally speaking, I think that's a fair characterization.

Page 75

Q    If we go to the fifth page, the last paragraph here on Page 5 states:  Acconcia confirmed that Blackstone would not make additional investment in the companies under the current capital structure.

Do you see that?

A    I see that sentence at the bottom of the page after a series of discussions from management and other board directors' commentary.

Q    And then on the next page, in the third full paragraph, it says:  Angelo Acconcia noted that the company's current position was significantly different as compared to a year ago during the height of the COVID pandemic and when oil prices were lower.  Acconcia noted that, given the change in position, a one rig program could be acceptable, though it would not be optimal to take advantage of current oil prices and the strong capabilities of the operating team.  He indicated that liquidity issues arise in association with accelerating to optimize value, but that, if the liquidity issues could not be resolved, the companies could simply run one rig eliminating the liquidity issues.  He stated his belief that the ability to lower liquidity risk and simultaneously optimize values were both available if the companies combined, but if that combination could not be

Page 76

achieved, continuing with a one-rig program would be acceptable.

Do you see that?

A    I see that paragraph as one of, you know, ten paragraphs on the page.

Q    And you don't have any reason to believe, as you sit here today, that you didn't state all of that at the June 9th, 2021 board meeting that you attended, do you?

A    I do not recall the specifics of this meeting.

Q    But it was your general practice to review board meetings for accuracy, correct?

A    I or others from Blackstone would typically review board meetings minutes.

Q    And it was generally your practice to correct any inaccuracies you saw in draft board meeting minutes, particularly if it misstated something that you had said, right?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I generally recall reviewing board meeting minutes.

BY MR. CAFORIO:

Q    Now, in your role on the Blackstone deal team overseeing the Primexx investment, you

Page 77

personally had communications with numerous investment bankers in Texas regarding potential Primexx transactions; is that fair?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I do not recall.

BY MR. CAFORIO:

Q    Do you recall communicating with David Habachy at Warburg Pincus regarding a potential Primexx transaction in 2021?

A    I do not recall.

Q    I'll put the next document in the chat.

MR. CAFORIO:  If the court reporter could mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 9 was marked for the record.)

BY MR. CAFORIO:

Q    It's an e-mail chain starting with Bates number BPP_0017182 and going through 187.

Do you see that?

A    Do you mind turning to the first page again.

I see that.  Thank you.

Q    And so going to the first -- there's a whole lot of disclaimers for the last couple pages, but the first actual e-mail is on Page 4, and you see

Page 78

it's an e-mail from a David Habachy.

Do you know how to pronounce that name?

A   Reading it, I believe it's Habachy.

Q   It's an e-mail from David Habachy to you, dated February 3rd, 2021, with the subject Tall City/Primexx.

Do you see that?

A   I see the e-mail from David with the subject line you noted.

Q   And Mr. Habachy wrote to you on February 3rd, 2021:  Angelo, hope you're well and off to a good start for 2021.  Here's to a better year this year.  I thought it made sense to touch base on a Warburg/Blackstone phone call on where things settled out with Tall City and Primexx.  Both teams data shared and had a number of discussions around a potential combination.  We've got enough to put numbers on paper and wanted to share that high level view with you and your team.

Do you see that?

A   I see that in the second paragraph, and it continues:  What works for a call next week to catch up on this?  Looking -- look forward to catching up.  I also think Peter separately reached out to David on the same topic.

Page 79

Q   And Mr. Habachy is an investment banker in Houston, Texas for Warburg Pincus; is that correct?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe Warburg Pincus is an investment firm that is based in New York City.  Where Peter, who is the head -- at the time, if I recall correctly, was the head of their energy team was based in New York City, along with what I recall generally being at the time the majority of the investment team.

BY MR. CAFORIO:

Q   I appreciate all that.  I'm just asking about David Habachy.  He's an investment banker located in Houston, Texas, right?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe David was a member of the Warburg Pincus organization.

BY MR. CAFORIO:

Q   In Houston?

A   I do not recall where he was located.

Q   And Tall City Exploration is an oil and gas company headquartered in Midland, Texas, right?

Page 80

A   I do not recall.

Q   You were discussing that possible combination, but you don't know?

A   I see the subject line here.  I do not recall specifics.

Q   You also had calls and initiated communications with Richard Punches at EIG Global Energy Partners in 2021 regarding a potential Primexx transaction, correct?

A   I do not recall.

Q   I put the next e-mail in the chat.

MR. CAFORIO:  Will the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 10 was marked for the record.)

BY MR. CAFORIO:

Q   Do you see this is a one-page e-mail chain with Bates number BPP_0016597.

Do you see that?

A   I see that noted at the bottom right-hand of the page.

Q   And this chain starts with an e-mail from you at Blackstone, dated February 1st, 2021, to Richard Punches, II, at EIGpartners.com with the subject Primexx Rosehill.

Page 81

Do you see that?

A   I see an e-mail from me to Richard Punches at the bottom of this document.

Q   And Mr. Punches was a Managing Director at EIG Global Energy Partners located in Houston, Texas, correct?

A   I see, in the e-mail above, it lists his name and his address.

Q   In Houston, Texas?

A   That is what his signature block notes.

Q   And you sent the first e-mail in this chain to Mr. Punches, right?

A   Based on the document you pulled up, I don't see an e-mail from myself to Richard Punches that --

Q   And you wrote in this e-mail:  Richard, hope all is well.  Enjoyed catching up last week.  We have a one-pager on Primexx we could share with you.  Wanted to see if you have the same on Rosehill, in which case, we could exchange one-pagers and could set up a call for you to connect with Chris Doyle, Primexx's CEO, to discuss further.

Do you see that?

A   I see that's what the e-mail says.

Q   So you had actually caught up with

Page 82

Mr. Punches the week before you sent this e-mail to him, right?

MR. DESAI: Objection. Form.

THE WITNESS: Generally speaking, investment firms had general dialogues more broadly to compare notes on industries or ideas, and so I recall general communications, you know, with Richard across a number of things; much similar to, you know, with David Habachy, across a number of topics or Peter at Warburg in New York across a number of topics from time to time.

BY MR. CAFORIO:

Q    And the topic here was a potential transaction between Primexx and Rosehill Exploration, correct?

MR. DESAI: Objection. Form.

THE WITNESS: This document shows an e-mail that I sent Richard Punches regarding setting up a call for him and Chris Doyle.

BY MR. CAFORIO:

Q    For a potential transaction between Primexx and Rosehill, correct?

Page 83

MR. DESAI: Objection. Form.

BY MR. CAFORIO:

Q    That's the subject of your e-mail, right, Primexx/Rosehill?

A    The e-mail says subject: Primexx/Rosehill. I do not recall specifics.

Q    Okay. And Rosehill Exploration is an oil and gas company in Houston, Texas, right?

A    I do not recall where Rosehill was located.

Q    Okay. You also initiated calls with Stephen Trauber at Citi in 2021 about a transaction between Primexx and Callon Petroleum, correct?

A    Stephen Trauber was an investment banker. So there were general conversations from time to time. I do not recall specific conversations.

Q    And Mr. Trauber is an investment banker in Houston, Texas, correct?

A    Mr. Trauber, I believe, was an investment banker that worked for CitiGroup that had offices across kind of the United States. I believe he, at one time, worked out of a New York office, a Houston office or other parts of country where he had a number of homes, based on my general recollection.

Q    And did you ever meet with Mr. Trauber

Page 84

in-person in Houston discussing the Primexx deal?

A    I do not recall.

Q    One way or the other?

A    I do not recall.

Q    I put the next document in the chat.

MR. CAFORIO: Would the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 11 was marked for the record.)

BY MR. CAFORIO:

Q    It's an e-mail chain starting with Bates number BPP_0018234 going to 235.

Do you see that?

A    I do.

Q    And the first e-mail on this chain starts at the very bottom of the first page and goes to the second page, but you see it's an e-mail from you, Angelo Acconcia, dated June 13th, 2021, to Stephen Trauber, subject Primexx.

Do you see that?

A    I see that at the bottom of the page.

Q    And you wrote the substance of your e-mail -- you'll see there's no substance on the bottom of the first page. It's on the second page, and you say: Could you and the senior members of the

Page 85

Capitan Citi team do a call tonight at 8:15 p.m. Eastern? Chris will join, as well.

Do you see that?

A    I do.

Q    And you sent the first e-mail in this chain to Mr. Trauber, right?

A    Based on this document, it looks like I sent the first e-mail.

Q    And Mr. Trauber responded to you just 12 minutes later that same day, June 13th, 2021, at 11:00.

Do you see that?

A    Mr. Trauber responded to me with a copy to two others at Blackstone.

Q    And those were the people that you had put on your first e-mail, right? Mr. Foley and Mr. Belz? It looks like he just did a reply.

A    It looks like those are the people that I copied on the e-mail.

Q    And you see Mr. Trauber's signature line; he is the Vice Chairman and Global Co-Head of Natural Resources and Clean Energy Transition at Citi located at 811 Main Street, Suite 3900, Houston, Texas, right?

A    That's what it says in his signature

Page 86

block in the e-mail.

Q    And actually his signature block shows up in all of his e-mails, and it doesn't disappear after one?  It's there later in the page, as well, right?

A    Based on this document, it looks like it appears twice.

Q    And he doesn't list any address in New York, does he?

A    I see what's here on the page, which is his signature page.

Q    And it doesn't list an address in New York, does it?

A    I don't see -- I don't see any -- other addresses.

Q    It doesn't list any of the homes around the country that you referenced earlier, did you -- does it?

A    Not from what I can read in this document.

Q    It just lists his address in Houston, Texas, right?

A    Under this signature block in his e-mail, lists that address.

Q    And Citi is the investment bank that Callon Petroleum used to effectuate the ultimate

Page 87

transaction with Primexx, correct?

A    I believe that that is the case.

Q    And Mr. Trauber was the primary person at Citi that you interacted with regarding the Primexx/Callon transaction, correct?

A    My primary interactions were with the Board of Directors, and the management team at Primexx was the primary group that had interactions with RBC, and I believe RBC was the primary group that interacted with Citi.

Q    I appreciate all that.  I'm just asking for you personally.  When you communicated, when you personally, Mr. Acconcia, communicated with somebody at Citi regarding the Primexx/Callon transaction, Mr. Trauber was your primary contact, right?

A    I do not recall specifics.

Q    But you were familiar enough with Mr. Trauber to know about his multiple homes across the country?

A    Mr. Trauber, as the Global Co-Head of Natural Resources and Clean Energy Transition, was involved across Citi's activities, and there were a number of dialogues, from time to time, across various investments and various opportunities or financings that created a dialogue and relationship

Page 88

with Trauber, much like other investment bankers, over the course of years.

Q    I put the next document in the chat.

(Deposition (Acconcia) Exhibit No. 12 was marked for the record.)

BY MR. CAFORIO:

Q    This is a document with Bates number BPP_0006569 through 6570.

Do you see that?

A    Do you mind turning to the second page, please.  I see that.

Q    And this document is an e-mail chain that starts with an e-mail from you dated August 1st, 2021.

Do you see that?

A    I see an e-mail at the bottom of this document from me to other members at Blackstone.

Q    To Erik Belz, Mark Henle, Anika Gautam, with the subject Primexx merger workstreams, right?

A    I believe that's what it says.  That's what the heading says.

Q    And you said:  Team, thanks for your efforts relates to the Capitan transaction.  I thought it might be helpful and efficient to summarize my thoughts on workstreams over the next 48

Page 89

hours to get this to signing.  Please add/amend as you see fit and reply to the group.  We can discuss if you like later today, but I think we are all up-to-speed on these, given our call this morning, and then you listed one through 13 different items for the signing workstream for the Primexx merger, right?

A    What this document shows is -- or it's an e-mail from me to members of -- some of the members of the Blackstone team that lists a number of items at the bottom of it.

Q    And those are the items that you wrote were the workstreams over the next 48 hours to get the transaction to signing, right?

A    Based on this e-mail, it looks like I'm referring to my thoughts on some of -- of the workstreams.

Q    And then you forwarded your e-mail to David Foley later that day, right?

A    Based on this, that's what it looks like.

Q    And you wrote:  FYI only.  So you understand key workstreams, right?

A    That's -- that's what this document reads.

Q    And Mr. Foley responded to you:

Page 90

Regarding the press release, the less mention of Blackstone the better. Clearly Callon needs to do a press release as a public company, but I don't think Primexx should do its own press release, too. I don't think we should have any BX people quoted in this. At announcement, the valuation of Primexx is only going to be 70 cents on our dollar of cost. So let's just keep a low profile, right?

A     That is, I believe, what his -- that is what his response says.

Q     And then you responded to him later that day: Completely agree on the low profile. That is our intent, right?

A     I believe that's what it says at the top, or that is what it says at the top.

Q     This wasn't a transaction that you or the Blackstone team were particularly proud of, was it?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall the specifics.

BY MR. CAFORIO:

Q     Just that you wanted to keep a low profile and keep Blackstone's name out of it?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

Page 91

BY MR. CAFORIO:

Q     Now, after the transaction was announced -- the Callon/Primexx transaction was announced, you participated in a meeting with Joe Gatto, right?

A     I do not recall.

Q     Do you know who Joe Gatto is?

A     I believe he was a member of the executive team at -- at Callon, if I recall correctly.

Q     He was the CEO of Callon Petroleum when you effectuated the Primexx/Callon transaction, right?

A     I don't recall his specific title. I do recall his general involvement.

Q     He was the CEO located in Houston, Texas at Callon's headquarters in Houston, Texas?

You don't recall that?

A     Sometimes CEOs go by different titles. So I don't recall his specific title, and I don't recall where he was located.

MR. CAFORIO: And if the court reporter would mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No.

Page 92

13 was marked for the record.)

BY MR. CAFORIO:

Q     It's BPP_0019155 through 157.

Do you see that?

A     Do you mind turning to the second page, please. Okay, and then the third page. Thank you.

I see that at the bottom right-hand of the page.

Q     And this is an e-mail from Mark Henle to you, copying Erik Belz and Anika Gautam on August 22nd, 2020 with the subject: Talking points for discussion with Joe, right?

A     That is what that first statement -- first sentence says.

Q     Yeah, and it says: Angelo, ahead of our team catch-up on Monday, please see attached talking points for the discussion with Joe. FYI we had been waiting to circulate these pending a few bullets from Chris regarding the productivity of Primexx's wells and preferred development approach, which we received this weekend, right?

A     That's what the e-mail says.

Q     And attached to the e-mail are the actual talking points for discussion with Joe Gatto, right?

A     I don't recall the specifics of this

Page 93

document. It looks like there are a number of bullet points that cover a number of topics.

Q     And you and Mr. Henley ultimately participated in the call with Joe Gatto on the Callon executive team in August of 2021, right?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q     You don't recall one way or the other if you had that meeting with the CEO of Callon while closing the merger between Primexx and Callon?

A     I do not recall specifics.

MR. CAFORIO: Well, I think, with the five minutes to spare before your hard stop, we can stop right there on our end.

MR. DESAI: We'll reserve our questions.

THE VIDEOGRAPHER: Stand by. The time is 11:56 a.m. We're going off the record.

(Thereupon, the deposition was concluded at approximately 11:56 a.m.)

Page 94

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:          Primexx v. Blackstone

Dep. Date:          February 21, 2025

Deponent:           Angelo Acconcia

CORRECTIONS

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Pg.    Ln.    Now Reads        Should Read       Reason

_____  _____  _____    _____     _____

Page 95

I, ANGELO ACCONCIA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

                _____
                ANGELO ACCONCIA

THE STATE OF_____)

COUNTY OF_____)

        Before me,_____, on this day personally appeared ANGELO ACCONCIA, known to me (or proved to me under oath or through_____) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

        Given under my hand and seal of office this _____day of_____,_____.

                _____
                NOTARY PUBLIC IN AND FOR
                THE STATE OF_____

COMMISSION EXPIRES:_____

Page 96

        NO. 24-BC01B-0010

PRIMEXX ENERGY              : IN THE BUSINESS COURT
OPPORTUNITY FUND, LP AND :
PRIMEXX ENERGY             :
OPPORTUNITY FUND II, LP, :
                           :
        Plaintiff,         :
                           : FIRST BUSINESS COURT
    vs.                    : DIVISION
                           :
PRIMEXX ENERGY             :
CORPORATION, M.            :
CHRISTOPHER DOYLE,         :
ANGELO ACCONCIA,           :
BLACKSTONE INC.,           :
BLACKSTONE HOLDINGS III  :
LP, BLACKSTONE EMA II      :
LLC, BMA VII LLC,          : DALLAS COUNTY, TEXAS
BLACKSTONE ENERGY          :
MANAGEMENT ASSOCIATES    :
II LLC, BLACKSTONE         :
ENERGY PARTNERS II LP,   :
BLACKSTONE MANAGEMENT      :
ASSOCIATES VII LLC,        :
BLACKSTONE CAPITAL         :
PARTNERS VII LP, BCP       :
VII/BEP II HOLDINGS        :
MANAGER LLC, BX PRIMEXX  :
TOPCO LLC, AND BPP         :
HOLDCO LLC,                :
                           :
        Defendants.   :
_____
        REPORTER'S CERTIFICATION
    VIDEOTAPED DEPOSITION OF ANGELO ACCONCIA
        February 21, 2025
_____
        I, Tanya L. Verhoven-Page, CSR-TX, CSR-GA, LCR-TN, certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

Page 97

        That the witness, ANGELO ACCONCIA, was duly sworn by the officer, and that the transcript of the oral deposition is a true record of the testimony given by the witness;

        That the deposition transcript was submitted on February 25th, 2025 to the witness or to the attorney for the witness for examination, signature, and return to me by _____;

        That the amount of examination time used by each party at the deposition is as follows:

        BY MR. CAFORIO:          02:49:10
        BY MR. DESAI:            00:00:00
        BY MR. EWING:            00:00:00
        BY MR. LEVESQUE:         00:00:00

        That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

        ON BEHALF OF THE PLAINTIFFS:

        SUSMAN GODFREY, LLP
        1900 Avenue of the Stars
        Suite 1400
        Los Angeles, California 90067
        BRYAN CAFORIO, ESQ.

## Page 98

ON BEHALF OF DEFENDANT BLACKSTONE AND ANGELO ACCONCIA:

LYNN, PINKER, HURST & SCHWEGMANN
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
YAMAN DESAI, ESQ.

ON BEHALF OF DEFENDANT PRIMEXX ENERGY CORPORATION:

KIRKLAND & ELLIS, LLP
401 Congress Avenue
Austin, Texas 78701
ZACK C. EWING, ESQ.

ON BEHALF OF DEFENDANT M. CHRISTOPHER DOYLE:
TROUTMAN PEPPER LOCKE, LLP
2200 Ross Avenue
Suite 2800
Dallas, Texas 75201
TAYLOR LEVESQUE, ESQ.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they

## Page 99

have occurred.

Certified to by me this day, the ____ day of _____

Tanya L. Verhoven-Page
Texas CSR No. 12254, Exp. 12/25
Lexitas-NG Reporting
Firm Registration #736
999 Old Eagle Road, Suite 118
Wayne, Pennsylvania 19087
215-494-7650

## Page 100

FURTHER CERTIFICATION UNDER RULE 203, TRCP

The original deposition/errata sheet was / was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and copies of exhibits, if any;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me on _____.

Tanya L. Verhoven-Page
Texas CSR No. 12254, Exp. 12/25
Lexitas-NG Reporting
Firm Registration #736
999 Old Eagle Road, Suite 118
Wayne, Pennsylvania 19087
215-494-7650

## 0

**0005954** 55:18

## 1

**1** 17:10,11 21:6,8 24:20 39:9

**10** 80:15

**100** 17:10

**10:07** 40:24

**10:12** 41:3

**11** 84:9

**11:00** 85:11

**11:05** 69:12

**11:10** 69:16

**11:30** 67:8

**11:56** 93:20,24

**12** 85:9 88:5

**12th** 28:21

**13** 89:5 92:1

**13th** 84:18 85:10

**14** 22:8,10

**150** 25:7 26:5 29:10

**153** 25:14 29:21

**157** 92:3

**15th** 62:16

**186,006** 29:23

**187** 77:18

**1st** 80:23 88:13

## 2

**2** 46:9,11

**2004** 14:16,18 15:1,22,24

**2016** 16:18 18:21 28:21 42:24

**2020** 60:12,24 92:11

**2020-2021** 43:14

**2021** 14:19 15:2,22 16:18 18:22 42:24 43:4,21,25 44:4,21 45:2 46:2, 22 47:10,22 48:15 49:1,18,21 50:6 53:17 54:1,7 55:21 56:9 57:9,19 61:20 62:16 64:16,17 65:1 67:11

69:23 70:20 71:20 72:12 73:5,18 76:8 77:9 78:5,11,12 80:8,23 83:12 84:18 85:10 88:14 93:5

**2022** 14:8,19

**2025** 8:1,8 21:17 94:3

**21** 8:1 94:3

**21st** 8:7

**22nd** 92:11

**235** 84:12

**24th** 21:17 46:22

**25th** 53:17 54:1,7,20,23

**27** 46:18

**28th** 50:6

**29th** 47:10,22 48:15 49:1

## 3

**3** 52:25 53:2

**30** 17:17 55:20 56:9 57:9

**30th** 57:18

**3700** 63:15

**3900** 85:23

**3:00** 67:8

**3rd** 60:12,24 78:5,11

## 4

**4** 55:6 77:25

**468** 70:13

**48** 88:25 89:13

## 5

**5** 60:4 75:2

**546** 60:8

**553** 62:8

**5954** 55:14

**5:30** 54:9

## 6

**6** 62:5

**609** 63:15

**6570** 88:8

**68** 24:19

**69** 24:18

**6:30** 54:9

## 7

**7** 28:17 65:14

**70** 90:7

**74** 28:1,16

## 8

**8** 70:9

**811** 85:23

**8:15** 85:1

## 9

**9** 77:15

**9:05** 8:2,7

**9th** 70:19 71:20 73:5,18 76:8

## @

**@primexx.com** 50:19

## A

**a.m.** 8:2,7 40:24 41:3 59:13 69:12,16 93:20,24

**ability** 12:19 75:23

**accelerating** 75:19

**acceptable** 75:15 76:2

**access** 13:19

**Acconcia** 8:10,25 9:22 10:3 21:7 25:25 27:5,14 41:6 46:8 52:12 53:1 55:5 60:3 62:4 65:13 69:19 70:8 74:3 75:2,10,14 77:14 80:14 84:8,18 87:13 88:4 91:25 94:4 95:1,5,11

**accuracy** 76:13

**accurate** 14:8,10 15:3,20 16:7 37:2 38:16 48:11 74:12

**achieved** 76:1

**acknowledged** 95:16

active 67:21 73:6

actively 73:20

activities 43:17 44:8 58:3 65:7 87:22

actual 15:9 21:25 28:3 77:25 92:23

add/amend 89:1

additional 75:3

address 26:2 50:19 60:24 61:5 63:3 64:15 81:8 86:7,11,20,23

addresses 86:14

advantage 75:16

advise 54:2

affects 12:19

affirm 9:18

affix 95:2

afternoon 59:14 66:3,9

agree 26:11 73:21 90:12

agreement 24:23 25:1 26:6 28:5,10, 15,20 30:7,11 31:4,8,13,19 39:14 42:13,19,21

ahead 25:6,7 92:15

aim 12:7

Amended 21:11 24:22,25 28:4,9,15, 19 30:6 39:13

America 64:1

amount 69:6

analyst 15:24

Angela 27:5

Angelo 8:9 9:22 25:24 27:14 53:18, 20 54:2 65:25 74:2 75:10 78:11 84:18 92:15 94:4 95:1,5,11

Anika 36:25 37:13 88:18 92:10

announced 91:3,4

announcement 90:6

answers 10:13

Apologies 43:7

apologize 28:7 30:25 38:21 40:13 41:13

appeared 95:11

appears 22:11 25:8 60:11 86:6

approach 92:20

appropriately 20:25

approve 33:23

approximately 93:24

April 62:16 64:17

Arclight 14:4,5,12,18,21

arise 75:18

aspects 34:24

assets 17:7

assistant 53:14 54:7,17 60:18,22 61:12 63:6 73:1

association 75:19

assume 10:23

attached 24:20 92:16,23

attempting 43:4

attendance 71:3

attended 73:5 74:16 76:9

attendees 71:5 73:25

attending 70:3

attention 25:24

August 88:13 92:10 93:5

availability 66:13,14

aware 24:10

**B**

B-E-L-Z 38:4

back 9:14 14:7 24:21 26:5 28:1 29:9 33:6 35:15,23 39:9 41:3,6 56:25 57:14 67:7 69:16,19

back-to-back 57:14,18,23 59:10

background 13:17

Ballpark 17:10

bank 63:25 86:24

banker 79:1,15 83:14,17,20

bankers 77:2 88:1

Baratta 19:3,22,23

base 78:13

based 54:16 66:14 72:20 79:7,10 81:13 83:24 85:7 86:5 89:15,20

basically 16:14

Bates 53:5 55:14 60:7 62:7 65:16 70:11 77:17 80:18 84:11 88:7

bathroom 12:8

begin 12:16

beginning 8:18

behalf 8:14,21,24 9:4,7,9 10:7 24:8 25:9 30:7 43:3 45:2 60:20 63:7 68:15

belief 75:22

Belz 36:15 37:1,11 38:3,8,12,14 41:19 47:11,23 65:22 85:17 88:18 92:10

Belz's 38:6

bi-weekly 66:2,8 67:10

biggest 74:4

billion 17:10,11

bit 25:7

Blackstone 8:12 9:1 14:13,15,17,21 15:1,5,16,18,19,22 16:2,6,15,18,21, 22,24,25 17:1,25 18:4,8,9,23 19:6,9, 18,19,25 20:3 22:12 23:10,14,16,20 24:1,3,8,12,16 25:22 31:17,21 32:4, 15,17 33:1,7 34:5,16,17,21,22 35:1,4, 12,16,20,24 36:2,5,10,18 37:7 38:7, 19,24 39:18,19,20 41:11,18 42:7,11 43:4,11,13 44:3 45:2,5 46:3 47:12,24 56:9,19,22 57:1,3 59:1,9 61:5,18 63:7 65:3 66:24 67:12 75:3 76:14,24 80:23 85:14 88:17 89:10 90:2,17 94:2

Blackstone's 20:2 32:6 35:7,21 36:3,19 38:20,25 39:7 40:6 41:24 42:23 43:2 44:1 52:4 90:23

Blackstone/primexx 37:3

Blatt 50:20,23,24 58:21 61:7 68:22 72:11

block 47:2 51:22 81:10 86:1,2,22

board 42:2,3,6,7 49:14,15,16 65:5 66:2,8,14 68:2,3,4,13,14 69:24 70:3, 17,18,23 71:18,19 73:6,18,24 74:5,16 75:8 76:8,13,15,17,22 87:7

boards 71:1

bottom 22:14 28:17 46:12 53:5,16 56:15 57:8 59:18 62:14 65:19 70:12 75:6 80:20 81:3 84:16,21,24 88:16 89:11 92:7

BPP 22:14 25:9,11,16,19,21 26:7,12, 17,19,20,25 27:6,7,14,15,23 29:6,11, 16,19,23 30:2,7 69:25 70:19,25 71:4, 14,19 74:6

BPP_0005953 55:14,16

BPP_0006569 88:8

BPP_0016545 60:7

BPP_0016597 80:18

BPP_0017182 77:18

BPP_0017552 62:8

BPP_0017994 53:5

BPP_0018234 84:12

BPP_0018469 65:17

BPP_0018525 46:14

BPP_0019155 92:3

branches 19:14

break 12:7,8,10,12 40:16 69:7,23

broader 18:11 34:20

broadly 68:16 82:6

Bryan 8:20 9:11 10:4 38:22 52:10,22
69:4

bullet 93:1

bullets 92:18

bunch 22:13

business 10:21 19:8,19 21:19,25

BX 90:5

### C

C-A-P-I-T-A-N 66:19

Caforio 8:20 10:2,4 21:3,9 22:19
23:19 24:2,9,17 26:23 27:3,12,19
30:22,23 32:11 40:17,22 41:5,15
43:9,19 44:10 45:7 46:10 52:14,21,23
53:3 55:7,10,12 58:19 60:1,5 62:1,6
64:4,24 65:10,15 67:16 68:7 69:8,18
70:6,10 72:17 73:12,15 76:23 77:6,
12,16 79:13,21 80:12,16 82:14,23
83:2 84:6,10 88:6 90:21 91:1,22 92:2
93:8,13

calculation 40:11

calendar 60:12,17,19,23 61:4 62:15,
18 63:2,7 64:7

call 11:16 48:4,10,14 57:24 60:25
61:13 62:20,24 64:7 67:6,24 72:6
78:14,22 81:21 82:21 85:1 89:4 93:4

called 9:23 48:18

Callon 43:21,25 44:11,21 45:1,8,16,
22 66:25 67:13,19 83:13 86:25 90:2
91:9,11 93:4,10,11

Callon's 91:17

Callon/primexx 91:3

calls 13:10 63:8 67:18,22 80:6 83:11

Canadian 63:24

capabilities 75:17

capital 14:4 39:18 63:11 75:4

Capitan 66:4,11,17,23 85:1 88:23

Captain 66:17

card 95:14

care 25:22

carried 38:19,25 39:2 40:4,12

case 10:21,23,24 11:4 21:24 22:3,6
32:21 35:14 61:16 81:20 87:2 94:2

catch 78:23

catch-up 92:16

catching 78:24 81:17

caught 81:25

CC'D 50:11

cents 90:7

CEO 17:25 81:22 91:11,16 93:10

CEOS 91:19

chain 18:11 46:22 47:8 50:14 53:8,16
55:19 56:2,6,7 62:11 63:10 77:17
80:18,22 81:12 84:11,15 85:6 88:12

Chairman 85:21

change 75:14

changed 15:23

characterization 33:21 35:19 40:8
74:25

characterize 49:14

chart 22:9,11,16,17,25 23:3,22 24:5,
12

Chase 51:1,4 53:22 54:13 55:20 56:8
59:19 61:7 68:22

chat 20:12,14 21:5 46:6 52:9 55:8,9
59:25 61:25 65:8 70:5 77:11 80:11
84:5 88:3

check 66:14

Chief 47:3

Chris 47:11,22 48:22 49:1,2,4 50:5,9
54:8 61:7 68:22 81:21 82:22 85:2
92:19

Christopher 9:7

circulate 92:18

Citi 83:12 85:1,22 86:24 87:4,10,14

Citi's 87:22

Citigroup 83:20

city 13:6 78:15 79:7,10,24

City/primexx 78:6

clarification 31:5

clarify 33:9 68:17

clarifying 47:19

classes 29:2

clause 39:16

Clean 85:22 87:21

closing 67:12 93:11

Co-head 85:21 87:20

code 46:13 66:24

coffee 69:6

colon 26:10

column 72:1

combination 74:6 75:25 78:17 80:3

combined 75:25

comment 44:17 72:7

commentary 75:8

COMMISSION 95:25

committee 16:20 33:3,4,10,13,20,23
34:2,4,12,14,19,20

communicate 13:20 49:17,21

communicated 63:21 87:12,13

communicating 77:7

communications 19:20 45:21
49:23 50:1 77:1 80:7 82:8

companies 75:4,21,24

company 13:25 14:2,3 15:7 65:7
79:25 83:8 90:3

company's 75:11

compare 82:6

compared 75:12

compensation 15:12,14 24:11,16
27:23,25 38:18,23 40:5

complaint 22:2,6

**completed** 42:13

**completely** 12:20,25 90:12

**concluded** 93:24

**concludes** 9:17

**conduct** 64:25

**conducted** 64:18

**confirmed** 75:2

**connect** 81:21

**consideration** 95:17

**considerations** 40:11

**contact** 87:15

**contents** 28:3

**context** 18:6

**continued** 42:22

**continues** 78:22

**continuing** 42:14 76:1

**conversations** 83:15,16

**Cook** 46:23 47:1 51:19,23,25 52:4 58:21 61:8 72:10

**coordinate** 60:19

**copied** 85:19

**copy** 85:13

**copying** 92:10

**corner** 21:17

**corporation** 9:4 28:22,23 45:9 69:25 70:18,24 71:10,18

**correct** 15:17 16:16 26:13 29:3 30:8 32:15 33:14,20,25 37:24 38:5 41:7 42:9 44:12,22 54:21 55:2 58:23 59:6 61:13 62:25 63:3 64:8,13 67:6 70:1 71:10,14,21 76:13,17 79:3 80:9 81:6 82:17,25 83:13,18 87:1,5 95:3

**corrected** 74:21

**CORRECTIONS** 94:5

**correctly** 31:3 79:9 91:10

**cost** 90:7

**counsel** 8:16 13:10

**counter-parties** 29:2 64:19

**country** 83:23 86:16 87:19

**County** 21:20 95:8

**couple** 19:4 77:24

**court** 9:18 10:14,22 21:3,19,24,25 52:24 55:10 60:1 62:1 65:10 70:6 77:12 80:12 84:6 91:22

**cover** 93:2

**COVID** 75:13

**created** 87:25

**current** 13:23 21:15 75:4,11,16

**cut** 52:13

---

**D**

**Dallas** 10:22 21:19,25 47:5 54:3,21, 23,24 71:20 72:11,19,23 73:2,20

**data** 78:16

**date** 28:21 62:19 94:3

**dated** 28:20 47:10,22 49:1 50:6 53:17 54:22 55:20 56:9 57:9 60:12,24 62:16 70:19 78:5 80:23 84:18 88:13

**dates** 43:1 44:23

**David** 17:22 37:1,11 77:7 78:1,4,8,25 79:15,18 82:10 89:19

**Davis** 51:11,15 52:4 58:21 65:22 67:4 68:22 72:11

**day** 54:7 59:6 73:2 85:10 89:19 90:12 95:11,19

**day-to-day** 65:6

**deal** 36:19,21,25 37:3 38:14 41:11, 18,24 43:3,11 56:23 59:5 60:20 61:5 76:24 84:1

**decided** 33:23

**decision** 31:17,22 74:4

**decisions** 33:4,8

**Defendant** 9:7

**Defendants** 9:1

**Dep** 94:3

**depending** 39:6 40:6

**Deponent** 94:4

**deposed** 11:6,14

**deposition** 8:9 10:11,15,20 11:3,19 12:16 13:3,9,12,21 21:5,7 46:8,11 52:25 53:1 55:5 60:3 62:4 65:13 70:8 77:14 80:14 84:8 88:4 91:25 93:23 95:2

**Desai** 8:22 9:11 22:18 23:12,23 24:6, 13 26:21 27:1,9,16 30:15 32:8 41:12

43:6,15 44:6 45:3 52:10,18 55:3 58:15 63:23 64:21 67:14,23 72:13 73:8 76:20 77:4 79:4,17 82:3,18 83:1 90:18,24 93:6,17

**describe** 41:9,23 42:10

**description** 95:13

**development** 92:20

**dialogue** 87:25

**dialogues** 82:5 87:23

**difficulties** 11:25

**diligence** 64:18 65:1,7

**dinner** 53:19,20,21 54:9

**direct** 19:23 20:18 27:24 45:21

**directly** 18:17 19:2

**director** 16:4,5 17:24 20:8 71:10,11 81:4

**directors** 42:2,3,7 70:17 71:4,18 73:24 87:7

**directors'** 75:8

**disappear** 86:3

**disclaimers** 77:24

**discovery** 30:18

**discuss** 12:16 34:16 59:13 66:25 81:22 89:2

**discussed** 41:17 45:15 56:13,14 71:25

**discussing** 67:19 72:16,21 80:2 84:1

**discussion** 41:20 62:21 64:6 72:15 92:12,17,24

**discussions** 31:10 75:7 78:16

**Division** 21:19

**document** 20:11 21:4,11 22:9 24:19 25:7,8,14 26:12,14 27:5,8,13 28:2,12 46:11,13,17,21 47:15 52:8,9 53:4 55:9,13 56:7 59:24 60:6,8,15 61:15, 24 62:7 63:5 64:10,16 65:8,16 70:11, 13,16 71:3,22 72:10 73:10 77:11 81:3,13 82:19 84:5 85:7 86:5,19 88:3, 7,12,17 89:8,23 93:1 95:14

**documents** 13:11 15:4 36:23

**dollar** 90:7

**download** 20:15

**downstairs** 13:16

**Doyle** 9:7 47:11,23 48:3,8,14,18,22 49:1,2,18,21,24 50:6,9 52:3 53:10,16 54:8,12,25 58:21 61:7 68:22 81:21 82:22

**Doyle's** 74:3

**draft** 76:17

**drafts** 31:12

**drink** 12:8

**drinks** 53:19,20 54:8

**due** 64:18,25

**duly** 9:23

**E**

**e-mail** 26:2,4 46:22,23 47:1,9,10,21, 22 48:2,8,12,25 49:3,22 50:4,5,8,13, 19 51:11 53:8,12,15,25 54:13,14,16, 20,22 55:8,19 56:6,7,8,16,21 57:8,9, 11,13,21 58:6,9,10,14,16,20,24,25 59:4,8,15,19 60:24 61:5 62:11,13,15 63:3,4,8,9,10 64:5,9,10 65:21,24,25 67:25 72:15,20,21,24 73:3 77:17,25 78:1,4,8 80:11,17,22 81:2,7,11,14,16, 24 82:1,20 83:3,5 84:11,15,17,23 85:5,8,16,19 86:1,22 88:12,13,16 89:9,15,18 92:9,22,23

**e-mails** 53:9 86:3

**earlier** 21:23 28:11 35:10 40:4 63:19 71:25 72:10,14 86:16

**early** 14:8 59:13

**earnings** 39:6

**eastern** 8:7 52:13 67:8 85:2

**Effective** 28:21

**effectuate** 86:25

**effectuated** 91:12

**effectuating** 45:1

**efficient** 88:24

**efforts** 88:23

**EIG** 80:7 81:5

**EIGPARTNERS.COM** 80:24

**eliminating** 75:21

**Ellis** 9:3

**employed** 13:25 14:2,11,13 23:21, 25

**employee** 36:5

**employees** 35:20 36:2 59:5 61:6

**employer** 15:9

**employers** 14:22

**end** 15:2 42:18,20 43:21,25 44:4,21 93:16

**ending** 46:18 60:8 62:8

**energy** 8:10 9:4 16:24,25 17:1,3,25 18:4,8,10 20:3 23:16 24:23 25:2,4 28:10,22 34:17,18,21,22 35:1,4,12 39:14,19 47:4 57:3 69:25 70:18,19, 24,25 71:10,18,19 79:9 80:8 81:5 85:22 87:21

**engaged** 61:18

**Enjoyed** 81:17

**enter** 31:18

**entered** 28:22

**entities** 10:8 22:13,25 23:3,4,6,9,18, 22 24:5,11 39:23 40:1

**entity** 15:13 25:3,5,11

**equals** 19:14

**equity** 15:25 17:2 18:5,6,9,12,17 20:1,2,9 57:3

**Erik** 36:15 37:1,11 38:8,12 47:11,23 66:1 88:18 92:10

**ERRATA** 94:1

**essentially** 15:1

**estimate** 11:16

**et al** 8:11,12

**evaluate** 68:15

**evening** 53:21

**event** 42:12

**events** 68:15

**Ewing** 9:2,3

**EXAMINATION** 10:1

**examined** 9:24

**exchange** 81:20

**executed** 95:16

**executive** 47:3 49:5,9 50:24 51:25 53:14 54:6,17 61:11 69:2 73:1 91:9 93:5

**exhibit** 12:1 20:16 21:5,7 24:20 25:14,18 29:22 39:9 46:5,8,11 52:25 53:1 55:5,11 56:7 60:2,3 62:3,4 65:12,13 70:7,8 77:13,14 80:13,14

84:7,8 88:4 91:24,25

**exhibits** 9:13 11:23

**exit** 44:15

**exiting** 44:3

**expect** 39:5

**EXPIRES** 95:25

**Exploration** 79:24 82:16 83:7

**explore** 61:19

**expressed** 74:3 95:17

**extent** 30:16

**F**

**facilitate** 74:5

**fact** 35:15 42:22 48:14 54:24

**factors** 40:10

**fair** 15:2 18:14,15 20:5 33:21 35:19 40:8 42:24 44:5 45:2 49:13 54:18,19 64:20 69:5 74:24 77:3

**familiar** 22:17,21,24 23:4 25:3 37:4, 17,21 54:18 70:23 73:17 87:17

**familiarize** 47:14 60:14

**fashion** 18:25

**February** 8:1,7 78:5,11 80:23 94:3

**feeling** 12:22

**fell** 20:3

**fight** 48:3

**filed** 21:16

**final** 16:6

**finance** 51:8

**Financial** 47:4

**financings** 87:25

**find** 74:5

**fine** 9:15

**finished** 52:15

**firm** 8:17 19:1 79:6

**firms** 82:5

**fit** 89:2

**flag** 52:20

**flight** 48:9 59:13

**Foley**  17:22 18:10,18,19,22 35:8,11,
14,18 37:1,11 38:15 41:19 85:16
89:19,25

**follow-up**  59:12

**foregoing**  95:1,15

**form**  22:18 23:12,23 24:6 26:21 27:1,
9,16 30:16 32:8 41:12 43:6,15 44:6
45:3 55:3 58:15 63:23 64:21 67:14,23
72:13 73:8 76:20 77:4 79:4,17 82:3,
18 83:1 90:18,24 93:6

**format**  11:22

**forward**  25:13 78:23

**forwarded**  53:25 89:18

**foundational**  22:22 32:13 33:16

**fourth**  14:6 50:4

**free**  12:6,7 59:13 67:6,7

**frequently**  12:9

**Friday**  8:1 66:3,4,9,11,12 67:8

**front**  21:10

**full**  68:1 75:10

**functional**  19:18

**fund**  8:11 10:5,6 39:3

**funds**  40:2,3,12

**FYI**  89:21 92:17

## G

**garden**  14:21,23

**Gardner**  8:23

**gas**  79:25 83:8

**Gatto**  91:5,7 92:24 93:4

**Gautam**  36:25 37:13,17 88:18 92:10

**general**  16:8,17 17:8 23:24 24:14
30:13,14 31:3,7 35:10 36:1 37:18
41:10,16,17,21 42:1,16 44:18 49:20
50:14 51:5,7 61:21 62:21 65:4 66:14
67:20 70:2 74:20 76:12 82:5,8 83:15,
24 91:15

**generally**  11:16 12:6 16:11,12 17:17
34:15,18 36:21 39:8,24,25 43:16,22
44:1,7,16 50:16 57:5,6,25 61:22 73:7
74:18,24 76:16,21 79:11 82:4

**gentleman**  17:22

**geographically**  13:2

**give**  15:2 49:8

**Global**  20:9 80:7 81:5 85:21 87:20

**Godfrey**  8:21 9:9

**good**  9:2 10:3 78:12

**great**  40:21

**group**  15:5,19,25 17:1,2,4,13,14,16,
18 18:1,5,6,9,12,17 19:25 20:1,3
25:22 35:4 36:1,3 37:6 57:4 68:21
87:8,9 89:2

**groups**  19:7,11,18 29:4 31:9 32:3
33:7 57:1,4,6 71:8

**guess**  50:3

**guys**  66:11

## H

**Habachy**  77:8 78:1,3,4,10 79:1,15
82:10

**hand**  95:18

**Hannigan**  9:8

**hard**  52:13 93:15

**head**  17:18 20:9 79:8,9

**heading**  88:21

**headquartered**  45:11 79:25

**headquarters**  91:17

**hear**  11:25

**heard**  31:2 68:13

**height**  75:12

**held**  71:20 73:19

**helpful**  88:24

**Henle**  37:1,15 47:12,24 88:18 92:9

**Henley**  37:18 65:22 93:3

**high**  78:18

**higher**  39:6 40:5

**history**  15:22

**Holdco**  22:14 25:9,11,16,19,21 26:7,
12,17,19,20,25 27:6,7,23 29:6,11,16,
19,23 30:2,7

**Holdco's**  27:14,15

**homes**  72:6 83:24 86:15 87:18

**hope**  78:11 81:17

**hopeful**  52:15

**hour**  12:7 40:15 69:5

**hours**  89:1,13

**Houston**  45:12,15 48:4,9,14,19
57:14,18,23 58:5,8,14,22 59:6,10
63:16 64:13,14 79:2,16,22 81:5,9
83:8,18,22 84:1 85:23 86:20 91:16,17

**Hurst**  8:24

## I

**idea**  66:3,10

**ideas**  82:7

**identity**  95:14

**II**  10:6 39:19 80:24

**in-person**  11:18 52:3 71:20 73:19
84:1

**inaccuracies**  74:23 76:17

**inaccurate**  74:21

**included**  41:19 68:1

**includes**  44:3

**including**  36:25 44:11

**inclusive**  32:3 42:1

**indication**  74:4

**indirectly**  39:3

**individuals**  69:2

**industries**  82:7

**initiated**  61:12 62:24 80:6 83:11

**Inoa**  8:13

**instance**  68:12

**instrument**  95:15

**intent**  90:13

**interacted**  18:5,24 19:21 87:4,10

**interactions**  87:6,8

**interest**  38:20,25 39:2 40:4,12

**internal**  74:6

**interrupt**  30:20

**introduce**  8:16

**introductions**  9:17

**invest**  31:22 33:20,24 34:11

**invested**  17:2

**investment**  16:19,20 31:18,23,24

32:6,14,18 33:1,2,3,10,12,13,18,19,
22,24 34:2,4,6,10,12,13,14,16,19,20
35:7,9,13,22 36:4,6,11,20 37:8,19,23
38:2,7,8,20,25 39:3,7 40:2,7 41:24
42:12,15,23 44:2,4 45:6 52:5 63:25
65:4 75:3 76:25 77:2 79:1,6,12,15
82:5 83:14,17,19 86:24 88:1

**investments** 19:15 34:19 87:24

**investor** 13:24

**Investors"** 39:20

**invite** 53:22 60:12,17,23 61:4 62:15,
18 63:2 64:7

**invites** 60:20 63:7

**involved** 19:8,18 31:10 32:4 33:7
43:17 44:1,8 45:5 51:8 57:2,5,6 69:3
87:22

**involvement** 30:13,14 31:3,7 36:1
37:9,10,22 38:2,6 42:1,16,20 44:18
51:5,7 61:22 91:15

**involving** 45:23 53:9 61:19 64:19

**issues** 75:18,20,22

**items** 89:5,10,12

---

**J**

**January** 21:17

**Jeff** 57:5

**jeffkelly@blackstone.com** 56:15

**Jeffrey** 63:10 64:11

**job** 15:21 16:6,14,17 17:23

**jobs** 14:25

**Joe** 19:3,22,23 91:4,7 92:12,17,24
93:4

**join** 85:2

**joint** 70:17 71:17

**judge** 11:4

**July** 28:21

**June** 46:22 47:10,22 48:15 49:1 50:6
55:20 56:9 57:9,18 67:11 70:19 71:20
72:12 73:5,18 76:8 84:18 85:10

**junior** 36:3 38:10,12,15

**juniormost** 36:5

**jurisdictional** 30:18

---

**K**

**Kelly** 56:19,20

**Kenneth** 8:13

**key** 89:22

**kind** 19:13 33:6 50:4 83:21

**Kirkland** 9:3

**knowledge** 10:24 15:8 35:25 64:1

**Kyle** 8:23

---

**L**

**L.P.** 39:18,19

**land** 48:4

**landed** 48:10,14,18

**large** 17:4,14

**lead** 61:15

**leave** 14:21,23

**Lee** 53:10,13,16,25 54:17 61:12

**left** 16:6 73:7

**legal** 8:14 15:13 23:8,9,17,18 25:11
35:25 36:9

**level** 38:11 78:18

**Levesque** 9:5,6

**LEXITAS** 8:15

**Limited** 24:23,24 25:1,2,4 28:4,9,15,
19 39:13

**lines** 36:1,9

**liquidity** 75:18,20,22,23

**list** 25:18 71:12,14,16 86:7,11,15

**listed** 22:25 24:11 25:16 26:2 51:18
61:10 71:9,13,15 72:1 74:8 89:5

**listen** 68:4,9

**lists** 29:1 46:25 71:3 81:7 86:20,23
89:10

**litigation** 10:6

**LLC** 22:14 25:9,11,16,20,21 26:7
70:19

**Ln** 94:6,8,10,12,14,16,18,20,22,24

**located** 13:2,4,7 47:4 49:6 63:15,22
64:3,13 68:23 72:2,5,8 79:16,23 81:5
83:10 85:22 91:16,21

---

**locations** 72:7

**Locke** 9:6

**logistics** 72:16,21

**long** 14:5,14 26:20 46:17

**looked** 28:10 29:22 39:10,13 54:14
64:17 68:21

**lot** 19:7 77:24

**low** 90:8,12,22

**lower** 39:6 40:5 75:13,23

**lying** 58:12

**Lynn** 8:23

---

**M**

**made** 28:21 32:16 33:19 34:11 74:4
78:13

**Main** 63:15 85:23

**majority** 79:12

**make** 20:25 31:17 32:18 33:1 34:5,18
40:5 42:6 59:12 74:20 75:3

**makes** 33:2,4 53:19

**making** 31:16,22

**management** 17:7 65:5 68:5,9,10,
13,18,19,25 71:4,25 72:1,4,19,22
73:24 75:7 87:7

**manager** 71:14

**managers** 70:19 71:4,19

**Managing** 16:4,5 17:24 20:8 81:4

**Manhattan** 13:7

**mark** 21:4 37:1,15 47:12,23 55:11
60:2 62:2 65:11 66:1 70:7 77:13
80:13 84:7 88:18 91:23 92:9

**marked** 21:8 46:9 52:25 53:2 55:6
60:4 62:5 65:14 70:9 77:15 80:15
84:9 88:5 92:1

**Markets** 63:11

**material** 66:4,10,16

**materials** 64:6

**matrix** 18:23 19:6 33:6 35:16,24
56:25

**matter** 8:10

**matters** 30:17

**meant** 19:17 57:22 63:19

medication 12:18

meet 83:25

meeting 66:2,8,12 70:17,24 71:17
72:18,22 73:5,18 74:14 76:8,11,18,22
91:4 93:10

meetings 42:23,25 45:14 57:18 58:3
60:19 67:10 69:24 70:3 73:7 74:16
76:13,15

Megan 51:11,15 53:22 54:13 65:21,
24 68:22

member 16:19,20 25:19 31:23 38:8
41:11 49:5 50:24 51:25 56:20,21 57:5
65:4 68:3 79:19 91:8

members 25:19 34:1 49:16 58:25
61:5 68:4 72:19,22 73:24 84:25 88:17
89:9

memory 56:21

mention 52:11 90:1

mentioned 21:24 35:10 53:18 69:22
70:2 71:8

merger 44:17,19 88:19 89:6 93:11

messaging 13:20

met 52:2 54:25 72:10

mid 16:12,13

middle 21:18 50:5,8 57:7,11

Midland 79:25

mind 28:7 30:25 34:7 36:14,15 38:21
40:14,15 47:17 48:23 55:23 56:4
69:4,7 73:9,14 77:20 88:10 92:5

minute 11:2

minutes 40:18,20 54:1 69:8,23
70:16,24 73:4,19 74:2,11,16,21
76:15,18,22 85:10 93:14

misstated 76:18

misunderstand 32:14

moment 42:19 44:13 73:11

Monday 92:16

month 72:12

morning 9:2 10:3 48:3 66:5,9,11,12
69:6 89:4

move 52:17 66:12

multiple 17:6 87:18

### N

named 17:22 19:3 29:4

names 23:2,5,7,8 37:4,20,21 50:13,
17,19 56:13

Natural 85:21 87:21

nature 33:7 35:24 40:16 56:25 69:7

negotiating 30:10 31:7

negotiation 31:4

noise 13:17

noon 52:13,16

North 64:1

NOTARY 95:22

note 74:2

noted 49:23 59:2,20 62:18 73:22
75:10,14 78:9 80:20 95:3

notes 81:10 82:6

noticed 74:22

noticing 8:19

November 60:12,24

number 11:10 16:3 18:24 29:4 35:17
36:13 40:10 53:5 55:14 60:7 62:8
65:17 70:12 72:6 77:18 78:16 80:18
82:9,11,12 83:24 84:12 87:23 88:7
89:10 93:1,2

numbers 78:18

numeric 46:13

numerous 77:1

### O

oath 10:10 41:7 69:20 95:12

object 30:15,16

objection 22:18 23:12,23 24:6,13
26:21 27:1,9,16 30:19 32:8 41:12
43:6,15 44:6 45:3 55:3 58:15 63:23
64:21 67:14,23 72:13 73:8 76:20 77:4
79:4,17 82:3,18 83:1 90:18,24 93:6

obligation 42:14

occupation 13:23

occurring 67:11

office 83:22,23 95:18

Officer 47:4

offices 63:25 83:20

official 74:22

oil 75:13,16 79:24 83:7

one-page 65:16 80:17

one-pager 81:18

one-pagers 81:20

one-rig 76:1

one-time 42:12

operating 75:17

operations 56:22 65:7

operative 21:15

opportunities 87:24

Opportunity 8:11 10:5,6

optimal 75:16

optimize 75:19,24

org 22:9,11,16,17,25 23:3,22 24:5,12

organization 18:23 19:6 35:16
79:20

original 59:19

overseeing 41:24 76:25

oversight 65:6

owned 29:23

### P

p.m. 54:9 67:8 85:1

package 38:24

pages 25:13 46:17 77:24

paid 15:11,14

pandemic 75:13

paper 78:18

paragraph 28:18 74:2 75:2,10 76:4
78:21

paragraphs 76:5

parentheses 67:8

part 17:14 18:4 33:18 37:2 38:14,18,
23 50:13

participant 67:21 73:6

participants 73:23

participate 45:14 69:24

**participated** 73:21 91:4 93:4

**participating** 42:22

**partner** 25:16

**partners** 14:4 16:24,25 17:1,25 18:4, 8,10 20:3 23:16 24:24 25:2,4,15 28:10 34:17,18,21,22 35:1,2,3,4,12 39:14,18,19 47:4 57:3 69:25 70:19,25 71:19 80:8 81:5

**partnership** 24:23 25:1 26:6 28:5,9, 15,20 30:7,11 31:4,8,11,12,19 39:14 42:13,19,21

**parts** 20:13 83:23

**party** 8:18

**Patricia** 53:9,12,13,14

**pause** 41:1 69:14

**PDF** 28:16

**pending** 10:21,25 12:11 21:24 92:18

**people** 13:16 17:12,15,17 18:7,12, 16,20,24 19:10,11 31:24 32:2,4 35:17 36:7,10,14,15 37:7 38:13 45:5 50:11, 12 54:14 57:2 59:2,8 63:7,20 64:2 68:21 71:16 85:15,18 90:5

**Pepper** 9:6

**perform** 43:11

**performed** 24:4 37:13

**period** 14:20,24 17:8 18:22 20:7 42:17 43:5,14 49:18 58:4 65:1 67:11

**periods** 16:1

**person** 13:20 18:1 19:2,21 32:19,20 34:12 36:14 59:9 87:3 95:14

**personal** 39:5 40:5

**personally** 38:19,24 43:23 64:17,25 72:5 77:1 87:12,13 95:11

**Peter** 78:24 79:7 82:11

**petition** 11:1 21:11,16 22:1 24:21

**Petroleum** 43:21,25 44:12,21 45:1, 8,22 83:13 86:25 91:11

**Pg** 94:6,8,10,12,14,16,18,20,22,24

**Phil** 46:23,25 47:1 51:19,23,25 53:22 54:13 61:7

**phone** 78:14

**phrase** 58:1

**Pincus** 77:8 79:2,6,19

**Pinker** 8:23

**Plaintiffs** 8:21 9:10 10:5

**Plaintiffs'** 21:11

**Plan** 59:16,22

**platforms** 13:20

**play** 30:10 31:16,21 43:3,12,23 44:25 56:23

**played** 67:18

**point** 15:23 32:16 61:17

**points** 20:18 92:11,17,24 93:2

**portfolio** 56:22

**portion** 20:20

**position** 16:13 75:11,14

**potential** 45:15,16,23 61:19 63:21 64:18 65:2 67:19 72:22 77:2,8 78:17 80:8 82:15,24

**potentially** 66:1,8

**practice** 74:15,20 76:12,16

**pre** 53:20

**preferred** 29:6,11,13,16,19,23 30:2 92:20

**prepare** 13:8,11

**president** 26:6,10,12,17,19,20,25 27:6,7,14,15 47:3

**press** 90:1,3,4

**prices** 75:13,17

**primary** 32:5,7,10,25 33:5 87:3,6,8, 9,15

**Primexx** 8:10 9:4 10:5 23:15 24:23 25:1,3 28:10,22 31:11,18,22 32:6,18 33:1,20,25 34:6,11 35:8,13,22 36:4,6, 11,19,25 37:7,19,23 38:2,7,14,20 39:1,4,7,14 40:7 41:11,18,23,25 42:3, 8,12,23 43:3,4,11,13,18,20,24 44:2,4, 9,21 45:6,23 46:23 47:4,11,23 49:1,5, 10,21 50:20,23,25 51:1,9,11,12,15, 19,24 52:1,5 53:10 55:1,20 56:8,10, 23 58:13 59:3,5,9 61:6,18,19 62:20 63:21 64:18 65:2,5,6,22 66:24 67:12, 18 68:10,19,23 69:3,24 70:18,24 71:4,10,11,18 72:2,18 74:6 76:25 77:3,9 78:15 80:8,25 81:18 82:16,25 83:13 84:1,19 87:1,8 88:19 89:6 90:4, 6 93:11 94:2

**Primexx's** 81:22 92:19

**Primexx/blackstone** 60:25

**Primexx/callon** 87:5,14 91:12

**Primexx/rosehill** 83:4,6

**PRIMEXX029462** 70:12

**prior** 30:11 31:13

**private** 15:25 17:2 18:5,6,9,11,17 20:1,2,9 57:3

**proceeding** 8:19 11:4

**process** 32:15 43:12,24

**productivity** 92:19

**profile** 90:8,12,23

**profitability** 39:7 40:6

**program** 75:15 76:1

**promoted** 16:1,2

**pronounce** 78:2

**Proposal** 59:16,22

**proud** 90:17

**proved** 95:12

**provided** 66:15 67:5

**public** 90:3 95:22

**pulled** 81:13

**Punches** 80:7,24 81:3,4,12,14 82:1, 20

**purposes** 95:17

**put** 11:23 20:11,12,16 39:10,15 46:5 52:8 55:8 65:8 70:4 77:11 78:17 80:11 84:5 85:16 88:3

**putting** 46:6 59:24 61:25

---

**Q**

**question** 12:1,11 27:18 31:1 32:24 34:8,24 38:22 43:8 47:18 49:4 56:5 64:23 73:14,16

**questions** 10:7 12:19 30:17 32:13, 20,22 33:16 93:18

**quickly** 52:16

**quoted** 90:5

---

**R**

**RBC** 61:18 63:11,20,24 68:14 87:9

**RBC's** 61:22

**RBC/BX** 62:21

**reached** 16:13 78:24

**read** 23:2 86:18 94:6,8,10,12,14,16,
18,20,22,24 95:1

**reading** 58:24 59:8 78:3

**reads** 26:10 28:14,16,17 89:24 94:6,
8,10,12,14,16,18,20,22,24

**reason** 12:24 27:4 44:13 48:7,17
74:10 76:6 94:6,8,10,12,14,16,18,20,
22,24

**recall** 11:9,15,20 15:25 16:8,10,11
17:9,16 20:10 22:5,7,23 23:8,17 25:5
26:15,18,22 27:2,10,22 29:8,20 30:4,
13 31:3,14 32:1 34:10 35:5,6 36:8,13,
17 37:5,6,9,10,14,16,18,22 38:1
41:20 42:1,25 43:20,22 44:15,16,23,
24 45:10,11,17,20,24 46:1,4 48:12,
13,16,20 49:19,20,23,25 51:5,6,17
52:2,6,7 55:4 57:20 58:2,7,11,17
59:7,23 60:21 61:14,17,21,22 63:1,5
64:2 66:22,23 67:1,3,10,15,17 71:2,
23 72:4,14,20 73:22 74:13,18 76:10,
21 77:5,7,10 79:8,11,23 80:1,5,10
82:7 83:6,9,16 84:2,4 87:16 90:19,25
91:6,9,14,15,18,20,21 92:25 93:7,9,
12

**receive** 31:12 68:9

**received** 24:11,15 27:22,24 64:5,9,
10 92:20

**recitals** 39:17

**recognize** 23:5,7,13,14,15 39:23
50:13,16

**recollection** 26:24 29:15,18 30:1
35:24 37:12 43:1 59:21 70:3 83:24

**recommendation** 32:17 33:19,24
34:11

**recommendations** 33:2 68:6

**recommended** 34:5

**recommending** 32:6,25

**record** 8:8 21:8 40:25 41:4 46:9 53:2
55:6 60:4 62:5 65:14 69:13,17 70:9
74:22 77:15 80:15 84:9 88:5 92:1
93:21

**reference** 15:4 39:18 66:21

**referenced** 40:3 67:25 68:1 72:15
86:16

**references** 36:23 66:16

**referencing** 21:23

**referred** 15:15 36:24

**referring** 42:4 54:16 68:10,18,24

89:16

**refers** 58:1

**refresh** 29:15,18 30:1

**refreshing** 56:21

**regular** 70:17 71:17 74:15

**regularly** 19:22

**relate** 30:17

**related** 43:17 44:8

**relates** 88:23

**relationship** 87:25

**relationships** 19:20

**relative** 40:9

**release** 90:1,3,4

**remainder** 16:15

**remember** 38:13 72:9

**remote** 8:9 11:19,21

**remotely** 10:10

**repeating** 28:7 30:25 34:7 38:21
47:17 56:4 73:14

**rephrase** 43:8

**reply** 85:17 89:2

**report** 18:16,21 35:8,11 49:12

**reported** 18:19,25 19:2 35:14,17,21
36:4 49:14

**reporter** 9:18 10:14 21:4 52:24 55:10
60:2 62:2 65:11 70:6 77:12 80:13
84:7 91:23

**reporting** 19:13,20 35:25 36:9

**reports** 19:23

**represent** 8:18,25 10:4 21:15

**rescheduling** 66:1,8

**reserve** 93:17

**resolved** 75:20

**Resources** 85:22 87:21

**responded** 54:6 67:4 85:9,13 89:25
90:11

**response** 90:10

**responsibilities** 16:18,23 41:10,23
42:11,18

**responsibility** 32:5,7,25

**rest** 55:1 58:12

**Restated** 24:22 25:1 28:4,9,15,19
39:13

**resulted** 43:24

**retained** 68:14

**review** 13:11 73:11 74:15 76:13,15

**reviewing** 76:22

**Richard** 80:7,24 81:2,14,16 82:9,20

**rig** 75:15,21

**right-hand** 65:19 80:20 92:7

**risk** 75:23

**role** 17:13 26:15 30:10 31:16,21 43:2,
3,10,12,23 44:25 46:2 49:10,12 51:6
56:23 65:3 67:18 76:24

**roles** 37:5

**room** 13:14,18

**rooms** 20:23

**Rosehill** 59:16,22 80:25 81:19
82:16,25 83:7,9

**run** 75:21

**S**

**sale** 44:11,15,20 45:15

**Sam** 50:20,23,24 53:22 54:13 61:7
68:22

**Sarah** 9:8,11

**schedule** 25:15 53:17 54:18 63:8

**scheduled** 61:12

**scheduling** 57:24

**Schwegmann** 8:24

**screen** 20:12,17,21 24:21 39:10,15
46:7 49:22 52:24

**seal** 95:18

**sector** 16:22

**self-employed** 14:1

**sell** 43:4,13

**send** 60:19 63:6

**senior** 16:3,5 17:19,20,24 18:2,7,10,
12 19:12 20:8 35:11 38:10 84:25

**sense** 53:19 78:13

**sentence** 75:6 92:14

**separately** 78:24

series 13:10 29:1,6,11,13,16,19,23 30:2 42:14 75:7

serving 70:25

set 59:11 81:21

setting 28:8 82:21

settled 78:15

seven-page 70:13 73:10

share 20:17 46:6 52:23 78:18 81:18

shared 21:5 78:16

sharing 30:5

SHEET 94:1

short 14:20

show 11:1 24:19

shown 11:4

shows 63:5 64:9,10 82:19 86:2 89:8

sic 48:3

sick 12:22

signature 25:12 27:20 29:9 30:9 47:2 51:22 63:14 64:12,14 81:10 85:20,25 86:2,10,22 95:2

signed 25:9 26:5,11 27:5,7,13 29:12 30:6 42:13,19,20

significantly 75:11

signing 30:12 31:13 89:1,6,14

silently 67:22

similar 82:10

simply 32:24 75:21

simultaneously 75:23

sit 67:22 76:7

skip 25:6

Skipping 51:10

slightly 11:22

small 11:10

smoothly 12:3

sold 43:21,24

sort 36:18

sound 37:2

spare 93:14

speaking 17:17 34:15,18 36:21 39:8, 24 44:16 57:25 74:18,24 82:4

specific 10:24 15:8,13,25 16:21,23 17:5 20:13,18 23:1,8 34:23 35:25 36:8 37:5 38:1 41:14,17 43:1 44:14, 23 48:24 51:6 58:2 68:12 83:16 91:14,20

specifically 11:9,15 13:18 16:10 20:10 22:7 25:5 26:15,18 31:14 32:1 35:5,6,13 36:13,17 60:22 64:2 72:5,8 74:19

specifics 17:17 23:17 27:11 29:20 30:4 33:5 41:22 44:15 45:20 48:20 50:15 52:6,7 57:20 58:11 59:7 61:14 63:6 71:2,23 73:22 74:13 76:10 80:5 83:6 87:16 90:20 92:25 93:12

spelled 66:19

Spence 63:11,14 64:6

Spence's 64:12

stage 28:8

Stand 69:11 93:19

start 14:14 41:16 67:11 78:12

started 9:12 14:12,18 15:24 16:9 55:20 56:3 67:12

starting 77:17 84:11

starts 46:22 56:8 65:21 80:22 84:15 88:13

state 8:17 57:25 76:7 95:7,23

stated 75:22

statement 48:11 92:13

states 26:9 64:14 75:2 83:21

status 62:21

Stephen 83:12,14 84:18

steps 61:1 62:21

stop 30:5 93:15

Strategic 60:25

strategical 68:15

Street 63:15 85:23

strong 75:17

structure 23:18 75:4

struggling 33:4

subject 53:17 59:15,19 60:25 62:20, 23 78:5,9 80:4,25 83:3,5 84:19 88:19 92:11

subscribed 95:15

substance 84:22,23

substantial 31:17

substantive 28:12

Suite 63:15 85:23

summarize 88:25

summary 18:14,15

support 34:21 35:1 74:3

Susman 8:21 9:9

swear 9:18

sworn 9:23

**T**

table 28:3 29:25

takes 14:7

taking 12:18 36:12 44:13 58:3

talk 17:6

talked 15:16

talking 92:11,16,24

Tall 78:5,15 79:24

Taylor 9:5

team 16:19 31:23,25 33:2,10,12,18, 24 34:5,10,13,16 36:19,25 37:3 38:9, 14 41:11,18,24 43:3,11 49:5,9 50:25 51:8 52:1 53:21 54:9,12 55:1 56:9,10, 22,24 58:13 59:1,5,13 60:20 61:6 65:5,6 67:19 68:5,10,11,13,18,19,25 69:3 71:25 72:4,8 75:18 76:25 78:19 79:10,12 85:1 87:7 88:22 89:10 90:17 91:9 92:16 93:5

teams 36:22 78:15

technical 11:25

teens 16:12,14

teleconference 71:21 73:20

ten 40:18 71:15 73:24 76:5

term 58:1

terms 30:11 31:7 41:10,22 61:21

testified 9:24

testify 12:25

testifying 13:15

testimony 11:3

Texas 10:21 28:23 46:3 47:5 49:6 52:3 58:21 61:7,18,23 63:16,20,22 64:13,19 68:23 71:20 72:2 77:2 79:2,

16,25 81:6,9 83:8,18 85:23 86:21 91:16,17

**Texas-based** 45:8

**thing** 12:10

**things** 19:4 52:17 78:14 82:9

**thought** 78:13 88:24

**thoughts** 88:25 89:16

**Thursday** 62:16

**time** 8:6,7 11:13,24 14:7,20,24 16:2, 15 17:8 18:22 20:7,19 30:21 35:5,6 40:23 41:2 42:17,25 43:5,14 44:2,9 47:16 49:18 58:2,3 59:11 65:1,3 67:11 69:12,15 70:25 79:8,12 82:13 83:15,16,22 87:23 93:20

**times** 11:8 15:5 16:1,3 67:9

**timing** 14:9

**title** 16:3,6,9,14 17:23 20:6 26:6 51:6 70:16,22 91:14,20

**titled** 21:11 24:22

**titles** 15:23 91:19

**today** 10:8,18 12:16,19,22,25 57:14, 23 59:10 76:7 89:3

**today's** 13:8

**told** 48:8,19 58:13,22 59:6

**tomorrow** 59:14 66:2,9

**tonight** 85:1

**top** 21:17,18 22:12 23:11 28:14,16 29:13 47:9,21 63:9,13 70:22 71:7 74:8 90:14,15

**topic** 78:25 82:15

**topics** 82:11,13 93:2

**totally** 32:14

**touch** 78:13

**transaction** 44:16,18,20,23 45:1,16, 23 61:19 63:22 66:25 67:13,19 77:9 80:9 82:16,24 83:12 87:1,5,14 88:23 89:14 90:16 91:2,3,12

**transactions** 64:19 65:2 77:3

**transcribed** 10:14

**TRANSCRIPT** 94:1

**Transition** 85:22 87:21

**Trauber** 83:12,14,17,19,25 84:19 85:6,9,13 87:3,15,18,20 88:1

**Trauber's** 85:20

**travel** 46:3

**trip** 57:20

**Troutman** 9:6

**true** 95:3

**truthfully** 12:20,25

**Tuesday** 53:18

**turn** 68:15

**turning** 77:20 88:10 92:5

**two-page** 60:7

**typically** 60:18 63:6 76:15

---

## U

**ultimate** 16:3 44:11 86:25

**ultimately** 43:13,20 93:3

**understand** 10:9,13,17,20 11:2 27:18 32:9,12 33:15 41:7 49:4 61:23 64:23 66:20 69:20 89:22

**understanding** 15:6 23:25 24:15 40:1 50:12

**understood** 30:22 71:24

**unfamiliar** 23:6 37:20

**United** 83:21

**unitholder** 29:7,11,14,16,19 30:2

**unitholders** 29:3

**Units** 29:23

**unusual** 11:22

**up-to-speed** 89:4

**upcoming** 66:25

**update** 66:4,11,16

**updates** 68:4,9,13

---

## V

**valuation** 90:6

**values** 75:24

**version** 21:16

**versus** 8:11

**Vice** 47:3 85:21

**video** 8:9

**video-recorded** 10:18

**view** 78:19

**VII** 39:18

**visible** 13:22

---

## W

**waiting** 92:18

**wanted** 41:16 52:20 78:18 81:19 90:22

**Warburg** 77:8 79:2,5,19 82:12

**Warburg/blackstone** 78:14

**warning** 30:19

**ways** 17:7 52:19

**Wednesday** 53:21

**week** 53:19 54:25 78:22 81:17 82:1

**weekend** 92:21

**wells** 92:19

**whatnot** 20:22

**White** 51:1,4 52:3 55:20 56:8 59:19 61:7 68:22 72:11

**window** 66:14 67:5

**wondering** 35:12 43:10

**word** 33:5 44:14

**work** 12:2 17:12 19:10,11 24:4 37:13 43:12 46:3 53:21 67:9

**worked** 15:15,19 17:14 19:14 24:7,8 34:15 36:3,8,11,19 37:7,19 83:20,22

**working** 14:14,18 36:5 38:14 43:13 68:23

**works** 22:13 32:15 59:11 78:22

**workstream** 89:6

**workstreams** 88:19,25 89:13,17,22

**wrong** 33:15,16

**wrote** 48:2 54:1,12,20,22 57:13,17, 21 67:5,7 78:10 81:16 84:22 89:12,21

---

## Y

**Yaman** 8:22

**year** 14:6 75:12 78:12,13

**years** 11:16 42:15 88:2

**York**  8:1 13:4,5 79:7,10 82:12 83:22
86:8,12

---

### Z

**Zack**  9:3

# EXHIBIT 6

# FILED UNDER SEAL

To: Chris Doyle[chris.doyle@primexx.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Hamilton, Jonathan[Jonathan.Hamilton@Blackstone.com]; Kelly, Jeff[jeff.kelly@blackstone.com]; Gautam, Anika [Anika.Gautam@Blackstone.com]
From: Acconcia, Angelo[acconcia@Blackstone.com]
Sent: Tue 1/12/2021 4:31:51 PM Eastern Standard Time
Subject: RE: Colgate [External]

Yes. Thank you.

From: Chris Doyle <chris.doyle@primexx.com>
Sent: Tuesday, January 12, 2021 4:30 PM
To: Acconcia, Angelo <acconcia@Blackstone.com>
Cc: Belz, Erik <Erik.Belz@Blackstone.com>; Hamilton, Jonathan <Jonathan.Hamilton@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>
Subject: RE: Colgate [External]

Apparently they're working remotely. He did ask if we could have a call, which I will have. You comfortable with me saying something to the effect that my understanding was Warburg was supposed to get back to BX on potential valuation metrics?

From: Acconcia, Angelo <acconcia@Blackstone.com>
Sent: Tuesday, January 12, 2021 2:50 PM
To: Chris Doyle <chris.doyle@primexx.com>
Cc: Erik Belz <Erik.Belz@Blackstone.com>; Hamilton, Jonathan <Jonathan.Hamilton@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>
Subject: RE: Colgate [External]

Good idea.

From: Chris Doyle <chris.doyle@primexx.com>
Sent: Tuesday, January 12, 2021 3:43 PM
To: Acconcia, Angelo <acconcia@Blackstone.com>
Cc: Belz, Erik <Erik.Belz@Blackstone.com>; Hamilton, Jonathan <Jonathan.Hamilton@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>
Subject: RE: Colgate [External]

BTW – TC is in the same building in Midland as Primexx. I think it would make sense to give Oestmann a heads up that I'm out there and see how he responds.

From: Chris Doyle
Sent: Tuesday, January 12, 2021 11:55 AM
To: Acconcia, Angelo <acconcia@Blackstone.com>
Cc: Erik Belz <Erik.Belz@Blackstone.com>; Hamilton, Jonathan <Jonathan.Hamilton@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>
Subject: RE: Colgate

No additional developments. Based on James's note, they will be responding to our questions by mid-week – and want to grab a drink while I am in Midland. I was waiting until today or tomorrow to see if they actually respond to our questions or under the guise of trying to lock down my Midland schedule. I was going to propose a quick discussion to review our questions (to read the room) followed by a drink. My thought would be Jeff, Sam, and me.

I discussed the TC idea with Chase, and he thinks their behavior is consistent with previous deals with Colgate. He indicated a general lack of maturity in previous negotiations and believes that could be what's going on here. I don't see Tall City moving the needle for them outside of more production and it would seem to be a strange move this far advanced in talks with us. I could reach out to Oestmann to meet up with him in Midland to gauge what's going on. TC went quiet around the same time we decided to hold back from an entire download of technical information (thinking they may just be interested in learning from us – not discussing a combination). You could also call Warburg and see why they dropped the ball.

Happy to jump on a call (outside of 5:30 and 7:00 EST) to discuss best next steps.

Chris

From: Acconcia, Angelo <acconcia@Blackstone.com>
Sent: Tuesday, January 12, 2021 9:57 AM
To: Chris Doyle <chris.doyle@primexx.com>
Cc: Erik Belz <Erik.Belz@Blackstone.com>; Hamilton, Jonathan <Jonathan.Hamilton@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>
Subject: Colgate

Chris,

Just wanted to check-in to see if there were any developments on Colgate. Agree with your tactic to wait for them to come back to you.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

Relatedly, I am concerned they are doing something with Tall City. They are in the midst of "making a couple of acquisitions", likely using the diligence on Primexx to do so and in advance of a relative value discussion as they probably see the 50/50 writing on the wall. This would also explain why Tall City has not come back to us.

Wanted to debate what we should do about this, if anything.

Angelo

Angelo G. Acconcia
Senior Managing Director
Private Equity
The Blackstone Group
345 Park Avenue, 43rd Floor
New York, NY 10154
T: 212.583.5211
F: 212.201.2874
M: 917.747.0987

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

EXHIBIT 7

FILED UNDER SEAL

To: Chris Doyle[chris.doyle@primexx.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Henle, Mark[Mark.Henle@Blackstone.com]
From: Acconcia, Angelo[acconcia@Blackstone.com]
Sent: Tue 6/29/2021 11:17:53 AM Coordinated Universal Time
Subject: Re: [External]RE: biweekly materials [External]

On a fight this morning to Houston. Will call you when I land.

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Tuesday, June 29, 2021 12:25 AM
**To:** Steven Pully
**Cc:** Acconcia, Angelo; Hirshberg, Al; Belz, Erik; Henle, Mark; Tom Fagadau; Chip Fagadau; James Jeffs; Jim Langdon; John Kelly; Gautam, Anika; Kelly, Jeff; Sam Blatt; Chase White; John Schopp; Megan Davis; Phil Cook; Tom Fagadau
**Subject:** Re: [External]RE: biweekly materials [External]

We will make Thursday afternoon work according to your schedule.
Chris

Sent from my iPhone

> On Jun 28, 2021, at 11:12 PM, Steven Pully <sjpully@yahoo.com> wrote:
>
>
> Chris, I think that is a good suggestion. I am in trial prep and testimony though late Wednesday...can we do something on Thursday afternoon? Happy for anyone to be invited. Also, I recognize that my questions relate to BPP equity and I am certainly not a BPP director...that being said, if the second rig is dropped, Primexx shareholders suffer too, which is why I am so keenly interested.
>
> Regards, Steve
>
> Steven J. Pully, CFA
> 214 587-6133

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 10:34 PM
**To:** Steven Pully <sjpully@yahoo.com>
**Cc:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <Al.Hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>; Gautam, Anika <Anika.Gautam@blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** Re: [External]RE: biweekly materials

Thank you, Steve. I would suggest the team have a call with you and/or a BPP Board member to discuss exactly what question you are trying to answer. We believe the analysis provided this weekend is directly responsive to your question of equity returns on incremental capital as are the multiple models run for the Special Committee.

Speak soon,

Chris

Sent from my iPhone

> On Jun 28, 2021, at 8:05 PM, sjpully@yahoo.com wrote:
>
>
> Chris, I was appointed to my 29[th] board today...recommended, by the way, by one of the large energy lenders that we are talking to. **Never in all of the boards that I've been on has it been so difficult to get the management team to run a model!** Can't you guys just run the model that I am asking for and we can debate what it says/means later? I feel like I have a duty to see this information.
>
> Steve
>
> Steven J. Pully, CFA
> 214 587-6133

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

*The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 7:15 PM
**To:** Steven Pully <sjpully@yahoo.com>; Angelo Acconcia <acconcia@Blackstone.com>; 'Hirshberg, Al' <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; 'Henle, Mark' <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; 'James Jeffs' <jjeffs@westgate-ep.com>; 'Jim Langdon' <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** 'Gautam, Anika' <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; 'John Schopp' <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** RE: [External]RE: biweekly materials

Thanks for following up, Steve. Everyone may have different assumptions, but here is how the team thought about your questions/comments:

1. While "new equity always wants a discount" may be true, wanting and receiving are two different things. Since the largest current equity owner has indicated that they were not supportive of making a complicated capital structure more complicated with the addition of outside capital, the team believes that assuming a no-discount entry is the appropriate assumption (if not aggressive). Since BPP always has the opportunity to run two rigs in the future, we assume current equity owners would be unlikely to offer a discounted entry as you suggest.

2. I agree with your methodology assuming all current equity owners would consider funding their pro rata share. Since the largest equity owner has indicated they don't currently have the support to infuse more capital into this business as currently configured, your approach falls apart and is not viable. Given the guidance the Board has given us, the best shot would be an aggressive bid from external capital, and that has not materialized after months of pursuing. Discussions with potential equity providers indicated previous investments were based on valuations of PDP PV15. That level of value is not compelling.

3. I won't assume to know all of the questions you may have about liquidity, but I assume one question would be the actual quantum of liquidity as a minimum. We assume more aggressive (lower) liquidity limits than the Board has currently approved. While more aggressive than current Board guidance, minimum assumed liquidity at BPP of $40 million and $80 million at the combined PRD/BPP are appropriate assumptions. One might consider an even more aggressive minimum threshold (and I have run active operations much tighter), but because this is new equity coming into the business, the appropriate assumption is to maintain a reasonable/conservative cushion to ensure the infusion of equity is sufficient to fund the business and absorb additional business risks.

Chris

---

**From:** sjpully@yahoo.com <sjpully@yahoo.com>
**Sent:** Monday, June 28, 2021 6:54 AM
**To:** Chris Doyle <chris.doyle@primexx.com>; Angelo Acconcia <acconcia@Blackstone.com>; 'Hirshberg, Al' <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; 'Henle, Mark' <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; 'James Jeffs' <jjeffs@westgate-ep.com>; 'Jim Langdon' <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** 'Gautam, Anika' <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; 'John Schopp' <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** [External]RE: biweekly materials

Chris, I do have some questions/comments regarding the BPP equity infusion:

- New equity is not likely to pay 5x EBITDA; new equity always wants a discount. The returns would be higher if the new money was coming in at a more compelling valuation.
- The better way to run the analysis (as an example only) is to have the three equity holders fund their prorata analysis and then look what their returns are on all the equity that they have invested with two rigs; compare that to the current one rig investment scenario and what the returns would be from that
- I also have some questions about the exact liquidity need

Thanks.

Steve

Steven J. Pully, CFA
214 587-6133

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

*The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 12:22 AM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; Steven Pully <sjpully@yahoo.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** RE: biweekly materials

Please see attached materials as follow up to Friday's biweekly call.

Let us know if you have any questions or would like for us to go through the materials 1:1.

Thanks,

Chris

---

**From:** Phil Cook <phil.cook@primexx.com>
**Sent:** Thursday, June 24, 2021 8:13 PM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <al.hirshberg@blackstonesradvisors.com>; Chris Doyle <chris.doyle@primexx.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; Steven Pully <sjpully@yahoo.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** FW: biweekly materials
**Importance:** High

Directors,

Please see materials for tomorrow's call.

Phil

*Philip W. Cook*
*Executive Vice President and Chief Financial Officer*
*Primexx Energy Partners*
*Two Energy Square*
*4849 Greenville Ave*
*Dallas TX, 75206*
*O-214.635.2613*
*M-918.606.4204*
<image001.png>

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 8

# FILED UNDER SEAL

Thanks. Lets do drinks with Chris at 5:30pm and then dinner at 6:30pm with the team. Could be fearings if that works for both.

Could we do 12pm EST on Tues for the board call?

---

**From:** Li, Patricia <Patricia.Li@Blackstone.com>
**Sent:** Tuesday, May 25, 2021 1:29 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Fwd: Schedule next Tuesday [External]

Angelo,

Please advise on the below as you will be in Dallas.

Thanks
Patricia Li

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Tuesday, May 25, 2021 1:21 PM
**To:** Li, Patricia
**Subject:** Schedule next Tuesday [External]

Patricia – can you quickly tell me what windows work for Tuesday afternoon next week for a Primexx Board call? We would need an hour.

Also – Angelo mentioned having drinks/dinner next week. I think it makes sense for Angelo and I to have pre-dinner drinks and then have a team dinner Wednesday evening. Does that work? I would invite Phil, Megan, Chase, and Sam.

Thanks,

Chris

**M. Chris Doyle**
President & CEO

**Primexx Operating Corporation**
Two Energy Square
4849 Greenville Ave, Suite 1600
Dallas, TX 75206
Office: 214-369-5909
Direct: 214.635.2632
chris.doyle@primexx.com

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 9

# FILED UNDER SEAL

To: Angelo Acconcia[acconcia@Blackstone.com]
From: Chris Doyle[chris.doyle@primexx.com]
Sent: Fri 7/2/2021 12:49:58 PM Eastern Standard Time
Subject: FW: Rosehill Plan B Proposal [External]
Attachment: Rosehill Overview Materials_06.30.21.pdf

Slide 3

---

**From:** Chase White <chase.white@primexx.com>
**Sent:** Wednesday, June 30, 2021 2:30 PM
**To:** Erik Belz <Erik.Belz@Blackstone.com>; Angelo Acconcia <acconcia@Blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** RE: Rosehill Plan B Proposal [External]

Draft materials we can run through here at 330 ET.

Chase

---

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 10:12 AM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Chase White <chase.white@primexx.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** RE: Rosehill Plan B Proposal [External]

Sounds good. Chase – would 3:30pm ET work? I think we can keep this call relatively short, as the objective with this bid should be to get into the next round, and so we are really bidding the book at this point. Based on the sell side info, what is PDP PV 10, 12 and 15 (at current strip)? If you take a 10% discount to the seller's PDP volumes, what is the PDP PV 10, 12 and 15?

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 11:07 AM
**To:** Belz, Erik <Erik.Belz@Blackstone.com>; Chase White <chase.white@primexx.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** Re: Rosehill Plan B Proposal [External]

I am back to back in Houston today. Why don't you set the time that works best for you all and if I can't make it I will follow-up with the team to discuss.

I am on a flight early am but free for most of the afternoon tomorrow.

---

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 9:25 AM
**To:** Chase White; Acconcia, Angelo; Gautam, Anika; Kelly, Jeff; Henle, Mark
**Cc:** Chris Doyle; Sam Blatt; Phil Cook; Megan Davis
**Subject:** RE: Rosehill Plan B Proposal [External]

I cannot do 5:30pm ET. Would 3:30pm or 4pm ET work? Could also try to do something late morning today. If not, I could do later tonight after 8:30pm ET.

---

**From:** Chase White <chase.white@primexx.com>
**Sent:** Wednesday, June 30, 2021 10:20 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** Rosehill Plan B Proposal [External]

BX Team - We are wanting to hop on the phone this afternoon to run through Rosehill proposal/strategy. RBC has worked our PDP / opex assumptions as well as prepared a high level contribution analysis for us to consider.

Does 5:30pm ET work? Trying to kick out into afternoon post RRR/JP closings this morning. Thanks.

Chase

**Chase A. White**
Primexx Operating Corporation
Office: 214-691-3114
Cell: 214-536-6089
chase.white@primexx.com

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

EXHIBIT 10

FILED UNDER SEAL

**To:** Angelo Acconcia[acconcia@Blackstone.com]; Jeff Kelly[jeff.kelly@blackstone.com]; Erik Belz[Erik.Belz@Blackstone.com]; Hamilton, Jonathan [Jonathan.Hamilton@Blackstone.com]; Gautam, Anika[Anika.Gautam@Blackstone.com]; Chris Doyle[chris.doyle@primexx.com]; Sam Blatt[sam.blatt@primexx.com]; Phil Cook [phil.cook@primexx.com]

**Cc:** Gilman, Rachael[Rachael.Gilman@Blackstone.com]; Oglesby, Amanda[Amanda.Oglesby@Blackstone.com]; Li, Patricia[Patricia.Li@Blackstone.com]

**From:** Chase White[chase.white@primexx.com]

**Sent:** Wed 1/6/2021 2:56:17 PM Coordinated Universal Time

**Subject:** RE: Call: Primexx/ Blackstone- Strategic Next Steps [External]

**Attachment:** Conversation Tracker_01.05.21.pdf

Tracking materials ahead of this call.

-----Original Appointment-----
**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Tuesday, November 3, 2020 3:05 PM
**To:** Angelo Acconcia; Jeff Kelly; Erik Belz; Hamilton, Jonathan; Gautam, Anika; Chris Doyle; Sam Blatt; Chase White; Phil Cook
**Cc:** Gilman, Rachael; Oglesby, Amanda; Li, Patricia
**Subject:** Call: Primexx/ Blackstone- Strategic Next Steps
**When:** Wednesday, January 6, 2021 10:00 AM-10:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Dial: +1(646)558-8656 // Meeting ID: 991 1629 0179 // Smartphone: +1(646)558-8656,99116290179#// No Participant Code Required

Dial: +1(646)558-8656 // Meeting ID: 991 1629 0179 // Smartphone: +1(646)558-8656,99116290179#// No Participant Code Required

**TO JOIN FROM A PC, MAC, IOS OR ANDROID:**
https://blackstone.zoom.us/j/99116290179
**Meeting ID: 991 1629 0179**

**TO USE MOBILE ONE-TAP:**
+16465588656,,99116290179# US Toll
+13126266799,,99116290179# US Toll

**TO JOIN FROM A TELEPHONE:**
Dial(for higher quality, dial a number based on your current location):
US: +1 646 558 8656 or +1 312 626 6799 or +1 301 715 8592 or +1 253 215 8782 or +1 346 248 7799 or +1 669 900 6833 or 888 788 0099 (Toll Free) or 877 853 5247 (Toll Free)

United Kingdom: +44 203 901 7895 or +44 208 080 6591 or +44 208 080 6592 or +44 330 088 5830 or +44 131 460 1196 or +44 203 481 5237 or +44 203 481 5240 or 0 800 031 5717 (Toll Free)

Singapore: +65 3165 1065 or +65 3158 7288 or 800 852 6054 (Toll Free)
Hong Kong SAR: +852 5803 3730 or +852 5803 3731 or +852 5808 6088 or +852 3008 3297 or +852 3012 6283 or 800 906 780 (Toll Free) or 800 931 189 (Toll Free) or 800 931 645 (Toll Free)

Australia: +61 3 7018 2005 or +61 7 3185 3730 or +61 8 6119 3900 or +61 8 7150 1149 or +61 2 8015 6011 or 1800 893 423 (Toll Free)

China: +86 10 8783 3177 or +86 10 5387 6330
Costa Rica: +506 4000 3843 or +506 4100 7699
India: +91 224 879 8012 or +91 22 71 279 525 or +91 80 71 279 440 or +91 22 48 798 004
Philippines: +63 92 3099 0478 or 1800 1110 2219 (Toll Free)
Taiwan: +886 (2) 7741 7473
United Arab Emirates: 800 035 704 555 (Toll Free) or 800 035 704 239 (Toll Free)
Viet Nam: +84 28 4458 2373 or +84 869 402 526
International numbers available: https://blackstone.zoom.us/u/aexhoBRZyb
**Meeting ID: 991 1629 0179**

**TO JOIN FROM SKYPE FOR BUSINESS (LYNC):** https://blackstone.zoom.us/skype/99116290179
OR AN H.323/SIP ROOM SYSTEM:
H.323:
162.255.37.11 (US West)
162.255.36.11 (US East)
221.122.88.195 (China)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)
213.19.144.110 (Amsterdam Netherlands)
213.244.140.110 (Germany)
103.122.166.55 (Australia)
209.9.211.110 (Hong Kong SAR)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)
207.226.132.110 (Japan)
**Meeting ID: 991 1629 0179**
SIP: 99116290179@zoomcrc.com

0105

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

BPP_0016545

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

# EXHIBIT 11

# FILED UNDER SEAL

**To:** Acconcia, Angelo[acconcia@Blackstone.com]; Cain, Matt[matt.cain@rbccm.com]; Chris Doyle[chris.doyle@primexx.com]; Chase White[chase.white@primexx.com]; Richardson, Scott[Scott.Richardson@rbccm.com]; Numelin, Tye[tye.numelin@rbccm.com]; Belz, Erik[Erik.Belz@Blackstone.com]; Hamilton, Jonathan[Jonathan.Hamilton@Blackstone.com]; Kelly, Jeff[jeff.kelly@blackstone.com]; Gautam, Anika[Anika.Gautam@Blackstone.com]; Foley, David[foley@blackstone.com]
**Cc:** Oglesby, Amanda[Amanda.Oglesby@Blackstone.com]; Rozon, Onoria[Onoria.Rozon@Blackstone.com]; Gilman, Rachael[Rachael.Gilman@Blackstone.com]; Sow, Maty [Maty.Sow@Blackstone.com]; Li, Patricia[Patricia.Li@Blackstone.com]; Sam Blatt[sam.blatt@primexx.com]; Megan Davis[megan.davis@primexx.com]; Phil Cook[phil.cook@primexx.com]
**From:** Spence, Jeffrey[jeffrey.spence@rbccm.com]
**Sent:** Tue 4/20/2021 2:07:58 PM Coordinated Universal Time
**Subject:** RE: Call: Primexx/ RBC/ BX re: general status and next steps discussion [External]
**Attachment:** Primexx Process Update_20210420.pdf

---

All,

Please see the attached materials for discussion on the call this morning.

Thank you,

Jeffrey Spence
RBC Capital Markets | RBC Richardson Barr
609 Main St, Suite 3700, Houston, TX 77002
O: 713.585.3344 | C: 832.628.6604
jeffrey.spence@rbccm.com

-----Original Appointment-----
**From:** Acconcia, Angelo [mailto:acconcia@Blackstone.com]
**Sent:** Monday,April 19, 2021 11:54 AM
**To:** Acconcia, Angelo; Cain, Matt; Spence, Jeffrey; Chris Doyle; Chase White; Richardson, Scott; Numelin, Tye; Belz, Erik; Hamilton, Jonathan; Kelly, Jeff; Gautam, Anika; Foley, David
**Cc:** Oglesby, Amanda; Rozon, Onoria; Gilman, Rachael; Sow, Maty; Li, Patricia; Sam Blatt; Megan Davis; Phil Cook
**Subject:** FW: Call: Primexx/ RBC/ BX re: general status and next steps discussion
**When:** Tuesday,April 20, 2021 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required

-----Original Appointment-----
**From:** Acconcia, Angelo [mailto:acconcia@Blackstone.com]
**Sent:** Thursday,April 15, 2021 9:40 AM
**To:** Acconcia, Angelo; Chris Doyle; Chase White; Richardson, Scott; Numelin, Tye; Belz, Erik; Hamilton, Jonathan; Kelly, Jeff; Gautam, Anika; Foley, David
**Cc:** Oglesby, Amanda; Rozon, Onoria; Gilman, Rachael; Sow, Maty; Li, Patricia; Sam Blatt; Megan Davis; Phil Cook
**Subject:** Call: Primexx/ RBC/ BX re: general status and next steps discussion
**When:** Tuesday,April 20, 2021 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required

[External]
Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required
**TO JOIN FROM A PC, MAC, IOS OR ANDROID:**
https://blackstone.zoom.us/j/2125835211
**Meeting ID: 212 583 5211**

**TO JOIN FROM A BLACKSTONE CONFERENCE ROOM OR OFFICE TELEPHONE:**
Dial extension x6300:
**Meeting ID: 212 583 5211**
**TO USE MOBILE ONE-TAP:**
+16465588656,,2125835211# US Toll
+16699006833,,2125835211# US Toll

**TO JOIN FROM A TELEPHONE:**
**US: +1 646 558 8656 or +1 669 900 6833**
United Kingdom: +44 203 966 3809 or +44 203 695 0088
Singapore: +65 3165 1065 or +65 3158 7288
Hong Kong, China: +852 5808 6088
Australia: +61 8 7150 1149 or +61 2 8015 2088
China: +86 10 87833177 or +86 10 53876330
Costa Rica: +506 4000 3843
India: +91 22 62 192 563 or +91 22 71 279 525 or +91 80 71 279 440 or +91 22 48 798 004
Philippines: +63 92 3099 0478
Taiwan, China: +886 (2) 7741 7473
United Arab Emirates: 800 035 704 555 (Toll Free) or 800 035 704 239 (Toll Free)
**TO JOIN FROM SKYPE FOR BUSINESS (LYNC):**

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

BPP_0017552

https://blackstone.zoom.us/skype/2125835211

**OR AN H.323/SIP ROOM SYSTEM:**

H.323:
  162.255.37.11 (US West)
  162.255.36.11 (US East)
  221.122.88.195 (China)
  115.114.131.7 (India)
  213.19.144.110 (EMEA)
  202.177.207.158 (Australia)
  209.9.211.110 (Hong Kong)
  64.211.144.160 (Brazil)
  69.174.57.160 (Canada)
Meeting ID: 212 583 5211
  SIP: 2125835211@zoomcrc.com

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.
_____ This E-Mail (including any attachments) may contain privileged or confidential information. It is intended only for the addressee(s) indicated above. The sender does not waive any of its rights, privileges or other protections respecting this information. Any distribution, copying or other use of this E-Mail or the information it contains, by other than an intended recipient, is not sanctioned and is prohibited. If you received this E-Mail in error, please delete it and advise the sender (by return E-Mail or otherwise) immediately. This E-Mail (including any attachments) has been scanned for viruses. It is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free. The sender accepts no responsibility for any loss or damage arising in any way from its use. E-Mail received by or sent from RBC Capital Markets is subject to review by Supervisory personnel. Such communications are retained and may be produced to regulatory authorities or others with legal rights to the information. IRS CIRCULAR 230 NOTICE: TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES OR TO PROMOTE, MARKET, OR RECOMMEND TO ANOTHER PARTY ANY TRANSACTION OR MATTER. Please see link for RBCCM disclosures. https://www.rbccm.com/rbccm/policies-disclaimers.page

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 12

# FILED UNDER SEAL

Works for me as well.

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 23, 2021 10:15 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Megan Davis <megan.davis@primexx.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** RE: Bi-Weekly Meeting-Reschedule Again? [External]

That window works for me.

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Wednesday, June 23, 2021 10:14 AM
**To:** Megan Davis <megan.davis@primexx.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** RE: Bi-Weekly Meeting-Reschedule Again? [External]

Yes, thanks.

I can free up 11:30-3pm EST on Friday (or other times if those don't work).

**From:** Megan Davis <megan.davis@primexx.com>
**Sent:** Wednesday, June 23, 2021 10:05 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** Bi-Weekly Meeting-Reschedule Again? [External]

Angelo, Erik, Mark: I am looking at potentially rescheduling the Bi-weekly board meeting again from tomorrow afternoon to Friday morning, with the idea that we are more likely to have a material update on Capitan by Friday morning. Would you guys like to move the meeting to Friday morning? If so, please let me know your availability, and I will check general board availability based on the window you provide.

*Megan Davis*
*General Counsel and Secretary*
*Primexx Energy Partners*
*Two Energy Square*
*4849 Greenville Ave*
*Dallas TX, 75206*
*O-469.547.2078*
*M-214.218.1639*



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

BPP_0018469

# EXHIBIT 14

# FILED UNDER SEAL

0112

To: Acconcia, Angelo[acconcia@Blackstone.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Li, Patricia[Patricia.Li@Blackstone.com]
From: Habachy, David[david.habachy@warburgpincus.com]
Sent: Tue 3/9/2021 4:24:58 PM Coordinated Universal Time
Subject: RE: Tall City/Primexx [External]

Erik,

I caught up with Mike Oestmann at Tall City and they are good with the plan forward. Also, just to confirm, each company will be presenting their view of their own asset as well as the other's asset to each of us. Just wanted to make sure that both teams were prepared to speak to both assets.

Thanks, and let's set things in motion with RBC.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Sunday, March 7, 2021 7:28 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Great. Thanks. Lets connect then. Including Erik on our end as well (Erik let us know if this doesn't work).

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Sunday, March 7, 2021 8:15 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

5 p.m. CT / 6 p.m. ET tomorrow would work for a call. Good weekend, hope you had the same Angelo.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Sunday, March 7, 2021 1:35 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks. Friday was back to back. How does your tomorrow night look (or any windows earlier in the day).

Hope your weekend is going well.
Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, March 4, 2021 9:02 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

No worries Angelo, I understand. How does a catch-up call tomorrow in the 4-6 p.m. ET window work for you?

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, March 4, 2021 9:29 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Apologies for the delay. We have been tied up on a number of fronts.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

Think Peter reached out to David to connect here and discuss. Lets connect after their next conversation if that works.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Monday, February 22, 2021 11:15 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

I think we can accomplish both simultaneously. What about having an agreed-upon investment bank participating on both calls? Happy to discuss tomorrow, as well.

We managed through the week. Pretty crazy week, no power and water for a few days. We were walking around in ski gear trying to stay warm! We've got some busted pipes outside with the pool and the water hose spigots, but all things considering we managed pretty well given no issues inside the house. So, a lot to deal with in the aftermath, but all manageable.

We're not tough like you guys up north!

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Monday, February 22, 2021 8:32 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks David. I hope you and your family have been well amidst the challenging conditions.

I would suggest we setup a call with each mgnt team for early next week and then go from there to see if it makes sense to engage a bank.

Our team is willing to put together a short presentation for you / Warburg to review as part of this.

Let me know if you would like to further discuss.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Friday, February 19, 2021 3:36 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

Angelo,

Just coming up for air from snow, ice, no water, and no power...been fun down here in Texas this week!

Thought I'd check in and see how your conversation with Chris went and what your thoughts are on engaging a 3rd party investment bank?

Thanks, and have a good weekend man.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 8:20 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks. What is the best number to reach you at?

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, February 11, 2021 9:19 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

No worries at all Angelo. I'm free until 11 a.m. ET, if anything before then works.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 8:18 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Apologies – my call is running late. You free later this morning?

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, February 11, 2021 8:53 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

9:20 ET? Sure

Get Outlook for iOS

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 7:40:06 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
I have a 9am but could end earlier. Can I try you around 9:20am if it does? If not, happy to connect later today.

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Wednesday, February 10, 2021 10:13 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

Angelo, good catching up today man.

Wanted to run something by you if you have a moment in the a.m. How does 8:15 a.m. CT / 9:15 a.m. ET work for a call tomorrow?

Thanks,

David

Get Outlook for iOS

---

**From:** Habachy, David
**Sent:** Wednesday, February 10, 2021 11:07:37 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

Angelo,

Here's the slide that we'll talk from on our call later this afternoon. Thanks, and talk then.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Friday, February 5, 2021 12:54 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

[**EXTERNAL EMAIL**]
Great. Looking forward to it.

Have a good weekend.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Friday, February 5, 2021 1:22 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>; Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

Angelo, more for us on the Blackstone and Warburg sides. We'll have our deal team on our side for the call.

Look forward to catching up. Have a good weekend.


David


Get Outlook for iOS

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 4, 2021 1:06 PM
**To:** Habachy, David
**Cc:** Li, Patricia; Acconcia, Angelo
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks for reaching out. Would suggest a call on Tues / Wed.

Would you prefer principals only or mgnt. Copying my assistant here who can help coordinate a call.

Best,
Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Wednesday, February 3, 2021 1:30 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Tall City/Primexx [External]

Angelo,

Hope you're well and off to a good start for 2021. Here's to a better year this year!

Thought it made sense to touch base on a Warburg/Blackstone phone call on where things settled out with Tall City and Primexx. Both teams data shared and had a number of discussions around a potential combination. We've got enough to put numbers on paper and wanted to share that high-level view with you and your team.

What works for a call next week to catch up on this? Look forward to catching up. I also think Peter separately reached out to David on the same topic.


David

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

---

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

---

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

EXHIBIT 15

FILED UNDER SEAL

To: Punches II, Richard[richard.punches@eigpartners.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Chris Doyle[chris.doyle@primexx.com]
From: Acconcia, Angelo[acconcia@Blackstone.com]
Sent: Wed 2/3/2021 4:55:58 PM Coordinated Universal Time
Subject: RE: [EXT] Primexx / Rosehill [External]

Ok.

**From:** Punches II, Richard <richard.punches@eigpartners.com>
**Sent:** Tuesday, February 2, 2021 11:39 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Chris Doyle <chris.doyle@primexx.com>
**Subject:** RE: [EXT] Primexx / Rosehill [External]

Angelo,

Thanks for the email and follow up from our conversation. I've thought further on this and think we should hold off for now. We just got a new CEO in the Company late last year. If ok with you guys perhaps we could circle back on the topic in a couple months...

Richard



GLOBAL ENERGY PARTNERS

Richard K. Punches > Managing Director > richard.punches@eigpartners.com

Three Allen Center > 333 Clay Street > Suite 3500 > Houston, TX 77002 > (o) 713.615.7415 > (m) 713.828.0482 > (f) 713.615.7456

The information contained in this email is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient of this email, please promptly notify the sender that you have received it and delete all copies of this email along with all attachments.

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Monday, February 1, 2021 8:45 PM
**To:** Punches II, Richard <richard.punches@eigpartners.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Chris Doyle <chris.doyle@primexx.com>
**Subject:** [EXT] Primexx / Rosehill

Richard,

Hope all is well. Enjoyed catching-up last week. We have a one-pager on Primexx we could share with you. Wanted to see if you had the same on Rosehill in which case we could exchange one-pagers and could setup a call for you to connect with Chris Doyle (Primexx's CEO) to discuss further.

Best,
Angelo

Angelo G. Acconcia
Senior Managing Director
Private Equity
The Blackstone Group
345 Park Avenue, 43rd Floor
New York, NY 10154
T: 212.583.5211
F: 212.201.2874
M: 917.747.0987

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 16

# FILED UNDER SEAL

**To:** 'Trauber, Stephen '[stephen.trauber@citi.com]; Acconcia, Angelo[acconcia@Blackstone.com]
**Cc:** Belz, Erik[Erik.Belz@Blackstone.com]; Schlopy, Fritz[fritz.schlopy@citi.com]; Tismen, Serge[serge.tismen@citi.com]; Fernandez, T[t.fernandez@citi.com]
**From:** Foley, David[foley@blackstone.com]
**Sent:** Sun 6/13/2021 3:19:48 PM Coordinated Universal Time
**Subject:** RE: Primexx [External]

I can do it at the 8:15pm Eastern time proposed. Can do it anytime later this evening too, but can not join a call between 5:30 and 7:30pm.

---

**From:** Trauber, Stephen <stephen.trauber@citi.com>
**Sent:** Sunday, June 13, 2021 11:14 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Foley, David <foley@blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Schlopy, Fritz <fritz.schlopy@citi.com>; Tismen, Serge <serge.tismen@citi.com>; Fernandez, T <t.fernandez@citi.com>
**Subject:** RE: Primexx [External]

Let's assume we can do it. Waiting to hear from our team. Cc'd our team here

Stephen M. Trauber
Vice Chairman & Global Co-Head of
Natural Resources & Clean Energy Transition
Citi
811 Main St., Suite 3900
Houston, TX 77002
(O) 713-821-4800
(C) 713-306-3325

**Please excuse all typos**
Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** [Blackstone.com] Acconcia, Angelo <acconcia@Blackstone.com>
**Date:** Sunday, Jun 13, 2021, 11:04 AM
**To:** Trauber, Stephen [ICG-BCMA] <st98993@imcnam.ssmb.com>
**Cc:** Foley, David <foley@blackstone.com>, Belz, Erik <Erik.Belz@Blackstone.com>
**Subject:** Re: Primexx [External]

Just citi.

---

**From:** Trauber, Stephen <stephen.trauber@citi.com>
**Sent:** Sunday, June 13, 2021 11:00 AM
**To:** Acconcia, Angelo
**Cc:** Foley, David; Belz, Erik
**Subject:** RE: Primexx [External]

With client or just Citi?

Stephen M. Trauber
Vice Chairman & Global Co-Head of
Natural Resources & Clean Energy Transition
Citi
811 Main St., Suite 3900
Houston, TX 77002
(O) 713-821-4800
(C) 713-306-3325

**Please excuse all typos**
Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** [Blackstone.com] Acconcia, Angelo <acconcia@Blackstone.com>
**Date:** Sunday, Jun 13, 2021, 10:48 AM
**To:** Trauber, Stephen [ICG-BCMA] <st98993@imcnam.ssmb.com>
**Cc:** Foley, David <foley@blackstone.com>, Belz, Erik <Erik.Belz@Blackstone.com>
**Subject:** Primexx

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

Could you and the senior members of the Capitan Citi team do a call tonight at 8:15pm est? Chris will join as well.

Angelo

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| § | |
| PRIMEXX ENERGY OPPORTUNITY FUND, LP and PRIMEXX ENERGY OPPORTUNITY FUND II, LP,  §  §  §  § | IN THE BUSINESS COURT |
| Plaintiffs,  § | |
| v.  §  § | FIRST BUSINESS COURT DIVISION |
| PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE INC., BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP, BCP VII/BEP II HOLDINGS MANAGER LLC, BX PRIMEXX TOPCO LLC, and BPP HOLDCO LLC,  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  §  § | DALLAS COUNTY, TEXAS  **CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL OR AEO** |
| Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO THE SPECIAL APPEARANCE OF ANGELO ACCONCIA

# Table of Contents

**I.   New Evidence Confirms Mr. Acconcia's Robust Purposeful Contacts in Texas**............................................................... 2

**II. This Court Has Specific Jurisdiction Over Mr. Acconcia** ....... 4

**III.   Conclusion**............................................................... 9

ii

0125

## Table of Abbreviations

| Abbreviation | Definition |
|---|---|
| PEC | Primexx Energy Corporation |
| BPP HoldCo | BPP HoldCo LLC |
| Partnership Agreement | Third Amended and Restated Limited Partnership Agreement |

0126

Now that Plaintiffs have completed the Court-ordered jurisdictional deposition of Angelo Acconcia, Plaintiffs submit the following Supplemental Opposition in further support of Plaintiffs' November 13, 2024 Opposition to the Special Appearance of Angelo Acconcia.[1]

Plaintiffs deposed Mr. Acconcia on February 21, 2025. Ex. 1. The deposition revealed that:

- Mr. Acconcia physically traveled to Texas to meet in-person with the PEC executive team in June 2021 when Mr. Acconcia, Blackstone, and PEC were actively working to execute the Callon Sale.

- Mr. Acconcia repeatedly initiated both email and telephone communications with PEC's Texas-based executives and Texas-based third-party investment bankers about the Callon Sale while either he or those individuals were located in Texas.

- Mr. Acconcia had a carried interest in Blackstone's Primexx investment that gave him a personal financial stake in the performance of Primexx.

Mr. Acconcia's deposition and the limited documents produced by Blackstone thus far leave no remaining doubt that this Court has specific personal jurisdiction over Mr. Acconcia.

---

[1] Plaintiffs incorporate in full their November 13, 2024, Opposition to the Special Appearance of Angelo Acconcia, which describes the background and legal standard in further detail.

1

**I.  New Evidence Confirms Mr. Acconcia's Robust Purposeful Contacts in Texas**

In addition to the evidence previously submitted, Mr. Acconcia's jurisdictional deposition and accompanying documents reveal the following additional information:

Mr. Acconcia routinely conducted business related to Primexx *while he was physically located in Texas*, including meeting with the PEC executive team in Dallas:

- Mr. Acconcia traveled to Dallas in early June 2021 to meet with the PEC leadership team. Ex. 1 at 53:4-55:4; Ex. 2.

- In late June 2021, Mr. Acconcia flew to Houston for meetings and called Mr. Doyle, who was located in Texas, while in Houston. Ex. 3; Ex. 1 at 48:2–49:16.

- Mr. Acconcia had "back to back" meetings in Houston on June 30, 2021. Ex. 4; Ex. 1 at 57:13–59:14.

Mr. Acconcia's work on the Primexx investment, as head of Blackstone's deal team managing Blackstone's multi-hundred million dollar Primexx investment, involved repeatedly meeting and corresponding with PEC executives while they were located in Texas:

- Mr. Acconcia played a role in Blackstone's decision to enter into the Partnership Agreement, and he served as a member of both the investment team and the investment committee at Blackstone that decided to invest in Primexx in Texas. Ex. 1 at 31:16–23; 33:9–34:2.

2

- Mr. Acconcia's role on Blackstone's deal team for Primexx included his role as a Director of Primexx Energy Corporation and involved working on the Primexx investment in the 2016-2021 time period, including during the Callon Sale. Ex. 1 at 41:21–43:18.

- After signing the Partnership Agreement, Mr. Acconcia took on a set of "continuing obligations" over a series of years that required his "general involvement over a period of time" during which he was "generally involved in the activities related to Primexx" over that time. Ex. 1 at 42:10–43:18.

- Mr. Acconcia participated in "bi-weekly meetings" with the Texas-based PEC executive team and board. Ex. 6; Ex. 1 at 67:10–69:3.

- A PEC board meeting on June 9, 2021, was held "in person in Dallas, Texas and via teleconference." Ex. 5. Mr. Acconcia actively participated in the meeting and discussed Primexx's strong operational position while the Board evaluated next steps. Ex. 5; Ex. 1 at 71:17–76:22.

Mr. Acconcia organized and participated in meetings with finance executives and investment bankers located in Texas to discuss the Callon Sale or Primexx's potential collaboration with other Texas oil companies:

- In June 2021, Mr. Acconcia organized and initiated a call with Citibank investment bankers based in Houston regarding the Callon Sale. Ex. 7; Ex. 1 at 83:11–87:2. Citibank represented Callon in the Callon Sale. Ex. 1 at 86:24–87:2.

- In April 2021, Mr. Acconcia organized and initiated a call with the PEC executive team and RBC bankers based in Houston titled "Primexx/ RBC/ BX re: general status and next steps discussion." Ex. 8; Ex. 1 at 62:11–64:15.

3

- Mr. Acconcia arranged a call and discussed a potential Primexx collaboration with an oil and gas company based in Midland, Texas with an investor from Warburg Pincus while that investor was located in Texas. Ex. 9 (investor writing to Mr. Acconcia that it has "been fun down here in Texas this week"); Ex. 1 at 79:14–80:5.

- Mr. Acconcia reached out to an investment banker based in Houston's office of Global Energy Partners regarding a potential Primexx collaboration with an oil and gas company in the Permian Basin. Ex. 10; Ex. 1 at 80:22–83:10.

Mr. Acconcia had a personal financial interest in the Primexx investment:

- As part of his compensation from Blackstone Inc., Mr. Acconcia had a carried interest in Blackstone's Primexx investment. Ex. 1 at 38:23–39:8 ("Q. So did you expect that your personal earnings could be higher or lower depending on the profitability of Blackstone's investment in Primexx? A. Generally speaking, yes.").

## II.  This Court Has Specific Jurisdiction Over Mr. Acconcia

When evaluating whether a court has specific jurisdiction over a particular defendant, the "plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the terms of the Texas long-arm statute." *Vak v. Net Matrix Sols., Inc.*, 442 S.W.3d 553, 558 (Tex. App.—Houston [1st Dist.] 2014, no pet.). The court can "consider both a plaintiff's pleadings *and its response to the defendant's special appearance* in determining whether the plaintiff satisfied its

4

burden." *Id.* (emphasis added). When a plaintiff makes allegations sufficient "to bring a nonresident defendant within the provisions of the long-arm statute," the specially appearing defendant "carries the burden of negating all bases of personal jurisdiction." *BMC Software*, 83 S.W.3d at 793. Here, the Plaintiffs' allegations and the record evidence establish specific jurisdiction over Mr. Acconcia.

The record confirms that Mr. Acconcia has substantially more than the required "minimum contacts" with Texas such that the exercise of specific jurisdiction "does not offend traditional notions of fair play and substantial justice."[2] *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017). First, with respect to minimum contacts, Mr. Acconcia "purposefully avail[ed]" himself of conducting business in Texas. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Mr. Acconcia traveled to Dallas in early June 2021 to meet with the PEC leadership team. Ex. 2. Mr. Acconcia

---

[2] Texas has a broad long-arm statute that encompasses any "acts that may constitute doing business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The Texas Supreme Court has thus established that "Texas's long-arm statute 'extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will permit.'" *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, 512 S.W.3d 878, 885 (Tex. 2017) (quoting *BMC Software Belgium, NV. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).

0131

communicated with Mr. Doyle regarding Primexx while Mr. Acconcia was conducting meetings in Texas. Ex. 3. Mr. Acconcia actively contributed to PEC board meetings regarding Primexx operations in the lead-up to the Callon Sale while participants were located in Texas. Ex. 5. Mr. Acconcia conducted outreach and arranged calls regarding Primexx, including the Callon Sale, with bankers located in Texas. Exs. 7–9. Taken together, Mr. Acconcia purposefully availed himself of the resources of Texas in order to take on "continuing obligations" over a multi-year period to conduct business in Texas on behalf of Blackstone and for his own financial benefit.[3]

---

[3] The fact that Mr. Acconcia seemingly conducted his activities in Texas on behalf of or in connection with his Blackstone Inc. employment does not defeat either personal jurisdiction or the merits of the claims against Mr. Acconcia. The Texas Supreme Court recently reiterated that "independent of the 'vicarious' liability that may be imposed on corporate shareholders and officers based on veil-piercing theories, we have also long held that corporate agents are 'personally liable for [their] own fraudulent or tortious acts' 'even though they were acting on behalf of the corporation.'" *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024) (quoting *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002)).

It follows that the fiduciary shield doctrine does not apply to the exercise of *specific jurisdiction* over an individual acting in a corporate capacity. *See, e.g.*, *Tabacinic v. Frazier*, 372 S.W.3d 658, 669 (Tex. App.—Dallas 2012, no pet.) ("Because this specific jurisdiction case includes allegations sounding in tort for which [individual defendants] may be held individually liable, the fiduciary shield doctrine does not apply."); *Cagle v. Clark*, 401 S.W.3d 379, 392 (Tex. App.—Texarkana 2013, no pet.) (finding specific jurisdiction over corporate officer because the "fiduciary shield doctrine does not apply because general jurisdiction is not at issue").

6

Mr. Acconcia's established contacts far exceed what Texas courts have deemed sufficient to establish specific jurisdiction.[4] *See, e.g., Yujie Ren v. ANU Res., LLC*, 502 S.W.3d 840, 848 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("[A] single contact may be sufficient to establish specific jurisdiction."); *Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W.3d 157, 163 (Tex. App.—Fort Worth 2008, no pet.) (finding specific jurisdiction based on remote participation in telephonic board meetings with shareholders based in Texas); *Fjell Tech. Group v. Unitech Int'l, Inc.*, No. 14-14-00255-CV, 2015 WL 457805, at *6 (Tex. App.—Houston [14th Dist.] Feb. 3, 2015, pet. denied) (finding specific jurisdiction when foreign company sought to profit from mails sent into Texas).

As to the second part of the minimum contacts analysis, Plaintiffs' claims against Mr. Acconcia "arise[] from or [are] related to" his Texas "contacts or activities." *See Retamco*, 278 S.W.3d at 337. Plaintiffs allege that Mr. Acconcia knowingly participated in, and aided and abetted, the

---

[4] For example, there could still be specific jurisdiction over Acconcia even if he never entered the state of Texas in connection with Primexx. *See Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009) ("[J]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state.") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

7

Blackstone Defendants' and PEC's breaches of fiduciary duty. Those alleged beaches began "in the months leading up to the Callon Sale," when Acconcia "actively participated in, and facilitated, Blackstone's and PEC's failure to evaluate Primexx's viable options" and their "failures to conduct a proper due diligence, sale, or marketing process." First Amended Petition at ¶¶ 71–72. Mr. Acconcia ultimately "played a central role in forcing the Board to approve" the Callon Sale. First Amended Petition at ¶¶ 83. Mr. Acconcia's intentional contacts with Texas, as discussed above, relate to Mr. Acconcia's ongoing management of Primexx throughout 2021 in the lead-up to the Callon Sale and his involvement in the Callon Sale itself.

For the reasons discussed in Plaintiffs' November 13, 2024, Opposition to the Special Appearance of Angelo Acconcia, the exercise of specific jurisdiction over Mr. Acconcia "does not offend traditional notions of fair play and substantial justice." *See M&F Worldwide Corp.*, 512 S.W.3d at 88. Mr. Acconcia is not unduly burdened by appearing in Texas, especially considering his travel to Texas in connection with his role as a director of PEC, a Texas corporation, in which Mr. Acconcia represented the majority shareholder. *See Moncrief Oil*, 414 S.W.3d at 155. Texas has

8

a compelling interest in adjudicating the claims against Mr. Acconcia, which involve Mr. Acconcia's active leadership of a Texas corporation's sale of oil assets physically located in Texas to another oil company based in Texas—including Mr. Acconcia's physical travel to Texas and repeated communication with executives and investors located in Texas, all while seeking to personally profit thanks to his carried interest in the Primexx investment.

## III.     Conclusion

This Court should deny Mr. Acconcia's Special Appearance on the basis of Plaintiffs' November 13, 2024, Opposition to the Special Appearance of Angelo Acconcia and this Supplemental Opposition, including the evidence revealed at the jurisdictional deposition of Mr. Acconcia and the accompanying documents.

Dated: March 7, 2025                    Respectfully submitted,

                                        SUSMAN GODFREY L.L.P.


                                        By: */s/ Stephen Shackelford, Jr.*
                                            Stephen Shackelford, Jr.
                                            State Bar No. 24062998 (TX)
                                            sshackelford@susmangodfrey.com
                                            SUSMAN GODFREY L.L.P.

9

0135

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Marc M. Seltzer
(*pro hac vice forthcoming*)
State Bar No. 54534 (CA)
mseltzer@susmangodfrey.com
Bryan Caforio (*pro hac vice*)
State Bar No. 261265 (CA)
bcaforio@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Lindsey Godfrey Eccles (*pro hac vice*)
State Bar No. 33566 (WA)
leccles@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Sarah Hannigan (*pro hac vice*)
State Bar No. 5961248 (NY)
shannigan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

0136

*Attorneys for Plaintiffs Primexx
Energy Opportunity Fund, LP
and Primexx Energy Opportunity
Fund II, LP*

11

## Certificate of Service

This is to certify that on March 7, 2025, a true and correct copy of the above and foregoing instrument was properly forwarded to counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure.

*/s/ Stephen Shackelford, Jr.*
Stephen Shackelford, Jr.

0138

# EXHIBIT 1

# FILED UNDER SEAL

# In the Matter Of:

*PRIMEXX ENERGY OPPORTUNITY FUND vs*

*PRIMEXX ENERGY*

*ANGELO ACCONCIA*

*February 21, 2025*



0140

NO. 24-BC01B-0010

PRIMEXX ENERGY                    : IN THE BUSINESS COURT
OPPORTUNITY FUND, LP AND :
PRIMEXX ENERGY                    :
OPPORTUNITY FUND II, LP, :
                                  :
            Plaintiff,            :
                                  : FIRST BUSINESS COURT
     vs.                          : DIVISION
                                  :
PRIMEXX ENERGY                    :
CORPORATION, M.                   :
CHRISTOPHER DOYLE,                :
ANGELO ACCONCIA,                  :
BLACKSTONE INC.,                  :
BLACKSTONE HOLDINGS III :
LP, BLACKSTONE EMA II             :
LLC, BMA VII LLC,                 : DALLAS COUNTY, TEXAS
BLACKSTONE ENERGY                 :
MANAGEMENT ASSOCIATES             :
II LLC, BLACKSTONE                :
ENERGY PARTNERS II LP,            :
BLACKSTONE MANAGEMENT             :
ASSOCIATES VII LLC,               :
BLACKSTONE CAPITAL                :
PARTNERS VII LP, BCP              :
VII/BEP II HOLDINGS               :
MANAGER LLC, BX PRIMEXX :
TOPCO LLC, AND BPP                :
HOLDCO LLC,                       :
                                  :
            Defendants.           :

                    CONFIDENTIAL

      VIDEOTAPED STENOGRAPHIC DEPOSITION OF
                 ANGELO ACCONCIA
               NEW YORK, NEW YORK
            FRIDAY, FEBRUARY 21, 2025


                 (Reported Remotely)


REPORTED BY:  TANYA L. VERHOVEN-PAGE,
              CCR-B-1790
FILE NO.  2025-972806

## Page 2

February 21, 2025

9:05 a.m.

Videotaped stenographic deposition of ANGELO ACCONCIA, held in New York, New York before Tanya L. Verhoven-Page, Certified Court Reporter (GA), Licensed Court Reporter (TN) and Certified Shorthand Reporter (TX).

## Page 3

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

SUSMAN GODFREY, LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, California 90067
(310) 789-3100
BY:  BRYAN CAFORIO, ESQ.
     e-mail: bcaforio@susmangodfrey.com
     (Via Zoom)
SUSMAN GODFREY, LLP
One Manhattan West
New York, New York 10001-8602
(212) 336-8330
BY:  SARAH HANNIGAN, ESQ.
     e-mail: shannigan@susmangodfrey.com
     (Via Zoom)

On behalf of Defendant Blackstone and Angelo Acconcia:

LYNN, PINKER, HURST & SCHWEGMANN
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
(214) 981-3800
BY:  YAMAN DESAI, ESQ.
     e-mail: ydesai@lynnllp.com
BY:  KYLE GARDNER, ESQ.
     e-mail: kgardner@lynnllp.com
     (Via Zoom)

## Page 4

APPEARANCES OF COUNSEL

On behalf of Defendant Primexx Energy Corporation:
KIRKLAND & ELLIS, LLP
401 Congress Avenue
Austin, Texas 78701
(512) 678-9100
BY:  ZACK C. EWING, ESQ.
     e-mail: zack.ewing@kirkland.com
     (Via Zoom)

On behalf of Defendant M. Christopher Doyle:
TROUTMAN PEPPER LOCKE, LLP
2200 Ross Avenue
Suite 2800
Dallas, Texas 75201
(214) 740-8000
BY:  TAYLOR LEVESQUE, ESQ.
     e-mail: taylor.levesque@troutman.com
     (Via Zoom)

ALSO PRESENT:
Kenneth Inoa, Videographer

-   -   -

## Page 5

I N D E X

WITNESS: ANGELO ACCONCIA

Examination                                Page

BY MR. CAFORIO                              10

## Page 6

EXHIBITS INDEX:

Deposition
(Acconcia)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 1 | Plaintiffs' First Amended Petition | 21 |
| Exhibit 2 | Document bearing Bates numbers BPP_0018525 through BPP_0018527 | 46 |
| Exhibit 3 | Document bearing Bates number BPP_0017994 | 53 |
| Exhibit 4 | Document bearing Bates numbers BPP_005953 through BPP_005954 | 55 |
| Exhibit 5 | Document bearing Bates numbers BPP_0016545 through BPP_0016546 | 60 |
| Exhibit 6 | Document bearing Bates numbers BPP_0017552 through BPP_0017553 | 62 |
| Exhibit 7 | Document bearing Bates number BPP_0018469 | 65 |
| Exhibit 8 | Document bearing Bates numbers PRIMEXX029462 through PRIMEXX029468 | 70 |
| Exhibit 9 | Document bearing Bates numbers BPP_0017182 through BPP_0017187 | 77 |
| Exhibit 10 | Document bearing Bates number BPP_0016597 | 80 |
| Exhibit 11 | Document bearing Bates numbers BPP_0018234 through BPP_0018235 | 84 |

## Page 7

EXHIBITS INDEX:

Deposition
(Acconcia)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 12 | Document bearing Bates numbers BPP_0006569 through BPP_0006570 | 88 |
| Exhibit 13 | Document bearing Bates numbers BPP_0019155 through BPP_0019157 | 91 |

## Page 8

NEW YORK, NEW YORK; FRIDAY, FEBRUARY 21, 2025

9:05 A.M.

P R O C E E D I N G S

THE VIDEOGRAPHER: The time is 9:05 a.m. Eastern Time on February 21st, 2025, and we're going on the record for the remote video deposition of Angelo Acconcia in the matter of Primexx Energy Opportunity Fund, et al. versus Blackstone, et al.

My name is Kenneth Inoa, and I'm the legal videographer on behalf of LEXITAS.

Will counsel please introduce themselves and state their firm and who they represent, beginning with the party noticing this proceeding.

MR. CAFORIO: Bryan Caforio from Susman Godfrey on behalf of Plaintiffs.

MR. DESAI: Yaman Desai. I'm here with Kyle Gardner, from Lynn, Pinker, Hurst & Schwegmann, on behalf of Mr. Acconcia, and we also represent the

## Page 9

various Blackstone Defendants.

MR. EWING: Good morning. This is Zack Ewing, from Kirkland & Ellis, on behalf of Primexx Energy Corporation.

MR. LEVESQUE: This is Taylor Levesque, at Troutman Pepper Locke, on behalf of Defendant Christopher Doyle.

MS. HANNIGAN: And Sarah Hannigan, from Susman Godfrey, on behalf of Plaintiffs.

MR. DESAI: And, Sarah and Bryan, before we get started, I haven't gotten the exhibits yet.

Oh, actually, I take that back. They just went through. I'm fine.

THE VIDEOGRAPHER: All right. If that concludes our introductions, will the court reporter please swear or affirm in the witness.

Thereupon --

ANGELO ACCONCIA,

called as a witness, having been first duly sworn, was examined and testified as follows:

Page 10

EXAMINATION

BY MR. CAFORIO:

Q   All right.  Good morning, Mr. Acconcia.
My name is Bryan Caforio, and I represent the
Plaintiffs, Primexx Opportunity Fund and Primexx
Opportunity Fund II, in this litigation.

I'll be asking you questions on behalf of
those entities today.

You understand that, even though we're
doing this remotely, you are under oath for this
deposition?

A   I do.

Q   And you understand that your answers are
being transcribed by a court reporter throughout the
deposition?

A   I do.

Q   And you understand that you are being
video-recorded today, as well?

A   I do.

Q   And you understand that this deposition
is taken in a case pending in the Texas Business
Court in Dallas, right?

A   I assume that that's the case.  I don't
have specific knowledge as to exactly where this case
is pending.

Page 11

Q   Okay.  And we'll show you the petition in
a minute and you can see that, but do you understand
that your deposition testimony may be used in this
proceeding and shown to the judge in this case?

A   I do.

Q   Have you ever been deposed before?

A   I have.

Q   How many times?

A   I don't recall specifically, but a few, a
small -- a small number.

Q   More or less five would you say?

A   Less.

Q   Okay.  When was the last time you were
deposed?

A   I don't recall specifically.  I could
generally estimate more than -- call it -- five years
ago.

Q   Okay.  So that was probably an in-person
deposition then, or was it remote, as well?

A   I don't recall.

Q   Okay.  Well, since it is remote, it's a
slightly unusual format doing it this way, and I'll
try to put the exhibits up so you can see them
clearly, but at any time, as we're going, if you have
any technical difficulties, if you can't hear my

Page 12

question, if you can't see an exhibit, just let us
know, and we can work that out so everything goes
smoothly.

Okay?

A   Thank you.

Q   And you're free to take -- I generally
aim to take a break at least every hour.  You're free
to ask for a break, go to the bathroom, get a drink,
whatever you want more frequently than that.  The
only thing I ask is that you don't take a break while
a question is pending but instead answer the question
and then ask to take a break.

Okay?

A   I appreciate it.

Q   Okay.  Is there anything that you would
like to discuss before we begin the deposition today?

A   No.

Q   Okay.  Are you taking any medication
today that affects your ability to answer questions
truthfully and completely?

A   No.

Q   Are you feeling sick today?

A   No.

Q   Is there any other reason you're not able
to testify truthfully and completely today?

Page 13

A   No.

Q   Where are you located geographically for
this deposition?

A   I'm located in New York.

Q   You're in New York.  Okay.

In the city or elsewhere?

A   I'm located in Manhattan.

Q   How did you prepare for today's
deposition?

A   I had a series of calls with my counsel.

Q   Did you review any documents to prepare
for the deposition?

A   No.

Q   Is there anybody in the room with you
right now where you're testifying from?

A   No.  There are people downstairs.  So
there may be some background noise, but nobody in the
room specifically.

Q   Okay.  Do you have any access to any
messaging platforms where a person could communicate
with you during this deposition?

A   I do not have anything visible.

Q   Okay.  What's your current occupation?

A   I am an investor.

Q   Are you employed by a company, or are you

Page 14

self-employed?

A    I am not employed by a company.

Q    And what company is that?

A    ArcLight Capital Partners.

Q    How long have you been at ArcLight?

A    I believe I'm going on my fourth year.

Q    So that takes you back to some time in, say, early 2022? Is that about accurate, or is that timing off?

A    That's about accurate.

Q    Okay. Where were you employed before you started at ArcLight?

A    I was employed at Blackstone.

Q    How long -- when did you start working at Blackstone?

A    I believe it was in 2004.

Q    Were you at Blackstone all the way from 2004 right up until you started working at ArcLight in 2021 or 2022?

A    There was a short period of time between Blackstone and ArcLight where I was on garden leave, but there were no employers in between.

Q    What's garden leave?

A    A period of time where you are between jobs.

Page 15

Q    So essentially at Blackstone from 2004 to the end of 2021, give or take; is that fair?

A    That is accurate.

Q    And I've seen documents that reference at different times Blackstone Group and Blackstone, Inc.

Do you have an understanding if that's the same company or a different company?

A    I do not have specific knowledge.

Q    Do you know who was your actual employer?

A    I do not.

Q    Do you know who actually paid your compensation?

A    I do not know the specific legal entity that paid my compensation.

Q    Okay. You just referred to having worked for Blackstone is how you talked about it?

A    Correct.

Q    Okay. Whether that was Blackstone, Inc. or Blackstone Group, just you worked for Blackstone?

A    That is accurate.

Q    Okay. Can you take me through your job history at Blackstone from 2004 to 2021 if your titles changed at any point?

A    I started in 2004 as an analyst in the private equity group. I don't recall the specific

Page 16

periods of times that I was promoted, but through the course of my time at Blackstone, I was promoted a number of times to the ultimate title of Senior Managing Director.

Q    And Senior Managing Director was the final job title you had when you left Blackstone?

A    That is accurate.

Q    Do you recall, in general, when you started with that title?

A    I don't recall specifically.

Q    Do you recall generally?

A    Generally in the mid teens.

Q    So you reached that position in the mid teens, and you basically had that job title for the remainder of your time at Blackstone?

A    That is correct.

Q    What were your general job responsibilities at Blackstone between 2016 and 2021?

A    I was a member of the investment team, and I was a member of the investment committee.

Q    For the whole of Blackstone or a specific sector at Blackstone?

A    My responsibilities were specific to Blackstone Energy Partners.

Q    And what is Blackstone Energy Partners?

Page 17

A    Blackstone Energy Partners was a group within the private equity group that invested in energy.

Q    And how large was that group?

A    I'm sorry. Can you be more specific?

Q    Well, we can talk about it in multiple different ways, but how much assets under management did you have in that general time period?

A    I don't recall.

Q    Ballpark, 1 billion, 100 billion?

A    More than 1 billion.

Q    Okay. How many people did you work with in your role in that group?

A    I worked with a large part of that group.

Q    And about how many people was that?

A    The group overall was -- I don't recall specifics -- generally speaking, 30 people.

Q    And were you the head of that group, or was there somebody senior to you?

A    There was somebody senior to me.

Q    Who was that?

A    A gentleman named David Foley.

Q    Do you know what his job title was?

A    I believe it was Senior Managing Director and CEO of Blackstone Energy Partners.

Page 18

Q    Was he the only person in the group senior to you, or was there anybody else senior to you?

A    Blackstone Energy Partners was part of the private equity group and interacted with the private equity group.  So in that context, there were other people that were more senior to me.

Q    So Blackstone Energy Partners is within the overall private equity group.  Within Blackstone Energy Partners, Mr. Foley was senior to you, but then, going up the chain to the broader private equity group, there were other people also senior to you?

Is that a fair summary?

A    That is a fair summary.

Q    Did you report to any of those people in the private equity group directly, or did everything go through Mr. Foley on the way up?

A    I reported to Mr. Foley but also other people.

Q    Who else did you report to in that 2016 to 2021 time period besides Mr. Foley?

A    Blackstone is a matrix organization.  So there were a number of people that I interacted with and reported to in one fashion, you know, across the

Page 19

firm.

The person that I directly reported to was named Joe Baratta.

Q    Okay.  A couple things:  What does it mean to be -- what do you mean when you say Blackstone is a matrix organization?

A    Well, there are a lot of different groups that are involved in -- in the business of Blackstone.

Q    And so you would work with people -- are you saying you would work with people in other groups that might not be senior to you?  You weren't reporting to them because you were just kind of equals in different branches who worked together on particular investments?

Is that what you mean?

A    I meant more so that there are different functional groups within Blackstone that are involved in the business of Blackstone where there are reporting relationships or communications.

Q    And the person you said you interacted with regularly was Joe Baratta; is that right?

A    Joe Baratta was one of my direct reports.

Q    And where was he -- where was he at Blackstone?  Was he in a particular group or --

Page 20

A    He was in the private equity group.

Q    He was in Blackstone's private equity group, and then Blackstone Energy Partners fell within that?

A    That is fair.

Q    Do you know what his title was in that time period?

A    I believe it was Senior Managing Director and Head of Global Private Equity, but I do not recall specifically.

Q    Okay.  I'm going to put a document into the chat.  I'm going to put it up on the screen, also, and go through the specific parts I'm going to look at, but it's in the chat for you.  If you want to download it, take a look at it.

For any exhibit that I put up, I'm going to go through it.  I'll share my screen, and there will be specific points that I'll direct you to, but take all the time you want to look at any other portion, or if you can't see some of it on the screen, you need it to -- you know, a different page or whatnot, just let me know.

Okay.  Since we're in different rooms, I can't tell exactly what you're doing, and I want to make sure you're able to see it appropriately.

Page 21

Okay?

A    Thank you.

MR. CAFORIO:  So if the court reporter can mark the document I just shared in the chat as Deposition Exhibit 1.

(Deposition (Acconcia) Exhibit No. 1 was marked for the record.)

BY MR. CAFORIO:

Q    Can you see in front of you a -- a document titled Plaintiffs' First Amended Petition?

Do you see that?

A    I do.

Q    Okay. and so this is the -- I can represent to you this is the current operative version of the petition that was filed -- you see up in the top corner -- on January 24th, 2025, and at the top middle of this first page, it says in the Business Court, First Business Court Division, Dallas County.

Do you see that?

A    I see that on the page.

Q    And that's what I was referencing earlier when I mentioned this was court -- a case pending in the Business Court in Dallas, and here's the actual

Page 22

petition that says that.

Q Have you ever seen the complaint in this case before?

A I have.

Q Okay. Do you recall when you first saw the complaint in this case?

A I do not recall specifically.

Q I'm going to go to Page 14 of this document, and are you looking at an org chart now?

A I see Page 14.

Q Okay. And it appears to be an org chart, and it has Blackstone, Inc. at the top, and then it works its way down through a bunch of entities with BPP HoldCo, LLC at the bottom.

Do you see all that?

A I see the org chart.

Q Are you familiar with this org chart?

MR. DESAI: Objection. Form.

BY MR. CAFORIO:

Q I just want to know if you've seen it before, if this looks familiar to you or not. It's just foundational.

A I do not recall.

Q Okay. Are you familiar with any of the entities that are listed in this org chart?

Page 23

A I'm sorry. Can you be more specific?

Q Well, do you -- as you read the names of the different entities on this org chart, are you familiar with those entities?

Do you recognize those names, or are you unfamiliar with these entities, and you don't recognize those names?

A I do not recall specific legal names or legal entities.

Q Okay. Other than Blackstone, Inc. at the top?

MR. DESAI: Objection. Form.

THE WITNESS: I recognize the name Blackstone. I recognize the name Primexx, and I recognize the name Blackstone Energy Partners, but I do not recall specifics around the legal structure or legal entities.

BY MR. CAFORIO:

Q Other than Blackstone, Inc., do you believe you've ever been employed by any of the entities on this org chart?

MR. DESAI: Objection. Form.

THE WITNESS: My general understanding was that I was employed by

Page 24

Blackstone.

BY MR. CAFORIO:

Q Other than Blackstone, Inc., do you believe you've ever performed work for any of the entities on this org chart?

MR. DESAI: Objection. Form.

THE WITNESS: I worked -- I believe I worked on behalf of Blackstone.

BY MR. CAFORIO:

Q Are you aware of whether you ever received compensation from any of the entities listed on this org chart other than Blackstone?

MR. DESAI: Objection.

THE WITNESS: My general understanding was that I received compensation from Blackstone.

BY MR. CAFORIO:

Q Okay. We can go to Page 69 of this document, which -- actually, go to 68 just to show you. This is Exhibit 1 that's just attached at the back of the petition, and do you see on your screen here what's titled the Third Amended and Restated Limited Partnership Agreement of Primexx Energy Partners Limited?

A I can see that it says Third Amended and

Page 25

Restated Limited Partnership Agreement of Primexx Energy Partners Limited.

Q Are you familiar with the entity Primexx Energy Partners Limited?

A I do not recall that entity specifically.

Q Okay. Well, let's go ahead and skip ahead a little bit to Page 150 of this document.

Can you see that this document appears to be signed by you on behalf of BPP HoldCo, LLC?

Do you see that?

A I see the legal entity BPP HoldCo, LLC, and I see my signature.

Q Okay. And if we go forward a few pages to Page 153, this is Exhibit A to this document, and it has a schedule of partners, and you see the first partner listed there is BPP HoldCo, LLC?

Do you see that?

A I see Exhibit A. I see a list of members, and I see the first member is BPP HoldCo, LLC.

Q And the -- for BPP HoldCo, LLC, it says in care of the Blackstone Group, right?

A It does.

Q And then with attention to you, Angelo Acconcia, right?

Page 26

A    It does.

Q    And that's your e-mail address listed there?

A    That was my e-mail.

Q    And so going back to Page 150, you signed this partnership agreement with the title President of BPP HoldCo, LLC?

Do you see that?

A    I see that it states my name and then reads Its, colon, President.

Q    And you would agree you signed this document as the President of BPP HoldCo; is that correct?

A    I see that is what the document says. I don't recall specifically my role.

Q    Okay. You're not sure if you were President of BPP HoldCo.

A    I do not recall specifically.

Q    If you were President of BPP HoldCo, do you know how long you were President of BPP HoldCo?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q    Do you have any recollection of somebody else being president of BPP HoldCo other than you?

Page 27

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q    Do you have any reason to believe that when you signed this document, Angela Acconcia, President of BPP HoldCo, that you weren't the President of BPP HoldCo when you signed that document?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall specifics.

BY MR. CAFORIO:

Q    Would you have signed a document that says Angelo Acconcia was BPP HoldCo's President if you were not BPP HoldCo's President?

MR. DESAI: Objection. Form.

THE WITNESS: I'm sorry. I don't understand the question.

BY MR. CAFORIO:

Q    That is your signature, right?

A    I believe it is.

Q    Do you recall if you ever received any compensation from BPP HoldCo?

A    I do not believe I received any direct compensation.

Page 28

Q    Let's go back to Page 74 of this document. It's the first page of the -- you can see it's the table of contents and then the first actual page of the Third Amended and Restated Limited Partnership Agreement.

Do you see that?

A    I apologize. Do you mind repeating that.

Q    So I'm just setting the stage. This is the Third Amended Restated Limited Partnership Agreement of Primexx Energy Partners that we looked at earlier, and I'm just going to the first page -- substantive page of that document.

Do you see that?

A    I see the top of the page reads Third Amended and Restated Limited Partnership Agreement. Although, at the top of the PDF, it reads Page 74, and at the bottom, it reads Page 7.

Q    And in the first paragraph of this page, it says that the Third Amended and Restated Limited Partnership Agreement (the "Agreement"), dated as of July 12th, 2016 (the "Effective Date") is made and entered into by and among Primexx Energy Corporation, a Texas Corporation.

Do you see that?

A    I see that on the page.

Page 29

Q    Okay. And then it lists a series of the other counter-parties were various classes of unitholders, correct?

A    I see a number of different groups named here.

Q    And BPP HoldCo was a Series B preferred unitholder, right?

A    I do not recall.

Q    Well, we can go back to your signature on Page 150. Do you see where it says right there, Series B Preferred Unitholder BPP HoldCo, and then you signed it?

A    I now see at the top Series B Preferred Unitholder.

Q    Does that refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    That is what I see on the page.

Q    Does it refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    I don't recall the specifics.

Q    Okay. And if we look at Page 153, this Exhibit A we already looked at, you see it says that BPP HoldCo owned 186,006 Series B Preferred Units.

Do you see that?

A    I see that on the table.

Page 30

Q    Does that refresh your recollection that BPP HoldCo was a Series B Preferred Unitholder?

A    That is what it says on the page. I don't recall specifics.

Q    Now -- I'm going to stop sharing this.

You signed, as we saw, that Third Amended Partnership Agreement on behalf of BPP HoldCo, correct?

A    I saw my signature on the page.

Q    Did you play any role in negotiating the terms of the partnership agreement prior to you signing it?

A    I recall general involvement.

Q    And what was your general involvement?

MR. DESAI:  I am going to object to form.  Object to the extent that the questions relate to matters that are outside of jurisdictional discovery and just keep that as a warning objection so I don't need to interrupt every time, but --

MR. CAFORIO:  Understood.

BY MR. CAFORIO:

Q    You can answer.

A    I apologize.  Do you mind repeating the

Page 31

question?

Q    Yeah.  I -- you said, if I heard you correctly, that you recall a general involvement in the negotiation of the partnership agreement, and so I was just asking for clarification.

What do you mean when you say you had a general involvement in negotiating the terms of the partnership agreement?

A    I was one of several groups that were involved in the discussions around that -- the partnership with -- with Primexx.

Q    Did you receive drafts of the partnership agreement prior to signing it?

A    I don't recall specifically, but I believe I would have.

Q    Did you play any role in making the decision for Blackstone to make its substantial investment into Primexx and enter into the partnership agreement?

A    I did.

Q    What role did you play in Blackstone making the decision to invest in Primexx?

A    I was a member of the investment team.

Q    How many people were on that investment team?

Page 32

A    I don't recall specifically.

Q    More or less than five people?

A    Inclusive of the other groups at Blackstone that were involved, more than five people.

Q    Did you have primary responsibility for recommending Blackstone's investment into Primexx, or did somebody else have primary responsibility?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I don't understand what you mean by primary.

BY MR. CAFORIO:

Q    And I'm just trying to understand.  This is foundational for later questions, and so I could be totally -- misunderstand how the investment process works at Blackstone.  So please correct me, but presumably at some point someone made this recommendation that Blackstone should look into this and make an investment into Primexx, and I just want to know, if that person was you, then we can go into questions on that, or if that person was somebody else, in which case, I can ask you for a name, and I don't need to ask those questions because it wasn't you.

So my question is simply:  Who had primary responsibility for recommending that

Page 33

Blackstone make its investment into Primexx?

A    The investment team makes recommendations to the investment committee, and the investment committee makes decisions.  So I'm struggling with the specifics of the word primary.

This gets back to kind of the matrix nature of Blackstone, and groups are involved in decisions.

Q    And to clarify, were you on the investment team and the investment committee or only one of those?

A    I was both on the investment team and on the investment committee.

Q    Okay.  So -- please correct me if I'm wrong.  I'm just trying to understand it.  It's foundational to ask later questions.  If I'm wrong, I want to know.

So you were part of the investment team that made the recommendation to the investment committee to invest in Primexx; is that correct?

A    I believe that's a fair characterization.

Q    And you were also on the investment committee that decided whether to approve the recommendation from the investment team to invest in Primexx; is that correct?

Page 34

A   I was one of the many members of the investment committee.

Q   Okay.  Was there anybody else on the investment committee who was also on the investment team that recommended that Blackstone make its investment in Primexx?

A   Sorry.  Would you mind repeating the question?

Q   Was there anybody else besides you that you recall being on both the investment team that made the recommendation to invest in Primexx and on the investment committee, or were you the only person who was on both the investment team and the investment committee?

A   Generally speaking, the way it worked was the investment team would discuss within Blackstone Energy Partners and Blackstone Energy -- Blackstone Energy Partners would make -- generally speaking, investments that were taken to investment committee, because that investment committee was broader than Blackstone Energy Partners, it had the support of the other partners within Blackstone Energy Partners, which is why I'm trying to think through the specific aspects of your question.

Q   And how many -- you said it had the

Page 35

support of the other partners at Blackstone Energy Partners.

How many partners were there within the Blackstone Energy Partners group?

A   I don't recall specifically at the time but -- I don't recall specifically at the time.

Q   With regards to Blackstone's investment in Primexx, did you report to Mr. Foley with regards to that investment?

You mentioned earlier just in general Mr. Foley was your senior that you would report to at Blackstone Energy Partners, and so I'm just wondering specifically, for the Primexx investment, was it still the case that you reported to Mr. Foley?

A   This gets back to the fact that Blackstone is a matrix organization.  So there were a number of people that I reported to.

Q   Was Mr. Foley one of them?

A   I believe that's a fair characterization.

Q   Were there any Blackstone employees who reported to you with regards to Blackstone's investment in Primexx?

A   This, again, gets back to more of the matrix nature of Blackstone where, to my recollection and knowledge, there weren't specific legal reporting

Page 36

lines.  There was general group involvement.

Q   And were there Blackstone employees junior to you in the group who worked on Blackstone's investment in Primexx that reported to you, or were you the juniormost Blackstone employee working on the Primexx investment?

A   There were other people that -- that worked with me.  I do not recall there being specific legal reporting lines.

Q   And who were the people at Blackstone who worked with you on the Primexx investment?

A   Sorry.  It's taking me a second to try to recall specifically because there were a number of people.  The person who comes to mind -- one of the people that come to mind is Erik Belz.

Q   Anybody else?

A   I don't recall specifically.

Q   Now, was there at Blackstone some sort of deal team that worked on Blackstone's Primexx investment?

A   Generally speaking, there were deal teams.

Q   And I've seen references in documents -- and we might look at some later but that referred to the Primexx deal team as including you, Anika Gautam,

Page 37

Mark Henle, Erik Belz and David Foley.

Does that sound accurate for who was part of the Blackstone/Primexx deal team?

A   Those names are familiar to me.  I do not recall specific roles.

Q   Okay.  Do you recall whether that group of people at Blackstone worked on the Primexx investment?

A   I recall some of their involvement.

Q   Whose involvement do you recall?

A   David Foley and Erik Belz.

Q   But you don't have a recollection right now of work that Anika Gautam performed?

A   I do not recall.

Q   Or Mark Henle?

A   I do not recall.

Q   Are you familiar with Ms. Gautam and Mr. Henley, in general, and you just don't recall that they worked on the Primexx investment, or are you unfamiliar with those names?

A   The names are familiar to me.  I just don't recall their involvement.

Q   In the Primexx investment?

A   Correct.

Q   One way or the other?

Page 38

A    I do not recall their specific involvement in the Primexx investment.

Q    Okay.  And what was Mr. Belz -- is that B-E-L-Z; is that right?

A    I believe that's correct.

Q    Okay.  What was Mr. Belz's involvement in the Primexx investment for Blackstone?

A    Erik Belz was a member of the investment team.

Q    Was he junior or senior to you or same level as you?

A    Erik Belz was junior. to me.

Q    Okay.  So for the people you remember working as part of the Primexx deal team, Mr. Belz was junior to you and you were junior to Mr. Foley; is that accurate?

A    I believe so.

Q    As part of your compensation from Blackstone, did you personally have any carried interest in Blackstone's investment in Primexx?

A    I apologize.  Do you mind repeating the question, Bryan?

Q    Yeah.  As part of your compensation package at Blackstone, did you personally have any carried interest in Blackstone's investment in

Page 39

Primexx?

A    I had a carried interest in our investment fund, which was indirectly associated with Primexx.

Q    So did you expect that your personal earnings could be higher or lower depending on the profitability of Blackstone's investment in Primexx?

A    Generally speaking, yes.

Q    Let's go back to Exhibit 1 that we already looked at.  I'll put something on the screen for you.

Do you see, again, this page we already looked at of the Third Amended and Restated Limited Partnership Agreement of Primexx Energy Partners?

A    I see the page you put up on the screen.

Q    And if you go to the fifth whereas clause under the recitals on that first page, there's a reference to Blackstone Capital Partners VII, L.P. and Blackstone Energy Partners II L.P. (the "Blackstone Investors").

Do you see that?

A    I do.

Q    Do you recognize those two entities?

A    Generally speaking, yes.

Q    And just generally, what -- what are

Page 40

those entities in your understanding?

A    I believe they were investment funds.

Q    Are those the funds that you referenced earlier that you had a carried interest in that would make your personal compensation higher or lower depending upon the profitability of Blackstone's Primexx investment?

A    I believe that's a fair characterization. Although, I would say it could relative to what -- because there are a number of factors and considerations that went into the calculation of the carried interest for the funds.

THE WITNESS:  And I apologize.  Do you mind if we take -- we're coming up on the hour.  Do you mind if we take a nature break?

MR. CAFORIO:  Yeah, yeah.  Do you need five minutes, ten minutes?  What do you need?

THE WITNESS:  Five minutes would be great.

MR. CAFORIO:  Okay.

THE VIDEOGRAPHER:  The time is 10:07 a.m., and we're going off the record.

Page 41

(Brief pause.)

THE VIDEOGRAPHER:  The time is 10:12 a.m.  We're going back on the record.

BY MR. CAFORIO:

Q    All right.  Welcome back, Mr. Acconcia. You understand you're still under oath, correct?

A    I do.

Q    Okay.  Can you please describe, in general terms, what were your responsibilities at Blackstone as a member of the Primexx deal team?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I apologize.  Could you be more specific?

BY MR. CAFORIO:

Q    Well, I wanted to start general and get more specific, but just, in general, we discussed the Primexx deal team at Blackstone, right, which included at least you, Mr. Belz and Mr. Foley, right?

A    I recall that discussion.

Q    Okay.  And I'm just asking, in general terms, before we get into specifics, how would you describe your responsibilities being on the Primexx deal team overseeing Blackstone's investment in Primexx?

Page 42

A    I recall general involvement inclusive of being on the Board of Directors.

Q    The Board of Directors of Primexx?  Is that what you're referring to?

A    Yes.

Q    I just want to make -- not the Board of Directors of Blackstone?  The Board of Directors of Primexx?

A    That is correct.

Q    Okay.  Would you describe your responsibilities from Blackstone regarding the Primexx investment to be a one-time event that was completed when you signed that partnership agreement, or did you have a continuing obligation over a series of years regarding that investment?

A    I would say general involvement over a period of time.

Q    Your responsibilities didn't end the moment you signed the partnership agreement?

A    My involvement did not end when I signed the partnership agreement.

Q    In fact, you continued participating in meetings regarding Blackstone's investment in Primexx from 2016 all the way through 2021; is that fair?

A    I recall meetings during that time.  The

Page 43

specific dates I don't have specific recollection of.

Q    And in your role on the Blackstone's Primexx deal team, did you play any role on behalf of Blackstone in attempting to sell Primexx in the 2021 time period?

MR. DESAI:  Objection.  Form.

THE WITNESS:  Apologies.  Could you rephrase the question?

BY MR. CAFORIO:

Q    Well, I'm just wondering, in your role on the Primexx deal team at Blackstone, did you perform any work or play any role in the process of Blackstone ultimately working to sell Primexx in the 2020-2021 time period?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I was generally involved in the activities related to Primexx.

BY MR. CAFORIO:

Q    And do you recall that ultimately Primexx was sold to Callon Petroleum in the end of 2021?

A    I generally recall that.

Q    And did you personally play any role in the process that resulted in Primexx being sold to Callon Petroleum at the end of 2021?

Page 44

A    I was generally involved in Blackstone's investment in Primexx during that time.

Q    And that includes Blackstone exiting its investment in Primexx at the end of 2021; is that fair?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I was generally involved in the activities related to Primexx during -- during that time.

BY MR. CAFORIO:

Q    Including its ultimate sale to Callon Petroleum; is that correct or not correct?

A    The reason why it's taking me a moment to think about this is your specific use of the word sale or exit.  I don't recall the specifics of the transaction, but, generally speaking, I recall it to be more of a merger, and, thus, my comment of my general involvement in the -- in the transaction.

Q    Okay.  So you were -- whether a merger or a sale, there was a transaction that -- between Primexx and Callon Petroleum at the end of 2021, correct?

A    I recall the transaction.  Specific dates I don't recall.

Q    Okay.  And you did play a role in

Page 45

effectuating that transaction with Callon Petroleum in 2021 on behalf of Blackstone, is that fair?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I was one of many people at Blackstone involved in our investment in Primexx.

BY MR. CAFORIO:

Q    And Callon Petroleum is a Texas-based corporation; is that right?

A    I do not recall.

Q    You don't recall that it's headquartered in Houston?

A    I -- I do not.

Q    Did you ever participate in any meetings in Houston where you discussed the potential sale of -- or the potential transaction with Callon?

A    I do not recall.

Q    One way or the other?

A    I do not believe so, but I don't -- I do not recall specifics.

Q    Did you have any direct communications with anyone at Callon Petroleum regarding the potential transaction involving Primexx?

A    I do not recall.

Q    One way or the other?

Page 46

A    I do not recall.

Q    Okay.  In 2021, in your role at Blackstone, did you travel to Texas for work?

A    I do not recall.

Q    Let's put up the next exhibit.  I'm putting it in the chat right now, and I'll share my screen, as well.

(Deposition (Acconcia) Exhibit No. 2 was marked for the record.)

BY MR. CAFORIO:

So Deposition Exhibit 2 is a document, and do you see there's a -- at the bottom right of the document, there's a numeric code.  It says BPP_0018525.

Do you see that?

A    I see that.

Q    And this document is three pages long. It goes to ending in 27.

Do you see that?

A    I see that.

Q    And this is a document -- this is an e-mail chain that starts on June 24th, 2021 with an e-mail from Phil Cook at Primexx.

Do you see that?

A    I see, on the third page, it lists Phil

Page 47

Cook, an e-mail from Phil Cook.

Q    And it says, in his signature block, that he was the Executive Vice President and Chief Financial Officer of Primexx Energy Partners located in Dallas, Texas.

Do you see that?

A    I do.

Q    Okay.  And if you go up this chain to the first page, at the very top e-mail, do you see that's an e-mail that you sent dated June 29th, 2021 to Chris Doyle at Primexx with a CC to Erik Belz and Mark Henle, both at Blackstone?

Do you see that?

A    Sorry.  I'm just trying to familiarize myself with the document.

Q    Yeah.  Take your time.  Take your time.

A    Okay.  Thank you.  Do you mind repeating the question?

Q    Well, I think I was just clarifying if you saw this.

Do you see that the top e-mail is an e-mail from you dated June 29th, 2021 sent to Chris Doyle at Primexx with a CC to Erik Belz and Mark Henle, both at Blackstone.

Do you see that?

Page 48

A    I see that now.  Thank you.

Q    And you wrote in this e-mail to Mr. Doyle:  On a fight [sic.] this morning to Houston.  Will call you when I land.

Do you see that?

A    I do.

Q    Do you have any reason to believe that when you sent this e-mail to Mr. Doyle and told him that you were on a flight to Houston and that you would call him when you landed that that was not an accurate statement?

A    I do not recall this e-mail.

Q    Okay.  Do you recall whether you did, in fact, call Mr. Doyle when you landed in Houston on June 29th, 2021?

A    I do not recall.

Q    Do you have any reason to believe that you wouldn't have called Mr. Doyle when you landed in Houston as you told him you would?

A    I'm sorry.  I don't recall the specifics of this.

Q    Who is Chris Doyle?

A    Sorry.  Do you mind being a little more specific?

Q    Well, I don't know.  You sent an e-mail

Page 49

dated June 29th, 2021 to Chris Doyle at Primexx.

So I'm just asking you who is Chris Doyle that you sent this e-mail to?

A    I understand your question now.  Chris was a member of the executive team at Primexx.

Q    Was he located in Texas?

A    I believe he was.

Q    I'm going to give you -- I'm sorry.  You said he was on the executive team?  Is that what you described his role at Primexx?

A    I believe that's what I said.

Q    Okay.  Did he report to you in that role?

A    I believe it would be fair to characterize that he reported to the board.

Q    And you were on the board?

A    I was one of the members of the board.

Q    How often did you communicate with Mr. Doyle in the 2021 time period?

A    I do not recall.

Q    Do you recall, in general, that you did communicate with Mr. Doyle at Primexx in 2021?

A    I see the e-mail on screen that you noted.  I do not recall communications with Mr. Doyle.

Q    You don't recall any other

Page 50

communications.

A    No, I do not.

Q    Okay.  If you look at the -- I guess it's the fourth e-mail down, there's a line kind of in the middle of the page, and there's an e-mail from Chris Doyle dated June 28th, 2021.

Do you see that?

A    I see an e-mail in the middle of the page from Chris Doyle.

Q    Okay.  And I just -- looking at all the people who were CC'd here, there are -- do you have an understanding of who these people are?  Do you recognize the names that were part of this e-mail chain or no, just in general, and then we'll get into specifics?

A    I generally recognize some of these names.

Q    Okay.  So I just want to look at some of the names that have an @Primexx.com e-mail address.  So I see a Sam Blatt at Primexx.

Do you see that name?

A    I see that.

Q    Do you know who Sam Blatt at Primexx was?

A    Sam Blatt was a member of the executive team at Primexx.

Page 51

Q    The next name is Chase White at Primexx.  Do you see that?

A    I see that.

Q    Do you know who Chase White was?

A    I recall his general involvement.  I do not recall his specific role or title.

Q    What was his general involvement?

A    He was involved in the finance team at Primexx.

Q    Skipping one name that doesn't have a Primexx e-mail, the next name is Megan Davis at Primexx.

Do you see that?

A    I do.

Q    Do you know who Megan Davis at Primexx was?

A    I do not recall.

Q    And then the last name listed here is Phil Cook at Primexx.

Do you see that?

A    I do.

Q    And we saw his signature block on the third page, but do you -- do you know who Phil Cook at Primexx was?

A    Phil Cook was a member of the executive

Page 52

team at Primexx.

Q    Do you recall whether you ever met in-person in Texas with Mr. Doyle, Mr. White, Ms. Davis, or Mr. Cook regarding Blackstone's investment in Primexx?

A    I do not recall specifics.  I do not recall specifics.

Q    I'll take that document down and put the next document into the chat.

MR. DESAI:  Bryan, while you're doing that, I want to mention -- I know I've said this before, but Mr. Acconcia has a noon eastern hard cut.

MR. CAFORIO:  Yeah.  I'm very hopeful we'll be finished well before noon, but we'll see how quickly we can move through things.

MR. DESAI:  Yeah, I do, too, and I know we still have a ways to go before then, but I just wanted to flag it.

MR. CAFORIO:  Yeah.  Thank you.

THE WITNESS:  Thank you, Bryan.

MR. CAFORIO:  Let me share the screen here, and for the court reporter, it is now marked Deposition Exhibit 3.

Page 53

(Deposition (Acconcia) Exhibit No. 3 was marked for the record.)

BY MR. CAFORIO:

Q    Can you see this is a document with a Bates number down at the bottom BPP_0017994.

Do you see that?

A    I see that.

Q    And this is an e-mail chain between you -- it's various e-mails involving you, Patricia Lee and Mr. Doyle at Primexx.

Do you see that?

A    I see an e-mail from Patricia to myself.

Q    Who is Patricia Lee?

A    Patricia was my executive assistant.

Q    Okay.  And so the first e-mail on this chain at the bottom is from Mr. Doyle to Ms. Lee, dated May 25th, 2021; subject:  Schedule next Tuesday, and it says:  Angelo mentioned having drinks, dinner next week.  I think it makes sense for Angelo and I to have pre dinner drinks and then have a team dinner Wednesday evening.  Does that work?  I would invite Phil, Megan, Chase and Sam.

Do you see that?

A    I see that's what it says.

Q    And then Ms. Lee forwarded that e-mail to

Page 54

you eight minutes later on May 25th, 2021, and wrote: Angelo, please advise on the below, as you will be in Dallas.

Do you see that?

A I do.

Q And then you responded to your executive assistant later that same day, May 25th, 2021: Thanks. Let's do drinks with Chris Doyle at 5:30 p.m. and then dinner at 6:30 p.m. with the team.

Do you see that?

A I do.

Q And the team, as Mr. Doyle wrote it in that first e-mail, is Phil, Megan, Chase and Sam, the people we looked at on the last e-mail, right?

A I believe that that is what it's referring to based on the e-mail here.

Q And Ms. Lee, as your executive assistant, was familiar with your schedule; is that fair?

A That is fair.

Q And she wrote on this e-mail on May 25th, that you would be in Dallas, correct?

A I see that she wrote in her e-mail dated May 25th that I would be in Dallas.

Q And then you did, in fact, go to Dallas the next week where you met with Mr. Doyle and the

Page 55

rest of the Primexx team while you were there, correct?

MR. DESAI: Objection. Form.

THE WITNESS: I don't recall.

(Deposition (Acconcia) Exhibit No. 4 was marked for the record.)

BY MR. CAFORIO:

Q I'll put the next e-mail into the chat or document into the chat I should say.

MR. CAFORIO: If the court reporter would mark this as the next exhibit.

BY MR. CAFORIO:

Q Do you see this is a document with the Bates number BPP_0005953 through 5954?

Do you see that?

A I see the first page says BPP_0005953. Thank you. I now see the second page. It says 0005954.

Q Okay. And this is an e-mail chain started by Chase White at Primexx dated June 30, 2021?

Do you see that?

A Would you mind going to the second page, please?

Q Yeah.

Page 56

A Okay. Thank you.

Q So do you see that that's what this chain started with?

A Sorry. Would you mind repeating the question?

Q Yeah. This is an e-mail chain -- this document -- this exhibit -- is an e-mail chain that starts with an e-mail from Chase White at Primexx, dated June 30, 2021, to the Blackstone team and the Primexx team.

Do you see that?

A I see that.

Q And we've discussed most of these names, but there is one name I think we haven't discussed. There's a jeffkelly@blackstone.com at the bottom of this e-mail.

Do you see that?

A I see that.

Q Who is Mr. Kelly at Blackstone?

A Mr. Kelly was a member of -- and this e-mail is refreshing my memory -- a member of the portfolio operations team at Blackstone.

Q Did he play any role on the Primexx deal team?

A This gets back to the matrix like nature

Page 57

of Blackstone. So there were various groups and people that were involved, some of which were within Blackstone Energy Partners and the private equity group, some of who were in other groups were generally involved, and Jeff was a member of one of those other groups who was generally involved.

Q And about in the middle of this page, just the third e-mail up from the bottom, is an e-mail you sent dated June 30, 2021.

Do you see that?

A I see an e-mail from me in the middle of the page.

Q And you wrote in this e-mail: I am back -- I am back-to-back in Houston today.

Do you see that?

A I see -- I see that.

Q And when you wrote that, did you mean you had back-to-back meetings in Houston on June 30th, 2021?

A I don't recall the specifics of the trip.

Q But looking at the e-mail you wrote, do you know what you meant when you said I am back-to-back in Houston today with regards to scheduling a call?

A Generally speaking, I'd state that's a

Page 58

term or phrase that I believe refers to not having available time. I do not -- I do not recall specific activities or meetings or what was taking up my time during that period.

Q But you were in Houston when you sent this e-mail?

A I do not recall.

Q You said you were in Houston when you sent this e-mail, right?

A That is what the first line of the e-mail says. I do not recall any of the specifics.

Q Do you believe you were lying to the rest of the Primexx team when you told them you were in Houston when you sent that e-mail?

MR. DESAI: Objection. Form.

THE WITNESS: I see what the e-mail says. I just do not recall anything further.

BY MR. CAFORIO:

Q And this is an e-mail that you sent to Mr. Doyle, Mr. Blatt, Mr. Cook, Ms. Davis in Texas where you told them that you were in Houston, correct?

A This -- reading this e-mail, this is an e-mail that I sent to mostly members of the

Page 59

Blackstone team in the to line. There were five people noted in the to line. Only one of which was with Primexx.

Q Right, and you sent that e-mail to the Primexx deal team and the five Primexx employees and told them you were in Houston that day, correct?

A I do not recall the specifics. What I'm reading here is I sent an e-mail to four people at Blackstone and one person at Primexx, and what it says is I am back-to-back in Houston today. Why don't you set the time that works best for you all, and if I can't make it, I will follow-up with the team to discuss. I'm on a flight early a.m. but free for most of the afternoon tomorrow.

Q And the subject of this e-mail is a Rosehill Plan B Proposal.

Do you see that?

A I see at the bottom of the page the original e-mail that Chase White sent and the subject line as you noted.

Q And do you have a recollection right now what the Rosehill Plan B Proposal was?

A I do not recall.

Q Okay. I'm putting the next document in the chat.

Page 60

MR. CAFORIO: Would the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 5 was marked for the record.)

BY MR. CAFORIO:

Q Do you see this is a document with a Bates number BPP_0016545, and it's a two-page document ending 546.

Do you see that?

A I do.

Q And this is -- it appears to be a calendar invite from you dated November 3rd, 2020.

Do you see that?

A Sorry. I'm just trying to familiarize myself with the document.

Q Yep.

A This looks like a calendar invite, and while it says from me, typically my assistant was asked to coordinate meetings and would send calendar invites on behalf of myself or -- or the deal team.

So I -- I don't recall whether I sent this or whether my assistant sent it specifically.

Q But you see that it is a calendar invite sent by your e-mail address dated November 3rd, 2020 with the subject call Primexx/Blackstone Strategic

Page 61

Next Steps.

Do you see that?

A I do.

Q And this was a calendar invite that your e-mail address sent to members of the Blackstone deal team, as well as at least four Primexx employees in Texas, Chris Doyle, Sam Blatt, Chase White and Phil Cook?

Do you see that?

A I see them listed here on the to line.

Q And either you or your executive assistant, Ms. Lee, initiated and scheduled this call, correct?

A I do not recall the specifics; although, this document would lead me to believe that that was the case.

Q Okay. Do you recall at some point Primexx and Blackstone engaged with RBC in Texas to explore a potential transaction involving Primexx in 2021?

Do you recall that in general terms?

A I generally recall RBC's involvement. I don't understand what you mean by in Texas.

Q Sure. Let's go to the next document, and I'm putting into the chat.

Page 62

MR. CAFORIO: So if the court reporter will mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 6 was marked for the record.)

BY MR. CAFORIO:

Q    Do you see this is a document with Bates number BPP_0017552 ending at 553?

Do you see that?

A    I do.

Q    And the first e-mail on the chain -- I'll just look at the second page, and you'll see there's no other e-mail.

So the bottom on the first page is the first e-mail on the page. It is a calendar invite from you dated, Thursday, April 15th, 2021.

Do you see that?

A    I see there's a calendar invite noted from me with that date.

Q    And it has a subject: Call Primexx RBC/BX re: General status and next steps discussion.

Do you see that?

A    I see that in the subject line.

Q    And this was a call that you initiated, correct?

Page 63

A    I do not -- I do not recall.

Q    It's a calendar invite sent from your e-mail address, correct?

A    That's what this e-mail -- that's what this document shows. Again, I don't recall the specifics, and typically my assistant would send calendar invites on behalf of people at Blackstone to schedule calls that would come from my e-mail.

Q    And in the top e-mail -- so the last e-mail in the chain -- is an e-mail from a Jeffrey Spence at RBC Capital Markets.

Do you see this?

A    I see that at the top.

Q    And Mr. Spence has a signature line that says he's located at 609 Main Street, Suite 3700, Houston, Texas.

Do you see that?

A    I do.

Q    That's what I meant earlier when I said RBC in Texas. The people at RBC that you communicated regarding a potential Primexx transaction were located in Texas, right?

MR. DESAI: Objection. Form.

THE WITNESS: RBC is a Canadian investment bank that has offices, to my

Page 64

knowledge, across North America. I do not recall specifically where people were located.

BY MR. CAFORIO:

Q    But you received this e-mail from Mr. Spence with the materials for the discussion on the call that you had sent out a calendar invite for, correct?

A    This e-mail shows that I received -- this document shows that I received an e-mail from Jeffrey.

Q    And Mr. Spence's signature line indicates that he's located in Houston, Texas, correct?

A    His signature line states a Houston address.

Q    In 2021 -- and that document we just looked at was April 2021, but in 2021, you personally conducted due diligence regarding potential Primexx transactions involving Texas counter-parties; is that fair?

MR. DESAI: Objection. Form.

THE WITNESS: I'm sorry. I don't understand the question.

BY MR. CAFORIO:

Q    Did you personally conduct any due

Page 65

diligence in the 2021 time period with regards to potential Primexx transactions?

A    My role at Blackstone at the time, I believe, was as a member of the general investment team and on the board of Primexx. The management team at Primexx had day-to-day oversight on the operations, activities and diligence of the company.

Q    I'll put the next document in the chat, and we'll look at that.

MR. CAFORIO: And if the court reporter could mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 7 was marked for the record.)

BY MR. CAFORIO:

Q    It is a one-page document with Bates number BPP_0018469.

Do you see that?

A    I see that at the bottom right-hand of the page.

Q    And this starts with an e-mail from Megan Davis at Primexx to you, Mr. Belz, and Mr. Henley.

Do you see that?

A    I see the e-mail from Megan.

Q    And she says in this e-mail: Angelo,

Page 66

Erik, Mark, I'm looking at potentially rescheduling the bi-weekly board meeting again from tomorrow afternoon to Friday with the idea that we are more likely to have a material update on Capitan by Friday morning.

Do you see that?

A    I see that it says:  I'm looking to potentially rescheduling the bi-weekly board meeting again from tomorrow afternoon to Friday morning with the idea that we are more likely to have a material update on Capitan by Friday morning.  Would you guys like to move the meeting to Friday morning?  If so, please let me know your availability, and I will check general board availability based on the window you provided.

Q    She references a material update on -- and I don't know if that's Captain or Capitan.

Do you see that?

A    I see -- I see it spelled C-A-P-I-T-A-N.

Q    And do you know -- do you understand what that's a reference to?

A    I do not recall.

Q    Okay.  You don't recall that Capitan was the code name that Blackstone and Primexx used to discuss the upcoming Callon transaction?

Page 67

A    I do not recall.

Q    One way or the other?

A    I do not recall.

Q    And you responded to Ms. Davis that -- you wrote:  Yes, thanks, and then provided the window that you were free for the call, correct?

A    I wrote back:  Yes, thanks.  I can free up 11:30 to 3:00 p.m. Eastern on Friday, parentheses, or other times if those don't work.

Q    Do you recall if bi-weekly meetings did start occurring in the June 2021 time period as Primexx and Blackstone started closing in on the Callon transaction?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I do not recall.

BY MR. CAFORIO:

Q    And do you recall if -- do you recall what role you played on these calls with the Primexx team discussing the potential Callon transaction, and I just mean in general?

Were you an active participant, or would you mainly just sit silently on the calls?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe the call that was referenced in the e-mail

Page 68

referenced that it included the full board.

So as a board member and one of many board members, we listen to updates from the management team and their recommendations.

BY MR. CAFORIO:

Q    And when you said you -- you would receive updates from and listen to the management team, you're referring to the Primexx management team?

A    I believe, in this specific instance, the board heard updates from the management team and then also from RBC, who the board had retained on its behalf to evaluate strategical turn of events more broadly.

Q    And I just want to clarify, when you were saying management team, are you referring to the Primexx management team?

A    Yes.

Q    Okay.  That group of people we looked at, Megan Davis, Sam Blatt, Chris Doyle, Chase White located in Texas working for Primexx?

Is that who you're referring to as the management team?

Page 69

A    I believe those were some of -- I believe those were some of the individuals of the executive team that were involved at Primexx.

THE WITNESS:  Bryan, do you mind?  We're on the hour again, and I had a fair amount of coffee this morning.  Do you mind if I take a nature break?

MR. CAFORIO:  Five minutes.

THE WITNESS:  Okay.  Thank you so much.

THE VIDEOGRAPHER:  Stand by.  The time is 11:05 a.m.  We're going off the record.

(Brief pause.)

THE VIDEOGRAPHER:  The time is 11:10 a.m.  We're going back on the record.

BY MR. CAFORIO:

Q    All right.  Welcome back, Mr. Acconcia.  You understand you're still under oath?

A    I do.  Thank you.

Q    Okay.  I -- you mentioned just a few minutes ago before the break that, throughout 2021, you would participate in board meetings for Primexx Energy Corporation and BPP Energy Partners; is that

Page 70

correct?

A    I believe I mentioned a general recollection as to attending board meetings.

Q    We can look at one of those. I put it into the chat.

MR. CAFORIO: If the court reporter would mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 8 was marked for the record.)

BY MR. CAFORIO:

Q    You see it's a document with the Bates number at the bottom PRIMEXX029462, and it's a seven-page document going to 468.

Do you see that?

A    I do.

Q    And the title of this document is Minutes of a Joint Regular Meeting of the Board of Directors of Primexx Energy Corporation and the Board of Managers of BPP Energy Partners, LLC, dated June 9th, 2021.

Do you see that?

A    I see the title at the top of the page.

Q    And are you familiar with the board meeting minutes from Primexx Energy Corporation and BPP Energy Partners from your time serving on those

Page 71

boards?

A    I do not recall specifics.

Q    This document it lists, for attendance, it has Primexx directors, BPP managers, management and other attendees.

Do you see that?

A    I see at the top there are different groups that are -- are mentioned.

Q    And you're the first one listed as a Primexx Energy Corporation Director, correct?

A    I see my name within the Primexx director list.

Q    And you're also the first name listed for the BPP manager list, correct?

A    I see myself as listed as one of ten people on that list.

Q    And this joint regular meeting of the Board of Directors of Primexx Energy Corporation and the Board of Managers for BPP Energy Partners was held on June 9th, 2021 in-person in Dallas, Texas and via teleconference, correct?

A    That is what this document says. Although, I do not recall the specifics.

Q    Okay. And you understood that the management team that we discussed earlier, many of

Page 72

which are listed in the management column, that they were located in Texas where Primexx was located, right?

A    I do not recall where the management team specifically and personally was located. I know a number of them had different homes or would call in from different locations. So I can't comment on specifically where that team was located.

Q    Okay. You do remember and we saw the document earlier where you met with Mr. Cook, Mr. Blatt, Mr. White and Ms. Davis in Dallas that same month, June 2021, right?

MR. DESAI: Objection. Form.

THE WITNESS: I recall earlier in our discussion you referenced an e-mail discussing logistics.

BY MR. CAFORIO:

Q    Of meeting with those four Primexx management members in Dallas, right?

A    Based on what I recall of that e-mail, that was an e-mail discussing logistics for a potential meeting with those members of management.

Q    In Dallas?

A    I believe that that is what the e-mail said.

Page 73

Q    And your executive assistant said you will be in Dallas that day, right?

A    That is what the e-mail said.

Q    Looking at these minutes from this June 9th, 2021 meeting that you attended, would you say you were an active participant at these board meetings or you generally left it to others?

MR. DESAI: Objection. Form.

THE WITNESS: If you don't mind, this is a seven-page document. I'd like a moment to review it, please.

MR. CAFORIO: Yeah.

THE WITNESS: Thank you. Do you mind repeating the question, please?

BY MR. CAFORIO:

Q    I don't know what the question was. Now that you're familiar, we can go on.

So at this June 9th, 2021 board meeting that the minutes indicate was held in-person in Dallas and via teleconference, you actively participated, would you agree?

A    I do not recall the specifics. I'm noted as one of the participants here amongst, you know, ten board of directors, six members of management and three other attendees.

Page 74

Q    Sure.  For example, on the second page, in the third paragraph, the minutes note:  Angelo Acconcia then expressed support for Doyle's indication that the biggest decision to be made by the board was to find a way to facilitate the internal combination of Primexx and BPP.

Do you see that?

A    I see my name listed at the top of the page.

Q    Do you have any reason to believe that what the minutes here indicate that you said is not accurate?

A    I do not recall the specifics of this meeting.

Q    Was it your regular practice to review minutes of board meetings that you attended after they came out?

A    Generally speaking, yes.  I don't recall specifically here.

Q    And was it your general practice to make sure any inaccurate minutes were corrected before they became the official record if you noticed any inaccuracies?

A    Generally speaking, I think that's a fair characterization.

Page 75

Q    If we go to the fifth page, the last paragraph here on Page 5 states:  Acconcia confirmed that Blackstone would not make additional investment in the companies under the current capital structure.

Do you see that?

A    I see that sentence at the bottom of the page after a series of discussions from management and other board directors' commentary.

Q    And then on the next page, in the third full paragraph, it says:  Angelo Acconcia noted that the company's current position was significantly different as compared to a year ago during the height of the COVID pandemic and when oil prices were lower.  Acconcia noted that, given the change in position, a one rig program could be acceptable, though it would not be optimal to take advantage of current oil prices and the strong capabilities of the operating team.  He indicated that liquidity issues arise in association with accelerating to optimize value, but that, if the liquidity issues could not be resolved, the companies could simply run one rig eliminating the liquidity issues.  He stated his belief that the ability to lower liquidity risk and simultaneously optimize values were both available if the companies combined, but if that combination could not be

Page 76

achieved, continuing with a one-rig program would be acceptable.

Do you see that?

A    I see that paragraph as one of, you know, ten paragraphs on the page.

Q    And you don't have any reason to believe, as you sit here today, that you didn't state all of that at the June 9th, 2021 board meeting that you attended, do you?

A    I do not recall the specifics of this meeting.

Q    But it was your general practice to review board meetings for accuracy, correct?

A    I or others from Blackstone would typically review board meetings minutes.

Q    And it was generally your practice to correct any inaccuracies you saw in draft board meeting minutes, particularly if it misstated something that you had said, right?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I generally recall reviewing board meeting minutes.

BY MR. CAFORIO:

Q    Now, in your role on the Blackstone deal team overseeing the Primexx investment, you

Page 77

personally had communications with numerous investment bankers in Texas regarding potential Primexx transactions; is that fair?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I do not recall.

BY MR. CAFORIO:

Q    Do you recall communicating with David Habachy at Warburg Pincus regarding a potential Primexx transaction in 2021?

A    I do not recall.

Q    I'll put the next document in the chat.

MR. CAFORIO:  If the court reporter could mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 9 was marked for the record.)

BY MR. CAFORIO:

Q    It's an e-mail chain starting with Bates number BPP_0017182 and going through 187.

Do you see that?

A    Do you mind turning to the first page again.

I see that.  Thank you.

Q    And so going to the first -- there's a whole lot of disclaimers for the last couple pages, but the first actual e-mail is on Page 4, and you see

Page 78

it's an e-mail from a David Habachy.

Do you know how to pronounce that name?

A     Reading it, I believe it's Habachy.

Q     It's an e-mail from David Habachy to you, dated February 3rd, 2021, with the subject Tall City/Primexx.

Do you see that?

A     I see the e-mail from David with the subject line you noted.

Q     And Mr. Habachy wrote to you on February 3rd, 2021:  Angelo, hope you're well and off to a good start for 2021.  Here's to a better year this year.  I thought it made sense to touch base on a Warburg/Blackstone phone call on where things settled out with Tall City and Primexx.  Both teams data shared and had a number of discussions around a potential combination.  We've got enough to put numbers on paper and wanted to share that high level view with you and your team.

Do you see that?

A     I see that in the second paragraph, and it continues:  What works for a call next week to catch up on this?  Looking -- look forward to catching up.  I also think Peter separately reached out to David on the same topic.

Page 79

Q     And Mr. Habachy is an investment banker in Houston, Texas for Warburg Pincus; is that correct?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe Warburg Pincus is an investment firm that is based in New York City.  Where Peter, who is the head -- at the time, if I recall correctly, was the head of their energy team was based in New York City, along with what I recall generally being at the time the majority of the investment team.

BY MR. CAFORIO:

Q     I appreciate all that.  I'm just asking about David Habachy.  He's an investment banker located in Houston, Texas, right?

MR. DESAI:  Objection.  Form.

THE WITNESS:  I believe David was a member of the Warburg Pincus organization.

BY MR. CAFORIO:

Q     In Houston?

A     I do not recall where he was located.

Q     And Tall City Exploration is an oil and gas company headquartered in Midland, Texas, right?

Page 80

A     I do not recall.

Q     You were discussing that possible combination, but you don't know?

A     I see the subject line here.  I do not recall specifics.

Q     You also had calls and initiated communications with Richard Punches at EIG Global Energy Partners in 2021 regarding a potential Primexx transaction, correct?

A     I do not recall.

Q     I put the next e-mail in the chat.

MR. CAFORIO:  Will the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 10 was marked for the record.)

BY MR. CAFORIO:

Q     Do you see this is a one-page e-mail chain with Bates number BPP_0016597.

Do you see that?

A     I see that noted at the bottom right-hand of the page.

Q     And this chain starts with an e-mail from you at Blackstone, dated February 1st, 2021, to Richard Punches, II, at EIGpartners.com with the subject Primexx Rosehill.

Page 81

Do you see that?

A     I see an e-mail from me to Richard Punches at the bottom of this document.

Q     And Mr. Punches was a Managing Director at EIG Global Energy Partners located in Houston, Texas, correct?

A     I see, in the e-mail above, it lists his name and his address.

Q     In Houston, Texas?

A     That is what his signature block notes.

Q     And you sent the first e-mail in this chain to Mr. Punches, right?

A     Based on the document you pulled up, I don't see an e-mail from myself to Richard Punches that --

Q     And you wrote in this e-mail:  Richard, hope all is well.  Enjoyed catching up last week.  We have a one-pager on Primexx we could share with you.  Wanted to see if you have the same on Rosehill, in which case, we could exchange one-pagers and could set up a call for you to connect with Chris Doyle, Primexx's CEO, to discuss further.

Do you see that?

A     I see that's what the e-mail says.

Q     So you had actually caught up with

Page 82

Mr. Punches the week before you sent this e-mail to him, right?

MR. DESAI: Objection. Form.

THE WITNESS: Generally speaking, investment firms had general dialogues more broadly to compare notes on industries or ideas, and so I recall general communications, you know, with Richard across a number of things; much similar to, you know, with David Habachy, across a number of topics or Peter at Warburg in New York across a number of topics from time to time.

BY MR. CAFORIO:

Q And the topic here was a potential transaction between Primexx and Rosehill Exploration, correct?

MR. DESAI: Objection. Form.

THE WITNESS: This document shows an e-mail that I sent Richard Punches regarding setting up a call for him and Chris Doyle.

BY MR. CAFORIO:

Q For a potential transaction between Primexx and Rosehill, correct?

Page 83

MR. DESAI: Objection. Form.

BY MR. CAFORIO:

Q That's the subject of your e-mail, right, Primexx/Rosehill?

A The e-mail says subject: Primexx/Rosehill. I do not recall specifics.

Q Okay. And Rosehill Exploration is an oil and gas company in Houston, Texas, right?

A I do not recall where Rosehill was located.

Q Okay. You also initiated calls with Stephen Trauber at Citi in 2021 about a transaction between Primexx and Callon Petroleum, correct?

A Stephen Trauber was an investment banker. So there were general conversations from time to time. I do not recall specific conversations.

Q And Mr. Trauber is an investment banker in Houston, Texas, correct?

A Mr. Trauber, I believe, was an investment banker that worked for CitiGroup that had offices across kind of the United States. I believe he, at one time, worked out of a New York office, a Houston office or other parts of country where he had a number of homes, based on my general recollection.

Q And did you ever meet with Mr. Trauber

Page 84

in-person in Houston discussing the Primexx deal?

A I do not recall.

Q One way or the other?

A I do not recall.

Q I put the next document in the chat.

MR. CAFORIO: Would the court reporter mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No. 11 was marked for the record.)

BY MR. CAFORIO:

Q It's an e-mail chain starting with Bates number BPP_0018234 going to 235.

Do you see that?

A I do.

Q And the first e-mail on this chain starts at the very bottom of the first page and goes to the second page, but you see it's an e-mail from you, Angelo Acconcia, dated June 13th, 2021, to Stephen Trauber, subject Primexx.

Do you see that?

A I see that at the bottom of the page.

Q And you wrote the substance of your e-mail -- you'll see there's no substance on the bottom of the first page. It's on the second page, and you say: Could you and the senior members of the

Page 85

Capitan Citi team do a call tonight at 8:15 p.m. Eastern? Chris will join, as well.

Do you see that?

A I do.

Q And you sent the first e-mail in this chain to Mr. Trauber, right?

A Based on this document, it looks like I sent the first e-mail.

Q And Mr. Trauber responded to you just 12 minutes later that same day, June 13th, 2021, at 11:00.

Do you see that?

A Mr. Trauber responded to me with a copy to two others at Blackstone.

Q And those were the people that you had put on your first e-mail, right? Mr. Foley and Mr. Belz? It looks like he just did a reply.

A It looks like those are the people that I copied on the e-mail.

Q And you see Mr. Trauber's signature line; he is the Vice Chairman and Global Co-Head of Natural Resources and Clean Energy Transition at Citi located at 811 Main Street, Suite 3900, Houston, Texas, right?

A That's what it says in his signature

Page 86

block in the e-mail.

Q    And actually his signature block shows up in all of his e-mails, and it doesn't disappear after one?  It's there later in the page, as well, right?

A    Based on this document, it looks like it appears twice.

Q    And he doesn't list any address in New York, does he?

A    I see what's here on the page, which is his signature page.

Q    And it doesn't list an address in New York, does it?

A    I don't see -- I don't see any -- other addresses.

Q    It doesn't list any of the homes around the country that you referenced earlier, did you -- does it?

A    Not from what I can read in this document.

Q    It just lists his address in Houston, Texas, right?

A    Under this signature block in his e-mail, lists that address.

Q    And Citi is the investment bank that Callon Petroleum used to effectuate the ultimate

Page 87

transaction with Primexx, correct?

A    I believe that that is the case.

Q    And Mr. Trauber was the primary person at Citi that you interacted with regarding the Primexx/Callon transaction, correct?

A    My primary interactions were with the Board of Directors, and the management team at Primexx was the primary group that had interactions with RBC, and I believe RBC was the primary group that interacted with Citi.

Q    I appreciate all that.  I'm just asking for you personally.  When you communicated, when you personally, Mr. Acconcia, communicated with somebody at Citi regarding the Primexx/Callon transaction, Mr. Trauber was your primary contact, right?

A    I do not recall specifics.

Q    But you were familiar enough with Mr. Trauber to know about his multiple homes across the country?

A    Mr. Trauber, as the Global Co-Head of Natural Resources and Clean Energy Transition, was involved across Citi's activities, and there were a number of dialogues, from time to time, across various investments and various opportunities or financings that created a dialogue and relationship

Page 88

with Trauber, much like other investment bankers, over the course of years.

Q    I put the next document in the chat.

(Deposition (Acconcia) Exhibit No. 12 was marked for the record.)

BY MR. CAFORIO:

Q    This is a document with Bates number BPP_0006569 through 6570.

Do you see that?

A    Do you mind turning to the second page, please.  I see that.

Q    And this document is an e-mail chain that starts with an e-mail from you dated August 1st, 2021.

Do you see that?

A    I see an e-mail at the bottom of this document from me to other members at Blackstone.

Q    To Erik Belz, Mark Henle, Anika Gautam, with the subject Primexx merger workstreams, right?

A    I believe that's what it says.  That's what the heading says.

Q    And you said:  Team, thanks for your efforts relates to the Capitan transaction.  I thought it might be helpful and efficient to summarize my thoughts on workstreams over the next 48

Page 89

hours to get this to signing.  Please add/amend as you see fit and reply to the group.  We can discuss if you like later today, but I think we are all up-to-speed on these, given our call this morning, and then you listed one through 13 different items for the signing workstream for the Primexx merger, right?

A    What this document shows is -- or it's an e-mail from me to members of -- some of the members of the Blackstone team that lists a number of items at the bottom of it.

Q    And those are the items that you wrote were the workstreams over the next 48 hours to get the transaction to signing, right?

A    Based on this e-mail, it looks like I'm referring to my thoughts on some of -- of the workstreams.

Q    And then you forwarded your e-mail to David Foley later that day, right?

A    Based on this, that's what it looks like.

Q    And you wrote:  FYI only.  So you understand key workstreams, right?

A    That's -- that's what this document reads.

Q    And Mr. Foley responded to you:

Page 90

Regarding the press release, the less mention of Blackstone the better. Clearly Callon needs to do a press release as a public company, but I don't think Primexx should do its own press release, too. I don't think we should have any BX people quoted in this. At announcement, the valuation of Primexx is only going to be 70 cents on our dollar of cost. So let's just keep a low profile, right?

A    That is, I believe, what his -- that is what his response says.

Q    And then you responded to him later that day: Completely agree on the low profile. That is our intent, right?

A    I believe that's what it says at the top, or that is what it says at the top.

Q    This wasn't a transaction that you or the Blackstone team were particularly proud of, was it?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall the specifics.

BY MR. CAFORIO:

Q    Just that you wanted to keep a low profile and keep Blackstone's name out of it?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

Page 91

BY MR. CAFORIO:

Q    Now, after the transaction was announced -- the Callon/Primexx transaction was announced, you participated in a meeting with Joe Gatto, right?

A    I do not recall.

Q    Do you know who Joe Gatto is?

A    I believe he was a member of the executive team at -- at Callon, if I recall correctly.

Q    He was the CEO of Callon Petroleum when you effectuated the Primexx/Callon transaction, right?

A    I don't recall his specific title. I do recall his general involvement.

Q    He was the CEO located in Houston, Texas at Callon's headquarters in Houston, Texas? You don't recall that?

A    Sometimes CEOs go by different titles. So I don't recall his specific title, and I don't recall where he was located.

MR. CAFORIO: And if the court reporter would mark this as the next exhibit.

(Deposition (Acconcia) Exhibit No.

Page 92

13 was marked for the record.)

BY MR. CAFORIO:

Q    It's BPP_0019155 through 157. Do you see that?

A    Do you mind turning to the second page, please. Okay, and then the third page. Thank you. I see that at the bottom right-hand of the page.

Q    And this is an e-mail from Mark Henle to you, copying Erik Belz and Anika Gautam on August 22nd, 2020 with the subject: Talking points for discussion with Joe, right?

A    That is what that first statement -- first sentence says.

Q    Yeah, and it says: Angelo, ahead of our team catch-up on Monday, please see attached talking points for the discussion with Joe. FYI we had been waiting to circulate these pending a few bullets from Chris regarding the productivity of Primexx's wells and preferred development approach, which we received this weekend, right?

A    That's what the e-mail says.

Q    And attached to the e-mail are the actual talking points for discussion with Joe Gatto, right?

A    I don't recall the specifics of this

Page 93

document. It looks like there are a number of bullet points that cover a number of topics.

Q    And you and Mr. Henley ultimately participated in the call with Joe Gatto on the Callon executive team in August of 2021, right?

MR. DESAI: Objection. Form.

THE WITNESS: I do not recall.

BY MR. CAFORIO:

Q    You don't recall one way or the other if you had that meeting with the CEO of Callon while closing the merger between Primexx and Callon?

A    I do not recall specifics.

MR. CAFORIO: Well, I think, with the five minutes to spare before your hard stop, we can stop right there on our end.

MR. DESAI: We'll reserve our questions.

THE VIDEOGRAPHER: Stand by. The time is 11:56 a.m. We're going off the record.

(Thereupon, the deposition was concluded at approximately 11:56 a.m.)

Page 94

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:          Primexx v. Blackstone

Dep. Date:          February 21, 2025

Deponent:           Angelo Acconcia

CORRECTIONS

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Pg.   Ln.   Now Reads        Should Read       Reason

_____ _____ _____ _____ _____

Page 95

I, ANGELO ACCONCIA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ANGELO ACCONCIA

THE STATE OF_____)
COUNTY OF_____)

Before me,_____, on this day personally appeared ANGELO ACCONCIA, known to me (or proved to me under oath or through_____) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____day of_____,_____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF_____

COMMISSION EXPIRES:_____

Page 96

NO. 24-BC01B-0010

PRIMEXX ENERGY              : IN THE BUSINESS COURT
OPPORTUNITY FUND, LP AND :
PRIMEXX ENERGY             :
OPPORTUNITY FUND II, LP, :
                           :
     Plaintiff,      :
                           : FIRST BUSINESS COURT
  vs.              : DIVISION
                           :
PRIMEXX ENERGY             :
CORPORATION, M.            :
CHRISTOPHER DOYLE,         :
ANGELO ACCONCIA,           :
BLACKSTONE INC.,           :
BLACKSTONE HOLDINGS III  :
LP, BLACKSTONE EMA II      :
LLC, BMA VII LLC,          : DALLAS COUNTY, TEXAS
BLACKSTONE ENERGY          :
MANAGEMENT ASSOCIATES    :
II LLC, BLACKSTONE         :
ENERGY PARTNERS II LP,   :
BLACKSTONE MANAGEMENT     :
ASSOCIATES VII LLC,       :
BLACKSTONE CAPITAL        :
PARTNERS VII LP, BCP      :
VII/BEP II HOLDINGS        :
MANAGER LLC, BX PRIMEXX  :
TOPCO LLC, AND BPP        :
HOLDCO LLC,                :
                           :
     Defendants.  :
_____

REPORTER'S CERTIFICATION
VIDEOTAPED DEPOSITION OF ANGELO ACCONCIA
February 21, 2025
_____

        I, Tanya L. Verhoven-Page, CSR-TX, CSR-GA, LCR-TN, certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

Page 97

That the witness, ANGELO ACCONCIA, was duly sworn by the officer, and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on February 25th, 2025 to the witness or to the attorney for the witness for examination, signature, and return to me by _____;

That the amount of examination time used by each party at the deposition is as follows:

    BY MR. CAFORIO:          02:49:10
    BY MR. DESAI:            00:00:00
    BY MR. EWING:            00:00:00
    BY MR. LEVESQUE:         00:00:00

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

    ON BEHALF OF THE PLAINTIFFS:

    SUSMAN GODFREY, LLP
    1900 Avenue of the Stars
    Suite 1400
    Los Angeles, California 90067
    BRYAN CAFORIO, ESQ.

Page 98

ON BEHALF OF DEFENDANT BLACKSTONE AND ANGELO ACCONCIA:

LYNN, PINKER, HURST & SCHWEGMANN
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
YAMAN DESAI, ESQ.

ON BEHALF OF DEFENDANT PRIMEXX ENERGY CORPORATION:

KIRKLAND & ELLIS, LLP
401 Congress Avenue
Austin, Texas 78701
ZACK C. EWING, ESQ.

ON BEHALF OF DEFENDANT M. CHRISTOPHER DOYLE:
TROUTMAN PEPPER LOCKE, LLP
2200 Ross Avenue
Suite 2800
Dallas, Texas 75201
TAYLOR LEVESQUE, ESQ.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they

Page 99

have occurred.

Certified to by me this day, the ____ day of _____

Tanya L. Verhoven-Page
Texas CSR No. 12254, Exp. 12/25
Lexitas-NG Reporting
Firm Registration #736
999 Old Eagle Road, Suite 118
Wayne, Pennsylvania 19087
215-494-7650

Page 100

FURTHER CERTIFICATION UNDER RULE 203, TRCP

The original deposition/errata sheet was / was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and copies of exhibits, if any;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me on _____.

Tanya L. Verhoven-Page
Texas CSR No. 12254, Exp. 12/25
Lexitas-NG Reporting
Firm Registration #736
999 Old Eagle Road, Suite 118
Wayne, Pennsylvania 19087
215-494-7650

**0**

**0005954** 55:18

**1**

**1** 17:10,11 21:6,8 24:20 39:9

**10** 80:15

**100** 17:10

**10:07** 40:24

**10:12** 41:3

**11** 84:9

**11:00** 85:11

**11:05** 69:12

**11:10** 69:16

**11:30** 67:8

**11:56** 93:20,24

**12** 85:9 88:5

**12th** 28:21

**13** 89:5 92:1

**13th** 84:18 85:10

**14** 22:8,10

**150** 25:7 26:5 29:10

**153** 25:14 29:21

**157** 92:3

**15th** 62:16

**186,006** 29:23

**187** 77:18

**1st** 80:23 88:13

**2**

**2** 46:9,11

**2004** 14:16,18 15:1,22,24

**2016** 16:18 18:21 28:21 42:24

**2020** 60:12,24 92:11

**2020-2021** 43:14

**2021** 14:19 15:2,22 16:18 18:22 42:24 43:4,21,25 44:4,21 45:2 46:2, 22 47:10,22 48:15 49:1,18,21 50:6 53:17 54:1,7 55:21 56:9 57:9,19 61:20 62:16 64:16,17 65:1 67:11

69:23 70:20 71:20 72:12 73:5,18 76:8 77:9 78:5,11,12 80:8,23 83:12 84:18 85:10 88:14 93:5

**2022** 14:8,19

**2025** 8:1,8 21:17 94:3

**21** 8:1 94:3

**21st** 8:7

**22nd** 92:11

**235** 84:12

**24th** 21:17 46:22

**25th** 53:17 54:1,7,20,23

**27** 46:18

**28th** 50:6

**29th** 47:10,22 48:15 49:1

**3**

**3** 52:25 53:2

**30** 17:17 55:20 56:9 57:9

**30th** 57:18

**3700** 63:15

**3900** 85:23

**3:00** 67:8

**3rd** 60:12,24 78:5,11

**4**

**4** 55:6 77:25

**468** 70:13

**48** 88:25 89:13

**5**

**5** 60:4 75:2

**546** 60:8

**553** 62:8

**5954** 55:14

**5:30** 54:9

**6**

**6** 62:5

**609** 63:15

**6570** 88:8

**68** 24:19

**69** 24:18

**6:30** 54:9

**7**

**7** 28:17 65:14

**70** 90:7

**74** 28:1,16

**8**

**8** 70:9

**811** 85:23

**8:15** 85:1

**9**

**9** 77:15

**9:05** 8:2,7

**9th** 70:19 71:20 73:5,18 76:8

**@**

**@primexx.com** 50:19

**A**

**a.m.** 8:2,7 40:24 41:3 59:13 69:12,16 93:20,24

**ability** 12:19 75:23

**accelerating** 75:19

**acceptable** 75:15 76:2

**access** 13:19

**Acconcia** 8:10,25 9:22 10:3 21:7 25:25 27:5,14 41:6 46:8 52:12 53:1 55:5 60:3 62:4 65:13 69:19 70:8 74:3 75:2,10,14 77:14 80:14 84:8,18 87:13 88:4 91:25 94:4 95:1,5,11

**accuracy** 76:13

**accurate** 14:8,10 15:3,20 16:7 37:2 38:16 48:11 74:12

**achieved** 76:1

**acknowledged** 95:16

active 67:21 73:6

actively 73:20

activities 43:17 44:8 58:3 65:7 87:22

actual 15:9 21:25 28:3 77:25 92:23

add/amend 89:1

additional 75:3

address 26:2 50:19 60:24 61:5 63:3
64:15 81:8 86:7,11,20,23

addresses 86:14

advantage 75:16

advise 54:2

affects 12:19

affirm 9:18

affix 95:2

afternoon 59:14 66:3,9

agree 26:11 73:21 90:12

agreement 24:23 25:1 26:6 28:5,10,
15,20 30:7,11 31:4,8,13,19 39:14
42:13,19,21

ahead 25:6,7 92:15

aim 12:7

Amended 21:11 24:22,25 28:4,9,15,
19 30:6 39:13

America 64:1

amount 69:6

analyst 15:24

Angela 27:5

Angelo 8:9 9:22 25:24 27:14 53:18,
20 54:2 65:25 74:2 75:10 78:11 84:18
92:15 94:4 95:1,5,11

Anika 36:25 37:13 88:18 92:10

announced 91:3,4

announcement 90:6

answers 10:13

Apologies 43:7

apologize 28:7 30:25 38:21 40:13
41:13

appeared 95:11

appears 22:11 25:8 60:11 86:6

approach 92:20

appropriately 20:25

approve 33:23

approximately 93:24

April 62:16 64:17

Arclight 14:4,5,12,18,21

arise 75:18

aspects 34:24

assets 17:7

assistant 53:14 54:7,17 60:18,22
61:12 63:6 73:1

association 75:19

assume 10:23

attached 24:20 92:16,23

attempting 43:4

attendance 71:3

attended 73:5 74:16 76:9

attendees 71:5 73:25

attending 70:3

attention 25:24

August 88:13 92:10 93:5

availability 66:13,14

aware 24:10

---

**B**

B-E-L-Z 38:4

back 9:14 14:7 24:21 26:5 28:1 29:9
33:6 35:15,23 39:9 41:3,6 56:25
57:14 67:7 69:16,19

back-to-back 57:14,18,23 59:10

background 13:17

Ballpark 17:10

bank 63:25 86:24

banker 79:1,15 83:14,17,20

bankers 77:2 88:1

Baratta 19:3,22,23

base 78:13

based 54:16 66:14 72:20 79:7,10
81:13 83:24 85:7 86:5 89:15,20

basically 16:14

Bates 53:5 55:14 60:7 62:7 65:16
70:11 77:17 80:18 84:11 88:7

bathroom 12:8

begin 12:16

beginning 8:18

behalf 8:14,21,24 9:4,7,9 10:7 24:8
25:9 30:7 43:3 45:2 60:20 63:7 68:15

belief 75:22

Belz 36:15 37:1,11 38:3,8,12,14
41:19 47:11,23 65:22 85:17 88:18
92:10

Belz's 38:6

bi-weekly 66:2,8 67:10

biggest 74:4

billion 17:10,11

bit 25:7

Blackstone 8:12 9:1 14:13,15,17,21
15:1,5,16,18,19,22 16:2,6,15,18,21,
22,24,25 17:1,25 18:4,8,9,23 19:6,9,
18,19,25 20:3 22:12 23:10,14,16,20
24:1,3,8,12,16 25:22 31:17,21 32:4,
15,17 33:1,7 34:5,16,17,21,22 35:1,4,
12,16,20,24 36:2,5,10,18 37:7 38:7,
19,24 39:18,19,20 41:11,18 42:7,11
43:4,11,13 44:3 45:2,5 46:3 47:12,24
56:9,19,22 57:1,3 59:1,9 61:5,18 63:7
65:3 66:24 67:12 75:3 76:14,24 80:23
85:14 88:17 89:10 90:2,17 94:2

Blackstone's 20:2 32:6 35:7,21
36:3,19 38:20,25 39:7 40:6 41:24
42:23 43:2 44:1 52:4 90:23

Blackstone/primexx 37:3

Blatt 50:20,23,24 58:21 61:7 68:22
72:11

block 47:2 51:22 81:10 86:1,2,22

board 42:2,3,6,7 49:14,15,16 65:5
66:2,8,14 68:2,3,4,13,14 69:24 70:3,
17,18,23 71:18,19 73:6,18,24 74:5,16
75:8 76:8,13,15,17,22 87:7

boards 71:1

bottom 22:14 28:17 46:12 53:5,16
56:15 57:8 59:18 62:14 65:19 70:12
75:6 80:20 81:3 84:16,21,24 88:16
89:11 92:7

BPP 22:14 25:9,11,16,19,21 26:7,12,
17,19,20,25 27:6,7,14,15,23 29:6,11,
16,19,23 30:2,7 69:25 70:19,25 71:4,
14,19 74:6

BPP_0005953 55:14,16

BPP_0006569 88:8

BPP_0016545 60:7

BPP_0016597 80:18

BPP_0017182 77:18

BPP_0017552 62:8

BPP_0017994 53:5

BPP_0018234 84:12

BPP_0018469 65:17

BPP_0018525 46:14

BPP_0019155 92:3

branches 19:14

break 12:7,8,10,12 40:16 69:7,23

broader 18:11 34:20

broadly 68:16 82:6

Bryan 8:20 9:11 10:4 38:22 52:10,22
69:4

bullet 93:1

bullets 92:18

bunch 22:13

business 10:21 19:8,19 21:19,25

BX 90:5

C

C-A-P-I-T-A-N 66:19

Caforio 8:20 10:2,4 21:3,9 22:19
23:19 24:2,9,17 26:23 27:3,12,19
30:22,23 32:11 40:17,22 41:5,15
43:9,19 44:10 45:7 46:10 52:14,21,23
53:3 55:7,10,12 58:19 60:1,5 62:1,6
64:4,24 65:10,15 67:16 68:7 69:8,18
70:6,10 72:17 73:12,15 76:23 77:6,
12,16 79:13,21 80:12,16 82:14,23
83:2 84:6,10 88:6 90:21 91:1,22 92:2
93:8,13

calculation 40:11

calendar 60:12,17,19,23 61:4 62:15,
18 63:2,7 64:7

call 11:16 48:4,10,14 57:24 60:25
61:13 62:20,24 64:7 67:6,24 72:6
78:14,22 81:21 82:21 85:1 89:4 93:4

called 9:23 48:18

Callon 43:21,25 44:11,21 45:1,8,16,
22 66:25 67:13,19 83:13 86:25 90:2
91:9,11 93:4,10,11

Callon's 91:17

Callon/primexx 91:3

calls 13:10 63:8 67:18,22 80:6 83:11

Canadian 63:24

capabilities 75:17

capital 14:4 39:18 63:11 75:4

Capitan 66:4,11,17,23 85:1 88:23

Captain 66:17

card 95:14

care 25:22

carried 38:19,25 39:2 40:4,12

case 10:21,23,24 11:4 21:24 22:3,6
32:21 35:14 61:16 81:20 87:2 94:2

catch 78:23

catch-up 92:16

catching 78:24 81:17

caught 81:25

CC'D 50:11

cents 90:7

CEO 17:25 81:22 91:11,16 93:10

CEOS 91:19

chain 18:11 46:22 47:8 50:14 53:8,16
55:19 56:2,6,7 62:11 63:10 77:17
80:18,22 81:12 84:11,15 85:6 88:12

Chairman 85:21

change 75:14

changed 15:23

characterization 33:21 35:19 40:8
74:25

characterize 49:14

chart 22:9,11,16,17,25 23:3,22 24:5,
12

Chase 51:1,4 53:22 54:13 55:20 56:8
59:19 61:7 68:22

chat 20:12,14 21:5 46:6 52:9 55:8,9
59:25 61:25 65:8 70:5 77:11 80:11
84:5 88:3

check 66:14

Chief 47:3

Chris 47:11,22 48:22 49:1,2,4 50:5,9
54:8 61:7 68:22 81:21 82:22 85:2
92:19

Christopher 9:7

circulate 92:18

Citi 83:12 85:1,22 86:24 87:4,10,14

Citi's 87:22

Citigroup 83:20

city 13:6 78:15 79:7,10,24

City/primexx 78:6

clarification 31:5

clarify 33:9 68:17

clarifying 47:19

classes 29:2

clause 39:16

Clean 85:22 87:21

closing 67:12 93:11

Co-head 85:21 87:20

code 46:13 66:24

coffee 69:6

colon 26:10

column 72:1

combination 74:6 75:25 78:17 80:3

combined 75:25

comment 44:17 72:7

commentary 75:8

COMMISSION 95:25

committee 16:20 33:3,4,10,13,20,23
34:2,4,12,14,19,20

communicate 13:20 49:17,21

communicated 63:21 87:12,13

communicating 77:7

communications 19:20 45:21
49:23 50:1 77:1 80:7 82:8

companies 75:4,21,24

company 13:25 14:2,3 15:7 65:7
79:25 83:8 90:3

company's 75:11

compare 82:6

compared 75:12

compensation 15:12,14 24:11,16
27:23,25 38:18,23 40:5

complaint 22:2,6

completed 42:13

completely 12:20,25 90:12

concluded 93:24

concludes 9:17

conduct 64:25

conducted 64:18

confirmed 75:2

connect 81:21

consideration 95:17

considerations 40:11

contact 87:15

contents 28:3

context 18:6

continued 42:22

continues 78:22

continuing 42:14 76:1

conversations 83:15,16

Cook 46:23 47:1 51:19,23,25 52:4
58:21 61:8 72:10

coordinate 60:19

copied 85:19

copy 85:13

copying 92:10

corner 21:17

corporation 9:4 28:22,23 45:9 69:25
70:18,24 71:10,18

correct 15:17 16:16 26:13 29:3 30:8
32:15 33:14,20,25 37:24 38:5 41:7
42:9 44:12,22 54:21 55:2 58:23 59:6
61:13 62:25 63:3 64:8,13 67:6 70:1
71:10,14,21 76:13,17 79:3 80:9 81:6
82:17,25 83:13,18 87:1,5 95:3

corrected 74:21

CORRECTIONS 94:5

correctly 31:3 79:9 91:10

cost 90:7

counsel 8:16 13:10

counter-parties 29:2 64:19

country 83:23 86:16 87:19

County 21:20 95:8

couple 19:4 77:24

court 9:18 10:14,22 21:3,19,24,25
52:24 55:10 60:1 62:1 65:10 70:6
77:12 80:12 84:6 91:22

cover 93:2

COVID 75:13

created 87:25

current 13:23 21:15 75:4,11,16

cut 52:13

## D

Dallas 10:22 21:19,25 47:5 54:3,21,
23,24 71:20 72:11,19,23 73:2,20

data 78:16

date 28:21 62:19 94:3

dated 28:20 47:10,22 49:1 50:6
53:17 54:22 55:20 56:9 57:9 60:12,24
62:16 70:19 78:5 80:23 84:18 88:13

dates 43:1 44:23

David 17:22 37:1,11 77:7 78:1,4,8,25
79:15,18 82:10 89:19

Davis 51:11,15 52:4 58:21 65:22
67:4 68:22 72:11

day 54:7 59:6 73:2 85:10 89:19 90:12
95:11,19

day-to-day 65:6

deal 36:19,21,25 37:3 38:14 41:11,
18,24 43:3,11 56:23 59:5 60:20 61:5
76:24 84:1

decided 33:23

decision 31:17,22 74:4

decisions 33:4,8

Defendant 9:7

Defendants 9:1

Dep 94:3

depending 39:6 40:6

Deponent 94:4

deposed 11:6,14

deposition 8:9 10:11,15,20 11:3,19
12:16 13:3,9,12,21 21:5,7 46:8,11
52:25 53:1 55:5 60:3 62:4 65:13 70:8
77:14 80:14 84:8 88:4 91:25 93:23
95:2

Desai 8:22 9:11 22:18 23:12,23 24:6,
13 26:21 27:1,9,16 30:15 32:8 41:12

43:6,15 44:6 45:3 52:10,18 55:3
58:15 63:23 64:21 67:14,23 72:13
73:8 76:20 77:4 79:4,17 82:3,18 83:1
90:18,24 93:6,17

describe 41:9,23 42:10

description 95:13

development 92:20

dialogue 87:25

dialogues 82:5 87:23

difficulties 11:25

diligence 64:18 65:1,7

dinner 53:19,20,21 54:9

direct 19:23 20:18 27:24 45:21

directly 18:17 19:2

director 16:4,5 17:24 20:8 71:10,11
81:4

directors 42:2,3,7 70:17 71:4,18
73:24 87:7

directors' 75:8

disappear 86:3

disclaimers 77:24

discovery 30:18

discuss 12:16 34:16 59:13 66:25
81:22 89:2

discussed 41:17 45:15 56:13,14
71:25

discussing 67:19 72:16,21 80:2
84:1

discussion 41:20 62:21 64:6 72:15
92:12,17,24

discussions 31:10 75:7 78:16

Division 21:19

document 20:11 21:4,11 22:9 24:19
25:7,8,14 26:12,14 27:5,8,13 28:2,12
46:11,13,17,21 47:15 52:8,9 53:4
55:9,13 56:7 59:24 60:6,8,15 61:15,
24 62:7 63:5 64:10,16 65:8,16 70:11,
13,16 71:3,22 72:10 73:10 77:11
81:3,13 82:19 84:5 85:7 86:5,19 88:3,
7,12,17 89:8,23 93:1 95:14

documents 13:11 15:4 36:23

dollar 90:7

download 20:15

downstairs 13:16

**Doyle** 9:7 47:11,23 48:3,8,14,18,22 49:1,2,18,21,24 50:6,9 52:3 53:10,16 54:8,12,25 58:21 61:7 68:22 81:21 82:22

**Doyle's** 74:3

**draft** 76:17

**drafts** 31:12

**drink** 12:8

**drinks** 53:19,20 54:8

**due** 64:18,25

**duly** 9:23

---

**E**

**e-mail** 26:2,4 46:22,23 47:1,9,10,21, 22 48:2,8,12,25 49:3,22 50:4,5,8,13, 19 51:11 53:8,12,15,25 54:13,14,16, 20,22 55:8,19 56:6,7,8,16,21 57:8,9, 11,13,21 58:6,9,10,14,16,20,24,25 59:4,8,15,19 60:24 61:5 62:11,13,15 63:3,4,8,9,10 64:5,9,10 65:21,24,25 67:25 72:15,20,21,24 73:3 77:17,25 78:1,4,8 80:11,17,22 81:2,7,11,14,16, 24 82:1,20 83:3,5 84:11,15,17,23 85:5,8,16,19 86:1,22 88:12,13,16 89:9,15,18 92:9,22,23

**e-mails** 53:9 86:3

**earlier** 21:23 28:11 35:10 40:4 63:19 71:25 72:10,14 86:16

**early** 14:8 59:13

**earnings** 39:6

**eastern** 8:7 52:13 67:8 85:2

**Effective** 28:21

**effectuate** 86:25

**effectuated** 91:12

**effectuating** 45:1

**efficient** 88:24

**efforts** 88:23

**EIG** 80:7 81:5

**EIGPARTNERS.COM** 80:24

**eliminating** 75:21

**Ellis** 9:3

**employed** 13:25 14:2,11,13 23:21, 25

**employee** 36:5

**employees** 35:20 36:2 59:5 61:6

**employer** 15:9

**employers** 14:22

**end** 15:2 42:18,20 43:21,25 44:4,21 93:16

**ending** 46:18 60:8 62:8

**energy** 8:10 9:4 16:24,25 17:1,3,25 18:4,8,10 20:3 23:16 24:23 25:2,4 28:10,22 34:17,18,21,22 35:1,4,12 39:14,19 47:4 57:3 69:25 70:18,19, 24,25 71:10,18,19 79:9 80:8 81:5 85:22 87:21

**engaged** 61:18

**Enjoyed** 81:17

**enter** 31:18

**entered** 28:22

**entities** 10:8 22:13,25 23:3,4,6,9,18, 22 24:5,11 39:23 40:1

**entity** 15:13 25:3,5,11

**equals** 19:14

**equity** 15:25 17:2 18:5,6,9,12,17 20:1,2,9 57:3

**Erik** 36:15 37:1,11 38:8,12 47:11,23 66:1 88:18 92:10

**ERRATA** 94:1

**essentially** 15:1

**estimate** 11:16

**et al** 8:11,12

**evaluate** 68:15

**evening** 53:21

**event** 42:12

**events** 68:15

**Ewing** 9:2,3

**EXAMINATION** 10:1

**examined** 9:24

**exchange** 81:20

**executed** 95:16

**executive** 47:3 49:5,9 50:24 51:25 53:14 54:6,17 61:11 69:2 73:1 91:9 93:5

**exhibit** 12:1 20:16 21:5,7 24:20 25:14,18 29:22 39:9 46:5,8,11 52:25 53:1 55:5,11 56:7 60:2,3 62:3,4 65:12,13 70:7,8 77:13,14 80:13,14

84:7,8 88:4 91:24,25

**exhibits** 9:13 11:23

**exit** 44:15

**exiting** 44:3

**expect** 39:5

**EXPIRES** 95:25

**Exploration** 79:24 82:16 83:7

**explore** 61:19

**expressed** 74:3 95:17

**extent** 30:16

---

**F**

**facilitate** 74:5

**fact** 35:15 42:22 48:14 54:24

**factors** 40:10

**fair** 15:2 18:14,15 20:5 33:21 35:19 40:8 42:24 44:5 45:2 49:13 54:18,19 64:20 69:5 74:24 77:3

**familiar** 22:17,21,24 23:4 25:3 37:4, 17,21 54:18 70:23 73:17 87:17

**familiarize** 47:14 60:14

**fashion** 18:25

**February** 8:1,7 78:5,11 80:23 94:3

**feeling** 12:22

**fell** 20:3

**fight** 48:3

**filed** 21:16

**final** 16:6

**finance** 51:8

**Financial** 47:4

**financings** 87:25

**find** 74:5

**fine** 9:15

**finished** 52:15

**firm** 8:17 19:1 79:6

**firms** 82:5

**fit** 89:2

**flag** 52:20

**flight** 48:9 59:13

**Foley** 17:22 18:10,18,19,22 35:8,11,
14,18 37:1,11 38:15 41:19 85:16
89:19,25

**follow-up** 59:12

**foregoing** 95:1,15

**form** 22:18 23:12,23 24:6 26:21 27:1,
9,16 30:16 32:8 41:12 43:6,15 44:6
45:3 55:3 58:15 63:23 64:21 67:14,23
72:13 73:8 76:20 77:4 79:4,17 82:3,
18 83:1 90:18,24 93:6

**format** 11:22

**forward** 25:13 78:23

**forwarded** 53:25 89:18

**foundational** 22:22 32:13 33:16

**fourth** 14:6 50:4

**free** 12:6,7 59:13 67:6,7

**frequently** 12:9

**Friday** 8:1 66:3,4,9,11,12 67:8

**front** 21:10

**full** 68:1 75:10

**functional** 19:18

**fund** 8:11 10:5,6 39:3

**funds** 40:2,3,12

**FYI** 89:21 92:17

**G**

**garden** 14:21,23

**Gardner** 8:23

**gas** 79:25 83:8

**Gatto** 91:5,7 92:24 93:4

**Gautam** 36:25 37:13,17 88:18 92:10

**general** 16:8,17 17:8 23:24 24:14
30:13,14 31:3,7 35:10 36:1 37:18
41:10,16,17,21 42:1,16 44:18 49:20
50:14 51:5,7 61:21 62:21 65:4 66:14
67:20 70:2 74:20 76:12 82:5,8 83:15,
24 91:15

**generally** 11:16 12:6 16:11,12 17:17
34:15,18 36:21 39:8,24,25 43:16,22
44:1,7,16 50:16 57:5,6,25 61:22 73:7
74:18,24 76:16,21 79:11 82:4

**gentleman** 17:22

**geographically** 13:2

**give** 15:2 49:8

**Global** 20:9 80:7 81:5 85:21 87:20

**Godfrey** 8:21 9:9

**good** 9:2 10:3 78:12

**great** 40:21

**group** 15:5,19,25 17:1,2,4,13,14,16,
18 18:1,5,6,9,12,17 19:25 20:1,3
25:22 35:4 36:1,3 37:6 57:4 68:21
87:8,9 89:2

**groups** 19:7,11,18 29:4 31:9 32:3
33:7 57:1,4,6 71:8

**guess** 50:3

**guys** 66:11

**H**

**Habachy** 77:8 78:1,3,4,10 79:1,15
82:10

**hand** 95:18

**Hannigan** 9:8

**hard** 52:13 93:15

**head** 17:18 20:9 79:8,9

**heading** 88:21

**headquartered** 45:11 79:25

**headquarters** 91:17

**hear** 11:25

**heard** 31:2 68:13

**height** 75:12

**held** 71:20 73:19

**helpful** 88:24

**Henle** 37:1,15 47:12,24 88:18 92:9

**Henley** 37:18 65:22 93:3

**high** 78:18

**higher** 39:6 40:5

**history** 15:22

**Holdco** 22:14 25:9,11,16,19,21 26:7,
12,17,19,20,25 27:6,7,23 29:6,11,16,
19,23 30:2,7

**Holdco's** 27:14,15

**homes** 72:6 83:24 86:15 87:18

**hope** 78:11 81:17

**hopeful** 52:15

**hour** 12:7 40:15 69:5

**hours** 89:1,13

**Houston** 45:12,15 48:4,9,14,19
57:14,18,23 58:5,8,14,22 59:6,10
63:16 64:13,14 79:2,16,22 81:5,9
83:8,18,22 84:1 85:23 86:20 91:16,17

**Hurst** 8:24

**I**

**idea** 66:3,10

**ideas** 82:7

**identity** 95:14

**II** 10:6 39:19 80:24

**in-person** 11:18 52:3 71:20 73:19
84:1

**inaccuracies** 74:23 76:17

**inaccurate** 74:21

**included** 41:19 68:1

**includes** 44:3

**including** 36:25 44:11

**inclusive** 32:3 42:1

**indication** 74:4

**indirectly** 39:3

**individuals** 69:2

**industries** 82:7

**initiated** 61:12 62:24 80:6 83:11

**Inoa** 8:13

**instance** 68:12

**instrument** 95:15

**intent** 90:13

**interacted** 18:5,24 19:21 87:4,10

**interactions** 87:6,8

**interest** 38:20,25 39:2 40:4,12

**internal** 74:6

**interrupt** 30:20

**introduce** 8:16

**introductions** 9:17

**invest** 31:22 33:20,24 34:11

**invested** 17:2

**investment** 16:19,20 31:18,23,24

32:6,14,18 33:1,2,3,10,12,13,18,19,
22,24 34:2,4,6,10,12,13,14,16,19,20
35:7,9,13,22 36:4,6,11,20 37:8,19,23
38:2,7,8,20,25 39:3,7 40:2,7 41:24
42:12,15,23 44:2,4 45:6 52:5 63:25
65:4 75:3 76:25 77:2 79:1,6,12,15
82:5 83:14,17,19 86:24 88:1

**investments**  19:15 34:19 87:24

**investor**  13:24

**Investors"**  39:20

**invite**  53:22 60:12,17,23 61:4 62:15,
18 63:2 64:7

**invites**  60:20 63:7

**involved**  19:8,18 31:10 32:4 33:7
43:17 44:1,8 45:5 51:8 57:2,5,6 69:3
87:22

**involvement**  30:13,14 31:3,7 36:1
37:9,10,22 38:2,6 42:1,16,20 44:18
51:5,7 61:22 91:15

**involving**  45:23 53:9 61:19 64:19

**issues**  75:18,20,22

**items**  89:5,10,12

---

## J

**January**  21:17

**Jeff**  57:5

**jeffkelly@blackstone.com**  56:15

**Jeffrey**  63:10 64:11

**job**  15:21 16:6,14,17 17:23

**jobs**  14:25

**Joe**  19:3,22,23 91:4,7 92:12,17,24
93:4

**join**  85:2

**joint**  70:17 71:17

**judge**  11:4

**July**  28:21

**June**  46:22 47:10,22 48:15 49:1 50:6
55:20 56:9 57:9,18 67:11 70:19 71:20
72:12 73:5,18 76:8 84:18 85:10

**junior**  36:3 38:10,12,15

**juniormost**  36:5

**jurisdictional**  30:18

---

## K

**Kelly**  56:19,20

**Kenneth**  8:13

**key**  89:22

**kind**  19:13 33:6 50:4 83:21

**Kirkland**  9:3

**knowledge**  10:24 15:8 35:25 64:1

**Kyle**  8:23

---

## L

**L.P.**  39:18,19

**land**  48:4

**landed**  48:10,14,18

**large**  17:4,14

**lead**  61:15

**leave**  14:21,23

**Lee**  53:10,13,16,25 54:17 61:12

**left**  16:6 73:7

**legal**  8:14 15:13 23:8,9,17,18 25:11
35:25 36:9

**level**  38:11 78:18

**Levesque**  9:5,6

**LEXITAS**  8:15

**Limited**  24:23,24 25:1,2,4 28:4,9,15,
19 39:13

**lines**  36:1,9

**liquidity**  75:18,20,22,23

**list**  25:18 71:12,14,16 86:7,11,15

**listed**  22:25 24:11 25:16 26:2 51:18
61:10 71:9,13,15 72:1 74:8 89:5

**listen**  68:4,9

**lists**  29:1 46:25 71:3 81:7 86:20,23
89:10

**litigation**  10:6

**LLC**  22:14 25:9,11,16,20,21 26:7
70:19

**Ln**  94:6,8,10,12,14,16,18,20,22,24

**located**  13:2,4,7 47:4 49:6 63:15,22
64:3,13 68:23 72:2,5,8 79:16,23 81:5
83:10 85:22 91:16,21

---

**locations**  72:7

**Locke**  9:6

**logistics**  72:16,21

**long**  14:5,14 26:20 46:17

**looked**  28:10 29:22 39:10,13 54:14
64:17 68:21

**lot**  19:7 77:24

**low**  90:8,12,22

**lower**  39:6 40:5 75:13,23

**lying**  58:12

**Lynn**  8:23

---

## M

**made**  28:21 32:16 33:19 34:11 74:4
78:13

**Main**  63:15 85:23

**majority**  79:12

**make**  20:25 31:17 32:18 33:1 34:5,18
40:5 42:6 59:12 74:20 75:3

**makes**  33:2,4 53:19

**making**  31:16,22

**management**  17:7 65:5 68:5,9,10,
13,18,19,25 71:4,25 72:1,4,19,22
73:24 75:7 87:7

**manager**  71:14

**managers**  70:19 71:4,19

**Managing**  16:4,5 17:24 20:8 81:4

**Manhattan**  13:7

**mark**  21:4 37:1,15 47:12,23 55:11
60:2 62:2 65:11 66:1 70:7 77:13
80:13 84:7 88:18 91:23 92:9

**marked**  21:8 46:9 52:25 53:2 55:6
60:4 62:5 65:14 70:9 77:15 80:15
84:9 88:5 92:1

**Markets**  63:11

**material**  66:4,10,16

**materials**  64:6

**matrix**  18:23 19:6 33:6 35:16,24
56:25

**matter**  8:10

**matters**  30:17

**meant**  19:17 57:22 63:19

---

medication 12:18

meet 83:25

meeting 66:2,8,12 70:17,24 71:17
72:18,22 73:5,18 74:14 76:8,11,18,22
91:4 93:10

meetings 42:23,25 45:14 57:18 58:3
60:19 67:10 69:24 70:3 73:7 74:16
76:13,15

Megan 51:11,15 53:22 54:13 65:21,
24 68:22

member 16:19,20 25:19 31:23 38:8
41:11 49:5 50:24 51:25 56:20,21 57:5
65:4 68:3 79:19 91:8

members 25:19 34:1 49:16 58:25
61:5 68:4 72:19,22 73:24 84:25 88:17
89:9

memory 56:21

mention 52:11 90:1

mentioned 21:24 35:10 53:18 69:22
70:2 71:8

merger 44:17,19 88:19 89:6 93:11

messaging 13:20

met 52:2 54:25 72:10

mid 16:12,13

middle 21:18 50:5,8 57:7,11

Midland 79:25

mind 28:7 30:25 34:7 36:14,15 38:21
40:14,15 47:17 48:23 55:23 56:4
69:4,7 73:9,14 77:20 88:10 92:5

minute 11:2

minutes 40:18,20 54:1 69:8,23
70:16,24 73:4,19 74:2,11,16,21
76:15,18,22 85:10 93:14

misstated 76:18

misunderstand 32:14

moment 42:19 44:13 73:11

Monday 92:16

month 72:12

morning 9:2 10:3 48:3 66:5,9,11,12
69:6 89:4

move 52:17 66:12

multiple 17:6 87:18

## N

named 17:22 19:3 29:4

names 23:2,5,7,8 37:4,20,21 50:13,
17,19 56:13

Natural 85:21 87:21

nature 33:7 35:24 40:16 56:25 69:7

negotiating 30:10 31:7

negotiation 31:4

noise 13:17

noon 52:13,16

North 64:1

NOTARY 95:22

note 74:2

noted 49:23 59:2,20 62:18 73:22
75:10,14 78:9 80:20 95:3

notes 81:10 82:6

noticed 74:22

noticing 8:19

November 60:12,24

number 11:10 16:3 18:24 29:4 35:17
36:13 40:10 53:5 55:14 60:7 62:8
65:17 70:12 72:6 77:18 78:16 80:18
82:9,11,12 83:24 84:12 87:23 88:7
89:10 93:1,2

numbers 78:18

numeric 46:13

numerous 77:1

## O

oath 10:10 41:7 69:20 95:12

object 30:15,16

objection 22:18 23:12,23 24:6,13
26:21 27:1,9,16 30:19 32:8 41:12
43:6,15 44:6 45:3 55:3 58:15 63:23
64:21 67:14,23 72:13 73:8 76:20 77:4
79:4,17 82:3,18 83:1 90:18,24 93:6

obligation 42:14

occupation 13:23

occurring 67:11

office 83:22,23 95:18

Officer 47:4

offices 63:25 83:20

official 74:22

oil 75:13,16 79:24 83:7

one-page 65:16 80:17

one-pager 81:18

one-pagers 81:20

one-rig 76:1

one-time 42:12

operating 75:17

operations 56:22 65:7

operative 21:15

opportunities 87:24

Opportunity 8:11 10:5,6

optimal 75:16

optimize 75:19,24

org 22:9,11,16,17,25 23:3,22 24:5,12

organization 18:23 19:6 35:16
79:20

original 59:19

overseeing 41:24 76:25

oversight 65:6

owned 29:23

## P

p.m. 54:9 67:8 85:1

package 38:24

pages 25:13 46:17 77:24

paid 15:11,14

pandemic 75:13

paper 78:18

paragraph 28:18 74:2 75:2,10 76:4
78:21

paragraphs 76:5

parentheses 67:8

part 17:14 18:4 33:18 37:2 38:14,18,
23 50:13

participant 67:21 73:6

participants 73:23

participate 45:14 69:24

**participated** 73:21 91:4 93:4

**participating** 42:22

**partner** 25:16

**partners** 14:4 16:24,25 17:1,25 18:4, 8,10 20:3 23:16 24:24 25:2,4,15 28:10 34:17,18,21,22 35:1,2,3,4,12 39:14,18,19 47:4 57:3 69:25 70:19,25 71:19 80:8 81:5

**partnership** 24:23 25:1 26:6 28:5,9, 15,20 30:7,11 31:4,8,11,12,19 39:14 42:13,19,21

**parts** 20:13 83:23

**party** 8:18

**Patricia** 53:9,12,13,14

**pause** 41:1 69:14

**PDF** 28:16

**pending** 10:21,25 12:11 21:24 92:18

**people** 13:16 17:12,15,17 18:7,12, 16,20,24 19:10,11 31:24 32:2,4 35:17 36:7,10,14,15 37:7 38:13 45:5 50:11, 12 54:14 57:2 59:2,8 63:7,20 64:2 68:21 71:16 85:15,18 90:5

**Pepper** 9:6

**perform** 43:11

**performed** 24:4 37:13

**period** 14:20,24 17:8 18:22 20:7 42:17 43:5,14 49:18 58:4 65:1 67:11

**periods** 16:1

**person** 13:20 18:1 19:2,21 32:19,20 34:12 36:14 59:9 87:3 95:14

**personal** 39:5 40:5

**personally** 38:19,24 43:23 64:17,25 72:5 77:1 87:12,13 95:11

**Peter** 78:24 79:7 82:11

**petition** 11:1 21:11,16 22:1 24:21

**Petroleum** 43:21,25 44:12,21 45:1, 8,22 83:13 86:25 91:11

**Pg** 94:6,8,10,12,14,16,18,20,22,24

**Phil** 46:23,25 47:1 51:19,23,25 53:22 54:13 61:7

**phone** 78:14

**phrase** 58:1

**Pincus** 77:8 79:2,6,19

**Pinker** 8:23

**Plaintiffs** 8:21 9:10 10:5

**Plaintiffs'** 21:11

**Plan** 59:16,22

**platforms** 13:20

**play** 30:10 31:16,21 43:3,12,23 44:25 56:23

**played** 67:18

**point** 15:23 32:16 61:17

**points** 20:18 92:11,17,24 93:2

**portfolio** 56:22

**portion** 20:20

**position** 16:13 75:11,14

**potential** 45:15,16,23 61:19 63:21 64:18 65:2 67:19 72:22 77:2,8 78:17 80:8 82:15,24

**potentially** 66:1,8

**practice** 74:15,20 76:12,16

**pre** 53:20

**preferred** 29:6,11,13,16,19,23 30:2 92:20

**prepare** 13:8,11

**president** 26:6,10,12,17,19,20,25 27:6,7,14,15 47:3

**press** 90:1,3,4

**prices** 75:13,17

**primary** 32:5,7,10,25 33:5 87:3,6,8, 9,15

**Primexx** 8:10 9:4 10:5 23:15 24:23 25:1,3 28:10,22 31:11,18,22 32:6,18 33:1,20,25 34:6,11 35:8,13,22 36:4,6, 11,19,25 37:7,19,23 38:2,7,14,20 39:1,4,7,14 40:7 41:11,18,23,25 42:3, 8,12,23 43:3,4,11,13,18,20,24 44:2,4, 9,21 45:6,23 46:23 47:4,11,23 49:1,5, 10,21 50:20,23,25 51:1,9,11,12,15, 19,24 52:1,5 53:10 55:1,20 56:8,10, 23 58:13 59:3,5,9 61:6,18,19 62:20 63:21 64:18 65:2,5,6,22 66:24 67:12, 18 68:10,19,23 69:3,24 70:18,24 71:4,10,11,18 72:2,18 74:6 76:25 77:3,9 78:15 80:8,25 81:18 82:16,25 83:13 84:1,19 87:1,8 88:19 89:6 90:4, 6 93:11 94:2

**Primexx's** 81:22 92:19

**Primexx/blackstone** 60:25

**Primexx/callon** 87:5,14 91:12

**Primexx/rosehill** 83:4,6

**PRIMEXX029462** 70:12

**prior** 30:11 31:13

**private** 15:25 17:2 18:5,6,9,11,17 20:1,2,9 57:3

**proceeding** 8:19 11:4

**process** 32:15 43:12,24

**productivity** 92:19

**profile** 90:8,12,23

**profitability** 39:7 40:6

**program** 75:15 76:1

**promoted** 16:1,2

**pronounce** 78:2

**Proposal** 59:16,22

**proud** 90:17

**proved** 95:12

**provided** 66:15 67:5

**public** 90:3 95:22

**pulled** 81:13

**Punches** 80:7,24 81:3,4,12,14 82:1, 20

**purposes** 95:17

**put** 11:23 20:11,12,16 39:10,15 46:5 52:8 55:8 65:8 70:4 77:11 78:17 80:11 84:5 85:16 88:3

**putting** 46:6 59:24 61:25

---

## Q

**question** 12:1,11 27:18 31:1 32:24 34:8,24 38:22 43:8 47:18 49:4 56:5 64:23 73:14,16

**questions** 10:7 12:19 30:17 32:13, 20,22 33:16 93:18

**quickly** 52:16

**quoted** 90:5

---

## R

**RBC** 61:18 63:11,20,24 68:14 87:9

**RBC's** 61:22

**RBC/BX** 62:21

**reached** 16:13 78:24

**read** 23:2 86:18 94:6,8,10,12,14,16, 18,20,22,24 95:1

**reading** 58:24 59:8 78:3

**reads** 26:10 28:14,16,17 89:24 94:6, 8,10,12,14,16,18,20,22,24

**reason** 12:24 27:4 44:13 48:7,17 74:10 76:6 94:6,8,10,12,14,16,18,20, 22,24

**recall** 11:9,15,20 15:25 16:8,10,11 17:9,16 20:10 22:5,7,23 23:8,17 25:5 26:15,18,22 27:2,10,22 29:8,20 30:4, 13 31:3,14 32:1 34:10 35:5,6 36:8,13, 17 37:5,6,9,10,14,16,18,22 38:1 41:20 42:1,25 43:20,22 44:15,16,23, 24 45:10,11,17,20,24 46:1,4 48:12, 13,16,20 49:19,20,23,25 51:5,6,17 52:2,6,7 55:4 57:20 58:2,7,11,17 59:7,23 60:21 61:14,17,21,22 63:1,5 64:2 66:22,23 67:1,3,10,15,17 71:2, 23 72:4,14,20 73:22 74:13,18 76:10, 21 77:5,7,10 79:8,11,23 80:1,5,10 82:7 83:6,9,16 84:2,4 87:16 90:19,25 91:6,9,14,15,18,20,21 92:25 93:7,9, 12

**receive** 31:12 68:9

**received** 24:11,15 27:22,24 64:5,9, 10 92:20

**recitals** 39:17

**recognize** 23:5,7,13,14,15 39:23 50:13,16

**recollection** 26:24 29:15,18 30:1 35:24 37:12 43:1 59:21 70:3 83:24

**recommendation** 32:17 33:19,24 34:11

**recommendations** 33:2 68:6

**recommended** 34:5

**recommending** 32:6,25

**record** 8:8 21:8 40:25 41:4 46:9 53:2 55:6 60:4 62:5 65:14 69:13,17 70:9 74:22 77:15 80:15 84:9 88:5 92:1 93:21

**reference** 15:4 39:18 66:21

**referenced** 40:3 67:25 68:1 72:15 86:16

**references** 36:23 66:16

**referencing** 21:23

**referred** 15:15 36:24

**referring** 42:4 54:16 68:10,18,24

89:16

**refers** 58:1

**refresh** 29:15,18 30:1

**refreshing** 56:21

**regular** 70:17 71:17 74:15

**regularly** 19:22

**relate** 30:17

**related** 43:17 44:8

**relates** 88:23

**relationship** 87:25

**relationships** 19:20

**relative** 40:9

**release** 90:1,3,4

**remainder** 16:15

**remember** 38:13 72:9

**remote** 8:9 11:19,21

**remotely** 10:10

**repeating** 28:7 30:25 34:7 38:21 47:17 56:4 73:14

**rephrase** 43:8

**reply** 85:17 89:2

**report** 18:16,21 35:8,11 49:12

**reported** 18:19,25 19:2 35:14,17,21 36:4 49:14

**reporter** 9:18 10:14 21:4 52:24 55:10 60:2 62:2 65:11 70:6 77:12 80:13 84:7 91:23

**reporting** 19:13,20 35:25 36:9

**reports** 19:23

**represent** 8:18,25 10:4 21:15

**rescheduling** 66:1,8

**reserve** 93:17

**resolved** 75:20

**Resources** 85:22 87:21

**responded** 54:6 67:4 85:9,13 89:25 90:11

**response** 90:10

**responsibilities** 16:18,23 41:10,23 42:11,18

**responsibility** 32:5,7,25

**rest** 55:1 58:12

**Restated** 24:22 25:1 28:4,9,15,19 39:13

**resulted** 43:24

**retained** 68:14

**review** 13:11 73:11 74:15 76:13,15

**reviewing** 76:22

**Richard** 80:7,24 81:2,14,16 82:9,20

**rig** 75:15,21

**right-hand** 65:19 80:20 92:7

**risk** 75:23

**role** 17:13 26:15 30:10 31:16,21 43:2, 3,10,12,23 44:25 46:2 49:10,12 51:6 56:23 65:3 67:18 76:24

**roles** 37:5

**room** 13:14,18

**rooms** 20:23

**Rosehill** 59:16,22 80:25 81:19 82:16,25 83:7,9

**run** 75:21

## S

**sale** 44:11,15,20 45:15

**Sam** 50:20,23,24 53:22 54:13 61:7 68:22

**Sarah** 9:8,11

**schedule** 25:15 53:17 54:18 63:8

**scheduled** 61:12

**scheduling** 57:24

**Schwegmann** 8:24

**screen** 20:12,17,21 24:21 39:10,15 46:7 49:22 52:24

**seal** 95:18

**sector** 16:22

**self-employed** 14:1

**sell** 43:4,13

**send** 60:19 63:6

**senior** 16:3,5 17:19,20,24 18:2,7,10, 12 19:12 20:8 35:11 38:10 84:25

**sense** 53:19 78:13

**sentence** 75:6 92:14

**separately** 78:24

**series** 13:10 29:1,6,11,13,16,19,23 30:2 42:14 75:7

**serving** 70:25

**set** 59:11 81:21

**setting** 28:8 82:21

**settled** 78:15

**seven-page** 70:13 73:10

**share** 20:17 46:6 52:23 78:18 81:18

**shared** 21:5 78:16

**sharing** 30:5

**SHEET** 94:1

**short** 14:20

**show** 11:1 24:19

**shown** 11:4

**shows** 63:5 64:9,10 82:19 86:2 89:8

**sic** 48:3

**sick** 12:22

**signature** 25:12 27:20 29:9 30:9 47:2 51:22 63:14 64:12,14 81:10 85:20,25 86:2,10,22 95:2

**signed** 25:9 26:5,11 27:5,7,13 29:12 30:6 42:13,19,20

**significantly** 75:11

**signing** 30:12 31:13 89:1,6,14

**silently** 67:22

**similar** 82:10

**simply** 32:24 75:21

**simultaneously** 75:23

**sit** 67:22 76:7

**skip** 25:6

**Skipping** 51:10

**slightly** 11:22

**small** 11:10

**smoothly** 12:3

**sold** 43:21,24

**sort** 36:18

**sound** 37:2

**spare** 93:14

**speaking** 17:17 34:15,18 36:21 39:8, 24 44:16 57:25 74:18,24 82:4

**specific** 10:24 15:8,13,25 16:21,23 17:5 20:13,18 23:1,8 34:23 35:25 36:8 37:5 38:1 41:14,17 43:1 44:14, 23 48:24 51:6 58:2 68:12 83:16 91:14,20

**specifically** 11:9,15 13:18 16:10 20:10 22:7 25:5 26:15,18 31:14 32:1 35:5,6,13 36:13,17 60:22 64:2 72:5,8 74:19

**specifics** 17:17 23:17 27:11 29:20 30:4 33:5 41:22 44:15 45:20 48:20 50:15 52:6,7 57:20 58:11 59:7 61:14 63:6 71:2,23 73:22 74:13 76:10 80:5 83:6 87:16 90:20 92:25 93:12

**spelled** 66:19

**Spence** 63:11,14 64:6

**Spence's** 64:12

**stage** 28:8

**Stand** 69:11 93:19

**start** 14:14 41:16 67:11 78:12

**started** 9:12 14:12,18 15:24 16:9 55:20 56:3 67:12

**starting** 77:17 84:11

**starts** 46:22 56:8 65:21 80:22 84:15 88:13

**state** 8:17 57:25 76:7 95:7,23

**stated** 75:22

**statement** 48:11 92:13

**states** 26:9 64:14 75:2 83:21

**status** 62:21

**Stephen** 83:12,14 84:18

**steps** 61:1 62:21

**stop** 30:5 93:15

**Strategic** 60:25

**strategical** 68:15

**Street** 63:15 85:23

**strong** 75:17

**structure** 23:18 75:4

**struggling** 33:4

**subject** 53:17 59:15,19 60:25 62:20, 23 78:5,9 80:4,25 83:3,5 84:19 88:19 92:11

**subscribed** 95:15

**substance** 84:22,23

**substantial** 31:17

**substantive** 28:12

**Suite** 63:15 85:23

**summarize** 88:25

**summary** 18:14,15

**support** 34:21 35:1 74:3

**Susman** 8:21 9:9

**swear** 9:18

**sworn** 9:23

---

## T

**table** 28:3 29:25

**takes** 14:7

**taking** 12:18 36:12 44:13 58:3

**talk** 17:6

**talked** 15:16

**talking** 92:11,16,24

**Tall** 78:5,15 79:24

**Taylor** 9:5

**team** 16:19 31:23,25 33:2,10,12,18, 24 34:5,10,13,16 36:19,25 37:3 38:9, 14 41:11,18,24 43:3,11 49:5,9 50:25 51:8 52:1 53:21 54:9,12 55:1 56:9,10, 22,24 58:13 59:1,5,13 60:20 61:6 65:5,6 67:19 68:5,10,11,13,18,19,25 69:3 71:25 72:4,8 75:18 76:25 78:19 79:10,12 85:1 87:7 88:22 89:10 90:17 91:9 92:16 93:5

**teams** 36:22 78:15

**technical** 11:25

**teens** 16:12,14

**teleconference** 71:21 73:20

**ten** 40:18 71:15 73:24 76:5

**term** 58:1

**terms** 30:11 31:7 41:10,22 61:21

**testified** 9:24

**testify** 12:25

**testifying** 13:15

**testimony** 11:3

**Texas** 10:21 28:23 46:3 47:5 49:6 52:3 58:21 61:7,18,23 63:16,20,22 64:13,19 68:23 71:20 72:2 77:2 79:2,

16,25 81:6,9 83:8,18 85:23 86:21 91:16,17

**Texas-based** 45:8

**thing** 12:10

**things** 19:4 52:17 78:14 82:9

**thought** 78:13 88:24

**thoughts** 88:25 89:16

**Thursday** 62:16

**time** 8:6,7 11:13,24 14:7,20,24 16:2, 15 17:8 18:22 20:7,19 30:21 35:5,6 40:23 41:2 42:17,25 43:5,14 44:2,9 47:16 49:18 58:2,3 59:11 65:1,3 67:11 69:12,15 70:25 79:8,12 82:13 83:15,16,22 87:23 93:20

**times** 11:8 15:5 16:1,3 67:9

**timing** 14:9

**title** 16:3,6,9,14 17:23 20:6 26:6 51:6 70:16,22 91:14,20

**titled** 21:11 24:22

**titles** 15:23 91:19

**today** 10:8,18 12:16,19,22,25 57:14, 23 59:10 76:7 89:3

**today's** 13:8

**told** 48:8,19 58:13,22 59:6

**tomorrow** 59:14 66:2,9

**tonight** 85:1

**top** 21:17,18 22:12 23:11 28:14,16 29:13 47:9,21 63:9,13 70:22 71:7 74:8 90:14,15

**topic** 78:25 82:15

**topics** 82:11,13 93:2

**totally** 32:14

**touch** 78:13

**transaction** 44:16,18,20,23 45:1,16, 23 61:19 63:22 66:25 67:13,19 77:9 80:9 82:16,24 83:12 87:1,5,14 88:23 89:14 90:16 91:2,3,12

**transactions** 64:19 65:2 77:3

**transcribed** 10:14

**TRANSCRIPT** 94:1

**Transition** 85:22 87:21

**Trauber** 83:12,14,17,19,25 84:19 85:6,9,13 87:3,15,18,20 88:1

**Trauber's** 85:20

**travel** 46:3

**trip** 57:20

**Troutman** 9:6

**true** 95:3

**truthfully** 12:20,25

**Tuesday** 53:18

**turn** 68:15

**turning** 77:20 88:10 92:5

**two-page** 60:7

**typically** 60:18 63:6 76:15

---

**U**

**ultimate** 16:3 44:11 86:25

**ultimately** 43:13,20 93:3

**understand** 10:9,13,17,20 11:2 27:18 32:9,12 33:15 41:7 49:4 61:23 64:23 66:20 69:20 89:22

**understanding** 15:6 23:25 24:15 40:1 50:12

**understood** 30:22 71:24

**unfamiliar** 23:6 37:20

**United** 83:21

**unitholder** 29:7,11,14,16,19 30:2

**unitholders** 29:3

**Units** 29:23

**unusual** 11:22

**up-to-speed** 89:4

**upcoming** 66:25

**update** 66:4,11,16

**updates** 68:4,9,13

---

**V**

**valuation** 90:6

**values** 75:24

**version** 21:16

**versus** 8:11

**Vice** 47:3 85:21

**video** 8:9

**video-recorded** 10:18

**view** 78:19

**VII** 39:18

**visible** 13:22

---

**W**

**waiting** 92:18

**wanted** 41:16 52:20 78:18 81:19 90:22

**Warburg** 77:8 79:2,5,19 82:12

**Warburg/blackstone** 78:14

**warning** 30:19

**ways** 17:7 52:19

**Wednesday** 53:21

**week** 53:19 54:25 78:22 81:17 82:1

**weekend** 92:21

**wells** 92:19

**whatnot** 20:22

**White** 51:1,4 52:3 55:20 56:8 59:19 61:7 68:22 72:11

**window** 66:14 67:5

**wondering** 35:12 43:10

**word** 33:5 44:14

**work** 12:2 17:12 19:10,11 24:4 37:13 43:12 46:3 53:21 67:9

**worked** 15:15,19 17:14 19:14 24:7,8 34:15 36:3,8,11,19 37:7,19 83:20,22

**working** 14:14,18 36:5 38:14 43:13 68:23

**works** 22:13 32:15 59:11 78:22

**workstream** 89:6

**workstreams** 88:19,25 89:13,17,22

**wrong** 33:15,16

**wrote** 48:2 54:1,12,20,22 57:13,17, 21 67:5,7 78:10 81:16 84:22 89:12,21

---

**Y**

**Yaman** 8:22

**year** 14:6 75:12 78:12,13

**years** 11:16 42:15 88:2

**York**  8:1 13:4,5 79:7,10 82:12 83:22
86:8,12

## Z

**Zack**  9:3

# EXHIBIT 2

# FILED UNDER SEAL

**To:** Li, Patricia[Patricia.Li@Blackstone.com]
**From:** Acconcia, Angelo[acconcia@Blackstone.com]
**Sent:** Tue 5/25/2021 5:48:40 PM Coordinated Universal Time
**Subject:** RE: Schedule next Tuesday [External]

Thanks. Lets do drinks with Chris at 5:30pm and then dinner at 6:30pm with the team. Could be fearings if that works for both.

Could we do 12pm EST on Tues for the board call?

---

**From:** Li, Patricia <Patricia.Li@Blackstone.com>
**Sent:** Tuesday, May 25, 2021 1:29 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Fwd: Schedule next Tuesday [External]

Angelo,

Please advise on the below as you will be in Dallas.

Thanks
Patricia Li

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Tuesday, May 25, 2021 1:21 PM
**To:** Li, Patricia
**Subject:** Schedule next Tuesday [External]

Patricia – can you quickly tell me what windows work for Tuesday afternoon next week for a Primexx Board call? We would need an hour.

Also – Angelo mentioned having drinks/dinner next week. I think it makes sense for Angelo and I to have pre-dinner drinks and then have a team dinner Wednesday evening. Does that work? I would invite Phil, Megan, Chase, and Sam.

Thanks,

Chris

**M. Chris Doyle**
President & CEO

**Primexx Operating Corporation**
Two Energy Square
4849 Greenville Ave, Suite 1600
Dallas, TX 75206
Office: 214-369-5909
Direct: 214.635.2632
chris.doyle@primexx.com

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 3

# FILED UNDER SEAL

To: Chris Doyle[chris.doyle@primexx.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Henle, Mark[Mark.Henle@Blackstone.com]
From: Acconcia, Angelo[acconcia@Blackstone.com]
Sent: Tue 6/29/2021 11:17:53 AM Coordinated Universal Time
Subject: Re: [External]RE: biweekly materials [External]

On a fight this morning to Houston. Will call you when I land.

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Tuesday, June 29, 2021 12:25 AM
**To:** Steven Pully
**Cc:** Acconcia, Angelo; Hirshberg, Al; Belz, Erik; Henle, Mark; Tom Fagadau; Chip Fagadau; James Jeffs; Jim Langdon; John Kelly; Gautam, Anika; Kelly, Jeff; Sam Blatt; Chase White; John Schopp; Megan Davis; Phil Cook; Tom Fagadau
**Subject:** Re: [External]RE: biweekly materials [External]

We will make Thursday afternoon work according to your schedule.
Chris

Sent from my iPhone

> On Jun 28, 2021, at 11:12 PM, Steven Pully <sjpully@yahoo.com> wrote:
>
>
> Chris, I think that is a good suggestion. I am in trial prep and testimony though late Wednesday...can we do something on Thursday afternoon? Happy for anyone to be invited. Also, I recognize that my questions relate to BPP equity and I am certainly not a BPP director...that being said, if the second rig is dropped, Primexx shareholders suffer too, which is why I am so keenly interested.
>
> Regards, Steve
>
> Steven J. Pully, CFA
> 214 587-6133

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 10:34 PM
**To:** Steven Pully <sjpully@yahoo.com>
**Cc:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <Al.Hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>; Gautam, Anika <Anika.Gautam@blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** Re: [External]RE: biweekly materials

Thank you, Steve. I would suggest the team have a call with you and/or a BPP Board member to discuss exactly what question you are trying to answer. We believe the analysis provided this weekend is directly responsive to your question of equity returns on incremental capital as are the multiple models run for the Special Committee.

Speak soon,

Chris

Sent from my iPhone

> On Jun 28, 2021, at 8:05 PM, sjpully@yahoo.com wrote:
>
>
> Chris, I was appointed to my 29[th] board today...recommended, by the way, by one of the large energy lenders that we are talking to. **Never in all of the boards that I've been on has it been so difficult to get the management team to run a model!** Can't you guys just run the model that I am asking for and we can debate what it says/means later? I feel like I have a duty to see this information.
>
> Steve
>
> Steven J. Pully, CFA
> 214 587-6133

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

BPP_0018525

*The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 7:15 PM
**To:** Steven Pully <sjpully@yahoo.com>; Angelo Acconcia <acconcia@Blackstone.com>; 'Hirshberg, Al' <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; 'Henle, Mark' <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; 'James Jeffs' <jjeffs@westgate-ep.com>; 'Jim Langdon' <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** 'Gautam, Anika' <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; 'John Schopp' <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** RE: [External]RE: biweekly materials

Thanks for following up, Steve. Everyone may have different assumptions, but here is how the team thought about your questions/comments:

1. While "new equity always wants a discount" may be true, wanting and receiving are two different things. Since the largest current equity owner has indicated that they were not supportive of making a complicated capital structure more complicated with the addition of outside capital, the team believes that assuming a no-discount entry is the appropriate assumption (if not aggressive). Since BPP always has the opportunity to run two rigs in the future, we assume current equity owners would be unlikely to offer a discounted entry as you suggest.

2. I agree with your methodology assuming all current equity owners would consider funding their pro rata share. Since the largest equity owner has indicated they don't currently have the support to infuse more capital into this business as currently configured, your approach falls apart and is not viable. Given the guidance the Board has given us, the best shot would be an aggressive bid from external capital, and that has not materialized after months of pursuing. Discussions with potential equity providers indicated previous investments were based on valuations of PDP PV15. That level of value is not compelling.

3. I won't assume to know all of the questions you may have about liquidity, but I assume one question would be the actual quantum of liquidity as a minimum. We assume more aggressive (lower) liquidity limits than the Board has currently approved. While more aggressive than current Board guidance, minimum assumed liquidity at BPP of $40 million and $80 million at the combined PRD/BPP are appropriate assumptions. One might consider an even more aggressive minimum threshold (and I have run active operations much tighter), but because this is new equity coming into the business, the appropriate assumption is to maintain a reasonable/conservative cushion to ensure the infusion of equity is sufficient to fund the business and absorb additional business risks.

Chris

---

**From:** sjpully@yahoo.com <sjpully@yahoo.com>
**Sent:** Monday, June 28, 2021 6:54 AM
**To:** Chris Doyle <chris.doyle@primexx.com>; Angelo Acconcia <acconcia@Blackstone.com>; 'Hirshberg, Al' <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; 'Henle, Mark' <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; 'James Jeffs' <jjeffs@westgate-ep.com>; 'Jim Langdon' <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** 'Gautam, Anika' <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; 'John Schopp' <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** [External]RE: biweekly materials

Chris, I do have some questions/comments regarding the BPP equity infusion:

- New equity is not likely to pay 5x EBITDA; new equity always wants a discount. The returns would be higher if the new money was coming in at a more compelling valuation.
- The better way to run the analysis (as an example only) is to have the three equity holders fund their prorata analysis and then look what their returns are on all the equity that they have invested with two rigs; compare that to the current one rig investment scenario and what the returns would be from that
- I also have some questions about the exact liquidity need

Thanks.

Steve

Steven J. Pully, CFA
214 587-6133

0184

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

BPP_0018526

*The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential, proprietary, and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers.*

---

**From:** Chris Doyle <chris.doyle@primexx.com>
**Sent:** Monday, June 28, 2021 12:22 AM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <al.hirshberg@blackstonesradvisors.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; Steven Pully <sjpully@yahoo.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** RE: biweekly materials

Please see attached materials as follow up to Friday's biweekly call.

Let us know if you have any questions or would like for us to go through the materials 1:1.

Thanks,

Chris

---

**From:** Phil Cook <phil.cook@primexx.com>
**Sent:** Thursday, June 24, 2021 8:13 PM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Hirshberg, Al <al.hirshberg@blackstonesradvisors.com>; Chris Doyle <chris.doyle@primexx.com>; Erik Belz <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>; Tom Fagadau <tom.fagadau@primexx.com>; Chip Fagadau <wrf@fagadauhawk.com>; Steven Pully <sjpully@yahoo.com>; James Jeffs <jjeffs@westgate-ep.com>; Jim Langdon <jimclangdon@gmail.com>; John Kelly <jkelly@westgate-ep.com>
**Cc:** Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Sam Blatt <sam.blatt@primexx.com>; Chase White <chase.white@primexx.com>; John Schopp <schopp.energy@outlook.com>; Megan Davis <megan.davis@primexx.com>; Phil Cook <phil.cook@primexx.com>
**Subject:** FW: biweekly materials
**Importance:** High

Directors,

Please see materials for tomorrow's call.

Phil

*Philip W. Cook*
*Executive Vice President and Chief Financial Officer*
*Primexx Energy Partners*
*Two Energy Square*
*4849 Greenville Ave*
*Dallas TX, 75206*
*O-214.635.2613*
*M-918.606.4204*
<image001.png>

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 4

# FILED UNDER SEAL

To: Angelo Acconcia[acconcia@Blackstone.com]
From: Chris Doyle[chris.doyle@primexx.com]
Sent: Fri 7/2/2021 12:49:58 PM Eastern Standard Time
Subject: FW: Rosehill Plan B Proposal [External]
Attachment: Rosehill Overview Materials_06.30.21.pdf

---

Slide 3

---

**From:** Chase White <chase.white@primexx.com>
**Sent:** Wednesday, June 30, 2021 2:30 PM
**To:** Erik Belz <Erik.Belz@Blackstone.com>; Angelo Acconcia <acconcia@Blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** RE: Rosehill Plan B Proposal [External]

Draft materials we can run through here at 330 ET.

Chase

---

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 10:12 AM
**To:** Angelo Acconcia <acconcia@Blackstone.com>; Chase White <chase.white@primexx.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Jeff Kelly <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** RE: Rosehill Plan B Proposal [External]

Sounds good. Chase – would 3:30pm ET work? I think we can keep this call relatively short, as the objective with this bid should be to get into the next round, and so we are really bidding the book at this point. Based on the sell side info, what is PDP PV 10, 12 and 15 (at current strip)? If you take a 10% discount to the seller's PDP volumes, what is the PDP PV 10, 12 and 15?

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 11:07 AM
**To:** Belz, Erik <Erik.Belz@Blackstone.com>; Chase White <chase.white@primexx.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** Re: Rosehill Plan B Proposal [External]

I am back to back in Houston today. Why don't you set the time that works best for you all and if I can't make it I will follow-up with the team to discuss.

I am on a flight early am but free for most of the afternoon tomorrow.

---

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 30, 2021 9:25 AM
**To:** Chase White; Acconcia, Angelo; Gautam, Anika; Kelly, Jeff; Henle, Mark
**Cc:** Chris Doyle; Sam Blatt; Phil Cook; Megan Davis
**Subject:** RE: Rosehill Plan B Proposal [External]

I cannot do 5:30pm ET. Would 3:30pm or 4pm ET work? Could also try to do something late morning today. If not, I could do later tonight after 8:30pm ET.

---

**From:** Chase White <chase.white@primexx.com>
**Sent:** Wednesday, June 30, 2021 10:20 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Gautam, Anika <Anika.Gautam@Blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Kelly, Jeff <jeff.kelly@blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Cc:** Chris Doyle <chris.doyle@primexx.com>; Sam Blatt <sam.blatt@primexx.com>; Phil Cook <phil.cook@primexx.com>; Megan Davis <megan.davis@primexx.com>
**Subject:** Rosehill Plan B Proposal [External]

BX Team - We are wanting to hop on the phone this afternoon to run through Rosehill proposal/strategy. RBC has worked our PDP / opex assumptions as well as prepared a high level contribution analysis for us to consider.

Does 5:30pm ET work? Trying to kick out into afternoon post RRR/JP closings this morning. Thanks.

Chase

**Chase A. White**
Primexx Operating Corporation
Office: 214-691-3114
Cell: 214-536-6089
chase.white@primexx.com

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

HIGHLY CONFIDENTIAL: ATTORNEY'S EYES ONLY

# EXHIBIT 6

# FILED UNDER SEAL

**To:** Belz, Erik[Erik.Belz@Blackstone.com]; Acconcia, Angelo[acconcia@Blackstone.com]; Megan Davis[megan.davis@primexx.com]
**From:** Henle, Mark[Mark.Henle@Blackstone.com]
**Sent:** Wed 6/23/2021 2:20:05 PM Coordinated Universal Time
**Subject:** RE: Bi-Weekly Meeting-Reschedule Again? [External]

Works for me as well.

**From:** Belz, Erik <Erik.Belz@Blackstone.com>
**Sent:** Wednesday, June 23, 2021 10:15 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Megan Davis <megan.davis@primexx.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** RE: Bi-Weekly Meeting-Reschedule Again? [External]

That window works for me.

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Wednesday, June 23, 2021 10:14 AM
**To:** Megan Davis <megan.davis@primexx.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** RE: Bi-Weekly Meeting-Reschedule Again? [External]

Yes, thanks.

I can free up 11:30-3pm EST on Friday (or other times if those don't work).

**From:** Megan Davis <megan.davis@primexx.com>
**Sent:** Wednesday, June 23, 2021 10:05 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Henle, Mark <Mark.Henle@Blackstone.com>
**Subject:** Bi-Weekly Meeting-Reschedule Again? [External]

Angelo, Erik, Mark: I am looking at potentially rescheduling the Bi-weekly board meeting again from tomorrow afternoon to Friday morning, with the idea that we are more likely to have a material update on Capitan by Friday morning. Would you guys like to move the meeting to Friday morning? If so, please let me know your availability, and I will check general board availability based on the window you provide.

*Megan Davis*
*General Counsel and Secretary*
*Primexx Energy Partners*
*Two Energy Square*
*4849 Greenville Ave*
*Dallas TX, 75206*
*O-469.547.2078*
*M-214.218.1639*



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 7

# FILED UNDER SEAL

To: 'Trauber, Stephen '[stephen.trauber@citi.com]; Acconcia, Angelo[acconcia@Blackstone.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Schlopy, Fritz[fritz.schlopy@citi.com]; Tismen, Serge[serge.tismen@citi.com]; Fernandez, T[t.fernandez@citi.com]
From: Foley, David[foley@blackstone.com]
Sent: Sun 6/13/2021 3:19:48 PM Coordinated Universal Time
Subject: RE: Primexx [External]

I can do it at the 8:15pm Eastern time proposed. Can do it anytime later this evening too, but can not join a call between 5:30 and 7:30pm.

From: Trauber, Stephen <stephen.trauber@citi.com>
Sent: Sunday, June 13, 2021 11:14 AM
To: Acconcia, Angelo <acconcia@Blackstone.com>
Cc: Foley, David <foley@blackstone.com>; Belz, Erik <Erik.Belz@Blackstone.com>; Schlopy, Fritz <fritz.schlopy@citi.com>; Tismen, Serge <serge.tismen@citi.com>; Fernandez, T <t.fernandez@citi.com>
Subject: RE: Primexx [External]

Let's assume we can do it. Waiting to hear from our team. Cc'd our team here

Stephen M. Trauber
Vice Chairman & Global Co-Head of
Natural Resources & Clean Energy Transition
Citi
811 Main St., Suite 3900
Houston, TX 77002
(O) 713-821-4800
(C) 713-306-3325

**Please excuse all typos**
Sent with BlackBerry Work
(www.blackberry.com)

From: [Blackstone.com] Acconcia, Angelo <acconcia@Blackstone.com>
Date: Sunday, Jun 13, 2021, 11:04 AM
To: Trauber, Stephen [ICG-BCMA] <st98993@imcnam.ssmb.com>
Cc: Foley, David <foley@blackstone.com>, Belz, Erik <Erik.Belz@Blackstone.com>
Subject: Re: Primexx [External]

Just citi.

From: Trauber, Stephen <stephen.trauber@citi.com>
Sent: Sunday, June 13, 2021 11:00 AM
To: Acconcia, Angelo
Cc: Foley, David; Belz, Erik
Subject: RE: Primexx [External]

With client or just Citi?

Stephen M. Trauber
Vice Chairman & Global Co-Head of
Natural Resources & Clean Energy Transition
Citi
811 Main St., Suite 3900
Houston, TX 77002
(O) 713-821-4800
(C) 713-306-3325

**Please excuse all typos**
Sent with BlackBerry Work
(www.blackberry.com)

From: [Blackstone.com] Acconcia, Angelo <acconcia@Blackstone.com>
Date: Sunday, Jun 13, 2021, 10:48 AM
To: Trauber, Stephen [ICG-BCMA] <st98993@imcnam.ssmb.com>
Cc: Foley, David <foley@blackstone.com>, Belz, Erik <Erik.Belz@Blackstone.com>
Subject: Primexx

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

Could you and the senior members of the Capitan Citi team do a call tonight at 8:15pm est? Chris will join as well.

Angelo

---

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 8

# FILED UNDER SEAL

To: Acconcia, Angelo[acconcia@Blackstone.com]; Cain, Matt[matt.cain@rbccm.com]; Chris Doyle[chris.doyle@primexx.com]; Chase White[chase.white@primexx.com]; Richardson, Scott[Scott.Richardson@rbccm.com]; Numelin, Tye[tye.numelin@rbccm.com]; Belz, Erik[Erik.Belz@Blackstone.com]; Hamilton, Jonathan[Jonathan.Hamilton@Blackstone.com]; Kelly, Jeff[jeff.kelly@blackstone.com]; Gautam, Anika[Anika.Gautam@Blackstone.com]; Foley, David[foley@blackstone.com]
Cc: Oglesby, Amanda[Amanda.Oglesby@Blackstone.com]; Rozon, Onoria[Onoria.Rozon@Blackstone.com]; Gilman, Rachael[Rachael.Gilman@Blackstone.com]; Sow, Maty [Maty.Sow@Blackstone.com]; Li, Patricia[Patricia.Li@Blackstone.com]; Sam Blatt[sam.blatt@primexx.com]; Megan Davis[megan.davis@primexx.com]; Phil Cook[phil.cook@primexx.com]
From: Spence, Jeffrey[jeffrey.spence@rbccm.com]
Sent: Tue 4/20/2021 2:07:58 PM Coordinated Universal Time
Subject: RE: Call: Primexx/ RBC/ BX re: general status and next steps discussion [External]
Attachment: Primexx Process Update_20210420.pdf

All,

Please see the attached materials for discussion on the call this morning.

Thank you,

**Jeffrey Spence**
RBC Capital Markets | RBC Richardson Barr
609 Main St, Suite 3700, Houston, TX 77002
O: 713.585.3344 | C: 832.628.6604
jeffrey.spence@rbccm.com

-----Original Appointment-----
From: Acconcia, Angelo [mailto:acconcia@Blackstone.com]
Sent: Monday,April 19, 2021 11:54 AM
To: Acconcia, Angelo; Cain, Matt; Spence, Jeffrey; Chris Doyle; Chase White; Richardson, Scott; Numelin, Tye; Belz, Erik; Hamilton, Jonathan; Kelly, Jeff; Gautam, Anika; Foley, David
Cc: Oglesby, Amanda; Rozon, Onoria; Gilman, Rachael; Sow, Maty; Li, Patricia; Sam Blatt; Megan Davis; Phil Cook
Subject: FW: Call: Primexx/ RBC/ BX re: general status and next steps discussion
When: Tuesday,April 20, 2021 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
Where: Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required

-----Original Appointment-----
From: Acconcia, Angelo [mailto:acconcia@Blackstone.com]
Sent: Thursday,April 15, 2021 9:40 AM
To: Acconcia, Angelo; Chris Doyle; Chase White; Richardson, Scott; Numelin, Tye; Belz, Erik; Hamilton, Jonathan; Kelly, Jeff; Gautam, Anika; Foley, David
Cc: Oglesby, Amanda; Rozon, Onoria; Gilman, Rachael; Sow, Maty; Li, Patricia; Sam Blatt; Megan Davis; Phil Cook
Subject: Call: Primexx/ RBC/ BX re: general status and next steps discussion
When: Tuesday,April 20, 2021 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
Where: Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required

[External]
Dial: +1(646)558-8656 // Meeting ID: 212 583 5211 // Smartphone: +1(646)558-8656,2125835211#// No Participant Code Required
TO JOIN FROM A PC, MAC, IOS OR ANDROID:
https://blackstone.zoom.us/j/2125835211
Meeting ID: 212 583 5211

TO JOIN FROM A BLACKSTONE CONFERENCE ROOM OR OFFICE TELEPHONE:
Dial extension x6300:
Meeting ID: 212 583 5211
TO USE MOBILE ONE-TAP:
+16465588656,,2125835211# US Toll
+16699006833,,2125835211# US Toll

TO JOIN FROM A TELEPHONE:
US: +1 646 558 8656 or +1 669 900 6833
United Kingdom: +44 203 966 3809 or +44 203 695 0088
Singapore: +65 3165 1065 or +65 3158 7288
Hong Kong, China: +852 5808 6088
Australia: +61 8 7150 1149 or +61 2 8015 2088
China: +86 10 87833177 or +86 10 53876330
Costa Rica: +506 4000 3843
India: +91 22 62 192 563 or +91 22 71 279 525 or +91 80 71 279 440 or +91 22 48 798 004
Philippines: +63 92 3099 0478
Taiwan, China: +886 (2) 7741 7473
United Arab Emirates: 800 035 704 555 (Toll Free) or 800 035 704 239 (Toll Free)
TO JOIN FROM SKYPE FOR BUSINESS (LYNC):

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER
BPP_0017552

https://blackstone.zoom.us/skype/2125835211

## OR AN H.323/SIP ROOM SYSTEM:

H.323:

162.255.37.11 (US West)
162.255.36.11 (US East)
221.122.88.195 (China)
115.114.131.7 (India)
213.19.144.110 (EMEA)
202.177.207.158 (Australia)
209.9.211.110 (Hong Kong)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)

**Meeting ID: 212 583 5211**

SIP: 2125835211@zoomcrc.com

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.
_____ This E-Mail (including any attachments) may contain privileged or confidential information. It is intended only for the addressee(s) indicated above. The sender does not waive any of its rights, privileges or other protections respecting this information. Any distribution, copying or other use of this E-Mail or the information it contains, by other than an intended recipient, is not sanctioned and is prohibited. If you received this E-Mail in error, please delete it and advise the sender (by return E-Mail or otherwise) immediately. This E-Mail (including any attachments) has been scanned for viruses. It is believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free. The sender accepts no responsibility for any loss or damage arising in any way from its use. E-Mail received by or sent from RBC Capital Markets is subject to review by Supervisory personnel. Such communications are retained and may be produced to regulatory authorities or others with legal rights to the information. IRS CIRCULAR 230 NOTICE: TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES OR TO PROMOTE, MARKET, OR RECOMMEND TO ANOTHER PARTY ANY TRANSACTION OR MATTER. Please see link for RBCCM disclosures. https://www.rbccm.com/rbccm/policies-disclaimers.page

# EXHIBIT 9

# FILED UNDER SEAL

To: Acconcia, Angelo[acconcia@Blackstone.com]
Cc: Belz, Erik[Erik.Belz@Blackstone.com]; Li, Patricia[Patricia.Li@Blackstone.com]
From: Habachy, David[david.habachy@warburgpincus.com]
Sent: Tue 3/9/2021 4:24:58 PM Coordinated Universal Time
Subject: RE: Tall City/Primexx [External]

Erik,

I caught up with Mike Oestmann at Tall City and they are good with the plan forward. Also, just to confirm, each company will be presenting their view of their own asset as well as the other's asset to each of us. Just wanted to make sure that both teams were prepared to speak to both assets.

Thanks, and let's set things in motion with RBC.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Sunday, March 7, 2021 7:28 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Great. Thanks. Lets connect then. Including Erik on our end as well (Erik let us know if this doesn't work).

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Sunday, March 7, 2021 8:15 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

5 p.m. CT / 6 p.m. ET tomorrow would work for a call. Good weekend, hope you had the same Angelo.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Sunday, March 7, 2021 1:35 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks. Friday was back to back. How does your tomorrow night look (or any windows earlier in the day).

Hope your weekend is going well.
Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, March 4, 2021 9:02 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

No worries Angelo, I understand. How does a catch-up call tomorrow in the 4-6 p.m. ET window work for you?

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, March 4, 2021 9:29 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Apologies for the delay. We have been tied up on a number of fronts.

Think Peter reached out to David to connect here and discuss. Lets connect after their next conversation if that works.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Monday, February 22, 2021 11:15 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

I think we can accomplish both simultaneously. What about having an agreed-upon investment bank participating on both calls? Happy to discuss tomorrow, as well.

We managed through the week. Pretty crazy week, no power and water for a few days. We were walking around in ski gear trying to stay warm! We've got some busted pipes outside with the pool and the water hose spigots, but all things considering we managed pretty well given no issues inside the house. So, a lot to deal with in the aftermath, but all manageable.

We're not tough like you guys up north!

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Monday, February 22, 2021 8:32 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks David. I hope you and your family have been well amidst the challenging conditions.

I would suggest we setup a call with each mgnt team for early next week and then go from there to see if it makes sense to engage a bank.

Our team is willing to put together a short presentation for you / Warburg to review as part of this.

Let me know if you would like to further discuss.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Friday, February 19, 2021 3:36 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

Angelo,

Just coming up for air from snow, ice, no water, and no power...been fun down here in Texas this week!

Thought I'd check in and see how your conversation with Chris went and what your thoughts are on engaging a 3rd party investment bank?

Thanks, and have a good weekend man.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 8:20 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks. What is the best number to reach you at?

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, February 11, 2021 9:19 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

No worries at all Angelo. I'm free until 11 a.m. ET, if anything before then works.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 8:18 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Apologies – my call is running late. You free later this morning?

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Thursday, February 11, 2021 8:53 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

9:20 ET? Sure

Get Outlook for iOS

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 11, 2021 7:40:06 AM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
I have a 9am but could end earlier. Can I try you around 9:20am if it does? If not, happy to connect later today.

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Wednesday, February 10, 2021 10:13 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

Angelo, good catching up today man.

Wanted to run something by you if you have a moment in the a.m. How does 8:15 a.m. CT / 9:15 a.m. ET work for a call tomorrow?

Thanks,

David

Get Outlook for iOS

---

**From:** Habachy, David
**Sent:** Wednesday, February 10, 2021 11:07:37 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

Angelo,

Here's the slide that we'll talk from on our call later this afternoon. Thanks, and talk then.

David

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Friday, February 5, 2021 12:54 PM
**To:** Habachy, David <david.habachy@warburgpincus.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>
**Subject:** RE: Tall City/Primexx [External]

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

[**EXTERNAL EMAIL**]
Great. Looking forward to it.

Have a good weekend.

Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Friday, February 5, 2021 1:22 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Li, Patricia <Patricia.Li@Blackstone.com>; Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Re: Tall City/Primexx [External]

Angelo, more for us on the Blackstone and Warburg sides. We'll have our deal team on our side for the call.

Look forward to catching up. Have a good weekend.


David


Get Outlook for iOS

---

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Thursday, February 4, 2021 1:06 PM
**To:** Habachy, David
**Cc:** Li, Patricia; Acconcia, Angelo
**Subject:** RE: Tall City/Primexx [External]

[**EXTERNAL EMAIL**]
Thanks for reaching out. Would suggest a call on Tues / Wed.

Would you prefer principals only or mgnt. Copying my assistant here who can help coordinate a call.

Best,
Angelo

---

**From:** Habachy, David <david.habachy@warburgpincus.com>
**Sent:** Wednesday, February 3, 2021 1:30 PM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Subject:** Tall City/Primexx [External]

Angelo,

Hope you're well and off to a good start for 2021. Here's to a better year this year!

Thought it made sense to touch base on a Warburg/Blackstone phone call on where things settled out with Tall City and Primexx. Both teams data shared and had a number of discussions around a potential combination. We've got enough to put numbers on paper and wanted to share that high-level view with you and your team.

What works for a call next week to catch up on this? Look forward to catching up. I also think Peter separately reached out to David on the same topic.


David

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

---

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

---------- Notice: This message is the property of Warburg Pincus LLC and contains information that may be confidential and/or privileged. If you are not the intended recipient, you should not use, disclose or take any action based on this message. If you have received this transmission in error, please immediately contact the sender by return e-mail and delete this e-mail, and any attachments, from any computer. The information contained in this e-mail is not intended as an offer to sell or solicitation of an offer to purchase any security or investment product. In connection with our business activities, we may collect and process your personal data. Information on how we use personal data is outlined in Warburg Pincus Privacy Notice.

EXHIBIT 10

FILED UNDER SEAL

**To:** Punches II, Richard[richard.punches@eigpartners.com]
**Cc:** Belz, Erik[Erik.Belz@Blackstone.com]; Chris Doyle[chris.doyle@primexx.com]
**From:** Acconcia, Angelo[acconcia@Blackstone.com]
**Sent:** Wed 2/3/2021 4:55:58 PM Coordinated Universal Time
**Subject:** RE: [EXT] Primexx / Rosehill [External]

Ok.

**From:** Punches II, Richard <richard.punches@eigpartners.com>
**Sent:** Tuesday, February 2, 2021 11:39 AM
**To:** Acconcia, Angelo <acconcia@Blackstone.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Chris Doyle <chris.doyle@primexx.com>
**Subject:** RE: [EXT] Primexx / Rosehill [External]

Angelo,

Thanks for the email and follow up from our conversation. I've thought further on this and think we should hold off for now. We just got a new CEO in the Company late last year. If ok with you guys perhaps we could circle back on the topic in a couple months...

Richard



**GLOBAL ENERGY PARTNERS**

Richard K. Punches ⟩ Managing Director ⟩ richard.punches@eigpartners.com

Three Allen Center ⟩ 333 Clay Street ⟩ Suite 3500 ⟩ Houston, TX 77002 ⟩ (o) 713.615.7415 ⟩ (m) 713.828.0482 ⟩ (f) 713.615.7456

The information contained in this email is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient of this email, please promptly notify the sender that you have received it and delete all copies of this email along with all attachments.

**From:** Acconcia, Angelo <acconcia@Blackstone.com>
**Sent:** Monday, February 1, 2021 8:45 PM
**To:** Punches II, Richard <richard.punches@eigpartners.com>
**Cc:** Belz, Erik <Erik.Belz@Blackstone.com>; Chris Doyle <chris.doyle@primexx.com>
**Subject:** [EXT] Primexx / Rosehill

Richard,

Hope all is well. Enjoyed catching-up last week. We have a one-pager on Primexx we could share with you. Wanted to see if you had the same on Rosehill in which case we could exchange one-pagers and could setup a call for you to connect with Chris Doyle (Primexx's CEO) to discuss further.

Best,
Angelo

Angelo G. Acconcia
Senior Managing Director
Private Equity
The Blackstone Group
345 Park Avenue, 43rd Floor
New York, NY 10154
T: 212.583.5211
F: 212.201.2874
M: 917.747.0987

This e-mail communication is intended only for the addressee(s) named above and any others who have been specifically authorized to receive it and may contain information that is privileged, confidential or otherwise protected from disclosure. Please refer to www.blackstone.com/email-disclaimer for important disclosures regarding this electronic communication, including information if you are not the intended recipient of this communication.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

BPP_0016597

(Exhibit 1), which the Court incorporated in its Opinion and Order dated July 16, 2025 (referred to as "in camera" exhibits).

Plaintiffs respectfully request that the Clerk of Court supplement the appellate record in No. 15-25-00120-CV in the Fifteenth Court of Appeals to include the following items on the public record, which are filed as attachments to this submission. Defendants consent to the supplementation of the record with these unredacted briefs and exhibits:

1. Plaintiffs' Unredacted Opposition to the Special Appearance of Blackstone Inc. and Exhibits 4, 6–12, and 14–16 (attached as Exhibit 2).[1]

2. Plaintiffs' Unredacted Supplemental Opposition to the Special Appearance of Angelo Acconcia and Exhibits 1–4 and 6–10 (attached as Exhibit 3).

Additionally, Plaintiffs request that the Clerk supplement the record with the following exhibits under seal: Exhibits 13 and 17 to the Opposition to the Special Appearance of Blackstone Inc., and Exhibit 5 to the Supplemental Opposition to the Special Appearance of Angelo Acconcia. Defendants maintain that those exhibits contain confidential information.

Thank you for your attention to this matter.

Sincerely,

*/s/ Stephen Shackelford, Jr.*

Stephen Shackelford, Jr.

---

[1] Exhibits 1–3, 5, and 18 were filed on the public docket.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stephen Shackelford on behalf of Stephen Shackelford
Bar No. 24062998
sshackelford@susmangodfrey.com
Envelope ID: 106795813
Filing Code Description: No Fee Documents
Filing Description: Request to Clerk for Supplementation of Appellate Record
Status as of 10/14/2025 8:49 AM CST

Associated Case Party: BLACKSTONE HOLDINGS III LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher W.Patton | | cpatton@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Scott Smoot | | ssmoot@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| NATALIE STALLBOHM | | nstallbohm@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Kerri Jones | | kjones@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Gina Flores | | gflores@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Christopher Schwegmann | | cschwegmann@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Yaman Desai | | ydesai@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |
| Kyle Gardner | | kgardner@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stephen Shackelford | | sshackelford@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |
| Sarah Hannigan | | shannigan@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |
| Nicholas Perrone | | nicholas.perrone@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 10/14/2025 7:34:04 AM | SENT |
| Jessica Cox | | jcox@lynnllp.com | 10/14/2025 7:34:04 AM | SENT |

Associated Case Party: M. CHRISTOPHER DOYLE

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| M. TaylorLevesque | | taylor.levesque@troutman.com | 10/14/2025 7:34:04 AM | SENT |
| Louisa Karam | | louisa.karam@lockelord.com | 10/14/2025 7:34:04 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Stephen Shackelford on behalf of Stephen Shackelford
Bar No. 24062998
sshackelford@susmangodfrey.com
Envelope ID: 106795813
Filing Code Description: No Fee Documents
Filing Description: Request to Clerk for Supplementation of Appellate Record
Status as of 10/14/2025 8:49 AM CST

Associated Case Party: M. CHRISTOPHER DOYLE

| | | | | |
|---|---|---|---|---|
| Louisa Karam | | louisa.karam@lockelord.com | 10/14/2025 7:34:04 AM | SENT |
| Theressa Washington | | Theressa.Washington@lockelord.com | 10/14/2025 7:34:04 AM | SENT |
| Roger BCowie | | Roger.Cowie@troutman.com | 10/14/2025 7:34:04 AM | SENT |
| Veronica Long | | Veronica.Long@troutman.com | 10/14/2025 7:34:04 AM | SENT |

Associated Case Party: PRIMEXX ENERGY CORPORATION

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Gary Vogt | | gvogt@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Michael Patton | | michael.patton@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Laura QuinnBrigham | | laura.brigham@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Zack Ewing | | zack.ewing@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Griffin Vail | | griffin.vail@kirkland.com | 10/14/2025 7:34:04 AM | SENT |
| Austin Lesch | | austin.lesch@kirkland.com | 10/14/2025 7:34:04 AM | SENT |

Associated Case Party: Primexx Energy Opportunity Fund, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Bryan Caforio | | bcaforio@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |
| Michelle Williams | | mwilliams@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |
| Josephine Wang | | jwang@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |
| Lindsey Godfrey Eccles | | leccles@susmangodfrey.com | 10/14/2025 7:34:04 AM | SENT |

0208

# CIVIL DOCKET 24-BC01B-0010

| STYLE | ATTORNEYS | CASE TYPE | DATE OF FILING |
|---|---|---|---|
| PRIMEXX ENERGY OPPORTUNITY FUND, LP | STEPHEN SHACKELFORD, JR. (212) 729-2012 | SECURITIES/STOCK | 10/25/2024 |
| vs. | | | **JURY FEE DATE:** |
| PRIMEXX ENERGY CORPORATION | JEREMY FIELDING 214-972-1770 | | **PAID BY:** |

| DATE | ENTRY |
|---|---|
| | |

| | |
|---|---|
| 11/12/2024 | Hearings tentatively set for 11/21/2024 at 0900 |

0209

| | | | |
|---|---|---|---|
| **CAUSE NO. 24-BC01B-0010** | | | |
| **PRIMEXX ENERGY OPPORTUNITY FUND, LP** | | | **IN THE** |
| **VS.** | | | **BUSINESS COURT OF TEXAS** |
| **PRIMEXX ENERGY CORPORATION** | | | **DIVISION 1B** |

# BILL OF COSTS

| Fee Code | Fee Description | Initial | Balance |
|---|---|---:|---:|
| CV-BCMF | Business Court - Motion Fee | $250.00 | $0.00 |
| CV-BCFF | Business Court Filing Fee | $2,500.00 | $0.00 |
| | Business Court Subsequent Filing Fee | $70.00 | |
| 3CC3 | State Consolidated - E-file System | $90.00 | $0.00 |
| 2DC2 | State Consolidated - Indigent Services | $40.00 | $0.00 |
| 2DC4 | State Consolidated - Judicial Court Personnel Training | $15.00 | $0.00 |
| 2DC1 | State Consolidated - Judicial Support Fund | $82.00 | $0.00 |
| ACRF | Appeal -Clerk Record Preparation Fee | $1,085.00 | 0.00 |
| ACRF | Appeal -Clerk Record Preparation Fee | $11,930.00 | $0.00 |

| | | | |
|---|---|---:|---:|
| | Total | $16,062.00 | $0.00 |

You have been ordered by the court to pay the costs of the above suit. Please remit payment by money order, cashier's check or cash to the **Business Court Clerk, 300 W. 15th Street, Suite 606, Austin, Texas 78701** and enclose a copy of this bill with your remittance.

I hereby certify the above to be a correct account of the costs now due in the above cause. Given under my hand and seal on this the on this the 1st day of August, 2025.



**BEVERLY CRUMLEY**
Clerk of the Business Court of Texas
300 W. 15th Street, Suite 606
Austin, Texas 78701

By: _Beverly Crumley_

## CLERK'S CERTIFICATE

STATE OF TEXAS                    §
                                  §
BUSINESS COURT                    §

I, BEVERLY CRUMLEY, Clerk of the Business Court in and for the State of Texas, do hereby certify that the above and foregoing are true and correct copies of all proceedings to be included in the transcript in Cause No. 24-BC01B-0010 in the case of Primexx Energy Opportunity Fund, LP, Primexx Energy Opportunity Fund II, LP vs. PRIMEXX ENERGY CORPORATION, M. CHRISTOPHER DOYLE, ANGELO ACCONCIA, BLACKSTONE HOLDINGS III LP, BLACKSTONE EMA II LLC, BMA VII LLC, BLACKSTONE ENERGY MANAGEMENT ASSOCIATES II LLC, BCP VII/BEP II HOLDINGS MANAGER LLC, BX PRIMEXX TOPCO LLC, BPP HOLDCO LLC, BLACKSTONE ENERGY PARTNERS II LP, BLACKSTONE MANAGEMENT ASSOCIATES VII LLC, BLACKSTONE CAPITAL PARTNERS VII LP as the same appears from the originals now on file and of record in this office.

Given under my hand and seal of office on the 15th day of October, 2025.

BEVERLY CRUMLEY, Clerk
Business Court of Texas

_Beverly Crumley_

0211

# APPENDIX 10

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 4. Partnerships (Refs & Annos)
      Chapter 152. General Partnerships (Refs & Annos)
        Subchapter A. General Provisions

V.T.C.A., Business Organizations Code § 152.002

## § 152.002. Effect of Partnership Agreement; Nonwaivable and Variable Provisions

Currentness

(a) Except as provided by Subsection (b), a partnership agreement governs the relations of the partners and between the partners and the partnership. To the extent that the partnership agreement does not otherwise provide, this chapter and the other partnership provisions govern the relationship of the partners and between the partners and the partnership.

(b) A partnership agreement or the partners may not:

(1) unreasonably restrict a partner's or former partner's right of access to books and records under Section 152.212;

(2) eliminate the duty of loyalty under Section 152.205, except that the partners by agreement may identify specific types of activities or categories of activities that do not violate the duty of loyalty if the types or categories are not manifestly unreasonable;

(3) eliminate the duty of care under Section 152.206, except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

(4) eliminate the obligation of good faith under Section 152.204(b), except that the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable;

(5) vary the power to withdraw as a partner under Section 152.501(b)(1), (7), or (8), except for the requirement that notice be in writing;

(6) vary the right to expel a partner by a court in an event specified by Section 152.501(b)(5);

(7) restrict rights of a third party under this chapter or the other partnership provisions, except for a limitation on an individual partner's liability in a limited liability partnership as provided by this chapter;

(8) select a governing law not permitted under Sections 1.103 and 1.002(43)(C); or

(9) except as provided in Subsections (c) and (d), waive or modify the following provisions of Title 1:[1]

(A) Chapter 1, if the provision is used to interpret a provision or to define a word or phrase contained in a section listed in this subsection;

(B) Chapter 2, other than Sections 2.104(c)(2), 2.104(c)(3), and 2.113;

(C) Chapter 3, other than Subchapters C and E[2] of that chapter; or

(D) Chapters 4, 5, 10, 11, and 12, other than Sections 11.057(a), (b), (c)(1), (c)(3), (d), and (f).

(c) A provision listed in Subsection (b)(9) may be waived or modified in a partnership agreement if the provision that is waived or modified authorizes the partnership to waive or modify the provision in the partnership's governing documents.

(d) A provision listed in Subsection (b)(9) may be waived or modified in a partnership agreement if the provision that is modified specifies:

(1) the person or group of persons entitled to approve a modification; or

(2) the vote or other method by which a modification is required to be approved.

(e) Notwithstanding Subsection (b)(2), (3), or (4), a partnership agreement of a limited partnership may eliminate any or all of the duty of loyalty under Section 152.205, the duty of care under Section 152.206, and the obligation of good faith under Section 152.204(b), to the extent the partnership agreement expressly provides so.

**Credits**

Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2007, 80th Leg., ch. 688, § 104, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 23 (S.B. 859), § 3, eff. Sept. 1, 2015; Acts 2023, 88th Leg., ch. 27 (S.B. 1514), § 54, eff. Sept. 1, 2023; Acts 2025, 89th Leg., ch. 21 (S.B. 29), § 21, eff. May 14, 2025.

Footnotes

1        V.T.C.A., Business Organizations Code § 1.001 et seq.

2        V.T.C.A., Business Organizations Code § 3.101 and § 3.201.

V. T. C. A., Business Organizations Code § 152.002, TX BUS ORG § 152.002
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Business Organizations Code (Refs & Annos)
        Title 4. Partnerships (Refs & Annos)
            Chapter 152. General Partnerships (Refs & Annos)
                Subchapter D. Relationship Between Partners and Between Partners and Partnerships (Refs & Annos)

V.T.C.A., Business Organizations Code § 152.204

## § 152.204. General Standards of Partner's Conduct

Currentness

(a) A partner owes to the partnership, the other partners, and a transferee of a deceased partner's partnership interest as designated in Section 152.406(a)(2):

(1) a duty of loyalty; and

(2) a duty of care.

(b) A partner shall discharge the partner's duties to the partnership and the other partners under this code or under the partnership agreement and exercise any rights and powers in the conduct or winding up of the partnership business:

(1) in good faith; and

(2) in a manner the partner reasonably believes to be in the best interest of the partnership.

(c) A partner does not violate a duty or obligation under this chapter or under the partnership agreement merely because the partner's conduct furthers the partner's own interest.

(d) A partner, in the partner's capacity as partner, is not a trustee and is not held to the standards of a trustee.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2005, 79th Leg., ch. 64, § 77, eff. Jan. 1, 2006.

V. T. C. A., Business Organizations Code § 152.204, TX BUS ORG § 152.204
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Business Organizations Code (Refs & Annos)
     Title 4. Partnerships (Refs & Annos)
       Chapter 152. General Partnerships (Refs & Annos)
         Subchapter D. Relationship Between Partners and Between Partners and Partnerships (Refs & Annos)

V.T.C.A., Business Organizations Code § 152.205

## § 152.205. Partner's Duty of Loyalty

Currentness

A partner's duty of loyalty includes:

(1) accounting to and holding for the partnership property, profit, or benefit derived by the partner:

(A) in the conduct and winding up of the partnership business; or

(B) from use by the partner of partnership property;

(2) refraining from dealing with the partnership on behalf of a person who has an interest adverse to the partnership; and

(3) refraining from competing or dealing with the partnership in a manner adverse to the partnership.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006.

V. T. C. A., Business Organizations Code § 152.205, TX BUS ORG § 152.205
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 4. Partnerships (Refs & Annos)
      Chapter 152. General Partnerships (Refs & Annos)
        Subchapter D. Relationship Between Partners and Between Partners and Partnerships (Refs & Annos)

V.T.C.A., Business Organizations Code § 152.206

## § 152.206. Partner's Duty of Care

Currentness

(a) A partner's duty of care to the partnership and the other partners is to act in the conduct and winding up of the partnership business with the care an ordinarily prudent person would exercise in similar circumstances.

(b) An error in judgment does not by itself constitute a breach of the duty of care.

(c) A partner is presumed to satisfy the duty of care if the partner acts on an informed basis and in compliance with Section 152.204(b).

**Credits**

Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006.

V. T. C. A., Business Organizations Code § 152.206, TX BUS ORG § 152.206
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 2. Corporations (Refs & Annos)
      Chapter 21. For-Profit Corporations (Refs & Annos)
        Subchapter E. Shareholder Rights and Restrictions

V.T.C.A., Business Organizations Code § 21.223

## § 21.223. Limitation of Liability for Obligations

Currentness

(a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:

(1) the shares, other than the obligation to pay to the corporation the full amount of consideration, fixed in compliance with Sections 21.157-21.162, for which the shares were or are to be issued;

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or

(3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:

(A) comply with this code or the certificate of formation or bylaws of the corporation; or

(B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

(b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

**Credits**

Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2007, 80th Leg., ch. 688, § 74, eff. Sept. 1, 2007.

V. T. C. A., Business Organizations Code § 21.223, TX BUS ORG § 21.223
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

171 S.W.3d 680
Court of Appeals of Texas,
Dallas.

Daniel SPETHMANN, Mark A. Kelley,
and Jeffrey Crawford, Appellants,

v.

Fred R. ANDERSON, Strategic
Controls Corporation, and Strategic
Gas Services, Inc., Appellees.

No. 05–04–01139–CV.
|
Aug. 18, 2005.

**Synopsis**
**Background:** Corporations and shareholder sued other shareholders and officers on various claims of fraud, misrepresentation, breach of fiduciary duty, and conspiracy in connection with merger and post-merger conduct. Following jury trial, the 116th District Court, Dallas County, Robert Frost, J., rendered judgment for plaintiffs. Defendants appealed.

**Holdings:** The Court of Appeals, Mazzant, J., held that:

chief financial officer (CFO) did not misrepresent value of business entity with which merger was contemplated;

plaintiff shareholder justifiably relied on various other misrepresentations about valuation;

award of damages for fraud and misrepresentation was excessive;

awards on both fraud and breach of fiduciary claims were duplicative;

defendants breached duty to corporation by enforcing stock repurchase agreement;

damages award for breach of fiduciary duty was not excessive; and

CFO breached fiduciary duty in connection with unsecured loan of funds to president.

Reversed and rendered in part, reversed and remanded in part, and affirmed in part.

**Procedural Posture(s):** On Appeal.

**Attorneys and Law Firms**

**\*683** Daniel B. Jones, Plano, James A. McCorquodale, Vial Hamilton Koch & Knox, Dallas, for Appellants.

Ronald G. Wiesenthal, St. Louis, MO, for Appellees.

Before Justices MORRIS, LANG, and MAZZANT.

OPINION

Opinion by Justice MAZZANT.

Daniel Spethmann, Mark A. Kelley, and Jeffrey Crawford appeal the trial court's judgment rendered against them in favor of Fred R. Anderson, Strategic Controls Corporation, and Strategic Gas Services, Inc. Appellants bring seventeen issues challenging the legal and factual sufficiency of the evidence to support the jury's verdict. After reviewing all the evidence, we affirm in part, reverse and render in part, and reverse and remand in part.

**I. BACKGROUND**

Fred Anderson headed his family's corporation, Gas Services, Inc. (GSI). As the company grew, it hired Mark Kelley, CPA, to be the in-house accountant for GSI. Over time, Anderson came to rely heavily on Kelley's financial expertise. In 1996, Kelley was the chief financial officer for GSI and was a 10 percent shareholder in the corporation. Under a stock-purchase agreement with GSI, Kelley could demand the company buy his shares for book value.

Fred Spethmann owned two corporations, Strategic Controls Corporation (SCC) and BMP Software. Spethmann and Anderson met through GSI's use of BMP's software. After working on a project together, Anderson and Spethmann decided in 1996 that their companies complemented one another and that it might be advantageous to merge. They intended for Spethmann and Anderson to be equal

shareholders in the merged corporation and Kelley and Jeff Crawford, an employee of SCC, to be lesser shareholders.

In the spring of 1997, Kelley, on behalf of GSI, and Spethmann began examining each other's companies in their "due diligence" analysis. One obstacle to a merger as equals became apparent: GSI had a book value of approximately $1.6 million, but SCC had a book value of only $400,000. This situation resulted in a hotly disputed area of evidence. Anderson testified Spethmann told him that his software development company, BMP, would be included in the merger, that BMP was worth nearly a million dollars, and that BMP and SCC combined would come close to equaling the book value of GSI. Anderson also testified Spethmann made these statements in front of Kelley and Crawford and they said nothing. Spethmann denied telling Anderson that BMP was worth nearly one million dollars or that BMP and SCC together would almost equal the value of GSI. Kelley testified he told Anderson that under the accounting principles GSI used, BMP had no book value, and he testified he told Anderson the merger was a "bad deal." Anderson testified Kelley never told him these things.

As Kelley and Spethmann continued the due diligence investigations, Anderson was trying to build business in Venezuela and Bolivia. In July 1997, Anderson sent an employee, Steve House, to Bolivia. House had to change planes in Mexico City, where he was arrested and jailed for having a firearm in his luggage. Anderson's time and energy then became consumed **\*684** by trying to get House safely out of Mexico. Anderson's efforts succeeded, and House was released by the Mexican authorities on October 12, 1997.

Meanwhile, Kelley had examined his own prospects under the merger and realized they would be damaged by the merger. In GSI, he was a 10 percent shareholder in a $1.6 million corporation; after the merger, as then envisioned by the parties, he would be a five percent shareholder in a $2 million corporation, which would result in an immediate loss of $40,000 equity. On August 13, 1997, Kelley sent Anderson a letter requesting GSI buy back his stock pursuant to the GSI stock-purchase agreement. Both Kelley and Anderson interpreted the letter as a notice of resignation. Anderson testified the letter was "a huge blow" because Anderson relied heavily on Kelley's financial expertise, and Anderson had no time to personally handle the merger while he was trying to get House out of Mexico. After getting the letter, Anderson asked Kelley to explain why he wanted to sell his shares. Kelley prepared a chart styled "Mark's Stock Inequality." This

chart showed the reasons Kelley thought he should have a 15 percent share of the new company instead of a five percent share. Anderson agreed to give Kelley a 30 percent share in GSI, which would result in his having a 15 percent share of the merged companies. Thus, going into the merger, Anderson owned 70 percent of GSI and Kelley owned 30 percent.

The closing on the merger was scheduled for November 12, 1997, and the parties met in a pre-closing meeting on November 5, 1997, to work out any last minute problems. At that meeting, Anderson observed that the GSI–SCC merger was unequal because BMP was not included in the merger papers. Anderson testified that Spethmann agreed to include BMP, which Spethmann said was "just under $1 million." Spethmann made this representation concerning the value of BMP in front of Kelley, and Kelley did not contradict Spethmann. Spethmann explained that BMP was not included in the merger in order for it to realize certain tax advantages. However, he promised Anderson it would be included in the new parent company by April 1, 1998. Based on Spethmann's promise to include BMP in the merger and his representation of its value, Anderson agreed to go ahead with the merger. The merger closed on November 12, 1997.

Part of the merger agreement included a stock-purchase agreement called the Buy–Sell Agreement. Under that agreement, the company could demand a shareholder surrender his shares for the book value of the company. The repurchase of the shares could be paid for with cash or with an unsecured no-interest promissory note paid in five equal installments over four years.

The new company was called Strategic Gas Services, Inc. (SGSI), and the shareholders were Anderson (35%, 1800 shares), Spethmann (35%, 1800 shares), Kelley (15%, 771.4 shares), and Crawford (15%, 771.4 shares). In SGSI, Anderson was chairman of the board of directors and business development manager. Spethmann was president and a director, Kelley was chief financial officer, and Crawford was vice president of operations.

As business development manager, Anderson continued his work in Venezuela and Bolivia. Anderson's expenses, including his salary, were about $17,000 each month. The other shareholders disagreed with Anderson's view of the value of his efforts in South America, and they told Anderson they wanted the traveling expenses to stop by April 1 because the **\*685** company did not have the money to pay for his efforts.

In April, the company's note with the bank came up for renewal. This note was owed by GSI and was for a million dollar line of credit. Anderson had guaranteed the note. When the note came up for renewal in April 1998, the other shareholders asked Anderson to guarantee the renewed note. Anderson did so. The other shareholders did not sign the guaranty.

In May 1998, appellants decided to remove Anderson from the company. At a meeting on May 22, 1998, Spethmann said the company would buy back Anderson's shares for "what [he] came in with." On May 28, 1998, Anderson sent appellants a memo stating the amount he came in with was $1.8 million, and he also demanded the company relieve him of his personal guaranty to the bank. Negotiations then ensued over the details of buying Anderson's shares. Spethmann structured deals under both the Buy–Sell Agreement and under the promise to give Anderson what he came in with. All the offers were rejected by Anderson, and he remains a shareholder. Anderson's role as an employee, officer, and director in the company ceased in June 1998.

In October 1998, SGSI sold GSI for $2.4 million, of which $1.7 million was in cash and the remainder paid the balance on the line of credit owed to the bank, thus relieving Anderson of his potential liability to the bank on his guaranty of the line of credit. The money from the sale was put in the bank, where it earned three percent interest. In late October, Spethmann proposed to Kelley that Spethmann borrow $300,000 of the money at seven percent interest. Spethmann intended to put the money into a corporation he owned that developed distributorships of vitamins and other nutritional products. Kelley determined that the loan would not hurt the company's ongoing operations.

Kelley prepared a promissory note in which SCC loaned Spethmann $300,000 at seven percent interest rate, requiring monthly payment of interest, with $100 late fees if the interest payments were more than ten days late, but no payment of principal until the due date of the note, April 30, 2000. The note was unsecured and lacked an acceleration clause. It appears from the testimony that the bylaws or other rules of SCC required the loan be approved by the other directors, Crawford and Kelley. The day before Spethmann signed the note, Spethmann told Crawford about the loan. Crawford told Spethmann that $300,000 was a lot of money and that they would have to discuss it later. Spethmann then told Kelley he "had run it by" Crawford. On November 1,

1998, Spethmann signed the promissory note, and Kelley authorized the wire transfer to Spethmann. That same day, Kelley saw Crawford, and Crawford told Kelley he did not approve of the loan to Spethmann. Kelley tried to stop the wire transfer of the money, but it was already too late. Kelley and Crawford confronted Spethmann and demanded he return the money; Spethmann refused. Kelley consulted an attorney to learn what could be done. The trial court excluded testimony of what the lawyer told Kelley, but Kelley and Crawford took no legal action. Between November 1998 and April 1999, Spethmann did not make the monthly interest payments, and he did not pay the late fees. The minutes of the April 9, 1999 meeting of the board of directors stated the loan was unauthorized by SCC because Spethmann wired the funds to a bank account he controlled without the knowledge or authorization of the other SCC director, Crawford. Spethmann refused to approve the minutes. On April 15, 1999, Kelley and Crawford sent Spethmann a letter demanding **\*686** Spethmann return the $300,000 principal and pay the unpaid interest and late fees.

The minutes of the April 22, 1999 SCC board of directors meeting showed the meeting was attended by Crawford and Kelley. The minutes stated Spethmann had made no interest or principal payments on the unauthorized loan, that Spethmann had taken advances from the corporation for $30,208, and that Crawford and Kelley had worked diligently to get Spethmann to pay this loan and the advances. The minutes then stated SCC was authorized to make eighteen-month nonrecourse loans to Crawford and Kelley in the amount of $222,842 at seven percent interest secured by their stock in SGSI. The minutes stated SCC would authorize the $300,000 loan to Spethmann if its terms were changed to a nonrecourse loan like those approved for Crawford and Kelley. The minutes then acknowledged the diligent work of the officers, Spethmann, Crawford, and Kelley, and resolved to give them each a bonus of $33,000, less any advances outstanding on the date of payment. Spethmann refused to turn the $300,000 note into a non-recourse note, and he still failed to pay the interest and accruing late fees. Kelley then began deducting the interest payments from Spethmann's pay check each month.

Although the minutes authorized Crawford and Kelley to receive $222,842 loans, those loans were not funded. The $33,000 bonuses, however, were paid. Kelley testified the purpose of the bonuses was to properly account for Spethmann's unpaid advances, to equalize the compensation to Kelley and Crawford due to Spethmann's advances, and also to reward them for their diligent work.

Spethmann's borrowing of the $300,000 soured Kelley and Crawford's relationship with him. At the same time, the company's business declined, and it became apparent that the company could not afford to pay all three of them. Crawford and Kelley lacked the funds to buy out Spethmann, so in July 1999, they announced their intention to resign.

Under the Buy–Sell Agreement, when a shareholder ceases his employment with SGSI, his shares become available for sale. The first party with an option to purchase the shares is the other "Related Shareholder," that is, the other shareholder from the same original corporation in the merger. Thus, Spethmann had the first option to purchase Crawford's shares, and vice-versa, and Anderson had the first option to purchase Kelley's shares. If the Related Shareholder declined to purchase the shares, then SGSI had the option to purchase. If SGSI declined to purchase the shares, then the shareholders from the other merging corporation had the option to purchase the shares. The price for the shares was to be "book value per Share using generally accepted accounting principles, as determined by the Company's certified public accountant." The purchaser of the shares, whether another shareholder or SGSI, had the option of paying in cash or giving a no-interest promissory note payable in five annual installments with the first installment due within thirty days of the date of the note.

In accordance with the Buy–Sell Agreement, notice was sent to the other shareholders, including Anderson, that the shares were for sale for $288.88 per share. Anderson asked for more information about the stock sale, but he did not exercise his option to purchase the shares. Spethmann, as a director of SGSI, approved SGSI's purchase of Crawford's and Kelley's shares. Crawford and Kelley, as directors, approved the purchase of each other's shares, but they did not participate in the approval of their own shares. The **\*687** purchases were in cash, not installments, for $222,842.03 to each of them, which was three cents more than the unfunded nonrecourse loans they had approved for themselves in April.

The purchase of Kelley's and Crawford's stock depleted about 80 percent of SGSI's cash resources. However, Kelley and Crawford testified they thought the company was still viable and that they would not have taken the cash if they had thought it would cripple the company. After Kelley and Crawford left, Spethmann tried to sell SGSI, but the deal fell through. SGSI then ceased doing business.

At trial, Spethmann testified he did not pay the $300,000 note when it became due and that he has made no interest payments other than those deducted from his paycheck by Kelley.

Anderson sued appellants for common-law fraud, fraud in a stock transaction under section 27.01 of the Texas Business and Commerce Code, and negligent misrepresentation arising out of Spethmann's misrepresentation that the value of SCC and BMP would almost equal the value of GSI. Anderson sued Kelley for breach of fiduciary duty for remaining silent when Spethmann made the misrepresentation. Anderson also sued appellants for conspiracy. SGSI sued appellants for breach of fiduciary duty from Crawford's and Kelley's sale of their stock to SGSI. SCC sued appellants for breach of fiduciary duty for the $300,000 loan to Spethmann. Anderson also requested exemplary damages based upon appellants' malice and attorney's fees.

The jury found appellants liable to Anderson for common-law and statutory fraud and negligent misrepresentation concerning the merger, that Anderson suffered damages of $1,680,000, and that Anderson should receive exemplary damages of $250,000 from Crawford, $300,000 from Kelley, and $1,000,000 from Spethmann. The jury found that Kelley breached his fiduciary duty to Anderson in the merger and that Anderson suffered damages of $318,261. The jury also found appellants conspired against Anderson.

The jury found appellants breached their fiduciary duty to SGSI concerning the sale of Crawford and Kelley's stock, that SGSI's damages were $445,684.06, and that SGSI should receive exemplary damages of $250,000 from Crawford, $300,000 from Kelley, and $2,000,000 from Spethmann. The jury found appellants breached their fiduciary duty to SCC concerning the "loan" to Spethmann and that SCC's damages were $300,000. The trial court entered judgment in accordance with these findings.

## II. FRAUD, NEGLIGENT MISREPRESENTATION, CONSPIRACY, AND BREACH OF FIDUCIARY DUTY TO ANDERSON

### A. Liability

In the first, second, third, fifth, and thirteenth issues, appellants assert the evidence is legally and factually insufficient to support the jury's findings that they were liable to Anderson for statutory and common-law fraud and

negligent misrepresentation and that Kelley was liable to Anderson for breach of fiduciary duty. Anderson's claims were based on his testimony that before the merger, Spethmann represented to him that BMP was worth just under a million dollars, the representation was made in front of Kelley, Kelley knew BMP was worth nothing or much less than a million dollars, Kelley did not contradict Spethmann, and Anderson relied on Spethmann's representation of the value of BMP and Kelley's silence in deciding to go ahead with the merger. Spethmann **\*688** testified he made no such representation to Anderson, and Kelley testified he told Anderson that BMP had no value.

In determining the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *see also City of Keller v. Wilson,* 168 S.W.3d 802, 808–09 (Tex.2005). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *see City of Keller,* 168 S.W.3d at 813–14. More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co.,* 907 S.W.2d at 499 (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)); *see also City of Keller,* 168 S.W.3d at 822 ("If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so."). In determining the factual sufficiency of the evidence, we consider and weigh all the evidence. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

**1. Kelley's Liability for Statutory Fraud, Affirmative Common–Law Fraud, and Negligent Misrepresentation**

In the second issue, Kelley contends the evidence is legally and factually insufficient to support Anderson's causes of action against him for statutory fraud,[1] common-law fraud through affirmative misrepresentation,[2] and negligent misrepresentation[3] because Anderson did not allege or present any evidence of Kelley making an affirmative misrepresentation to him concerning the merger.

We agree there is no evidence of Kelley making an affirmative misrepresentation or supplying false information to Anderson, and we conclude there is no evidence to support the jury's findings on these causes of action **\*689** against Kelley. We sustain the second issue to the extent it concerns the causes of action against Kelley for statutory fraud, common-law fraud through affirmative misrepresentation, and negligent misrepresentation.

[1] To prove statutory fraud in a stock transaction under section 27.01 of the Texas Business and Commerce Code, a plaintiff must show: (1) a false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing the person to enter into a contract; and (B) relied on by that person in entering into that contract; or (2) a false promise to do an act, when the false promise is (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract. Tex. Bus. & Com.Code Ann. § 27.01(a) (Vernon 2002).

[2] The elements of common-law fraud through affirmative misrepresentation are: (1) a material misrepresentation; (2) that was false when made; (3) that was known by the speaker to be false when it was made or that was made recklessly as a positive assertion without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party justifiably relied on the representation; and (6) the party was injured as a result. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

[3] Negligent misrepresentation requires proof that (1) the defendant, in the course of his business or in a transaction in which he had an interest; (2) supplied false information for the guidance of others; (3) without exercising reasonable care or competence in communicating the information; (4) the plaintiff justifiably relied on the information; (5) proximately causing the plaintiff's injury. *See McCamish, Martin, Brown, & Loeffler v. FE Appling Interests,* 991 S.W.2d 787, 791 (Tex.1999).

**2. Kelley's Liability to Anderson for Breach of Fiduciary Duty and Common–Law Fraud Through Non–Disclosure and Spethmann's Liability to Anderson**

In the first, second, and thirteenth issues, Kelley argues the evidence is legally and factually insufficient to support the jury's finding him liable for common-law fraud through

nondisclosure[4] and breach of fiduciary duty[5] because, Kelley asserts, the evidence shows he tried to persuade Anderson not to proceed with the merger, making Anderson's reliance on Kelley's silence unjustifiable. In the first and fifth issues, Spethmann also asserts the evidence is legally and factually insufficient to support the jury's finding him liable for statutory and common-law fraud and negligent misrepresentation because Anderson could not have justifiably relied on any representation by him concerning BMP's value.

[4]   The jury was instructed that "Fraud occurs when— (1) a party fails to disclose a material fact within the knowledge of that party, (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (3) the party intends to induce the other party to take some action by failing to disclose the fact, and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact." *See Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.,* 941 S.W.2d 138, 144 (Tex.App.-Corpus Christi 1995), *rev'd on other grounds,* 960 S.W.2d 41 (Tex.1998).

[5]   The jury was instructed that Kelley had the burden to prove he complied with his fiduciary duty to Anderson. The instructions stated that to prove he complied, Kelley had to show: (a) the transaction in questions was fair and equitable to Anderson; (b) he made reasonable use of the confidence Anderson placed in him; (c) he acted in the utmost good faith and exercised the most scrupulous honesty toward Anderson; (d) he placed Anderson's interests before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Anderson, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and (3) he fully and fairly disclosed all important information to Anderson concerning the transaction.

To support their argument that Anderson could not have justifiably relied on Spethmann's representation of the value of BMP, appellants cite to Kelley's testimony that he repeatedly told Anderson that BMP would not equalize the value Anderson and Spethmann brought into the merger. However, Anderson testified Kelley did not tell him that.[6]

[6]   Anderson's testimony concerning Kelley's failure to tell him BMP was not worth just under a million dollars was in response to a question from appellants' attorney:

> Q. Didn't Mr. Kelley tell you prior to the merger that BMP, in fact, did not have a value of $900,000?
>
> A. I don't recall him ever saying that, no, sir.

Appellants argue, "Anderson's testimony that he 'cannot recall' Kelley informing him that BMP was not worth $900,000 is not evidence that Kelley did not do so." We disagree. Anderson's testimony was not that he could not recall whether Kelley had told him; his answer consisted of two parts: (1) he did not recall Kelley ever telling him that; and (2) "no, sir." In context, it is clear that Anderson's answer was intended to be a denial of appellants' counsel's assertion that Kelley had told him that BMP was not worth $900,000.

Appellants also cite to Anderson's testimony where he admitted testifying as follows in a deposition:

> Question: Okay, do you deny that Mr. Kelley told you that BMP was not worth $900,000?
>
> Answer: I do not recall.
>
> Question: He may have told you that, you just didn't remember as you sit here today?
>
> Answer: He was aware of the negotiation and the relative values anticipated and expected the CFO would take exception if there was something misleading or misstated.

When Anderson was asked to affirm that he did not remember whether Kelley told him BMP was not worth $900,000, Anderson did not do so. Anderson's two answers, read together, show (1) he did not recall Kelley telling him BMP was not worth $900,000, and (2) he expected Kelley to tell him if BMP or the other companies to be merged did not meet their expected value. Contrary to appellants' assertion, this deposition testimony does not prove Anderson could not recall *whether* Kelley told him BMP was not worth $900,000. Assuming this deposition testimony tended to impeach Anderson, it did not require the jury to reject his in-court testimony. Jurors are the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller,* 168 S.W.3d at 819.

**\*690** Appellants also cite to Kelley's stock inequality chart that Anderson admitted receiving, which shows that the value of Kelley's stock, and thus also Anderson's, would decline substantially as a result of the merger. However, Anderson testified that when Kelley prepared the chart, Kelley was not aware of the plan to include BMP in the merger. Because, according to Anderson, the chart shows the value of the merger without BMP, it does not prove Anderson could not have justifiably relied on Spethmann's representation about the value of BMP.

Appellants also argue that Anderson could not have justifiably relied on Spethmann's representation that BMP had a book

value of just under one million dollars because Defendant's Exhibit 6, the balance sheet for BMP as of July 31, 1996, showed BMP had a book value of $330,642.42. However, no evidence in the record showed Anderson ever saw this document. Also, no evidence showed the value of BMP on July 31, 1996 was the same as it was during the merger.

Appellants also argue that Anderson could not have justifiably relied on Spethmann's representation that the combined book values of SCC and BMP would be nearly the same as GSI because, appellants assert, the representation was made in the adversarial context of business negotiations. Appellants, however, cite to no evidence that Spethmann and Anderson were adversaries in the merger. By the last time Spethmann made the misrepresentation, which Anderson testified was one week before the closing of the merger, the two companies had worked as partners on projects for over a year, and the combining of their corporate offices and functions had been ongoing for about eight months.

We conclude the evidence is legally and factually sufficient to support the jury's finding that Anderson justifiably relied on Spethmann's representation about the value of BMP and Kelley's silence in the face of Spethmann's representation. We overrule appellants' first, second, fifth, and thirteenth issues as to Anderson's causes of action against Spethmann for common-law and statutory fraud and negligent misrepresentation and as to Anderson's causes of action against Kelley for breach of fiduciary and common-law fraud through nondisclosure.

### 3. Crawford's Liability to Anderson

In the third issue, Crawford asserts the evidence is legally and factually insufficient to support the fraud findings against him. We agree the evidence is legally insufficient. The record contains no evidence of any affirmative representation by Crawford concerning the book value of BMP or the combined book value of **\*691** BMP and SCC. The record also contains no evidence that Crawford was aware that Spethmann's representations to Anderson were false. Accordingly, we conclude there is no evidence to support one or more elements of Anderson's common-law and statutory fraud, his negligent misrepresentation, and conspiracy causes of action.

### B. Damages for Fraud and Negligent Misrepresentation

In their fourth and sixth issues, appellants complain that the damages awarded Anderson for his fraud and negligent misrepresentation claims are excessive. The jury found Anderson's damages for both fraud causes of action and the negligent misrepresentation cause of action were $1,680,000. The standard of review for a claim of excessive damages is factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998). In reviewing the factual sufficiency of the evidence, our task is to determine whether the jury's findings of $1,680,000 damages are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We sustain the third issue.

### 1. Formula for Fraud Damages

In determining the damages for the fraud causes of action, the trial court instructed the jury:

> Consider the following elements of damages, if any, and none other.
>
> The difference in the value of Fred Anderson's stock in Strategic Gas Services, Inc. on the day it was issued and the amount it would have been worth but for the fraud made the subject of Question No. 1 [statutory fraud] and 3 [common-law fraud].

The jury answered $1,680,000.[7] We construe the term "value of Fred Anderson's stock in [SGSI] ... but for the fraud" as meaning the value Anderson's stock in SGSI would have had if SCC and BMP had been worth Spethmann's representation of their value. Thus, the instruction required the jury to apply the following equation: Damages equal the Represented Value of Anderson's 35 percent of SGSI on the day of the merger minus the Actual Value of his 35 percent of SGSI on the day of the merger, or: $D = .35\,RV - .35\,AV$. The Represented Value was Spethmann's representation to Anderson that the combined values of SCC and BMP would nearly equal the value of GSI. Thus, the Represented Value of SGSI was approximately 2 GSI. The Actual Value was the combined actual values of GSI, SCC, and BMP. Thus, the formula for the damages may be expressed as $D = (.35 \times 2\,GSI) - .35\,(GSI + SCC + BMP)$, with all values computed on the day of the merger.

[7]    The question then asked the jury to determine "The amount of earnings lost by Fred Anderson from the date of his discharge by Strategic Gas Services to the date of trial. Do no include in your answer any amount that

you find Fred Anderson could have earned by exercising reasonable diligence in seeking other employment." The jury answered this damages element "$0.00." Anderson does not appeal that jury finding.

## 2. Formula for Negligent Misrepresentation Damages

The jury was instructed to determine Anderson's negligent misrepresentation damages in the past using the following formula:

> The difference between the value Fred Anderson has received in the transaction and the purchase price or value given.

The jury answered $1,680,000.[8] We construe this instruction as requiring the jury **\*692** to apply the equation of Damages equal the Value Given, which was Anderson's 70 percent of GSI, minus the Value Received, which was 35 percent of SGSI. This formula may be expressed as D = VG − VR, or D = .7 GSI − .35 SGSI. Because SGSI was the combined value of the companies, the formula becomes D = .7 GSI − .35 (GSI + SCC + BMP).

[8]    Using that same formula, the jury was also asked to determine Anderson's damages that "in reasonable probability will be sustained in the future," and the jury answered "$0.00." The jury was then asked to determine "The pecuniary loss, if any, otherwise suffered as a consequence of Fred Anderson's reliance on the misrepresentation." For the damages that "were sustained in the past," the jury answered "0.00"; for the damages that "in reasonable probability will be sustained in the future," the jury answered $261,000. The trial court did not award the $261,000 future damages. Anderson does not appeal these jury findings or the trial court's failure to render judgment on the $261,000 future damages.

## 3. The Formulas Unified

Because .7 GSI and .35 x 2 GSI are the same, the two damages formulas, even though worded differently, actually are the same: the value of 70 percent of GSI (which is the same as 35 percent of the represented value of SGSI) minus the actual value of 35 percent of SGSI, with all values determined as of the time of the merger. It is logical for the two formulas to be identical because, as the merger was to be an exchange of equal values, the value Anderson gave in the form of his

shares of GSI should have equaled the value he received in SGSI but for the fraud.

## 4. Calculations Under the Formula

Much of the evidence showed GSI was worth, and that before the merger the parties thought it was worth, about $1.6 million. The evidence also showed SCC was worth about $400,000 and BMP was worth nothing, which would make the value of SGSI $2 million. Using these values in the damages formula, 70 percent of GSI ($1.12 million) minus 35 percent of SGSI ($700,000) yields damages of $420,000, or only one-fourth of the $1.68 million in the jury's answers.

Even if the jurors considered SCC and BMP to be worth nothing, their calculations under the trial court's instructions still could not approach $1.68 million. Using those zero values in the damages formula, Anderson's damages would be 70 percent of GSI ($1.12 million) minus 35 percent of SGSI (and if the only company with any value was GSI, it would be $560,000), which would equal $560,000. This is only one-third of the damages found by the jury.

By contrast, Anderson asserts the value that should be assigned to GSI should be the amount it sold for after the merger, $2.4 million, and that SCC should be valued not at zero, but at −$92,783, as Anderson reported its value to the IRS in his income tax return for 1997.[9] Anderson contends the damages calculation should simply be 70 percent of $2.4 million, which is $1.68 million. However, because the **\*693** jury had to use the formula prescribed by the trial court, we cannot agree with his calculation. Adding the sale price of GSI, $2.4 million, the negative tax-return value for SCC, −$92,783, and zero for BMP gives a value for SGSI $2,307,217. Anderson's 35 percent share of that would equal $807,525.95. When one subtracts $807,525.95 from Anderson's 70 percent of GSI, $1.68 million, according to the formula, the balance is damages of $872,474.05. These damages are only about 52 percent of the $1.68 million in damages found by the jury.

[9]    Anderson argues the value of the stock in SGSI was zero based on SCC's negative value. However, the only way the jury could find Anderson's damages were $1.68 million was by finding the value of SCC and BMP equaled −$2.4 million. No evidence supports this assertion.

Appellants assert the $2.4 million sale price is inappropriate because the sale was almost a year after the merger, and Kelley testified that GSI was improved, made "more profitable," and achieved a "very positive cash flow" between the merger and the sale. Kelley testified that if they had tried to sell it at the time of the merger, "we would not have had the same results." Because we conclude that using the $2.4 million valuation does not support the damages award, we need not consider this argument.

Anderson also asserts the damages could be calculated by starting with the combined value of GSI and SCC at $2 million, subtracting 35 percent of the value of SCC, and awarding Anderson 70 percent of the remaining figure. However, this calculation does not follow the jury's instructions for calculating damages.

After reviewing the entire record, we conclude the jury's award of $1,680,000 for fraud and negligent misrepresentation was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We sustain appellants' fourth and sixth issues.

We cannot reverse only on unliquidated damages when, as in this case, liability is contested. Tex.R.App. P. 44.1(b); *Redman Homes, Inc. v. Ivy,* 920 S.W.2d 664, 669 (Tex.1996). Accordingly, we must remand the liability portions of the fraud and negligent misrepresentation causes of action as well. Because attorney's fees and exemplary damages cannot be supported without a finding of liability, we sustain appellants' fourteenth and sixteenth issues. Tex. Bus. & Com.Code Ann. § 27.01(e) (Vernon 2002); Tex. Civ. Prac. & Rem.Code Ann. § 41.003 (Vernon Supp.2004–05); Likewise, because the conspiracy claim cannot stand when the underlying tort (in this case fraud) fails, we sustain appellants' seventeenth issue.

## C. Double Recovery for Fraud and Breach of Fiduciary Duty

In the twelfth issue, Kelley contends the judgment's award of damages for both fraud and breach of fiduciary duty to Anderson gave Anderson a prohibited double recovery. The damages question for Kelley's breach of his fiduciary duty to Anderson instructed the jury to determine "[t]he difference, if any, between the value of Fred Anderson's 35% interest in Strategic Gas Services, Inc. as agreed to by the parties and its actual value. The difference in value, if any, shall be

determined at the time and place the merger occurred." The jury answered $318,261. Under the evidence before the jury, "the value ... as agreed to by the parties" and, under the fraud instruction, "the amount it would have been worth but for the fraud" were the same, about twice the value of GSI. Like the fraud damages, the values in the computation of the breach-of-fiduciary-duty damages were determined as of the time of the merger.

Thus, under trial court's instruction and the evidence, the formula for determining the damages for breach of fiduciary duty may be expressed as $D = (.35 \times 2 \ GSI) - .35 \ (GSI + SCC + BMP)$, with all values determined at the time of the merger. This is the same formula as for the fraud damages. *See supra* pp. 691–92. Accordingly, we conclude the damages for Kelley's breach of fiduciary duty to Anderson were duplicative of the fraud damages.

Anderson argues the awards are not duplicative because the jury could have computed Anderson's breach-of-fiduciary-duty damages by computing the value of the 20 percent of GSI Anderson gave Kelley. **\*694** [10] However, this figure is irrelevant to the instructed computation: the difference between the value of SGSI "as agreed to by the parties and its actual value." Under these facts, the jury instructions for calculating the damages for fraud and breach of fiduciary duty to Anderson involve the same calculation: the difference in value at the moment of the merger between Anderson's SGSI stock as promised/agreed to and its actual value.

[10] In Plaintiff's Exhibit 10, "Mark's Stock Inequality," Kelley stated the value of his 10 percent share of GSI was $159,130. Twice that amount, or 20 percent of GSI, is $318,260, just one dollar off the jury's damages calculation for breach of fiduciary duty.

Anderson also argues the breach-of-fiduciary-duty damages do not constitute a double recovery with the fraud damages because the breach of fiduciary duty and the fraud involved separate conduct. Anderson asserts that the breach of fiduciary duty arose from Kelley's request for an additional 20 percent of GSI. We disagree. The jury question on Kelley's breach of fiduciary duty to Anderson was for "the transaction in question," which, under the facts of this case, was the merger, not Kelley's pre-merger negotiations for additional shares of GSI. If the trial court intended for the jury question on breach of fiduciary duty to concern Kelley's additional 20 percent of GSI, then the damages question for breach of that duty would not have concerned the difference in value of

Anderson's shares in SGSI "as agreed to by the parties and its actual value ... at the time ... the merger occurred."

We conclude the judgment contains a double recovery for Anderson. The trial court should have required Anderson to elect between the awards of damages against Kelley for fraud and for breach of fiduciary duty. Because we are reversing and remanding the fraud causes of action, we conclude we must also reverse and remand Anderson's breach of fiduciary duty cause of action against Kelley because it concerns the same damages. *See Willis v. Donnelly,* 118 S.W.3d 10, 48 (Tex.App.-Houston [14th Dist.] 2003, pet. filed). We sustain Kelley's twelfth issue. Because of our resolution of the twelfth issue, we need not reach the eleventh issue asserting the fraud and breach-of-fiduciary-duty damages findings fatally conflict.

## III. BREACH OF FIDUCIARY DUTY TO SGSI

The jury found appellants breached their fiduciary duty to SGSI and that the breach of fiduciary duty from SGSI's purchase of its stock from Kelley and Crawford proximately caused damages to SGSI of $445,684.06. In the seventh issue, appellants contend no evidence or factually insufficient evidence shows they breached their fiduciary duty through Kelley and Crawford's sale of their stock to SGSI. In the eighth issue, they contend the jury's findings are not "supported by legally sufficient or alternatively factually sufficient evidence."

The charge placed the burden of proof on appellants to prove they did not breach their fiduciary duties. An appellant attacking the legal sufficiency of an adverse jury finding on which he had the burden of proof must demonstrate that the evidence establishes, as a matter of law, all vital facts in support of the finding. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam). In reviewing such a claim, we first examine the record for evidence supporting the jury's finding, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the fact finder's answer, **\*695** only then will we review the entire record to assess whether the contrary proposition was established as a matter of law. *See Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). If an appellant challenges a jury finding regarding an issue upon which the appellant had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow*

*Chem. Co.,* 46 S.W.3d at 241. In reviewing this challenge, we consider all of the evidence in determining whether the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See In re King's Estate,* 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951). We may reverse and remand for a new trial if we conclude the jury's failure to find is against the great weight and preponderance of the evidence. *See Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).

### A. Liability

The jury was instructed that for each defendant to prove he complied with his fiduciary duty he must show:

a. the transaction in question was fair and equitable to Strategic Gas Services, Inc.;

b. the particular defendant made reasonable use of the confidence that Strategic Gas Services, Inc. placed in him;

c. the particular defendant acted in the utmost good faith and exercised the most scrupulous honesty toward Strategic Gas Services, Inc.;

d. the particular defendant placed the interests of Strategic Gas Services, Inc. before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Strategic Gas Services, Inc., and did not place himself in any position where his self interest might conflict with his obligations as a fiduciary; and

e. the particular defendant fully and fairly disclosed all important information to Strategic Gas Services, Inc. concerning the transaction.

The jury answered that all three appellants failed to prove they complied with their fiduciary duty to SGSI.

Appellants argue the "business judgment rule" bars judgment against them on this claim. To preserve error, a party must have brought the complaint to the attention of the trial court and obtained a ruling. Tex.R.App. P. 33.1(a). Appellants did not plead the business judgment rule, the trial court did not instruct the jury on the business judgment rule, appellants did not request submission of an instruction on the business judgment rule, and appellants did not raise the business judgment rule in any of their post-verdict motions before the trial court. Because appellants did not raise this issue before

the trial court, we conclude they have not preserved any error regarding the applicability of the business judgment rule.

Appellants next argue that they cannot be held liable for breach of fiduciary duty because their actions in the sale of their stock were in accordance with the Buy–Sell Agreement. Appellants cite several cases in support of this argument, but none of them involved fiduciaries. *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203 (Tex.1996); *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105 (Tex.1984), *overruled on other grounds by Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex.1989); *Montgomery v. Phillips Petroleum Co.,* 49 S.W.2d 967 (Tex.Civ.App.-Amarillo 1932, writ ref'd); **\*696** *First Fed. Sav. & Loan Ass'n v. Ritenour,* 704 S.W.2d 895 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.). Accordingly, those cases are not applicable. Moreover, the fact the appellants had the contractual right to sell their stock to the corporation if the corporation agreed to buy it and the corporate authority to cause the corporation to buy the stock does not establish as a matter of law that they did not breach a fiduciary duty to SGSI in doing so. The issue is not whether the parties followed the Buy–Sell Agreement but whether the transaction was fair to SGSI and was performed with the utmost good faith and scrupulous honesty and without taking advantage of their position with SGSI at the expense of SGSI.

The jury could have concluded that appellants' use of the cash option, instead of the five-installment option, constituted a breach of their fiduciary duty. Appellants testified that one of the reasons for Crawford and Kelley's resignation was to stop the cash drain of their salaries. Despite this professed intention of preserving SGSI's cash resources, they proceeded to transact the purchase under the cash option instead of the installment option, which depleted 80 percent of the company's cash resources. Thus, the jury could have concluded that purchasing the shares for cash was not fair and equitable toward SGSI, was not in keeping with appellants' duty of utmost good faith and scrupulous honesty toward SGSI, and that appellants' took advantage of their positions with SGSI at the expense of SGSI. We conclude the evidence is legally and factually sufficient to support the jury's finding that appellants' breached their fiduciary duty to SGSI. We overrule appellants' seventh issue.

**B. Damages**

In the eighth issue, we consider whether the evidence is legally and factually insufficient to support the jury's award of $445,684.06, the entire amount SGSI paid Crawford and Kelley for their shares. The company's collapse within a few months of the stock sale is some evidence that the removal of 80 percent of the company's cash resources caused it damage. Unlike the damages questions on the fraud and breach of fiduciary causes of action, the jury was not given a formula for determining damages. Instead the jury was simply instructed to determine "[t]he damages, if any, caused to Strategic Gas Services, Inc. by the purchase of the stock in Strategic Gas Services, Inc. owned by Mark Kelley and Jeff Crawford." Under this broad instruction, the jury could have concluded the damages SGSI suffered was the loss of the remaining value of the corporation after the purchase of Crawford's and Kelley's shares. Kelley and Crawford received the book value of $288.88 per share. At that time, there were 5142.8 shares outstanding, so the book value of the corporation was $1,485,652.06. That amount, minus the value of Crawford's and Kelley's shares, $445,684.06, yields damages of $1,039,968. These damages that the jury could have rendered are two-and-one-third times the damages the jury actually rendered. Accordingly, we conclude the evidence is legally and factually sufficient to support the jury's finding of damages, and the damages awarded are not excessive. We overrule appellants' eighth issue.

In the fifteenth issue, appellants contend the trial court erred in awarding exemplary damages based on the breach of fiduciary duty to SGSI. This issue is dependent upon our reversing the SGSI's cause of action for breach of fiduciary duty. Because we have not reversed it, appellants' arguments lack merit. We overrule appellants' fifteenth issue.

**\*697 IV. BREACH OF FIDUCIARY DUTY TO SCC**

In the ninth and tenth issues, Kelley and Crawford contend the evidence is legally and factually insufficient to support the jury's findings that they breached their fiduciary duty to SCC in the events surrounding the $300,000 loan to Spethmann. Spethmann does not challenge his liability on this cause of action.

The trial court instructed the jury that for each defendant to prove he complied with his fiduciary duty he must show:

a. the transaction in question was fair and equitable to Strategic Controls Corporation;

b. the particular defendant made reasonable use of the confidence that Strategic Controls Corporation placed in him;

c. the particular defendant acted in the utmost good faith and exercised the most scrupulous honesty toward Strategic Controls Corporation;

d. the particular defendant placed the interests of Strategic Controls Corporation before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Strategic Controls Corporation, and did not place himself in any position where his self interest might conflict with his obligations as a fiduciary; and

e. the particular defendant fully and fairly disclosed all important information to Strategic Controls Corporation concerning the transaction.

### A. Crawford's Liability

Having reviewed all the evidence, we conclude the record conclusively establishes that Crawford did not breach his fiduciary duty to SCC concerning the $300,000 loan to Spethmann. The evidence is undisputed that Crawford opposed the loan initially, did not participate in the creation of the loan, refused to give his consent to the loan when Spethmann asked him, and consistently insisted that Spethmann return the money or, at the least, put up security for the loan. Crawford received no financial or other gain from Spethmann's receipt of the loan. Nothing indicates Crawford acted other than with the utmost good faith and the most scrupulous honesty concerning the unauthorized loan. We conclude no evidence shows Crawford breached his fiduciary duty to SCC concerning the $300,000 unauthorized loan, and Crawford established as a matter of law that he did not breach his fiduciary duty to SCC in that transaction. We sustain the ninth issue.

### B. Kelley's Liability

The evidence shows Kelley, like Crawford, received no financial or other benefit from Spethmann's receipt of the $300,000 and that Kelley worked to get Spethmann to return the money or put up security for the loan. However, the record also shows Spethmann would never have received the money if Kelley had checked with Crawford, as he was required to

do, to make sure all the directors authorized the loan before approving and funding the $300,000 loan to Spethmann. The evidence that Kelley approved and funded the loan based solely on Spethmann's statement that he "had run it by" Crawford shows Kelley did not make "reasonable use of the confidence that Strategic Controls Corporation placed in him." It also shows Kelley had not "fully and fairly disclosed all important information to Strategic Controls Corporation concerning the transaction," namely, that he had not obtained Crawford's authorization for the loan before approving and funding it.

**\*698** Because some evidence shows Kelley breached his fiduciary duty to SCC, we conclude Kelley has not shown the evidence is legally insufficient. We also conclude the jury's finding is not against the great weight and preponderance of the evidence. We overrule the tenth issue.

### V. CONCLUSION

We reverse the trial court's judgment in part and render judgment that Anderson and SCC take nothing from Crawford.

We render judgment that Anderson take nothing from Kelley on his causes of action for common-law fraud through affirmative misrepresentation, negligent misrepresentation, and statutory fraud and that Anderson take nothing on his claims against Kelley for attorney's fees and exemplary damages concerning those causes of action.

We reverse and remand for further proceedings Anderson's causes of action against Spethmann for common-law and statutory fraud, negligent misrepresentation, and conspiracy as well as Anderson's claims for attorney's fees and exemplary damages concerning those causes of action.

We reverse and remand for further proceedings Anderson's causes of action against Kelley for common-law fraud through nondisclosure, conspiracy, and breach of fiduciary duty as well as Anderson's claim for exemplary damages concerning those causes of action.

We affirm the trial court's judgment in all other respects.

### All Citations

171 S.W.3d 680

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

925 S.W.2d 565

Supreme Court of Texas.

The LENAPE RESOURCES CORPORATION

d/b/a Pomfret Production Company, Inc.,

and d/b/a Enercorp Resources, Inc., Tesoro

Exploration and Production Company,

Gulf Energy Pipeline Company and

Coastal Oil & Gas Corporation, Petitioners,

v.

TENNESSEE GAS PIPELINE

COMPANY, Respondent.

No. 94–0278
|
Argued Dec. 13, 1994.
|
Decided April 18, 1996.
|
Rehearing Overruled Aug. 16, 1996.

**Synopsis**

Natural gas pipeline brought action against gas sellers for declaratory judgment concerning meaning of various provisions of take-or-pay gas purchase agreement between pipeline and sellers. The 57th District Court, Bexar County, Charles W. Barrow, J., entered judgment for sellers in part, and appeals were taken. The San Antonio Court of Appeals, Shirley W. Butts, J., 870 S.W.2d 286, affirmed in part, reversed in part, and remanded. On application for writ of error, the Supreme Court, Enoch, J., held that: (1) Uniform Commercial Code (UCC) provision governing output, requirements, and exclusive dealings contracts did not apply to gas purchase agreement so as to impose proportionality limitation on pipeline's take-or-pay obligation; (2) some evidence supported finding that agreement included both annual inflation adjustment factor and independent and additional growth escalation factor in price escalation of nonregulated gas; (3) agreement required pipeline to purchase 50% of 85% of sellers' delivery capacity of gas produced from wells anywhere on new units which included acreage not originally dedicated to agreement; and (4) pipeline was precluded from contesting continued viability of agreement under agreement release provision based on termination of gas leases between sellers and lessors for failure to produce in paying quantities.

Affirmed in part and reversed and rendered in part.

Phillips, C.J., concurred and dissented and filed opinion in which Gonzalez, Hecht, and Owen, JJ., joined.

 ***567** Appeal from the San Antonio Court of Appeals, Fourth Judicial District; Shirley W. Butts, Judge.

**Attorneys and Law Firms**

Jane M.N. Webre, Austin, William T. Armstrong, III, San Antonio, Rudy A. England, Houston, Dwight A. Dalrymple, Houston, Emerson Banack, Jr., San Antonio, Charles R. Roberts, San Antonio, Ernest E. Smith, III, Austin, Frank Douglass, Austin, Elizabeth N. Miller, Austin, Steve Selby, Austin, for petitioners.

Thomas H. Watkins, Austin, C.A. Davis, Austin, Elizabeth G. Bloch, Austin, John R. Hathaway, Austin, Theodore R. Tetzlaff, Chicago, IL, Donald R. Cassling, Chicago, IL, Norman M. Hirsch, Chicago, IL, Ralph H. Duggins, Fort Worth, Sloan B. Blair, Fort Worth, H. Carter Burdette, Fort Worth, for respondent.

**Opinion**

ENOCH, Justice, delivered the opinion of the Court on Motion for Rehearing, in which CORNYN, SPECTOR, BAKER, and ABBOTT, Justices, join.

We grant Petitioners' motions for rehearing. We withdraw our opinion and judgment of August 1, 1995 and substitute the following opinion.

The principal issue in this case is whether the good faith and proportionality restrictions of section 2.306 of the Uniform Commercial Code, Tex.Bus. & Com.Code § 2.306, apply to the take-or-pay gas purchase agreement between Lenape Resources Corporation and Tennessee Gas Pipeline Company. The court of appeals held that the take-or-pay contract was an output contract subject to section 2.306. 870 S.W.2d 286. We disagree. We reverse in part and affirm in part the judgment of the court of appeals.

Tennessee transports and stores natural gas for distribution to customers who provide natural gas to consumers throughout the southern United States. Tennessee entered into the Gas Purchase Agreement (GPA) in 1979 with Lenape's predecessor in interest. Under the GPA, Tennessee agreed to

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

take, or pay for if not taken, gas produced from gas reserves committed under the GPA. The committed reserves include the Fantina Yzaguirre Gas Unit and the Jesus Yzaguirre Gas Unit in Zapata County.

In entering into the GPA in August 1979, Tennessee sought to obtain as much gas as could be produced from the committed reserves. The GPA plainly reflects this objective. Specifically, the GPA provides that Lenape is not obligated to deliver to Tennessee any predetermined quantities of gas or to maintain any predetermined level of deliverability; that Lenape may unitize its leases with other properties in the same field; and that Lenape, in its sole discretion, may drill new wells to all depths and horizons and repair or rework old wells.

From the beginning of the GPA term in 1979 until 1989, Lenape produced gas from **\*568** only two wells on the committed acreage, one of which was a low-producing stripper well. Despite this low production, Tennessee sought to be released from its obligations under the GPA. In the early 1980s, market conditions for natural gas changed dramatically. The price and demand for natural gas plummeted. Roland, Comment, *Take-or-Pay Provisions: Major Problems for the Natural Gas Industry,* 18 St. Mary's L.J. 251, 262 (1986). In 1983, Tennessee sent its producers, including Lenape, notice that it was instituting an "emergency gas purchase policy," whereby Tennessee proposed to reduce its purchases and limit its take-or-pay obligations and refused to recognize any take-or-pay obligations for producers who refused to amend their contracts as Tennessee demanded. *See Mandell v. Hamman Oil & Ref. Co.,* 822 S.W.2d 153, 156–57 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (Tennessee reduced its take-or-pay obligations with gas producer by half under emergency gas purchase policy). Again in 1985 and 1986, Tennessee sought to be released from its obligations under the GPA first by seeking to amend the GPA and next by asserting a force majeure defense based on depressed market conditions.

In light of these developments, Lenape had little incentive to increase production or develop new wells. Lenape's lessors grew impatient with the low production and sued Lenape for breach of its implied covenant to develop the leases underlying the committed acreage, for failure to produce in paying quantities, and for abandonment of the leases. Tesoro Exploration and Production Company obtained lease options from the lessors and backed the lessors in their lawsuit against Lenape. Lenape settled the lawsuit with its lessors and agreed to unitize part of the committed acreage with

adjacent property. The unitization formed the Guerra A and B units, each comprised of one-half of the committed acreage and additional acreage outside the GPA's committed acreage. After unitization, Lenape entered into a farmout agreement with Tesoro and Coastal Oil & Gas Corporation. As a result of the farmout, Tesoro and Coastal became "Sellers" under the GPA. Tesoro drilled three wells, one bottomed on the committed acreage and two inside the Guerra A and B units on acreage outside the acreage originally committed to the GPA. The two wells on the Guerra A and B units were highly successful.

The successful Guerra A and B wells would vastly increase Tennessee's take-or-pay obligations. Tennessee sued Lenape and the other Sellers in August 1990 seeking a declaration under various theories that it was not obligated to take or pay for any of the increased production resulting from the Guerra A and B wells. Specifically, Tennessee sought a declaration that:

(1) the GPA is governed by section 2.306 of the UCC and that current and anticipated gas production from the Guerra A and B wells[1] is in bad faith and unreasonably disproportionate to prior production in violation of section 2.306;

[1]    There is no evidence in the record of the extent of the increased production. Tennessee claims that if this cause were remanded, it would show that for the first twelve years of the GPA, it never paid more than $300,000 for gas produced in any single year. In 1993, by contrast, Tennessee claims it paid under protest $89 million for gas produced under the GPA.

(2) alternatively, if not governed by section 2.306, the GPA is void and unenforceable for indefiniteness and lack of mutuality;

(3) alternatively, Tennessee is not obligated to take or pay for quantities of gas tendered in bad faith and which do not comport with prior history and course of performance;

(4) the GPA covers only the Sellers' interest in the reserves physically located under the leases originally dedicated to the GPA and Tennessee is not obligated to purchase gas produced from wells outside the original leases;

(5) the GPA does not permit pooling;

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

(6) the Fantina Yzaguirre Gas Unit leases terminated for Lenape's failure to produce in paying quantities, failure to reasonably develop, and abandonment of the leases and thus are no longer subject to the GPA; and

(7) the parties did not intend for the price of non-regulated gas to escalate by the **\*569** annual inflation adjustment factor plus a growth factor.

In addition, Tennessee asserted that Lenape, Tesoro, and Coastal's conduct, including their "bad faith pooling," violated the Deceptive Trade Practices and Consumer Protection Act. Tex.Bus. & Com.Code §§ 17.41–.63.

Lenape counterclaimed, alleging breach of contract, anticipatory repudiation, and that Tennessee's DTPA claims were asserted in bad faith. Tesoro and Coastal asserted similar counterclaims. These counterclaims and the DTPA claims have been resolved and are not at issue in this appeal.

The trial court granted a partial summary judgment for the Sellers, determining: (1) the GPA is not an output contract subject to section 2.306; (2) the GPA permits pooling/unitization; and (3) Tennessee could not contest the validity of the leases underlying the GPA. After a bench trial on the remaining issues, the trial court rendered judgment for the Sellers on all of Tennessee's remaining claims. Specifically, the trial court found: (1) the Sellers had not acted in bad faith in drilling the new wells or forming the Guerra A and B units; (2) the GPA is not void for indefiniteness or lack of mutuality; (3) the GPA allows for unitization and obligates Tennessee to purchase the Sellers' interest in gas produced anywhere within the pooled units; (4) the GPA mandates that the price for non-regulated gas escalate in accordance with section 102(b)(2) of the Natural Gas Policy Act; and (5) escrow monies and attorneys' fees should be paid to the Sellers.

The court of appeals reversed the trial court's summary judgment on the section 2.306 issue, holding that the GPA is an output contract subject to the good faith and proportionality restrictions of section 2.306. 870 S.W.2d at 291–92. With the exception of Tennessee's DTPA claims, which were voluntarily resolved by agreement of the parties, the court of appeals affirmed the remainder of the trial court's judgment. All parties sought writ of error in this Court. We consider the Sellers' contentions first, then those of Tennessee.

**I**

Whether section 2.306 of the UCC applies to this take-or-pay contract is a question of first impression in this jurisdiction. Section 2.306 applies only if (1) the take-or-pay contract is an output contract, and (2) the parties have not otherwise opted to vary the quantity obligations by agreement. Tex.Bus. & Com.Code § 2.306; *Jon–T Chems., Inc. v. Freeport Chem. Co.,* 704 F.2d 1412, 1416 (5th Cir.1983). The GPA defines the quantity of gas Tennessee must take or pay for as a percentage of the Sellers' capacity to deliver gas. Specifically, section 3(a) of the GPA provides:

3. *Quantity:*

(a) Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive, or pay for if available and not taken, Seller's pro rata part of the following quantities of gas produced from the committed reserves:

. . .

(ii) A quantity of gas well gas equal to eighty-five percent (85%) of Seller's delivery capacity.

Delivery capacity is defined in section 1(f) of the GPA as:

Seller's pro rata part of the average amount of gas well gas per day which can be efficiently withdrawn from the wells on the lease(s) in the course of a delivery capacity test conducted as provided in section 3(f) hereof under applicable rules and regulations and in accordance with prudent operating practices, the production from which is covered by this Agreement and which is available for delivery ...

Tennessee asserts the GPA is an output contract simply because the quantity is defined in terms of Lenape's delivery capacity, i.e., its capacity to produce natural gas from the covered acreage. This construction, while alluring in its simplicity, ignores the realities of gas production.

An output contract is one in which the buyer agrees to buy the seller's entire output of production. Under a take-or-pay contract, the buyer does not have to buy any production. The take-or-pay contract provides for alternative performance by the buyer: either **\*570** purchase a specified quantity of gas or pay the producer for the right to purchase that quantity of gas in the future. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 689 (10th Cir.1991). Because of this alternative performance, the pay option under a take-or-pay contract is not a payment for the sale of gas. *Id.; Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1167–

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

68 (5th Cir.1988); *see also Mandell,* 822 S.W.2d at 164–65; *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 268 (Tex.App.— San Antonio 1991, writ denied). Rather, it is a payment for the exclusive dedication of reserves for a fixed period of time. *International Minerals & Chem. Corp. v. Llano, Inc.,* 770 F.2d 879, 882 (10th Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986); Medina et al., *Take or Litigate: Enforcing the Plain Meaning of the Take-or-Pay Clause in Natural Gas Contracts,* 40 Ark.L.Rev. 185, 188 (1986). If a buyer opts not to take any gas, the gas remains in the well unproduced. Thus, the quantity of gas actually produced and purchased by the buyer is determined in large part by the buyer's nominations.

Other forces delimit gas production as well. The laws of physics obviously affect a producer's ability to produce gas. Further, regulatory constraints of the Texas Railroad Commission limit the amount of gas that may be produced. To say that the quantity is determined solely by the Sellers' output or delivery capacity thus oversimplifies the physical realities of gas production and overstates the Sellers' control over the quantity of gas produced.

Regardless of whether the take-or-pay contract is an output contract, section 2.306 does not apply to this gas purchase agreement because the parties agreed to quantity obligations that differ from those imposed by section 2.306. Section 2.306, like many other provisions of Article 2 of the UCC, is a gap-filler and may be varied by the parties' agreement. Tex.Bus. & Com.Code § 1.102(c); *Jon–T Chems.,* 704 F.2d at 1416; White & Summers, Uniform Commercial Code 111– 12 (2d ed. 1980); *see also Prenalta,* 944 F.2d at 687 (gas purchase contracts are contracts for the sale of goods and are governed by Article 2, but parties can vary the provisions of the UCC by agreement); *Colorado Interstate Gas Co. v. Chemco, Inc.,* 854 P.2d 1232, 1236 (Colo.1993) (parties to take-or-pay gas contract may vary provisions of the UCC by agreement); Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC,* 1973 Duke L.J. 599, 622 (as an alternative to section 2.306, contracting parties will be mindful of the Code's invitation to modify its basic rules by agreement).

As a gap-filler, section 2.306 operates to render output and requirements contracts definite. Under the UCC, a contract for the sale of goods for the price of $500 or more is not enforceable absent some writing evidencing a contract for the sale that has been signed and that specifies a quantity. Tex.Bus. & Com.Code § 2.201(a). A contract does not fail for

indefiniteness if the parties intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy. *Id.* § 2.204(c). Section 2.306 renders output and requirements contracts sufficiently definite as to quantity and enforceable by reading into such contracts a quantity that is the actual good faith output or requirements of the particular party. *Id.* § 2.306 cmt. 2.

Section 2.306 fills in the quantity term only when a contract does not unambiguously specify the quantity of the output of the seller or the requirements of the buyer. *Id.* § 2.306(a). It does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity. *See Riegel Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 790 (5th Cir.1975) (contract for sale of cotton sufficiently definite when quantity may be determined from acreage covered by contract and estimated yield of acreage); *Fort Hill Lumber Co. v. Georgia–Pacific Corp.,* 261 Or. 431, 493 P.2d 1366, 1368 (1972) (contract not indefinite when contract for purchase of all timber logged provided method for determining quantity).

The GPA requires Tennessee to purchase a set quantity of gas produced from the committed reserves defined as eighty-five percent of Lenape's delivery capacity. Lenape's **\*571** delivery capacity is a readily ascertainable quantity, measured as often as once every three months through a delivery capacity test. The specific quantity of natural gas for which Tennessee must take or pay is a simple mathematical calculation: .85 multiplied by Sellers' delivery capacity. Section 2.306 does not apply to fill in the quantity—good faith tender—because the quantity is specified as a determinable amount, Sellers' delivery capacity.

Tennessee insists that unless section 2.306 is read into the GPA to vary its terms, the GPA's quantity provisions effect a waiver of the good faith and reasonableness standards of the UCC, contrary to section 1.102(c) of the UCC. Section 1.102(c) provides:

> [T]he obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

Tex.Bus. & Com.Code § 1.102(c). We do not agree that the GPA disclaims any good faith or reasonableness standards.

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

The GPA does permit the Sellers to increase delivery capacity by drilling new wells and by unitizing the committed reserves. But nothing in the GPA permits the Sellers to undertake these activities in bad faith. Any increase in delivery capacity is still subject to the good faith obligation of section 1.203 as defined in sections 1.201(19) (honesty in fact) and 2.103(a)(2) (for merchants, honesty in fact and observance of reasonable commercial standards of fair dealing in the trade). The UCC limits Tennessee's take-or-pay obligations to good faith increases in delivery capacity.

Moreover, Tennessee's reading of the GPA would render the quantity term of the GPA uncertain. Instead of defining Tennessee's take-or-pay obligations in terms of a fixed percentage of Sellers' delivery capacity, Tennessee would have us read the GPA as requiring Tennessee to purchase only a portion of gas that may be tendered as reasonably proportionate to any normal or otherwise comparable prior output. The quantity of gas which Tennessee must either take or pay for would depend on a number of indeterminate variables: prior output; *normal* prior output; *comparable* prior output; *proportionality* to either normal or comparable prior output; and *reasonableness* of the proportionality. Reading these factors into Tennessee's take-or-pay obligations, any increase in production and delivery capacity would be measured after the fact by these variables, thus injecting uncertainty into the parties' obligations under the GPA.

Not only does the contract specify the quantity with sufficient definiteness, but the GPA also expresses the parties' agreement to provide for production increases subject to Tennessee's take-or-pay obligations. The take-or-pay contract specifically provides that the Sellers are not obligated to deliver to Tennessee any predetermined quantities of gas or to maintain any predetermined level of deliverability. Additionally, the GPA gives the Sellers the right to increase production, and thereby increase delivery capacity, through unitization. The GPA further provides that the Sellers may, in their sole discretion, drill new wells. It does not limit production to existing wells in discovered reservoirs. Accordingly, the GPA anticipates that the Sellers may drill new wells in new depths and horizons and increase production and delivery capacity in discovering new reserves.

These provisions taken together demonstrate that the parties to the GPA, both sophisticated players in the oil and gas industry, expected that production and delivery capacity could increase significantly. To read section 2.306 as limiting the quantity obligations under the take-or-pay contract here

would eviscerate the contract the parties bargained for in 1979.

Tennessee bargained for the exclusive right to purchase "all gas produced from the committed reserves." Tennessee also contracted to encourage increased production by Lenape by giving Lenape the right to develop new wells and to unitize any of its leases. In exchange for the exclusive dedication and access to Lenape's reserves, Tennessee gave Lenape a take-or-pay clause ensuring Lenape **\*572** a set market for its gas production and a steady cash flow. *International Minerals,* 770 F.2d at 882; Medina, *Take or Litigate,* 40 Ark.L.Rev. at 188.

Tennessee would have this Court rewrite the parties' contract on Tennessee's concession that it no longer will demand the exclusive dedication of the gas reserves. Tennessee concedes that any gas produced in violation of section 2.306 may be sold by Lenape to third parties. While a party may concede certain facts that have implications under the law, here Tennessee is making a concession of a contractual obligation (waiving its right to exclusive dedication of reserves) in exchange for a restriction on Lenape's rights under the GPA (application of section 2.306 to limit production). Tennessee's concession is not really a concession. It is simply another way of arguing that it should be relieved of its obligation to take or pay for eighty-five percent of Lenape's delivery capacity.

Applying section 2.306 to the take-or-pay clause, as Tennessee urges, would fundamentally alter the risk allocation of the take-or-pay clause in gas purchase contracts. We recognized recently that the "central purpose underlying take-or-pay contracts" is to "allow the risk of fluctuations in market demand to be allocated to the buyer." *Exxon Corp. v. West Texas Gathering Co.,* 868 S.W.2d 299, 302 (Tex.1993). In applying section 2.306 to the take-or-pay clause, Tennessee retains the benefits of the exclusive dedication of Lenape's reserves essentially under a right of first refusal, but Lenape no longer has a certain market for its natural gas. Any increase in production will be subject to an after-the-fact determination of whether the increased amount is "unreasonably disproportionate" to prior normal or comparable production and, if so, will relieve Tennessee from its minimum take-or-pay obligation.

Shifting the market risk back to the producer will inevitably chill exploration and production. Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry,* 97 Harv.L.Rev. 345, 357 (1983). Why develop new

**Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)**

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

wells if there is no buyer? In the event of a decline in the market, producers may well be left with an unmarketable product. Further, producers rely on the steady cash flow of take-or-pay contracts to cover operating expenses as well as exploration and production costs of new wells. Thus, a revision of the take-or-pay relationship that reduces the certainty of cash flow creates financial uncertainty for the gas producer that will discourage investment in the natural gas industry. Roland, Comment, 18 St. Mary's L.J. at 261 n. 51, n. 57; *see also* Johnson, *Natural Gas Sales Contracts,* 34 Inst. on Oil & Gas Terms 83, 111 (1983) (guaranteed income from take-or-pay clause used as collateral). Altering the market risk thus injects into the producer-pipeline relationship instability that discourages investment in the industry. *See* Roland, Comment, 18 St. Mary's L.J. at 261 (take-or-pay provision adopted to minimize instability).

The instability is compounded by compromising the lessor-lessee relationship as well. Texas law places upon lessees an implied obligation to reasonably develop the land covered by the oil and gas lease. *Grubb v. McAfee,* 109 Tex. 527, 212 S.W. 464, 465 (1919). Thus, to fulfill its obligations to its lessors, a gas producer must drill additional wells as would a reasonably prudent operator. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 693–94 (1959). Applying section 2.306 in these circumstances would dissuade a producer from drilling new wells, contrary to the producer's obligations under an oil and gas lease. As a result, if a producer does not drill additional wells, it may be liable to its lessors for breach of the implied covenant to reasonably develop the lease; if a producer does drill additional wells that produce in large quantities, it may be unable to market the increased production. Further, it is questionable whether a reasonably prudent operator would drill additional wells if the producer has either no market or an uncertain market for the increased production. Applying section 2.306 to this take-or-pay contract may have profound ramifications not only for the producer-pipeline relationship but also for lessor-lessee relationship and natural gas exploration in general.

In sum, we hold that section 2.306 of the UCC does not apply to rewrite the parties' **\*573** bargained-for contract. The GPA requires Tennessee to take or pay for eighty-five percent of Lenape's delivery capacity, an amount readily ascertainable by simple mathematical calculation. It clearly expresses the parties' expectations that Tennessee's take-or-pay obligations would extend to any good faith increases in delivery capacity, even though such increases may be significant. To apply section 2.306 contrary to the express terms of the GPA not

only rewrites the quantity term of the GPA, but also effects a fundamental shift in the party bearing the market risk and injects uncertainty into the natural gas production industry. The take-or-pay gas purchase contract is not subject to section 2.306. The court of appeals erred in holding otherwise.[2]

2      Because of our disposition on this issue, we need not address and express no opinion on the application of section 2.306 standards to output or requirements contracts governed by that section.

## II

In its application for writ of error, Tennessee first complains that the court of appeals erred in holding that there was sufficient evidence to support the trial court's finding that the parties intended to include a double escalation factor in the price of the unregulated natural gas subject to the GPA. We agree with the court of appeals.

When the parties executed the GPA on January 16, 1979, the price for natural gas was regulated by the Federal Energy Regulatory Commission. All of the gas produced from the Fantina Yzaguirre and the Jesus Yzaguirre wells has remained price-regulated under section 102(b)(2) of the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3350, 3358 (repealed 1989) (the "NGPA"). Section 8(c) of the GPA requires Tennessee to pay the highest maximum price allowed by regulation for gas produced that is subject to the regulations. The GPA also provides a mechanism to calculate the price of "new natural gas," or gas not subject to the regulations, in the event that the production price became deregulated. The price for "new natural gas" was deregulated in 1985. As a result, all the gas produced from the Guerra A wells No. 1 and No. 4 and the Guerra B well No. 1 is classified as "new natural gas," and section 8(a) of the GPA governs calculation of its price.

Section 8(a) provides as follows:

8. *Prices:*

(a) The price to be paid by Buyer to Seller from the effective date hereof for all gas delivered hereunder, or for the contract quantity if available and not taken by Buyer, shall be $2.067 per Mcf, escalating on the first day of January, 1979 and the first day of each month thereafter for the term of this Agreement to the product obtained by multiplying the price in effect hereunder for

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

the preceding month by the monthly equivalent of the *annual inflation adjustment factor applicable for such month, as such factor is defined in Section 102(b)(2) of the Natural Gas Policy Act of 1978,* Public Law 95–621. (emphasis added)

This language is inconsistent because the "annual inflation adjustment factor" is not defined in section 102(b)(2) of the NGPA. Rather, the annual inflation adjustment factor is defined in section 101(a) of the NGPA.[3] Section 102(b)(2), the section specifically referenced in the above quoted paragraph, instead defines an inflation adjustment factor unique to gas that is subject to section 102.[4] **\*574** The unique inflation adjustment factor of section 102 incorporates not only the annual inflation adjustment factor defined in section 101(a) of the NGPA, but also an independent and additional growth escalation factor.

[3]    Section 101(a)(1) provides that the "annual inflation adjustment factor" shall be the sum of (A) a factor equal to one hundredth of the quarterly percent change in the GNP implicit price deflator; plus (B) a correction factor of 1.002. NGPA § 101(a)(1), 92 Stat. at 3356.

[4]    Section 102(b)(2) of the NGPA states:
The maximum lawful price under this section for any month shall be—
....
(2) in the case of any month [after April 1977], the maximum lawful price, per million Btu's, prescribed under this subsection for the preceding month multiplied by the monthly equivalent of a factor equal to the sum of (A) the annual inflation adjustment factor applicable for such month; plus (B) ... (ii) .04, in the case of any month beginning after April 20, 1981.
NGPA § 102(b)(2), 92 Stat. at 3358.

Tennessee contends that the section in question provides for the single annual inflation adjustment escalation factor defined in section 101(a) of the NGPA, even though that section is not referenced in section 8(a) of the GPA. The Sellers, on the other hand, contend that the same section provides for the application of the double escalation factor defined in section 102(b)(2) of the NGPA as specifically referenced in the GPA.

Our first task is to determine, as a matter of law, whether section 8(a) of the GPA is ambiguous. If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and it can be construed as a matter of law. *Coker v. Coker,* 650

S.W.2d 391, 393 (Tex.1983). If its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed, then it is ambiguous and its meaning must be resolved by a finder of fact. *Id.* at 394; *see also Sage Street Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 445–46 (Tex.1993) (trial court properly submitted ambiguity to jury when issue was tried by consent).

In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the written instrument. *Coker,* 650 S.W.2d at 393. If the written instrument is ambiguous, the trier of fact may look to parol evidence to determine the parties' intent. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex.1980); *see also Paragon Resources Inc. v. National Fuel Gas Distribution Corp.,* 695 F.2d 991, 996 (5th Cir.1983). The court of appeals correctly held that section 8(a) is ambiguous.

Tennessee employs a number of rules of construction to support its interpretation that the parties intended section 8(a) to escalate the gas price by only the single inflation adjustment factor. Tennessee argues that when there is variance between unambiguous written words ("annual inflation adjustment factor") and figures ("§ 102(b)(2)"), the written words control. *See Guthrie v. National Homes Corp.,* 394 S.W.2d 494, 496 (Tex.1965). In addition, it argues that terms stated earlier in a contract ("annual inflation adjustment factor") are favored over subsequent terms ("§ 102(b)(2)"). *See Coker,* 650 S.W.2d at 393. Moreover, the language used by the parties ("factor," not "factors", modified by "defined in") should be accorded its plain, grammatical meaning unless it definitely appears the parties' intent would thereby be defeated. *See Lyons v. Montgomery,* 701 S.W.2d 641, 643 (Tex.1985).

Each application of these rules of construction propounded by Tennessee leads to the complete negation of the line "defined in Section 102(b)(2) of the Natural Gas Policy Act of 1978." In construing a contract, we strive to give meaning to each provision. *Southland Royalty Co. v. Pan Am. Petroleum Corp.,* 378 S.W.2d 50, 53 (Tex.1964). Moreover, we have stated that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. Thus, a court need not embrace strained rules of construction that would avoid ambiguity at all costs. *Reilly v. Rangers Management, Inc.* 727 S.W.2d 527, 530 (Tex.1987). On balance, we conclude that section 8(a) of the GPA is ambiguous as a matter of law, so that the trial court's consideration of parol evidence was proper.

**Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)**

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

Based on that parol evidence, the trial court found that the parties intended to include two escalating factors in the price escalation of the non-regulated gas. Tennessee contends that the court of appeals erred in holding that some evidence supported this finding. We disagree.

The Sellers' expert testified that the term "annual inflation adjustment" has a unique meaning in the industry, encompassing both growth and escalation adjustment factors. In addition, the only remaining living person who participated in the negotiations, Charles Faulk, testified that the base price stated in section 8(a) came from **\*575** section 102 of the NGPA, and that the reference to section 102(b)(2) in section 8(a) is intentional. Faulk, a Tennessee employee who negotiated on Tennessee's behalf, further testified that the reference was discussed with and approved by Tennessee's attorneys and that it was a part of the standard agreement used by Tennessee.

We therefore hold that the court of appeals did not err in holding that the provision was ambiguous and in affirming the trial court's finding that the parties intended the price of non-regulated new natural gas to escalate by both factors included in section 102(b)(2) of the NGPA.

## III

Tennessee next complains that although the GPA gives the Sellers the right to unitize, it did not afford the Sellers the right to force Tennessee to purchase a proportionate share of the gas produced from unitized acreage.

As we note above, Lenape's lessors sued to terminate the leases in the Fantina Yzaguirre gas unit. By a settlement on August 17, 1989, however, all parties agreed that the Fantina Yzaguirre leases remained intact and had remained intact at all times. Lenape unitized the committed acreage, forming the Guerra A and B units, each consisting of one-half of the committed acreage from the Fantina unit and one-half new acreage. The trial court found that because half of the land within the units is GPA acreage, Tennessee was obligated to purchase fifty percent of eighty-five percent of the Sellers' delivery capacity from the new wells. The court of appeals affirmed the trial court's finding. 870 S.W.2d at 299–300. We agree.

The GPA specifically granted to the Sellers the power to "unitize its lease(s) with other properties of Seller[s] and of others in the same field." The district court found that the Sellers' unitization was not done in bad faith, and Tennessee does not challenge that finding.

Tennessee argues it is only required to take or pay for whatever gas is produced from "committed reserves." "Committed reserves" is defined in section 3(e) of the GPA as follows:

> (e) The term "committed reserves" shall mean all of the gas reserves located in and under the lease(s) described in Exhibit "B" and outlined in Exhibit "C" hereto which are attributable to the interest of Seller therein.

Tennessee claims that because of this definition, it is required to take or pay for gas produced only from below the committed acreage and not gas produced from land unitized into the tract. We disagree.

Section 5(e) of the Gas Production Agreement provides that production of gas from wells located on any tract included in the unit will be considered production under the GPA:

> 5. *Reservations of Seller:* Seller reserves the following prior rights with sufficient gas to satisfy such rights:

. . .

> (e) To unitize its lease(s) with other properties of Seller and of others in the same field, *in which event this Agreement will cover Seller's interest in the unit attributable to the reserves committed hereunder.*

(emphasis added) The GPA's committed acreage comprises fifty percent of the new units. Tennessee does not dispute that as between the Sellers and the other owners of interests in the unit, "Sellers' interest in the unit attributable to the reserves committed hereunder" is fifty percent. Therefore, the court of appeals correctly concluded that Tennessee is obligated to purchase fifty percent of eight-five percent of the Sellers' delivery capacity of gas produced from the wells anywhere on the units.

## IV

The last issue that we must consider is whether Tennessee may properly contest the continued viability of the GPA under section 5 of that contract based on a termination of the underlying leases between the Sellers and the lessors for

**Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)**

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

failure to produce in paying quantities. The trial court granted summary judgment to the Sellers, holding that Tennessee was not entitled to establish **\*576** that the leases were no longer in force. The court of appeals affirmed. 870 S.W.2d at 294–95. Again, we agree.

Tennessee relies on section 5(a) of the GPA, which expressly provides:

> 5. *Reservation of Seller:* Seller reserves the following prior rights with sufficient gas to satisfy such rights:
>
> (a) To operate its property free from any control by Buyer in such a manner as Seller, in its sole discretion, may deem advisable, including without limitation, the right, but never the obligation, to drill new wells, to repair and rework old wells, and to plug any well or surrender any lease or portion thereof when no longer deemed by Seller to be capable of producing gas in paying quantities under normal methods of operation; provided, however, in the event Seller should terminate or surrender any lease described in Exhibit "B" and outlined in Exhibit "C" hereto, written notice of same shall be given to Buyer within thirty (30) days. Should Seller terminate or surrender any lease, or a portion thereof, covered by this Agreement, said lease or portion shall be released from the terms of this Agreement effective as of the date of such termination or surrender. Upon Seller's request, Buyer agrees to amend this agreement to effect such a release.

Under this provision, Tennessee maintains that the GPA is no longer in force for any lands on which it could show that the oil and gas lease had terminated or reverted back to the landowners pursuant to the operation of the lease's terms for failure to produce in paying quantities. In settling their lawsuit against Lenape, however, Lenape's lessors agreed:

> to confirm and declare that said Fantina Yzaguirre leases in all of their terms, conditions and provisions have been from the dates of the leases, and currently are, binding upon Plaintiffs [lessors] and ... and that the Fantina Yzaguirre leases are valid and subsisting oil, gas and mineral leases ... and have been at all times since the dates of such leases.

Tennessee was not notified of the lawsuit or the settlement. It seeks now to prove the occurrence of an event, namely the termination of the underlying leases, that releases it from its duty to purchase gas pursuant to the GPA.

The unambiguous language of section 5(a) of the GPA, however, grants to Sellers, not Buyer, the contractual right

to surrender any lease when no longer deemed by Sellers to be capable of producing gas in paying quantities. The record is undisputed that Lenape has never surrendered any of the leases, nor has Lenape deemed any lease to be no longer capable of producing in paying quantities. Section 5(a) provides only that "Should *Seller* terminate or surrender any lease ... said lease ... shall be released from the terms of this agreement." (emphasis added). There is no contention that the Sellers have affirmatively terminated or surrendered any lease. The provision at issue is found in a section entitled "Reservations of Sellers." Thus, Tennessee is precluded from attempting to prove under section 5(a) of the GPA that the contract is no longer in effect due to the termination of the underlying leases. We express no opinion on whether Tennessee could prove that the GPA was no longer in effect based upon any theory or claim other than one based on section 5 of the GPA.

\* \* \*

We hold that section 2.306 does not apply to the take-or-pay gas purchase agreement at issue here. We reverse those parts of the court of appeals' judgment reversing the trial court's partial summary judgment on section 2.306 of the UCC and the final judgment on escrow funds and attorneys' fees and render judgment on those issues in accordance with the trial court's judgment. We affirm the remainder of the judgment of the court of appeals.

PHILLIPS, C.J., files a concurring and dissenting opinion, in which GONZALEZ, HECHT and OWEN, JJ., join.

PHILLIPS, Chief Justice, delivered a concurring and dissenting opinion.

I join in parts II, III, and IV of the Court's opinion. Because I believe that the Gas Purchase Agreement ("GPA") at issue here is an output contract which is subject to **\*577** section 2.306 of the Uniform Commercial Code, however, I cannot join in a decision to reinstate the trial court's summary judgment. As I explain below, I would remand the case to the trial court for further proceedings as to whether the Sellers' increased tender of gas either occurred in bad faith or was unreasonably disproportionate to prior output.

**I**

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

Output contracts are open-quantity contracts in which the quantity is determined by the seller's output or production of a certain commodity. Because of their lack of a quantity term, output contracts "have historically had two problems: indefiniteness and lack of mutuality." *See* Henning & Wallach, The Law of Sales Under The Uniform Commercial Code ¶ 3.08[2] (Rev. ed. 1992). The "common-law hostility to output and requirements contracts," 1 Hawkland, Uniform Commercial Code Series § 2–306:01 (Art 2) (1995), is evidenced by numerous pre-Code cases refusing to enforce such contracts due to the lack of a specified quantity. *See, e.g., Crane v. C. Crane & Co.,* 105 F. 869, 873 (7th Cir.1901); *Harrington Bros. v. City of New York,* 51 F.2d 503, 505 (S.D.N.Y.1931); *Sealtest S. Dairies Div. v. Evans,* 103 Ga.App. 835, 120 S.E.2d 887 (1961); *G.H. Baber v. Lay,* 305 S.W.2d 912 (Ky.1957). *See also* Annotation, 14 A.L.R. 1300 (1921).

Section 2.306 of the UCC provides a statutory mechanism for saving output contracts. It solves what the official comments refer to as the "specific problem" of requirement and output contracts by providing that

> [a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimated to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

Tex.Bus. & Com.Code Ann. § 2.306(a) (Vernon 1994). The Texas Legislature has made the UCC applicable to mineral sales contracts by declaring that gas is a good if it is to be severed from the land. *Id.* § 2.107(a) ("A contract for the sale of minerals or the like (including oil and gas) ... to be removed from realty is a contract for the sale of goods within this chapter....")[1]

[1] Almost every other state has adopted an identical provision stating that a contract for the sale of minerals, including oil and gas to be severed from land, is a contract for the sale of goods under the UCC. Ala.Code § 7–2–107; Alaska Stat. § 45.02.107; Ariz.Rev.Stat.Ann. § 47–2107; Ark.Code Ann. § 4–2–107; Cal.Com.Code § 2107; Colo.Rev.Stat.Ann. § 4–2–107; Conn.Gen.Stat.Ann. § 42a–2–107; Del.Code Ann. tit. 6, § 2–107; D.C.Code § 28:2–107; Fla.Stat.Ann. § 672.107; Ga.Code Ann. § 11–2–107; Haw.Rev.Stat.Ann. § 490:2–107; Idaho Code § 28–2–107; Ill.Ann.Stat. ch. 810, para. 5/2–107; Ind.Code Ann. § 26–1–2–107; Iowa Code Ann. § 554.2107; Kan.Stat.Ann. § 84–2–107; Ky.Rev.Stat.Ann. § 355.2–107; Me.Rev.Stat.Ann. tit. 11, § 2–107; Mass.Gen.Laws Ann. ch. 106, § 2–107; Mich.Comp.Laws Ann. § 440.2107; Minn.Stat.Ann. § 336.2–107; Miss.Code Ann. § 75–2–107; Mo.Ann.Stat. § 400.2–107; Mont.Code Ann. § 30–2–107; Neb.Rev.Stat. § 2–107; Nev.Rev.Stat. § 104.2107; N.H.Rev.Stat.Ann. § 382–A:2–107; N.J.Stat.Ann. § 12A:2–107; N.M.Stat.Ann. § 55–2–107; N.Y.U.C.C.Law § 2–107; N.C.Gen Stat. § 25–2–107; N.D.Cent.Code § 41–02–07; Okla.Stat.Ann. tit. 12A, § 2–107; Or.Rev.Stat. § 72.1070; 13 Pa.Cons.Stat.Ann. § 2107; R.I.Gen.Laws Ann. § 6A–1–107; S.C.Code Ann. § 36–2–107; S.D.Codified Laws § 57A–2–107; Tenn.Code Ann. § 47–2–107; Utah Code Ann. 70A–2–107; Va.Code Ann. § 8.2–107; Wash.Rev.Code Ann. § 62A.2–107; W.Va.Code § 46–2–107; Wis.Stat.Ann. § 402.107.

The GPA at issue in this case is that type of mineral sales agreement commonly called a "take-or-pay" contract. Distilled to its essence, "[a] take-or-pay contract obligates a pipeline to purchase a specified volume of gas at a specified price and, if it is unable to do so, to pay for that volume." *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distrib. Cos.,* 498 U.S. 211, 229, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991). In many take-or-pay contracts, the "specified volume" is not a fixed quantity of gas, but is instead a volume of gas equal to a particular measurement specified in the contract. The obligation to purchase may be expressed in terms of a percentage of reserves or, as in this case, a percentage of deliverability.

Whether such a take-or-pay contract for the sale of gas is an output contract is an issue of first impression in Texas. Indeed, there appear to be only two cases addressing this issue, both of which have concluded that **\*578** a take-or-pay contract is an output contract. *See United States v. Great Plains Gasification Assoc.,* 819 F.2d 831, 834 (8th Cir.1987) (applying Illinois law on the contract issues) (concluding that a take-or-pay contract "unambiguously require[s] the pipelines to purchase the project's entire output"); *American Exploration Co. v. Columbia Gas Transmission Corp.,* 779 F.2d 310, 311 (6th Cir.1985) (applying Ohio law) (stating that in a contract nearly identical to the one at issue here, "[t]he basic structure of the contract is thus that of a fixed-price output contract").

Sellers contend that the GPA is not an output contract, making section 2.306 inapplicable. Their first argument is grounded in the contract's provision that the Buyer may either "take", that is, cause to be produced and then purchase

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

"nominated" gas, or "pay", that is, compensate the Sellers for the exclusive dedication of the reserves for the contract period. The presence of the "pay" alternative for performance means, they claim, that the quantity term is not determined solely by the Seller's output or delivery capacity. Yet the GPA clearly states that the "Buyer agrees to purchase and receive, or pay for if available and not taken ... a quantity of gas well gas equal to eighty-five percent (85%) of Seller's delivery capacity." Thus, whether taking or paying, the Buyer is obligated to compensate the Sellers for a quantity of gas measured by the delivery capacity of the Sellers' wells.[2]

2    Moreover, the authorities cited by Sellers and the Court in support of the argument that "paying" is not purchasing are not convincing. *See Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 689 (10th Cir.1991); *Diamond Shamrock Exploration Co. v. Hodel,* 853 F.2d 1159, 1167–68 (5th Cir.1988); *Mandell v. Hamman Oil and Refining Co.,* 822 S.W.2d 153, 164–65 (Tex.App.—Houston [1st Dist.] 1991, writ denied) ("Take or pay is not a payment for production; it is a payment for non-production."); *Killam Oil Co. v. Bruni,* 806 S.W.2d 264, 267–68 (Tex.App.—San Antonio 1991, writ denied). The latter three authorities involve only an interpretation of the royalty clause in a contract. Here, however, we must decide whether a particular type of gas purchase agreement is subject to a statute that applies to mineral sales in general. Other courts, including the *Prenalta* court, have held that gas purchase and sales agreements containing a take-or-pay clause are subject to Article 2 of the UCC. *See Prenalta,* 944 F.2d at 687–90. (holding, in case involving take-or-pay contracts, that gas purchase contracts are governed by Article 2 of the UCC despite acknowledging that payments made under the contracts pursuant to the "pay" alternative are not payments for the sale of gas); and *Universal Resources Corp. v. Panhandle E. Pipe Line Co.,* 813 F.2d 77, 78–80 (5th Cir.1987) (applying Article 2 of the UCC to a gas purchase contract containing a take-or-pay clause).

The "take-or-pay" aspect of the GPA simply reflects that, because of the nearly unique nature of the sale and production of natural gas, gas is not actually produced and does not become the seller's "output" if the buyer does not take delivery. This is not a valid basis for removing gas purchase contracts from the reach of section 2.306. Since the buyer's obligation under the contract is dependent upon the seller's physical capacity to deliver gas at a given point in time, that is, the seller's potential output, I conclude that the GPA is an output contract.

Sellers next argue that the GPA is not an output contract because only a finite amount of gas exists under the committed acreage, whereas an output contract assumes that the seller can increase production at will. I find nothing in section 2.306 to indicate that infinite production or purchasing capability is a requisite for an output contract. While the total volume of gas under the dedicated acreage does constitute the outer limit of production that could be subject to the GPA, the acreage of a farm or a forest or various practical limitations on factory capacity constitute similar limits which do not render output contracts impossible. Other courts have applied section 2.306 to various non-manufacturing sales contracts in which, as here, output cannot be easily regulated by simply increasing or decreasing component parts. *See, e.g., Orange & Rockland Utils., Inc. v. Amerada Hess Corp.,* 59 A.D.2d 110, 397 N.Y.S.2d 814 (1977) (utility fuel oil); *Shea–Kaiser–Lockheed–Healy v. Dep't of Water & Power,* 73 Cal.App.3d 679, 140 Cal.Rptr. 884 (1977) (aggregate for concrete); *Philadelphia Corp. v. Niagara Mohawk Power Corp.,* 207 A.D.2d 176, 621 N.Y.S.2d 237 (1995) (hydroelectricity). *See also, State Dept. of Fisheries v. J–Z Sales Corp.,* 25 Wash.App. 671, 610 P.2d 390, 393–94 (1980) (discussing potential application of 2.306 to **\*579** contract for surplus salmon eggs and carcasses).

## II

The Court reaches its decision without ever resolving whether the GPA is an output contract. Instead, it bases its decision on the conclusion that section 2.306 is a "gap-filler" provision which is inapplicable here, even if the GPA is an output contract, because the parties, by the provisions of the GPA itself, "agreed to quantity obligations that differ from those imposed by section 2.306." 925 S.W.2d at 570. Although I would decide, rather than merely assume, the threshold issue, I would hold that section 2.306 does apply because the GPA has all the "gaps" that normally exist in an output contract.

At the outset, I reject Sellers' argument that the quantity "gap" here is filled by the physical attributes of the reservoir, which limit the volume of gas that can be produced under the GPA, much as a tract of land physically limits the quantity of a crop that can be produced on it during a year. *See Tennell v. Esteve Cotton Co.,* 546 S.W.2d 346 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.) (holding that a contract covering all of the cotton produced from a tract of land during a year was not governed by section 2.306 because identification of the "entire production" was sufficiently specific). This argument

**Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)**

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

is not convincing. Even if *Tennell* was correctly decided, this case differs from a crop production case in that here the parties did *not* contract for the "entire field of gas," or anything like it. They contracted for 85% of Sellers' delivery capacity for twenty years. That could be all of the gas, or only a fraction of it, depending not only on fortune and physics, but also to some extent on the Sellers' aggressiveness in exploring and developing the underlying leases. The physical attributes of the committed reservoir simply are not such a firm quantity figure for the parties' take-or-pay obligation as to remove the GPA from the ambit of section 2.306.

For similar reasons, I reject Sellers' argument and the Court's conclusion that various quantity provisions in the GPA "fill the gap." While it may be true that section 2.306 "does not apply when the contract either specifies a numeric quantity or provides a standard for determining a specific quantity,"[3] 925 S.W.2d at 570, I cannot conclude, as the Court does, that the "GPA requires Tennessee to purchase *a set quantity of gas* defined as eighty-five percent of Lenape's delivery capacity." 925 S.W.2d at 570 (emphasis added). There is nothing "set" about the quantity here, as the perhaps several hundredfold increase in production that actually occurred amply demonstrates. Indeed, the rest of the Court's opinion is replete with statements proving that delivery capacity is anything but a "set quantity." As the Court points out, the GPA permits the Sellers to increase delivery capacity by drilling new wells and unitizing, provides that Sellers are not obligated to deliver any predetermined quantity or to maintain any predetermined level of deliverability, anticipates that the Sellers may increase delivery capacity, and demonstrates by virtue of all its provisions taken together that the parties expected that delivery capacity could increase significantly. 925 S.W.2d at 570–571. Delivery capacity under this GPA, then, is anything but a "set quantity." Rather, as Tennessee argues, it is a "moving **\*580** target" that the parties had the right to retest at least as often as every three months, or even more often under certain circumstances. The delivery capacity provisions of the GPA do nothing to negate the application of section 2.306.

3    I agree that if a contract "specifies a numeric quantity or provides a standard for determining a specific quantity" for the *total* amount of the commodity to be sold under that contract, it is manifestly not an output contract subject to section 2.306, but rather an ordinary supply contract providing for the sale of a fixed quantity of goods. *See Cooper v. Fortney,* 703 S.W.2d 217, 219 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

The same conclusion would apply to a contract which purported to measure quantity by output but in fact specified a fixed numeric quantity for that output, as in "I will sell you all my output of widgets, which we agree will total 100 widgets per month." Note, however, that by its very terms, section 2.306 applies to an output contract which specifies an *estimate* of what output will be.

I strongly disagree, however, with the Court's suggestion that section 2.306 does not apply to a contract which "provides a standard for determining a specific quantity" for output on an ongoing basis over the life of the contract. If that were true, section 2.306 would never apply. *All* output contracts will provide for some means of measuring what the specific quantity of output under the contract is on an ongoing basis—how else would the buyer make the payments due for that quantity of output?

The Court claims that two cases support its conclusion that the quantity specified in the GPA—delivery capacity—is a determinable amount that takes the contract outside the reach of section 2.306. Neither does so. *Riegel Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 790 (5th Cir.1975), held that contracts for the sale of cotton grown on a certain number of acres which provided a projected yield per acre were not unenforceable for lack of definiteness. The court endorsed the view that "simply by multiplying the number of acres stated in the contracts times the estimated yield, one derives a quantity term stated in pounds of cotton." *Id.* at 790 n. 14. Similarly, *Fort Hill Lumber Co. v. Georgia–Pacific Corp.,* 261 Or. 431, 493 P.2d 1366, 1368 (1972), held that a contract for all existing hemlock trees to be logged in a certain area over a period of approximately two years contained the requisite definiteness "because the total area to be logged was known ... and it is possible, therefore, to determine the volume of the hemlock in the total area." In both these cases, the contract provided a standard for determining a specific total quantity (of corn or logs) subject to the contract. Here, there is no such standard. Delivery capacity measures only "the Sellers' pro rata part of the average amount of gas well gas per day which can be efficiently withdrawn from the wells on the lease(s)" at the time the test is taken. Delivery capacity provides no standard whatsoever for determining a specific total quantity of gas subject to the GPA. Thus, the GPA contains the same quantity "gap" that all output contracts contain, a "gap" that the UCC fills with the dual provisions of good faith and reasonable proportionality contained in section 2.306.

The Sellers argue, however, that there is no quantity gap because the GPA clearly communicates the parties' intent as to quantity—to wit, that there be no limits on the amount of gas which Sellers could produce. This allowance for infinite

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

output, in conjunction with the requirement that Tennessee purchase 85% of delivery capacity, is specific enough to displace any "gap filling" good faith requirements of section 2.306 which might otherwise apply.

I agree that the GPA clearly sets out the parties' expectations and intent that quantity not be limited to any amount. Moreover, trial court finding of fact No. 3, unchallenged by any party, states:

> When the parties negotiated the GPA in 1978 and 1979, and executed it on January 16, 1979, Buyer needed and wanted to obtain under long term commitment or dedication as much gas as possible, and the parties intended that the GPA not limit, for any reason, the volume of the committed reserves or amount of gas to be delivered therefrom to Buyer by Seller(s) over the 20–year term of the GPA.

Consistent with this finding, the trial court concluded in part:

> The GPA as a whole is unambiguous. If, however, the GPA were to be considered ambiguous, the court's construction stated herein expresses the true intentions of the parties at the time of the execution of the GPA in 1979.
>
> ... The GPA does not limit, for any reason, the volume of committed reserves or amount of gas to be delivered therefrom to Buyer by Seller(s) over the 20–year term of the GPA.

I conclude, however, that the "gap" inherent in all output contracts and in this GPA—the lack of a certain quantity term—can not be successfully "filled" by a statement of intent that there be no limit on quantity.

The Code supports this conclusion. Section 1.102 of the Code provides that "the obligations of good faith, reasonableness and care prescribed by this title may not be disclaimed by agreement," although "the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable." Thus, parties may not by contract waive the application of section 2.306; but they may, by "not manifestly unreasonable" provisions, set the **\*581** standard of performance by which good faith and reasonableness are measured.

A contract which intentionally sets *no limits* whatsoever on increases in quantity hardly sets a standard of performance by which good faith or reasonableness is measured. Since the Code prohibits waiver of the obligations of good faith and reasonableness, and the parties have not set their own standard

by which compliance with these standards may be measured, I reject Sellers' argument that the parties by the terms of the GPA have displaced section 2.306.[4]

[4]      It is not enough to conclude, as the Court does, that the GPA *does not disclaim* the good faith and reasonableness standards or that, regardless of section 2.306's applicability, any increase in delivery capacity is still subject to the good faith obligation of section 1.203. The issue is whether the dual requirements of good faith and reasonableness under section 2.306 apply, or whether the parties have *set their own standard* by which compliance with these standards may be measured, thereby displacing section 2.306. Because the GPA's "no limits" standard is no standard at all, I conclude that section 2.306 applies.

The Sellers and numerous amici have urgently suggested that such a holding would ineluctably bring the oil and gas industry in Texas to a grinding halt. Their arguments, while no doubt sincere, are for several reasons not persuasive.

First, I am not convinced that applying section 2.306 would make the GPA and contracts like it less certain than not applying it. Having no limit whatsoever on quantity is hardly a means of ensuring certainty, except perhaps for Sellers, who want to be certain that the sky's the limit on quantity sold in a rising market for their product.

Nor do I believe that applying section 2.306 would fundamentally alter the risk allocation of the take-or-pay clause in gas purchase contracts. The Seller still has a certain market for all the natural gas it pumps in good faith and in a reasonable proportion to estimated or prior output. This should be, in almost all cases, all the gas that a Seller produces. As I discuss below, what is "reasonable" will depend on the parties' expectations, which in almost any oil and gas setting must encompass very wide fluctuations in quantity.

Finally, I do not believe that the GPA's exclusive dedication of the reserves suffices to excuse the application of section 2.306. The Court mischaracterizes Tennessee's "concession" that any gas produced in violation of section 2.306 may be sold by Lenape to third parties as a veiled attempt to have this Court rewrite the parties' contract. However, applying section 2.306 to the GPA no more rewrites that contract than applying any section of the UCC to any other freely bargained contract. Tennessee's "concession," moreover, is consistent with the contract. Section 4 of the GPA states:

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

*Commitment of Reserves*

(a) Seller commits to the performance of this Agreement all gas produced from the committed reserves.

(b) Seller agrees not to sell to any other party or parties, except contractors conducting drilling or reworking operations for Seller, any gas produced from the committed reserves during the term hereof without *the written consent of Buyer.*

. . .

(Emphasis added.)

## III

Having concluded that the GPA is an output contract to which section 2.306 applies, I next consider how the good faith and unreasonably disproportionate standards of that provision operate in this case. At the outset, I would consider the nature of the good faith requirement under section 2.306, with specific focus on whether this good faith standard is further defined by the unreasonably disproportionate standard, or whether good faith and unreasonably disproportionate are two separate standards.

The good faith standard applicable to output and requirements contracts under section 2.306 of the Code, as under the common law, permits quantity variations for valid business reasons and disallows quantity variations caused by speculation or contract manipulation to take advantage of a favorable differential between market and contract price. *See generally* Stacey Silkworth, **\*582** *Quantity Variation in Open Quantity Contracts,* 51 U.Pitt.L.Rev. 235, 265–67 (1990).[5] Thus, the basic test for good faith here is whether and to what extent the Sellers would have increased the quantity of gas proffered had the contract price equaled the market price, *i.e.,* was there a valid business reason for the increased quantity independent of price? As Silkworth points out, "[w]hereas the good faith test considers the conduct of the parties, the reasonableness test speaks to the magnitude of the quantity variation itself." *Id.* at 275.

___

[5]     Silkworth's analysis of numerous pre- and post-Code quantity variation cases leads her to conclude:

> The business reason factor and the contract manipulation factor lend context to the pre-Code good faith standard. Many courts and commentators have

stated that the primary concern in quantity variation cases is good faith. Courts have been reluctant to define good faith; ... [n]evertheless, ... courts have held that the presence of a valid business reason and/or the absence of contract manipulation constitute good faith in open quantity contracts. On the other hand, absence of a business reason and/or presence of contract manipulation constitute bad faith in open quantity contracts. The U.C.C. has codified this good faith standard.

Silkworth, *supra,* at 270 (footnotes omitted).

When faced with increases in quantity under an open-quantity contract, most courts and commentators have recognized a distinction between reasonable proportionality and good faith in applying section 2.306. *See, e.g., Shea–Kaiser–Lockheed–Healy,* 140 Cal.Rptr. at 890 (demand for aggregate in excess of 20% over contract estimate held unreasonably disproportionate); *Philadelphia Corp.,* 621 N.Y.S.2d at 240 (declaratory judgment that under three output contracts for sale of hydroelectricity which did not contain stated estimates, no quantity unreasonably disproportionate to prior output may be tendered); *Orange and Rockland Utilities, Inc.,* 397 N.Y.S.2d at 818 (demand for more than double the estimated amount of fuel oil held unreasonably disproportionate). *See also State Dept. of Fisheries v. J–Z Sales Corp.,* 610 P.2d at 394 (Wash.App.1980) (opining that, if section 2–306 applied, output of $2/3$ more than contract estimate would be unreasonably disproportionate); 1 Alderman, A Transactional Guide to the Uniform Commercial Code, § 1.33–12, at 75 (2d ed. 1983) ("In addition to acting in good faith, the requirements buyer or output seller must also keep his demands within an amount not 'unreasonably disproportionate' to any stated estimate or normal output or requirements."); 1 White & Summers, Uniform Commercial Code § 3–8, at 167 (3d ed. 1988) ("An increase might be in good faith, yet unreasonably disproportionate to prior requirements."); John C. Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC,* 1973 Duke L.J. 599, 647 ("Properly read, section 2–306 operates as a codification of both the good faith standard and an equitable limitation on the extent to which quantities can be increased by the quantity-determining party.").[6]

___

[6]     In cases involving decreases in quantity, most courts applying section 2.306 have held that the quantity-determining party, whether a requirements buyer or output seller, should be held to only a good faith standard. *See, e.g., Atlantic Track & Turnout Co. v. Perini Corp.,* 989 F.2d 541, 544–45 (1st Cir.1993); *Empire Gas,*

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

840 F.2d at 1337–38; *Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc.,* 636 F.2d 232, 232 (8th Cir.1980) (per curiam). While some commentators have criticized the disparate treatment of increases and decreases, *see* Silkworth, *supra,* at 268–70; Owings, Note, *Output Contracts and the Unreasonably Disproportionate Clause of § 2–306,* 59 Mo.L.Rev. 1051, 1059–60 (1994), there is no need to resolve any inconsistency here, nor do I make any comment on the standards applicable to quantity decreases, since this case involves only an increase of quantities tendered by an output seller.

The clear statutory language of section 2.306 imposes a standard of reasonable proportionality that is separate from the requirement of good faith. In recognizing reasonable proportionality as a standard distinct from good faith under section 2.306, the court in *Orange and Rockland* said: "Obviously this language ['no quantity unreasonably disproportionate'] is not the equivalent of 'lack of good faith' [because] it is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." *Orange and Rockland,* 397 N.Y.S.2d at 818. The court concluded: "Thus, even where one party acts with complete good faith, the section limits the other party's risk in accordance with the reasonable expectations of the parties." *Id.* at 819.

 **\*583**  Having recognized that section 2.306 imposes separate requirements of reasonable proportionality and good faith for quantity increases under an output contract, I would address in turn the applicability of each proviso to the GPA.

In addressing reasonable proportionality, the first inquiry must be whether or to what extent it must be dependant on the parties' expectations. *Orange and Rockland* concluded that it could not be expressed by a fixed quantity. Instead, for the reasonable proportionality limitation to take effect, "it is not enough that a demand for requirements be disproportionate to the stated estimate; it must be *unreasonably so in view of the expectation of the parties.*" *Orange and Rockland,* 397 N.Y.S.2d at 819 (emphasis added). I agree. Applying the unreasonably disproportionate limitation to disallow an increase in fuel oil requirements that was 63% greater than the contract estimate, *Orange and Rockland* held:

> Defendant had no reasonable basis on which to forecast or anticipate an increase of this magnitude. Indeed the contract suggests the parties contemplated that any variations from the estimate would be on the downside.... [T]he quantities of oil utilized ... were not within the reasonable expectations of the parties when the contract

was executed, and accordingly we hold that those "requirements" were unreasonably disproportionate to the contract estimates.

*Id.* at 822 (citation omitted). *See also* 1 White & Summers, *supra,* § 3–8 at 167 (stating that "[t]he word 'unreasonably' allows for the interplay of almost any factor a court properly considers relevant," and suggesting that anticipation of large increases in requirements might prevent the party resisting the increase from prevailing under section 2.306). Thus, the parties' expectations should not be considered only in light of past performance under the contract, as urged by Tennessee, but also in light of the original expectations of the parties as well as the industry context in which their agreement was made.

Tennessee argues that the increase in quantity of gas tendered by Sellers from the new wells is unreasonably disproportionate because it is so great compared to Sellers' prior output under the GPA. But whether the magnitude of the disproportion here is unreasonable under section 2.306 depends on the expectations of the parties when the contract was executed and whether such an increase in output could have been reasonably forecast or anticipated. *Orange and Rockland,* 397 N.Y.S.2d at 822. Objective indicia of the parties' reasonable expectations at that time may also be considered, including the size and capabilities of the pipe lines and other facilities, the history of the area, the nature of the formation, local industry practices, reserve and deliverability estimates and so forth.

The parties' expectations should also be considered in light of the general nature of the industry. The possibility of greatly increased output, and the awareness of that possibility, is an essential characteristic of the oil and gas industry, which provides the context in which the GPA must be considered. Texas courts have long recognized that the existence of oil or gas in a particular tract of land and "the amount of [a well's] output" is highly speculative. *Hatt v. Walker,* 33 S.W.2d 489, 499 (Tex.Civ.App.—Dallas 1930, writ dism'd w.o.j.), *followed in KMI Continental Offshore Prod. Co. v. ACF Petroleum Co.,* 746 S.W.2d 238, 244–45 (Tex.App.—Houston [1st Dist.] 1987, writ denied).

Moreover, these sophisticated parties obviously were aware of Lenape's duty as lessee to reasonably develop the leases underlying the GPA, *see Sun Exploration and Prod. Co. v. Jackson,* 783 S.W.2d 202, 204 (Tex.1989) (discussing *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959)), and Lenape's duty as an operator to protect the leasehold

Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

from drainage, which could give rise to a duty to drill an offset well under certain circumstances. *See Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 568 (Tex.1981). Especially in light of Lenape's duties under the underlying leases, Tennessee's reasonable expectations had to encompass the possibility that at any time during the twenty-year term, new and productive wells might be drilled. Likewise, the parties' reasonable expectations would have encompassed reasonable industry **\*584** practices relating to the production and sale of gas. On remand, the parties would have the opportunity to put forward all such relevant evidence concerning the nature of the industry as it impacts the parties' reasonable expectations at the time the GPA was entered into.

Given the nature of the oil and gas industry and the relationship of unreasonable proportionality to parties' expectations, it should be clear that producers will not face a jury trial over the enforceability of a take-or-pay gas purchase contract every time a new well is drilled or a successful strike is celebrated. Only in extraordinary cases will a fact issue be raised as to whether a tendered quantity is unreasonably disproportionate to prior output under section 2.306. Even then, of course, "[i]t is fundamental that an issue, which is normally a question of fact, can be proved so conclusively by the evidence at trial that it becomes a question of law, rather than a question of fact." *Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex.1980). Whether the complained-of increased quantity of gas tendered in this case is unreasonably disproportionate under section 2.306 as a matter of law is not raised in this Court.

Finally, I would also remand to the trial court for further proceedings regarding whether Sellers caused the complained-of increase in production to occur in bad faith, *i.e.,* for no valid business reason or for the purpose of manipulating the contract to take advantage of a price disparity in their favor. If the increased output did not occur in good faith, section 2.306 should apply to prevent Sellers from forcing Tennessee to pay for the bad faith increase.

Tennessee contends and I agree that it was prevented from trying the issue of good faith because the trial court ruled on summary judgment that section 2.306 does not apply to the GPA. Since the trial court decided as a matter of law that section 2.306 did not apply, there was no opportunity to present evidence of or arguments about the Sellers' failure to abide by the provisions of that section.

Sellers counter that section 2.306 does not contain the only good-faith requirement in the UCC. The official comments indicate that section 2.306 applies to requirement and output contracts the general good faith requirement of the Code, codified in section 1.203, and further defined for merchants in section 2.103(a)(2).[7] Thus, the same obligation of good faith applies to an output contract whether it is through the general application to all sales contracts of section 1.203, in conjunction with section 2.103(a)(2), or through the good faith requirement of section 2.306, applicable to output contracts. Based on these observations, the Sellers originally contended in this Court that Tennessee was not denied its right to prove bad faith, but rather that Tennessee voluntarily gave up that right by its own act of dismissing all section 1.203 good faith claims in a Motion for Agreed Partial Judgment.[8]

---

[7] The official comments state that section 2.306(1) applies to the "specific problem" [of the absence of a quantity term in output and requirements contracts] the general approach of the Act which "requires the reading of commercial background and intent into the language of any agreement and demands good faith in the performance of that agreement." Tex.Bus. & Com.Code § 2.306 cmt. 1. The Code's general good faith and reasonableness requirement provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Tex.Bus. & Com.Code § 1.203. Good faith is further defined for merchants as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Tex.Bus. & Com.Code § 2.103(a)(2).

[8] The Application for Writ of Error filed jointly by Tesoro, Coastal, Lenape and Gulf states that "on the eve of trial, Tennessee dismissed with prejudice all claims for bad faith under § 1.203, but retained its claim under § 2.306."

On rehearing, Sellers correctly point out that Tennessee did not dismiss its bad faith claims under section 1.203 against Lenape. The motion for agreed partial judgment states: "Plaintiff Tennessee Gas Pipeline has agreed to dismiss any of its claims for bad faith or lack of good faith that it may have against [Tesoro and Coastal] ... with the exception of, and it expressly reserves to itself, any claims that it might have under Section 2.306 of the Uniform Commercial Code." The Agreed Partial Judgment signed by the trial judge likewise reflects **\*585** that Tennessee's agreement was with Tesoro and Coastal, not Lenape. Tennessee thus went to trial against Lenape with a live good faith claim under section 1.203, and the trial judge found no bad faith as to the formation of the new units and the drilling of the new wells.

**Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565 (1996)**

137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759...

However, the central question of whether the increased output complained of by Tennessee occurred for a valid business reason or as a result of speculation and/or contract manipulation by the Sellers has not been fully litigated. The record indicates that the case was tried under the assumption that the court had precluded any argument that the contract was an output contract.[9] As a result, the trial judge could not have focused on whether the complained-of increase in quantity tendered under an output contract occurred in bad faith, whether under section 2.306 or section 1.203.[10] Therefore, I would remand this action to the trial court for further proceedings on the issue of the Sellers' good faith with regard to the increased production of gas subject to the GPA.

[9] Tennessee made a partial summary judgment motion seeking a ruling that the GPA was an output contract governed by section 2.306. Tennessee specifically argued that the GPA agreement "meets the definition of an output contract as the contract quantity is indefinite and is measured by the future output (delivery capacity) of the seller." Lenape, in its brief in response, argued that the GPA was not an output contract because it requires Tennessee to purchase the entire production of gas from specified acreage. Tesoro and Coastal also filed a summary judgment motion, joined by Lenape, which sought a ruling by the court that the GPA was not an output contract subject to 2.306. Their brief contained arguments that the GPA was not an output contract and that, even if it was, it is not governed by section 2.306. Without specifying the grounds of its decision, the trial court denied Tennessee's motion and granted Tesoro and Coastal's motion.

During opening statements (before the Hon. Charles W. Barrow, retired Justice of this Court, sitting by designation), counsel for Tennessee, after indicating to the court that various claims had been voluntarily dismissed by the parties, stated:

> The only thing left in this case is a previous judge [the Hon. Carlos C. Cadena, retired Chief Justice of the Fourth Court of Appeals, sitting by designation] in a grant of summary judgment had *knocked out our right to claim that this was [a]n output contract.* The output section of the Uniform Commercial Code imposes a good faith obligation upon the parties. We have preserved that if on appeal somewhere up the line

> that is reversed and sent back for trial on the output question, that whatever bad faith claims or good faith claims we might have under solely the output section of the Uniform Commercial Code is preserved.

(Emphasis added.) Given the summary judgment rulings and this statement to the judge, which went unchallenged by counsel for the Sellers, I believe that the parties and the court proceeded to trial under the assumption that the court had effectively ruled that the GPA was not an output contract.

[10] The record supports this conclusion. During the opening and closing statements of the trial, none of the parties identified bad faith increase in delivery capacity or output as an issue to be tried or in any way attempted to link (or not) the increase in output with market price changes for gas. Moreover, the only explicit question about "good faith" posed to a witness during the trial was in regard to Lenape's duty as a lessee to its lessors to pool in good faith. During cross-examination by Tesoro and Coastal, Mr. Devine, senior vice president for Lenape Resources, testified that he was aware that an operator is required to pool in good faith, and that in his opinion the two new units in question were formed in good faith "as far as the oil and gas leases are concerned." But, of course, any duty owed by Lenape to its lessors is not at issue in this case. Thus, from this review of the record, I conclude that the issue of whether the complained-of increase in output occurred in good faith has not been tried.

This is a very unusual, perhaps a unique, case. It involves wildly fluctuating market conditions uncommon even in the volatile gas industry, a type of contract no longer in use, and a large discovery seldom replicated. But merely because a case is not likely to arise again should not prevent the law from being fairly applied to the situation as it actually occurred. In this instance, I believe the law permits Tennessee to attempt to prove that Sellers' increased tender of gas either occurred in bad faith or was unreasonably disproportionate to prior output. Therefore, I would affirm the court of appeals' judgment in all respects.

**All Citations**

925 S.W.2d 565, 137 Oil & Gas Rep. 630, Util. L. Rep. P 26,527, 29 UCC Rep.Serv.2d 759, 39 Tex. Sup. Ct. J. 496

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

601 S.W.3d 904
Court of Appeals of Texas, Houston (14th Dist.).

SHANNON MEDICAL CENTER, Appellant

v.

TRIAD HOLDINGS III, L.L.C., Individually
and Derivatively on Behalf of Regional
Cancer Treatment Center, Ltd., Appellee

NO. 14-18-00638-CV
|
Opinion filed December 5, 2019

**Synopsis**
**Background:** Managing general partner filed suit for judicial dissolution of limited partnership on ground that it was not reasonably practicable to carry on partnership's business in conformity with its governing documents. Minority general partner counterclaimed in its individual capacity and brought derivative action on behalf of partnership alleging that general partner breached common-law and statutory fiduciary duties. Following jury trial, the 340th District Court, Tom Green County, awarded damages to partnership for managing partner's breach of duty, ordered managing partner to disgorge profits to minority general partner, and ordered managing partner to pay partnership and minority general partner's attorney fees and expenses. Managing general partner appealed.

**Holdings:** The Court of Appeals, Christopher, J., held that:

question submitted to jury about whether managing general partner complied with its duty of care to partnership did not commingle valid and invalid theories of liability;

partnership agreement could not, and did not purport to, disclaim managing general partner's statutory duty of care to limited partnership;

evidence in derivative action supported jury's finding that managing general partner breached statutory duty of care when it negotiated increase in limited partnership's rent with managing partner's wholly owned subsidiary, which was partnership's landlord;

there was no evidence of extent to which managing general partner profited from excess rent that limited partnership paid to its landlord and thus minority general partner was not entitled to award of profit disgorgement regarding claims of breach of fiduciary duties;

voting deadlock as to managing general partner and minority general partner did not exist in limited partnership, and thus judicial dissolution of partnership on ground that it was not reasonably practicable to carry on partnership's business in conformity with its governing document was unwarranted; and

award of appellate attorney fees must conditioned upon a successful appeal.

Affirmed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Judgment.

 **\*907 On Appeal from the 340th District Court, Tom Green County, Texas, Trial Court Cause No. C150381C, Martin (Brock) Jones, Judge**

**Attorneys and Law Firms**

Samuel V. Houston III, William H. Ford, Veronica Wolfe, San Antonio, Guy D. Choate, San Angelo, for Appellant.

Melissa Michelle Davis, Austin, Reed Randel, Michael Warren Stockham, Dallas, Jeffrey S. Lisson, San Angelo, for Appellee.

Panel consists of Justices Christopher, Bourliot, and Zimmerer.

**OPINION**

Tracy Christopher, Justice

Shannon Medical Center and Triad Holdings III, L.L.C. are general partners in Regional Cancer Treatment Center, Ltd. (the Partnership). The Partnership operates its regional cancer-treatment center (RCTC) on premises leased from Shannon's subsidiary, Shannon Real Estate Services, Inc. (SRES). Shannon, the managing general partner, sued for judicial dissolution of the Partnership so that it can take over RCTC's operations. Triad, both individually and derivatively on behalf of the Partnership, sued Shannon for breach of

common-law and statutory fiduciary duties. In accordance with the jury's verdict, the trial court rendered judgment denying Shannon's request for judicial dissolution and awarding the Partnership actual damages in the amount of excess rent that Shannon bound the Partnership to pay to SRES. The trial court additionally ordered Shannon to pay the identical amount to Triad as equitable disgorgement of profits. Finally, the trial court awarded Triad and the Partnership their attorneys' fees, costs, and expenses. Shannon appeals the judgment.[1]

[1]    Pursuant to an order by the Supreme Court of Texas, this case was transferred to us from the Third Court of Appeals, and we have applied that court's precedent to the extent that it is inconsistent with our own. *See* Tex. R. App. P. 41.3.

We affirm the portions of the judgment denying Shannon's request for judicial dissolution and awarding actual damages to the Partnership; however, we reverse the disgorgement award to Triad because there is neither a finding nor evidence of Shannon's profits from the excessive rent charged by, and paid to, a different entity. In light of our disposition of these claims, we reverse the awards of attorney's fees, costs, and expenses, and we remand the case solely for relitigation of this ancillary relief.

## I. Background

Since its formation in 1988, the Partnership has operated RCTC from a building **\*908** constructed by the Trust of the Margaret Shannon Estate. The Trust then transferred the building to Shannon, and in 2007 Shannon transferred the building to its wholly owned subsidiary, SRES. Except for this partnership, Shannon and Triad are competitors.

Under the terms of the Partnership Agreement, the general partners manage and control the Partnership "through and by virtue of their selection of the Partnership Committee and the Managing General Partner." The Partnership Committee consists of one representative of each general partner. For several years Shannon and Triad have been the only general partners. Shannon serves as the managing general partner, for which the Partnership pays Shannon management fees under a separate agreement.

For some time now, Shannon has been attempting to dissolve the Partnership and take over RCTC. The Partnership Agreement provides that the Partnership will dissolve upon

the earliest of (a) December 31, 2038; (b) approval of 75% of the partnership units; (c) the Partnership's ceasing to operate a radiotherapy facility; or (d) the occurrence of any other circumstance that, under the Texas Revised Limited Partnership Act,[2] would require dissolution. Shannon has attempted to obtain the right to vote 75% of the partnership units in favor of dissolution.

[2]    The Act expired in 2010; now see Title 4 of the Texas Business Organizations Code, Tex. Bus. Orgs. Code Ann. §§ 151.001–154.204.

There originally were three general partners and a varying number of limited partners, but the third general partner left the Partnership and sold its partnership units to Shannon and Triad. With the addition of those units, Shannon owned about 72.32% of the partnership units, Triad owned about 24.35%, and limited partners Drs. Bolen, Gordon, and Hughes owned, respectively, 1.72%, 0.86%, and 0.75%.

### A. The 2012 Lease Amendment

The Partnership's landlord SRES informed the Partnership that it would not renew the Partnership's five-year lease upon its expiration in 2012. SRES offered to withdraw the notice of termination if Triad, as the only other member of the Partnership Committee, would agree to change the Partnership's name to "Shannon Regional Cancer Treatment Center, Ltd." Triad declined.

Three days before the lease expired, Bryan Horner, who is both Shannon's chief executive officer and SRES's president, sent the Partnership and Triad a lease amendment he had executed on behalf of Shannon, as the Partnership's managing partner, and SRES. The lease raised the Partnership's annual rent of about $16.00/sq. ft. to $31.04/sq. ft., of which $11.79/sq. ft. was purportedly to reimburse SRES for specialized tenant improvements it made to the building for the Partnership's use. The building's features that are characterized as specialized tenant improvements are two vaults designed to contain radiation from the facility's linear accelerators. Contrary to these representations, however, Shannon knew that SRES had not modified the building and that the Trust had included the vaults as part of the building's original construction in 1988.

### B. Assignment of Voting Rights

To reach the 75% threshold needed for it to dissolve the Partnership, Shannon **\*909** proposed voting agreements

with the limited partners, offering a guaranteed floor price for a limited partner's units upon dissolution of the Partnership in exchange for the limited partner's proxy. Triad blocked this move by entering into a voting agreement with Dr. Bolen. The Triad-Bolen Voting Agreement is binding upon the parties' successors and assigns and it cannot be assigned absent the other party's written consent. With this agreement, Triad controlled the votes of more than 26% of the Partnership, effectively preventing Shannon from forcing the Partnership to dissolve without Triad's consent.

Shannon subsequently bought some of partnership units that were subject to the Triad-Bolen Voting Agreement before entering into a similar voting agreement with Dr. Hughes. Believing that these transactions gave it the right to vote 75% of the partnership units, Shannon unilaterally issued a "Written Consent" purporting to dissolve the Partnership and transfer the Partnership's assets and liabilities to Shannon. In response, Triad pointed out that its proxy to vote Dr. Bolen's partnership units is binding on Dr. Bolen's successors, so that Triad retains the right to vote those units that Dr. Bolen later sold to Shannon. Shannon concedes this point and agrees that the Written Consent was ineffective.

By the time of trial, Shannon and Triad had purchased all of the limited partners' partnership units, making them the only members of the partnership. Due to the voting agreements, Shannon has the right to vote slightly less than 74% of the partnership units, and Triad has the right to vote slightly more than 26%.

**C. The Lawsuit**

Unable to cast the votes of 75% of the partnership units as needed to dissolve the Partnership, Shannon filed this suit for judicial dissolution on the ground that it is not reasonably practicable to carry on the Partnership's business in conformity with its governing documents. Triad counterclaimed in its individual capacity and additionally brought a derivative action on behalf of the Partnership. For clarity, we refer to the derivative claims as if brought by the Partnership directly.

The jury charge contained separate questions asking whether Shannon complied with common-law fiduciary duties, with the statutory duty of loyalty, and with the statutory duty of care. Regardless of the theory of liability, the jury was told to measure the Partnership's damages, if any, by "[t]he amount of any improperly charged rents." The jury found that Shannon did not comply with any of these duties to the

Partnership or to Triad and assessed the Partnership damages of $572,725.00, which is equal to the sum of the annual charges of $11.79/sq. ft. of the leased premises over the five-year lease term. This is the amount that Shannon bound the Partnership to pay SRES, purportedly to reimburse SRES for its costs of constructing the vaults. The trial court also included an allegedly unpleaded claim, asking the jury if Shannon committed fraud by non-disclosure against Triad "in connection with the Lease Amendment." The jury then was again asked, "What was the amount of any improperly charged rents," and again answered, "$572.725.00." The jury answered all of Shannon's affirmative-defense questions in the negative and failed to find any of the statutory grounds for judicial dissolution of the Partnership.

The trial court awarded the Partnership actual damages of $572,725.00 as found by the jury for breach of duty. Triad recovered **\*910** no damages, but the trial court ordered Shannon to pay Triad $572,725.00 as equitable disgorgement of profits. Finally, Shannon was ordered to pay Triad's and the Partnership's attorneys' fees and expenses. Shannon appeals the judgment.

**II. Issues Presented**

Of Shannon's first two issues, we address only the arguments in Shannon's second issue challenging the jury's finding that Shannon breached its statutory duty of care.[3] In its fourth issue, Shannon seeks reversal of Triad's disgorgement award, and in its fifth issue, Shannon argues that it conclusively established a basis for judicial dissolution of the Partnership. In its two remaining issues, Shannon challenges both the unconditional nature of the award of appellate attorneys' fees and the amount of fees awarded.

[3]  Shannon's first two issues challenge the jury's findings on three alternative theories of liability: (1) breach of general, common-law fiduciary duties; (2) breach of the statutory duty of loyalty; and (3) breach of the statutory duty of care. Because we affirm the judgment for the Partnership based on Shannon's breach of the statutory duty of care, it is unnecessary to address the Partnership's alternative liability theories.

Given the differences in the claims and the relief awarded to the Partnership and to Triad individually, we separately address Shannon's appellate arguments concerning the Partnership's claims, Triad's individual claims, and Shannon's

judicial-dissolution claim, before addressing the incidental relief of attorneys' fees, costs, and expenses.

### III. Breach of the Duty of Care to the Partnership

In this issue, Shannon maintains that the charge's question regarding breach of the duty of care does not support the judgment because none of the transactions or conduct relied upon give rise to a legally viable claim.[4]

4    Although this question pertains both to the Partnership and to Triad individually, we dispose of the judgment for Triad on other grounds. *See* Section IV, *infra*.

### A. Question 6: The Charge on the Statutory Duty of Care

Shannon first contends the trial court erroneously charged the jury on breach of the statutory duty of care. A trial court must submit jury questions, instructions, and definitions that "are raised by the written pleadings and the evidence." Tex. R. Civ. P. 278; *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). When reviewing a complaint of charge error, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *United Scaffolding*, 537 S.W.3d at 469 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009)). We review the trial court's ruling on charge objections and charge requests for abuse of discretion. *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). A trial court abuses its discretion when it acts without reference to guiding rules or principles. *In re Thetford*, 574 S.W.3d 362, 374 (Tex. 2019) (orig. proceeding). Charge error is reversible if, under the totality of these circumstances, the error "amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *United Scaffolding*, 537 S.W.3d at 469 (quoting **\*911** *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986) (op. on reh'g)).

Question 6 of the charge addressed the duty of care as follows:

Did Shannon comply with its duty of care to [Triad] and the Partnership?

As a partner in the Partnership, Shannon owes [Triad] and the Partnership a duty of care. Shannon must discharge this duty and conduct the Partnership business

(1) in good faith and (2) in a manner that Shannon reasonably believes to be in the best interest of the Partnership.

To prove it complied with its duty of care, Shannon must show that, in conducting the Partnership's business, it acted with the care of an ordinarily prudent person in similar circumstances. An error in judgment does not by itself constitute a breach of the duty of care.

A partner is presumed to have satisfied the duty of care if the partner acted on an informed basis, in good faith, and in a manner that the partner reasonably believed to be in the best interest of the Partnership.

A partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interests.

The jury answered "no" as to both Triad and the Partnership. A "no" answer to Question 6 was one of several alternative predicates to Question 7, in which the jury was asked to determine the amount that would compensate the Partnership for its damages, if any, "that were proximately caused by the non-compliant conduct." The jury was instructed to consider only "[t]he amount of any improperly charged rents, determined at the time and place of the payment."

#### 1. *Alleged* Casteel *Error*

Shannon asserts that trial court reversibly erred in submitting Question 6 because it commingles valid and invalid theories of liability. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (op. on reh'g) ("[W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory."). Shannon argues that a breach of duty cannot be based on its attempt to dissolve the Partnership by Written Consent because "partners have no duty to remain partners."[5] Shannon further contends that a breach of duty cannot be based on "transactions that never closed, proposals that were rejected, or actions that had no legal effect," such as Shannon's various offers to purchase partnership units, the proposal to the Partnership to choose between renaming itself after Shannon or vacating the premises, and its attempts to obtain voting agreements from Drs. Hughes and Bolen. Shannon states in its brief that these theories cannot support a finding that it failed to comply with the duty of care it owed to the

Partnership because these uncompleted transactions neither benefited Shannon nor harmed Triad.

5      *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 544 (Tex. 1998).

We disagree that the jury could have based its answers on any of these scenarios. The damage question that is predicated on any finding that Shannon failed to **\*912** comply with a common-law or statutory duty required the jury to determine the amount of "improperly charged rents" proximately caused by Shannon's "non-compliant conduct." Thus, the non-compliant conduct at issue was Shannon's agreement, as the Partnership's managing partner, to pay SRES the "improperly charged rents."

Some of the scenarios that Shannon alleges were improperly encompassed in Question 6 could not have been included for the additional reason that they were excluded by the accompanying instruction. The instruction informed the jury that Shannon owed a duty of care in conducting *the Partnership's* business, not Shannon's own business, and we presume the jury followed the charge instructions. *See Barnes v. Mathis*, 353 S.W.3d 760, 765 (Tex. 2011) (per curiam). In attempting to purchase partnership units, Shannon was conducting its own business, not Partnership business, and the renaming ultimatum was made by SRES, not by Shannon. As defined in the charge, "Shannon" meant only Shannon Medical Center and specifically excluded SRES and the Trust.

We conclude that the scenarios Shannon describes as invalid theories of liability were not submitted to the jury. They instead were merely factual matters that were admitted into evidence without objection or a request for a limiting instruction, and they were not encompassed in Question 6.

### 2. The Partnership Agreement's Effect on the Duty of Care

On appeal, Shannon also reurges its objection that the duty-of-care question "does not adequately address the partnership agreement and the alterations of the statutory duty of care." *See* Tex. Bus. Orgs. Code Ann. §§ 152.206, 153.003. Shannon argues on appeal that the duty of care was contractually disclaimed and that Shannon's conduct was authorized.

As a matter of law, however, the duty of care cannot be disclaimed. *See id.* § 152.002(b)(3). A partner must conduct the partnership's business "with the care an ordinarily prudent person would exercise in similar circumstances."

*Id.* § 152.206(a). A partner additionally must discharge the partner's duties "in good faith" and "in a manner the partner reasonably believes to be in the best interest of the partnership." *Id.* § 152.204(b). Although the Partnership Agreement authorizes contracts between the Partnership and a partner or a partner's affiliate, a partner entering into such a contract still must comply with the duty of care by acting in good faith and in a manner the partner reasonably believes to be in the partnership's best interest. The Partnership Agreement could not change this and did not purport to do so.

The instructions accompanying this question tracked the statute. The instructions additionally clarified that "[a] partner does not violate a duty or obligation merely because the partner's conduct furthers the partner's own interest" and that "a[n] error in judgment does not by itself constitute a breach of the duty of care." Under these instructions, the jury could find that Shannon complied with its duty of care by entering into a contract with the Partnership that furthered Shannon's interest, so long as Shannon acted in good faith and reasonably believed that the contract also was in the Partnership's best interest. Because this charge correctly reflects both the governing law and the Partnership Agreement's terms, the trial court did not abuse its discretion in overruling Shannnon's **\*913** objection. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g) (no abuse of discretion where controlling question was accompanied by instructions tracking statute's language).

### B. The Evidence That Shannon Failed to Comply with Its Duty of Care

Shannon further asserts there is no evidence to support the jury's finding that Shannon failed to comply with its statutory duty of care. Because the jury returned an adverse finding on this issue on which Shannon bore the burden of proof, Shannon must demonstrate on appeal that the evidence conclusively established that it complied with its statutory duty of care. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).[6] We review the record in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (per curiam). After reviewing the record in accordance with this standard, we hold that the evidence does not conclusively show that Shannon complied with its duty of care concerning the lease amendment.

6    In a footnote in its brief, Shannon states that it also objected to the three breach-of-duty questions on the ground that they improperly shifted the burden to Shannon. Shannon offers no argument or authority in support of that objection; thus, it too is waived. *See* Tex. R. App. P. 38.1(i). We note, however, that under the common law, when a fiduciary enters into a transaction in which its self-interest might conflict with the beneficiary's interests, the fiduciary bears the burden to show compliance with the duty of care. *Stephens Cty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974). The Texas Business Organizations Code makes this burden-shifting rule applicable to alleged violations of statutory duties as well. *See* Tex. Bus. Orgs. Code Ann. § 153.003 (in matters not addressed in Business Organizations Code chapter 153 dealing with limited partnerships, "the provisions of Chapter 152 governing partnerships that are not limited partnerships and the rules of law and equity govern"); *id.* § 152.003 ("The principles of law and equity and the other partnership provisions supplement this chapter unless otherwise provided by this chapter or the other partnership provisions."); *see also id.* §§ 152.004, 153.002(b) ("The rule that a statute in derogation of the common law is to be strictly construed does not apply" to the statute's partnership and limited-partnership provisions).

Before the lease was renewed in 2012, SRES asked appraiser Dale Scoggins to analyze the fair-market rental value of the leased premises. Scoggins determined that the annual fair-market rental range was $18.50 to $19.25/sq. ft. In his report, Scoggins stated,

> The above rental amount does not include consideration of the amortization of the specialized items of tenant improvements (TI) that might be a part of a new lease agreement. The subject suite has two vaults that house linear accelerator equipment. The estimated costs for each of these vaults is $450,000 or a total of $900,000. These improvements were installed at the time of original construction. The building was built in 1988 making the improvements 24 years old. Typical economic life for medical office buildings is 50 years. The accrued depreciation attributable to the vault improvements would therefore be (24/50) 48%.... The depreciated value of the specialized TI is $468,000. Typically specialized TI is amortized over the primary lease term. In this case no amortization of this cost has occurred.

From these figures, Scoggins calculated that the post-depreciation cost of the two vaults, if amortized over a five-year term, **\*914** would increase the annual rent by $11.79/sq. ft.

The day after receiving the report, Bryan Horner, both in his capacity as Shannon's CEO and as president of SRES, executed a lease amendment and sent it to Triad and the Partnership, enclosing a copy of Scoggins's report. The lease amendment states, "A market rental analysis prepared for SRES indicates that specialized tenant improvements *funded by the landlord*, such as the [Partnership] linear accelerator vaults, are typically amortized and reimbursed by the tenant."[7] The amendment called for annual rent of $31.04/sq. ft., which is the sum of the highest fair-market rental value found by Scoggins plus an additional $11.79/sq. ft. to "reimburse" SRES.

7    Emphasis added.

But Shannon knew that SRES did not fund the improvements that were made in 1988, because Shannon was the previous owner and transferred the building—with the vaults already in place—to SRES in 2007.

Moreover, there is legally sufficient evidence that the improvements also were not funded by Shannon. According to Horner, the building was constructed by the Trust, which then transferred ownership to Shannon, who later transferred the building to SRES.

Further still, the original lease indicates that the Partnership had no financial responsibility for improvements that were part of the original construction. Attached to the Partnership's original 1988 lease is an exhibit cover sheet that appears to give directions to clerical staff, stating, "Attach floor plan of demised premises showing ... all improvements to be constructed by Landlord" and directing someone to type on the floor plan, "All improvements, equipment and furnishings shown hereon are to be constructed, furnished and installed at the sole cost and expense of Landlord." A private placement memorandum seeking investors in the Partnership identifies the Trust as the landlord.

Although the floor plan itself is missing from the lease, the building's 1987 blueprints show that the vaults are part of the original construction. The 1988 lease did not require the Partnership to pay for any part of the original construction but to pay only for those improvements that were added after the lease's "Commencement Date," which was defined as the date the Partnership "delivers written notice to Landlord that the demised premises are complete and fully suitable to [the Partnership] for the purpose for which same are leased."

From this evidence, the jury reasonably could conclude that the Trust assumed sole responsibility for the cost of constructing a building suitable for use as a radiotherapy center, and this included construction of the vaults shown on the blueprints.

The evidence also establishes that Shannon knew there was no support for the position taken in the 2012 lease amendment that "a rate of $31.04 per year per square foot (including reimbursement of specialized tenant improvements funded by SRES) is within the range of fair market value." Shannon knew that the vaults were included in the original construction nearly two decades before SRES acquired the building. Moreover, Scoggins asked for documentation of the costs of constructing the vaults, but because the vaults were included as an integral part of the building's **\*915** original construction, Shannon could find none. To the contrary, Shannon's controller informed Horner, "The best I've been able to come up with for the 1988 vaults is a lease agreement that indicates [the] landlord is responsible for all leasehold improvements...." Scoggins additionally explained to Horner, "*The TI increment* is not included in the market rental amount as it *is not an aspect of market rent* but an individual modification to a building for a particular tenant rather than a feature that would be typical of the market."[8] Thus, Shannon knew that (1) the vaults were not a modification to the building, and thus, they were not a "tenant improvement"; (2) the Trust, not SRES, paid to construct the building, including the vaults; and (3) the vaults' construction-costs are not part of the building's fair-market rental value. There accordingly was no basis for Shannon, as the Partnership's managing general partner, to bind the Partnership to "reimburse" SRES for construction costs Shannon knew had been paid by the Trust in accordance with its agreement with the Partnership.

[8]      Emphasis added.

Although Shannon emphasizes that the Partnership Agreement permits the Partnership to contract with a partner's affiliate such as SRES, the agreement specifies that such contracts "must be competitive with the terms that the Partnership could obtain from third parties in an arm's length transaction." The Partnership was not renting space that SRES had modified at the landlord's expense to satisfy the Partnership's requirements; the Partnership was renting a space that already satisfied the Partnership's requirements without requiring the landlord to modify it. Scoggins's report shows that the highest annual fair-market rental value for

the property was $19.25/sq. ft., and the record supports the finding that in binding the Partnership to pay SRES an additional $11.79/sq. ft., Shannon did not act "on an informed basis, in good faith, and in a manner [it] reasonably believed to be in the [Partnership's] best interest."

We conclude the jury's assessment of the Partnership's actual damages is amply supported by the evidence. We overrule Shannon's second issue, and we affirm the portion of the judgment awarding the Partnership actual damages as found by the jury.

## IV. Triad's Disgorgement Award

Shannon argues that Triad's disgorgement award must be reversed because, among other reasons, there is no evidence of Shannon's profits. We agree, and because this point is dispositive, we do not address Shannon's remaining challenges to this award.[9]

[9]      Shannon argues in its third issue that the disgorgement award cannot be supported by the jury's finding of fraud by non-disclosure in connection with the lease amendment, because (a) the claim was not pleaded, (b) Triad lacks standing to pursue the claim, and (c) there is no evidence of one or more elements of fraud by non-disclosure. In its fourth issue, Shannon contends that the trial court abused its discretion in ordering equitable disgorgement to Triad of Shannon's profits because (a) that request for relief was not pleaded, (b) there is no direct relationship between Triad and the amount to be disgorged, (c) no clear and serious breach occurred, and (d) there is no basis for the amount awarded. Under the latter subheading, Shannon argues that the rent was paid to SRES, not Shannon, and there is no evidence of Shannon's profits from the 2012 lease amendment. Because this point is dispositive of the judgment in Triad's favor, we do not address Shannon's other arguments.

In determining the amount that equity required Shannon to disgorge to Triad, the **\*916** trial court relied on the jury's answer to Question 9 of the charge, in which the jury was asked, "What was the amount of any improperly charged rent?" The jury answered, "$572,725.00."

But Texas law limits profit disgorgement to the amount of a fiduciary's profits obtained as a result of the fiduciary's breach of duty. *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 877–78 (Tex. 2017) (citing *ERI*

*Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010)).[10] As Shannon pointed out at the charge conference, the Partnership paid the rent to its landlord SRES, and SRES is a corporation distinct from Shannon, SRES's sole shareholder. *See Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) ("Under Texas law, a corporation is an entity separate from its shareholders."). The excess rent was SRES's profit, not Shannon's, and Triad did not plead or litigate any basis for ignoring the distinction between the two entities. The extent to which Shannon profited from the excess rent paid to SRES was a question of fact[11] on which there is no finding and no evidence.

10    We address only the disgorgement of profits, not the forfeiture or disgorgement of fees, which are not at issue in this appeal.

11    *See Longview*, 533 S.W.3d at 877–78.

In response, Triad asserts that the damages Shannon now must pay to the Partnership "inure ... primarily to Shannon's benefit as the [Partnership's] majority owner." But this argument misses the mark for several reasons. First, the judgment Shannon must pay to the Partnership is not Shannon's profit; it is Shannon's debt. *See* Tex. Civ. Prac. & Rem. Code Ann. § 31.008(h)(2) (party against whom judgment is rendered is a "judgment debtor"). Second, when Shannon pays the judgment, the money will inure to the Partnership's benefit, not to Shannon's. The extent of Shannon's partnership interest is irrelevant, because a partnership is "an entity distinct from its partners" and "[p]artnership property is not property of the partners." Tex. Bus. Orgs. Code Ann. §§ 152.056, 152.101. Third, if Triad intends to imply that some part of the judgment that Shannon pays to the Partnership will later be repaid to Shannon in the form of a partnership distribution, this theory cannot support the judgment because there is no fact finding on the subject. And fourth, no evidence was offered that would have supported the submission of a question asking the jury to measure Shannon's profits from the improperly charged rents by the amount of a partnership distribution. The rent increase became effective in October 2012, and the evidence showed that the only distribution since that time was in January 2013. The distribution could not have included any improperly charged rent, because the Partnership paid the rent to SRES, so the Partnership had no improperly charged rent to distribute.

For each of these reasons, we sustain Shannon's fourth issue in part, and we do not reach Shannon's remaining challenges to the judgment in Triad's favor. Because Triad's only recovery was the disgorgement award, which cannot stand, we reverse this part of the judgment and render judgment that Triad take nothing by its claims in its individual capacity.

### V. Shannon's Claim for Judicial Dissolution of the Partnership

On application by a partner in a domestic partnership, a district court may **\*917** order the winding up and termination of the partnership "if the court determines that it is not reasonably practicable to carry on the entity's business in conformity with its governing documents."[12] The jury was asked, "Is it reasonably practicable to carry on the Partnership's business in conformity with the governing documents, and the jury answered, "Yes." In its fifth issue, Shannon contends it is entitled to judicial dissolution of the Partnership because it conclusively established the contrary.

12    Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 11.314(2), 2003 Tex. Gen. Laws 267, 400–01 (amended 2009 & 2017; now codified at Tex. Bus. Orgs. Code Ann. § 11.314(3)).

Citing *Wiess v. McFaddin*, 211 S.W. 337, 342 (Tex. App. —Beaumont 1919, no writ), Shannon argues that voting deadlock is a recognized basis for judicial dissolution of a partnership, and now that Shannon and Triad are the only partners, the two are bound to become deadlocked on important matters. But the evidence before us—and Shannon's own admission—easily distinguish the facts in this case from those in *Wiess*. In *Wiess*, all of the property of an unincorporated joint stock association was vested in a board of three trustees: Wiess, Kyle, and McFaddin. *Id.* at 338. Wiess died and was succeeded by one of his children; however, the joint-stock agreement provided that the election of a new trustee would not be complete unless a certificate of acknowledgment was signed by the two remaining trustees and the new trustee signed an acceptance of the trust. *Id.* at 338–39. Wiess's successor was elected, but McFaddin refused to sign the necessary certificate. *Id.* at 339. The court noted that it was decided in an earlier case that McFaddin could not be compelled to sign the certificate, and Kyle refused to act until the board was complete. *See id.* at 342 (citing *McFaddin v. Wiess*, 168 S.W. 486, 487 (Tex. App.—Galveston 1914, no writ)). Because it was impossible to operate the business in conformity with its governing documents, the court affirmed the business's judicial dissolution. *See id.*

No such deadlock does, or could, exist here. As Shannon admits, the Partnership Agreement provides that a deadlock may be broken "upon the 'Approval of the General Partners,' " which is defined as the approval by those general partners holding a majority of the partnership units. Shannon concedes that it can "break the deadlock on its own because it holds the majority" of the partnership units.

Shannon nevertheless speculates that "Triad would inevitably object to any effort by Shannon to resolve the deadlock on its own" and "would resort to a lawsuit." But "speculation is not evidence." *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 164 (Tex. 2004). Moreover, a partnership can carry on its business in accordance with its governing documents despite litigation between partners—and the Partnership has done so.

Shannon's arguments, and the record, fall far short of conclusively establishing that it is not "reasonably practicable to carry on the Partnership's business in conformity with its governing documents." We overrule this issue.

## VI. Attorneys' Fees

A trial court has discretion to award the plaintiff reasonable attorneys' fees and expenses if the plaintiff is wholly or partly successful in prosecuting a derivative action. **\*918** Tex. Bus. Orgs. Code Ann. § 153.405. Moreover, the Partnership Agreement provides that in litigation between partners relating to the Partnership, the prevailing partner "shall be entitled to recover, in addition to all damages allowed by law and other relief, all court costs and reasonable attorney's fees incurred in connection therewith from the Partner or Partners not prevailing." Based on these provisions, the trial court ordered Shannon to pay Triad's and the Partnership's fees, expenses, and court costs. These amounted to almost $1.19 million in attorney's fees through trial, expenses of nearly $247,000, and over $12,000 in court costs. The trial court also conditionally awarded attorneys' fees of $75,000 in the event of an appeal to an intermediate court of appeals; $25,000 in the event that a petition for review is filed with the Texas Supreme Court, and $55,000 if the Texas Supreme Court requests briefing on the merits.

In its sixth issue, Shannon contends that the trial court erred in failing to condition the award of appellate attorneys' fees upon the success of the appeal, and in its seventh issue, Shannon argues that reversal of the judgment requires remand for a new

trial on attorneys' fees, costs, and expenses. We agree with both points.

Awards of appellate fees must be conditioned upon a successful appeal. *See A.G. Edwards & Sons, Inc. v. Beyer,* 235 S.W.3d 704, 707 n.1 (Tex. 2007). Triad acknowledges this and does not oppose reformation of the judgment to expressly condition the award of appellate attorneys' fees upon Shannon's success on appeal; however, in light of our reversal of Triad's disgorgement award, the case must be remanded for a redetermination of the appropriate award of fees, costs, and expenses. *Cf. Young v. Qualls,* 223 S.W.3d 312, 314 (Tex. 2007) (per curiam) ("Although attorney's fees in this case were awarded by the trial court rather than the jury, the factors governing their assessment are the same and include consideration of the 'results obtained.' " (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex. 1997))).

We sustain Shannon's sixth and seventh issues, and we remand the case for for a new trial solely on the issues of attorneys' fees, reasonable expenses, and costs, and with instructions to the trial court to condition any award of appellate attorneys' fees on a successful appeal.

## VII. Conclusion

We overrule Shannon's arguments challenging the portion of the judgment awarding the Partnership actual damages for Shannon's breach of the duty of care, and we affirm this part of the judgment without reaching Shannon's arguments regarding the Partnership's remaining claims. We likewise affirm the portion of the judgment denying Shannon's request for judicial dissolution of the Partnership.

Because no evidence supports the trial court's disgorgement-of-profits award to Triad, we reverse this part of the judgment and render judgment that Triad take nothing by its claims in its individual capacity. In light of this result, we reverse the trial court's award of attorneys' fees, expenses, and costs, and we remand the case to the trial court for a new trial only on this ancillary relief, with any award of appellate attorneys' fees to be conditioned on a successful appeal.

## All Citations

601 S.W.3d 904

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S.
Government Works.

482 S.W.3d 559
Supreme Court of Texas.

RAILROAD COMMISSION
OF TEXAS, Petitioner,

v.

GULF ENERGY EXPLORATION

CORPORATION, Respondent.

No. 14–0534
|
Argued September 22, 2015
|
OPINION DELIVERED: January 29, 2016

**Synopsis**
**Background:** Oil-and-gas lessee brought negligence and breach of contract action against Railroad Commission, after Commission mistakenly plugged abandoned offshore well that it had previously agreed with lessee to postpone plugging. The trial court entered judgment on jury verdict in favor of lessee. Commission appealed. The Corpus Christi - Edinburg Court of Appeals, 2014 WL 3107507, affirmed. Commission filed petition for review, which was granted.

**Holdings:** The Supreme Court, Lehrmann, J., held that:

legislative resolution granting lessee permission to bring action did not preclude Commission from raising good-faith defense;

good-faith defense was applicable to Commission's mistakenly plugging well;

whether lessee's damages resulted from acts of Commission that were conducted in good faith was question of fact for jury;

good faith refers to conduct that is honest in fact, free of improper motive or wilful ignorance of facts at hand;

whether Commission and lessee intended to be legally bound before Commission plugged well was disputed fact issue that should have been presented to jury; and

good-faith defense is not limited to tort actions.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

 **\*562**  On Petition for Review from the Court of Appeals for the Thirteenth District of Texas, Valdez, Rogelio, Judge

**Attorneys and Law Firms**

Joseph David 'Jody' Hughes, Assistant Solicitor General, Jonathan F. Mitchell, Solicitor General, J.R. Schneider Jr., Assistant Attorney General, Gaston M. Broyles Jr., Assistant Attorney General, Daniel T. Hodge, First Asst. Attorney General, Gregory W. Abbott, Attorney General, Charles Kenneth Eldred, Financial & Tax Litigation Division, Office of the Attorney General, Austin, for Petitioner.

David Roberts, Roberts, Roberts, Odefey & Witte, LLP, Port Lavaca, Kenneth R. Wynne, David Edwards Wynne, Wynne & Wynne LLP, Houston, for Respondent.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

After agreeing with an oil-and-gas lessee to postpone plugging several abandoned offshore wells, the Railroad Commission of Texas mistakenly plugged one of those wells. The lessee sued the Commission with legislative permission and obtained a favorable jury verdict on the lessee's negligence and breach-of-contract claims. The court of appeals affirmed the judgment on the verdict. The Commission complains that the trial court erred in failing to submit a jury question on a statutory good-faith defense, which the Commission contends forecloses its liability on both claims, and in failing to submit a question about whether the Commission and lessee entered into a binding contract before the well was plugged. We hold that the trial court erred in refusing to submit a jury question on the good-faith defense. We also hold that a fact question exists on the contract-formation issue. Accordingly, we reverse the court of appeals' judgment and remand the case for a new trial.

**I. Background**

**A. Statutory Framework**

This case arises out of the Commission's duties with respect to abandoned oil-and-gas wells, which are governed by Texas Natural Resources Code chapter 89. One of the statute's express purposes is to protect Texas's water and land from pollution by providing "additional means" for the plugging of abandoned wells. Tex. Nat. Res. Code § 89.001. The statute and accompanying Commission rules place primary responsibility on an inactive well's[1] operator[2] to plug the well.[3] *Id.* §§ 89.011(a), .042(a); 16 Tex. Admin. Code § 3.15(b)(1)(B), (d)(1)(B). Nonoperators, defined as persons with a working interest in a well who do not qualify as operators, have secondary plugging responsibility. Tex. Nat. Res. Code §§ 89.002(a)(3), .042(b). If the Commission determines after notice and a hearing that a well has not been properly plugged, and the operator and nonoperator (if any) either cannot be found or do not have sufficient assets, the Commission may plug the well. *Id.* § 89.043(a); 16 Tex. Admin. Code § 3.14(b)(3)(A).

[1] An inactive well is "an unplugged well that has had no reported production, disposal, injection, or other permitted activity for a period of greater than 12 months." Tex. Nat. Res. Code § 89.002(a)(12).

[2] An operator is "a person who assumes responsibility for the physical operation and control of a well as shown by a form the person files with the commission and the commission approves." *Id.* § 89.002(a)(2).

[3] In lieu of plugging an inactive well, the operator may restore the well to active status or seek approval from the Commission for an extension of the plugging deadline. 16 Tex. Admin. Code § 3.15(b).

Chapter 89 also provides a liability defense to those engaged in plugging operations **\*563** in good faith. Specifically, "[t]he commission and its employees and agents, the operator, and the nonoperator are not liable for any damages that may occur as a result of acts done or omitted to be done by them or each of them in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. The application of this defense is the parties' principal focus in this Court.

## B. Facts

In January 2008, the Commission issued orders requiring American Coastal Enterprises (ACE) to plug a number of inactive offshore wells the company operated in the Gulf of Mexico. Those plugging orders became final in March 2008.

Because ACE did not have sufficient assets to carry out the orders—the company declared bankruptcy in May 2008—the Commission took over that responsibility. On April 24, 2008, the Commission awarded Superior Energy Services a contract to plug eight of the ACE wells, including the two at issue in this case identified as 707S–5 and 708S–5.[4]

[4] Offshore wells are identified by the tract number in the State's mapping system. Well 707S–5 is in tract 707, and well 708S–5 is in tract 708.

When the plugging order was issued, Gulf Energy Exploration Corporation was the lessee of the offshore area that included the 708S–5, having acquired the lease from the General Land Office in 2007. Gulf Energy was considering applying to the Commission to take over as operator of some of the abandoned ACE wells. On May 19, 2008, representatives of Gulf Energy, ACE, and the Commission, including lawyers from the Attorney General's Office, met to discuss Gulf Energy's proposal. As of that date, Superior had commenced plugging operations and had already plugged one of the eight wells. The representatives reached an oral agreement at the meeting that the Commission would delay plugging four of the remaining wells covered by the plugging order, including the 708S–5. Meanwhile, Gulf Energy would post a bond and would apply to the Commission to supersede the plugging order and take over as operator of those four wells no later than June 12, 2008. The other three wells, including the 707S–5, would be plugged as planned.

In the days following the meeting, the participants confirmed the terms of the agreement in a series of e-mails and reduced it to writing in a formal Settlement and Forbearance Agreement.[5] The Commission representative signed the written agreement on June 6, 2008, and ACE's president and Gulf Energy's CEO signed it on June 9. The bankruptcy court approved the settlement, and the Commission does not dispute that Gulf Energy fulfilled its obligations with respect to the bond and required Commission filings.

[5] The Agreement stated that it was between ACE and the Commission and did not describe Gulf Energy as a party in the introductory language. However, representatives of ACE, the Commission, and Gulf Energy all signed the Agreement.

In September 2008, the Commission issued several orders superseding the plugging orders on the wells covered by the agreement and approving Gulf Energy's application to transfer their operation. A few months later, Gulf Energy

discovered that the 708S–5 was plugged. As it turned out, the Commission had plugged the well on May 25, 2008 under the mistaken belief that it was plugging the 707S–5. The circumstances surrounding that error were the subject of the resulting lawsuit.

The mistake originated with an admitted clerical error by Commission employee **\*564** Jimmy Zambrano. Before the Commission contracted with Superior to plug the eight wells, Zambrano took aerial photographs of and prepared a plugging procedure sheet for each well. But Zambrano inadvertently transposed the coordinates for several of the wells, resulting in 708S–5's photo and coordinates being labeled as those of 707S–5, and vice versa. These mislabeled procedure sheets were provided to Superior with the plugging contract.

Gulf Energy's theory at trial was that Superior received information from Fugro Chance, Inc., the subcontractor Superior hired to perform sonar surveys of the ocean floor around the well sites in advance of the plugging operation, alerting it that the coordinates on the procedure sheets were incorrect. Gulf Energy presented evidence that Fugro Chance provided this information to Superior employees several days before the 708S–5 was plugged, and that they failed to pass it along to the boat crew conducting the operation. Gulf Energy also explored the theory that the crew members, including the Commission representative on board, ignored obvious indicators that they were at the wrong well when they mistakenly plugged the 708S–5.

## C. Procedural History

After discovering that the 708S–5 had been plugged, Gulf Energy sought and obtained legislative consent to sue the Commission. Specifically, the Legislature adopted Senate Concurrent Resolution No. 72, which authorized Gulf Energy to sue the Commission for no more than $2.5 million in damages, subject to Texas Civil Practice and Remedies Code chapter 107. Pursuant to chapter 107, the resolution did not waive the Commission's immunity from liability, nor did it waive any defense of law or fact "except the defense of immunity from suit without legislative permission." Tex. Civ. Prac. & Rem. Code § 107.002(a)(7)–(8), (b).

Gulf Energy then sued the Commission and Superior for wrongfully plugging well 708S–5.[6] Gulf Energy's live pleading at trial included breach-of-contract and negligence claims against the Commission and Superior,[7] and a gross

negligence claim against Superior. All claims were submitted to the jury, but Gulf Energy and Superior settled while the jury was deliberating.

[6]    Gulf Energy also sued Fugro Chance for negligence and gross negligence, but the trial court dismissed those claims with prejudice and severed them from the underlying suit.

[7]    Gulf Energy also initially asserted fraud, negligent-misrepresentation, and gross-negligence claims against the Commission and sought exemplary damages. The Commission filed a plea to the jurisdiction, arguing that the legislative resolution waiving its immunity from suit did not extend to Gulf Energy's tort claims. The trial court denied the plea, and on interlocutory appeal the court of appeals affirmed as to the negligence claim but reversed as to the fraud and negligent misrepresentation claims as well as the request for exemplary damages. *R.R. Comm'n of Tex. v. Gulf Energy Exploration Corp.,* No. 13–10–015–CV, 2010 WL 3049083, at \*6–\*7 (Tex.App.–Corpus Christi Aug. 5, 2010, no pet.) (mem.op.). On remand, Gulf Energy amended its petition to assert only breach of contract and negligence.

During the charge conference, the Commission objected to the jury charge's failure to include a question on contract formation, arguing that a fact issue existed on whether the parties had a meeting of the minds when the contract was allegedly breached. The trial court overruled the objection and orally ruled that a contract between the Commission and Gulf Energy was formed as a matter of law before the well was plugged.[8] In effect, the trial **\*565** court held that the parties had a binding contract when they reached the oral agreement on May 19, 2008—before the well was plugged—not when they signed the written settlement agreement three weeks later on June 9—after the well was plugged. The trial court also overruled the Commission's objection to the absence of a question on the Commission's good faith under Natural Resources Code section 89.045 and refused the Commission's requested good-faith question, which asked:

Did the Railroad Commission of Texas, and its employees and agents, act in good faith in carrying out its policy as stated below:

Natural Resources Code, Section 89.001. Policy—The conservation and development of all the natural resources of this state are declared to be a public right and duty. It is also declared that the protection of water and land of the state against pollution or the escape of oil or gas is in the public interest. In the exercise of the police power of

the state, it is necessary and desirable to provide additional means so that wells that are drilled for the exploration, development, or production of oil or gas, or as injection or salt water disposal wells, and that have been abandoned and are leaking salt water, oil, gas, or other deleterious substances into freshwater formations or on the surface of the land, may be plugged, replugged, or repaired by or under the authority and direction of the commission.

8    It appears that the trial court initially made this ruling during the informal charge conference, which was not recorded. But the trial court confirmed the ruling on the record during the formal charge conference.

The jury found that the Commission "fail[ed] to comply with its agreement to postpone plugging and abandoning the 708S–5" and that the Commission's negligence proximately caused Gulf Energy's damages.[9] On the negligence claim, the jury attributed 65% of the responsibility to Superior and 35% to the Commission. The jury awarded identical damages on each claim and awarded attorney's fees on the contract claim. Gulf Energy moved for entry of judgment on the contract claim. Taking into account the settlement credit and the damage limit in the resolution authorizing suit, the trial court rendered judgment in Gulf Energy's favor for $2.5 million, the maximum amount recoverable.

9    The jury also found Superior liable for breach of contract, negligence, and gross negligence, but the settlement rendered those findings moot.

The court of appeals affirmed. 480 S.W.3d 570 (Tex.App.– Corpus Christi–Edinburg 2014). The court rejected the Commission's assertion of charge error on the contract question, holding that (1) the Commission waived its complaint that the question "erroneously assumes that the Railroad Commission entered into a legally-enforceable agreement" to postpone plugging the well, (2) even if preserved, any error was harmless, and (3) the Commission did not meet its burden to rebut the presumption that the contract was supported by consideration. *Id.* at \*3, \*8. The court of appeals also rejected the Commission's complaint of charge error on the negligence question, holding that the Commission waived its arguments that the proper standard was good faith rather than negligence and that the evidence conclusively established the Commission's good faith.[10] *Id.* at \*9. We granted the Commission's petition for review.

10    The court overruled several additional complaints about the negligence question and related instructions, as well

as complaints related to the damages award, but the Commission does not challenge those rulings here.

**\*566  II. Discussion**

In this Court, the Commission presents two principal issues. First, it argues that the evidence conclusively establishes its entitlement to the good-faith defense under section 89.045 and, alternatively, that the trial court erred in failing to submit a jury question on the defense. Second, as an alternative argument in the event the Court concludes that section 89.045 bars Gulf Energy's tort damages but not its contract damages, the Commission contends that the trial court erred in ruling as a matter of law that a binding contract was in effect when the well was plugged and in refusing to submit that issue to the jury. We address these issues in turn.

**A. Good–Faith Defense**

**1. Preliminary Issues**

To reiterate, under section 89.045 "[t]he commission and its employees and agents, the operator, and the nonoperator are not liable for any damages that may occur as a result of acts done or omitted to be done by them or each of them in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. No findings were made about this defense because the trial court refused to submit it to the jury.

As an initial matter, Gulf Energy argues that the legislative resolution granting it permission to sue precludes the Commission from invoking section 89.045. We disagree. As required by statute, the resolution did not waive any defense of law or fact "except the defense of immunity from suit without legislative permission." Tex. Civ. Prac. & Rem. Code § 107.002(a)(7)–(8). The Commission's immunity from suit is a jurisdictional component of its sovereign immunity and exists under common law unless expressly waived by statute. *Brown & Gay Eng'g, Inc. v. Olivares,* 461 S.W.3d 117, 121 (Tex.2015). By contrast, section 89.045 applies to both the Commission and private entities that qualify as operators or nonoperators and provides a statutory affirmative defense to liability for those entities' "good-faith effort[s] to carry out this chapter."[11] Tex. Nat. Res. Code § 89.045; *see Zorrilla v. Aypco Constr. II, LLC,* 469 S.W.3d 143, 155–56 (Tex.2015) (defining "affirmative defense" as a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's

or prosecution's claim, even if all the allegations in the complaint are true." (quoting Black's Law Dictionary 509 (10th ed. 2009))). This statutory defense is distinct from and independent of the Commission's common-law immunity from suit. The resolution, by its terms and by statutory mandate, did not waive the good-faith defense.

11 The Commission does not dispute that it had the burden to plead and prove section 89.045 as an affirmative defense.

Gulf Energy next argues section 89.045's good-faith defense "applies only to acts that involve discretion," like policy decisions, and does not extend to the ministerial act of plugging the wrong well. In making this argument, Gulf Energy ignores the statute's language and cites case law regarding an inapplicable doctrine. Section 89.045's language is broad, foreclosing liability for "any damages" resulting from acts or omissions "in a good-faith effort to carry out" chapter 89. The only limitation on the acts or omissions that qualify is the "good-faith effort" requirement. Construing the statute to apply only to discretionary acts would require us to impermissibly limit the defense's application in a manner that contravenes the statute's plain language and thus flouts **\*567** legislative intent. *See Kia Motors Corp. v. Ruiz,* 432 S.W.3d 865, 872 (Tex.2014) (rejecting a party's interpretation of a statute that "impermissibly adds language and alters the statute's plain meaning").

To support its argument, Gulf Energy cites case law regarding the affirmative defense of official immunity, which shields government officials from personal liability for discretionary acts in good faith and within the scope of their authority. *E.g., Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004). Official immunity is a common-law doctrine, a specific element of which is that the act for which immunity is sought be in the performance of a discretionary duty. *Id.* It has no bearing on our interpretation of an independent, unrelated statute that places no such limitation on the acts and omissions to which it applies. Accordingly, we reject Gulf Energy's argument that section 89.045 cannot apply to the Commission's erroneous plugging of well 708S–5.

## 2. Defining and Applying Good–Faith Defense

On section 89.045's application to the facts at hand, the Commission argues that the trial evidence conclusively established that the Commission acted in good faith or, at the very least, the trial court erred in failing to submit a

good-faith jury question. To properly apply the good-faith defense, we must first examine the parties' dispute as to what "good faith" means. Again, section 89.045 provides a defense to liability "for any damages that may occur as a result of acts done or omitted to be done by [the Commission] in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. The statute does not define "good faith" or "good-faith effort."[12] The Commission argues that the term is subjective, reflecting "an honest or genuine effort to accomplish the task at hand, as opposed to a sham effort or an effort to achieve a different result." The Commission contends that the evidence conclusively establishes the honest and inadvertent nature of its misidentification of well 708S–5, foreclosing its liability to Gulf Energy.[13] Gulf Energy responds that good faith under section 89.045 should be measured by an objective standard and that the Commission failed to meet that standard.[14]

12 The term "good faith claim" is defined in chapter 89 as "a factually supported claim based on a recognized legal theory to a continuing possessory right in a mineral estate." Tex. Nat. Res. Code § 89.002(a)(11). That term is used only once in the chapter—one of the requirements for an application to extend the operator's deadline to plug an inactive well is the inclusion of "a statement that the operator has, and on request will provide evidence of a good faith claim to a continuing right to operate the well." *Id.* § 89.023(a)(2).

13 We disagree with the court of appeals' holding that the Commission inadequately briefed the issue in that court by failing to cite the relevant portions of the record. 480 S.W.3d at 586. The statement of facts in the Commission's brief cited Zambrano's testimony about his transposition error and noted the undisputed fact that the boat crew members thought they were plugging the 707S–5. The Commission was not required to repeat those cites in the argument section in order to preserve error. *City of Arlington v. State Farm Lloyds,* 145 S.W.3d 165, 167 (Tex.2004) (per curiam).

14 Gulf Energy argues that the Commission waived its argument for a purely subjective definition of good faith by adopting Superior's proposed definition of the term, which included an objective component. However, this argument mischaracterizes the record. At the charge conference, the Commission objected to the absence of a good-faith question and adopted Superior's similar objection. The Commission did not purport to adopt the question and instruction on good faith that Superior

submitted. Rather, the Commission submitted its own good-faith question that did not define the term.

**\*568** An undefined statutory term is given its ordinary meaning unless "a different or more precise definition is apparent from the term's use in the context of the statute." *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). Webster's defines good faith as "a state of mind indicating honesty and lawfulness of purpose"; "belief in one's legal title or right"; "belief that one's conduct is not unconscionable or that known circumstances do not require further investigation"; and "absence of fraud, deceit, collusion, or gross negligence." Webster's Third New Int'l Dictionary 978 (2002). None of these definitions incorporates an objective reasonableness standard. Black's Law Dictionary defines good faith as a "state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." Black's Law Dictionary 808 (10th ed.2009). Only one of these four definitions references a reasonableness standard, and it is essentially identical to one of the Uniform Commercial Code's statutory definitions of the term. *See* Tex. Bus. & Com. Code § 1.201(b)(20) (defining good faith to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing").[15]

[15] Chapter 5 of the UCC, which governs letters of credit, defines good faith for purposes of that chapter in subjective terms as "honesty in fact in the conduct or transaction concerned." Tex. Bus. & Com. Code § 5.102(a)(7).

These definitions focus overwhelmingly on subjective state of mind and are consistent with our interpretation of the term in an unrelated context. In *Associated Indemnity Corp. v. CAT Contracting, Inc.,* we examined a surety agreement that required indemnity for claims settled by the surety in good faith. 964 S.W.2d 276, 282–83 (Tex.1998). We held that "good faith" in the surety agreement

> refers to conduct which is honest in fact, free of improper motive or wilful ignorance of the facts at hand. It does not require proof of a "reasonable" investigation by the surety. Stating the proposition conversely ..., "bad faith" means more than merely negligent or unreasonable conduct; it requires proof of an improper motive or wilful ignorance of the facts.

*Id.* at 285. We believe the term "good faith" in section 89.045 refers to similar conduct. Had the Legislature intended to place an objective limitation on the term in contravention of its ordinary meaning, it could have done so. *See, e.g.,* Tex. Civ. Prac. & Rem. Code § 74.351(l) (requiring trial court to grant a motion challenging the adequacy of an expert report under the Texas Medical Liability Act if the report "does not represent an objective good faith effort to comply" with the statute).

As the Commission argues, the absence of an "objective reasonableness" component makes sense for two reasons. First, if the Commission's actions must simply be objectively reasonable to qualify as a good-faith effort to comply with chapter 89, then the good-faith defense merely duplicates the negligence standard and serves no purpose. *See Methodist Healthcare Sys. of San Antonio, Ltd. v. Rankin,* 307 S.W.3d 283, 290 (Tex.2010) (holding that statutes of repose that could be tolled or deferred would serve no purpose and that allowing tolling would equate statutes of repose with statutes of limitations); *City of Lancaster v. Chambers,* 883 S.W.2d 650, 655 (Tex.1994) (noting in the official-immunity context that good faith serves no purpose if it is equivalent to a negligence standard).

**\*569** Second, we disagree with Gulf Energy's suggestion that we import the good-faith element of the official-immunity defense into section 89.045. As noted, that defense immunizes government employees from claims "arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Chambers,* 883 S.W.2d at 653. An employee acts in good faith for official-immunity purposes if "a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Ballantyne,* 144 S.W.3d at 426. This modified objective standard makes sense in the context of reviewing an official's performance of discretionary functions, which "involve[ ] personal deliberation, decision and judgment." *Chambers,* 883 S.W.2d at 654. But as discussed above and unlike in the official-immunity context, section 89.045 is not limited to discretionary acts. For example, at oral argument, the parties discussed "all the things that can happen when you're out there trying to plug a well" that do not involve the exercise of discretion, from a slip and fall to a vehicle collision to an accident involving a tool. When that type of conduct causes damage, the question of whether a reasonable official could have believed the conduct was justified simply has no place.

Accordingly, we hold that a good-faith effort to carry out chapter 89 requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand. Applying that standard, we cannot say that the evidence conclusively establishes the Commission's good faith. While nothing indicates that Zambrano's original transcription error was anything more than a negligent oversight, Gulf Energy presented trial evidence that Superior's plugging crew and the Commission representative aboard the boat ignored obvious indicators that they were at the wrong well when the 708S–5 was plugged.

As noted, when the May 19 meeting took place, Superior was already in the process of plugging eight of the offshore wells that were the subject of the Commission's plugging order. Zambrano was the Commission representative aboard Superior's boat and had prepared a binder with the plugging procedure sheets arranged in the sequence in which the wells were to be plugged. Sometime after the meeting, Zambrano was told not to plug four wells, including the 708S–5, and removed the procedure sheets for those wells from the binder.[16] On or about May 23, Gene Reed replaced Zambrano as the Commission representative on the boat, and Zambrano explained to Reed that four procedure sheets had been removed from the binder due to the instruction not to plug those wells. This was Reed's first experience on an offshore-plugging operation.

[16]    On May 21, Superior forwarded to Zambrano a communication from Fugro Chance indicating some confusion regarding the location of the 707S–5 and 708S–5 because the coordinates Fugro Chance had been given did not plot to the proper state tract. Zambrano then "checked the coordinates [in the plugging procedures] compared to the locations they were at" and "compared the photographs of wells as [the Commission] had them labeled ... to the pictures Fugro Chance had of the wells." But the documents Zambrano turned to for clarification were the unknown source of the error.

On May 24, the boat reached the coordinates listed on the procedure sheet for the 707S–5, and, although several wells were visible from that location, the coordinates had led the crew to open water. Reed called Zambrano, who told him to look at the photographs Zambrano had taken in order to confirm which well to approach. **\*570** Unfortunately, those were the same photographs Zambrano had previously mislabeled along with the procedure sheets. Based on those photographs, Reed and the crew approached the 708S–5 believing that it was the 707S–5.

By itself, we cannot say that this is willful ignorance of the facts at hand. However, two more red flags emerged before the well was plugged calling into question whether the boat was at the correct well. First, the procedure sheets described the 707S–5 as having only a single string of tubing, but the well that the boat approached had a dual tree, raising the possibility of a second string.[17] The crew ran a slickline down the second tree and encountered an obstacle about fifteen feet down. The crew subsequently confirmed that no tubing in the second tree required plugging, but only after they had plugged the first string. Accordingly, the decision to plug the first string was made before the crew knew whether the well conformed to the procedure sheet's description. Second, when the crew ran the slickline down the first string, the well measured almost 300 feet deeper than the data reflected on the 707S–5 procedure sheet.

[17]    The 708S–5 is described in the Commission's records as a dual-completion well.

Zambrano and Reed gave conflicting testimony about the Commission's reaction to these discrepancies. Zambrano testified that Reed called him to discuss both matters and that neither of them affected his conclusion that the boat was at the correct well. When asked whether he had ever seen a single-string well with a dual tree, he responded, "Maybe not often, but it does happen." He also testified that he had been involved in plugging operations in which the well ran deeper than expected. He testified that, in light of this experience, he instructed Reed to proceed to plug the well.

By contrast, Reed testified that he did not speak to Zambrano about either issue. With respect to the well's having a dual tree, Reed testified:

Q So the 707S5, you remember, was the well that you were supposed to plug next and the well data that you had for that was a single completion well?

A That's correct.

Q But when you got up and set up next to the 708S5 you could see when you got close enough to the tree that it was a dual completion tree, couldn't you?

A That's correct.

Q But that didn't stop anybody from embarking on the plugging procedure for that well, did it?

A No, sir.

Q And you have no memory of ever talking to [Zambrano] about that disparity from the well data for the well that you meant to be on because you'd already decided, based on the picture, to plug that well; right?

A Yes, sir.

Reed also testified about the well's unexpected depth:

Q You went deeper by almost 300 feet from what the well data for the 707S5 indicated was the bottom of that well, didn't you?

A Right.

Q Okay. And you didn't call [Zambrano] about that. You had already decided, because of the picture, you had had enough conversation, that's the well you were going to plug; right?

A I don't remember calling him, no, sir.

Based on this evidence, we cannot say as a matter of law that the Commission acted in good faith. On the one hand, the jury **\*571** could reasonably infer that the Commission's representatives considered the facts and decided that the boat was at the correct well. On the other hand, the jury could also reasonably infer that, once Reed determined that the well visually matched the picture, he willfully ignored the discrepancies between the well data and the well itself in addition to the potential consequence of those discrepancies. Accordingly, we hold that a fact issue exists as to whether Gulf Energy's damages resulted from acts of the Commission that were conducted in a good-faith effort to carry out chapter 89.[18] Tex. Nat. Res. Code § 89.045.

[18]    At oral argument, Gulf Energy contended that, in postponing plugging the 708S–5, the Commission was attempting to conserve the cleanup fund established under Natural Resources Code chapter 81 and that the Commission thus was not carrying out chapter 89 (in good faith or otherwise) when it erroneously plugged that well. We disagree. When it plugged the 708S–5, the Commission was doing exactly what chapter 89 authorized it to do: plugging inactive wells whose operator was financially insolvent. *See* Tex. Nat. Res. Code § 89.043. To the extent this conduct resulted in damages, section 89.045's good-faith defense was triggered.

### 3. Waiver and Harm

Because a fact issue exists on the Commission's good faith, we may not render judgment in its favor. However, the Commission requested and was entitled to a jury question on this defense, and the trial court erred in failing to submit it. Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions ... which are raised by the written pleadings and the evidence.").

Gulf Energy argues the Commission waived any error relating to the trial court's refusal of its proposed good-faith question by failing to request a definition of good faith in conjunction with the question. We disagree. The procedural rules governing jury charges state in pertinent part that "[f]ailure to submit a question may not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." Tex. R. Civ. P. 278.[19] Generally, a question on a statutory cause of action or defense "should track the language of the provision as closely as possible." *Borneman v. Steak & Ale of Tex., Inc.,* 22 S.W.3d 411, 413 (Tex.2000) (citations and internal quotation marks omitted).

[19]    Although not pertinent here, the rule continues that an objection is sufficient to preserve error "if the question is one relied upon by the opposing party." Tex. R. Civ. P. 278.

Gulf Energy does not dispute that the Commission's proposed good-faith question generally tracked the pertinent statutory language. The Commission complied with Rule 278 and did not waive the trial court's error in refusing to submit that question by failing to request an accompanying extra-statutory definition. We are particularly loath to find waiver for failing to propose a definition of a statutory term when no case law provided explicit guidance on what the proper definition of that term should be.

Because the trial court's error was not waived, we must consider whether it is reversible. Tex. R. App. P. 61.1 (trial court's error is not reversible unless it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts"). Charge error "is generally considered harmful" and thus reversible "if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v.*

*Hawley,* 284 S.W.3d 851, 856 (Tex.2009). **\*572** The good-faith defense qualifies as such an issue, and the trial court committed reversible error in failing to submit it to the jury. Accordingly, we reverse the court of appeals' judgment.

## B. Contract Claim

### 1. Contract Formation

The Commission's remaining issues concern the jury's finding that the Commission breached its contract with Gulf Energy in light of the Commission's assertion that a binding contract did not exist when the breach occurred. The parties' specific dispute is whether Gulf Energy and the Commission entered into a binding contract on May 19, 2008—the date of the meeting between representatives of Gulf Energy, the Commission, and ACE—even though a formal written agreement was not signed by all parties until June 9. The Commission argues they did not, and that it could not have breached the contract by plugging the well on May 25 because no contract existed at that time. The Commission contends that a fact issue exists as to when the contract was formed and that the trial court erred in failing to submit that issue to the jury.

The court of appeals held that the Commission waived this complaint, concluding that the Commission "did not object at trial to question one [the breach-of-contract question] on the basis it complains of on appeal." 480 S.W.3d at 576. We disagree. Question one asked the jury: "Did the Railroad Commission fail to comply with its agreement to postpone plugging and abandoning the 708S–5?" At the charge conference, the Commission objected "to the failure to have a formation question with regard to the contract," arguing:

> With the way [the question] is submitted now, it will allow a breach of contract prior to the meeting of the minds, which is antithetical to the law of breach of contract because it is vague and because also question one, the way it is worded, does not tie in when the actual agreement was reached and when the breach may have occurred....

In the court of appeals, the Commission argued that the trial court "erred by instructing the jury that there was a legally binding contract between the Railroad Commission and Gulf Energy on May 19, 2008," and that the submitted question "erroneously assumes that the Railroad Commission entered into a legally-enforceable agreement to postpone plugging the

well on May 19, 2008." The Commission further argued that, assuming the parties entered into a valid contract, "it was not formed until June 9, so nobody breached the June 9 contract by plugging the well on May 26."

We agree with the Commission that its objection to the contract question and its argument in the court of appeals are similar in substance. The Commission contended both at the charge conference and on appeal that the May 19 agreement was not binding and that the issue of contract formation should have been submitted to the jury. The court of appeals erred in holding that the Commission waived its charge-error complaint on the contract question.

Turning to the merits, our analysis is governed by *Foreca, S.A. v. GRD Development Co.,* in which we addressed the "increasingly common [situation] in business negotiations" in which an "[a]greement was reached as to certain material terms, yet another formal document was contemplated by the parties." 758 S.W.2d 744, 745 (Tex.1988). We considered whether "the contemplated formal document [was] a condition precedent to **\*573** the formation of a contract or merely a memorial of an already enforceable contract."[20] *Id.* The answer depends on the intent of the parties, which is usually a question for the trier of fact. *Id.* at 746 (citing *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 557 (Tex.1972)). The documents evidencing the alleged agreement in *Foreca* stated that they were "subject to legal documentation contract to be drafted by [one party's attorney]." *Id.* at 745. We held that such language was not conclusive, that the evidence was disputed as to the parties' intent to be bound before "execution of the contemplated legal documentation," and that the issue was properly submitted to the jury. *Id.* at 746; *see also Martin v. Black,* 909 S.W.2d 192, 197 (Tex.App.–Houston [14th Dist.] 1995, writ denied) (holding that the parties' briefing on a motion to enforce a mediated settlement agreement "reflect[ed] a dispute on whether the parties intended the term sheets to be the 'final agreement merely memorialized by a formal document' ").

[20] This is a related but distinct issue from whether an agreement is not binding because it "leaves material matters open for future adjustment and agreement that never occur." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex.2000).

By contrast, in *Hardman v. Dault,* the court of appeals held as a matter of law that a memorandum outlining the essential terms of a mediated settlement was a binding contract as opposed to a tentative agreement to agree, even though

one of the provisions stated that "[f]inal documents [were] to be signed by" a particular date. 2 S.W.3d 378, 380–81 (Tex.App.–San Antonio 1999, no pet.). The court explained that the provision did not contain any "subject to" language or otherwise indicate that signing the subsequent documents was a condition precedent to the formation of an enforceable contract. *Id.* at 381.

In this case, the evidence is conflicting as to whether the Commission and Gulf Energy intended to be bound by the oral agreement reached at the May 19 meeting, or whether the formal Forbearance and Settlement Agreement subsequently signed by the parties was necessary for the formation of a binding contract. The following evidence is relevant to this issue:

• Sheila Weigand, a Commission employee who attended the meeting, testified that the Commission agreed in the meeting to postpone plugging four wells (including the 708S–5) to give Gulf Energy an opportunity to get approval from the ACE bankruptcy judge and to obtain an order from the Commission superseding the plugging order as to those wells. Ms. Weigand was then asked whether there would be any justification for the Commission to plug those wells "contrary to the agreement they just made," and she responded, "No."

• Lowell Williams, the supervisor of the enforcement section of the Commission's office of general counsel, also attended the meeting and ultimately signed the written agreement on the Commission's behalf. Mr. Williams testified: "I don't think anything had been agreed to in that meeting other than we would look at —the Railroad Commission being 'we'—would look at and try to determine whether or not it was possible that we could delay our operations and whether we wanted to delay our operations in proceeding to carry out the terms of the [plugging] order." Mr. Williams also testified that "there was some confusion" at the meeting "as to what particular wells" Gulf Energy wanted to take over and **\*574** that, when he left the meeting, he "didn't have a clear understanding of what wells were involved."

• In an e-mail exchange the day after the meeting among its participants, Hal Morris, an assistant attorney general in the bankruptcy division, wrote that the purpose of the e-mail was "to endeavor to memorialize our agreement reached yesterday." Included in the email was a "FIRST ROUGH DRAFT" of the agreement. Morris also stated in the e-mail that "[a]s time is of the essence, I am sending this to EVERYONE and thus must respectfully reserve the right for the [Commission], who has not previously been furnished this writing, with the ability to make suggested changes."

• ACE's attorney also sent an e-mail "to confirm the key terms of the settlement/compromise negotiated" between the Commission and ACE.

• Several drafts of the agreement were e-mailed in the days following the meeting, confirming among other things the particular wells that would not be plugged, the amount of the bond Gulf Energy would be required to post,[21] and the date by which Gulf Energy would post the bond. The e-mails reflect a dispute between the parties on the latter term, with the Commission ultimately agreeing to allow Gulf Energy to post the bond by the date of the hearing on Gulf Energy's motion to supersede the plugging order, rather than the date the motion was to be filed.

• In a May 23 e-mail, Morris wrote: "Understandably, until I have the [Commission's] sign off, I cannot finally approve the agreement but as you know from our previous communications over the past week, [ACE] and the [Commission] have indeed reached an agreement as has been memorialized in principle in numerous emails and we are now merely at producing final documentation to submit to [the bankruptcy judge]."

• The bankruptcy court signed an agreed order approving the settlement agreement "entered into on June 9, 2008." In a later opinion, the bankruptcy court stated that ACE and the Commission "entered into a settlement" on May 19, 2008. *In re Am. Coastal Energy, Inc.,* 399 B.R. 805, 808 (Bankr.S.D.Tex.2009).

• The legislative resolution waiving the Commission's immunity from suit stated that the parties "reached a tentative settlement and forbearance agreement" on May 19, "pending approval of the commission, attorney general, and bankruptcy court."

• Bill Rhea, Gulf Energy's CEO, was asked whether he had authority from the company's board of directors "to go forward with the project" on May 19. He testified that he "had authority to participate in that meeting and see what would come of the opportunity." As to whether he had authority "to say yes we're going to take over all of those wells in that project," Mr. Rhea testified that he "had the overall approval, but [he] had to go

back to the Board with specifics" and get the Board's approval "to say yes we are going to this deal." Later, Mr. Rhea testified inconsistently that, before going into the meeting, he "received authority **\*575** from the Board to make the agreement that [he] made that day."

- In a memorandum to Gulf Energy's board of directors prepared two days after the meeting, Mr. Rhea wrote that he "met Monday with ACE, the [Commission], and the State Attorney General's office in a bid to postpone further abandonment and allow for some time for [Gulf Energy] to assess the opportunity, undertake due diligence, and seek approval from the Company's Board to proceed."

21    Gulf Energy deposited $400,000 with the Commission as security when it applied to take over operation of the four wells. After discovering that the 708S–5 had been plugged, Gulf Energy sought and received a $100,000 refund from the Commission.

In light of this evidence, we agree with the Commission that whether the parties intended to be legally bound on May 19 is a disputed fact issue that should have been presented to the jury. Some portions of the e-mails and testimony described above support Gulf Energy's position that the formal Settlement and Forbearance Agreement was "merely a memorial of an already enforceable contract." *Foreca,* 758 S.W.2d at 745. Others support the Commission's position that the parties did not intend to be legally bound absent a negotiated formal document. *Id.* The question of the parties' intent to be bound is usually one of fact, and we cannot say that this case presents the unusual situation in which that question may be decided as a matter of law.

Accordingly, we hold that the trial court erred in resolving the contract-formation issue as a matter of law. Whether the Commission's conduct in plugging the well on May 25 constituted a breach of contract depends on whether the parties had entered into a binding contract at that time. *See David J. Sacks, PC v. Haden,* 266 S.W.3d 447, 450 (Tex.2008) ("A meeting of the minds is necessary to form a binding contract."). On remand, the Commission is entitled to have this disputed issue of material fact resolved by the jury.

**2. Application of Good–Faith Defense to Contract Claim**

Because we are remanding for a new trial, we address an additional dispute between the parties on the good-faith defense's application to Gulf Energy's contract claim. The Commission argues that, because section 89.045 protects the Commission from liability for *any* damages resulting from the Commission's good-faith efforts to carry out chapter 89, the defense is not limited to tort liability and limits Gulf Energy's ability to recover on the contract claim as well. Gulf Energy counters that good faith is irrelevant in a breach-of-contract context.[22]

22    Gulf Energy argues that the Commission failed to preserve section 89.045 as a defense to the contract claim because, in the trial court and court of appeals, the Commission pled and argued the statute only as a defense to the negligence claim. Because charge error necessitates a new trial on both claims, we address the issue of whether the defense applies to the contract claim to provide clarity to the parties and the trial court.

The Commission does not dispute that bad faith is not an element of a breach-of-contract claim and that a party generally may be liable for breach of contract regardless of whether the breach was intentional or inadvertent. However, section 89.045 does not tie the good-faith defense to a specific cause of action or category of claims. Rather, it applies broadly to "any damages" resulting from "acts done or omitted to be done by [the Commission] in a good-faith effort to carry out this chapter." Tex. Nat. Res. Code § 89.045. Had the Legislature intended to apply the defense to a particular claim or class of claims, it could have done so. Instead, the Legislature determined that the policies underlying chapter 89 —protection of Texas's water and land through the plugging **\*576** of abandoned wells—warranted a defense to liability for entities that are carrying out those policies in good faith. *See id.* §§ 89.001, .045. Limiting the defense's reach in the manner Gulf Energy suggests would require us to rewrite the statute. Accordingly, we hold that the good-faith defense is not limited to tort actions.

**III. Conclusion**

We hold that the trial court erred in (1) failing to submit a jury question on section 89.045's good-faith defense and (2) failing to submit a jury question on contract formation. We reverse the court of appeals' judgment and remand the case for a new trial.

**All Citations**

482 S.W.3d 559, 184 Oil & Gas Rep. 580, 59 Tex. Sup. Ct. J. 309

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

594 S.W.3d 524
Court of Appeals of Texas, El Paso.

Robert G. HOULE, Appellant,

v.

Jose Luis CASILLAS, Casco Investments Inc. and JLC Ventures, Inc., Appellees.

No. 08-17-00189-CV
|
September 24, 2019

**Synopsis**
**Background:** Investor sued renovator, and renovator brought counterclaims and third-party complaint against investor and related entities related to a real estate investment and renovation project that failed to pan out as planned. The 210th District Court, El Paso County, Alyssa G. Perez, J., granted investor's motion for summary judgment. Renovator appealed.

**Holdings:** The Court of Appeals, Palafox, J., held that:

renovator failed to preserve for review denial of summary judgment on his claim for wrongful foreclosure;

evidence existed to support renovator's claims for breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, unjust enrichment, breach of contract, and constructive fraud;

affidavit of renovator setting forth his understanding of agreement with investor was admissible;

renovator was qualified as lay witness to offer estimate of damages;

summary judgment was warranted on renovator's claim for fraud; and

renovator waived review of trial court's decision to strike third amended pleading.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment; Motion to Amend the Complaint; Motion to Strike Affidavit; Motion for New Trial.

 **\*532** Appeal from the 210th District Court of El Paso County, Texas (TC #2011-2614), The Honorable Alyssa G. Perez, Judge

**Attorneys and Law Firms**

ATTORNEY FOR APPELLANT, Robert E. Hedicke, P. O. Box 640175, El Paso, TX 79904-0175.

ATTORNEY FOR APPELLEES, David James Ellis, 4115 Trowbridge Dr, El Paso, TX 79903-1825.

Before Rodriguez, J., Palafox, J., and Larsen, J. (Senior Judge), Larsen, J. (Senior Judge), sitting by assignment

## OPINION

GINA M. PALAFOX, Justice

Appellant Robert G. Houle appeals from several different orders by the trial court which were not subject to review until after the court finally disposed of all claims. After Appellee Casco Investments, Inc. (Casco), filed suit against Appellant Houle, he returned fire by filing a variety of causes of action against Casco, and asserted those same claims by cross-claim against Casco's sole owner, Jose Luis Casillas (Casillas), and against JLC Ventures, Inc. (JLC Ventures), a second entity Casillas had also established. Ultimately, the trial court granted judgment in favor of Casillas, individually, and as a corporate representative of Casco and JLC Ventures (collectively, "Appellees"). The parties' suit against each other stemmed from difficulties that arose from a real estate investment and renovation project that failed to pan out as planned. For the reasons set forth below, we affirm in part, and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties' Agreement

Most of the facts regarding when and how the parties first entered into their business venture in the summer of 2009 are undisputed. At that time, Houle, an El Paso resident, and Casillas, a resident of Mexico, had known each other

for approximately 25 years. Houle was then married to Casillas' sister, Ana Casillas, although they were in the process of divorcing after 18 years of marriage. The venture began when Houle—who worked for a bank in El Paso and harbored an interest in owning **\*533** real estate—learned of a large, older home for sale in El Paso that had already been divided into apartment units. The property was located at 3901 Pershing (the "Pershing Property"). Eventually, Houle met with Casillas and the two orally agreed to purchase the property. The parties initially intended to renovate the building for resale, but soon they decided they would keep it instead and lease out the apartment units after they were renovated. Before purchasing, the parties inspected the building during which Houle informed Casillas that he believed renovations could be accomplished in three to four months, at a cost amounting somewhere between $40,000 and $50,000.

In general, the parties agreed that Casillas would provide financing for purchasing and renovating the property while Houle would apply his expertise in overseeing renovations; thereafter, once Casillas had been reimbursed for his initial investment, the parties would split profits equally regardless of whether profits arose from selling the property, or from rental income generated from leasing units. Houle further claims that the parties agreed he would be entitled to manage the property after renovations were completed.

In furtherance of their agreement, Houle suggested that they form a limited liability corporation (LLC) to purchase the Pershing Property with the entity to be known as the Pershing 3901 LLC ("the Pershing LLC").[1] At Houle's suggestion, Casillas formed a separate corporation to shield himself from personal liability, which he named Casco Investments, Inc.[2] Thereafter, Houle and Casco were named as the two sole members of the Pershing LLC. The parties orally agreed that Casillas, in his individual capacity, would fund the project by loaning $100,000 to the Pershing LLC to purchase the property, and he would loan additional monies thereafter to fund renovations as planned.

[1] The documents forming the LLC simply stated that the LLC was formed for any "lawful purpose[.]"

[2] Casco was formed on July 24, 2009, with Casillas as its president and only director. In turn, Casco, was wholly owned by another entity that Casillas had formed in Mexico as part of his farming business, along with his mother, known as Verduras Deliciosas.

On July 27, 2009, the Pershing LLC purchased the property for $100,000, and with Houle's agreement, Casillas took back a promissory note from the Pershing LLC, secured by a deed of trust on the property in the principal amount of $100,000 (the "original deed of trust"). The promissory note, which was dated July 27, 2009, named Casillas as lender and the Pershing LLC as borrower with the entire principal balance and all accrued unpaid interest being due and payable, in a lump sum, on or before July 31, 2010. The note indicated that the annual interest rate "shall be the daily Prime Interest Rate during the term of the Note, with interest calculated based on the Prime Interest Rate in effect for each day during the term of the loan." Prime Interest Rate is further defined as "the annual rate of interest identified as the 'prime rate' in the 'Money Rates' column published in the Wall Street Journal." After the note became due and payable, the interest rate would rise to 18 percent on matured, unpaid amounts.

**The Year-Long Renovation Project**

The renovations began shortly after the purchase and continued for a year, until July of 2010, with Houle overseeing the project. From time to time, Houle made purchases himself and paid renovation workers using a credit card in the LLC's **\*534** name, but he sought reimbursement for his expenses from Casillas. According to Houle, he submitted approximately 16 reimbursements totaling $45,030.25 in the first year of the renovations. Although Houle admitted that the project was not completed within the contemplated timeframe, he claimed that delays occurred because he ran into unexpected plumbing, draining, and electrical issues which caused renovations to require significantly longer time than he had initially estimated.

**The July 6, 2010 Memo**

On July 6, 2010, Casillas sent a detailed email to Houle outlining the parties' original agreement, i.e., to complete renovations in three to four months at cost expected to total $40,000. Casillas complained that Houle had not fulfilled his commitment given that a year had already passed, and the renovations remained incomplete despite Casillas having already spent around $40,000, or the total amount originally expected. Casillas accused Houle of making unilateral decisions, such as not hiring a general contractor, trying to do much of the work himself, and taking unauthorized "draws" in return for his work, despite the fact that there was no

agreement that Houle would be reimbursed for his services. He further complained that none of the apartments had been leased and that he had not yet received any return on his investment.[3]

[3] We note, however, that evidence was presented showing that at least one unit was being rented out at that time. Moreover, in Casco's original petition, it was alleged that three units had been leased out, two of which had been completely renovated, and one of which was apparently leased in its original condition. That pleading was verified by Casillas as president of Casco.

Expressing concern over the security of his investment, Casillas requested an accounting, an updated projected budget and repair schedule, and an addendum to the promissory note to increase the interest rate. Casillas expressed that if he felt more secure in his investment he would not mind if Houle kept "delaying the project in a reasonable manner." In addition, Casillas further expressed his opinion that the property belonged to him, repeatedly referring to the property as being "mine," unless and until he received a reimbursement for his investment.[4]

[4] At trial, Houle claimed that he hired laborers to perform work on the property, but he paid for their service by writing a check to himself, then cashed it, then paid cash to the laborer. Occasionally, he worked on the project himself. He further admitted that, although the parties never agreed to such, he did reimburse himself for some of the mileage that he had incurred in delivering parts to the project site, but claimed that he did not take any draws for the actual work that he did on the project.

The parties disagree over what occurred after the memo was sent. Houle claimed that he provided some of the requested information, including a partial proposed budget, but that Casillas refused to continue funding the renovations in July of 2010, and instead suggested that they have a meeting in September of that year. Houle recalled that the parties met, but apparently did not resolve the matter; he claims that he nevertheless did additional work on the project for which he was never compensated.

According to Casillas, however, Houle did not provide him with the requested information, and at their September 2010 meeting, Houle advised him that he no longer intended to work on the project, and thereafter refused to communicate with him; he therefore faulted Houle for breaching the agreement. Casillas recalled that he suggested they try to sell the **\*535** building at that time and split any profits they might receive after Casillas was reimbursed for his investment. Casillas claimed that Houle refused to cooperate as he did not believe Casillas would get his money back if the property was sold at that time.

**The Second Promissory Note and Deed of Trust**

Casillas thereafter contacted a law firm in El Paso (the "Gordon Law Firm"), to determine how best to protect his investment. At that point, the parties agree that Casillas had the right to foreclose on his original promissory note of $100,000. However, in order to protect his additional investment for sums he had advanced for renovations, the law firm drafted a promissory note that Casillas signed on November 15, 2010, to "memorialize" the advances that he had previously made to the Pershing LLC.[5] In addition, the law firm drafted a second deed of trust in which it identified the Pershing, LLC, as the "borrower," and Casillas as the "lender," stating that the amount owed to Casillas was $45,030.25. Marcelo Rivera, a member of the law firm, was designated as the trustee on the deed of trust. The deed stated that in order to secure payment of the obligation, the Pershing LLC, as grantor, conveyed the Pershing Property to the trustee (Rivera) in trust. The note further stated that if the Pershing LLC failed to perform any of its obligations, the lender had the right to declare any unpaid principal balance due and payable immediately, and to direct the trustee to foreclose the lien through a duly noticed foreclosure sale. The deed was dated November 15, 2010, and the maturity date was on that same date—in essence allowing Casillas to immediately start foreclosure proceedings on the deed. Casillas signed the document on December 6, 2010, in the capacity indicated as follows:

**PERSHING 3901, L.L.C.**

By: Casco Investments, Inc.

Its: Manager

BY: _____

Jose Luis Casillas, President

[5] The second deed of trust references the promissory note, but the promissory note itself does not appear to be in the record. Nevertheless, both parties agreed that a promissory note was in fact executed.

According to Houle, Casillas signed this second deed of trust, as well as the promissory note, without his knowledge or consent.

Shortly thereafter, on April 8, 2011, Casillas signed a substitute trustee instrument naming another member of the Gordon Law Firm, Salena Ayoub, as substitute trustee. Casillas signed the substitute trustee instrument in the same capacity as he did the deed of trust, i.e., in his capacity as president and/or manager on behalf of either Pershing LLC or Casco Investments, Inc., rather than in his individual capacity as the lender.

On April 9, 2011, Ayoub signed a Notice of Substitute Trustee's Sale, dated April 8, 2011, stating that pursuant to the default on the second deed of trust dated November 15, 2010, the Pershing Property would be sold on May 3, 2011 at any time beginning at 10 a.m., up to three hours later, in the El Paso County Courthouse. Houle acknowledges that he received actual notice of the foreclosure sale from Casillas on or about March 14, 2011. Houle claims he sought a temporary restraining order (TRO) to prevent the foreclosure sale from going through, but after a hearing on April 8, 2011, his request was denied.[6]

6    We note that the appellate record does not contain any documents pertaining to the TRO proceedings.

 **\*536**  On May 3, 2011, Ayoub signed a substitute trustee's deed, stating that the foreclosure sale took place on that same day at 11:55 a.m. in the designated area of the courthouse, for a sale price of $50,000, and that the buyer was "JLC Ventures, Inc.," with an address of 833 River Oaks Drive in El Paso Texas, the same address that Casillas used as his address as the "lender" in the second deed of trust. However, as Houle points out, and Casillas admits, JLC Ventures had not yet been formed; instead, at that time, the Gordon Law Firm was in the process of forming the corporation as the entity to hold title to the Pershing Property upon foreclosure. In addition, Houle claimed that he was at the courthouse at the appointed time, but did not observe a sale take place, and alleges that the sale was therefore a "fiction."

**The Parties' Pleadings**

On June 29, 2011, Casco, the corporate entity wholly owned by Casillas, filed suit against Houle in his individual capacity. Casco alleged Houle had breached his fiduciary duties owed to Casco and to the Pershing LLC, had engaged in wrongful, fraudulent, and unauthorized conduct, and had impaired Casco with abusive self-dealing. In addition to damages, Casco sought a declaratory judgment, inspection of corporate books and records, and an accounting, among his many claims. Casco further asserted that it intended to wind up the Pershing LLC.

On September 22, 2011, Houle filed a denial of Casco's claims along with a combined counterclaim against Casco and third-party complaint against Casillas and JLC Ventures. Seeking affirmative relief, Houle asserted a variety of claims to include breach of contract, breach of fiduciary duty, and trespass. In addition to damages, Houle sought a constructive trust over the subject property, an accounting of income and expenses, a partition of the property, and an award of quantum meruit for the reasonable value of his unpaid labor. Thereafter, on November 15, 2013, Houle filed a first amended counterclaim and third-party petition, in which he reasserted his original claims and added claims for "money had and received," for "conversion," and for a "violation of Texas Business Organizations Code" arising from unilateral actions by Casillas, Casco, and/or JLC Ventures, in procuring the second deed of trust used to foreclose on the property. After he obtained a new attorney, Houle then filed a second amended counterclaim and third-party petition on April 19, 2016, which remained the live pleading of Houle's claims against Appellees.

In his live pleading, Houle incorporated by reference paragraphs 5 through 76 of his first amended pleading relating to his denial of Casco's allegations and his affirmative defenses. The second amended pleading alleged that Casillas and Houle were partners, and that Casillas—both in his individual capacity and as president of Casco—owed him a fiduciary duty and duty of good faith and fair dealing. Houle alleged that these duties were violated when Casillas ceased advancing funds to him and when Casillas obtained the second deed of trust without notice to him, leading to what Houle labelled as the "fraudulent" and "completely fictitious" foreclosure sale of the property. Houle further alleged that Casillas controlled both Casco and JLC Ventures, and that he used those entities "to perpetrate fraud and engage in unjust enrichment." Although Houle's second amended pleading is somewhat vague about which causes of action are asserted, when construed liberally Houle appears to allege a claim for breach of contract, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, fraud, and unjust enrichment.

**\*537**  Houle claimed that he was damaged as a result of the allegedly tortious and fraudulent conduct of Casillas "and his corporate entities," citing his loss of time, labor and "business opportunity." He asked for an accounting of "all receipts, expenses, and profits concerning the Property since 2010," and asked the trial court to "award the past receipt[s] and profits" from the property to Houle as damages, together with attorney's fees and punitive damages for the alleged fraud. And finally, Houle asked the court for a "Declaratory Judgment declaring the rights of the parties and imposing a constructive trust [on the subject property,] if necessary[,] and for such other and further relief as to which Houle shall show himself justly entitled."

### The Parties' Motions for Summary Judgment

Houle filed a motion for partial summary judgment (albeit on a request for relief not set forth in his second amended pleading), asking that the trial court "set aside" the foreclosure sale of the property based on his allegation that the purported conveyance was "fatally defective." He argued that the substitute trustee (Ayoub) had not been properly appointed given that Casillas had made the appointment in his capacity as president/manager of Casco rather than as the original lender of the outstanding debt.[7] Following a hearing held on July 29, 2016, the trial court denied Houle's motion by written order signed on August 5, 2016, without elaboration.[8]

[7]    As explained below, Houle filed a third amended pleading months later in which he requested that the foreclosure sale be set aside, but the trial court ultimately struck that pleading.

[8]    The reporter's record of this hearing is not included in the appellate record.

Thereafter, Casillas, as a third-party defendant, filed his first motion for summary judgment, as both a no-evidence and traditional motion, arguing that Houle had no evidence to support any of his causes of action, challenging all elements of Houle's claims, and arguing that Houle owed no fiduciary duties to Houle as a matter of law. In his motion, Casillas identified five causes of action that Houle had alleged in his live pleading as follows: (1) fraud; (2) unjust enrichment; (3) breach of contract; (4) breach of fiduciary duty; and (5) breach of the implied covenant of good faith and fair dealing.[9] Casillas also requested that the court sever Houle's claims and causes of action against him from the balance of the case, to create a final and appealable order in the event the court granted Casillas' motion.

[9]    In his motion, Casillas also stated that Houle had alleged a sixth cause of action, i.e., "criminal enterprise." However, it does not appear that Houle ever raised that claim in any of his pleadings, and he does not address that claim on appeal. Moreover, in response to Casillas' first motion for summary judgment, Houle expressly stated that he did not intend to raise a claim of "criminal enterprise," but that he did intend to raise a civil RICO claim as the result of "the wire fraud (use of the internet and email) and mail fraud (sending notices of acceleration and foreclosure through the mails) and the existence of a criminal enterprise (CASCO INVESTMENTS, INC.) which is used to perpetrate those frauds." Houle, however, never actually alleged a RICO claim in any of his pleadings, and also fails to discuss any purported RICO claim on appeal.

Houle filed his response to Casillas' motion in which he attached as evidence (1) the memo of July 6, 2010; and (2) his own affidavit. Houle asserted that a partnership had been formed between himself and Casillas which gave rise to fiduciary duties owed to each other. Houle asserted that Casillas had breached their agreement, had engaged in a fraudulent course of **\*538**  conduct in foreclosing on the Pershing Property, and had been unduly enriched by taking sole control of the property without any compensation to Houle. After a hearing, the trial court granted Casillas' motion in part, dismissing Houle's claims for unjust enrichment and for breach of fiduciary duty and the implied covenant of good faith and fair dealing; but allowed Houle's breach of contract and fraud claims to proceed to trial.[10]

[10]    At the hearing on Casillas' motion, Casillas orally objected to Houle's affidavit, alleging that it was not competent evidence, that it consisted solely of hearsay and unsupported opinions. However, it does not appear that the trial court ruled on that objection.

### The Recusal and Mistrial

The matter then went to trial on Houle's two remaining claims on February 21, 2017. After hearing testimony from several witnesses, including Houle and Casillas, Houle's attorney made a motion to recuse the trial court contending that the court had exhibited "bias" throughout the proceedings. After a conference held off the record, the trial court granted Houle's

motion to recuse and his motion for a mistrial. On February 22, 2017, the trial court issued a written order of recusal and the matter was assigned to a new judge.

**Casillas' Second Motion for Summary Judgment**

Shortly thereafter, on March 15, 2017, Casillas filed his second motion for summary judgment, seeking dismissal of Houle's two remaining claims for breach of contract and fraud. In the motion, Casillas challenged all elements of Houle's fraud claim, arguing that Houle had no evidence to establish that Casillas had made a material and false representation upon which he intended for Houle to rely. In addition, Casillas also contended that Houle had no evidence to establish that he was "injured or damaged" as a result of Casillas' allegedly fraudulent conduct. With regard to the breach of contract claim, Casillas challenged only the element of damages, claiming that the parties had agreed to sell the property following the renovations, and that the undisputed evidence demonstrated that the property was now worth less than the amount that Casillas was owed.

Houle responded to the motion attaching a more detailed affidavit setting forth how he believed he was damaged, primarily arguing that the parties did not agree to sell the property, and that instead, they had agreed to keep the property, lease out the apartment units, then split the profits from the rental income; further, Houle averred that the parties had agreed that he would serve as property manager at that time, thereby characterizing his damages as primarily being the loss of a business opportunity. In addition, he claimed that he had been damaged by the fact that he was not compensated for the work that he performed during the year-long renovation project. In his affidavit, he provided a detailed assessment of what he believed the units in the apartment would have rented for, the amount of money he would have received for managing the property, and provided his estimate of the value of the work he performed on behalf of the alleged partnership. He also attached a spreadsheet describing the work that had been performed on the project.

**Casillas' Objections to Houle's Second Affidavit**

On April 26, 2017, Casillas filed objections to Houle's second affidavit, and its attachments, arguing in general, that Houle was an "interested witness," and that his affidavit did not provide testimony that was "clear, positive, direct, credible, free from contradiction, and uncontroverted," **\*539** as required by Tex. R. Civ. P. 166a(c). On May 17, 2017, Casillas filed more detailed objections to Houle's affidavit, objecting with more particularity to each paragraph in the affidavit, raising various objections to the affidavit, including hearsay objections, objections based on the statute of frauds, objections based on Houle's reference to documents not attached to the affidavit, objections to statements considered to be uncorroborated and self-serving "opinions" and/or impermissible "legal conclusions."

After a hearing, the trial court issued two orders with both dated May 30, 2017. First, the court issued evidentiary rulings granting and denying a variety of objections raised against Houle's affidavit. Second, the trial court granted Casillas' second motion for summary judgment dismissing Houle's two remaining causes of action filed against Casillas, individually, and in his representative capacity for Casco and JLC Ventures.

**Houle's Motion for New Trial**

On June 28, 2017, Houle filed a motion for new trial, urging the trial court to reconsider its order granting Casillas' objections to his affidavit; the two orders granting Casillas' motions for summary judgment, and the trial court's earlier order denying Houle's motion for partial summary judgment. In support of his motion, Houle attached his response to Casillas' requests for disclosure, in which he had identified himself as an expert witness who would testify as to the "value of the real estate in issue in this case, knowledge of business procedures, and valuation of damages," together with his resume. The trial court held a hearing on Houle's motion for new trial on July 19, 2017, and at the close of the hearing denied the motion. Thereafter, the trial court granted Casillas' motion for non-suit, dismissing its claims against Houle, thereby leaving no claims pending in the trial court. This appeal followed.

**DISCUSSION**

On appeal, Houle argues that the trial court erred by denying his motion for partial summary judgment, and by granting two motions for summary judgment asserted by Casillas, individually, and in his representative capacity on behalf of Casco and JLC Ventures (collectively, Appellees). As well, Houle argues that the trial court erred by granting Casillas' objections to his second summary judgment affidavit, and by

striking a third amended pleading that he attempted to file after the mistrial was declared.

For clarity, we will number each argument then address each in turn. As a preliminary matter, we first discuss the state of the parties briefing of this appeal.

### BRIEFING ISSUES

Initially, Houle's opening brief included inadequate citations to the record and few citations, if any, to legal authorities relied on in support of his positions. Citing to Texas Rule of Appellate Procedure 38.1, the responsive brief filed by Appellees Casillas, Casco, and JLC Ventures, collectively, argued almost exclusively that Houle had waived error, if any, wholly based on inadequate briefing.[11] In reply, Houle requested permission to file an amended **\*540** brief, which he attached with his request. Appellees argued in response that the amended brief continued to violate Rule 38.1, and, in any event, it would be unfair to allow Houle to file his amended brief as Appellees had based their own argument on briefing waiver. Over Appellees' objection, we granted Houle permission to file his Amended Appellant's Brief on July 6, 2018. We note here that Appellees never sought permission to file their own amended response to address the merits of Houle's arguments, nor did they ask for a reconsideration of our decision allowing amended briefing by Houle. Accordingly, we proceed with our discussion without benefit of a response on the merits from Appellees.

11    Rule 38.1(g) provides that: "The brief must state concisely and without argument the facts pertinent to the issues or points presented. In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references." Tex. R. App. P. 38.1(g). In addition, Rule 38.1(i) provides that: "The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i).

### ISSUE ONE: THE DENIAL OF HOULE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On appeal, Houle argues first that the trial court erred in denying his motion for partial summary judgment voiding the substitute trustee's deed. Houle asserts that Ayoub's appointment as substitute trustee was unlawful and the

foreclosure sale itself was "fatally defective." Rather than address the merits of these arguments, Appellees contend that the denial of Houle's motion is not reviewable on appeal given that Houle had failed to seek a final judgment in his motion for partial summary judgment. We agree with Appellees.

Under Texas law, a cause of action for wrongful foreclosure has three elements: "(1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price." *See Sauceda v. GMAC Mortgage Corp.*, 268 S.W.3d 135, 139 (Tex. App.—Corpus Christi 2008, no pet.); *see also University Sav. Ass'n v. Springwoods Shopping Ctr.*, 644 S.W.2d 705, 706 (Tex. 1982) (a plaintiff seeking damages for wrongful foreclosure must show that (1) there was an irregularity in the foreclosure sale and (2) the irregularity caused the plaintiff damages); *Sotelo v. Interstate Financial Corp.*, 224 S.W.3d 517, 523 (Tex. App.—El Paso 2007, no pet.) ("The elements of wrongful foreclosure are (1) an irregularity at the sale; and (2) the irregularity contributed to an inadequate price."). "The purpose of a wrongful foreclosure action is to protect mortgagors against those sales where, through mistake, fraud, or unfairness, the sale results in an inequitably low price." *In re Keener*, 268 B.R. 912, 921 (Bankr. N.D. Tex. 2001). To void a foreclosure sale, there must be both grossly inadequate consideration, and evidence that there was an irregularity in the sale that contributed to the inadequate sale price. *Am. Sav. & Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581, 587 (Tex. 1975). An individual who has been dispossessed of property through a wrongful foreclosure may request that the sale be set aside, or in the alternative, seek damages equal to the difference between the value of the property and the indebtedness. *See Pinnacle Premier Prop., Inc. v. Breton*, 447 S.W.3d 558, 565 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Wells Fargo Bank, N.A. v. Robinson*, 391 S.W.3d 590, 593–94 (Tex. App.—Dallas 2012, no pet.); *see also University Savings Ass'n*, 644 S.W.2d at 706; *UMLIC VP LLC v. T & M Sales and Envtl. Sys., Inc.*, 176 S.W.3d 595, 610 (Tex. App.—Corpus Christi 2005, pet. denied) (citing *Univ. Sav. Ass'n*, 644 S.W.2d at 706) (failure to properly foreclose on property gives rise to a cause of action for either the return of the property or damages).

Here, Houle's petition neither raises a claim for wrongful foreclosure, expressly nor impliedly, nor does he seek the **\*541** remedy of setting aside the foreclosure sale. Unlike his motion, his petition does not allege irregularities either in Ayoub's appointment or in the foreclosure sale itself. Moreover, Houle did not ask that the foreclosure sale be set

aside. Instead, it appears that Houle first raised a complaint about Ayoub's appointment in his motion for partial summary judgment. Even in his motion, however, Houle does not explain how Ayoub's appointment—whether improper or not —resulted in an inadequate selling price. This failure is significant in several respects.

By the very nature of a summary judgment proceeding, a plaintiff may only move for summary judgment on a cause of action that has been actually pleaded. *See* Tex. R. Civ. P. 166a(a) ("A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof."); *see generally Cullins v. Foster*, 171 S.W.3d 521, 530 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (recognizing that a plaintiff moving for summary judgment must conclusively prove all essential elements of its claim) (citing *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986); *see Geiselman v. Cramer Fin. Group, Inc.*, 965 S.W.2d 532, 535 (Tex. App.—Houston [14th Dist.] 1997, no writ)). Moreover, it is fundamental that the motion for summary judgment must be supported by the pleadings on file, and the final judgment of the court must conform to those pleadings. *See, e.g.*, 68 Tex. Jur. 3d Summary Judgment § 60 n.4 (citing *Galtex Property Investors, Inc. v. City of Galveston*, 113 S.W.3d 922 (Tex. App.—Houston 14th Dist. 2003, no pet.); *Elite Towing, Inc. v. LSI Financial Group*, 985 S.W.2d 635 (Tex. App.— Austin 1999, no pet.)). Therefore, a trial court's order denying a motion for summary judgment on a claim that was not raised by the pleadings in effect leaves nothing for this court to review. *See generally Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 871–72 (Tex. App.—San Antonio 1997, no writ) (where even the most liberal reading of the plaintiff's petition supports the conclusion that he has never asserted a claim for breach of contract, irrespective of the partial summary judgment granted on that basis, thus, any complaint on appeal with regard to contractual breaches is inappropriate, and presents nothing for review on appeal).

Moreover, as Appellees point out, the denial of a motion for summary judgment is not typically considered reviewable as it is not considered a final judgment. *See, e.g., Cincinnati Life Ins. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996) (citing *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex. 1980)). The only exception to this rule is when the parties have filed competing and/or cross-motions seeking summary judgment, and the trial court grants one and denies the other; in that

instance, an appellate court may review both motions and render the judgment the trial court should have rendered. *See, e.g., Holmes v. Morales*, 924 S.W.2d 920, 922 (Tex. 1996) (citing *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988) (recognizing that when both parties move for summary judgment, the non-prevailing party may appeal both the prevailing party's motion as well as its own)); *see also Southern Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013) (when both parties move for summary judgment and the trial court grants one motion and denies the other, an appellate court reviews both sides' summary judgment evidence and renders the judgment the trial court should have rendered); **\*542** *Lopez-Franco v. Hernandez*, 351 S.W.3d 387, 391 (Tex. App.—El Paso 2011, pet denied) (when both sides move for summary judgment and the trial court grants one motion and denies the other, the court of appeals reviews the summary judgment proof presented by both sides and determines all questions presented). Moreover, an appellate court must review all of the summary judgment grounds on which the trial court actually ruled, whether granted or denied, which are dispositive of the appeal regardless of whether the competing motions were filed at the same time. *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 5–6 (Tex. 1999).

Nevertheless, as Appellees point out, various courts have held that in order for this exception to apply both parties must have sought a *final* judgment in their competing or cross-motions for summary judgment, and the filing of a motion for partial summary judgment does not bring the case within the scope of the exception. *See Fair v. Arp Club Lake, Inc.*, 437 S.W.3d 619, 628 (Tex. App.—Tyler 2014, no pet.) (where appellant's cross-motion for partial summary judgment did not seek a final judgment, its denial was not reviewable) (citing *In re D.W.G.*, 391 S.W.3d 154, 164 (Tex. App.—San Antonio 2012, no pet.)); *see also Cowboy's Retail & Wholesale Beverage Distribution, LLC v. Davis*, No. 12-14-00085-CV, 2015 WL 6165884, at \*3 (Tex. App.—Tyler Oct. 21, 2015, pet. denied) (mem. op.) (the denial of a cross-motion for summary judgment is reviewable only if that cross-motion sought a disposition of all claims in the trial court); *Shaw v. Shaw*, 835 S.W.2d 232, 235 (Tex. App.—Waco 1992, writ denied) (although the partial summary judgment was merged into the final judgment and became appealable at that time, the denial of appellant's motion for a partial summary judgment was interlocutory and not appealable). Moreover, the parties must have filed competing motions for summary judgment on the same issue for the exception to apply. *See generally CU Lloyd's of Texas v. Feldman*, 977 S.W.2d 568, 569 (Tex.

1998) (in order to come under the exception to the general rule that the denial of a motion for summary judgment is not appealable, both parties must have sought final judgment relief in cross-motions for summary judgment or moved for summary judgment on the same issue) (citing *Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 889-90 (Tex. 1990)).

Here, Casillas did not file a competing motion for summary judgment with respect to a claim of wrongful foreclosure, as Houle never raised such a claim in his pleadings. Instead, Casillas moved for final summary judgment listing five causes of action he believed Houle had raised in his live pleadings, and his motion did not include wrongful foreclosure among the causes of action that he challenged. In his response, Houle did not correct Casillas' assertion and appeared to acquiesce to Casillas' characterization of claims asserted. More importantly, the trial court's two orders addressing Casillas' motions for summary judgment, taken together, only addressed the five claims discussed in Casillas' motions, and the trial court therefore never rendered judgment on any claim for wrongful foreclosure. Therefore, we conclude that a claim of wrongful foreclosure was not properly before the Court.[12] Issue One is overruled.

[12]    We recognize that Houle did request that the foreclosure sale be set aside in his third amended pleading; however, the trial court later struck this pleading. Thus, the trial court did not consider Houle's third amended counter-claim at the time it considered his motion for partial summary judgment, and on appeal, our review of the court's ruling is limited to only what was before the trial court at the time it made its ruling. *See generally Felhaber v. Pieper*, No. 08-02-00351-CV, 2003 WL 22015551, at *3 (Tex. App.—El Paso Aug. 26, 2003, no pet.) (mem. op.) (in considering a motion for summary judgment, a trial court may consider only the evidence on file at the time of the hearing or filed thereafter and before judgment with permission of the court) (citing Tex. R. Civ. P. 166a(c); *Leinen v. Buffington's Bayou City Service Co.*, 824 S.W.2d 682, 685 (Tex. App.—Houston [14th Dist.] 1992, no writ)).

**\*543    ISSUE TWO: THE GRANTING OF APPELLEES' FIRST MOTION FOR SUMMARY JUDGMENT**

In Issue Two, Houle contends that the trial court erred in granting summary judgment on his three claims for unjust enrichment, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. In their brief, Appellees devote two sentences in responding to Houle's arguments. First, Appellees state in a single sentence that Houle "failed to produce more than a scintilla of evidence as to unjust enrichment, breach of fiduciary duty and criminal enterprise." And second, Appellees argue that the trial court properly granted summary judgment as there is no tort involving an implied covenant of good faith and fair dealing.

**Standard of Review**

On appeal, we review a trial court's order granting both no-evidence and traditional motions for summary judgment *de novo. See Border Demolition & Envtl., Inc. v. Pineda*, 535 S.W.3d 140, 151 (Tex. App.—El Paso 2017, no pet.) (citing *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)); *see also Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When, as here, a party has moved for summary judgment on both no-evidence and traditional grounds, we first review the no-evidence grounds. *See Cmty. Health Sys. Prof'l Services Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017); *Lightning Oil Co. v. Anadarko E & P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). If we conclude that the trial court properly granted the no-evidence summary judgment motion, we need not address the traditional motion to the extent that it addresses the same claims. *See Lightning Oil Co.*, 520 S.W.3d at 45 (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)).

No-evidence motions for summary judgment are governed by Rule 166a(i) of the Texas Rules of Civil Procedure, which requires a movant to allege that adequate time for discovery has passed and that the non-movant still has no evidence to support one or more essential elements of a claim for which the non-movant would bear the burden of proof at trial. *See Stierwalt v. FFE Transp. Services, Inc.*, 499 S.W.3d 181, 194 (Tex. App.—El Paso 2016, no pet.) (citing *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015)); Tex. R. Civ. P. 166a(i). The motion must specifically state the elements as to which the movant contends there is no evidence. Tex. R. Civ. P. 166a(i); *see also Timpte Industries, Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Wade Oil & Gas, Inc. v. Telesis Operating Company, Inc.*, 417 S.W.3d 531, 540 (Tex. App.—El Paso 2013, no pet.). The burden thereafter shifts to the non-movant to produce at least a scintilla of evidence to raise a genuine issue of material fact regarding each challenged element. Tex. R. Civ. P. 166a(i); *see also Lightning Oil Co.*,

520 S.W.3d at 45; *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *Wade Oil & Gas*, 417 S.W.3d at 540. More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. **\*544** *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Although the nonmoving party is not required to marshal all of his proof in response to a summary judgment motion, he must present countervailing evidence that raises a genuine fact issue on the challenged elements. *Duchene v. Hernandez*, 535 S.W.3d 251, 258 (Tex. App.—El Paso 2017, no pet.) (citing *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing Tex. R. Civ. P. 166a)). The non-movant fails in their burden of creating a fact issue when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas*, 417 S.W.3d at 540; *see also Lozano v. Lozano*, 52 S.W.3d 141, 145 (Tex. 2001); *see also Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

The movant for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the challenged cause of action. *Lightning Oil Co.*, 520 S.W.3d at 45 (citing Tex. R. Civ. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). If the initial burden is met, the burden then shifts to the non-movant to raise an issue of fact, and in order to do so, the non-movant must come forward with more than a scintilla of evidence. *Amedisys, Inc.*, 437 S.W.3d at 511; *see also Chance v. Elliot & Lillian, LLC*, 462 S.W.3d 276, 283 (Tex. App.—El Paso 2015, no pet.); *Ciguero v. Lara*, 455 S.W.3d 744, 747 (Tex. App.—El Paso 2015, no pet.). If the initial burden is not satisfied, the non-movant need not respond or present any evidence. *See Amedisys, Inc.*, 437 S.W.3d at 511; *see also State v. Ninety Thousand Two Hundred Thirty–Five Dollars and No Cents in U.S. Currency ($90,235)*, 390 S.W.3d 289, 292 (Tex. 2013) (citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam)).

In reviewing the granting of a traditional or a no-evidence motion for summary judgment, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Pineda*, 535 S.W.3d at 151 (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)); *see also Lightning Oil Co.*, 520 S.W.3d at 45. We further indulge

every reasonable inference in favor of the non-movant and resolve any doubts against the motion. *Lightning Oil Co.*, 520 S.W.3d at 45 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)). If the trial court's order does not specify the grounds on which the summary judgment was granted, "we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *see also FM Properties Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex. 2000) (citing *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995)).

**A. Houle's Claims For Breach of Fiduciary Duty and the Implied Covenant of Good Faith and Fair Dealing**

We first note that under Texas law not all contracts contain an implied covenant of good faith and fair dealing. *Saucedo v. Horner*, 329 S.W.3d 825, 831–32 (Tex. App.—El Paso 2010, no pet.) (citing *City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000)); *see also English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983) (expressly rejecting the inclusion of a general implied covenant of good faith and fair **\*545** dealing in Texas contracts). Nonetheless, it is recognized that the duty of "good faith and fair dealing" is one of many duties that fiduciaries owe to each other. *Saucedo*, 329 S.W.3d at 831–32 (citing *City of Midland*, 18 S.W.3d at 215); *see generally Fred Loya Ins. Agency, Inc. v. Cohen*, 446 S.W.3d 913, 919 (Tex. App.—El Paso 2014, pet. denied) (citing *Vogt v. Warnock*, 107 S.W.3d 778, 782 (Tex. App.—El Paso 2003, pet. denied) (in general, a fiduciary owes his principal a high duty of good faith, fair dealing, honest performance, and strict accountability)). Therefore, we combine our discussion of Houle's claim for breach of fiduciary duty and his claim of breach of the implied covenant of good faith and fair dealing, as both involve a threshold question of whether Casillas did in fact owe a fiduciary duty to Houle. *See, e.g., First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) (the elements of a claim for breach of fiduciary duty are: "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages").

In his response to Casillas' motion for summary judgment, Houle argued that he and Casillas were in a partnership, albeit an informal one, to purchase and renovate the Pershing Property, and that under Texas law, partners owe each other a fiduciary duty. In support of his argument, Houle attached a copy of the July 6, 2010 memo from Casillas, which

chronicled the history of the parties' agreement and their relationship.[13] In addition, Houle submitted his own affidavit asserting facts about the parties' agreement and intended partnership.[14] In his affidavit, Houle averred that he and Casillas had orally agreed to a partnership for the purpose of purchasing and renovating the Pershing Property, and they further agreed they would form the Pershing LLC to effectuate their agreement and partnership.

[13]  Houle alternatively argued that this same fiduciary relationship and duty to each other would still be owed even if the court labeled the parties' agreement as a "joint venture" rather than a partnership. Finding sufficient evidence of a partnership, we need not address this alternative argument.

[14]  At the hearing on Casillas' motion, Casillas orally objected to Houle's affidavit, alleging it was not competent evidence because it consisted solely of hearsay and personal opinions without supporting evidence. However, it does not appear that the trial court ruled on Casillas' objection, and in any event, much of what Houle averred in his affidavit regarding the parties' agreement was confirmed by the July 6, 2010 memo that Houle attached to his response.

At a hearing held on January 20, 2017, Casillas argued there was no evidence of a partnership or other relationship that would give rise to any such duties, arguing that any such partnership was required to be in writing. In addition, Casillas pointed out that the parties had formed an LLC, which it argued had taken the place of any pre-existing partnership, and he argued that members of an LLC do not owe each other any fiduciary duties.

### *Fiduciary Duties Owed in Partnership Relationships*

As a preliminary matter, we note that most informal relationships, such as friendships or even familial relationships, will not necessarily give rise to any special relationship that imposes fiduciary duties on the parties. *Jones v. Thompson*, 338 S.W.3d 573, 583–84 (Tex. App.—El Paso 2010, pet. denied) (mere subjective trust resulting from an informal and confidential relationship does not create a fiduciary relationship) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) (Texas courts are reluctant to recognize informal fiduciary relationships)). Nor does a fiduciary relationship **\*546** exist in an ordinary lender-borrower relationship. *Id.* (citing *Wil–Roye Inv. Co. II*

*v. Washington Mut. Bank, FA*, 142 S.W.3d 393 (Tex. App.—El Paso 2004, no pet.); *Manufacturers' Hanover Trust Co. v. Kingston Investors Corp.*, 819 S.W.2d 607, 610 (Tex. App.—Houston [1st Dist.] 1991, no writ)).

However, the Texas Supreme Court has recognized that in certain formal relationships, including partnerships, a fiduciary duty arises as a matter of law. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Bohatch v. Butler & Binion*, 977 S.W.2d 543, 545 (Tex. 1998). As the Court explained, "[t]he relationship between ... partners ... is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise." *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 264 (1951) (quotation omitted); *Bohatch*, 977 S.W.2d at 545; *see also Home Comfortable Supplies, Inc. v. Cooper*, 544 S.W.3d 899, 907 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (partners share "the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise").

It is less clear, however, whether members of an LLC owe each other a fiduciary duty. Chapter 101 of the Texas Business Organizations Code, also known as the Limited Liability Act, which establishes the existence of LLCs, is silent on whether such a duty is imposed, and at least one of our sister courts has held that the Act does not itself impose a fiduciary duty upon members of an LLC, and that it would be improper to impose such a duty as a matter of law. *Suntech Processing Sys., L.L.C. v. Sun Communications, Inc.*, No. 05-99-00213-CV, 2000 WL 1780236, at \*6–7 (Tex. App.—Dallas December 5, 2000, pet. denied). By analogizing LLCs to closely-held corporations, *Suntech* concluded that such a duty may nevertheless arise between members based, at least in part, in situations in which the members are in "unequal" positions of power, such as when one member exercises superior control over the LLC. *Id.*, at \*6–7. In that instance, the court held that the existence of a fiduciary relationship is a fact question. *Id.*; *see also Kaspar v. Thorne*, 755 S.W.2d 151, 155 (Tex. App.—Dallas 1988) (recognizing that except in limited circumstances, the existence of a fiduciary relationship is a fact question); *see generally In re Lau*, 2013 WL 5935616, at 27 (Bankr. E.D. Tex. 2013) (noting that Chapter 101 of the Texas Business Organizations Code does not directly address duties owed by LLC managers and members but implies that certain duties may be owed and allows contracting parties to address duties

in their LLC agreement).[15] Nevertheless, we note that Houle does not appear to be arguing that Casillas owed him a duty as a fellow member of the LLC, and instead, appears to find the fiduciary relationship in a pre-existing, albeit oral and informal partnership, which he claims was formed when he and Casillas entered into their agreement to purchase and renovate the Pershing Property, and that they formed the LLC simply as a means of effectuating their **\*547** pre-existing partnership. And to this extent, we agree with this argument.

[15]     For example, section 101.401 of the Texas Business Organizations Code provides that a "company agreement of a limited liability company may expand or restrict any duties, including fiduciary duties, and related liabilities that a member, manager, officer, or other person has to the company or to a member or manager of the company[,]" thereby also suggesting the existence of a fiduciary duty between members. Tex. Bus. Orgs. Code Ann. § 101.401.

The fact that the parties agreed to form an LLC to effectuate their agreement does not preclude the possibility that the parties already had a pre-existing—and continuing—partnership. In this regard, the present case is similar to the facts set forth in *Cielo Vista Bank v. McCutcheon*, 719 S.W.2d 658 (Tex. App.—El Paso 1986, writ ref'd n.r.e.). In *McCutcheon*, two businessmen agreed to open an automobile dealership and to share the profits. *Id.* at 661. The two men then formed a corporation for the purpose of buying a piece of property on which to establish the car lot. *Id.* at 659. From that point on, we concluded that the two businessmen were either "partners or incorporators," which in turn created a fiduciary relationship, and therefore, they owed "each other the duty of utmost good faith." *Id.* at 660-61. We noted that trust amongst businessmen will not establish a fiduciary relationship, but the "agreement to purchase and the eventual purchase of the property were within the scope of the duties arising from the prior relationship," and that this agreement was sufficient to create a fiduciary duty between the two men. *Id.* at 661 (citing *Winchester Oil Company v. Glass*, 683 S.W.2d 35, 39 (Tex. App.—Texarkana 1984, no writ)). As in *McCutcheon*, the relationship at issue here, between Houle and Casillas, predates the creation of the LLC and continued long after its formation. We therefore must next determine whether in fact the parties' relationship can be considered a partnership.

In the trial court, Casillas argued that a partnership was not formed, primarily because the parties did not sign a written agreement to that effect. The fact that a written agreement was not signed, however, is not dispositive of the question of whether a partnership was actually formed, as the law has long recognized the existence of oral partnership agreements.[16] *Malone v. Patel*, 397 S.W.3d 658, 674–75 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Ingram v. Deere*, 288 S.W.3d 886, 894-97 (Tex. 2009)). Under long-standing common law principles, which have since been codified, a partnership agreement may be either express or implied from the parties' conduct. *Ingram*, 288 S.W.3d at 893-94 (citing *Donald v. Phillips*, 13 S.W.2d 74, 76 (Tex.Com.App. 1929)). When an express agreement does not exist, the question of whether the parties intended to enter into a partnership must be "determined by an examination of the totality of the circumstances." *Ingram*, 288 S.W.3d at 903-904.

[16]     We note that the failure to reduce an agreement to writing (as well as any proffered explanation for that failure) is relevant for the jury's consideration but is not dispositive of the existence of a partnership agreement. *Malone v. Patel*, 397 S.W.3d 658, 674–75 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Ingram v. Deere*, 288 S.W.3d 886, 894-97 (Tex. 2009)).

Section 152.051 of the Texas Business Organizations Code, which was in effect in July of 2009 when the parties allegedly entered into their partnership, provides that: an "association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." Tex. Bus. Orgs. Code Ann. § 152.051; *see also Ingram*, 288 S.W.3d at 894-95.[17] The Code sets forth five factors **\*548** that a court should review in determining whether a partnership exists: "(1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the business; (3) participation or right to participate in control of the business; (4) agreement to share or sharing: (A) losses of the business; or (B) liability for claims by third parties against the business; and (5) agreement to contribute or contributing money or property to the business." Tex. Bus. Orgs. Code Ann. § 152.052(a); *see also Ingram*, 288 S.W.3d at 894–95; *Rojas v. Duarte*, 393 S.W.3d 837, 841–46 (Tex. App.—El Paso 2012, pet. denied) (discussing similar factors under the TRPA).

[17]     In *Ingram*, the reviewing court discussed the provisions of the TRPA, the predecessor statutes to the Texas Business Organizations Code; however, as *Ingram* noted, the provisions relating to the definition of a partnership and the factors to be used in determining whether a partnership exists are virtually identical under the TRPA

and the Code. *Ingram*, 288 S.W.3d at 894 n.4. Therefore, we rely on the analysis of Ingram here, when applicable.

Under the Code, a party seeking to establish the existence of a partnership is not required to provide evidence of all five factors; in particular, the Code expressly provides that an agreement to share losses is not necessary to create a partnership. Tex. Bus. Orgs. Code Ann. § 152.052(c). The Code further provides that evidence of only one factor standing alone is not sufficient to establish a partnership in a business. Tex. Bus. Orgs. Code Ann. § 152.052. However, as the Court in *Ingram* explained, evidence of all five factors establishes a partnership as a matter of law, and therefore, the five-factor test is considered on a "continuum" between these two points. *Ingram*, 288 S.W.3d at 893-94, 896; *see also Rojas*, 393 S.W.3d at 846 (noting that the evidence, or lack thereof, in support of the five factors is considered on a continuum).

Based on this statutory framework, we next consider whether Houle presented more than a scintilla of evidence to establish the factors indicative of a partnership.

### 1. Profit Sharing

With his affidavit supported by the memo dated July 6, 2010, Houle presented evidence indicating that the parties had an agreement to share equally in profits after renovations were completed and after Casillas was reimbursed for his investment.[18] Although the partnership ended before any profits were shared, we find that the undisputed summary judgment evidence demonstrated that the parties had agreed they would share profits when profits were earned. We therefore conclude that this factor supports a finding that a partnership existed. *See, e.g., Rojas*, 393 S.W.3d at 841-42 (where the evidence demonstrated that the parties intended to share profits in the future, this supported a finding that a partnership existed even though the parties had not yet started sharing profits).

[18] In fact, the original petition filed by Casillas on behalf of Casco, indicated that the "rents would be split evenly between" Houle and Casco, after Casillas was reimbursed for his investment.

### 2. Expression of Intent to Be Partners

The Texas Business Organizations Code expressly provides that a partnership may be found even though the parties may not have expressly intended to create a partnership, and regardless of whatever name they use to describe their relationship. Tex. Bus. Orgs. Code Ann. § 152.051; *see also Ingram*, 288 S.W.3d at 894-95. Therefore, direct proof of the parties' intent to form a partnership is not needed. *Ingram*, 288 S.W.3d at 895-96; *see also Tubb v. Aspect Int'l, Inc.*, No. 12-14-00323-CV, 2017 WL 192919, at *9 (Tex. App.—Tyler Jan. 18, 2017, pet. denied) (mem. op.) (citing Tex. Bus. Orgs. Code Ann. §§ 152.051(b)(1) and 152.052(a)(2)).

**\*549** Nevertheless, the question of whether the parties made a direct expression of their intent is one factor, albeit not a necessary one, which can be used to establish the existence of a partnership.[19] *Ingram*, 288 S.W.3d at 900. In determining whether a direct expression was made, a court may look to the "partners' speech, writings, and conduct" to see if such an intent has been expressed, although "there must be evidence that both parties expressed their intent to be partners." *Id.* at 899-900. The Court noted that, "[e]vidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Id.* at 900 (citing *Reagan v. Lyberger*, 156 S.W.3d 925, 928 (Tex. App.—Dallas 2005, no pet.)); *see also Rojas*, 393 S.W.3d at 842 (finding evidence of an expression of intent where three witnesses testified that they heard both parties introduce themselves as partners in different business settings).

[19] *Ingram* noted, "[r]eferring to a friend, employee, spouse, teammate, or fishing companion as a 'partner' in a colloquial sense is not legally sufficient evidence of expression of intent to form a business partnership." *Ingram*, 288 S.W.3d at 900 (citing *Murphy v. McDermott Inc.*, 807 S.W.2d 606, 613 (Tex. App.—Houston [14th Dist.] 1991, pet. denied) (explaining that although one party referred to the other party as his partner, this alone did not create a partnership)).

Here, we see only one mention of the term "partner" in the communications between the parties. In the July 6, 2010 memo, Casillas complained that Houle was making unilateral decisions regarding "how to do things" during the renovations, and he further asserted that he was "not a 'Silent Partner' as [Houle] called [him] once." Although this indicates that Houle—at some point in their relationship—expressed to Casillas that he considered him to be a partner, there is no evidence that Casillas similarly expressed any such

intent to Houle or to anyone else. We therefore conclude that the record does not contain evidence that both parties made a direct expression of their intent to form a partnership.

### 3. Control

The third factor under the analysis is participation in or right to participate in control of the business, which this Court has noted is one of the most important factors in determining whether a partnership exists. *Rojas*, 393 S.W.3d at 843. As this Court has recognized, "[t]he right to control a business is the right to make executive decisions." *Id.* (citing *Ingram*, 288 S.W.3d at 901). As we have further recognized, "[s]everal sub-factors are relevant to concluding that a party has the right to make executive decisions, including: (1) the exercise of authority over the business's operation; (2) the right to write checks on the business's checking account; (3) control over and access to the business's books; and (4) the receipt of and management of all of the business's assets and monies." *Id.* at 843 (citing *Ingram*, 288 S.W.3d at 901–02).

Here, Houle's affidavit and Casillas' July 6, 2010 memo indicate that the parties handled their arrangement informally. We note additionally that there is no direct evidence that the partnership maintained any "books" or a "checking account." Nonetheless, we find clear evidence that the parties both controlled various aspects of the business's operation, and both exercised control over its assets and monies. The undisputed summary judgment evidence demonstrates that Houle and Casillas jointly made the decision to purchase the Pershing Property, decided how to finance **\*550** the property, and agreed to form an LLC for the purpose of protecting their personal interests. In addition, the undisputed evidence demonstrates that the two men jointly decided how they would divide up their responsibilities, with Casillas providing the financing for the project, and Houle providing his expertise and management skills in overseeing the renovations; moreover, the undisputed evidence establishes that for the first year of the project, the parties communicated regularly, with Houle submitting requests for reimbursements, and Casillas approving those requests.

On this record, we find there is more than a scintilla of evidence that the parties made executive decisions together and exercised joint control over the operation of the partnership. *See, e.g., Nguyen v. Hoang*, 507 S.W.3d 360, 373 (Tex. App.—Houston [1st Dist.] 2016, no pet.)

(finding that all parties participated in exercising control over the business of their partnership, where they jointly made decisions regarding the purchase of property and the method of the purchase, decided when to sell property and the terms of sale, and agreed upon who would operate the property and who would receive salaries and how much salary each would receive); *see also Price v. Wrather*, 443 S.W.2d 348, 351–52 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.) (noting that a party could control a business by receiving and managing all of the business's assets and monies); *Brown v. Cole*, 155 Tex. 624, 291 S.W.2d 704, 710 (1956) (noting that evidence of control of a business could be found in the exercise of authority over the business's operations).

The fact that the parties may have effectively controlled different aspects of the business operations does not foreclose a finding that they both had the right to make, and did in fact make, executive decisions about those operations. *See, e.g., Rojas*, 393 S.W.3d at 843 (finding evidence of "control" one party was considered "management," but the two parties nevertheless made decisions collaboratively, such as the decision to purchase a certain property, and both parties had access to the business's finances). We therefore conclude that this factor supports a finding that a partnership existed.

### 4. Sharing of Losses and Liability for Third Party Claims

Under the Texas Business Organizations Code, an agreement to share losses although a factor in the analysis, is not necessary to create a partnership. Tex. Bus. Orgs. Code Ann. § 152.052(c); *see also Ingram*, 288 S.W.3d at 901. In the present case, while the parties did agree to share profits equally after Casillas was reimbursed, there is nothing in the record to suggest that they also agreed to share equally in the losses or liabilities of the partnership. Therefore, although this factor is not necessary to the creation of a partnership, we conclude that it weighs against finding a partnership.

### 5. Contribution of Money or Property

The final factor under the Texas Business Organizations Code, considers whether the parties agreed to contribute money and/or property to the partnership. Tex. Bus. Orgs. Code Ann. § 152.052(A)(5); *see also Ingram*, 288 S.W.3d at 902 (noting that under the TRPA, "property" was defined as "all property, real, personal, or mixed, tangible or intangible, or an interest in that property").

Here, the undisputed evidence demonstrated that the parties agreed that Casillas would contribute money to fund the project by extending a loan to the LLC to purchase and renovate the Pershing Property, while Houle would contribute by offering **\*551** his skills and services. We have no trouble finding that Casillas' agreement to lend money to fund the project was the equivalent of contributing money to the partnership. *See generally Hoss v. Alardin*, 338 S.W.3d 635, 647 (Tex. App.—Dallas 2011, no pet.) (recognizing that loans of money can constitute contributions to the business under the TRPA) (citing *Reagan*, 156 S.W.3d at 928).

Although not quite as clear, we also conclude that Houle's agreement to lend his labor and time to oversee or supervise the renovations of the Pershing Property, was the equivalent of contributing money or property to the partnership. In reaching this conclusion, we recognize that if Houle had simply been an employee of the company, and only contributed his services in that capacity, this would not result in a finding that he contributed anything of value to the partnership itself. *See Ingram*, 288 S.W.3d at 903 (noting that although employees may contribute to a business endeavor by lending their time and reputation, this is not a contribution to the venture indicative of a partnership interest). However, the undisputed summary judgment evidence established that Houle was not serving in an employee capacity during the renovations, and that he instead contributed his time and skills, or in other words his "sweat equity" in furtherance of the partnership itself. We find this to be sufficient to constitute a contribution to the partnership under the Code. *See, e.g., Tubb*, 2017 WL 192919, at \*9 (finding that the agreement of a party to lend his name and reputation to a business venture could be considered a contribution of property to support the creation of a partnership); *Estate Land Co. v. Wiese*, No. 14-13-00524-CV, 2015 WL 1061553, at \*7 (Tex. App.—Houston [14th Dist.] March 10, 2015, pet. denied) (mem. op.) (upholding the trial court's determination that a party's contribution of "sweat equity" towards a project was sufficient to support a finding of partnership); *Malone*, 397 S.W.3d at 678 (party's unpaid work, time and effort in starting up a company, which he considered to be his "sweat equity," could be considered as evidence of his contribution to the company); *see generally Black v. Redmond*, 709 Fed. Appx. 766, 770 (5th Cir. 2017) (noting that a party's contribution of "know-how and sweat equity" to a partnership could be considered a contribution to the partnership for which he was entitled to reimbursement). We therefore conclude that this factor supports a finding that a partnership existed.

### *Conclusion*

We conclude that the record contains more than a scintilla of evidence in support of three of the five factors for establishing a partnership under the Texas Business Organizations Code: (1) an agreement to share profits, (2) control over the enterprise, and (3) a contribution of money and property to the enterprise by both parties. Given that these factors are generally recognized as being the most dispositive and important factors of the analysis, we further conclude that there is sufficient evidence to raise a factual question regarding the existence of a partnership between the parties. Because partners owe each other fiduciary duties, we turn next to determine whether the evidence also raises a question of fact on a breach of their fiduciary duties.

### Breach of Fiduciary Duties and Duty of Good Faith and Fair Dealing

Assuming that a fiduciary relationship did exist, we must next determine whether Houle presented more than a scintilla of evidence to raise a question of fact on the issue of whether Casillas breached his fiduciary duties including his **\*552** duty of good faith and fair dealing. Houle argues that his affidavit, which chronicled Casillas' conduct, starting with Casillas' decision to stop funding the renovations, his subsequent decision to sign a promissory note to himself and to take out a second deed of trust on the Pershing Property, without notice to Houle, and his steps taken to foreclose on the property, without considering any interest that Houle may have had in the property, all raised a question of fact on whether Casillas breached his fiduciary duties.[20] We agree.

[20]  Houle argues that Casillas' fraudulent intent or scheme can be found in his July 6, 2010 memo, in which he repeatedly states that he believed he owned the property, asserting that Casillas was in effect telegraphing his intent to obtain the property for himself. We do not necessarily read Casillas' memo in such a harsh light, as it can be fairly read instead as Casillas expressing his concerns about the security of his investment in the property and otherwise reminding Houle that he held the original deed of trust on the property for which he was entitled to foreclose.

In general, partners owe each other a strict duty of good faith and candor, as well as a duty to one another to make

full disclosure of all matters affecting the partnership and to account for all partnership profits and property. *Zinda v. McCann St., Ltd.*, 178 S.W.3d 883, 890–91 (Tex. App.—Texarkana 2005, pet. denied) (citing *Brosseau v. Ranzau*, 81 S.W.3d 381, 394 (Tex. App.—Beaumont 2002, pet. denied)). The evidence that Casillas engaged in a course of conduct with regard to clearly significant matters affecting the partnership, such as signing the promissory note and deed of trust without notice to Houle, and subsequently foreclosing on the subject property, without considering any of Houle's interests, was sufficient to raise a question of fact with respect to whether Casillas breached his fiduciary duties to Houle including his duty of good faith and fair dealing.

In reaching this conclusion, we note that Casillas, at some point, could have taken steps to foreclose on the original deed of trust and/or to end the partnership if he believed that Houle was not fulfilling his obligations. *See, e.g., Bohatch*, 977 S.W.2d at 545 (quoting *Gelder Med. Group v. Webber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 870–71, 363 N.E.2d 573, 577 (1977)) (recognizing that even though partners owe each other a fiduciary duty, they have "no obligation to remain partners," because, at the "heart of the partnership concept is the principle that partners may choose with whom they wish to be associated"); *see also Bendalin v. Youngblood & Associates*, 381 S.W.3d 719, 738 (Tex. App.—Texarkana 2012, pet. denied); *LG Ins. Mgmt. Services, L.P. v. Leick*, 378 S.W.3d 632, 643 (Tex. App.—Dallas 2012, pet. denied). However, in exiting the partnership, Casillas was required to do so in a manner that was consistent with fiduciary duties owed to Houle and consistent with the terms of the parties' partnership agreement. *See generally Bohatch*, 977 S.W.2d at 547 (holding that a partner who was expelled from a partnership was entitled to damages where the partnership reduced her tentative distribution for that year to zero without requisite notice to her in violation of the partnership agreement). We believe that a question of fact exists on the issue of whether Casillas acted in accordance with his obligations by essentially terminating the partnership agreement in the manner in which he did.

**Evidence of an Injury Resulting from the Breach**

And finally, we must next determine whether Houle provided sufficient evidence to respond to Casillas' claim in his motion that Houle had no evidence to support **\*553** a finding that he suffered "any injury" as a result of any alleged breach of fiduciary duties, and/or that Casillas obtained a "benefit" as

a result of any breach. Houle's response was weakest on this issue, with Houle's affidavit asserting a general claim that he was injured when Casillas took control over the Pershing Property for himself alone through his allegedly fraudulent course of conduct, thereby depriving Houle of his "interest" in the property, and without compensating Houle for the work that he performed in improving the property over the course of the year-long renovations. In his affidavit, Houle provided no information regarding the amount of any damages he had suffered as a result of the breach, and in particular, he did not provide any evidence of what he believed the value of his "interest" in the property was and/or the value of the services he contributed to the partnership for which he was not reimbursed.

Nevertheless, we conclude that Houle's affidavit provides at least a scintilla of evidence to raise a question of fact on the issue of whether he did in fact suffer an injury as a result of Casillas' conduct. In reaching this conclusion, we find it significant that in his motion for summary judgment, Casillas only argued in very general terms that Houle had no evidence to establish that Houle had suffered any injury as a result of Casillas' alleged breach or that Casillas benefitted from such a breach. More importantly, we note that in his first motion for summary judgment—unlike his second motion to be discussed next—Casillas did not challenge Houle to provide evidence pertaining to the economic value of his alleged injury and/or the economic value of the benefit that Casillas received.

As we recently discussed, it is critical for a party moving for summary judgment to provide the non-movant with notice of the elements that are being challenged so that the non-movant will know how to respond. *See, e.g., Pineda*, 535 S.W.3d at 156 (citing Tex. R. Civ. P. 166a(i); *Timpte Industries, Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Wade Oil & Gas*, 417 S.W.3d at 540). The requirement that a moving party identify the element upon which it is moving for summary judgment "serves the purposes of providing adequate information to the opposing party by which it may oppose the motion and defining the issues to be considered for summary judgment." *Id.* at 157 (citing *Gish*, 286 S.W.3d at 311) (quoting *Westchester Fire Ins. Co. v. Alvarez*, 576 S.W.2d 771, 772 (Tex. 1978)). As Casillas only challenged Houle to come forward with evidence of an alleged "injury," we do not believe that this would have put Houle on notice that he needed to provide an accounting of the monetary amount of the injury that he suffered. And as set forth above, Houle

simply responded in kind by providing evidence, albeit in general terms, regarding the nature of his injury.

Moreover, we note that in the present case, Houle did not simply seek monetary damages for Casillas' alleged breach of fiduciary duty, and instead also requested equitable relief, such as a "Declaratory Judgment declaring the rights of the parties and imposing a constructive trust" on the subject property, based on Casillas' allegedly fraudulent conduct in taking the property for himself. In analogous situations, the Texas Supreme Court has held that when a plaintiff seeks equitable relief for the breach of fiduciary duty, the plaintiff does not necessarily need to present evidence of actual damages stemming from the breach. *See, e.g., First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220-21 (Tex. 2017) (referring to laws on agency and trust relationships, the Court held that a client of an attorney **\*554** who allegedly took money from the client's trust fund account was not required to prove actual damages for the attorney's breach of his fiduciary duties, as the client was entitled to equitable relief, including the forfeiture or disgorgement of any benefit obtained by the attorney as the result of his breach); *see also Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (holding that the plaintiff, who established that the defendant breached a fiduciary duty and obtained a "secret gain or benefit" from a third party while serving as the plaintiff's agent, was entitled to equitable relief requiring the defendant to account to his principal for all he has received).

Accordingly, for the reasons set forth above, we conclude that Houle provided at least a scintilla of evidence to raise a question of fact regarding whether Casillas owed him a fiduciary duty, whether that duty was breached, and whether he was injured by the breach and/or whether he was entitled to the equitable relief requested in his pleadings. We therefore conclude that the trial court erred by granting Casillas' motion for summary judgment on Houle's cause of action for breach of fiduciary duty and the implied covenant of good faith and fair dealing.

## B. Houle's Claim for Unjust Enrichment

Houle next argues that the trial court erred by dismissing his claim for unjust enrichment. And, as set forth above, in response to Houle's argument, Appellees' brief does no more than proclaim, in a single sentence, that Houle did not

come forward with evidence to support his claim for unjust enrichment. We agree with Houle on this issue.

## The Law on Unjust Enrichment

A claim for relief under a theory of "unjust enrichment" is an equitable concept that arises in situations in which another person has "wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111–12 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied)); *see also Kohannim v. Katoli*, 440 S.W.3d 798, 813 (Tex. App.—El Paso 2013, pet. denied), *disapproved of on other grounds by Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014) (citing *Heldenfels Brothers, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 43 (Tex. 1992)) ("Unjust enrichment demands restitution when a party receiving property or benefits would be unjustly enriched if it were permitted to retain the property or benefits at the expense of another."). A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Kohannim*, 440 S.W.3d at 813 (citing *Heldenfels Brothers*, 832 S.W.2d at 41).

Recovery under a theory of unjust enrichment is based on quasi-contract, and therefore, when a valid, express contract covers the subject matter of the parties' dispute, there can generally be no recovery under this theory, as allowing such recovery would be inconsistent with the parties' express agreement. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex. 2000); *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) ("A party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished."); *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ) (the unjust enrichment doctrine applies the principles of restitution to disputes which **\*555** are not governed by a contract between the contending parties). However, when a person has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon that person to restore the benefits to the plaintiff. *Eun Bok Lee*, 411 S.W.3d at 111–12 (citing *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 97 (Tex. App.—Texarkana 1996), *aff'd sub nom., Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467 (Tex. 1998)). A plaintiff may also recover

under this equitable doctrine if a contemplated agreement is unenforceable, impossible, not fully performed, thwarted by mutual mistake, or void for other legal reasons. *Id.* (citing *French v. Moore*, 169 S.W.3d 1, 11 (Tex. App.—Houston [1st Dist.] 2004, no pet.)).

As a preliminary matter, we note that in his live pleading, Houle pleaded both a claim for breach of contract and a claim for equitable relief under the quasi-contract theory of unjust enrichment. Therefore, as explained above, Houle would not be permitted to obtain relief on both claims; nevertheless, we conclude that he was entitled to plead both claims for relief, in the alternative, allowing him the opportunity to seek relief on his quasi-contract claim if a jury rejected his claim for breach of contract. *See generally* 58 Tex. Jur. 3d Pleading § 129 (recognizing that a pleader may set forth two or more statements of a claim, alternatively or hypothetically, either in one count or in separate counts, and that a party may state as many separate claims as it has, regardless of consistency, and whether based on legal or equitable grounds or both). Further, we conclude that Houle provided at least a scintilla of evidence in response to Casillas' motion for summary judgment to raise a question of fact regarding whether Casillas was unjustly enriched by his allegedly fraudulent conduct.

First, the evidence clearly supports a finding that Houle provided a substantial amount of his time and effort toward renovating the Pershing Property pursuant to the parties' agreement. As described above, Houle's affidavit, as well as Casillas' July 6, 2010 memo, demonstrate that Houle spent approximately one year contributing his time and efforts into renovating the property. Second, Houle attached a spreadsheet to his affidavit, chronicling the various improvements that were made to the property during the year-long renovation project. As well, although the parties' dispute exactly how much improvements were made to the property, in his verified original petition in this matter, which was filed on June 29, 2011, Casillas acknowledged that after Houle worked on the project for a year, at least two of the units at the building had been completely renovated and were being rented out. We consider this to be a judicial admission that the property was in fact improved to some extent during the year-long project. *See generally In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.) (factual allegations in live pleadings constitute a judicial admission of the facts alleged and relieves the opposing party from the requirement of putting on proof of the admitted fact); *see also Trinity Drywall v. Toka Gen. Contrs.*, 416 S.W.3d 201, 213 (Tex. App.—El Paso 2013, pet. denied) (in a party's live pleadings, assertions of fact that are not pleaded in the alternative are regarded as formal judicial admissions) (citing *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 568 (Tex. 2001)). Third, although Casillas denied any wrongdoing, Houle's affidavit provides support for his theory that Casillas engaged in a fraudulent course of conduct by which he took sole possession of the Pershing Property through the foreclosure sale, without **\*556** compensating Houle for any of the work that he performed in improving the property and/or without regard to any interest that Houle may have had in the property.

Therefore, we conclude that there was sufficient evidence in the record to raise a question of fact on the issue of whether Casillas, by taking the improved property without compensation to Houle, "wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee*, 411 S.W.3d at 111. Accordingly, we conclude that the trial court erred by granting summary judgment in Appellees' favor on Houle's claim for unjust enrichment. Issue Two is sustained.

## ISSUE THREE: THE SECOND MOTION FOR SUMMARY JUDGMENT AND HOULE'S SECOND AFFIDAVIT

After the trial court declared a mistrial pertaining to Houle's remaining two causes of action for fraud and breach of contract, and after a new trial court judge was appointed to hear those claims, Casillas filed a second motion for summary judgment seeking dismissal of remaining claims, but this time primarily focusing on the element of damages. Although Houle responded with a second affidavit providing more details on his factual allegations, including his claim for damages, the trial court sustained Casillas' objections to the affidavit, and struck substantial portions of the affidavit, leaving him with little evidence to support his claim for damages. Thereafter, the trial court granted Casillas' motion for summary judgment, dismissing Houle's two remaining claims. In two separate, but related issues, Houle claims that the trial court erred in granting Casillas' objections to his affidavit, and contends that if the trial court had not granted the objections, his affidavit would have provided sufficient summary judgment evidence to rebut the motion for summary judgment.

Once again, Casillas does not address the merits of Houle's arguments, and instead argues that Houle did not adequately

brief this issue, as Houle did not address each of the objections that the trial court granted, and did not provide adequate record cites with respect to the objections. We note, however, that in his amended brief, Houle did provide adequate record cites, and addressed each category of objections that Casillas made to his affidavit. We find this sufficient to enable our review on appeal.

We start our analysis by reviewing the summary judgment evidence that Houle presented in support of his claim that he suffered damages as a result of Casillas' alleged breach of contract.

## A. The Breach of Contract Claim

The four elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach. *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.) (citing *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex. App.—El Paso 1993, no writ)). The last element encompasses a causation requirement. *Id.* (citing *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership*, 323 S.W.3d 203, 215 (Tex. App.—El Paso 2010, pet. denied)). Specifically, the evidence must show that the damages are the "natural, probable, and foreseeable consequence" of the defendant's conduct. *Id.* (citing *Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App.—El Paso 1998, pet. denied)).

 **\*557** Here, Casillas' motion for summary judgment only challenged the damages element of Houle's claim for breach of contract. Casillas alleged that the parties had agreed to purchase and renovate the property, with Casillas providing the funding and Houle supervising the renovation, and to then sell the property, splitting any profits evenly after Casillas was reimbursed for his investment. Casillas then argued that the undisputed evidence demonstrated that he was entitled to be reimbursed for well over $150,000, and whereas the undisputed evidence demonstrated that the value of the property would not exceed $150,000, if it were sold to a third party there would have been no profits to split.

In support of his argument, Casillas attached multiple excerpts from Houle's deposition and trial testimony, in which Houle acknowledged that the parties had agreed that he would not be entitled to receive any portion of the profits until

after Casillas was reimbursed for his initial investment of $100,000 to purchase the property, and advances that he made for renovations. Casillas also provided a copy of the original promissory note and deed of trust, indicating that he had loaned the LLC $100,000 to purchase the property, and that he was entitled to interest on the loan. Next, Casillas provided excerpts from Houle's testimony acknowledging that Casillas thereafter funded the renovations, and that in all, Casillas had advanced over $45,000 for renovations. In total, Casillas provided a spreadsheet in which he calculated that he was owed a balance totaling $266,824.52 as of February of 2017. And finally, Casillas attached excerpts from Houle's deposition and trial testimony in which he acknowledged that the value of the Pershing Property was approximately $150,000 at various times, beginning in 2011, together with a letter that Houle wrote to the IRS in June of 2013, in which he argued that the value of the property was worth that same amount. Based on this evidence, Casillas argued that the Pershing Property was worth less than what he was owed, and that Houle therefore, by his own admissions, could not prove that he suffered any damages by any alleged breach of contract.

In his response, Houle argued, among other things, that the value of the property was in "flux," and that at most, his prior testimony constituted an estimate of the property's value, and argued that prior to the mistrial, no "firm evidence" of the value of the property had been presented by either party.[21] More importantly, Houle pointed out that the parties' agreement was not to sell the property, and that the parties had instead decided to renovate the property and thereafter rent out the apartment units, and split any profits from the rental income after Casillas had been reimbursed for his investment. Houle therefore argued that he had suffered an entirely different type of damage, i.e., the loss of a "business opportunity," as outlined with more particularity in his attached affidavit. In support of his response, Houle submitted a second, more detailed affidavit outlining the parties' agreement to renovate the Pershing Property and to thereafter keep it and rent out the apartment units rather than sell the building, and to split the profits after Casillas was reimbursed for his investment. In addition, Houle attached the July 6, 2010 memo from Casillas, in which Casillas himself stated that the parties had in fact agreed *not* to sell the building after it was renovated, and to  **\*558**  instead lease out the apartment units and split any profits after expenses, and after Casillas was reimbursed for his investment.

In his response, Houle also argued that he had evidence to support the elements of ALL of his causes of action, including those previously dismissed. However, since the second motion for summary judgment only addresses the breach of contract and fraud claims, we need not consider Houle's arguments about his previously-dismissed claims for relief.

In his affidavit, Houle also addressed the issue of damages in great detail, expressing his opinion that based on 2011 rental rates, the property, which had nine units, should be generating income of approximately $63,000, less taxes and various expenses, for a total net annual income that he estimated to be $52,750.[22] Houle then multiplied that amount by 26.5 years to arrive at a figure of $1,397,875 in "business damages" for this lost business opportunity. Houle also claimed that by taking the property away from the partnership, Casillas had prevented him from managing the property from May of 2011 until the day he signed his affidavit, a period of six years, and that the "market rate" for property management in the area was approximately 6 percent of gross receipts. Using the above-described figures, Houle calculated that he was deprived of approximately $18,990 in property management fees during that time.

[22] In particular, he stated that the three upstairs units in the building would generate monthly income of $1,600, the two full downstairs units would generate monthly income of $900, a garage studio unit would generate monthly income of $350, a ¾ downstairs space would generate monthly income of $700, a side storage/ commercial unit would generate monthly income of $500, and a basement unit would generate monthly income of $500, for a monthly total of $5,250.

In addition, Houle claimed that he had spent approximately 836.75 hours over the course of the year-long renovation in overseeing the work on the project. Valuing his work at $20 an hour, he claimed that the total value of his "sweat equity" amounted to $16,375. In addition, he claimed that he had contributed approximately 96.5 hours in accounting or bookkeeping work on behalf of the partnership, which he valued at $30 an hour for a total of $2,895. As well, Houle claimed that he had approximately $2,000 in unreimbursed expenses to date. In support of this allegation, Houle attached a copy of the spreadsheet chronicling the work that had been performed on the property over the course of the year-long renovation project. And finally, Houle claimed that he had suffered lost wages, as he was unable to find work at a comparable salary to his former positions because future employers were allegedly aware of the pending lawsuit that

Casillas had filed against him, which included various fraud allegations.

**Damages Arising from a Lost Business Opportunity**

As a preliminary matter, we note that a plaintiff is generally entitled to contract damages based on lost profits, including lost rental income, from a business venture gone awry, if those losses were the natural, probable and foreseeable consequence of the defendant's conduct, and the plaintiff is able to "show the loss by competent evidence and with reasonable certainty." *See, e.g., Peterson Group, Inc. v. PLTQ Lotus Group, L.P.*, 417 S.W.3d 46, 64 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)). If the business for which lost profits are sought is shown to be an ongoing business, then evidence that the business was established and making a profit at the time when the tort was committed is admissible to show lost profits. *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366–67 (Tex. App.—Dallas 2005, no pet.) (citing **\*559** *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.— Dallas 1988, no pet.)). However, a claim for lost profits will not be denied simply because a business was new, where there are "firmer reasons to expect a business to yield a profit[.]" *See Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 381–82 (Tex. App.—Fort Worth 2003, pet. denied).

A party seeking to recover lost profits must prove the loss through competent evidence with reasonable certainty. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *VingCard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 863 (Tex. App.—Fort Worth 2001, pet. denied). The requirement of "reasonable certainty" is a flexible one in order to accommodate the myriad circumstances in which claims for lost profits arise. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); *Szczepanik*, 883 S.W.2d at 649; *VingCard A.S.*, 59 S.W.3d at 863 (at a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained). Reasonable certainty is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises. *Teletron Energy*

*Mgmt., Inc.*, 877 S.W.2d at 279; *VingCard A.S.*, 59 S.W.3d at 863. In general, "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Szczepanik*, 883 S.W.2d at 649. However, recovery for lost profits does not require that the loss be susceptible of exact calculation. *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010).

We conclude that Houle's affidavit was sufficient to raise a question of fact regarding whether he was deprived of a lost business opportunity, as it provided his opinion and estimates of what his losses were with reasonable certainty, and he explained the objective basis of his estimates. Unlike many of the cases involving a lost business opportunity, this was a relatively simple case involving two factors, i.e., rental rates for similar apartment units in the area, and the market rates for property management. Calculating lost rent or lost wages does not require speculation, and instead, can be calculated based on objective facts and data. As such, we conclude that Houle's affidavit provided a legitimate basis for calculating damages based on his theory of a lost business opportunity.

However, as set forth above, the trial court sustained several objections that Casillas made to the affidavit, and therefore much of the information that Casillas provided regarding his alleged damages was stricken, which we assume led the trial court to grant Casillas' motion for summary judgment. Therefore, we must next determine whether the trial court erred in this regard.

### 1. The Law on Summary Judgment Affidavits

The Texas Rules of Civil Procedure provide that both "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Tex. R. Civ. P. 166a(f); *see also Concierge Nursing Ctrs., Inc. v. Antex Roofing, Inc.*, 433 S.W.3d 37, 50 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). In addition, to prove facts through the affidavit testimony of an interested witness, the witness's testimony **\*560** must be uncontroverted, clear, positive, direct, credible, free from contradiction, and susceptible to being readily controverted. Tex. R. Civ. P. 166a(c). Testimonial statements by an interested witness that meet these requirements may be the basis for a summary judgment.[23] *Id.*; *see also Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989).

[23] As a preliminary matter, Houle argues on appeal that Rule 166a does not apply to affidavits filed in opposition to motions for summary judgment, and that the Rule only applies to affidavits attached in support of motions for summary judgment. This, however, is not true. As we have previously recognized, affidavits, whether supporting or opposing the motion for summary judgment, must meet the requirements of Rule 166a. *See, e.g., Felhaber*, 2003 WL 22015551, at \*1–3.

However, conclusory statements are not credible or susceptible to being readily controverted, and therefore will not support a summary judgment. *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *see also Concierge Nursing Ctrs., Inc.*, 433 S.W.3d at 50 (conclusory statements in affidavits are incompetent to support the rendition of summary judgment as a matter of law). Similarly, affidavits consisting only of conclusions are insufficient to raise an issue of fact in response to a motion for summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). A conclusory statement is one that does not provide the underlying facts to support the conclusion. *Residential Dynamics, LLC v. Loveless*, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006, no pet.) (citing *Haynes v. City of Beaumont*, 35 S.W.3d 166, 178 (Tex. App.—Texarkana 2000, no pet.)); *see also Concierge Nursing Ctrs., Inc.*, 433 S.W.3d at 50 (conclusory means expressing a factual inference without stating the underlying facts in which the inference is based).

Parties may raise objections to the form of an affidavit, and in particular may raise the following objections: (1) lack of personal knowledge; (2) hearsay; (3) statement of an interested witness that is not clear, positive, direct, or free from contradiction; and (4) competence. *Rockwall Commons Associates, Ltd. v. MRC Mortg. Grantor Tr. I*, 331 S.W.3d 500, 507 (Tex. App.—El Paso 2010, no pet.) (citing *Broadnax v. Kroger Texas, L.P.*, No. 05–04–01306–CV, 2005 WL 2031783, at \*4 (Tex. App.—Dallas August 24, 2005, no pet.)) (mem. op.) (citing *Stewart v. Sanmina Texas L.P.*, 156 S.W.3d 198, 207 (Tex. App.—Dallas 2005, no pet.) (lack of personal knowledge and hearsay), *Choctaw Properties, L.L.C. v. Aledo I.S.D.*, 127 S.W.3d 235, 241 (Tex. App.—Waco 2003, no pet.) (interested witness, hearsay, and lack of personal knowledge), *and Rizkallah v. Conner*, 952 S.W.2d 580, 585–86 (Tex. App.—Houston [1st Dist.] 1997, no pet.) (lack of personal knowledge and competence)).

## 2. Houle's Statements Regarding the Parties' Agreement

In order to raise a claim for this lost business opportunity, i.e., the lost profits, the first thing Houle was required to provide evidence to support his assertion that the parties had agreed to not sell the Pershing Property, and to instead keep the property as an ongoing business, and lease out the apartment units. Houle addresses this in his affidavit by describing his understanding of the parties' agreement. Casillas, however, objected to these paragraphs, contending that they contained Houle's "personal opinions," which were not based on facts, and were "biased," and "wholly unsupported by competent facts, evidence or documents." The trial court struck all but one paragraph of Houle's statements regarding his assessment **\*561** of the parties' agreement, apparently agreeing with Casillas' argument. We disagree with the trial court's conclusion.

As set forth above, even though Houle was a party to the case, and therefore an "interested witness," he was entitled to provide testimony regarding factual matters within his personal knowledge, if uncontroverted, clear, positive, direct, credible, free from contradiction, and susceptible to being readily controverted. Tex. R. Civ. P. 166a(c). In his affidavit, Houle provided clear and direct statements regarding the terms of the parties' agreement, which could have been easily controverted by Casillas. *See generally Republic Nat. Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607 (Tex. 1986) (statements in affidavit contending that plaintiff had failed to make certain payments on a lease and stating the amount of damages claimed pertained to factual matters that were readily controvertible). Moreover, we note that Casillas did not in fact controvert these statements, and in fact appeared to agree with those terms in his own July 6, 2010 memo to Houle. We therefore conclude that the trial court erred in sustaining Casillas' objection to Houle's recitation of the parties' agreement in his affidavit.

## 3. Houle's Statements Regarding Casillas' Alleged Breach of the Agreement

Second, Casillas objected to several of Houle's statements, in which Houle expressed his belief that Casillas had breached the parties' agreement and acted in a fraudulent manner by unilaterally stopping the funding of the project and thereafter taking steps to "take control of the property." However, the trial court in its order expressly refused to consider those objections, and therefore did not strike any of those statements.

## 4. Houle's Statements that he was Damaged by the Loss of the Pershing Property

The trial court, however, did sustain Casillas' next objection to the paragraphs in which Houle stated that the Pershing Property was the sole asset of the parties' partnership and that he was damaged when Casillas took that property for himself. In his objection, Casillas argued that "[Houle's] entire argument fails to overcome the statute of frauds in that no written contract exists making the subject property a partnership asset." We do not, however, believe that this is a valid objection to the affidavit, as it does not go to the form of the affidavit, and is instead a legal argument that goes to the merits of Houle's theory of liability.[24] While Casillas arguably could have objected to the form of the affidavit by alleging that Houle was providing an improper legal conclusion, this was not the basis of Casillas' objection, and we therefore decline to address **\*562** that issue on appeal. *See, generally, Rockwall Commons Associates, Ltd.*, 331 S.W.3d at 507 (defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend).

[24]    Casillas' argument appears to be incorrect in any event. First, as set forth above, there is no requirement that a partnership agreement be in writing, and instead, the Texas Business Organizations Code clearly recognizes the existence of oral, informal partnerships. Tex. Bus. Orgs. Code Ann. § 152.051. Second, the statute of frauds only requires "a contract for the sale of real estate" to be in writing. *See* Tex. Bus. & Com. Code Ann. § 26.01. In the present case, Houle did not argue that the partnership actually purchased the partnership, and he instead recognizes that the Pershing LLC made the actual purchase and held the legal title to the property. However, as explained above, Houle's theory is that the parties created the LLC simply as a means of effectuating the partnership and protecting them from personal liability, but that the Pershing Property itself was an asset that belonged to the partnership, and was inextricably tied to the partnership's very purpose and existence.

## 5. Houle's Detailed Estimates of his Damages

And finally, Casillas made multiple objections to Houle's statements in which he provides his estimate of the damages he suffered in terms of his lost business opportunity to receive rental income from the property and/or management fees; his estimate of the value of the work that he put into the renovations and the value of his unreimbursed business expenses; as well as his estimate of his legal fees and other expenses. In particular, Casillas contended that Houle was not an expert witness, and that as a "lay witness" he was "wholly unqualified to render his detailed valuations of the damages which he alleges[;]" that his valuations were "nothing more tha[n] his biased, self-serving, personal opinions," and his claim of damages was not supported by "any documentation or other evidence[.]" The trial court granted all of these objections and struck the entire portion of the affidavit in which Houle testified about the measure and amount of his estimated damages.

As a preliminary matter, we note the Texas Rules of Evidence permit opinion testimony from lay witnesses as well as expert witnesses. *Health Care Serv. Corp. v. E. Texas Med. Ctr.*, 495 S.W.3d 333, 338 (Tex. App.—Tyler 2016, no pet.) (citing Tex. R. Evid. 701, 702). The personal experience and knowledge of a lay witness may establish that the witness is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge. *Id.* (citing *Hathcock v. Hankook Tire Am. Corp.*, 330 S.W.3d 733, 747 (Tex. App.—Texarkana 2010, no pet.)). It is only where the fact finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert. *Id.*

Therefore, "Texas courts regularly allow business owners and company officers to testify as lay witnesses, based on knowledge derived from their positions and any other relevant experience." *Id.* at 338-39 (citing *Am. Heritage, Inc. v. Nev. Gold & Casino, Inc.*, 259 S.W.3d 816, 827 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (former chief financial officer testified about lost profits); *Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 797 (Tex. App.—Dallas 2007, no pet.) (business owner testified about value of services he provided to retail chain); *SAS & Assoc., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 302 (Tex. App.—Dallas 2005, pet. denied) (sole shareholder, director, and officer testified about reasonable cost of repairing company's damaged personal property)). However, such opinion testimony is limited to those opinions or inferences that are rationally based on the lay witness's perceptions and in situations in which the

testimony is helpful to clearly understanding their testimony or determining a fact in issue. *Id.* (citing Tex. R. Evid. 701).

Here, as Houle points out, this issue was addressed, at least in part, by the first judge hearing the case, who ruled prior to trial that even though Houle had not been designated as an expert witness, he would be allowed to testify at trial as a lay witness on the issue of the value of the Pershing Property and his damages. After the mistrial, we recognize that the newly appointed judge was, of course, entitled to come to a different conclusion. Nonetheless, we believe it was improper for the **\*563** trial court to make the determination that Houle was not qualified to testify as a lay witness based solely on Casillas' bald statement that Houle was a "lay witness wholly unqualified to render" his opinion on damages. Casillas provided no argument or legal authorities for the proposition that Houle was not qualified to testify as a lay witness; in particular, he did not explain why Houle, who averred that he had personal knowledge and experience in business and real estate, could not testify on the question of how much an apartment that he himself renovated would rent for, or why he could not express an opinion regarding the market rates for property managers in the area. Further, Casillas did not explain why Houle would not have had personal knowledge of the value of the work that he performed in renovating the project, the value of his accounting and bookkeeping work, or the business expenses he incurred for which he had not been reimbursed. We therefore conclude that the trial court erred by sustaining Casillas' unsupported objection to Houle's statements in his affidavit.

We also note that Casillas alleged, and the trial court agreed, that Houle's estimates of his damages were improper because they were not supported by "documentation or other evidence." Casillas, however, did not cite any legal authority for the proposition that damages estimates must in all instances be supported by documentary evidence, nor are we aware of any. To the contrary, the Texas Supreme Court has held that when a witness testifies as to his estimate of the damages suffered by the loss of a business opportunity, it is not necessary to produce in court the documents supporting the opinions or estimates, although the lack of such documentation may affect the weight of the testimony. *See, e.g., Swinnea*, 318 S.W.3d at 876 (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)).

And finally, we note that Casillas objected to the spreadsheet that Houle attached to his affidavit in which he set forth the amount of work that was done on the Pershing Property

during the year that he supervised the renovations, on the ground that Rule 166a(f) requires "sworn or certified copies of all papers or parts of papers referred to in an affidavit." Although it is not entirely clear, it appears that the trial court sustained that objection as well. We find this decision to be in error.

As the Supreme Court has recognized, "copies of documents which are attached to a properly prepared affidavit are sworn copies within the meaning" of the Rule's requirements. *Schindler*, 717 S.W.2d at 607 (citing *Zarges v. Bevan*, 652 S.W.2d 368, 369 (Tex. 1983); *Life Insurance Company of Virginia v. Gar-Dal, Inc.*, 570 S.W.2d 378, 380 (Tex. 1978)). Thus, where an affidavit states that the attached documents are true and correct copies of the originals, and the affidavit itself is properly sworn, the trial court may consider the attached documents as proper summary judgment evidence. *Id.*; *see also Landry's Seafood Restaurants, Inc. v. Waterfront Cafe, Inc.*, 49 S.W.3d 544, 551 (Tex. App.—Austin 2001, pet. dism'd) (recognizing that copies of documents attached to a properly prepared affidavit are sworn copies within the meaning of Rule 166a(f)). In his affidavit, Houle expressly stated that "[t]he facts stated herein and in Exhibits A [the spreadsheet] and C are true and correct of my own personal knowledge." As such, we conclude that the trial court erred by sustaining Casillas' objection to this exhibit.

In conclusion, we find that Houle provided clear and direct testimony explaining how he arrived at his calculation of damages, explaining in detail the metrics he used in arriving at his estimate. As well, **\*564** his statements pertaining to the market rate for rents and property management, as well as his estimates of the value of the work he performed, were all easily controvertible, and therefore constituted admissible summary judgment evidence under Tex. R. Civ. P. 166a(c). We therefore conclude that the trial court erred in striking these statements from Houle's affidavit, and as expressed above, we believe that the affidavit, as submitted by Houle in its original form, provided at least a scintilla of evidence to support the damages element of his claim for breach of contract. Accordingly, we conclude that the trial court erred in granting summary judgment on Houle's claim for breach of contract.

## B. Actual and Constructive Fraud

Houle also argues that the trial court erred by granting Casillas' motion for summary judgment on his claim for fraud,

arguing that his affidavit provided sufficient evidence of the allegedly fraudulent course of conduct in which Casillas engaged. On appeal, Appellees do not address the merits of Houle's argument, and instead argue that Houle did not provide adequate cites to the record and/or provide adequate citations to legal authorities in his original brief to support his argument, and that Houle therefore waived this issue.

Texas law recognizes two types of common law fraud claims: actual fraud and constructive fraud. *In re Estate of Kuykendall*, 206 S.W.3d 766, 770–71 (Tex. App.—Texarkana 2006, no pet.) (citing *Chien v. Chen*, 759 S.W.2d 484, 494–95 (Tex. App.—Austin 1988, no writ)). The elements of a claim for actual fraud are: "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (citing *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)); *see also Sprick v. Sprick*, 25 S.W.3d 7, 15 (Tex. App.—El Paso 1999, pet. denied) (citing *Stone v. Lawyers Title Insurance Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)). A claim for actual fraud therefore involves dishonesty of purpose or intent to deceive. *See TransPecos Banks v. Strobach*, 487 S.W.3d 722, 730 (Tex. App.—El Paso 2016, no pet.) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986)); *see also Sprick*, 25 S.W.3d at 15.

On the other hand, in a claim for constructive fraud, the actor's intent is irrelevant. *Kuykendall*, 206 S.W.3d at 770–71 (citing *Sprick*, 25 S.W.3d at 15); *see also Chien*, 759 S.W.2d at 495 (citing *Archer v. Griffith*, 390 S.W.2d 735 (Tex. 1965)). Instead, constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Strobach*, 487 S.W.3d at 730 (citing *Castleberry*, 721 S.W.2d at 273). As this Court has recognized, constructive fraud occurs when a party violates a fiduciary duty or breaches a confidential relationship. *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet. denied) (citing *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.—Dallas

2009, pet. denied)); *see also In re Estate of Kuykendall*, 206 S.W.3d at 770–71.

As set forth above, in his motion for summary judgment, Casillas challenged **\*565** Houle to come forward with evidence to support all elements of his fraud claim, primarily focusing on the question of whether Houle had any evidence to establish that Casillas had made a material and false representation to Houle upon which he intended for him to rely. We agree with Casillas that Houle did not come forward with evidence of any actual misrepresentation that Casillas made to him. Therefore, we conclude that there is no evidence to support a claim for actual fraud.

However, the evidence does raise a question of fact regarding whether Casillas committed constructive fraud. As discussed above, Houle presented evidence in his affidavit to support a conclusion that the parties had entered into an oral partnership agreement for which they owed each other fiduciary duties to include a duty of good faith and fair dealing, a duty of candor, and a duty to make full disclosures to each other. *Zinda*, 178 S.W.3d at 890–91. Houle included facts in his affidavit, which the trial court did not strike, chronicling what he believed was a breach of such fiduciary duties and assertion of conduct which was intended to deceive Houle. As such, we conclude that Houle came forward with at least a scintilla of evidence to raise a question of fact regarding whether Casillas engaged in constructive fraud.

Accordingly, we conclude that the trial court did not err in granting summary judgment on Houle's claim of actual fraud. However, we conclude the trial court erred in granting summary judgment on Houle's claim for constructive fraud. Houle's Issue Three is overruled in part and sustained in part.

## ISSUE FOUR: HOULE'S THIRD AMENDED PLEADING

Shortly after the mistrial, on February 27, 2017, Houle filed a third amended pleading, which, among other things, appeared to raise the same causes of action (i.e. unjust enrichment and breach of fiduciary duty and duty of good faith and fair

dealing), which the trial court had dismissed by summary judgment, as well as a request that the trial court set aside the foreclosure sale. On March 9, 2017, Casillas moved to strike the third amended pleading on the grounds that Houle was seeking to raise previously dismissed causes of action. Ultimately, on May 24, 2017, the trial court granted Casillas' motion to strike the pleading and dismissed it with prejudice.

In his fourth argument, Houle contends that the trial court's order striking his third amended pleading was in error, as he believes the law allows him to file an amended pleading that raises previously dismissed claims. Houle, however, does not cite any legal authority for this proposition nor are we aware of any. To the contrary, as Houle points out, the trial court explained at the hearing on Houle's motion for new trial, that it had struck the third amended pleading because it contained causes of action that were previously dismissed by summary judgment. Houle's only recourse once the trial court dismissed his claims was to raise a challenge to the dismissal by way of direct appeal. We therefore conclude that the trial court did not abuse its discretion in striking the third amended pleading. *See generally Hardin v. Hardin*, 597 S.W.2d 347, 349-50 (Tex. 1980) (holding that a trial court's ruling on an amended pleading is reviewed under an abuse of discretion standard). Houle's Issue Four is overruled.

## CONCLUSION

We affirm the trial court's order to the extent it granted summary judgment to **\*566** Appellees on Houle's cause of action for actual fraud. However, we reverse the trial court's order to the extent it granted summary judgment to Appellees on Houle's causes of action for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of contract, and constructive fraud. We therefore remand to the trial court for further proceedings consistent with this opinion.

## All Citations

594 S.W.3d 524

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

592 S.W.3d 125
Supreme Court of Texas.

Ralph S. JANVEY, in his Capacity as
Court-Appointed Receiver for the Stanford
International Bank Limited, et al., Appellants,

v.

GMAG, L.L.C.; Magness Securities, L.L.C.;
Gary D. Magness; Mango Five Family
Incorporated, in its Capacity as Trustee for the
Gary D. Magness Irrevocable Trust, Appellees

No. 19-0452
|
Argued October 8, 2019
|
OPINION DELIVERED: December 20, 2019

**Synopsis**
**Background:** Receiver appointed to recover bank's assets
and distribute them to victims of Ponzi scheme perpetrated
by bank brought action against investors who profited from
scheme, seeking to recover funds pursuant to Texas Uniform
Fraudulent Transfer Act (TUFTA). After jury verdict in
investors' favor, the United States District Court for the
Northern District of Texas, David C. Godbey, J., 2017 WL
8780882, denied receiver's motions for judgment as matter
of law and for entry of judgment, and, 2017 WL 8780883,
denied receiver's renewed motions for judgment as matter of
law and entry of judgment. Receiver appealed. On rehearing,
the Court of Appeals, 925 F.3d 229, certified question.

As a matter of first impression, the Supreme Court, Busby, J.,
held that a transferee on inquiry notice of a fraudulent transfer
may not satisfy the good-faith defense under TUFTA without
conducting a diligent investigation.

Question answered.

**Procedural Posture(s):** Certified Question.

**\*126** On Certified Question from the United States Court of
Appeals for the Fifth Circuit

**Opinion**

Justice Busby delivered the opinion of the Court.

The Texas Uniform Fraudulent Transfer Act (TUFTA) is
"designed to protect creditors from being defrauded or left
without recourse due to the actions of unscrupulous debtors."
*KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 89 (Tex. 2015).
Creditors may invoke TUFTA to "claw back" fraudulent
transfers from their debtors to third-party transferees. Yet
even if a transfer is fraudulent, the statute does not always
require the transferee to relinquish the transferred asset. If the
transferee proves as an affirmative defense that it acted in
good faith and the transfer was for a reasonably equivalent
value, it may keep the transferred asset.

The U.S. Court of Appeals for the Fifth Circuit has
requested our guidance on what constitutes good faith
under TUFTA. Specifically, the Fifth Circuit asks whether a
transferee on inquiry notice of fraudulent intent can achieve
good faith without investigating its suspicions. Without
comprehensively defining the contours of TUFTA's good-
faith defense, we answer the question no. When a transferee
on inquiry notice attempts to use TUFTA's affirmative
defense to shield the transfer from the statute's clawback
provision, it must show at minimum that it investigated
its suspicions diligently. The investigation may not turn up
additional evidence of fraud that should be imputed to the
transferee, but that result does not negate the suspicions
that a transferee on inquiry notice has at the time of the
transfer. An investigation is an opportunity for the transferee
to demonstrate its good faith, and requiring proof of an
investigation negates any incentive transferees may have to
remain willfully ignorant of fraud.

**Background**

Stanford International Bank, Ltd. (the Bank) ran a highly
complex Ponzi scheme for almost two decades that attracted
over $7 billion in investments. The Bank sold **\*127**
fraudulent certificates of deposit and issued "returns" to its
old investors with money procured from new investors. The
Bank deceived over 18,000 investors before the Securities and
Exchange Commission (SEC) uncovered the scheme in 2009.

Appellee Gary D. Magness and several entities through
which Magness invested his funds (collectively, Magness)
were among the investors deceived by the Bank. Magness

was one of the largest investors, purchasing $79 million of the fraudulent certificates of deposit. Magness withdrew his investments from the Bank sometime after news of the SEC's investigation became public. In 2008, Magness recovered $88.2 million through loans from the Bank: his original investment of $79 million and $9.2 million of "accrued interest" credited to his account with the Bank. He later repaid $700,000 to the Bank, so his net return was $8.5 million.

Once the SEC discovered the Bank's Ponzi scheme, a federal district court appointed appellant Ralph S. Janvey (the Receiver) to recover the Bank's assets and distribute them among the investors equitably. The Receiver sought return of Magness's net payout from the Bank.

The Receiver sued Magness in federal district court to recover these funds, alleging (1) Magness's withdrawal from the Bank should be avoided because it constituted a fraudulent transfer under TUFTA, and (2) Magness was unjustly enriched. *Janvey v. GMAG, L.L.C.*, 913 F.3d 452, 454 (5th Cir. 2019), *vacated and superseded on reh'g*, 925 F.3d 229 (5th Cir. 2019). Magness responded that he satisfied TUFTA's good-faith defense, thus preventing the Receiver from avoiding the Bank's transfer to Magness. The district court granted the Receiver's motion for partial summary judgment for the net amount Magness received from the Bank in excess of his investment; Magness subsequently paid the Receiver this $8.5 million. *Id.* The district court left to the jury, however, whether the Receiver was entitled to claw back Magness's original $79 million investment. *Id.* The district court also denied Magness's motions for partial summary judgment regarding his defense of good faith and the Receiver's claim of unjust enrichment. *Id.*

Following trial, the jury found Magness had inquiry notice of the Ponzi scheme. *Id.* at 454–55. The jury charge provided: "Inquiry notice is knowledge of facts relating to the transaction at issue that would have excited the suspicions of a reasonable person and led that person to investigate." *Id.* at 454. The next question in the charge asked whether "a diligent inquiry would ... have revealed to a reasonable person that Stanford was running a Ponzi scheme." *Id.* at 455. The jury found that "an investigation [would] have been futile." *Id.* The district court denied the Receiver's motion for entry of judgment on the verdict and renewed motion for judgment as a matter of law, holding that Magness satisfied his good-faith affirmative defense. *Id.*

The Receiver appealed to the Fifth Circuit, raising several issues. *Id.* As relevant here, the Receiver contended "the jury's finding of inquiry notice defeated Magness's TUFTA good faith defense as a matter of law." *Id.* The Fifth Circuit agreed and reversed the district court's judgment, rendering judgment for the Receiver. *Id.* at 458. Specifically, the Fifth Circuit determined that Magness failed to satisfy TUFTA's good-faith affirmative defense and that there is no "futility exception" to that defense. *Id.*

Following the Fifth Circuit's decision, Magness sought rehearing. He urged the Fifth Circuit to certify the good-faith question instead of relying on its *Erie* guess. The Fifth Circuit vacated its prior opinion **\*128** and certified the following question, which we accepted:

> Is the Texas Uniform Fraudulent Transfer Act's "good faith" defense against fraudulent transfer clawbacks, as codified at Tex. Bus. & Com. Code § 24.009(a), available to a transferee who had inquiry notice of the fraudulent behavior, did not conduct a diligent inquiry, but who would not have been reasonably able to discover that fraudulent activity through diligent inquiry?

*Janvey v. GMAG, L.L.C.*, 925 F.3d 229, 235 (5th Cir. 2019).

## Analysis

May a transferee on inquiry notice of a fraudulent transfer satisfy TUFTA's good-faith defense without conducting a diligent investigation? We conclude that the answer is no. If a transferee has actual knowledge of facts that would lead a reasonable person to suspect the transfer is voidable under TUFTA but does not investigate, the transferee may not achieve good-faith status to avoid TUFTA's clawback provision—regardless of whether the transferee reasonably could have discovered the fraudulent activity through diligent inquiry.

### I. Standard and scope of review

"The Supreme Court of Texas may answer questions of law certified to it by any federal appellate court if the certifying court is presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1; *accord* Tex. Const. art. V, § 3–c(a). The question certified requires us to interpret section 24.009 of the Texas Business and Commerce Code. *GMAG*, 925 F.3d at 235. We are asked to determine how a transferee found to be on inquiry

notice can prove good faith to qualify for section 24.009's affirmative defense, which is a question of law. *Id.*

Although the Fifth Circuit certified its question without limiting this Court's response, we typically "provide answers solely as to the status of Texas law on the questions asked." *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 620 (Tex. 2004). This certified question is narrow and assumes the transferee did not investigate the suspicious circumstances initially raising concern.[1] We limit our holding to this question.

[1]   "How our answer is to be applied to the facts of this case is the province of the certifying court." *Interstate Contracting Corp.*, 135 S.W.3d at 620 (citing *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 798 (Tex. 1992)). Therefore, although Magness asserted in his briefing and at oral argument that he actually investigated his suspicions, we express no opinion on that issue.

**II. TUFTA protects creditors but provides an affirmative defense for transferees.**

The Uniform Fraudulent Transfer Act (UFTA) was created to ensure defrauded creditors attain similar remedies. *See* Unif. Fraudulent Transfer Act Prefatory Note, 7A pt. II U.L.A. 4–7 (2006). Creditors may circumvent transfers made or obligations incurred by their debtors in certain circumstances, including where the transfer was made or obligation incurred with the intent to hinder, delay, or defraud any creditor. *Id.* § 7. Because "the intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof," UFTA provides badges of fraud on which creditors and courts can rely. *Id.* at Prefatory Note. UFTA allows defrauded creditors to "obtain ... avoidance of the transfer or obligation to the extent necessary to satisfy" their claims. *Id.* § 7(a)(1).

**\*129** At least twenty-five jurisdictions have adopted some version of UFTA. *Id.* at Prefatory Note. Texas joined that group in 1987. Tex. Bus. & Com. Code ch. 24. TUFTA's purpose mirrors UFTA's and is designed "to prevent debtors from prejudicing creditors by improperly moving assets beyond their reach." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 566 (Tex. 2016). TUFTA provides its own badges of fraud in "a list of eleven, nonexclusive indicia of fraudulent intent." *Id.* Similar to UFTA, TUFTA's badges provide guidance in determining whether a transfer was made or obligation incurred with actual intent to hinder, delay, or defraud a creditor. Bus. & Com. Code § 24.005(b). If so, a creditor may invoke TUFTA's clawback provision to avoid

the transfer or obligation, or to obtain certain other remedies. *Id.* § 24.008.

Avoidance is not unbridled, however. TUFTA protects a transferee against avoidance of a fraudulent transfer (or an obligee against avoidance of a fraudulent obligation) if it can prove it "took in good faith and for a reasonably equivalent value." *Id.* § 24.009(a). We have previously considered the "reasonably equivalent value" prong of this defense. *See generally Golf Channel*, 487 S.W.3d 560. Today, we address the "good faith" prong.

**III. The "good faith" prong of the transferee's defense includes concepts of inquiry notice, honesty in fact, and lack of willful ignorance.**

TUFTA does not define good faith. *Cf.* Bus. & Com. Code § 24.002 (listing defined terms). UFTA, which we have used previously to interpret TUFTA,[2] similarly fails to define good faith. When a statute does not define a word or phrase, we look to its plain or common meaning. *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). Mindful of TUFTA's instruction that "principles of law and equity ... supplement its provisions," Bus. & Com. Code § 24.011, we also consider the common law in determining the meaning of good faith.

[2]   *Cf. Golf Channel*, 487 S.W.3d at 572–73 (using UFTA to construe TUFTA's "reasonably equivalent value" prong).

Good faith has been defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing ..., or (4) absence of intent to defraud or to seek unconscionable advantage." *Good Faith*, Black's Law Dictionary (11th ed. 2019).[3] We have explained that good faith "requires conduct that is honest in fact and is free of both improper motive and willful ignorance of the facts at hand." *Gulf Energy*, 482 S.W.3d at 569 (defining good faith in the Texas Natural Resources Code when the Railroad Commission mistakenly plugged an offshore well). And we have recognized "reasonableness" as a component of good faith. *Wichita County v. Hart*, 917 S.W.2d 779, 786 (Tex. 1996) (combining "honesty in fact" with "reasonableness" to define what constitutes good faith under the Whistleblower Act).

[3]   *See R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 568 (Tex. 2016) (using dictionary to

give undefined term in Natural Resources Code its plain meaning).

We conclude that the meaning of good faith under TUFTA is consistent with these principles. A transferee must show that its conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud. In applying this standard, Texas courts have considered "whether a transferee received fraudulent transfers with actual knowledge or inquiry notice of fraud." *GMAG*, 913 F.3d at 455–56 (citing **\*130** *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). The Fifth Circuit's certified question presumes, and the jury found, that Magness was on inquiry notice. We therefore focus our analysis on how a transferee with inquiry notice of fraud can prove good faith.

Inquiry notice is "[n]otice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further." *Inquiry Notice*, Black's Law Dictionary (11th ed. 2019). A person is on inquiry notice when he or she is "aware of facts that would have prompted a reasonable person to investigate." *Id.* Whether inquiry notice exists is determined at the time of the transfer, not with the benefit of hindsight. *See Golf Channel*, 487 S.W.3d at 569 (reaching same conclusion as to value and reasonable equivalency components of defense).

As one court of appeals has explained, a transferee is on inquiry notice when it "takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence" regarding "the fraudulent nature of an alleged transfer." *Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A transferee on inquiry notice knows facts that are, or should be, suspicious: red flags that a reasonable person would have investigated prior to engaging in the transfer.[4]

[4]     *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at \*3 (N.D. Tex. Feb. 7, 2007) (holding transferee's attempt to prove TUFTA's good-faith defense failed as matter of law because a reasonable person would have investigated legitimacy of transfer).

There are at least two types of knowledge a transferee has when on inquiry notice: (1) actual knowledge of facts that raise a suspicion of fraud, and (2) constructive knowledge of what the transferee could have uncovered in an investigation. Understanding the distinction between these types of knowledge helps to explain why a transferee on inquiry notice of the debtor's fraudulent intent cannot

prove good faith without conducting a diligent investigation—regardless of what that investigation would reveal.

In the context of inquiry notice, actual knowledge means "[k]nowledge of information that would lead a reasonable person to inquire further." *Actual Knowledge*, Black's Law Dictionary (11th ed. 2019). As we have recognized, actual knowledge of suspicious facts shifts a transferee's status from taking in good faith to being on inquiry notice of fraud. *See Blum v. Simpson*, 66 Tex. 84, 17 S.W. 402, 403 (1886) ("Taking all these circumstances in connection, it does seem that there was enough to arouse a suspicion in the mind of any prudent man that there was an intention on the part of [debtor] to dispose of his property in such a way that, if he had any creditors, ... they would be deprived of all power to enforce their claims against him.").[5]

[5]     *Blum* was decided under a predecessor fraudulent transfer statute providing that a purchaser with "notice" of the debtor's fraudulent intent could not keep the transfer. *See* Tex. Rev. Civ. Stat. Ann. art. 2465 (1879).

If a diligent inquiry could have uncovered facts showing fraudulent intent, Texas common law imputes knowledge of those additional facts to the transferee as well. *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286, 289 (1951). Constructive knowledge is "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019). The transferee can be charged with this knowledge in hindsight so long as it reasonably **\*131** could have been discovered at the time of the transfer. *Ruebeck v. Hunt*, 142 Tex. 167, 176 S.W.2d 738, 739 (1943) ("Knowledge of facts that would cause a reasonably prudent person to make inquiry, which if pursued would lead to a discovery of fraud, is in law equivalent to knowledge of the fraud.").

### IV. A transferee on inquiry notice of fraud must conduct a diligent investigation to prove good faith.

As framed by these legal principles regarding good faith and inquiry notice, the question we must decide is: how can a transferee prove good faith when it has actual knowledge of facts raising a suspicion that the transfer is voidable under TUFTA but lacks constructive knowledge of facts showing fraudulent intent? The jury found that Magness was on inquiry notice because he or his agents had actual "knowledge of facts relating to the transaction at issue that would have excited the suspicions of a reasonable person and led that

person to investigate." In this circumstance, a transferee seeking to prove good faith must show that it investigated the suspicious facts diligently. A transferee who simply accepts a transfer despite knowledge of facts leading it to suspect fraud does not take in good faith. *See Blum,* 17 S.W. at 403 ("Yet [transferee] made no inquiry .... This showed a disposition on his part to make the trade, and get possession of the property at a low figure, no matter how much the seller's creditors might suffer thereby.").

Magness responds by pointing out that the jury also found "a diligent inquiry would not have revealed to a reasonable person that Stanford was running a Ponzi scheme." Because any investigation would have been fruitless, he contends knowledge of the Bank's fraudulent intent cannot be imputed to him, and therefore he took in good faith.

We agree with Magness's premise, but we reject his conclusion. Whether a transferee lacks constructive knowledge of the debtor's fraudulent intent does not, by itself, determine good faith. Magness's proposed rule does not acknowledge his actual knowledge of facts that raised a suspicion of fraud. Nor does it acknowledge that choosing to remain willfully ignorant of any information an investigation might reveal is incompatible with good faith.

A transferee cannot show good faith in this situation because, irrespective of what a hypothetical investigation could reveal, the facts giving rise to a reasonable suspicion of fraud have not been confronted. Even if the fraud is inherently undiscoverable, the transferee still has actual knowledge of facts at the time of the transfer that would lead a reasonable person to suspect fraud and investigate. If the transferee fails to demonstrate its good faith and avoid willful ignorance by conducting a diligent investigation, it cannot be characterized as acting with honesty in fact.

Magness contends that our decision in *Wethered's Administrator v. Boon* supports his position that when a reasonable inquiry could not have revealed the true facts, a finding of inquiry notice is inappropriate.[6] But the transferee in *Wethered's Administrator* investigated his suspicions diligently,[7] so that case is not instructive in answering the certified question. We are **\*132** not asked to define under what circumstances a diligent investigation by a transferee on inquiry notice of fraud will be sufficient to establish good faith, and we express no view on that issue. Instead, we are simply asked whether an investigation is necessary—that is, whether a transferee on inquiry notice of fraud may achieve

good faith without any investigation at all. We conclude that in this situation, a transferee wishing to take advantage of the defense must show it conducted a diligent investigation.

6     17 Tex. 143, 150 (1856) ("The general doctrine is, that whatever puts a party upon an inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty ... and would lead to the knowledge of the requisite fact, by the exercise of ordinary diligence and understanding.").

7     *See id.* at 148–49, 151 (reversing judgment based on jury finding of inquiry notice where transferee conducted diligent investigation).

The parties and amici also dispute whether *Humphries v. Freeman,* 22 Tex. 45 (1858), supports the proposition that a transferee can take in good faith despite its initial suspicions of fraud when a diligent investigation would not have revealed the fraud. Applying a predecessor statute to TUFTA,[8] we explained in *Humphries*:

It is not necessary that [transferee] should have been influenced in what he did, by a like fraudulent intent, in order to avoid the assignment as to him also; or that he should have intended to assist [debtor] to defraud his creditors; or that he should have had actual knowledge that such, in fact, was the intention of [debtor]. It is sufficient to affect him with notice, if by ordinary diligence he might have known. If he had a knowledge of such facts, as were calculated to create a suspicion that such was the purpose of [debtor], and to put him upon inquiry; if, in a word, he had reason to know or believe that such was the intention of [debtor], it is sufficient to avoid the assignment as to him, as effectually as if he had actually known it.

*Id.* at 50.

8     *See* Act approved Jan. 18, 1840, 4th Cong., R.S., § 2, 1840 Repub. Tex. Laws 28, 29, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822–1897,* at 202, 203 (Austin, Gammel Book Co. 1898) (providing fraudulent transfer was void unless "possession shall really and bona fide remain with the donee").

The Receiver relies on the last sentence to argue that a transferee on inquiry notice cannot achieve good faith. But according to the University of Miami as amicus, the second sentence suggests that a transferee on inquiry notice can still take in good faith unless a hypothetical diligent investigation would reveal fraud, as the transferee only has constructive knowledge of what the investigation would reveal. Under this

view, Magness would not be responsible for the knowledge that initially raised his suspicions of fraud because the jury found an investigation would have been futile, and he may invoke TUFTA's good-faith defense successfully.

We conclude that *Humphries* does not affect our answer to the certified question. That case addressed whether a creditor seeking to void a transfer must show that the transferee had fraudulent intent or actual knowledge of fraud, or whether a lesser standard of notice is also sufficient. We concluded that notice is sufficient and reversed a jury's verdict for the transferee as contrary to the evidence, which showed the facts known to the transferee

> were certainly sufficient to put him on inquiry, and to affect him with notice; and consequently, to affect the property, in his hands, with the fraud of his assignor. The evidence ought to have been decisive in the minds of the jury, that the assignment was fraudulent and void under the statute, as having been made with the intent to delay, hinder and defraud the creditors of [debtor].

*Id.* at 51. We went on to observe that the jury should have been instructed actual knowledge was not required, *id.* at 53, but we had no occasion to parse the concepts of inquiry notice and constructive knowledge **\*133** to provide a detailed analysis of what proof would be sufficient to avoid the transfer.

Magness also cites a litany of cases he argues "consistently recogniz[e] that a party may be charged with notice only of

'those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.' "[9] The cases cited decide whether an individual may be charged with constructive knowledge, which is not the question before us. Rather, we are asked to decide how a transferee on inquiry notice can prove good faith to invoke TUFTA's defense.

9   Quoting *Woodward*, 237 S.W.2d at 289; *see also Flack v. First Nat'l Bank of Dalhart*, 148 Tex. 495, 226 S.W.2d 628 (1950); *Ruebeck*, 176 S.W.2d at 739–40; *Ron Carter, Inc. v. Kane*, No. 01-10-00815-CV, 2011 WL 5100903 (Tex. App.—Houston [1st Dist.] Oct. 27, 2011, pet. denied) (mem. op.).

## Conclusion

A transferee on inquiry notice of fraud cannot shield itself from TUFTA's clawback provision without diligently investigating its initial suspicions—irrespective of whether a hypothetical investigation would reveal fraudulent conduct. To hold otherwise rewards willful ignorance and undermines the purpose of TUFTA. We answer the certified question no.

## All Citations

592 S.W.3d 125, 63 Tex. Sup. Ct. J. 250

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

97 S.W.3d 871

Court of Appeals of Texas,
Dallas.

MORGAN BUILDINGS
AND SPAS, INC., Appellant,

v.

TURN–KEY LEASING, LTD., Appellee.

No. 05–02–00819–CV.
|
Feb. 5, 2003.

**Synopsis**

Building company brought action against leasing company with which it had formed a partnership, alleging that leasing company's retention of building company's partnership interest as partial satisfaction of loan which building company defaulted on was void. The 192nd Judicial District Court, Dallas County, Merrill Hartman, J., granted leasing company partial summary judgment. Building company appealed. The Court of Appeals, Douglas S. Lang, J., held that: (1) Uniform Commercial Code (UCC) provisions regarding secured transactions applied to amended partnership agreement, and (2) agreement could not vary the requirement of advanced notice of disposition and commercially reasonable disposition of collateral under the UCC.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*873** Clifton T. Hutchinson, Hughes & Luce, L.L.P., Dallas, for appellant.

Kirk E. Crutcher, Amarillo, for appellee.

Before Justices MOSELEY, LANG, and LAGARDE.[1]

[1]    The Honorable Sue Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

**OPINION**

Opinion by Justice LANG.

Morgan Buildings and Spas, Inc. ("Morgan") appeals the summary judgment rendered against it in favor of Turn–Key Leasing, Ltd. ("Turn–Key"). Morgan brings forth two issues asserting the trial court erred in granting Turn–Key's motion for partial summary judgment because (1) Turn–Key's purported foreclosure on Morgan's partnership interest failed to comply with the provisions of the Texas version of Uniform Commercial Code ("U.C.C." or "the Code") Article Nine[2] and is therefore invalid and void, and (2) numerous fact issues preclude the entry of summary judgment. For reasons stated below, we resolve Morgan's first issue in its favor, reverse the trial court's decision, and remand this cause for further proceedings.

[2]    Substantial revisions to Chapter Nine of the Texas Business and Commerce Code were made during the 76th Legislature. *See* Act of June 18, 1999, 76th Leg., R.S., Ch. 414, § 1.01, 1999 Tex. Gen. Laws 2639–2736. These amendments took effect on July 1, 2001. All references to the Business and Commerce Code or the Uniform Commercial Code (U.C.C.) in this opinion are to the version that existed prior to the 1999 revisions because the applicable agreements in this case were entered into before the revisions took effect. For convenience, citation in the text will refer to the relevant provisions of the sections as they existed under the previous version of Article Nine, while the correct citation of these repealed sections will be included, where appropriate, in footnotes.

**Factual and Procedural Background**

In 1993, Morgan and Turn–Key formed a joint venture (the "partnership") by entering into a joint venture agreement (the "JVA") for the limited purpose of acquiring, owning, leasing, financing, and selling modular buildings. In late 2000, Morgan experienced a cash flow shortage and consulted Turn–Key about a distribution from the partnership. Michael Borger, Turn–Key's president, proposed a loan from Turn–Key to Morgan as opposed to having the partnership pay distributions. Morgan agreed to Turn–Key's proposed loan.

On January 9, 2001, Turn–Key lent Morgan $450,000. Morgan, in turn, signed a promissory note and a security

agreement. The promissory note was scheduled to mature on June 15, 2001 and described the collateral securing its payment as a "security interest created in a security agreement that covers [Morgan's] right, title, and interest in and to" the partnership. The security agreement classified the collateral as "general intangibles" and described it as: "All of [Morgan's] interest in and to [the partnership] under [the JVA] ... together with all income and distributions from the [partnership] (whether upon the dissolution and winding up of the [partnership] or otherwise); all of the foregoing, whether now owned or hereafter acquired and the proceeds thereof."

Contemporaneous with the execution of the promissory note and security agreement, **\*874** Morgan and Turn–Key executed an amendment to their 1993 JVA (the "amended agreement"). This amended agreement changed paragraph 14 of the 1993 JVA entitled "Limitation on Transfer."[3]

[3]    The 1993 JVA provided that no partner could "sell, assign, transfer, encumber, or otherwise dispose of" any interest in the partnership. The amended agreement, however, provided the following:

> It is understood and agreed that a partner may encumber all or a part of its interest in the joint venture to another partner to secure performance of an obligation to that partner. The terms of such pledge, including events of default, must be in a writing signed by the partners. In the event of default which allows foreclosure on the pledged interest, title of the pledged joint venture interest shall immediately pass according to this paragraph. Title shall pass by adjusting the capital accounts defined in Paragraph 11 of this Agreement by reducing the capital account of the defaulting partner by the amount of the default and by increasing the capital account of the non-defaulting partner by the same amount. In the event such an adjustment to the capital account occurs, the distributive share of each partner pursuant to Paragraph 12 will be adjusted so that the pro rata distributive shares will be allocated in the same proportion as the capital accounts after adjustment. In the event the default amount exceeds the defaulting partner's capital account balance, the partner's joint venture interest will terminate, and the defaulting partner shall remain liable for the excess amount.

As the scheduled maturity date of June 15, 2001 approached, Morgan contacted Turn–Key to seek an extension of the loan until December 31, 2001. The parties discussed an extension but reached no agreement. On June 21, Turn–Key wrote a letter to Morgan notifying it of Turn–Key's decision not to renew and extend the loan. The June 21 letter stated that the $450,000 loan, which had become due and payable six days earlier, would now need to be repaid no later than June 28, 2001. Morgan claims its efforts to contact Turn–Key after receipt of the June 21 letter were unsuccessful.

On June 29, 2001, Turn–Key sent another letter to Morgan stating that it considered Morgan to be in default. The letter also notified Morgan that, in accordance with the terms of the amended agreement, the following actions had already taken place: (1) Morgan's interest in the partnership passed to Turn–Key; (2) Turn–Key reduced Morgan's capital account by the amount of the principal, interest, and attorney's fees (totaling $455,384.93); (3) Turn–Key increased its own capital account in the same amount by which it reduced Morgan's capital account; and (4) Turn–Key adjusted the distributive shares of the partnership in the same proportion as the adjusted capital accounts. Turn–Key also informed Morgan that it remained liable to Turn–Key for the deficiency of the loan in the amount of $112,124.71. Furthermore, the June 29 letter stated that, notwithstanding Turn–Key's exercise of its rights under the amended agreement, Turn–Key intended that (1) the indebtedness evidenced by the promissory note had not been cancelled or extinguished, and (2) the security interest created by the security agreement was not released and was to remain "valid and in full force against the collateral." Finally, Turn–Key informed Morgan that the security interest created by the security agreement would continue to be effective and would be reinstated if at any time payment or reduction of all or any part of the indebtedness evidenced by the promissory note was "rescinded or must otherwise be returned by Turn–Key, as though such payment or reduction had not been made."

On July 11, 2001, Morgan wrote to Turn–Key. Morgan said that Turn–Key's June 29 letter appeared to propose that **\*875** Turn–Key retain Morgan's partnership interest in satisfaction of all or any portion of the note. Morgan protested any such retention of Morgan's partnership interest. Rather, Morgan stated that because of its objection, Turn–Key was compelled to dispose of the interest in accordance with the applicable provisions of the Texas U.C.C. Then, Morgan reserved the right to hold Turn–Key liable for any losses caused by Turn–Key's failure to comply with the U.C.C.

Morgan filed suit on July 9, 2001, claiming, *inter alia,* that Turn–Key's attempted retention[4] of Morgan's partnership interest in partial satisfaction of Morgan's debt was void. Morgan alleged that both the terms of the amended agreement and Turn–Key's actions violated the advance notice and

commercially reasonable disposition requirements of sections 9.504 and 9.505 of Article Nine. Turn–Key filed a motion for partial summary judgment on December 26, 2001.[5] Morgan then filed its own motion for partial summary judgment on February 22, 2002.[6] On March 21, 2002, the trial court granted Turn–Key's motion for partial summary judgment without specifying the grounds. Morgan non-suited its remaining claims,[7] and this appeal followed.

[4]     By its actions in adjusting the partnership interests and capital accounts in its favor, Morgan claimed that Turn–Key had "retained" the collateral as that term is used under Article Nine. However, at oral argument of this appeal, Morgan indicated that Turn–Key had since sold (i.e., "disposed" of) a portion of the partnership to a third party. There is no evidence in the record regarding the sale of any portion of the partnership to a third party.

[5]     Turn–Key moved for partial summary judgment on Morgan's claims for (1) breach of the JVA; (2) breach of the duty of loyalty; (3) usurpation of partnership opportunity; (4) wrongful foreclosure; (5) unreasonable disposition of partnership assets; (6) impermissible foreclosure; (7) impermissible winding up of the partnership; (8) injunctive relief requiring Turn–Key to continue the partnership; (9) injunctive relief preventing Turn–Key from disposing of partnership assets; and (10) injunctive relief preventing Turn–Key from using the partnership name.

[6]     Morgan moved for partial summary judgment on the grounds that (1) Turn–Key's notice was untimely; (2) Turn–Key could not retain the collateral; (3) Turn–Key's disposition of the collateral was unreasonable; (4) Turn–Key could not retain the collateral and claim a deficiency; (5) the advance notice and commercially reasonable disposition requirements of the Texas U.C.C. could not be waived; and (6) Turn–Key's attempted transfer of its partnership interest was invalid.

[7]     The claims Morgan non-suited were its request for an accounting, its request for a winding up of the partnership, and "other declaratory relief" regarding the applicability of the U.C.C. to the Turn–Key foreclosure. These claims are not before us, and we do not address their merits.

On appeal, Morgan argues the trial court erred in granting Turn–Key's motion for partial summary judgment because (1) Turn–Key's purported foreclosure on Morgan's partnership interest failed to comply with the provisions of Texas's U.C.C. Article Nine and is therefore invalid and void, and

(2) numerous fact issues preclude the entry of summary judgment. Although Morgan raises two issues, both center on whether the provisions of the amended agreement and the actions in disposition or retention of the partnership account and/or its partnership interest are governed by the U.C.C. If we were to find that the U.C.C. does not govern, Morgan's contention as to the existence of fact issues would be of no merit, since any such fact issues hinge on its claim that the U.C.C. applies to this transaction. However, if we were to find that the U.C.C. does apply, then the case should be reversed and remanded **\*876** for further proceedings consistent with this opinion.

**Standard of Review**

The standards for reviewing summary judgment under rule 166a(c) are well established. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *Orozco v. Dallas Morning News, Inc.,* 975 S.W.2d 392, 394 (Tex.App.-Dallas 1998, no pet.). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied); *West End Pink, Ltd. v. City of Irving,* 22 S.W.3d 5, 7 (Tex.App.-Dallas 1999, pet. denied) (citing *Keever v. Finlan,* 988 S.W.2d 300, 305 (Tex.App.-Dallas 1999, pet. dism'd)).

**U.C.C. Article Nine Governing Secured Transactions**

   **A. Applicable Law**
Article Nine of the U.C.C. applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts."[8] Generally, the test for creation of a security interest is whether the transaction was intended to have the effect as security, because parties must have intended that their transaction fall within the scope of Article Nine. *Superior Packing, Inc. v. Worldwide Leasing & Fin., Inc.,* 880 S.W.2d 67, 71 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing *John Bezdek Ins. Assocs., Inc. v. Am. Indem. Co.,* 834 S.W.2d 401, 403 (Tex.App.-San Antonio 1992, no writ)). Accordingly, we look to the transaction to determine if the parties intended to create a security interest in the type of property specified in section 9.102 of the Code for the purpose of securing payment or performance of an obligation. *John Bezdek Ins.,* 834 S.W.2d at 403. No formal wording

is required, and the court, in arriving at the intent of the parties, should examine the substance of the documents in light of the circumstances of the case. *Id.* (citing *In re Miller,* 545 F.2d 916, 918 (5th Cir.1977) (applying Texas law)). We determine the true intention of the parties by examining "the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983) (emphasis omitted). Finally, documents executed contemporaneously for the same purpose and as part of the same transaction should be read and construed together to determine the intent of the parties. *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex.1981).

8  Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–102, 1965 Tex. Gen. Laws 151, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.102, 1967 Tex. Gen. Laws 2520, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 999, *amended by* Act of June 18, 1997, 75th Leg., R.S., ch. 930, § 1, 1997 Tex. Gen. Laws 2926–27 (current version at Tex. Bus. & Com.Code Ann. § 9.109 (Vernon Supp.2003)).

Section five of Article Nine governs the rights and duties of secured parties and debtors in the event of default. Section 9.504 gives a secured party the right to sell or dispose of collateral after the debtor's default, while section 9.505 gives the secured party the right to retain the collateral in satisfaction of the debtor's obligation. However, advance notice of either means of disposition must be given by the secured party. *See Tanenbaum v. Econ. Lab., Inc.,* 628 S.W.2d 769, 771 (Tex.1982); *Acuff v. Lamesa Nat'l Bank,* 919 S.W.2d 154, 156 (Tex.App.-Eastland 1996, no writ).

**\*877** Section 9.504(c) governs a secured party's right to dispose of collateral after default by the debtor. It states: "Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... [B]ut every aspect of the disposition including the method, manner, time, place, and terms must be *commercially reasonable.*"9 Section 9.504 describes the "advance notice" requirement as follows:

9  Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–504(3), 1965 Tex. Gen. Laws 176, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.504(c), 1967 Tex. Gen. Laws 2550, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 1028, *amended by* Act of June 19, 1975, 64th Leg., R.S., ch. 353, § 8, 1975 Tex. Gen. Laws 942–43, *amended by* Act

of May 20, 1977, 65th Leg., R.S., ch. 163, § 4, 1977 Tex. Gen. Laws 334 (current version at Tex. Bus. & Com.Code Ann. § 9.610 (Vernon Supp.2003)) (emphasis added).

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification* of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed *after default* a statement renouncing or modifying his right to notification of sale.10

10  *Id.* (emphasis added).

A secured creditor, however, may elect not to dispose of the collateral. Section 9.505 allows a creditor to retain collateral in complete satisfaction of the indebtedness once it notifies the debtor of its intent. "Written notice of such proposal shall be sent to the debtor if he has not signed *after default* a statement renouncing or modifying his rights under this subsection.... If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under Section 9.504."11

11  Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–505, 1965 Tex. Gen. Laws 177, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.505, 1967 Tex. Gen. Laws 2551, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 1029, *amended by* Act of June 19, 1975, 64th Leg., R.S., ch. 353, § 9, 1975 Tex. Gen. Laws 943, *amended by* Act of May 20, 1977, 65th Leg., R.S., ch. 163, § 6, 1977 Tex. Gen. Laws 334 (current version at Tex. Bus. & Com.Code Ann. § 9.620 (Vernon Supp.2003)) (emphasis added).

Finally, section 9.501(c) states that certain provisions relating to the disposition and retention of collateral may not be waived, but that the parties may agree to "not manifestly unreasonable" standards as to fulfillment of those rights and duties. Specifically, that section provides:

[T]he rules stated in the subsections below *may not be waived* or varied ... but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured *if such standards are not manifestly unreasonable:*

....

(2) Subsection (c) of Section 9.504 and Subsection (a) of Section 9.505 which deal with disposition of collateral;

(3) Subsection (b) of Section 9.505 which deals with acceptance of collateral as discharge of obligation.[12]

[12]      Act of June 18, 1965, 59th Leg., R.S., ch. 721, § 9–501(3), 1965 Tex. Gen. Laws 174, *amended by* Act of June 14, 1967, 60th Leg., R.S., ch. 785, § 9.501(c), 1967 Tex. Gen. Laws 2548, *amended by* Act of June 14, 1973, 63rd Leg., R.S., ch. 400, § 5, 1973 Tex. Gen. Laws 1026 (current version at Tex. Bus. & Com.Code Ann. § 9.602 (Vernon Supp.2003)) (emphasis added).

**\*878 B. Application of Law to the Facts**

**1. Security Agreement or Alternative Means of Payment?**

Morgan claims that the substance of the amended agreement creates a security interest that is governed by Article Nine. In that regard, Morgan points to the language of the amended agreement, which, among other things, reflects the intent of the parties by authorizing a partner to "encumber" its partnership interest to "secure performance" of an obligation to that partner. The terms of such "pledge," including events of "default," must be in a writing signed by the partners. Further, the amended agreement provides that any "pledged interest" will immediately pass upon any event of default by adjusting the partners' capital accounts such that any debt is *automatically* offset by the defaulting party's capital account. If the amount of the debt due and unpaid exceeds the defaulting party's capital account, that partner's interest terminates, and the defaulting partner remains liable for the excess amount.

Turn–Key consistently argues its actions should not be governed by the U.C.C. The primary reason it cites is that the amended agreement authorized an alternate method of payment and, as a result, it was not limited to enforcement of its security interest under Article Nine. Thus, Turn–Key asserts it had two options after Morgan defaulted: (1) it could have foreclosed on its security interest subject to the security agreement and thus could have been subject to both the duties and protections of Article Nine, *or* (2) it could have simply adjusted the capital accounts by the amount of the debt and then could have sued Morgan for the deficiency, as provided under the terms of the amended agreement. As evidence of its election to pursue the latter option, Turn–Key directs us to its June 29 letter, which informed Morgan that Turn–Key

reserved all its rights under the security agreement since it had elected to proceed under the amended agreement. Hence, Turn–Key concludes that its actions pursuant to the amended agreement would not be an Article Nine foreclosure.

In making its argument, Turn–Key cites us to the Texas Revised Partnership Act (TRPA),[13] which it asserts governs this transaction to the exclusion of Article Nine of the U.C.C. Specifically, Turn–Key cites article 6132b–4.01(c), which provides that a partner who makes a payment or advance on behalf of the partnership is entitled to reimbursement by the partnership. *See* Tex.Rev.Civ. Stat. Ann. art. 6132b–4.01(c) (Vernon Supp.2003).[14] Turn–Key informs this Court in its brief that we should not **\*879** apply Article Nine of the U.C.C. to this transaction unless we are "also prepared to find an irreconcilable statutory conflict between the TRPA and the U.C.C." However, article 6132b–4.01(c) of the TRPA is inapposite to this case because it clearly refers only to transactions between a partner and the partnership itself. Turn–Key conceded as much during its oral argument at the submission of this appeal. We are not cited to any applicable provision of the TRPA that references transactions between partners where the partnership interest of one partner is encumbered, in the words of the amended agreement, "to secure performance of an obligation to that partner." Therefore, we find no irreconcilable statutory conflict between the TRPA and Article Nine as it relates to the facts of this case.

[13]      The Texas Revised Partnership Act, Tex.Rev.Civ. Stat. Ann. art. 6132b–1.01 to –11.04 (Vernon Supp.2003), applies to partnerships formed on or after January 1, 1994 and to those partnerships formed before that date that elect to be governed by the new act. *Id.* art. 6132b–11.03(a)(1). In this case, the 1993 JVA specifically provides that the parties' agreement was subject to the Texas Uniform Partnership Act, which preceded the Revised Partnership Act. Although Turn–Key makes no assertion that the parties here ever elected to be governed by the Revised Partnership Act, we assume for the sake of considering Turn–Key's argument, without so deciding, that the relevant provisions of the Revised Partnership Act are applicable to the Morgan/Turn–Key partnership.

[14]      Notwithstanding the applicability of the Texas Revised Partnership Act, subsection (c) of article 6132b–4.01 is drawn from and quite similar to section 18(1)(c) of the repealed Texas Uniform Partnership Act. *See* Act of May 16, 1961, 57th Leg., R.S., ch. 158, § 18(1)(c), 1961 Tex.

Gen. Laws 294, *repealed by* Act of June 19, 1993, 73rd Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3896.

Finding no applicable Texas authority to support its argument, Turn–Key cites us to a decision from the Georgia Court of Appeals in the case of *Consolidated Equities Corp. v. Bird, 195 Ga.App. 45, 392 S.E.2d 276 (1990)*. Turn–Key argues that this Georgia case supports its position that the amended agreement is merely an alternate method of payment and not a security agreement governed by Article Nine. Turn–Key suggests that the Georgia case addresses a factual situation similar to that before us.

The court in *Consolidated Equities* found the offset of several defaulting partners' capital accounts to be pursuant to an agreement for "alternate methods of payment" as opposed to a transaction governed by the U.C.C. *Id.* at 278. Although we do find some similarities between the facts recited in the *Consolidated Equities* case and those in the case before us, we read *Consolidated Equities* as distinguishable from the case at bar and decline to follow it. In *Consolidated Equities,* on the one hand, the court pronounced the general rule that "[a]n agreement for an alternative form of payment does not allow for an indirect evasion by the creditor of the debtor protection provisions of Article Nine." *Id.* Yet, on the other hand, the Georgia court found that since the "alternative method of payment" provided that there would be no claim for deficiency, the protection provisions of Article Nine were not evaded. According to that court's reasoning, the debtor protection provisions of Article Nine were "inapplicable and irrelevant." *Id.* at 278–79. We do not agree with the Georgia court's sweeping statement that Article Nine protections are "inapplicable and irrelevant" in instances where secured parties do not pursue defaulting partners for post-disposition and/or post-retention deficiency claims. Regardless of the Georgia court's reasoning, the amended agreement before us clearly allows for a deficiency claim against the defaulting partner. Even if the provisions of the amended agreement were to be construed by us as an "alternate method of payment," such an agreement could not be allowed to stand if it has even the indirect effect of "evasion ... of the debtor protection provisions of Article Nine." *Id.* at 278.

**2. Waiver of Debtor Safeguards or Reasonable Modification of Standards?**

Morgan argues the amended agreement constitutes a waiver of the notice and commercially reasonable requirements for disposition or retention of collateral in violation of the prohibitions of section 9.501(c). Morgan asserts

that, at the very least, the amended agreement was an impermissible "manifestly unreasonable" modification of these requirements. Morgan asserts that since the amended agreement provided for absolutely no advance notice of disposition, effectively, there was a waiver of the Article Nine notice requirements. Texas courts **\*880** have long prohibited waivers of the Article Nine requirements. *See, e.g., Tanenbaum v. Econ. Lab., Inc., 628 S.W.2d 769 (Tex.1982); Rabinowitz v. Cadle Co. II, Inc., 993 S.W.2d 796 (Tex.App.-Dallas 1999, pet. denied); Burton v. Nat'l Bank of Commerce of Dallas, 679 S.W.2d 115 (Tex.App.-Dallas 1984, no writ)*. Further, Morgan advises that Texas courts have not tolerated waiver of a secured party's obligation to dispose of collateral in a commercially reasonable manner. *See United States v. Terrey, 554 F.2d 685 (5th Cir.1977)* (applying Texas law); *Rabinowitz, 993 S.W.2d at 798–99; O'Neil v. Mack Trucks, Inc., 533 S.W.2d 832, 836 (Tex.Civ.App.-El Paso 1975), rev'd in part on other grounds, 542 S.W.2d 112 (Tex.1976), mandate recalled and reissued by 551 S.W.2d 32 (Tex.1977)* (per curiam). Turn–Key responds by arguing that there was no waiver. Alternatively, Turn–Key argues that even if the U.C.C. were to apply, its actions were pursuant to a "modification" authorized by section 9.501(c) that could not possibly be construed as "manifestly unreasonable," since Morgan had already agreed to the "modification" as to the disposition or retention of its partnership interest when it signed the amended agreement.

It is clear from a plain reading of section 9.501(c) that debtors' rights and secured creditors' duties under sections 9.504 and 9.505 may not be waived regarding (1) commercial reasonableness of the disposition of collateral, and (2) advance notice of disposition or retention of collateral. While a debtor and creditor may enter into an agreement that establishes "the standards by which the fulfillment of these rights and duties is to be measured," there is a limit. The proposed "standards" must not be "manifestly unreasonable."[15] The term "manifestly unreasonable" is not defined in the U.C.C., and no Texas case law has addressed the specific issue raised in this case. However, Black's Law Dictionary defines "manifest" as: "Evident to the senses, especially to the sight, obvious to the understanding, evident to the mind, not obscure or hidden, and is synonymous with open, clear, visible, unmistakable, indubitable, indisputable, evident, and self-evident." Black's Law Dictionary 962 (6th ed.1990).[16]

15 *See* § 9.501(c), *supra* note 12 (current version at Tex. Bus. & Com.Code Ann. § 9.603 (Vernon Supp.2003)).

16 Dictionary definitions can be utilized by courts in construing the plain meaning of words. *See* Tex. Gov't Code Ann. § 311.011 (Vernon Supp.2003) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

In reasoning toward our decision, and in view of the dearth of legal authority in Texas, we are mindful of the official comments to the various sections of the U.C.C. prepared by the American Law Institute and the National Conference of Commissioners on the Uniform Commercial Code. These comments provide valuable guidance to the meaning and purpose of the Code as enacted in Texas. In particular, we note that comment four to section 9.501 makes it abundantly clear that debtors' rights after default are to be carefully protected. It states: "In the area of rights after default our legal system has traditionally looked with suspicion on agreements designed to cut down the debtor's rights and free the secured party of his duties.... The default situation offers great scope for overreaching; the suspicious attitude of the courts has been grounded in common sense."[17]

17 *See* § 9.501(c), *supra* note 12, at cmt. 4 (current version at Tex. Bus. & Com.Code Ann. § 9.602 cmt. 2 (Vernon Supp.2003)).

**\*881  Conclusion**

Turn–Key's argument that the amended agreement is merely an alternative means of payment, exempt from the U.C.C. as found in the *Consolidated Equities* case, is simply not persuasive. The amended agreement does not stand alone. It simply authorizes a partner to "encumber" its partnership interest to "secure performance of an obligation" to another partner. The amended agreement imposes the requirement that a "pledge, including events of default," be in writing and authorizes "foreclosure" upon occurrence of an "event of default." Then, fitting neatly with the amended agreement, the security agreement effects a "pledge" of Morgan's partnership interest to "secure" the repayment of the sum due to be paid pursuant to the note, while the note and security agreement specify the "events of default." It is clear that the promissory note and security agreement, executed contemporaneously with the amended agreement, supply terms required for the operation of the disposition provisions in the amended agreement.

The plain intention of the parties found in the complementary provisions of the documents is that the amended agreement was created to authorize a security interest and provide an alternative means of foreclosure or disposition upon default. Hence, we conclude that Article Nine of the U.C.C. applies to the amended agreement and to Turn–Key's actions under the provisions of the amended agreement.[18]

18 *See* § 9.102(a), *supra* note 8 (current version at Tex. Bus. & Com.Code Ann. § 9.109 (Vernon Supp.2003)); *see also John Bezdek Ins.,* 834 S.W.2d at 403.

Because Article Nine of the U.C.C. applies, we find that Turn–Key's reliance on the amended agreement is unavailing to excuse it from failing to provide advance notice. We hold that the amended agreement is not enforceable to vary the requirement of advance notice under Article Nine since any such omission is violative of section 9.501(c) and the time honored prohibition of waiver of advance notice of the disposition or retention of collateral. *See Tanenbaum,* 628 S.W.2d at 772. Additionally, we hold that Turn–Key is not excused from its obligations of commercially reasonable disposition of the collateral based upon the provision of the amended agreement providing for an offset of the partnership account as the sole means of disposing of or retaining the collateral. That provision of the amended agreement, in substance, effects an unlawful waiver by the debtor of the secured party's obligation to dispose of the collateral in a commercially reasonable manner.[19]

19 *See* § 9.501(c), *supra* note 12 (current version at Tex. Bus. & Com.Code Ann. § 9.603 (Vernon Supp.2003)); *see also Rabinowitz,* 993 S.W.2d at 798–99.

Finally, we conclude that even if the "offset provision" was intended by the parties to define the "standards" for compulsory disposition or retention of collateral, including advance notice, under sections 9.504 and 9.505, those "standards" were and are "manifestly unreasonable" in light of the prohibition of waiver of those provisions. Accordingly, the "offset provision" fails to vary the rights and obligations of the parties as a matter of law.

We reverse the trial court's judgment and remand this cause for further proceedings consistent with this opinion.

**All Citations**

97 S.W.3d 871, 49 UCC Rep.Serv.2d 941

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

645 S.W.3d 212
Supreme Court of Texas.

ROSETTA RESOURCES
OPERATING, LP, Petitioner,

v.

Kevin MARTIN, Jamie Martin,
and Ashley Lusk, Respondents

No. 20-0898
|
Argued February 2, 2022
|
OPINION DELIVERED: May 6, 2022

**Synopsis**
**Background:** Lessors brought action against lessee and royalty interest assignee alleging breach of mineral lease agreements, fraud, negligence, conversion, mineral trespass, breach of fiduciary duty, and violation of Theft Liability Act. After severance of claims against lessee from those against assignee, the 156th District Court, Live Oak County, granted lessee's motion for summary judgment and denied lessors' motion for partial summary judgment. Lessors appealed. The Corpus Christi - Edinburg Court of Appeals, Contreras, C.J., 2020 WL 5887566, reversed and remanded with instructions. Lessee petitioned for review, which was granted.

**Holdings:** The Supreme Court, Busby, J., held that:

well drilled in unit that did not adjoin leased acreage did not qualify as triggering well under lease addendum;

well drilled in unit containing portion of leased acreage qualified as triggering well;

lessee's obligation under addendum to protect "un-drilled acreage" from drainage was limited to non-pooled southern portion of leased acreage;

addendum's phrase "drainage is occurring" required actual drainage, not a showing of deemed drainage;

fact issue as to whether parties intended location of triggering well to limit location of draining well precluded summary judgment on contract claim;

res judicata did not bar lessors from arguing that lessee's obligation to protect against drainage extended to well drilled in unit that did not adjoin leased acreage; and

Court of Appeals could not properly reverse summary judgment granted to lessee on tort and statutory claims.

Reversed and remanded.

**Procedural Posture(s):** Petition for Discretionary Review; On Appeal; Motion for Summary Judgment.

**\*216** On Petition for Review from the Court of Appeals for the Thirteenth District of Texas, Dori Contreras, J.

**Attorneys and Law Firms**

George Scott Christian, George S Christian atty at Law, Austin, for Amicus Curiae Texas Civil Justice League.

Christopher Michael Hogan, Hogan Thompson LLP, Houston, for Amicus Curiae Texas Oil and Gas Association.

Macey Reasoner Stokes, Amy Pharr Hefley, Joshua Morrow, Baker Botts L.L.P., Houston, James Danford Jr., Charles Stephen Kelley, Susan Alkadri, Mayer Brown LLP, Houston, for Petitioner.

Zachary Paul Hudler, Zachary P. Hudler, P.C., Johnson City, Juan J. Hinojosa, The Hinojosa Law Firm, P.C., Edinburg, for Respondents.

**Opinion**

Justice Busby delivered the opinion of the Court.

In this oil and gas case, the parties dispute the meaning and application of an express covenant to protect against drainage. The covenant appears in a unique and mistake-ridden lease addendum, which expressly limits the location of wells that may trigger the lessee's obligation to protect against drainage but does not directly address the location of wells that may cause drainage. The lessor plaintiffs argue that the covenant's language allows for separate triggering and draining wells, and that the lessee breached the covenant by failing to protect against drainage from a non-triggering well. The lessee defendant responds that it is only obligated

to protect against drainage from the limited class of triggering wells.

We conclude that the addendum is ambiguous because both interpretations of this poorly drafted covenant are reasonable. We also reject the lessee's res judicata defense, but we conclude that the court of appeals improperly reversed the trial court's take-nothing summary judgment on the lessors' tort and statutory claims, which they did not challenge on appeal. We therefore reverse the court of appeals' judgment, reinstate the trial court's summary judgment in part as to the lessors' tort and statutory claims, and remand for further proceedings on their claim for breach of the lease.

## Background

The lessors are respondents Kevin Martin, Jamie Martin, and Ashley Lusk (the Martins), who own land in Live Oak County. They entered into mineral lease agreements with Mesquite Development in 2001 and 2006. The leases contain two key provisions related to drainage. Paragraph 5 of the 2001 agreement provided:

> In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of and draining the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances. Lessee may at any time execute and deliver to Lessor or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.

In 2006, the parties agreed to various amendments and extensions including Addendum 18, which altered the terms of Paragraph 5 and is at issue here. The unique, customized language of Addendum 18 includes several typographical and grammatical errors and lacks helpful punctuation. We have inserted bold numbers and letters into its text (using brackets) to **\*217** help organize its content and facilitate our analysis. Addendum 18 provides:

> Notwithstanding anything contained herein to the contrary, it is further agreed that [**(1)(a)**] in the event a well is drilled on or in a unit containing part of this acreage or is drilled on acreage adjoining this Lease, [**(b)**] the Lessor [read "Lessee"], or its agent(s) shall protect the Lessee's [read

"Lessor's"[1]] undrilled acreage from drainage and [**(2)**] in the opinions of reasonable and prudent operations [read "operators"[2]], [**(a)**] drainage is occurring on the un-drilled acreage, even though the draining well is located over three hundred-thirty (330) feet from the un-drilled acreage, [**(b)**] the Lessee shall spud an offset well on said un-drilled acreage or on a unit containing said acreage within twelve (12) months from the date the drainage began or release the acreage which is un-drilled or is not a part of a unit which is held by production.

[1]    Both parties agree that "lessor" and "lessee" should be switched due to a scrivener's error.

[2]    Rosetta argues that "operations" should read "operators" and claims that the Martins have never argued otherwise.

Mesquite assigned its rights as lessee to petitioner Rosetta Resources Operating, LP, in 2007. Shortly thereafter, Newfield Exploration Co. and Dynamic Production, Inc. (collectively Newfield) joined with Rosetta to create the Martin Unit, which contained portions of the Martin Lease (the Martin Pooled Acreage) and property from unrelated leases. The southern portion of the Martin Lease acreage was not included in the unit. Rosetta assigned a percentage of its royalty interest in the Martin Pooled Acreage to Newfield but retained its entire interest in the non-unitized acreage to the south.

In 2008, Newfield drilled a well on the Martin Pooled Acreage (the Martin Well). In 2009, Newfield created a separate unit (the Simmons Unit) that does not adjoin the Martin Lease and drilled a well on that acreage (the Simmons Well).

In 2014, the Martins sued Rosetta and Newfield for breach of Addendum 18, alleging that the addendum obligated the lessees to protect the undrilled lease acreage south of the Martin Unit from drainage caused by the Simmons Well. The Martins also brought claims for common-law fraud, negligence, conversion, mineral trespass, breach of fiduciary duty, and violation of the Theft Liability Act. The lessees responded that the Simmons Well had not triggered their obligation to protect the undrilled acreage from drainage because it was not drilled on property adjoining the Martin Lease.

The trial court granted summary judgment for Newfield and severed the claims against it from those against Rosetta. Rosetta then moved for its own summary judgment on all the Martins' claims on several grounds.

On appeal from Newfield's summary judgment, the Martins argued—for the first time—that the Martin Well had triggered Addendum 18's covenant to protect against drainage, and that this obligation encompassed any drainage from the Simmons Well. *Martin v. Newfield Expl. Co.*, No. 13-17-00104-CV, 2018 WL 1633574, at \*3 (Tex. App.—Corpus Christi–Edinburg Apr. 5, 2018, pet. denied) (mem. op.). Rejecting that position as waived, the court of appeals affirmed, agreeing with Newfield that the Simmons Well did not trigger Addendum 18. *Id.*

After the Newfield appeal, the trial court returned to Rosetta's motion for summary judgment, inviting the Martins **\*218** to submit additional briefing and to move for summary judgment regarding the effect of the Martin Well. The Martins filed a second amended petition and a motion for partial summary judgment, asserting that Rosetta's obligation to protect against drainage—including that caused by the Simmons Well—was triggered by the Martin Well. The trial court granted Rosetta's motion for summary judgment on all the Martins' claims and denied the Martins' motion.

The court of appeals reversed and remanded, instructing the trial court to grant partial summary judgment for the Martins. —— S.W.3d ——, 2020 WL 5887566, at \*6 (Tex. App.—Corpus Christi–Edinburg Oct. 1, 2020). Construing Addendum 18, the court concluded that the Martin Well triggered both a general duty to protect against drainage and a specific obligation to spud an offset well or release the undrilled acreage if, "in the opinions of reasonable and prudent operations, drainage is occurring on the un-drilled acreage." *Id.* at ——, 2020 WL 5887566 at \*5. The court of appeals also concluded that the record showed drainage was indisputably occurring. *Id.* Additionally, because Rosetta and Newfield owned different interests and Rosetta's interests were not at issue during Newfield's summary judgment proceedings, the court of appeals rejected Rosetta's res judicata defense. *Id.*

Rosetta petitions for review, arguing that (1) Addendum 18 cannot be construed to allow separate triggering and draining wells, (2) the Martins' argument that the Martin Well triggered Addendum 18 is barred by res judicata, (3) the court of appeals erroneously concluded that drainage was not in dispute, and (4) the court erroneously reversed Rosetta's summary judgment as to all the Martins' claims when the Martins' appeal addressed only their claim for breach of contract. In response, the Martins argue that (1) the plain language of Addendum 18 allows for separate triggering and draining wells, (2) the court of appeals correctly concluded that the elements of res judicata were not met, (3) the summary judgment record includes production reports that establish drainage, and (4) in the alternative, Addendum 18 is ambiguous.

**Analysis**

**I. Addendum 18 is ambiguous regarding whether the Martin Well triggered Rosetta's obligation to protect against drainage from the Simmons Well.**

**A. Standard of review and applicable law**

We review summary judgments de novo. *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). To prevail on a motion for traditional summary judgment, the movant must show that no material fact issues exist and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "When both parties move for summary judgment and the trial court grants one motion and denies the other, ... we review both sides' summary judgment evidence and render the judgment the trial court should have rendered." *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013).

Mineral leases are contracts, so their meaning is determined using general principles of contract construction. *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147–48 (Tex. 2020). The goal of contract construction is to ascertain the parties' intent as expressed in the language of the agreement. *Id.* at 148.

**\*219** Whether a mineral lease is ambiguous is a question of law. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). An ambiguity exists when a contract's "meaning is uncertain and doubtful or it is reasonably susceptible to more than one interpretation." *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding). If there is "more than one reasonable interpretation" of the contractual language, then a fact issue arises regarding the parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Parties' conflicting interpretations cannot alone create an ambiguity. *Apache Deepwater, LLC v. McDaniel Partners, Ltd.*, 485 S.W.3d 900, 904 (Tex. 2016). Even if parties agree that a contract is unambiguous and argue that the unambiguous language merely creates different

results, we may independently conclude that the contract is ambiguous as a matter of law. *URI, Inc. v. Kleberg County,* 543 S.W.3d 755, 763 (Tex. 2018). "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex. 1983); *see also J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003).

To determine whether a lease is ambiguous, we must consider its language as a whole in light of well-settled construction principles. *Piranha Partners v. Neuhoff,* 596 S.W.3d 740, 743 (Tex. 2020) (citing *URI,* 543 S.W.3d at 763). These principles include giving the language its plain, ordinary, generally accepted meaning, *URI,* 543 S.W.3d at 764, considering the context in which words are used, *id.,* avoiding constructions that render provisions meaningless, *Coker,* 650 S.W.2d at 393, and construing contract provisions together so as to give effect to the whole, *Citizens Nat'l Bank in Abilene v. Tex. & P. Ry. Co.,* 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941). We also avoid constructions of contract language that would lead to absurd results. *Hemyari v. Stephens,* 355 S.W.3d 623, 626 (Tex. 2011) (per curiam). Extrinsic evidence cannot be used to create ambiguity within a contract, but it may be admitted if the court determines that the contract is ambiguous. *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen,* 525 S.W.3d 671, 681 (Tex. 2017).

The Martins' claims for breach of contract rely largely on the plain language of the lease. The lease provision at issue, Addendum 18, is an express covenant to protect against drainage.[3] When oil and gas leases do not expressly address drainage, a covenant to protect against both local and field-wide drainage is implied. *Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 567–68 (Tex. 1981). Parties often supersede this implied covenant with contractual language that imposes certain obligations on the lessee. *See Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 701 (Tex. 2008); 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law: Manual of Terms 683 (2020). Such obligations commonly include the drilling of an offset well, the payment of offset royalties, or the release of acreage. *See* 8 Manual of Terms at 684–85. Breach of a covenant gives rise to liability for **\*220** damages. *See Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex. 1989).

[3]     The Martins have also alleged that Rosetta breached an implied covenant to protect against drainage, but the parties' briefing in this Court does not separately

address this allegation. Because we are remanding for further proceedings on the Martins' claim for breach of contract, the parties are free to litigate the alleged implied covenant on remand if there is still a dispute regarding whether such a covenant exists or was breached.

Though Addendum 18 is an express covenant to protect against drainage, it incorporates the "reasonable and prudent operat[or]" standard of care (RPO standard), which also applies to the implied covenant to protect against drainage.[4] A plaintiff must show two elements to establish breach of an implied covenant: "proof (1) of substantial drainage from the lessor's field, and (2) that a reasonably prudent operator would have acted to prevent the drainage." *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 253 (Tex. 2004), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Tr.,* 268 S.W.3d 1 (Tex. 2008). A reasonably prudent operator would not act to prevent drainage unless there was a reasonable expectation of profit. *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 695–96 (1959).

[4]     *See Amoco,* 622 S.W.2d at 567–68 (explaining that "the standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances").

Parties are free to draft novel contractual terms that produce results some may consider odd; a court's duty is to give effect to the parties' intent as expressed in the contract's language. *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC,* 573 S.W.3d 198, 211 (Tex. 2019). From our review of available sources, it appears that Addendum 18 is an outlier among express covenants to protect against drainage. As the court of appeals noted, not only are the addendum's provisions unique, they "suffe[r] from both a lack of accuracy and a lack of clarity," including typographical and grammatical errors. —— S.W.3d at ——, 2020 WL 5887566, at \*3. As a result, we caution that our construction of Addendum 18 in this opinion may not provide useful guidance for determining how covenants to protect against drainage typically function.

**B. Though Addendum 18 lacks a coherent structure and helpful punctuation, many of its substantive provisions are unambiguous.**

The parties offer competing interpretations of Addendum 18, and we focus on its language to determine the reasonableness of those interpretations. *See Columbia Gas,* 940 S.W.2d at 589. To frame our discussion of the disputed terms, we begin by setting out the unambiguous portions of Addendum 18.

When holding that a portion of a contract is ambiguous, an appellate court should explain as much of the contract's unambiguous meaning as possible regarding the disputed issue, which will assist the parties and trial court in framing the remaining questions for the jury to resolve on remand. *Cf. J.M. Davidson, Inc.*, 128 S.W.3d at 229 ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."); *Columbia Gas*, 940 S.W.2d at 589 ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.").

For ease of reference, we have broken down Addendum 18's language into four parts: the Trigger (1)(a), Obligation (1)(b), Standard (2)(a), and Performance (2)(b) parts. Together, these parts unambiguously impose an obligation on Rosetta that is triggered under limited conditions and that uses an RPO standard to measure whether and when Rosetta must take certain actions to perform that obligation.

### 1. Trigger – part (1)(a)

Part (1)(a) lists various events that provide an initial condition for the covenant **\*221** contained in parts (1)(b) and (2). Though the parties disagree about whether part (1)(a) limits part (1)(b), a question we address below, part (1)(a) at least defines a triggering event that marks the beginning of Rosetta's obligation: when a well is drilled in one of the specified locations.

Typically, express covenants to protect against drainage are triggered by drilling on adjoining or proximity-limited acreage. *See* 8 Manual of Terms at 683. But under this non-typical clause, three types of wells may serve as a trigger: a well "on [leased] acreage," a well drilled "in a unit containing" leased acreage (thus including acreage pooled with leased acreage), or a well "on acreage adjoining" leased acreage.

Applying this language from part (1)(a) to undisputed facts in the summary judgment record, we conclude that the Simmons Well does not qualify as a triggering well because it is outside the lease and unit and is not located on adjoining acreage. *See Newfield*, 2018 WL 1633574, at \*3–4. The Martin Well qualifies as a triggering well, however, because it is located

on leased acreage and in a unit containing part of the leased acreage.

### 2. Obligation – part (1)(b)

Part (1)(b) contains the substance of Rosetta's promise to the Martins. This part explains what Rosetta is obligated to do: protect the lease's "un-drilled acreage" from drainage. Express covenants to protect against drainage commonly obligate the lessee to protect the entire lease, but Addendum 18 uniquely limits Rosetta's responsibility to the "un-drilled" portion of the Martin Lease, which the parties agree is the non-pooled southern portion. This limitation may impact how a reasonably prudent operator evaluates whether drainage is occurring. Addendum 18 does not otherwise define "drainage," and the parties dispute whether "drainage" is limited by part (1)(a). We address these issues below.

### 3. Standard – part (2)(a)

Compared to the broad "protect[ion]" Rosetta promised to provide in part (1)(b), part (2) contains a more specific set of instructions for when "drainage is occurring." In particular, part (2)(a) selects a standard for measuring whether Rosetta must take action or risk breach: the reasonably prudent operator standard. Together, parts (2)(a) and (2)(b) provide that when a reasonably prudent operator would conclude drainage is occurring, it must take certain actions within a twelve-month period thereafter to avoid breaching the covenant.

As mentioned above, the common-law standard that governs an implied covenant to protect against drainage involves two elements: proof of substantial drainage and that a reasonably prudent operator would expect it to be profitable to take action to prevent such drainage. *See Kerr–McGee*, 133 S.W.3d at 253; *Clifton*, 325 S.W.2d at 695–96. Addendum 18's text indicates, however, that the parties did not adopt the common-law standard in its entirety by referring to reasonable and prudent operations.

Departing from the "substantial drainage" element of the standard, part (2)(a) requires a lessee to act only if, "in the opinions of reasonable and prudent operat[ors], *drainage is occurring* on the un-drilled acreage." (Emphasis added). Though "occurring" drainage provides a lower threshold than "substantial drainage," the addendum's use of "is occurring"

signals that a reasonable opinion regarding actual drainage is required, not a showing of deemed drainage (an approach used in some express covenants). As to the second element of the standard, which requires that an operator act to prevent such drainage **\*222** only if there is a reasonable expectation of profit, the parties do not address whether the language of part (2) is consistent with this element.[5] In other words, the parties have not offered any views on whether the reference to a reasonably prudent operator requires evidence that action would be profitable before Rosetta must take one of the actions specified in part (2)(b). We likewise express no view on this question, and the parties may address it on remand if it proves necessary to do so.

[5]    *Cf. Bell v. Chesapeake Energy Corp.*, No. 04-18-00129-CV, 2019 WL 1139584, at \*10 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) (holding that because the "second element clearly refers back to the first," change to RPO drainage element—"deemed drainage" instead of "substantial drainage"—"logically negate[d] the requirement of proving economic benefit").

**4. Performance – part (2)(b)**

Part (2)(b) provides the actions that Rosetta must take once a reasonably prudent operator would form an opinion that drainage is occurring. This part of the addendum addresses how Rosetta may avoid breach: by spudding an offset well in the twelve months after drainage occurs or releasing the undrilled acreage. Departing from the implied covenant, which gives the lessee a variety of options to protect against field-wide drainage,[6] Addendum 18 gives Rosetta only two options.

[6]    "The duties of a reasonably prudent operator to protect from field-wide drainage may include (1) drilling replacement wells, (2) re-working existing wells, (3) drilling additional wells, (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief." *Amoco*, 622 S.W.2d at 568.

Despite grammatical problems, scrivener's errors, and a dearth of helpful punctuation, most of Addendum 18's requirements are unambiguous. The basic parts are there: Rosetta's obligation in part (1)(b) is triggered by a well drilled in one of the locations listed in part (1)(a), and the standard that applies to Rosetta in part (2)(a) informs whether it must take one of the specified actions in part (2)(b) to avoid breach. As we discuss below, however, the relationship between parts (1)(a) and (1)(b) is not clear.

**C. Addendum 18 is ambiguous because there are two reasonable interpretations regarding whether "drainage" in part (1)(b) is limited by part (1)(a).**

Having outlined how the unambiguous portions of Addendum 18 function, we come to the heart of the parties' dispute: whether the "drainage" that part (1)(b) obligates Rosetta to protect against is limited to drainage from a well listed in part (1)(a). Rosetta and the Martins offer different interpretations of how parts (1)(a) and (1)(b) relate, and the prevailing interpretation will inform the outcome of the Martins' claim that Rosetta breached Addendum 18. For example, if Rosetta's obligation to protect against drainage in part (1)(b) extends to wells not listed in part (1)(a), and if the Martins can show that a reasonably prudent operator would have concluded the Simmons Well was draining the undrilled acreage and that Rosetta did not act as required by part (2)(b) within twelve months thereafter, then Rosetta breached the addendum. By contrast, if drainage in part (1)(b) may only come from a triggering well listed in part (1)(a), then Rosetta did not breach the addendum because it need not protect against alleged drainage from the Simmons Well. We consider each interpretation in turn to determine whether it is reasonable.

*First*, the Martins argue that "drainage" in part (1)(b) is not limited by part (1)(a). Under this interpretation, a part (1)(a) **\*223** event—the drilling of a qualifying well—would trigger Rosetta's obligation but not necessarily identify the source of the drainage. Thus, the drilling of the Martin well—which falls under part (1)(a)—would trigger Rosetta's obligation to protect against drainage of the "un-drilled acreage," and that obligation includes drainage from the Simmons Well even though it is not in a location listed in part (1)(a).

This interpretation is reasonable because neither part (1)(a) nor part (1)(b) contains express language limiting Rosetta's drainage-protection obligation to a well in part (1)(a). Rather, the word "drainage" in (1)(b) is used without direct modification.

If the original parties to the addendum had wanted to obligate the lessee to protect only against drainage from wells identified in part (1)(a), they could easily have done so. Parties commonly trigger the obligation to drill an offset well

by identifying the location of a draining well, not merely a triggering well. *See* 4 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law § 671.3 (2020). In fact, Paragraph 5—the parties' previous, and superseded, express covenant—did just that. Paragraph 5 provided that "[i]n the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within 330 feet of *and draining* the leased premises, or land pooled therewith, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances." (Emphasis added). Paragraph 5 thus expressly requires that the triggering well be a draining well. The language of Addendum 18 is different: it expressly negates the 330-foot limit, expands where the triggering well can be located to include the leased premises and land pooled therewith, and deletes the requirements that the triggering well produce in paying quantities and drain the leased premises or land pooled therewith. It would be reasonable to conclude that Addendum 18 should not be read to contain language from Paragraph 5 that the parties agreed to change.

In addition, it would be reasonable to conclude that the parties intended the drilling of a well under part (1)(a) to signal that the lessee's obligation had begun, but not necessarily that drainage was occurring. Rosetta asks why "anyone in the Martins' shoes"—i.e., desiring general "protection from drainage to the south and southwest"—would "condition that protection on whether an entirely separate, non-draining well happened to have already been drilled elsewhere on their unit?" Perhaps the parties chose this limitation because until a well is drilled on the lease or unit, the lessee is more likely to be unaware of the threat of drainage from wells not adjoining the lease. Once the lessee has a well operating on the lease or unit, however, it is easier for it to notice such drainage.

Further support for the conclusion that the triggering and draining wells need not be the same comes from the parties' decision to allow a triggering well to be "on ... the leased acreage," including the non-unitized southern portion of the Martin Lease. A triggering well on this "un-drilled acreage" could not drain itself, which suggests that the parties contemplated the possibility of separate triggering and draining wells.

Ultimately, under the Martins' interpretation, the covenant begins with the drilling of a well under part (1)(a) but is not breached until an RPO would conclude drainage is occurring under part (2)(a) and the lessee fails to take action under part *224 (2)(b).[7] We conclude that such an interpretation is reasonable.

[7] If, on remand, the finder of fact agrees with the Martins' interpretation of Addendum 18, it may need to resolve additional fact issues regarding parts (2)(a) and (2)(b). For example, as the record presently stands, the Martins have not proven conclusively under part (2)(a) that a reasonably prudent operator would have formed the opinion that drainage was occurring. And under part (2)(b), the Martins have not proven conclusively that Rosetta failed to drill such a well within twelve months thereafter. The record includes production logs for the Martin Well showing a decrease after the Simmons Well was drilled. But this evidence does not address other possible causes, or when a reasonably prudent operator would have formed the opinion that drainage was occurring.

***Second***, Rosetta argues that "drainage" must come from a well identified in part (1)(a). Under this interpretation, a part (1)(a) event—the drilling of a qualifying well—would both trigger Rosetta's obligation and identify the source of the drainage against which it must protect. Here, Rosetta's obligation to protect against drainage from the Simmons Well would not have arisen because that well does not fall under part (1)(a).

This interpretation is also reasonable because Addendum 18 could be read to suggest that part (1)(b) is restricted by both parts (1)(a) and (2)(a). Because part (1)(a) is a conditional clause, the drilling of a qualifying well must occur before part (1)(b), the main clause, goes into effect. It would be reasonable to conclude that the conditional clause informs the scope of the main clause, especially if it does not conflict with subsequent limiting language. As Rosetta argues, part (1)(a) references only a single "event" and "well." If part (1)(a) provides the condition under which Rosetta must protect against drainage, then that single event and well could reasonably be read to inform the scope of the obligation.

Interpreting part (1)(a) to provide a list of possible draining wells would not produce absurd results. It may seem counterintuitive, at first glance, to mandate protection against drainage from wells drilled on leased property, but parties may agree to prevent "internal drainage" where some lease acreage is unitized with non-lease acreage. *See* 4 Williams & Meyers § 669.16. Here, because Rosetta's obligation is limited to drainage of the "un-drilled acreage," it would have been reasonable for the parties to include wells located on leased

acreage in part (1)(a)—such as the Martin Well—because wells on the Martin Unit may have paid a smaller royalty.

Additionally, Rosetta's reading would not create conflict between the sections of Addendum 18 that inform "drainage"—parts (1)(a) and (2)(a). Part (2)(a) tells us that a draining well under Addendum 18 is not defined by its distance from a particular area, as it was under the original Paragraph 5. But that is not to say that part (2)(a) does away with all proximity restrictions; the distance from which a reasonably prudent operator would conclude drainage is occurring is necessarily limited. And because part (1)(a)—under Rosetta's reading—would create a more restrictive limit on the location of draining wells, there is no conflict between the two provisions. Ultimately, it would be reasonable to conclude that the parties created a two-step system under which part (1)(a) describes a limited class of draining wells and the RPO standard provides a second check before the lessee would need to act on its obligation.[8]

[8]     If, on remand, the finder of fact agrees with Rosetta about the relationship between parts (1)(a) and (1)(b), then it may need to resolve a sub-ambiguity: whether Addendum 18 contains two separate obligations. The court of appeals construed Addendum 18 to contain two duties, one that requires the lessee to protect against drainage and another that requires spudding an offset well or releasing the acreage if an RPO concludes drainage is occurring. Under this two-duty construction, the first duty—contained in part (1)(b)—would obligate the lessee to protect against drainage only from wells identified in part (1)(a) but would arguably give the lessee the full range of options to protect against drainage under the implied covenant. By contrast, the second duty—contained in part (2)—would apply to any well from which an RPO would conclude drainage was occurring but would limit the lessee's options for compliance. This two-duty construction is not reasonable if part (1)(a) serves the function that the Martins' interpretation suggests. If the Martins are correct that part (1)(a) does not necessarily limit the source of drainage, then neither duty could be triggered without the other. But if Rosetta is correct that part (1)(a) describes the source of drainage from which it "shall protect" under part (1)(b), it may be necessary to determine whether part (2) contains a duty apart from that contained in part (1).

**\*225** Because we conclude that both interpretations are reasonable, a fact issue exists and summary judgment for any party was improper on the merits of the Martins' claim that Rosetta breached Addendum 18.

## II. Res judicata does not bar the Martins' argument that drilling the Martin Well triggered an obligation to prevent drainage from the Simmons Well.

Rosetta argues that it is nonetheless entitled to summary judgment on the Martins' claim of breach because it conclusively proved its affirmative defense of res judicata. In Rosetta's view, the Martins' argument that the Martin Well triggered Rosetta's duty to protect against drainage from the Simmons Well is barred because it could have been raised against Newfield in the trial court, but the court of appeals in *Newfield* held that it had not been preserved. We disagree for two reasons: res judicata does not apply between separate actions created by a trial-court severance, and Rosetta's challenge is to a new *argument* raised by the Martins, not a new *claim*.

The doctrine of res judicata, or claim preclusion, bars causes of action that have already been fully adjudicated or that, with the use of diligence, could have been brought in the prior suit. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021); *Barr v. Resol. Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 628 (Tex. 1992). Res judicata requires proof of three elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *see also* 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4404 (2d ed. 2002) ("Res judicata applies as between separate actions, not within the confines of a single action on trial or appeal."). Parties may be in privity if (1) they "control an action," (2) "their interests can be represented by a party to the action," or (3) they are "successors in interest." *Amstadt*, 919 S.W.2d at 653.

Though the severance of Newfield's summary judgment created a second action, *see Hall v. City of Austin*, 450 S.W.2d 836, 837–38 (Tex. 1970), and the Martins' attempt to raise the argument was unsuccessful in *Newfield*, claim preclusion does not apply for two independent reasons.

First, this case began as a single action against both Rosetta and Newfield, and the Martins' claims against Rosetta were raised in that action. We have recognized—as a "logical corollary" to the general rule—that "the res judicata effects of an action cannot preclude litigation of **\*226** claims that a trial court explicitly separates or severs from that action."

*Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985) (holding that, where trial court granted separate trials for intervention claim and malpractice counterclaim, judgment in first action did not have a res judicata effect on second); *Morrison v. St. Anthony Hotel*, 295 S.W.2d 246, 249 (Tex. App.—San Antonio 1956, writ ref'd n.r.e.) (concluding that prior severed appeal was not res judicata because third party was not part of appeal); *see also Law Offices of Robert D. Wilson v. Tex. Univest-Frisco, Ltd.*, 291 S.W.3d 110, 114 (Tex. App.—Dallas 2009, no pet.) ("The actions taken in the initial suit had no effect on the new cause, which had been severed by the trial court.").

Indeed, the reasons why a severance was permissible here confirm that the elements of res judicata are not met. One reason is that Newfield and Rosetta are not in privity. Neither Rosetta nor Newfield controlled the other, neither succeeded in interest from the other, and neither held the same interests with respect to the Martin Lease or Martin Unit. The Martins' claims against each party were also somewhat different, as Rosetta alone held a leasehold interest in the non-unitized southern portion of the Martin Lease. In addition, Rosetta was not a party to the *Newfield* appeal and the claims against it were not fully adjudicated. *See Morrison*, 295 S.W.2d at 249.

Second, and independently, Rosetta's res judicata defense fails because Rosetta does not seek to preclude the Martins' *claim*, but rather an issue the Martins have raised in support of that claim. Res judicata applies to claims, not issues. The basic nature of the Martins' claim that Rosetta and Newfield breached Addendum 18 has not changed; the Martins simply added a new argument (with the trial court's permission) regarding why Addendum 18 was triggered. *See Barr*, 837 S.W.2d at 628–29 (differentiating between issue and claim preclusion and concluding that alleged failure to bring "all theories of liability in one suit" constituted defense of claim preclusion).

For these reasons, Rosetta is not entitled to a take-nothing judgment on the Martins' claim of breach based on res judicata.

### III. The court of appeals erred by reversing Rosetta's summary judgment as to the Martins' tort and statutory claims.

Finally, Rosetta argues that the court of appeals erroneously reversed its entire summary judgment because the Martins failed to challenge Rosetta's independent grounds for granting summary judgment on the Martins' tort and statutory claims.

We agree. Rosetta sought summary judgment on the Martins' tort claims under the economic-loss rule and on their Theft Liability Act claim on the ground that Rosetta did not benefit from the Simmons Well. The Martins did not challenge either ground on appeal.

An appellate court may not reverse a trial court's judgment without properly assigned error. *Cent. Educ. Agency v. Burke*, 711 S.W.2d 7, 8 (Tex. 1986) (per curiam). When a trial court's order granting summary judgment does not specify the grounds on which its order is based, the appealing party must negate each ground upon which the judgment could have been based. *Malooly Bros. v. Napier*, 461 S.W.2d 119, 120–21 (Tex. 1970); *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 313 (Tex. App.—Dallas 2009, pet. denied).

**\*227** A party may negate each ground by raising separate issues "or asserting a general issue that the trial court erred in granting summary judgment and within that issue providing argument negating all possible grounds upon which summary judgment could have been granted." *Jarvis*, 298 S.W.3d at 313; *Tweedell v. Hochheim Prairie Farm Mut. Ins. Ass'n*, 1 S.W.3d 304, 309 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.) (affirming trial court's summary judgment on grounds not challenged "(1) by a separate [issue] or (2) by argument and citation to authority under" a broader issue).

A general statement that "the trial court erred by granting [the movant's] motion for summary judgment" may be sufficient to allow argument on all possible grounds that the summary judgment motion was granted, *Plexchem Int'l, Inc. v. Harris Cnty. Appraisal Dist.*, 922 S.W.2d 930, 931 (Tex. 1996) (per curiam), but if a party does not brief those arguments to the court of appeals, the court of appeals cannot properly reverse summary judgment on those grounds. *Malooly Bros.*, 461 S.W.2d at 121; *see also* Tex. R. App. P. 38.1(i) ("The [appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

Applying these principles here, we examine the Martins' causes of action, the grounds on which Rosetta moved for summary judgment, and whether the Martins attacked each of those grounds in their court-of-appeals briefing. These sources show that the court of appeals erroneously reversed Rosetta's summary judgment as to the Martins' tort and statutory claims.

In their second amended petition, the Martins alleged a breach-of-contract cause of action and several tort causes of action, including common-law fraud, negligence, negligent misrepresentation, conversion, mineral trespass, breach of fiduciary duty, and fraudulent concealment. They also alleged a statutory claim for violation of the Theft Liability Act.

In its motion for summary judgment, Rosetta challenged all these claims. On the tort claims, Rosetta first argued that each of the Martins' tort claims were barred by the economic loss rule. Rosetta then argued, in the alternative, that the Martins' tort claims failed because no duty existed in contract. Then, as to the Theft Liability Act claim and some of the other claims, Rosetta argued that they failed as a matter of law because it obtained no benefit from the Simmons Well, which was the alleged draining well. Without identifying specific grounds, the trial court granted summary judgment for Rosetta on all the Martins' claims.

We conclude that Rosetta's economic-loss-rule and no-benefit grounds for summary judgment were independent of its breach-of-contract grounds, and thus the Martins needed to challenge those grounds separately in the court of appeals. To determine whether a plaintiff's tort claim sounds in contract under the economic loss rule, we look at whether the loss is to "the subject of the contract." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 242 (Tex. 2014); *see also Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex. 1986). This is a separate inquiry from whether Rosetta can defeat the Martins' claim for breach of contract. Similarly, whether Rosetta benefited from the Simmons Well is a separate inquiry.

In their court-of-appeals briefing, the Martins' substantive arguments related only to Rosetta's contractual obligations under Addendum 18. There were no citations or authorities related to their tort or statutory causes of action or to Rosetta's economic-loss-rule defense. At most, the Martins make broad statements challenging **\*228** the sufficiency of Rosetta's

summary judgment evidence, such as "Rosetta did not show that they are entitled to a judgment as a matter of law." Such a statement is not sufficient to challenge Rosetta's economic-loss-rule ground for summary judgment on the tort claims or its no-benefit ground for summary judgment on the Theft Liability Act claim. *See Jarvis*, 298 S.W.3d at 313.

Because the Martins did not challenge each independent ground on which the trial court could have based its summary judgment on the tort and statutory claims, the trial court's take-nothing judgment on those claims should stand. The court of appeals improperly reversed the trial court's judgment in its entirety.

**Conclusion**

For these reasons, we hold that Addendum 18 is ambiguous regarding whether the source of "drainage" in part (1)(b) is limited to the well locations listed in part (1)(a). Therefore, a fact issue remains on the Martins' claim for breach of the lease, and summary judgment is not proper for either party. We also hold that the Martins' argument that drilling the Martin Well triggered Rosetta's obligation to prevent drainage from the Simmons Well is not barred by res judicata. But the court of appeals erred by reversing the take-nothing summary judgment as to the Martins' tort and statutory claims. We therefore reverse the court of appeals' judgment, reinstate the trial court's summary judgment in part as to the Martins' tort and statutory claims, and remand for further proceedings on the Martins' claim for breach of contract.

Justice Huddle and Justice Young did not participate in the decision.

**All Citations**

645 S.W.3d 212, 65 Tex. Sup. Ct. J. 949

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.